1              IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
2                   SPRINGFIELD DIVISION

3
   RICHARD M. SMEGO,                    )
4                                       )
                    PLAINTIFF,          )  08-3142
5                                       )
            VS.                         )  JURY TRIAL
6                                       )
   DR. JACQUELINE MITCHELL,             )  SPRINGFIELD, ILLINOIS
7                                       )
                    DEFENDANT.          )  VOL. I-B
8

9              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE SUE MYERSCOUGH
10              UNITED STATES DISTRICT JUDGE

11

   FEBRUARY 24, 2015
12

   A P P E A R A N C E S:
13

   FOR THE PLAINTIFF:            MATTHEW CHARLES CROWL
14                               ANN H. MacDONALD
                                 BRIAN O'CONNOR WATSON
15                               KAITLIN GRACE KLAMANN
                                 SCHIFF HARDIN LLP
16                               233 SOUTH WACKER DRIVE
                                 CHICAGO, ILLINOIS
17

18  FOR THE DEFENDANT:           ROBERT P. VOGT
                                 BETHANY SUE CAMPBELL
19                               WELDON LINNE & VOGT
                                 20 SOUTH CLARK STREET
20                               CHICAGO, ILLINOIS

21

22

23  COURT REPORTER:       KATHY J. SULLIVAN, CSR, RPR, CRR
                          OFFICIAL COURT REPORTER
24                        600 E. MONROE
                          SPRINGFIELD, ILLINOIS
25                        (217)492-4810


              KATHY J. SULLIVAN, CSR, RPR, CRR
                  OFFICIAL COURT REPORTER

```
1                    I N D E X

2    WITNESS          DIRECT  CROSS   REDIRECT  RECROSS
     JOHN DOVGAN (Outside
3    the presence of the
     jury.)                166

4
     JACQUELINE MITCHELL    257
5

6

7

8

9

10

11

12

13                E X H I B I T S

14   PLAINTIFF'S EXHIBIT
     NUMBER               IDENTIFIED   ADMITTED
15
     Exhibit 1              258          259
16

17

18

19

20   DEFENDANT'S EXHIBIT
     NUMBER               IDENTIFIED   ADMITTED
21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2         *   *   *   *   *   *   *   *   *   *   *

 3         (The following proceedings were held outside

 4         presence of the jury.)

 5             THE COURT:  All right.  This is 08-CV-3142,

 6    Richard Smego versus Dr. Jacqueline Mitchell.

 7         We have a witness present by video, Dr. Dovgan,

 8    as to his new opinion.  And there had been a renewed

 9    motion to exclude Dr. Dovgan's testimony.

10         Mr. Vogt -- it's Vogt, correct?

11             MR. VOGT:  That's correct, Judge.

12             THE COURT:  Okay.  Mr. Vogt.

13             MR. VOGT:  Judge, may I just ask -- you

14    know --

15         Judge, I've never been involved in a proceeding

16    like this, so I just don't know what the Court -- I

17    don't want to go through his whole testimony, I

18    don't think that's entirely necessary because that

19    that would take a couple of hours.  But at the same

20    time I want to address whatever concerns the Court

21    may have.  But I have no experience in this area so

22    I wasn't sure what to do, quite frankly.

23             THE COURT:  Okay.  Well, I hate to give you

24    an advisory ruling --

25             MR. VOGT:  No, no, I understand.  But I
```

1    mean -- well, I'll just start then, Judge.  And --

2         THE COURT:  Well, I'll share with you my

3    thoughts, since you've asked.

4       All right.  It seems to me that Dr. Dovgan can

5    probably testify to these items; pain should be

6    managed by the appropriate use of analgesics, as

7    well as expediting the treatment of patients whose

8    complaints of pain are clinically validated.

9       Dr. Mitchell's treatment on March 27, 2011, was

10   appropriate because Mr. Smego's reports of pain were

11   not clinically validated.

12      A general explanation of the types of cap --

13   cavities and periapical, periapical periodontitis.

14   Periapical periodontitis is treated by extraction or

15   root canal, there's no option to fill the tooth.

16   Mr. Smego had periapical periodontitis on Tooth 2.

17      Mr. Smego had many one, two, and three surface

18   cap -- cavities.  I'm so use to criminal cases and

19   captivities.  He also had Class V cavities, worn

20   surface, especially along the gum line.  These

21   lesions are more difficult to see radiographically

22   and are diagnosed on a clinical exam.

23      Mr. Smego had a dental exam on March 27th of

24   2011, which stated no evidence of decay on

25   radiographs.

1      The types of lesions are common amongst

2  patients with poor oral hygiene.

3      Once a patient is diagnosed with irreversible

4  pulpitis, there are only two options; one, extract

5  the tooth, or two, root canal therapy.

6      Dr. Mitchell's examine of Mr. Smego on

7  December 13, 2005, indicated he had some degree of

8  decay of 17 teeth.  However, the presence of tooth

9  decay alone does not automatically mandate

10  restorative care.  Patient's generally have some

11  degree of decay in their mouth.  The patient decides

12  the need for restorative care based on patient

13  sensitivity, pain, bleeding, discoloration, and

14  tolerance for the procedure.

15      Dr. Mitchell timely saw Plaintiff after

16  Plaintiff submitted three healthcare requests of

17  which there's a record.

18      The patient with the most emergent and serious

19  dental needs should be seen first.

20      Some of the problems that I've noted on the

21  opinions:

22      Once again, we have reference to correctional

23  institutions.  This is not a correctional

24  institution.

25      Dr. Mitchell knew Smego was not allergic to

1   this medication.  I don't know if we have foundation

2   for that and I don't think that's part of an expert

3   opinion.

4       It states in the opinion Dr. Mitchell also

5   timely treated Mr. Smego when he placed a healthcare

6   request and properly treated Mr. Smego within the

7   generally acceptable standard of care.  The issue is

8   actually whether the treatment was timely from the

9   day that Dr. Mitchell diagnosed the need and the day

10  the need was corrected or treated.

11      States materials considered; deposition

12  testimony, general knowledge of correctional

13  dentistry.  Which deposition testimony and what does

14  correctional dentistry have to do with this case?

15      I'm concerned that the National Commission on

16  Correctional Healthcare as a standard is the wrong

17  standard.  I believe it's the guidelines for -- also

18  as well are the Guidelines for Correctional Dental

19  Healthcare System.

20      And then there are opinions under factors

21  affecting wait times.  These factors are beyond the

22  control of Dr. Mitchell.  I think that's an issue

23  for the jury to decide.  We don't have foundation.

24      Detainees being away at court; certainly that's

25  correct, but I don't know how the doctor would know

1    that.

2         Refusal of care.  I don't know what the

3    relevance is because certainly there was no refusal

4    of care here.

5         Security issues.  I don't think we had any

6    security issues.  I don't think that's relevant.

7         Equipment failure.  No compressor available I

8    don't think is an expert's opinion.

9         Same with detainees transferred.

10        The issue of staffing I don't believe is within

11   this doctor's -- and by this doctor, I mean the

12   doctor we're going to be asking questions of, the

13   expert.  I don't think we need expert opinions on

14   staffing, I think that's going to be an issue which

15   may be presented to the jury.

16        And the hours Dr. Mitchell had cut from 40 to

17   15 and Wexford failing to hire I don't think is

18   subject to an expert opinion on the standard of

19   care.  And what the doctor finds is alarming I

20   certainly don't think is admissible.

21        Obviously some of this where the doctor is

22   quoting from Dr. Mitchell's deposition she can

23   already testify about that.

24        And I don't know how this doctor would know

25   Addus and Wexford were unable to hire additional

1    dental employees.

2        And this doctor testifying about healthcare

3    requests; I don't know what the foundation is for

4    that.  How he would know?

5        I know that as to Paragraph 10, where Mr. Smego

6    only had three healthcare requests.  Judge Baker

7    granted summary judgment on that issue but was

8    reversed.  The issue has become, or was, is, time

9    between identification of need and treatment of the

10   need.  So I don't think a lot of this goes to that

11   issue.

12       Equipment malfunction, foundation issues.

13       The testimony then about Dr. Mitchell's

14   authority.  We do not need expert testimony on that

15   and I'm not sure what the foundation is for it.

16       The nurse triage, I don't know what the

17   relevance is.

18       Staffing issues.  Again, Addus reduced the

19   number of hours.  I don't know what the foundation

20   is.  I certainly think that's an issue for the jury.

21   For oral argument as well.  I don't know that this

22   doctor can testify to it.

23       Addus and Wexford failed to live up to their

24   contract I don't think is permissible testimony.

25   It's a legal question as well.

1      So does that give you an idea of some of the

2  issues I see?

3          MR. VOGT:  Yes, Judge.  One point.

4      I mean the case is a difficult case, Judge,

5  because there are no other facilities in anyone's,

6  to anyone's knowledge in this case, like Rushville.

7  It is both a treatment and detention facility.

8  That's why all of the experts and even Rushville's

9  own records refer to the National Commission on

10 Correctional Healthcare, because it's the only

11 source of information for standards that's

12 available.

13     I mean that's why -- I mean there is no --

14 there are no other -- all I can say, Judge, is the

15 only dentist who has worked at the DHS facility in

16 this case is Dr. Mitchell.  The plaintiff's expert

17 has no experience working in a DHS facility,

18 detention and treatment facility.  Nor does any

19 other witness even know of such a facility in the

20 United States.

21     And that's why in this case the experts have

22 all worked out -- and the department itself has

23 said, we're going to adopt the IDOC for a period of

24 time and then we're gonna refer to the National

25 Commission on Correctional Healthcare, even though,

```
 1    even though this is only a treatment and detention
 2    facility.
 3        That's the -- there is some tension; I'm not
 4    disputing that; there is some tension in this area
 5    because of that.
 6        But I -- you know, I don't know what else to
 7    say, Judge.  I'll go through the points he's going
 8    to offer testimony on and ask him the basis for each
 9    of his opinions.  You know, I'll do that, Judge.
10    That's fine.
11            THE COURT:  Okay.  Any response, Mr.
12    Watson?
13            MR. WATSON:  No, Your Honor.  We have a
14    witness here and I prefer that the time is spent
15    with Mr. Vogt laying foundation and not leading his
16    witness and just asking questions.
17            THE COURT:  All right.  Mr. Vogt.
18            MR. VOGT:  Dr. Dovgan, can you hear me
19    okay?
20            THE WITNESS:  Yes.
21            MR. VOGT:  Could you tell us your name,
22    please?
23            THE COURT:  We need to swear the witness.
24    Excuse me.
25        (The witness was sworn.)
```

DOVGAN- DIRECT                              166

1          MR. VOGT:  All right, Doctor.  Could you

2    give us an educational -- your educational

3    background, please --

4          THE COURT:  Could you please show the

5    witness Mr. Vogt?  You can actually sit at the table

6    and be seen, but I think you're better visible or

7    more visible if you're at the podium.

8          MR. VOGT:  That's fine, Judge.  Thank you.

9          THE COURT:  Hold on.  Can you zoom up?

10   Would it be better if you turned the lights on?

11   Would Mr. Vogt be more visible?

12         THE WITNESS:  I think he's fine.  If you

13   can just go a little bit -- I have him in the very

14   corner of my vision on the right side of the screen.

15      There.  Yes, thank you.

16         THE COURT:  Okay.  Proceed.

17                 JOHN W. DOVGAN

18   called as a witness herein, having been duly sworn,

19   was examined and testified as follows:

20                 DIRECT EXAMINATION

21   BY MR. VOGT:

22      Q.  Sir, could you tell us your name, please?

23      A.  My name is John W. Dovgan, D-o-v-g-a-n.

24      Q.  And, Doctor, what is your profession?

25      A.  I'm a dentist.

DOVGAN- DIRECT                          167

1          Q.  How long have you been a dentist?

2          A.  I've been a practicing dentist for over

3     26 years.

4          Q.  And, sir, could you tell us where did you go

5     to undergraduate school for?

6          A.  I went to undergraduate and dental school at

7     Creighton University in Omaha, Nebraska.

8          Q.  And when did you graduate from Creighton

9     University with your dental degree?

10         A.  1989.

11         Q.  After graduating from Creighton with your

12    dental degree did you obtain any further education

13    in the field of dentistry?

14         A.  I've obtained over 2900 hours of continuing

15    education in dentistry, including everything from

16    full mouth reconstructive to cone beam technology,

17    CAD/CAM, which is three-dimensional dentistry.

18    Everything from fixed and removable prosthetics,

19    endodontics, everything pretty much but orthodontics

20    is the only field of dentistry that I do not

21    practice.

22         Q.  Okay.  And in your practice as a dentist you

23    repair cavities that patients suffer from?

24         A.  Every single day.  I did that today, sir.

25         Q.  And tell us, Doctor, in your estimation how

DOVGAN- DIRECT                                    168

1   many cavities have you repaired in your career?

2       A.  Oh, hundreds of thousands of cavities in my

3   career.

4       Q.  Sir, are you a board approved consultant in

5   the field of dentistry?

6       A.  Yes, I am.  I have had over 20 years as a

7   board consultant.  I've adjudicated over a thousand

8   cases for the Arizona State Dental Board.  That

9   includes deviations from the standard of care.

10      That particular facet goes to determination of

11  the particular time of everything from continuing

12  education, restitution, probation, restriction of

13  practice, or formal hearing.  That was pretty much

14  the basics for determination once you've determined

15  the standard of care breach.

16      I'm also a 1303 examiner, which is an

17  anesthesia evaluator.  I do the permits for oral

18  sedation in the State of Arizona.  I'm one of those

19  individuals.  I also do onsite inspections.  When I

20  do onsite inspections I look for deviations from the

21  standard of care, proper equipment, OSHA guidelines.

22  And I've been doing that for about five years now.

23      Q.  You mentioned doing dental board cases, sir.

24  As far as that is concerned, do those cases begin by

25  someone filing a complaint against a dentist?

DOVGAN- DIRECT                    169

1        A.  Yes.  Generally a complaint is filed.  And

2   the complaint goes through a process.  That has

3   changed dramatically over 20 years.  Before if you

4   filed a complaint, it would automatically go to a

5   hearing, where someone like myself would be the

6   chair person, you'd have a dentist on either side

7   and a lay person, and those three people or four

8   people would determine standard of care breaches.

9        Once the standard of care breaches occurred,

10  then of course we would recommend continuing

11  education, restitution, probation, restriction of

12  practice, or formal hearing for suspension of a

13  license.

14       Q.  In those instances was your job -- among

15  other things, but was one of your primary jobs to

16  ascertain what the standard of care was in

17  connection with the complaint that was filed against

18  the dentist?

19       A.  That is correct.  That's exactly what we do.

20       Q.  And during that period of time were you

21  familiar with the standard of care, for example, in

22  providing repair services for cavities?

23       A.  Yes.  Pretty much every facet of dental care

24  I have adjudicated, including fraud, insurance

25  fraud.  Every imaginable portion except

DOVGAN- DIRECT                        170

1    orthodontics.  Orthodontics is one field I choose

2    not to practice.

3        Q.  All right.  Then your background refers it a

4    template that's used by dental schools, sir.  Could

5    you explain to us, sir, what that involves?

6        A.  I developed a template that was used by the

7    board.  That particular template includes the four

8    blanket allegations that the board used for almost

9    20 years, which included health -- or clinical

10   evaluations, diagnosis, treatment plan, and

11   radiographs.

12       That particular template was utilized after I

13   had a number of colleagues call me asking what the

14   standard of care is in Arizona for each particular

15   facet of care.  And I had to let them know that

16   there's four blanket allegations.  And those four

17   blanket allegations, we look for specific factors in

18   each blanket allegation and how we determine what

19   was reasonable.

20       And the standard of care is what a reasonable

21   and prudent dentist would do in a like or similar

22   situation.  That's a difficult thing to say because

23   that's a majority, or 51 out of a hundred.  In order

24   to ascertain what the standard of care was, it

25   took -- it probably took me ten years to determine

DOVGAN- DIRECT                              171

1   each facet of care on each particular type of

2   dentistry that we were doing.  And after twenty

3   years I've not only adjudicated over a thousand

4   cases for the board, written the template, I've also

5   come up with a standard of care for reversal drug

6   called --

7        (Court reported asked for clarification.)

8        Q.  She didn't hear the name of the drug.

9   Flumazenil?

10       A.  It's Flumazenil.  It's a reversal drug for

11  sedation, oral sedation.  And I ended up giving that

12  information to the DOCS head person, which is the

13  largest sedation education program in the nation.

14  They invited me, after they incorporated that

15  information into their lectures, they invited me

16  this last weekend to come there and evaluate their

17  course for legal standard of care issues.

18       I actually did that and actually wrote back a

19  response of what I thought they needed to improve on

20  so that they could be within compliance with the

21  standard of care and whatever facets they were

22  looking for.

23       Q.  Now, you mentioned the standard of care.  Is

24  the standard of care in Arizona where you are, as

25  far as repairing cavities, is the standard of care

DOVGAN- DIRECT                                    172

1    in Arizona the same as the standard of care

2    everywhere else in the United States?

3         A.  The standard of care is the same for pretty

4    much all facets of dentistry except for exclusion,

5    such as Botox in some states is allowed by dentists

6    for cosmetic purposes.  It is not in Arizona.

7    Expanded functions for like Alaskan and Colorado

8    that don't necessarily have that particular facet in

9    other areas.  But all other areas of dentistry are

10   the same.

11        Q.  Your report refers to teaching dental

12   consultants and board members regarding the standard

13   of care.  Could you explain to us what do you do in

14   connection with those instructions?

15        A.  One of the problems is is every four years

16   you have a rotation of the board.  So when you have

17   a board member or a couple new board members,

18   they're not as familiar with the standard of care.

19        So what they do is is they present past cases

20   that I've utilized to understand what the standard

21   of care is in specific areas.  And they also use the

22   template to help them understand what we look for

23   when we're talking about a standard of care breach.

24        Q.  In connection with your audits you've

25   mentioned here that as a board examiner you audit

DOVGAN- DIRECT                          173

1    large corporate dental practices.  Do you do those

2    audits for the purpose of ascertaining compliance

3    with the standard of care?

4         A.  Yes, we do.  The -- if a board-initiated

5    complaint involves a facility and that facility

6    needs to be audited, I have been sent out on the

7    large corporate chains.  I'm more familiar with

8    policies and procedures of large corporate chains

9    because I've dealt with them in the past 20 years

10   adjudicating cases for the board.

11        So that if somebody had a complaint against a

12   specific dentist in a corporate entity, the policies

13   and procedures would need to be gone through to

14   understand what the problem was that created it.

15   And if it's a problem with the policies and

16   procedures, I would have to recommend the business

17   entity, that they need to change those policies and

18   procedures.  And they have done that.

19        In Arizona, understand, it use to be that only

20   dentists could own a dental practice.  That changed

21   about a number of years ago where a corporate entity

22   can own a dental practice.  And when a corporate

23   entity owns a dental practice, you have the issue of

24   them having no recourse for what the dentist did.

25   So the Arizona Board of Dental Examiners changed

DOVGAN- DIRECT                           174

1    their protocol so that now we can hold business

2    entities liable for what dentists do.

3         Q.  Have you served as an expert witness on the

4    standard of care in the field of dentistry prior to

5    this case, sir?

6         A.  Yes; over 70 times.

7         Q.  And have you represented -- I'm sorry, have

8    you testified as an expert witness on the standard

9    of care for both plaintiffs and defendants?

10        A.  Yes, I have.

11        Q.  In connection with one case I'd like to ask

12   you about is a case called Parsons versus Ryan.  Do

13   you recall that case, sir?

14        A.  Very much so, yes.

15        Q.  Okay.  And the expert on the other side of

16   that case was who?

17        A.  Dr. Jay Shulman.

18        Q.  He's the same expert that's involved in this

19   case for the plaintiff?

20        A.  That is correct.

21        Q.  Okay.  And in connection with your work on

22   the Parsons versus Ryan case; first of all, was that

23   a case involving a correctional institution?

24        A.  Yes, it was.

25        Q.  And what was your role in connection with

DOVGAN- DIRECT                                    175

1    that case?  In other words, why were you hired as an

2    expert in that Parsons versus Ryan case?

3         A.  I was hired as an expert in the Parsons

4    versus Ryan case to find out if there were any

5    deviations from the standard of care and to also

6    help explain whether there was any deliberate

7    indifference that occurred for that particular case.

8         I wrote three reports plus a summary judgment

9    report and I had multiple depositions.  The final

10   result of that case was there was no adverse dental

11   findings that occurred as a result of that

12   particular lawsuit.

13        Q.  And in connection with that case, sir, did

14   you have to review the records and the testimony and

15   the policies and procedures of multiple states?

16        A.  I ended up reviewing the policy and

17   procedures of 27 states.  I also went over

18   85,000 pages of documents.  I toured all the

19   facilities, including the facilities that we

20   mentioned in the report I believe.  And I also had

21   to go into and interview all the dentists that were

22   involved in the correctional facilities.

23        Several of the dentists were what we call

24   lifers; they had been there for their entire career.

25   And I was able to get a very clear picture of

DOVGAN- DIRECT                                    176

1    exactly how a correctional facility works; what the
2    pitfalls are and what the benefits are.  And I was
3    also able to ascertain with the assistance of those
4    dentists what factors were involved when there was a
5    delay in treatment.
6         Q.  Now, the dentists and all the records that
7    you reviewed in the Parsons case, as well as the
8    policies from the 27 states that you mentioned; were
9    those all -- were your efforts there focused on
10   trying to ascertain what is the standard of care and
11   was the standard of care complied with or breached?
12        A.  Yes.  A policy and procedure that's in
13   place, there are multiple different policies and
14   procedures for multiple different states, but
15   there's a commonalty amongst the states.
16        The commonality amongst the states is generally
17   emergency care is seen within a very short period of
18   time; usually 24 hours.  That urgent care such as
19   swelling and pain that's not life-threaten would be
20   seen within about 72 hours.  And that routine care,
21   if the patient made a healthcare request, was seen
22   within 90 days.
23        Q.  All right.  And now in connection with this
24   case, sir, in forming your opinions in this case,
25   did you review Dr. Mitchell's deposition?

DOVGAN- DIRECT                    177

1       A.  Yes, I did.

2       Q.  Did you review Mr. Smego's two depositions?

3       A.  Yes, I have.

4       Q.  Dr. Lochard's deposition?

5       A.  Yes, I have.

6       Q.  Ms. Vance's deposition?

7       A.  Yes, I have.

8       Q.  Ms. Walker-Lowe's deposition?

9       A.  Yes, I have.

10      Q.  The DHS directive relating to dental care?

11      A.  Yes, I have.

12      Q.  Dr. Shulman's deposition?

13      A.  Yes, I have.

14      Q.  Dr. Mitchell's dental records for Mr. Smego

15  spanning from 2005 to 2014?

16      A.  Yes, I have.

17      Q.  And then the contracts between the DHS and

18  Addus and Wexford, as well as the contracts between

19  Addus and Wexford and Dr. Mitchell?

20      A.  Yes, I have.

21      Q.  And did you then apply, after having

22  reviewed those materials, including the testimony

23  that we just mentioned, as well as the records, did

24  you -- was your goal to ascertain whether the

25  standard of care was complied with or breached?

DOVGAN- DIRECT                          178

1          MR. WATSON:  Objection, Your Honor.

2     A.  Yes.

3          THE COURT:  The objection is sustained.

4     Q.  What was the goal of your -- of your effort

5  here, sir?

6     A.  My goal was to determine what the standard

7  of care was for that particular facility and whether

8  the information that was given was a breach of the

9  standard of care.

10         The DHS directive has a fourteen day time limit

11  for once a healthcare request is received to have

12  treatment done.  And I ascertained that the three

13  healthcare requests that Mr. Smego had placed were

14  seen within that 14 day time period.

15    Q.  Let me back up sir.  The 14 day time period

16  that you're referring to; do you recall if that was

17  included in the contracts that the DHS had with

18  Addus and Wexford?

19         MR. WATSON:  Your Honor, objection --

20    A.  Yes.

21         MR. WATSON:  -- leading.

22         THE COURT:  Well, I'm going to allow a

23  certain amount of leading so we can get through this

24  and get the jury in.  I apologize to you,

25  Mr. Watson.

DOVGAN- DIRECT                    179

1        A.  Yes, there was.  It was in both contracts.

2        Q.  Okay.  Well, let's talk, sir, about some of

3   your opinions in this case with regard to Mr. Smego.

4        First of all, tooth No. 2.  Do you recall

5   reviewing the records and testimony regarding tooth

6   No. 2?

7        A.  Yes, I do.

8        Q.  And as far as tooth No. 2 is concerned, do

9   you recall the ultimate treatment that Dr. Mitchell

10  provided for tooth No. 2?

11       A.  Yes.  She ultimately extracted that tooth.

12       Q.  Your report refers to periapical

13  peridentitis, sir.  Could you tell us what is

14  periapical peridentitis and how did that relate to

15  the extraction of tooth No. 2?

16       A.  In Mr. Smego's case Dr. Mitchell had

17  identified that she had gotten into the nerve of the

18  pulp of the tooth, introduced bacteria, which was

19  irreversible.  Once you get bacteria into the tooth,

20  bacteria goes to the end of the tooth and causes the

21  end of the tooth or the tooth to basically die over

22  time.  But it's an ultimate -- ultimate extraction

23  of the tooth is necessary.  Or you can have a root

24  canal therapy.

25       Dr. Mitchell; and I'm just reading off her

DOVGAN- DIRECT                          180

1    testimony; did not do root canals, which tooth No. 2

2    is a molar, and therefore the only option with that

3    particular tooth was to extract the tooth.

4        It was on the mesial buccal root, which a very

5    close to the surface on most patients.  So you could

6    have a little bit of decay, a lot of decay, it's

7    very difficult to ascertain what could cause the

8    decay to get into the nerve.  It could take a month,

9    it could take a year, it could take ten years.  So

10   every patient is different.

11       Q.  The bottom line, sir, did you believe that

12   the extraction of tooth No. 2 by Dr. Mitchell was in

13   accordance with the standard of care?

14       A.  I do.

15       Q.  Okay.  I'd like to talk to you about

16   healthcare requests, sir.  In your work as an expert

17   in the field, what is a healthcare request?

18       A.  Well, a healthcare request is a request for

19   treatment that's generally given in writing.  It's

20   given to, in this case, nurses; which is pretty

21   typical.  Most facilities have nurses go through the

22   healthcare requests and triage.  And the most

23   serious cases are obviously done first, with the

24   less serious cases put on the back burner.

25       Most of the time cases are triaged and nurses

DOVGAN- DIRECT                                    181

1    are what we consider a mid-level provider, but they

2    are providers who are very knowledgeable about

3    infections, swelling, and pain.  They're certainly

4    qualified to be able to ascertain and triage a

5    patient.

6         Q.  And in this case the healthcare request is

7    prepared by the patient seeking treatment?

8         A.  That is correct.

9         Q.  And I think you just mentioned a moment ago

10   the nurses collect those and then triage those

11   patients' needs?

12        A.  That is correct.

13        Q.  And did you understand from reviewing the

14   materials how often Dr. Mitchell came to the

15   facility to provide dental care?

16        A.  Dr. Mitchell was there every weekend.  Two

17   days a week.

18        Q.  All right.  And when she -- who prepared the

19   list of patients that Dr. Mitchell is suppose to see

20   when she arrives on the weekend to treat the

21   patients at Rushville?

22        A.  The nurses would prepare the list of the

23   most serious patients going first.

24        Q.  And sir, one of the documents that you

25   mentioned having reviewed was the Rushville

DOVGAN- DIRECT                    182

1    handbook.  Does the handbook set forth that

2    residents are suppose to submit a healthcare request

3    if they want to see the dentist or doctor?

4         A.   That is correct.  That is what it states.

5         Q.   Now, because the nurses are the ones who

6    prepare the list for Dr. Mitchell to see, ultimately

7    could the patient get on the list without submitting

8    a healthcare request form?

9         A.   Well, only if the nurses were notified.

10        Q.   Because in the end, the nurses are the ones

11   who prepare the list for Dr. Mitchell?

12        A.   That is correct.

13        Q.   And sir, is -- are the nurses performing the

14   triage function like you've described here and

15   preparing the list for the doctor, is that

16   consistent with all of the states whose policies and

17   procedures you have reviewed?

18        A.   That is very consistent with the policies

19   and procedures of 27 other states; yes.

20        Q.   Is that a standard of care in the industry

21   for the nurses to do that?

22        A.   Yes, it is.

23        Q.   Thank you.  I'd like to ask you some

24   questions about Motrin, sir.  Are you -- first of

25   all, are you familiar with Motrin?

DOVGAN- DIRECT                                    183

1         A.  Yes, I am.

2         Q.  What is Motrin?

3         A.  Motrin is ibuprofen.  It's an

4  anti-inflammatory, non-steroidal anti-inflammatory

5  that's basically utilized for pain management

6  greatly in the dental field.  We also pair it up a

7  lot of times with acetaminophen or Tylenol.  And for

8  patients that are allergic to Motrin, we'll use

9  Lodine.

10        Q.  Okay.  With Motrin now.  You've reviewed all

11  the materials in this case.  Mr. Smego, as you may

12  recall from reading materials, claims that he is

13  allergic to Motrin.  And I'd like to ask you some

14  questions about that.

15        First of all, has any doctor diagnosed

16  Mr. Smego as being allergic to Motrin?

17        A.  There is no literature, written or

18  otherwise, that I've seen that Mr. Smego is

19  diagnosed as allergic to Motrin.

20        Q.  Do you recall reading the records in this

21  case in fact that Mr. Smego ingested Motrin on

22  several occasions?

23        A.  That is correct.

24        Q.  Based on the records that you reviewed has

25  Mr. Smego ever suffered from an allergic reaction

DOVGAN- DIRECT                          184

1    due to taking Motrin?

2         A.  None.

3         Q.  In your --

4         A.  Never.

5         Q.  -- 30 years of experience, sir, have you

6    ever seen a patient who was allergic to Motrin?

7         A.  In 26 years of practicing dentistry I've

8    never ever seen a patient allergic to Motrin.  It

9    would be a very, very rare event.

10        Q.  Okay.  At least you, yourself, have never

11   seen it in your practice?

12        A.  No, I have not.

13        Q.  Now, as far as Dr. Mitchell's individual

14   care of each of the teeth set forth in her records,

15   you've looked at those records, sir?

16        A.  I have.

17        Q.  And you're familiar with dental records of

18   that nature?

19        A.  Yes, I am.

20        Q.  And, sir, you have reviewed the records and

21   seen the treatment that Dr. Mitchell has provided.

22   Do you believe that Dr. Mitchell's care and

23   treatment of Mr. Smego's cavities complied with the

24   standard of care for a reasonably well-qualified

25   dentist?

1        A.  I do.  I have no indication otherwise.

2        Q.  Could you explain why you believe that, sir?

3        A.  Well, Dr. Mitchell, every time that there

4    was a healthcare request, Dr. Mitchell treated the

5    patient.  There was no indication on any of the

6    other occasions that the patient had pain or

7    swelling or any indication that the patient had

8    contacted Dr. Mitchell and stated they wanted an

9    appointment.

10        It's very similar to private practice.  If a

11   patient has 20 cavities and they don't schedule an

12   appointment, I certainly can't make them come in and

13   have their cavities done.  However, if a patient has

14   swelling or pain or something that is

15   life-threatening, that's a different issue.  That's

16   usual associated with emergency care and I would

17   expect to, in a healthcare facility or in a

18   dental -- or a DHS facility with a detainee, that if

19   there was pain and swelling, that the nurse would

20   triage that particular patient and that particular

21   patient would be seen within 72 hours.

22        Q.  And you saw, sir, in this case there are no

23   complaints regarding the nurses; is that correct?

24        A.  None that I've see; that's correct.

25        Q.  Okay.  With Dr. Mitchell being a part-time

DOVGAN- DIRECT                                    186

1    dentist working 15 hours per week.  First of all,

2    let me ask you this; is there any evidence in this

3    case from your review of all the materials that

4    Dr. Mitchell ever failed to do her job?  Meaning

5    that she ever failed to go in and work on the

6    patients who are on the list prepared by the nurses?

7         A.  No, I never saw any evidence to refute that.

8         Q.  In fact, was that Dr. Mitchell's job, based

9    on your understanding of the standard of care in

10   this industry as a doctor coming into the

11   institution, to go down and begin treating those

12   patients that the nurses have put forth as requiring

13   treatment on her list?

14        A.  That is correct.  That is very similar to

15   corporate dentistry.  That you have dentists come

16   in, let's say two days a week.  Those particular

17   patients for emergency are seen first and then

18   routine care is generally seen second.  If there's

19   no area or room on that particular day or days to

20   have routine care done, then it's deferred to a

21   later date.

22        Q.  Now, there are occasions that Dr. Mitchell's

23   records; and I know you saw all the evidence in this

24   case; where Dr. Mitchell put down that she wanted to

25   see Mr. Smego for a next visit on a particular date.

DOVGAN- DIRECT                    187

1   Do you recall seeing those entries in the records,

2   sir?

3        A.  I do.  I do.

4        Q.  And once that comes around now, even on

5   those dates, do the nurses still have to perform

6   their triage function?

7            MR. WATSON:  Objection, Your Honor.  Form,

8   foundation --

9        A.  Absolutely.

10           MR. WATSON:  -- leading.  There's no

11  foundation whatever about this.

12           THE COURT:  That's correct.  Can we have

13  some foundation.

14       Q.  Sure.  First of all, Doctor, let's back up.

15  Do you recall seeing the notes in Dr. Mitchell's

16  chart reflecting dates she wanted to see Mr. Smego

17  being a next visit?

18       A.  Yes, I do.

19       Q.  And as far as after she prepares and

20  finishes her charts, do you recall reading that the

21  charts are left for the nurses to pick up?

22           MR. WATSON:  Objection; form, foundation

23  for this exact question.

24           THE COURT:  Where did he get this

25  information?

DOVGAN- DIRECT                              188

1        Q.  From the depositions.  It's in

2   Dr. Mitchell's deposition.

3            THE COURT:  You're suppose to ask him.

4        Q.  Okay.  Doctor, could you explain to us; even

5   though Dr. Mitchell would say I'd like to see the

6   patient on the next visit and give a particular

7   date, could you explain how the triage system works

8   with what Dr. Mitchell's next visit involved?

9            MR. WATSON:  Objection, Your Honor.  Form,

10  foundation, same objection.

11           THE COURT:  I'm going to allow it.

12       A.  Generally what occurs with the chart is the

13  chart goes to the nurses station and the nurses go

14  ahead and schedule the patient.  And they also

15  schedule the patient with the most priority first.

16       So if a nurse schedules a patient on a

17  particular date and unfortunately there is more

18  serious need on that date, the nurse would have the

19  ability to move the patient to a later date.

20       Q.  And that again is the standard in the

21  industry, sir?

22       A.  That is the standard in the industry;

23  correct, sir.

24       Q.  And on those occasions, and keeping in mind

25  that -- first of all, let me back up a second.  Is

DOVGAN- DIRECT                            189

1   there any evidence in this case of Mr. Smego ever

2   suffering from a dental emergency?

3        A.  No --

4             MR. WATSON:  Objection, Your Honor --

5        A.  -- there is no indication he had a dental

6   emergency.

7             MR. WATSON:  -- constituting a dental

8   emergency.

9             THE COURT:  The objection is overruled.

10       Q.  I'm sorry, sir.  Could you tell us your

11  answer?

12       A.  I'm sorry.  There is no indication that

13  there was ever a dental emergency whatsoever with

14  Mr. Smego in any of the literature.

15       Q.  And Mr. Smego --

16            THE COURT:  Excuse me, could I ask a

17  question.  What industry?  The standard in the

18  industry?  What industry are we discussing?

19            MR. VOGT:  We're talk about dentist

20  industry.  But again, it's a cross-section, Judge,

21  because the standard of care -- the standard of care

22  is the same as far as how to treat cavities, but the

23  triage and healthcare -- healthcare request system

24  is something that is unique to the industry.

25            THE COURT:  Which industry?  Which

DOVGAN- DIRECT                                      190

1    industry?

2              MR. VOGT:  Unique to the Department of

3    Health -- I mean the Rushville Treatment and

4    Detention Facility.  That facility has a specific

5    healthcare request system and has a triage system.

6    And those two items are completely consistent with

7    the programs that are followed in other correctional

8    institutions.  Which is what the witness has been

9    saying, Judge.  And the plaintiff's expert agrees.

10             That's why I'm going through.  It isn't -- it

11   is an awkward positions, Judge, I'm not disagreeing

12   with you.  Because there are no other treatment and

13   detention facilities, but there are correctional

14   institutions.  And all of the experts in this case

15   have used them to say, okay, this is what they do at

16   all the other institutions.  Granted, the residents

17   there, inmates versus detainees, may be different,

18   but the systems in place are the same.  That's the

19   same as at Rushville.

20             THE COURT:  Does this doctor know that?

21             MR. VOGT:  Yes.  That --

22             THE COURT:  I'm not sure he has testified

23   to that.

24             MR. VOGT:  Well, that's why I asked him

25   about the 27 states and how they're all comparative.

DOVGAN- DIRECT                              191

 1          THE COURT:  But that was DOC.  For the

 2    record, I know in Minnesota we do have detention and

 3    treatment facilities.  We have a very similar system

 4    to what we have in Illinois.  And I believe -- well,

 5    I know the Federal Government has the ability to

 6    pursue these cases.  I don't know whether they have

 7    a separate facility for these inmates.

 8          MR. VOGT:  Judge, please understand, I'm

 9    not disagreeing with the Court.  But it's just that

10    never -- neither of the experts in this case, both

11    for the plaintiff or the defendant, have ever worked

12    at a treatment and detention facility.  Nor have

13    they ever reviewed anything to do with a treatment

14    and detention facility other than Rushville.  Dr.

15    Mitchell is the only dentist in this case that knows

16    what truly occurs and what happens at Rushville.

17       What the other experts have done; and there's

18    no contest about this --

19          MR. WATSON:  Yes, there is, Your Honor.

20          MR. VOGT:  -- the other expert has done is

21    he's looked at -- his only experience was with a

22    juvenile facility.  And he said, okay, I've looked

23    at the juvenile facility, I've looked at these other

24    states.  And he's quoted court cases in support of

25    his opinion and I asked him about those, all jail

DOVGAN- DIRECT                    192

1   cases involving Cook County, Lake County and other

2   counties as support for his opinion to say, look, I

3   know what I'm talking about, I looked at these other

4   orders and things.

5        And again it's because -- it's not necessarily

6   in appropriate; I'm not going to be arguing that the

7   Department of Corrections standards are the same;

8   although in our case they are, there is no dispute

9   about that.  It's not like -- there's no error in

10  this case, Judge.  And again, there's nowhere in

11  this case, I believe, where there's going to be

12  dispute between the standard that's applicable to

13  Mr. Smego.

14       And this -- this witness will testify to that

15  and has testified to that as we're going along; that

16  the standard of care is what he did.

17              THE COURT:  Mr. Watson?

18              MR. WATSON:  Your Honor, I'll cross examine

19  on this.

20              THE COURT:  Okay.

21  BY MR. VOGT:

22    Q.  Okay.  I'd like to now turn, sir, to

23  staffing issues.  In connection with your experience

24  as an expert have you reviewed what's required for

25  appropriate dental staffing in a facility?

DOVGAN- DIRECT                                    193

1        A.  Yes, I have.  I've reviewed multiple

2   documents, including Dr. Shulman's recommendations

3   that the staffing should be one full-time dentist to

4   a thousand prison inmates, but that's referring to

5   an inmate population.  When you're referring to a

6   population that has more -- such as a maximum

7   security and/or you have the ability to not charge a

8   co-pay, which in other words, the detainee has no --

9   no need to have to spend any of his own money to see

10  the dentist, the needs will only go up.

11       Generally we're probably looking at; and I

12  agree with Dr. Shulman a hundred percent; that there

13  should be one full-time dentist, one full-time

14  assistant, and probably one part-time hygienist to

15  facility the proper care of 550 detainees in the DHS

16  facility.

17       Q.  Now, Doctor, what's the basis for your

18  opinion?  We know you testified that Dr. Shulman,

19  the plaintiff's expert, agrees with you on that.  In

20  addition to that, sir, what have you done, what

21  education, training, and experience do you have to

22  explain to the jury that, look, with 550 residents,

23  you need at least one full-time dentist?  Can you

24  tell us that, sir?

25       A.  Well, that's a multi-facet -- that's a

1   multi-compound question.  I will break down the

2   first part.

3        That in my private practice, I know for my

4   private practice how many personnel I need for X

5   number of patients.  If I had 2,000 active patients

6   that I wanted to see on a yearly basis I would need

7   two doctors, four assistants, and two full-time

8   hygienists.

9        If I have one doctor that's seeing a thousand

10  patients per year, I would need myself, two

11  assistants, and a full-time hygienist.  To take out

12  the hygienist and one assistant you're going to

13  decrease the availability of appointment time and

14  subsequently increase the wait time considerably.

15       If you just look at the basic numbers, there is

16  actually no way that one dentist, even with an

17  assistant there the two days that they are there,

18  would possibly treat 550 patients.  And these are

19  patients generally that have poorer oral hygiene

20  than the general population.  Particular patients

21  that I would see generally may only need a cleaning,

22  but detainees or inmate populations have a much

23  greater need and a much higher need for dental care,

24  usually due to poor oral hygiene which is also due

25  to poor educational background.

DOVGAN- DIRECT                                    195

1        Q.  And in connection with the Parsons case that

2   you mentioned, did you review their staffing issues

3   as part of your role in that case?

4        A.  I did.  I absolutely did.

5        Q.  And what did you find in that case as far as

6   staffing issues were concerned?  How did you analyze

7   things?  Tell us the steps that you took to say,

8   look, there is adequate staffing, there isn't

9   adequate staffing in connection with dental care.

10       A.  That was a little bit easier because you had

11  healthcare requests at each particular facility.

12  And the number of healthcare requests would dictate

13  how much treatment was needed in each facility.

14       Perryville, which is an all-women's prison,

15  needed a much higher number of dental staff because

16  the healthcare requests were much higher.  For some

17  place like Lewis, which is not an all-women's

18  facility and also had a maximum security area, you

19  would also need more dentists because a maximum

20  security area you have to have that particular

21  patient treated by bringing one patient down, having

22  a guard watch that particular patient and the

23  treatment of both patients was much less.  So you'd

24  have to have a greater staffing for that particular

25  number.

DOVGAN- DIRECT                                    196

1          If you went to some place like Stafford or

2     Douglas, where you have minimum and medium security,

3     you would have a lower need for dental personnel

4     because those particular patients are generally

5     easier to see based on the fact that you could take

6     a Pod A or a Pod B; meaning you have gang

7     affiliations inside of a prison and that would

8     usually state that the people in Pod A could be seen

9     on one day and people on Pod B could be seen on

10    another day.

11         And you could have dental personnel, such as an

12    assistant, do multiple chairs for you at once and

13    they would clean up.  And you could have the nurse

14    triage and you'd be able to have the nurses arrange

15    the facility or the schedule.

16         And generally we found that automation or

17    computers were greatly helpful in that particular

18    scenario because computers could tell us exactly who

19    is on the list, who needed to be seen, who deferred,

20    and the generally wait time for healthcare requests.

21         Q.  And, sir, based on your work there and your

22    study of all those different prisons and the need

23    for dental care in those prisons, and then applying

24    those -- that education, training and experience

25    that you have in that area to Rushville, do you

DOVGAN- DIRECT                              197

1  believe that a single dentist providing 15 hours of

2  care per week is sufficient for 550 residents?

3       A.  I do not feel that that is a sufficient

4  amount of time to provide for 550 residents.  And I

5  believe Dr. Shulman agrees with me on that.

6       Q.  That is based on your professional

7  experience, background and training?

8       A.  Yes.

9       Q.  Dr. Shulman, the other expert in this case,

10  also agrees with you?

11          MR. WATSON:  Objection, Your Honor --

12       A.  He does.

13          MR. WATSON:  -- form, foundation as to that

14  question.

15       Q.  All right, let me rephrase the question.

16       Does Dr. Shulman also -- has he also testified

17  that Rushville does not have sufficient dental care?

18          MR. WATSON:  Objection, Your Honor, form

19  and foundation.

20          THE COURT:  How does he know?

21       Q.  Because he read the deposition.

22       A.  Deposition.

23       Q.  And his report, also.  Dr. Shulman's report

24  also says there was not sufficient dental care.  Is

25  that true, sir?

DOVGAN- DIRECT                                    198

1      A.   That is correct.   That is absolutely

2  correct.

3      Q.   Okay.   As far as Dr. Mitchell is concerned,

4  sir, does she have any involvement in the retention

5  of additional dentists, dental assistants, or dental

6  hygienist?

7      A.   None that I'm aware of.

8      Q.   And have you seen her testimony where

9  Wexford has been trying to get a dentist to assist

10 her for several years?

11     A.   That is correct.

12     Q.   And an as expert witness, why is that, or is

13 that important for you in the formation of your

14 opinions?

15     A.   Well, in that particular opinion I could

16 even extrapolate that to corporation, where if you

17 have one dentist on staff and you have, let's say,

18 2,000 patients, there is no way that that dentist

19 would be able to provide care for that particular

20 population and then you'll get an increased number

21 of complaints, which we see at the Arizona State

22 Board of Dental Examiners, saying that there's not

23 improper care or lack of care due to long wait times

24 for those particular facilities.   And we go in and

25 evaluate that and find out there's only one dentist

1    trying to provide care for thousands of people.

2         I don't know if you're familiar with HMOs, but

3    HMOs take a group of individuals, let's say 2,000

4    patients, and they place them with one doctor.  And

5    they give a stipend to that particular facility on a

6    monthly basis of the amount of money that they're

7    going to take care of all those patience.

8         When it's physically impossible to do that, we

9    have found that we reprimand the facility or the

10   business owner and say, listen, you cannot possibly

11   provide care for all those individuals and you have

12   one dentist on staff.  You need to have more staff,

13   period.  And if they don't do that, then we can take

14   measures to eliminate that facility from the State

15   of Arizona.

16        Q.  So your report states: (As read)  "I agree

17   with Dr. Shulman that Addus and Wexford did not

18   employ enough dentists."

19        Is that still your testimony under oath here

20   today?

21        A.  It is.

22             MR. VOGT:  Thank you very, sir.  Thank you,

23   Judge.

24             THE COURT:  All right.  Counsel, so my

25   intent at this point is to go ahead and excuse the

1   doctor and make my rulings.  Is that acceptable,

2   Mr. Watson?

3          MR. WATSON:  Your Honor, if that is your

4   intent, I have no objection.

5          THE COURT:  Okay.

6          MR. VOGT:  May I excuse the witness, Judge.

7          THE COURT:  Yes, you may.

8          MR. VOGT:  Thank you, Doctor, for your

9   time.

10         THE WITNESS:  Thank you.

11         THE COURT:  Your excused.  Court is in

12  recess for two minutes.

13      (Witness excused.)

14      (A recess was taken.)

15         THE COURT:  In light of the testimony of

16  Dr. Dovgan and the 7th Circuit opinion in this

17  matter that I've just reviewed, and in light of

18  Dr. Shulman's testimony, I'm going to allow

19  Dr. Dovgan to testify.

20      I am concerned about all of the -- and

21  obviously I will allow plaintiffs to cross

22  Dr. Dovgan on all of these issues.

23      But in light of all of the references to

24  Department of Corrections, I will consider, if it's

25  not clear in the jury instructions, adding an

1    instruction that this is not a Department of

2    Corrections facility, it is a Department of Human

3    Services facility, and that the plaintiff is civilly

4    committed to that facility.

5         All right?

6              MR. VOGT:  All right, Judge.

7              MR. WATSON:  Your Honor, just for the

8    record, we do object to allowing any of this

9    testimony.  I understand your -- the Court's ruling,

10   but we do object based on the testimony you have

11   just heard and our motion and considering he set the

12   standard of care by comparing only 27 institutions

13   that are correctional facilities.  And he testified

14   that he has never once studied a facility where

15   individuals are civilly detained.

16             THE COURT:  And I'm sure you will have

17   great joy on cross of bringing that out.

18        All right.  We need to bring the jury in.  I'll

19   do the preliminaries and then we will do opening.

20   And in -- again, I hope we will be brief.  I'm

21   concerned the jury has been back there so long.  But

22   I realize that's because I directed you to present

23   Dr. Dovgan.

24        So I will explain to the jury that we had some

25   legal matters to take care of and that's the reason

1    for the delay and it's my fault.  So bring the jury

2    in.

3              MR. VOGT:  We are to remain seated though?

4              THE COURT:  Yes.  For the record, that is

5    because Mr. Smego is shackled underneath the skirts.

6    And he is -- seated behind him are two DHS guards.

7    So we will have --

8         (The jury entered the courtroom.)

9              THE COURT:  I apologize to you for the

10   delay.  We had some legal issues that we had to take

11   care of and it was at my direction and my fault.  So

12   you have my apologies that we had to take care of

13   this today before we could give you your preliminary

14   instructions.

15        Susan is going to put them up on the screen.

16   Read along with me if you will.

17        Members of the jury, now that you have been

18   sworn, I will give you some preliminary instructions

19   to guide you in your participation in the trial.

20        It will be your duty to find from the evidence

21   what the facts are.  You and you alone will be the

22   judges of the facts.  You will then have to apply to

23   those facts the law as the Court will give it to

24   you.  You must follow that law whether you agree

25   with it or not.

1      Nothing the Court may say or do during the
2  course of the trial is intended to indicate or
3  should be taken by you as indicating what your
4  verdict should be.
5      The evidence from which you will find the facts
6  will consist of the testimony of witnesses,
7  documents, and other things received into the record
8  as exhibits, and any facts that the lawyers agree to
9  or stipulate to or that the Court may instruct you
10 to find.
11     Certain things are not evidence and must not be
12 considered by you.  I will list them for you now.
13     1.  Statements, arguments, and questions by
14 lawyers are not evidence.
15     2.  Objections to questions are not evidence.
16     Lawyers have an obligation to their clients to
17 make objections when they believe evidence being
18 offered is improper under the rules of evidence.
19 You should not be influenced by the objection or by
20 the Court's ruling on it.  If the objection is
21 sustained, ignore the question.  If it is overruled,
22 treat the answer like any other.
23     If you are instructed that some item of
24 evidence is received for a limited purpose only, you
25 must follow that instruction.  Testimony that the

1   Court has excluded or told you to disregard is not

2   evidence and must not be considered.

3        Anything you may have seen or heard outside the

4   courtroom is not evidence and must be disregarded.

5   You are to decide the case solely on the evidence

6   presented here in the courtroom.

7        There are two kinds of evidence; direct and

8   circumstantial.  Direct evidence is direct proof of

9   a fact, such as testimony of an eyewitness.

10  Circumstantial evidence is proof of facts from which

11  you may infer or conclude that other facts exist.  I

12  will give you further instructions on these, as well

13  as other matters, at the end of the case, but keep

14  in mind that you may consider both kinds of

15  evidence.

16       It will be up to you to decide which witnesses

17  to believe, which witnesses not to believe, and how

18  much of any witness's testimony to accept or reject.

19  I will give you some guidelines for determining the

20  credibility of witnesses at the end of the case.

21       I will give you detailed instructions on the

22  law at the end of the case and those instructions

23  will control your deliberations and decision, but in

24  order to help you follow the evidence I will now

25  give you a brief summary of the elements that

1    plaintiff must prove by a preponderance of the

2    evidence.

3         When I say something must be proved by a

4    preponderance of the evidence I mean that when you

5    have considered all the evidence in the case you

6    must be persuaded that it is more probably true than

7    now true.

8         To succeed on his claim plaintiff must prove

9    each of the following things by a preponderance of

10   evidence.

11        1.  Plaintiff has a serious medical or dental

12   need;

13        2.  Defendant was deliberately indifferent to

14   Plaintiff's serious medical on dental need; and

15        3.  Defendant's conduct caused harm to

16   Plaintiff.

17        When I use the term "serious medical or dental

18   need," I mean a condition that a doctor or dentist

19   says requires treatment, or something so obvious

20   that even someone who is not a doctor or dentist

21   would recognize it as requiring treatment.

22        In deciding whether a medical or dental need is

23   serious, you should consider the following factors:

24        The severity of the condition;

25        The harm, including pain and suffering, that

1   could result from the lack of medical or dental

2   care;

3        Whether providing treatment was feasible; and

4        The actual harm caused by the lack of medical

5   or dental care.

6        When I use the term "deliberately indifferent,"

7   I mean that Defendant actually knew of substantial

8   risk of serious harm to Plaintiff's dental or

9   medical health and that Defendant consciously

10  disregarded that risk by failing to take reasonable

11  measures to deal with it.

12       In deciding whether Defendant failed to take

13  reasonable measures you may consider whether it was

14  practical or possible for her to take corrective

15  action.

16       Deliberate indifference is intentional or

17  reckless conduct, not negligence.

18       A delay in providing effective treatment may

19  amount to deliberate indifference where the delay

20  causes prolonged and unnecessary pain.

21       Deliberate indifference may also arise when the

22  treatment decision is such a substantial departure

23  from accepted professional judgment, practice, or

24  standards that the decision is not based on

25  professional judgment.

1        If you find that Defendant strongly suspected
2   that things were not as they seemed, yet shut her
3   eyes for fear of what she would learn, you may
4   conclude that she was deliberately indifferent.  You
5   may not conclude that Defendant was deliberately
6   indifferent if she was merely careless in failing to
7   discover the truth.
8        Now, a few words about your conduct as jurors.
9        You as jurors must decide this case based
10  solely on the evidence presented here within the
11  four walls of this courtroom.  This means that
12  during the trial you must not conduct any
13  independent research about this case, the matters in
14  the case, and the individuals involved in the case.
15       In other words, you should not consult
16  dictionaries or reference materials, search the
17  internet, websites or blogs, or use any other
18  electronic tools to obtain information about this
19  case or to help you decide the case.  Please do not
20  try to find out information from any source outside
21  the confines of this courtroom.
22       Until you retire to deliberate you may not
23  discuss the case with anyone, even your fellow
24  jurors.  After you retire to deliberate you may
25  begin discussing the case with your fellow jurors,

1    but you can not discuss the case with anyone else

2    until you have returned a verdict and the case is at

3    an end.

4        I know that many of you use cellphones,

5    Blackberries, the internet, and other tools of

6    technology.  You also must not talk to anyone at any

7    time about this case or use these tools to

8    communicate electronically with anyone about the

9    case.  This includes your family and friends.

10       You may not communicate with anyone about the

11   case on your cellphone, through e-mail, Blackberry,

12   iPhone, text messaging or on Twitter or through any

13   blog or website, include Facebook, Google Plus,

14   LinkedIn, or YouTube.  You may not use any similar

15   technology of social media even if I have not

16   specifically mentioned it here.

17       I expect you will inform me as soon as you

18   become aware of another juror's violation of these

19   instructions.  A juror who violates these

20   restrictions jeopardizes the fairness of these

21   proceedings and a mistrial could result which would

22   require the entire trial process to start over.

23       Finally, do not form any opinion until all the

24   evidence is in.  Keep an open mind until you start

25   your deliberations at the end of the case.  I hope

1    that for all of you this case is interesting and

2    noteworthy.

3         If you want to take notes during the course of

4    the trial you may do so.  However, it is difficult

5    to take detailed notes and pay attention to what the

6    witnesses are saying at the same time.  If you do

7    take notes, be sure that your note-taking does not

8    interfere with your listening to and considering all

9    the evidence.

10        Also, if you do take notes, do not discuss them

11   with anyone before you begin your deliberations.  Do

12   not take your notes with you at the end of the day.

13   Be sure to leave them in your seat in the courtroom.

14   Be sure to put your name on the outside of the

15   notebook and the envelope so that we are able to

16   pair up the proper notepad with the proper envelope

17   and juror.  Your notes will not be seen or read by

18   anyone and they will be destroyed at the end of the

19   case.

20        If you choose not to take notes remember that

21   it is your own individual responsibility to listen

22   carefully to the evidence.  You cannot give this

23   responsibility to someone who is taking notes.  We

24   depend on the judgment of all members of the jury.

25   You all must remember the evidence in this case.

1      Notes are not entitled to any greater weight

2  than the recollections or impressions of each juror

3  about the testimony.

4      During this trial you may be permitted to ask

5  questions of witnesses, but you must follow the

6  procedures that I describe.

7      If you have a question for a witness and you

8  believe the answer would be helpful to you in

9  understanding the case, then after the lawyers have

10  completed their questions, but before that witness

11  is excused, I will give you a chance to submit your

12  question in writing.

13      You should not write your name or juror number

14  with the question.  Also, you should not discuss

15  your questions with your fellow jurors at this time.

16      You may submit one or more questions or no

17  question at all.  It's up to you.  Please keep in

18  mind though that you should only ask a question if

19  you think it's important to your ability to decide

20  the issues in this case fairly.

21      You should be sure you are asking a question

22  and not making a comment.  You should not use your

23  questions to argue with a witness or to express

24  opinions about a witness's testimony.  Your role is

25  to be an impartial fact-finder.  The purpose of your

1   question should be to clarify testimony that you

2   have not understood or that has failed to address a

3   factual question that you believe is important.

4       You will pass your questions to the first juror

5   in the box over here, Ms. ███.  After the bailiff

6   has collected the pieces of paper and given them to

7   me, I will decide whether the law allows the

8   question to be asked of the witness.

9       Not all questions can be asked or asked using

10  the wording that was submitted.  The rules of

11  evidence might not permit me to ask your question.

12  You should not concern yourself with the reason for

13  the exclusion or modification of any question

14  submitted.

15      If I cannot ask your question or if I rephrase

16  it, please do not be offended and do not let it

17  affect your judgment of the evidence or the witness

18  in any way.

19      If the question is allowed I will ask the

20  question of the witness and the attorneys may then

21  ask some follow-up questions.  Please do not speak

22  directly to me, the lawyers, or the witnesses.

23      The trial will now begin.  The trial will

24  proceed in the following manner:  First plaintiff's

25  attorney may make an opening statement.  Next

1    defendant's attorney may make an opening statement.

2        An opening statement is not evidence, but is

3    simply a summary of what the attorney expects the

4    evidence to be.  After the opening statements

5    plaintiff will call witnesses and present evidence.

6    Then defendant will have an opportunity to call

7    witnesses and present evidence.

8        After the evidence has been presented I will

9    instruct you on the law that applies to the case and

10   the attorneys will make closing arguments.  After

11   that you will go to the jury room to deliberate on

12   your verdict.

13       You're opening, Mr. Watson.

14           MR. WATSON:  Your Honor, we have also

15   prepared a Power Point presentation which we have

16   provided a copy.  If the courtroom deputy could show

17   it.

18           THE COURT:  I think we need to turn the

19   lights down in the middle.

20       Please proceed.

21           MR. WATSON:  May I proceed, Your Honor?

22           THE COURT:  Yes.

23           MR. WATSON:  Good afternoon, ladies and

24   gentlemen.

25       This case is about a dentist who has, for nine

1  years, violated professional standards and delayed

2  treatment so long that she's caused her own patients

3  needless and unnecessary pain and harm.

4      We've all been to the dentist.  No one expects

5  when they see the dentist that that dentist --

6          MR. VOGT:  Objection, Judge.  This is

7  argument.

8          THE COURT:  You may proceed.  The objection

9  is overruled.

10          MR. WATSON:  No one expects when they go to

11  the dentist that that dentist will repeatedly miss

12  visits after diagnosing their own patient with

13  dental disease and decay.

14      Sometimes it's a visit for an annual check-up

15  and appointment next year.  Sometimes it's a visit

16  that diagnoses a few cavities, an appointment next

17  week or next month to fill those cavities.  Other

18  times it's an appointment that's scheduled to stop

19  the jarring pain that won't stop without proper care

20  and treatment.

21      No matter what brings someone to the dentist,

22  when they sit back in that dentist chair and they

23  enter the dentist's office, everyone expects the

24  dentist will follow professional standards.  Because

25  dentists are professionals.  And we hold

1    professionals to higher standards.

2         And those professional standards don't change.

3    Those professional standards don't change if it's

4    the dentist's own family member, if it's a new

5    patient in the office, or a long-standing patient

6    that has seen that dentist for years.

7         We're here today with nine years of evidence

8    against Dr. Mitchell.  That evidence will show that

9    over the course of nine years Dr. Mitchell so

10   delayed treatment and so violated professional

11   standards that she was deliberately indifferent to

12   Mr. Smego's serious medical and dental needs.

13        Let's talk about that nine years of evidence.

14        First, we're gonna talk about Dr. Mitchell.

15   Second, we'll talk about Mr. Smego.  Third, we'll

16   talk about what Dr. Mitchell did to Mr. Smego.  And

17   fourth, we'll talk about those professional

18   standards that dentists are suppose to follow but

19   Dr. Mitchell violated.

20        Let's begin with Dr. Mitchell.  As Judge

21   Myerscough told you this morning, Dr. Mitchell is a

22   dentist who's licensed by the State of Illinois.  No

23   matter who she sees, no matter where she goes, she

24   holds herself out as Dr. Mitchell because she is

25   licensed.  She uses that same license to see

1    patients up in Chicago in her normal practice and

2    outside Chicago.  She holds herself out with that

3    same license because that license requires her to

4    provide treatment under the same standard of care.

5        In her regular practice Dr. Mitchell sees

6    patients up in Chicago, as I said.  But Dr. Mitchell

7    makes most of her money seeing patients outside of

8    Chicago.

9        Since 2001, Dr. Mitchell has stacked patient on

10   top of patient on an already busy load in Chicago

11   and elsewhere.  She stacked Mr. Smego on top of her

12   patients at the Illinois Department of Human

13   Services; DHS, as you heard it called this morning

14   and as you'll hear it called throughout the trial.

15       The Illinois Department of Human Services or

16   DHS keeps and treats individuals at treatment and

17   detention facilities.  People who are civilly

18   committed reside at treatment and detention

19   facilities.  To provide healthcare to its residents

20   the DHS hires private companies.  They hire large

21   private companies.  And those companies are paid by

22   state funds.

23       Those private companies are paid well.  Just

24   this year, for the facility that Mr. Smego is at,

25   the contract was $3.8 million.

1          Those private companies then hire their own
2     doctors and their own dentists and their own
3     healthcare workers to care for and to treat
4     residents of their facility.
5          Since 2001, Dr. Mitchell has worked for two of
6     those companies.  And you'll hear more about those
7     companies.  By working for those two companies
8     Dr. Mitchell makes more than twice as much money as
9     she makes in her other practice, in her Chicago
10    practice.  Dr. Mitchell makes more than $200,000
11    each year in total income.  And a substantial part
12    of that comes from her work at the treatment and
13    detention facility.
14          You'll hear about the kind of treatment that
15    she provided to Mr. Smego for nine years.  Or for
16    that matter, that she didn't provide Mr. Smego for
17    nine years.  And you'll be able to decide whether
18    her treatment is worth such a substantial paycheck.
19          Let's talk about Mr. Smego.  Mr. Smego was born
20    and raised in Illinois.  Mr. Smego is civilly
21    committed, as the Judge told you this morning.  As
22    the Judge also talked to you about this morning
23    during jury selection, Mr. Smego is entitled to the
24    same consideration that you would give any
25    individual person in this courtroom.

1          His mom and dad live in Pinckneyville.  He

2    comes from a family of nine children.  And as you'll

3    hear, Mr. Smego will describe in great detail, he'll

4    describe the lack of care and the lack of treatment

5    that Dr. Mitchell provided him for nine years.

6          In fact, let's talk about that care and

7    treatment.  Or lack of care and lack of treatment

8    for nine years.

9          The evidence will show over those past nine

10   years Dr. Mitchell has so delayed treatment and so

11   violated professional standard that she's

12   deliberately indifferent to his serious medical and

13   dental needs that she diagnosed in December of 2005.

14         On December 13, 2005, Mr. Smego first came

15   under the care of Dr. Mitchell at the treatment and

16   detention facility as a new resident.  Mr. Smego

17   expected, as any patient should, that Dr. Mitchell

18   would follow professional standards and that she

19   would provide timely treatment.

20         Mr. Smego had serious medical and dental needs.

21   He told Dr. Mitchell that his teeth were painful.

22   She probed his mouth and diagnosed him with his

23   reaction of sharp and shooting pain.  Dr. Mitchell

24   knew that Mr. Smego required her treatment because

25   Dr. Mitchell's own records from December, 2005, show

1    that he needed treatment.

2        Dr. Mitchell diagnosed Mr. Smego and wrote down

3    on her chart that Mr. Smego had 12 cavities.  That's

4    December 13, 2005, a diagnosis of 12 cavities.

5        Dr. Mitchell also wrote down on her chart that

6    Mr. Smego had an allergy to Motrin.

7        And as the professional standards required,

8    Dr. Mitchell prescribed a treatment plan.  She

9    promised a treatment plan.  She promised to see him

10   and to start filling his teeth in two months.  She

11   promised that follow-up treatment, but the evidence

12   will show in this that case Dr. Mitchell did not

13   keep that promise.

14       Dr. Mitchell so delayed Mr. Smego's treatment

15   that not only did she not see him for two months,

16   she didn't see him for 18 months.  18 months.

17   18 months of tooth decay, 18 months of tooth

18   disease.  More than one and a half years.  All of

19   2006, more than half of 2007.

20       And even after those 18 months you'll hear that

21   Dr. Mitchell still didn't start filling his

22   cavities.  Even after those 18 months Dr. Mitchell

23   continued to miss appointments.  Dr. Mitchell

24   continued to delay his treatment.

25       Dr. Mitchell also failed to notify Mr. Smego of

1   changes to his treatment plan.  Mr. Smego, to the

2   best of his knowledge during those 18 months,

3   thought he would see her in February 22nd, 2006.

4   18 months went by.

5       Dr. Mitchell also didn't give Mr. Smego an

6   opportunity to see a dentist outside of the

7   facility.  Because Mr. Smego resides at the

8   treatment and detention facility, Dr. Mitchell is

9   his only dentist, unless, unless she chooses to let

10  him see another dentist.

11      Dr. Mitchell has the ability to write what's

12  called a medical writ for another dentist to see him

13  outside of the treatment and detention facility.

14  Although Dr. Mitchell possessed that power, that

15  power of choice, in this case you'll see that

16  Dr. Mitchell never once exercised it.  Dr. Mitchell

17  never once referred Mr. Smego out for treatment.

18  Dr. Mitchell never once wrote a medical writ for

19  Mr. Smego.  Mr. Smego was held under Dr. Mitchell.

20      As anybody who's had a cavity knows, Mr. Smego

21  suffered pain and hurt for 12 cavities that rotted

22  in his mouth.  That was needless pain.  That was

23  unnecessary pain.  That was pain that was diagnosed

24  in December of 2005.

25      Mr. Smego would wake up at two a.m., he

1    couldn't sleep.  He'd tell the nurses about his

2    pain.  He'd tell his primary physician about his

3    pain.  He'd tell his therapist about his pain.  He'd

4    write healthcare requests about his pain.

5         But even when Dr. Mitchell chose to see him,

6    she'd treat the wrong tooth.  She'd treat a

7    different tooth than he even said was the most

8    painful one.  She pushed his complaints to the side

9    and for 18 months his disease and his decay

10   progressed without any professional care.

11        As Dr. Mitchell will describe it dental disease

12   is like cancer.  It spreads through the teeth when

13   it's untreated.  It grows deeper and deeper into the

14   root.  Because Dr. Mitchell delayed treatment for so

15   long, Mr. Smego's disease grew worse.  It spread

16   through his teeth and the pain got worse and worse

17   and worse.

18        And the evidence will show that even after

19   20 months of delay, Dr. Mitchell still didn't keep

20   that promise from December of 2005.  At the 20-month

21   mark, from December of 2005, Mr. Smego's treatment

22   was so delayed and so below professional standards

23   he had to have one of his teeth taken out, extracted

24   out of his mouth.  It died in his mouth.  One of his

25   teeth in the back, right-hand side, one of the big

1    teeth, dentists call them molars, was so riddled
2    with disease that Dr. Mitchell had to pull it.
3         And do we know at this point that that pain was
4    unnecessary?  Of course we do.  December, 2005,
5    Dr. Mitchell had promised to start filling that
6    tooth in two months.  This is 20 months later.
7    Twenty months earlier Dr. Mitchell had promised to
8    stop that decay and stop that disease.  And now,
9    after 20 months Mr. Smego's tooth went from
10   treatable and fixable to decayed, to diseased, to
11   pulled, and then to the trash can.
12        And anyone who has had a tooth pulled, one of
13   those big teeth from the back of their mouth, knows
14   that he suffered excruciating pain.  He suffered
15   needless pain while the tooth rotted and while it
16   was extracted from the rotted tooth socket.
17        So 20 months after that promise of December,
18   2005, Mr. Smego is now missing a tooth and Mr. Smego
19   still has ten untreated cavities in his mouth.
20   Twenty months later.  Twenty months after December
21   of 2005.
22        To reduce Mr. Smego's pain from ten untreated
23   cavities, to reduce his pain from having a big
24   tooth, the molar from the back, right-hand side
25   pulled out, she prescribed a painkiller.  She

1    prescribed him Motrin.  She prescribed him the drug

2    in December, 2005, that she wrote down he was

3    allergic to to reduce his pain.  She wrote down that

4    drug on his own chart in her own handwriting.  And

5    20 months later she prescribes that drug in order to

6    reduce pain for cavities that she hasn't treated and

7    a tooth that's now dead.

8         The evidence will show that Mr. Smego's delays

9    and missed appointments continued beyond 20 months.

10   After two years and nine months Dr. Mitchell finally

11   decided to start treating the cavities in the front

12   of his teeth.  But rather than fill the cavities

13   properly, Dr. Mitchell rushed.  She rushed the

14   procedure.  And what ended up on the front teeth of

15   Mr. Smego's mouth was a rough, clay-like surface

16   that would constantly catch his tongue.  A rough

17   surface, some of it with sharp edges.

18        Dr. Mitchell rushed through that treatment,

19   that treatment that was delayed for two years and

20   nine months when she chose to finally see him,

21   because she had a train to catch.  She cut the

22   treatment short.  She went out and got her train and

23   left his teeth with that clay-like substance on the

24   front teeth with the sharp edges that catches his

25   tongue because she had a train to catch.

1          After putting in that terrible fix, which

2     really was no fix at all for someone who has

3     problems that the doctor and the dentist diagnosed

4     years ago, Dr. Mitchell wouldn't see him again for

5     more than two years.  Two years with that clay-like,

6     rough, sharp, painful procedure that was now put on

7     the front of his teeth.

8          Mr. Smego will tell you his tongue would cut --

9     catch that material.  That material was in his mouth

10    every day, every night, day after day, night after

11    night following this two year lapse.

12         So Dr. Mitchell hadn't followed her own

13    treatment plan here since December of 2005.  And now

14    she gives him this treatment where it's stuck in his

15    own mouth.  And during this entire time Dr. Mitchell

16    still doesn't give him a choice to see another

17    dentist outside the facility.

18         During this time, during these lapses, during

19    these missed appointments, Dr. Mitchell instead

20    chose to see other patients, chose to see other

21    folks.  Chose not to see Mr. Smego.

22         And we already know from December of 2005, that

23    he needed that treatment.  She told him he needed

24    that treatment.  She wrote it down in her own chart.

25    He expected, as any patient should be able to

1    expect, you're telling me that I have cavities in my

2    mouth, I've told you they're painful, you've

3    diagnosed them, and now for years you haven't given

4    me the care that you prescribed or the option to see

5    another dentist and you're treating other people.

6         So after so many delays, and because of

7    Dr. Mitchell's indifference, Mr. Smego finally ended

8    up here.  Finally ended up suing Dr. Mitchell.

9    Enough was enough.

10        But even after Mr. Smego sued Dr. Mitchell she

11   still hasn't treated him.  Even after Mr. Smego has

12   sued Dr. Mitchell she still hasn't given him the

13   option to see another dentist.  The delays have

14   continued and the lack of treatment and care have

15   continued.

16        The pain for this delay and this substantial

17   violation brings us into this courtroom today.

18        In fact, Mr. Smego, sitting hear today, still

19   has three untreated cavities.  Three untreated

20   cavities that were diagnosed in December 13, 2005.

21   Today he still has those.  Nine years.

22        Nine years later Dr. Mitchell still refuses,

23   still hasn't provided the treatment plan that she

24   proposed; the I'll see you in two months treatment

25   plan; nine years later.

1        Dr. Mitchell hasn't treated -- still hasn't

2   followed, and fallen so far below, the professional

3   standards, we're here today.  Because she continues

4   to choose to see other patients and chooses not to

5   see Mr. Smego and chooses not to send him outside

6   the facility to go see another dentist.

7        And because of those delays and those

8   violations of the professional standards of care,

9   Dr. Mitchell's deliberately indifferent.  And that's

10  what the evidence will show.

11       I promised you a fourth topic.  We've talked

12  about the delays, now we'll talk about the

13  professional standards that we all expert dentists

14  to provide.  That everyone expects when they sit in

15  the dentist's chair and they go in the dentist's

16  office that the dentist will provide.

17              MR. VOGT:  This is argument again, Judge.

18              MR. WATSON:  You will learn about the

19  professional standards --

20              THE COURT:  The objection is overruled.

21              MR. WATSON:  You will learn about the

22  professional standards in two different ways.

23  First, as stated in a dentist's code of ethics.

24  Second, you'll hear about it from an expert that

25  we'll bring in.  His name is Dr. Jay Shulman.  I'll

1    tell you a little bit about Dr. Jay Shulman, but you

2    will learn a lot more about him.

3        Dr. Shulman is a dentist who has practiced for

4    43 years.  Dr. Shulman served 22 years in the United

5    States Army.  Dr. Shulman treated thousands of

6    soldiers and their family members and rose to the

7    level of Colonel.  And when Dr. Shulman retired,

8    Dr. Shulman became a professor.  He is still a

9    professor.  He's still on the faculty today of

10   Baylor University.

11       Dr. Shulman will tell you, Dr. Shulman will

12   take the stand and Dr. Shulman will tell you about

13   the professional standards and Dr. Mitchell's

14   violation of those professional standards.

15       She'll -- he'll tell you about what the delays

16   meant to Mr. Smego in terms of what disease

17   progressed and ultimately, to a reasonable degree of

18   dental certainty, what pain and permanent injury

19   Mr. Smego suffered.

20       Second, in terms of professional standards,

21   we'll talk about the ADA code of ethics.  The ADA

22   code of ethics is the American Dental Association.

23   It's the nation's largest dental association.  It

24   has hundreds of thousands of members across the

25   nation.  Dr. Mitchell will admit that she's familiar

1    with the ADA code.

2         And we'll just talk about three simple

3    standards from the ADA code.  And you've already

4    heard about the context for those standards:  Do no

5    harm, do good, and fairness.

6         Let's talk about do no harm.  Just like

7    everyone else's dentist, Dr. Mitchell should not

8    harm her own patients.  This is a simple standard.

9    It's a standard about safety.  It's a standard about

10   patient safety.  It requires that a dentist protect

11   her own patients.  It requires that a dentist give

12   their own patient treatment choices.

13        If Dr. Mitchell is overbooked, if she has too

14   many appointments on her log, she can't just refuse

15   to provide necessary treatment.  Dr. Shulman will

16   tell you she can't choose to provide care and

17   treatment that's below the professional standards.

18   That's not a choice.  You either provide

19   professional treatment or you choose an alternative

20   option of providing no treatment at all and saying

21   my license isn't worth it.  Or you provide an

22   option.

23        And in this case we've talked about that

24   option.  We've talked about the option of

25   Dr. Mitchell to write an order and give Mr. Smego an

1    opportunity to see another dentist.

2        Let's talk about the second ADA code:  Do good.

3    Just like everyone else's dentist, Dr. Mitchell is

4    required to do good by the patient.

5        For example, Dr. Mitchell should provide

6    education.  We've all received that education since

7    we were small children.  We've received the end of

8    the visit lecture from our dentist.  Here's how to

9    brush your teeth.  Here's how to floss.  Here are

10   some supplies, here are some sample supplies that

11   you would need to take care of yourself.  Here's how

12   to take care of yourself until the next visit.

13       As Dr. Shulman will tell you, that patient

14   education is critically important.  It helps

15   patients take care of themselves.  Dr. Mitchell

16   should be giving that education.  And Dr. Shulman

17   will tell you that.

18       In this case though, an entire treatment, or

19   lack of treatment, for Mr. Smego, you won't see one

20   entry in the dental chart of Dr. Mitchell giving

21   that critical patient education.  Over nine years.

22       Under this standard Dr. Mitchell was required

23   to give that patient education.  Dr. Mitchell should

24   have taught Mr. Smego how to care for his teeth.

25       Under this standard Dr. Mitchell is also

1  required to keep her scheduled visits.  Whether

2  those visits are for routine, annual treatment,

3  whether those visits are for the two month promise,

4  whether those visits are to take care of the next

5  cavity that develops, if you make a promise, you

6  should keep it.  Do good by the patient.

7  Dr. Mitchell can't abandon her patients.  She can't

8  leave Mr. Smego without treatment or care for

9  18 months.

10      Finally, fairness.  Just like everyone else's

11  dentist, Dr. Mitchell should treat all of her

12  patients fairly.  Whether that patient is a family

13  member, whether that patient is a long-standing

14  patient, whether that patient is a new patient

15  that's walked in the door, whether that patient is

16  someone at a treatment and detention facility run by

17  DHS like Mr. Smego.  Dr. Mitchell should provide

18  professional care.

19      As the ADA code states, a professional dentist

20  should provide care without prejudice.  Dentists

21  should provide care and treatment and put their

22  patient first.  The evidence will show that those

23  professional standards that we've talked about that

24  we're all familiar with cannot change depending on

25  who the patient is in that chair.

1              Do no harm, do good, and fairness.

2          I expect right after we have talked about

3    professional standards and we have talked about the

4    facts of delay and the 18-month delay and the nine

5    years sitting here today, and despite Dr. Mitchell's

6    professional standards and despite that delay,

7    Mr. Vogt will stand up here and he will give his

8    client's excuses.  His excuses why she isn't

9    deliberately indifferent.  I expect maybe

10   Dr. Mitchell will give even more excuses.

11         An example excuse:  Mr. Smego didn't explain

12   enough.  Mr. Smego didn't submit enough healthcare

13   requests.  I didn't order the supplies I needed.  I

14   have 30 years of experience and residents at the

15   detention and treatment facility should just accept

16   the treatment I provide, that I choose to provide,

17   no matter how bad and no matter how delayed.  I took

18   on too many patients.  My contract doesn't give me

19   enough hours.  My contract doesn't give me enough

20   money.  I've overbooked myself and I have fallen way

21   behind.

22         Mr. Vogt might tell you Dr. Mitchell had

23   overbooked herself and taken on hundreds of

24   patients.  That she believes that her contract only

25   gives her a certain number of hours.  Those are

1    excuses.  And those are excuses that just don't hold
2    water.  And we know that, because when Dr. Shulman
3    testifies he'll tell you that those excuses are just
4    that, they're excuses.
5        Dr. Shulman will tell you dentists don't get to
6    choose to provide substandard treatment.  They don't
7    get to mask their treatment in substandard care.
8    They are required to either meet professional
9    standards and provide timely treatment or give their
10   patients choices.  Make the patient have an
11   opportunity to get care and treatment from someone
12   else.  Write a medical order or choose to prioritize
13   Mr. Smego before -- since December of 2005, choose
14   to prioritize Mr. Smego, choose to provide his care
15   above other people's care.
16       Dr. Shulman will tell you, Dr. Mitchell, she's
17   the dentist.  She's the doctor.  She's accountable,
18   she's responsible.  In fact, every time you hear
19   that, those excuses, think about it.  Who's the
20   doctor?  Who's the dentist in this courtroom?  Who
21   is making the choices?  Who has the power?  We
22   expect from our doctors and our dentists care and
23   treatment, not excuses.
24       Every time you hear one of these excuses you
25   should ask yourself two simple questions.  What did

1    Dr. Mitchell already know and when did Dr. Mitchell

2    already know about it?  Those two questions will

3    help you -- and it will be a moment for you when you

4    look back and you say, what did Dr. Mitchell already

5    know and when did she know it?

6         And those are two simple questions for you to

7    answer.  Because when you think about those

8    questions and you look back on this case, you'll

9    look back nine years.  You'll look back to December

10   of 2005.  You'll look back and see Dr. Mitchell

11   diagnose these cavities herself in her own

12   handwriting, in her own chart, for her own self.

13   She wrote down that he needed care, that he needed

14   treatment.  And she promised care and treatment

15   beginning in February of 2006, and we're here nine

16   years later.

17        So I ask that you listen to all the evidence

18   very carefully.  Lookout for those excuses.  Think

19   of those two questions when you hear the excuses.

20   And when it comes down to it, this case is about a

21   dentist who has, for nine years, delayed treatment

22   so much and fallen so far below professional

23   standards that she's caused needless harm and

24   unnecessary harm and unnecessary pain and

25   unnecessary treatment or unnecessary suffering since

1  December of 2005.

2      At the end of the trial we'll stand up before

3  you and ask that you return a verdict, because based

4  on that evidence, based on those violations of

5  professional standard and those delays in treatment,

6  the only way that you can show that Dr. Mitchell and

7  every other reckless dentist like her can't get away

8  with violating professional standards and can't

9  delay treatment for so long is to return a verdict

10  and return a verdict in favor of Mr. Smego.

11      Thank you very much.

12          THE COURT:  It's 3:16 at this time.  Do you

13  wish to have a break before you begin your

14  statement?

15          MR. VOGT:  Is that all right?

16          THE COURT:  All right.  We will give you a

17  five minute recess.  Thank you.

18      (The jury left the courtroom.)

19      (A recess was taken.)

20      (The jury entered the courtroom.)

21          THE COURT:  Please be seated.  Court is

22  reconvened.  Mr. Vogt, your opening.

23          MR. VOGT:  Thank you, judge.

24      Good afternoon, ladies and gentlemen.  As Judge

25  Myerscough mentioned to you, my name is Robert Vogt.

1    Bethany Campbell is my associate.  And the two of

2    us, we represent Dr. Mitchell, Dr. Jacqueline

3    Mitchell, in this case.

4        I want to thank you for the time and attention

5    you're going to be giving to us.  I know that

6    sitting for a jury trial like this takes you out of

7    your normal lives, takes you out of your day-to-day

8    routines, and it's a burden.  But I hope that you

9    find it informative and helpful.

10       It's always interesting; the United States jury

11   system, as you know, is unique in the world.  No

12   other country in the world has what we have right

13   here.

14       And the United States Federal District Court,

15   ladies and gentlemen, it is the finest trial court

16   in the world.  And I'm honored and privileged to be

17   part of this trial with you.  And I want to thank

18   you again.

19       We agree that with the number of residents at

20   Rushville, there is no way Dr. Mitchell can provide

21   all dental care as needed in 15 hours a week.

22   That's true.

23       That testimony that you heard will come from a

24   witness right up here.  Dr. Shulman, the plaintiff's

25   own expert.  He will tell you, as will every other

1    dentist in this case, they're all gonna say the same

2    thing:  15 hours a week, which is what Dr. Mitchell

3    provides, that's what her contract says as you'll

4    here.  In fact, the contract with Wexford is very

5    clear:  Not more than 15 hours a week.

6        She is a part-time dentist.  And as you'll

7    hear, she goes to Rushville on the weekends and

8    provides 15 hours of dental care per week.

9        But as all the dentists in this case will tell

10   you, Dr. Mitchell, Dr. Shulman, the plaintiff's

11   expert, as well as our expert; everyone agrees that

12   that's grossly, grossly insufficient.

13       But in fact, you'll hear; again, from

14   plaintiff's own expert; there should be a full-time,

15   40-hour-a-week dentist.  And there should be a

16   full-time dental assistant.  And there should be a

17   part-time dental hygienist.  But there isn't and

18   never has been.

19       Now, the problem of course is that

20   Dr. Mitchell, again, is their -- she's

21   three-eighths, if you will, of a full-time employee.

22   A full-time employee, as you know, is 40 hours.

23   She's 15 hours.  She's three-eighths.  That isn't

24   even half of what they need.  Every dentist in this

25   case will tell you that.

1          So what's the problem?  Dr. Mitchell is all by

2    herself.  Think about it and you'll hear all the

3    evidence in this case, almost no dispute.  DHS, as

4    you heard Mr. Watson tell you, is responsible for

5    providing medical care and treatment and dentistry

6    and psychiatric services to residents like

7    Mr. Smego.  There are now 550 residents like

8    Mr. Smego at Rushville.

9          So DHS is responsible for providing that

10   service.  DHS, as you can see, is not here.  DHS

11   hires companies call Addus.  And you'll hear Addus

12   was responsible for providing medical care and

13   services, dental, psychiatric services from 2001

14   through 2007.  But as you can see, Addus is not

15   here.

16         Wexford.  Wexford has been there from 2007 to

17   today's date.  And as you heard Mr. Watson tell you,

18   those two companies, Addus and Wexford, make

19   millions of dollars on these contracts.  Millions

20   upon millions every year.  But Wexford is not here.

21         So what about Dr. Mitchell then?  All these

22   things said about Dr. Mitchell.

23         Well, here's Dr. Mitchell's story as you'll

24   hear it from her on the stand.  She works full-time,

25   40 hours a week, actually I think it's 37.5 hours a

1   week, at the Stateville Correctional Center up near

2   Joliet.  That's her full-time position.

3        She also has a small part-time office she has

4   in Chicago.  And that's true, you'll hear her

5   testify about that.  She works there a couples of

6   times a month.

7        On the weekends, as you'll hear, she gets onto

8   a train at about, I think she'll tell you it's a

9   6:30 Friday night train.  Travels -- first of all,

10  I'm sorry, to get to the train she has to drive an

11  hour to the train station.  She takes a three hour

12  train ride down on Friday night.  Once she gets down

13  there, she has already parked a car that she owns

14  near the train station.  She goes, gets in her car,

15  drives the car another hour to Rushville, where she

16  has rented an apartment.

17       She then gets up on Saturday morning, goes to

18  the treatment and detention facility.  And the

19  nurses have put together a list of residents for her

20  to see.

21       But before we get to the list and healthcare

22  system and all that stuff, again, back to

23  Dr. Mitchell.

24       She travels five hours to get there.  Hour in

25  the car, three hours on the train, hour in the car.

1    She goes by train and by car.  She rents an

2    apartment.

3         Now, ladies and gentlemen, you'll hear, there's

4    no contest about this, she pays for the train

5    ticket, she pays for the car, she pays for her

6    apartment, she pays for everything.

7         And of course on Sunday, after putting in the

8    fifteen hours, she gets back in, drives her car to

9    the train station, parks her car near the train

10   station, gets on the train, takes the train all the

11   way back, arrives near Chicago, gets in her car and

12   drives an hour home.  Five hours down, five hours

13   back.  Ten hours a week she travels to provide 15

14   hours of dental services.

15        She has been the only dentist for Rushville.

16   The only one.

17        You'll hear, of course, ladies and gentlemen,

18   and everyone will agree, that Wexford has been

19   trying to get more dentists, trying to get more

20   dental assistants.  But they have been unable to do

21   so.

22        And again, the experts will all agree, you

23   know, if you're gonna have the contract, you've got

24   to have the right number of dentists, you've got to

25   have the right number of professionals, and you'll

1    hear they did not.

2         Dr. Mitchell, as you will hear; and the

3    plaintiff's expert again, Dr. Shulman, will tell you

4    himself; Dr. Mitchell's job is to go there and

5    provide fifteen hours of dental services per week.

6    And there is no evidence that she has not done that.

7         There is no evidence that DHS has ever

8    complained or criticized her work.  No evidence that

9    Addus has ever complained or criticized her work.

10   No evidence that Wexford has ever complained and

11   criticized her work.  And what we know to be true,

12   actually know to be true, is they have re-hired her

13   again and again an again.

14        But what about the system at Rushville?

15        Now, ladies and gentlemen, the system at

16   Rushville, as you will hear; and again, it's all

17   recognized by all the experts and all the dentists

18   in the case will say, yes, the system at Rushville

19   is an appropriate system.  It's what the policy

20   requires.

21        It's very simple.  If you're a resident at

22   Rushville and you would like to see a doctor or

23   dentist or nurse or psychiatrist, you fill out what

24   you will hear is a healthcare request form.  You put

25   your name on there, you put the date on there, you

1    write something on there about your problem, and you

2    sign it and hand it in to either a lockbox or a

3    nurse or someone else.  You put the system in

4    motion.

5         Because as you can imagine, with 550 residents,

6    they have to have some order.  How do we know who

7    wants what?  And you'll hear the system was in place

8    and the handbook -- there was a handbook, Mr. Smego

9    will tell you, directs them, if you want to see the

10   doctor or dentist, please submit a healthcare

11   request form.

12        After that what happens is the nurses take

13   over.  And you'll hear the nurses do the same

14   process for all of the doctors; the primary care

15   physician, Dr. Mitchell, psychiatrist, podiatrist,

16   they're all -- they all do the same thing.

17        And what the nurses do is take the healthcare

18   requests that are submitted by the residents.  They

19   look at the resident's problems and they try to

20   prioritize or triage, if you will, the problems that

21   the residents have.

22        And you'll hear -- and again, all of this,

23   ladies and gentlemen, will be uncontested in this

24   case.  Dr. Shulman is going to agree with everything

25   I'm telling you right now, because it's true.

1      What the nurses do is they take it and they

2  say, well, they go and they assess the patient first

3  and they say, what's your problem, you say you want

4  this.  Let me take a look, maybe we can give you a

5  medication, maybe we can do something that the nurse

6  herself can resolve.  But if the nurse is unable to,

7  the nurse puts the patient on the list of patients

8  to see when the doctors come in.

9      And you'll hear that the only people that are

10  there on a daily basis 24/7 are the nurses.  The

11  primary care physician, Dr. Lochard, works four days

12  a week.  Dr. Mitchell works two days a week.  I

13  think you'll see the podiatrist works -- and the

14  psychiatrist work one day a week.  The eye doctor,

15  optometrist, comes in I think one day a week or

16  every other week.

17      What they do is they come in and the nurses

18  have prepared a list and the doctors, each of them,

19  work right down the list.  And that's the exact

20  triage system that exists at Rushville.

21      So when Dr. Mitchell comes in on Saturday, she

22  hasn't been there all week, she has been working at

23  Stateville Correctional Center.  She comes in

24  Saturday morning and the nurses say, Doctor, here's

25  a list of patients we need you to see.  And she goes

1    right down the list, one after another after

2    another.

3        That system, ladies and gentlemen, will not be

4    contested by anyone.  It is the triage system that

5    exists there.  And you'll hear that there's no

6    evidence that Dr. Mitchell did not follow that

7    program.

8        But Rushville also has another step.  Let's

9    assume, for example, that you wanted to see someone

10   and you were passed over or there wasn't enough time

11   or something like that.  Well, you'll hear, ladies

12   and gentlemen, that Rushville has an attempt to

13   resolve.  It's a pre-grievance procedure.  And

14   again, the whole idea; and Mr. Smego will agree with

15   this; the whole idea is try to resolve any problems

16   you have.

17       So for example, if you think you should have

18   seen the doctor or the dentist and you didn't,

19   either -- you can send in a healthcare request of

20   course at any time, or you can talk to the nurse and

21   ask the nurse to put you on the doctor's list and

22   maybe you can convince her to put you on the

23   doctor's list without putting a healthcare request

24   in.

25       But you can also say, I have a problem, I want

1    an attempt to resolve form.  And you will see the

2    forms, the forms are very simple again; you put your

3    name, the date, and the problem you have and the

4    person that you're complaining about.  Everyone is

5    going to agree with this, there's going to be no

6    contest about this.  And the whole idea is to

7    resolve disputes, to take care of problems that

8    people have.

9         But Mr. Smego will tell you not once, never,

10   did he file an attempt to resolve.

11        In fact, you've already heard Mr. Smego only

12   filed three requests for dental care.  And it will

13   be undisputed; again, everyone will agree; every

14   time he submitted a healthcare request, Dr. Mitchell

15   saw him right away.  Every time.

16        So when you're starting to think about this

17   case as the evidence comes in keep those ideas in

18   mind.  The system in place at Rushville, very

19   simple, almost common sense.  Submit a healthcare

20   request if you have a problem.  If not, go to

21   attempt to resolve, because the attempt to resolve

22   is sent to the people, the person you have the

23   problem with.  And they force you, as you'll hear,

24   to sit down and talk to the other person.  It forces

25   a face-to-face meeting to make sure that whole

1    lawsuits and things don't occur.  Let's resolve the

2    problem.

3         But there's more than that.  Because you'll

4    hear that even if the attempt to resolve doesn't

5    work, the resident can file a grievance.  Again,

6    another process.

7         And each of these processes, ladies and

8    gentlemen, involves a simple statement of need.  If

9    you want something, tell us.  If you have a problem,

10   submit a healthcare request.  If people are not

11   doing what you want, submit an attempt to resolve.

12   Tell them, I have a problem, I want to resolve it,

13   help me, and follow the procedure outlined.  And if

14   that doesn't work, file a grievance.

15        You'll hear never, never did Mr. Smego file a

16   grievance.  Never.

17        Now, Mr. Smego will tell you that he's fully

18   aware of the healthcare request system.  He will

19   tell you that it is his obligation to submit a

20   healthcare request.  He will tell you that the

21   resident handbook tells him to do that.  And you

22   will see the requests that he handed in.

23        The key, ladies and gentlemen, as you'll hear,

24   is that the system is very simple; if you have a

25   problem, tell someone.  That way the dentist knows

1    or the doctor knows.  You'll hear that everyone

2    relies on the system because that's what makes sense

3    when you have 550 inmates, 550 residents.  That's

4    the system that works.

5         You'll hear also that there were occasions, as

6    Mr. Watson already pointed out, where Dr. Mitchell

7    said, okay, she treated Mr. Smego on this occasion

8    for this cavity and that cavity, and then she put

9    in, next visit I will do tooth No. 15 or 14 or

10   whatever the case may be on June 1st.  And then you

11   will hear and you will see, and it's uncontested,

12   that on June 1st what happened is that he wasn't

13   seen.

14        Well, the evidence will show; and again, all of

15   the experts are going to agree on this; is that what

16   happens is the nurses take Dr. Mitchell's charts

17   that she's finished the patients that Monday and

18   they note when she wants to see the patients.  But

19   again, the most urgent patients need to be seen

20   first.  And the nurses do their triage.  They say,

21   what problems do you have, what can we do, how can

22   we fix it.  And they make a list for Dr. Mitchell.

23        And the bottom line, as you'll hear, is that on

24   each occasion that Mr. Smego wasn't seen there were

25   other patients on the nurses' list that had more

1    serious problems than him.

2         And so, as you'll hear, and Mr. Smego will tell

3    you, that he agrees that the patients with the most

4    urgent needs should be seen first.  And that's

5    exactly what Dr. Mitchell did.  The nurses prepared

6    the list and she followed the list.

7         Now, it's important also to point out on that

8    that the nurses, no one, no one, has any complaint

9    or criticism regarding the nurses who prepared the

10   list of patients for Dr. Mitchell to see.  No one is

11   suggesting -- they're not defendants in the case, of

12   course, and no one is suggesting that they ever did

13   anything wrong.  They put the list together and if

14   Mr. Smego wasn't on the list it's because he wasn't

15   the most serious patient on that day.

16        Then if he wants to be seen again, he either

17   can talk to the nurses and say, hey, you know, I was

18   suppose to see Dr. Mitchell, I want to see Dr.

19   Mitchell, and they would put him on the list.  Or he

20   can submit a healthcare request.  Or if somebody

21   doesn't think they're doing what he wants, say I

22   want to file an attempt to resolve and get to the

23   heart of the matter.  Let's resolve this problem I

24   think I have.

25        And you'll see the evidence on all of this,

1    ladies and gentlemen.

2         You'll also see that -- as far as dental care

3    is concerned, Dr. Mitchell is going to go over that

4    in great detail.  We have typed up her progress

5    notes.  You'll see the handwritten ones and then

6    we've typed them up so everybody can see exactly

7    what she wrote.

8         You'll see all of the examinations; we're gonna

9    go over all those; all of the teeth that she has

10   taken care of.  And you will hear her testify.

11   She'll tell you where the cavities were, what she

12   did, why she had to do this, why she had to do that.

13   I won't bore you with all the details now because

14   you're see her testify about it yourself and you'll

15   see her chart and she will explain everything.

16        The bottom line, ladies and gentlemen, as

17   you're hear in this case, is that Dr. Mitchell did a

18   very good job for Mr. Smego.  But Mr. Smego has

19   to -- has to do what his job is.  There is no way,

20   as you've heard me say, from Dr. Shulman's own

21   testimony, there's no way Dr. Mitchell could

22   remember everyone's dental needs.

23        And in addition, even if she did remember

24   something, again, the nurses are triaging the

25   patients.  Dr. Mitchell is not there Monday through

1    Friday.  She walked in on Saturday morning, after

2    traveling five hours, and she's there to take care

3    of these guys.  And the nurses say, here are the

4    residents you need to see.  And she goes and works

5    right down the list just like she's suppose to.

6        And you'll hear, ladies and gentlemen, that

7    she's done that at multiple other facilities.  You

8    will hear every time is the same.

9        And you know, Dr. Lochard; he is the primary

10   care physician at Rushville; he too will tell you

11   that's the exact system he follows too.  The nurses

12   prepare the list and he comes in and he goes right

13   down the list.

14       Everyone at Rushville is treated the same with

15   the footnote that those in the most pain, those with

16   the most urgent needs, are treated first.

17   Otherwise, it's a very simple proposition.  Keep in

18   mind, as you'll hear Mr. Smego admit, a healthcare

19   request takes less than 30 seconds to fill out.  "My

20   teeth hurt" is all you have to write.

21       The other thing about all of this -- all these

22   claims about pain.  Pay attention to the evidence in

23   this case regarding Mr. Smego's complaints of pain.

24   I won't bore you with it now, but pay attention to

25   the evidence regarding that.

1          Now, I know you've been here a long time and
2     I'm not gonna go over all the individual teeth.
3     I'll let Dr. Mitchell do all that rather than tell
4     you about all the different teeth.
5          The last thing I wanted to point out to you is
6     just a simple proposition of what everyone agrees
7     to.  Because in the end, ladies and gentlemen, I
8     think the one word that Mr. Watson did not use is
9     responsibility.
10         Everyone is going to say at Rushville if you
11    want to see a doctor or the dentist all you have to
12    do is fill out the healthcare request form.  Or all
13    you have to do is tell a nurse.  Or all you have to
14    do is tell somebody; could be the doctor, your
15    primary care physician, Dr. Lochard, you could tell
16    security people, you could tell anybody there that
17    you would like something taken care of and they will
18    undertake to help you do that.
19         And if they don't, file an attempt to resolve.
20    Tell them, I've got a problem, no one is helping me.
21    If that doesn't work you file a grievance.  On each
22    occasion you'll see there's a system in place to
23    make your needs known.
24         Dr. Mitchell, as you'll hear, is not a mind
25    reader.  Plaintiff's expert will tell you that.  She

1    -- her job, as you'll hear, is to go right down the

2    list of patients.  And everyone in this trial is

3    going to agree that's exactly what she does.  And

4    that's exactly what she did.

5         If Mr. Smego, like every other resident in

6    Rushville, has a problem, if he needs help, it's his

7    obligation, as you'll hear, to make that need known.

8    To say, I've got a healthcare problem, I've got a

9    problem I need help.

10        Well, one last point.  What about this idea of

11   the 2005 exam?

12        There is no question, ladies and gentlemen,

13   that December 13th, 2005, Dr. Mitchell examined

14   Mr. Smego's mouth and told him, you've got some

15   cavities here, we'll try and get you in.  And you

16   need them taken care of, submit a healthcare request

17   form.

18        You'll also hear that from 2002 to 2005, three

19   years prior to Mr. Smego coming in to Rushville, he

20   never saw a dentist.  Never had any dental problem,

21   never sought out any type of help.  Comes in, sees

22   Dr. Mitchell, she says you've got all these cavities

23   here, submit healthcare requests, we'll get things

24   moving.

25        Now, again, ladies and gentlemen, there are 550

1    residents at Rushville and Dr. Mitchell is the only

2    15-hour per week dentist there.  Mr. Smego, he'll

3    agree, is not special or unique.  His job, like

4    anyone, is if he wants his teeth repaired, if he

5    wants a cavity taken care of, submit a healthcare

6    request.  That's all he has to do.  But it is a

7    request service.  The dentists do not hunt down the

8    patients.

9        The patients want dental care, as you'll hear,

10   all they have to do is file a healthcare request.

11   Dr. Mitchell responded and treated Mr. Smego through

12   every healthcare request he submitted.  It is an

13   undisputed fact in this case.

14       Again, ladies and gentlemen, I will try to move

15   quick.  I'm told from -- unfortunately sometimes I

16   talk too swiftly, so I will try my best to slow

17   down.

18       You'll hear from Dr. Mitchell.  You'll hear

19   from Mr. Smego.  You'll hear from two dental

20   experts.  You'll hear from Dr. Lochard, the primary

21   care physician.  And I think you may hear from some

22   other people that were involved in other aspects of

23   the care at Rushville.

24       And at the end, ladies and gentlemen, I'm gonna

25   ask you to find in favor of Dr. Mitchell.  And

1   you'll see exactly, you'll see her testify, you'll

2   see what type of person she is.  You've already

3   heard a great deal about her character and you'll

4   see it.  She will explain everything to you.  And in

5   the end you'll see Dr. Mitchell's care of Mr. Smego

6   was far, far from deliberately indifferent.  She

7   complied with the standard of care and she did

8   exactly what she should do as a 15-hour-per-week

9   dentist at Rushville.

10      Thank you for your time.  Thank you, Judge.

11          THE COURT:  Thank you.

12      If you'll take the jury out, please.

13      (The jury left the courtroom.)

14          THE COURT:  We are outside the presence of

15  the jury at this time.  I wanted to finish

16  completing my description of the courtroom here.

17      And that is that the tables are draped and that

18  Mr. Smego's shackles cannot be seen from anywhere in

19  the courtroom.  We have checked that.

20      We will be having testimony by the witnesses up

21  here in the witness box with the podium pulled over

22  in front of everyone's feet so that everyone is in

23  the same position; no one's feet can be seen by the

24  jury.  And we will have the witnesses approach the

25  witness chair outside the presence of the jury.  And

1    they will descend from the witness chair outside the

2    presence of the jury so that there's no treatment of

3    Mr. Smego any differently from any of the other

4    witnesses.

5        So will Mr. Smego be your first witness?

6            MS. MacDONALD:  No, Your Honor,

7    Dr. Mitchell will.

8            THE COURT:  Okay.  Dr. Mitchell, if you'll

9    take the stand.  And can you two do the podium.

10           MR. WATSON:  Your Honor, also on this note.

11   We had the first reference by Mr. Vogt to inmates

12   during opening statements.  And I'd like to have

13   counsel at least instructed to not refer to

14   residents at the Rushville treatment and detention

15   center as inmates or even mention of inmates.  It's

16   of a prejudicial nature and the Court's prior

17   ruling.

18           MR. VOGT:  Your Honor, I apologize.  I did

19   say it once.  I caught myself as quickly as I could.

20   I will do my best not to cause any problems.

21           THE COURT:  You may have a seat.

22       All right.  Mr. Crowl, would you like to step

23   up in the jury box and assure yourself that the feet

24   cannot be seen.

25           MR. CROWL:  Yeah, the feet can't be seen,

1    Judge.

2              THE COURT:  All right.  If you'll sit back,

3    I will move this.  It has a short in it still.

4        I'm going to bring the jury back, but we're

5    going to break at 4:30.  So you'll just be beginning

6    with this witness and then we'll take a break and

7    take the jury out and let them go home.

8              MS. MacDONALD:  Before you bring in the

9    jury, I have one issue I'd like to raise.

10       Would Your Honor allow us to give the jurors

11   their own copies of Mr. Smego's dental chart?  Some

12   of the entries are quite small and we have found

13   it's easier to see if you actually have that

14   physical copy.

15             THE COURT:  Do you wish to use the overhead

16   also?

17             MS. MacDONALD:  Yes, Your Honor.

18             THE COURT:  May I see the exhibit?

19             MS. MacDONALD:  Yes, Your Honor.

20             THE COURT:  Is there any objection,

21   Mr. Vogt?

22             MR. VOGT:  May I see it, Judge.

23             THE COURT:  Yes.

24             MS. MacDONALD:  There's no --

25             THE COURT:  Dr. Mitchell, we're doing legal

1    matters here, my court reporter needs to take it

2    down.  You need to --

3              DR. MITCHELL:  I'm sorry.

4              THE COURT:  You need to repeat.

5              MS. MacDONALD:  These documents have been

6    stipulated as to their foundation.  There's no

7    question of their authenticity or foundation.

8              THE COURT:  I see no reason not to let the

9    jury have their own copies.

10             MR. VOGT:  Well, I guess, Judge --

11             THE COURT:  But then the question becomes

12   after you've completed Dr. Mitchell and as we break,

13   we should take these back from the jury so they

14   don't take them home or take them back into the jury

15   room with them.

16             MS. MacDONALD:  Will they be keeping their

17   notebooks overnight or --

18             THE COURT:  Yes.

19             MS. MacDONALD:  Could this be kept with

20   their notebooks?

21             THE COURT:  Yes, it could be, because they

22   will not have their notebooks and they'll be locked

23   up in the vault.

24             MS. MacDONALD:  All right.

25             THE COURT:  Go ahead and distribute those.

1    Do you need one back?

2            MR. VOGT:  Does the witness get one?

3            MS. MacDONALD:  It will be on her screen.

4            DR. MITCHELL:  I would like to have my own

5    copy.  Thank you.

6            MS. MacDONALD:  Would you like me to leave

7    them on their chairs?

8            THE COURT:  Yes.

9        All the witnesses will be sworn from the seat,

10   the witness chair.

11           MR. VOGT:  Do you do that before the jury

12   comes back in?

13           THE COURT:  No, we do that when the jury is

14   here.

15       Do some judges do it before the jury comes

16   back?

17           MR. VOGT:  I just don't know because of the

18   circumstances in this case, that's all.  Doesn't

19   make any difference to me, whatever the Court wants.

20           THE COURT:  Okay.  If you'll bring the jury

21   back, please.  Off the record.

22       (A discussion was held off the record.)

23       (The jury entered the courtroom.)

24           THE COURT:  The jury has returned.  We are

25   reconvened.  Will you please swear the witness.

MITCHELL - DIRECT                              257

1           (The witness was sworn.)

2               THE COURT:  Ms. MacDonald.

3                    JACQUELINE MITCHELL

4    called as a witness herein, having been duly sworn,

5    was examined and testified as follows:

6                    DIRECT EXAMINATION

7    BY MS. MacDONALD:

8       Q.  Would you please state your name for the

9    record?

10      A.  Jacqueline F. Mitchell Lawshea.

11      Q.  Dr. Mitchell, you're a dentist?

12      A.  Yes.

13      Q.  You are the dentist for the Rushville

14   Treatment and Detention Facility?

15      A.  Yes.

16      Q.  And before that you were the dentist at the

17   Joliet Treatment and Detention Facility?

18      A.  Yes.

19      Q.  You are the only dentist who is assigned to

20   the Rushville Treatment and Detention Facility at

21   this time?

22      A.  Yes.

23      Q.  When a resident at Rushville needs to see a

24   dentist, you are the only dentist they can see;

25   right?

MITCHELL - DIRECT                    258

1      A.  Yes.

2      Q.  You've treated plaintiff in this case,

3  Mr. Smego; right?

4      A.  Yes, but the previous question I had a

5  change of answer.

6      Q.  If a resident at Rushville needs to see a

7  dentist, you are the only dentist they can see?

8      A.  That's not correct.

9      Q.  You're the only dentist at Rushville; right?

10     A.  I'm the only dentist that provides service

11  at that facility.  However, patients are referred

12  out for oral surgery, periodontal service, TMJ

13  service, et cetera.

14     Q.  You saw Mr. Smego for a dental exam in

15  December, 2005; right?

16     A.  That would be correct.

17     Q.  When you saw him then you diagnosed him with

18  12 cavities; correct?

19     A.  Yes.

20     Q.  He had 12 cavities in ten different teeth

21  when you saw him in December of 2005?

22     A.  Let me just verify that.  That's correct.

23     Q.  And what you were just looking at,

24  Dr. Mitchell, is a copy of Plaintiff's Exhibit 1,

25  which is Mr. Smego's dental chart; right?

MITCHELL - DIRECT                    259

1      A.  Yes.

2      Q.  And we've provided for the jurors' ease a

3  copy of that dental chart which we'll refer to from

4  time to time.

5          THE COURT:  And let me caution the jury; I

6  will need you to leave these medical records, along

7  with your notepad, in the envelope that we will

8  collect and we will make sure are locked into a

9  vault overnight and brought back to the courtroom to

10  you.  Nobody will see these, so...

11          MS. MacDONALD:  Your Honor, at this time we

12  would offer Plaintiff's Exhibit 1 into evidence.

13          THE COURT:  Do you want me to use this as

14  the original?

15          MS. MacDONALD:  That's fine, Your Honor.

16          THE COURT:  All right.  Any objection?

17          MR. VOGT:  No, Judge.

18          THE COURT:  Plaintiff's 1, which is a group

19  exhibit, is admitted and so marked.

20      (Plaintiff's Exhibit 1 admitted.)

21  BY MR. MacDONALD:

22      Q.  And just to be clear, this first page of

23  Plaintiff's Exhibit 1 reflects the 12 different

24  cavities that you diagnosed Mr. Smego with in

25  December of 2005; correct?

MITCHELL - DIRECT                    260

1        A.  Correct.

2        Q.  You can set that to the side for right now,

3    Dr. Mitchell.  I just want to talk a little bit

4    about cavities generally for the benefit of the

5    jury.

6        What is a cavity?

7        A.  A cavity, or caries, which would be

8    synonymous, are generally disease processes that

9    occur in the actual tooth structure.

10       Q.  So a cavity is a disease?

11       A.  Yes.

12       Q.  And when a person has a cavity, if it's left

13   unattended to or untreated, it's going to get worse;

14   right?

15       A.  Not necessarily.

16       Q.  When a person has a cavity you have a

17   disease process and if you don't remove the disease

18   process, it progresses; right?

19       A.  Not necessarily.

20       Q.  Dr. Mitchell, you gave a deposition in this

21   case, didn't you?

22       A.  Yes.

23       Q.  And you took the same oath at that

24   deposition as you took here today?

25       A.  Yes.

MITCHELL - DIRECT                    261

1       Q.  And at that deposition I asked you the

2  following question and you gave the following

3  answer.  Question --  page 129 of your deposition

4  transcript I asked you: (As read)

5       "Does placing a filling make a tooth stronger?"

6       You answered: (As read)  "Teeth are the

7  strongest when they are initially in without any

8  type of restoration.  However, once you have a

9  disease process, if you don't remove the disease

10  process, it progresses."

11       That was your answer on that day; right?

12       A.  That was my answer.  I would just like to

13  clarify for you.  Generally speaking that is true.

14  And actually in reviewing Dr. Shulman, your expert's

15  bio and his information, there are such things as

16  incipient lesions.

17       Incipient lesions are cavities that are

18  actually in the enamel of the tooth that has not

19  progressed into the dentin.  And so I probably

20  misspoke.  And again, this is because Dr. Shulman's

21  deposition helped remind me of that.

22       One example, for instance, with Mr. Smego's

23  teeth, tooth No. 20, 21, and No. 18.  Number 18 is a

24  bite lesion, which is the start of caries.  A lot of

25  times you will see that with people that have had

MITCHELL - DIRECT                    262

1    orthodontic treatment.  It's the beginning of decay.
2    And we mark it, but it doesn't necessarily -- it has
3    not progressed to a point where it's through the
4    dentin and then it's becoming a real full-fledged
5    cavity.
6         There are some cavities or incipient lesions
7    that are on the occlusal surface of the teeth.  For
8    example, No. 20 and 21 on Mr. Smego --
9              THE COURT:  Doctor.  Doctor.  Occlusal
10   means what?
11        A.  Occlusal is the top surface of your teeth.
12   For instance, if you were to open your mouth and you
13   look down on your tooth, where the groves are at on
14   the top of the tooth, that's the occlusal surface.
15   The side closest to your lips is your buccal.
16   Inside is mesial or distal.
17        Mesial is always, just for the sake of people
18   who don't understand, if you were to divide your
19   mouth in half, the side of your tooth that's closest
20   to the midline is mesial.  The side that's furthest
21   from the midline is the distal.  And the side that's
22   closest to your tongue is considered lingual.
23        So when I'm speaking of occlusal, I'm talking
24   about the very tops of your teeth that have all the
25   groves and stuff.

MITCHELL - DIRECT                          263

1          For instance with Mr. Smego, 20 and 21 have

2     incipient lesions, meaning that there's a stick.  It

3     has not progressed through the actual dentin.

4          So that's why I said I have to correct myself.

5     And again, after reviewing the testimony of

6     Dr. Shulman, I misspoke and I should have corrected

7     that.  So hopefully everybody will understand it was

8     an error of omission, not that I was trying to be

9     deceptive or anything.

10          Hopefully that answers your question.

11          Q.  All right.  My question was a little bit

12     different than that.  And -- my question was, if you

13     have a cavity and it's unattended, it's possible

14     that you're gonna lose that tooth; correct?

15          A.  It's possible.  But for instance in the

16     example of No. 18, 20, and 21, Mr. Smego still has

17     them and he still has those incipient lesions and it

18     has not progressed any further.

19          So I guess over the life of the tooth and if he

20     does nothing for it, that's a great possibility,

21     that he could lose it.  But right now they have been

22     fine.

23          Q.  Dr. Mitchell, I understand that you have

24     some things you probably want to explain to the

25     jury, but if you would just make sure to answer my

MITCHELL - DIRECT                    264

1     question.  You'll have that opportunity to go into

2     other issues about Mr. Smego when your counsel asks

3     you questions.  All right?

4          A.  Okay.  I'll do the best I can.

5          Q.  Thank you.

6          A.  Okay.

7          Q.  And when you do a filling, there's two

8     primary things you want to do.  First you remove the

9     decay; right?

10         A.  Yes.

11         Q.  And then you want to fill the tooth to

12    maintain the truth structure; right?

13         A.  Yes.

14         Q.  And once a filling is put in a tooth, that

15    tooth should be healthy because there is no disease

16    process; right?

17         A.  Yes.

18         Q.  And tooth decay is like cancer in that way;

19    right?

20         A.  Well, I've had cancer, and so -- I guess,

21    yeah.

22         Q.  With cancer, if you remove the lesion

23    initially, there's no chance for the cells or

24    anything to spread out; right?

25         A.  If you remove the lesion then 90 percent of

MITCHELL - DIRECT                    265

1    the time it's not gonna progress at that point.

2    However, you can get recurrent decay around a tooth

3    if you're not brushing and taking care of the tooth.

4    So recurrent decay is different than an active decay

5    process in the actual tooth.  Sorry.

6         Q.  Again, Dr. Mitchell, if you could just

7    listen to my question.

8         A.  Okay, I'm sorry.

9         Q.  My question was about cancer.  And my

10   question was, with cancer, if you remove the lesion

11   initially, there's no chance for the cells or

12   anything to spread out; correct?

13        A.  I'm going to say yes.  However, there is

14   metastasis that occurs with cancer.  And I'm sorry.

15   But anyway, but yes.

16        Q.  And metastasis doesn't occur if you remove

17   the cancer; right?

18        A.  I think 90 percent of the time it shouldn't,

19   but there is occasions when cells have shot off and

20   you end up with metastasis.  But 90 percent of the

21   time, yes.

22        Q.  And if you leave cancer unattended for a

23   long period of time, that's when you get metastasis

24   to different areas; right?

25        A.  You can, yes.

MITCHELL - DIRECT                    266

1      Q.  Let's go back to your deposition in this

2  case, Dr. Mitchell.

3      I asked you about how decay progresses in that

4  case and you made an analogy to cancer.  And you

5  said:  (As read)

6      "Let me give you an example.  Cancer, people

7  have cancerous lesions.  After you remove the lesion

8  initially there's no chance for the cells or

9  anything to spread out.  So guess what, cancer has

10  been arrested at that point.  If you leave it

11  unattended for a long period of time, you get

12  metastasis to different areas.  Now you've got a

13  real problem."

14      Do you remember giving that answer?

15      A.  Yes.

16      Q.  And then you went on to explain that it's

17  the same with cavities; right?

18      A.  I did explain that to you, yes.

19      Q.  You start with one area of the tooth; right?

20      A.  Yes.

21      Q.  Decay starts on the top surface?

22      A.  That's correct.

23      Q.  And initially it's just straight into the

24  tooth; right?

25      A.  Generally when it goes through enamel it

MITCHELL - DIRECT                    267

1    does enter in a very straight pattern; yes.

2        Q.  And once it passes that enamel into the

3    dentin, then it can spread out; right?

4        A.  It can spread out.  Because the dentin are

5    tubules that the decay spreads through.

6        Q.  Now I'd like to show you a demonstrative

7    about the spread of the decay here.

8        Can you see that, Dr. Mitchell?

9        A.  Oh, yes.

10       Q.  Okay.  So here we have on the left side an

11   early stage decay of enamel; right?

12       A.  Yes.  That's like No. 18, 20, and 21.

13   That's correct.

14       Q.  And the second place we have here is

15   moderate cavity.  Decay reaches into the dentin.

16   That's when the decay is not treated and starts

17   moving into the middle of the tooth; right?

18       A.  That would be correct.

19       Q.  And then the right on this demonstrative we

20   have severe cavity, where decare is reaching into

21   the pulp of the tooth; right?

22       A.  Yes.

23       Q.  And so this shows the three different stages

24   of decay; right?

25       A.  Yes.

MITCHELL - DIRECT                          268

1        Q.   And one of the purposes of doing fillings is
2   to stop that decay early and maintain the tooth
3   structure; right?
4        A.   As soon as possible, yes.
5        Q.   And then once that decay keeps working its
6   way through the tooth, it can eventually reached the
7   nerve; right?
8        A.   Yes.
9        Q.   And if we look at this demonstrative we can
10  see along the bottom there the nerve that leaves the
11  tooth; right?
12       A.   Yes.
13       Q.   And then once the decay is past the enamel
14  and into the tooth, then a person can start to feel
15  the pain of that cavity; correct?
16       A.   At various stages, yes.
17       Q.   A person can start to feel pain at that
18  point; right?
19       A.   It depends on the individual, but yes.
20       Q.   Each person feels pain from decay in a
21  different way?
22       A.   That would be correct.
23       Q.   Some people are very, very sensitive?
24       A.   Some people are, yes.
25       Q.   Okay.  And for those folks, just the

MITCHELL - DIRECT                    269

1   slightest amount of decay will cause someone to have

2   pain; right?

3       A.  Yes, they will feel some discomfort, I

4   think.

5       Q.  Okay.  And some people feel their pain in

6   different places; right?

7       A.  You can get referred pain to another area.

8       Q.  Right.  And so referred pain means that

9   perhaps you're having an issue on the bottom of your

10  mouth, but you feel it on the top; is that right?

11      A.  Yes, you can refer to different areas.  Yes.

12      Q.  Okay.  And some people will say, I feel pain

13  here, but it's really below there; is that right?

14      A.  Yes, some people do that.  Yes.

15      Q.  It's just a matter of the person?

16      A.  Yes.

17      Q.  And a lot of times when you talk to a

18  patient they'll tell you that they can't really tell

19  you where the pain is, they just know it when they

20  feel it; right?

21      A.  They will say they feel something sometimes

22  when they eat something sweet or when they're

23  chewing, et cetera.  But yes.

24      Q.  A lot of times when you say tell me where

25  the pain is, they can't really tell you; right?

MITCHELL - DIRECT                    270

1          A.  That's correct.

2          Q.  And you were hired to provide preventive

3     dental care to residents at Rushville; correct?

4          A.  I was hired to provide preventive,

5     restorative, prosthetic, et cetera.

6          Q.  Okay.  And preventive care means cleaning

7     teeth and teaching people how to take care of their

8     teeth; right?

9          A.  That's correct.

10         Q.  And restorative dental care means, for

11    example, fillings; right?

12         A.  Yes.

13         Q.  So a patient at Rushville would be entitled

14    to a filing for a cavity; right?

15         A.  He certainly could request a filing for a

16    cavity; yes.

17         Q.  He would be entitled to the filing; right?

18         A.  If he requested it he would be -- he could

19    have a filing.

20         Q.  Let's go back to your deposition,

21    Dr. Mitchell.  I asked you the following question,

22    you gave me this answer: (As read)

23         "Then a patient at Rushville would be entitled

24    to a filing for a cavity."  And you said yes.  That

25    was your answer; right?

MITCHELL - DIRECT                        271

1        A.  I just told you yes a minute ago.  I'm

2   sorry.

3        Q.  And a patient at Rushville gets routine

4   fillings; right?

5        A.  That's the services that we provide, is

6   routine dental care.  Yes.

7        Q.  And a routine filling could be a silver

8   filling or a white filling?

9        A.  Yes.

10       Q.  And when it comes to fillings, residents at

11  Rushville are entitled to the same clinical care as

12  that you provide in your office in Chicago; right?

13       A.  Within some limitations.

14       Q.  Let's go back to your deposition,

15  Dr. Mitchell.  Page 89 of your deposition I asked

16  you the following question, you gave the following

17  answer: (As read)

18       "Did you treat patients that you saw at your

19  private practice differently than you treated

20  patients you saw at DHS facilities?"

21       And your answer said: (As read)

22       "If it's in reference to providing clinical

23  care, the clinical care that I provide is available

24  for those residents is what they get the same as in

25  my office."

1        Do you remember giving that answer?

2        A.  Yes, I did.  And just to clarify.  In my

3   office I do implants; at DHS I don't do implants.

4   In my office I provide crowns; at DHS that's not a

5   service that's available.  At my office I do gold

6   inlays; I don't do gold inlays there.  That's not a

7   restorative service that's available at that

8   facility.

9        In my office I do numerous other things just to

10  make sure my skill sets stay where it is.  At DHS

11  I'm allowed to do white restorative fillings, I'm

12  allowed to do amalgam fillings.  That's the

13  materials that are provided.

14       I can do anterior root canals.  In my office I

15  do posterior root canals.

16       So in terms of the care that I give and my

17  interest in making sure they get a reasonable

18  filling, et cetera, and that it is the quality that

19  I would provide for a person in my office that let's

20  say could not afford a crown, at DHS they get a

21  buildup just like I would do in my office, but the

22  services are different based upon what they allow me

23  to do.

24       So no, I don't do implants down there, I don't

25  do crown and bridge.  I do know how to do it and I

1    do do it in my private office, but I do not do it at

2    that facility.

3         So in that respect, yes, ma'am, I do do -- if

4    I'm gonna do a buildup, I'm gonna build it, I'm

5    gonna make it look like a tooth as I would in my

6    private office.  But I don't do implants, don't do,

7    like I said, crown and bridge.  I do not do crowns.

8    I don't do gold inlays or onlays at that facility.

9    That's not something that's available to those

10   patients.

11        Did I answer your question?

12   Q.  I think so.

13   A.  Thank you.

14   Q.  When it comes to fillings --

15   A.  Yes, ma'am.

16   Q.  -- you provide the same care in your office

17   as you do at Rushville; right?

18   A.  When I give a person I do the best filing

19   that I can do; yes, ma'am.

20   Q.  Whether it's at Rushville or in your office

21   in Chicago?

22   A.  That is correct.

23   Q.  Dr. Mitchell, I'd like to turn back to

24   Plaintiff's Exhibit 1, which is the document the

25   jury also has a copy of.  Do you have that in front

MITCHELL - DIRECT                    274

1    of you, Dr. Mitchell?

2         A.  Is that the first page?

3         Q.  Yes, ma'am.

4         A.  Yes.

5         Q.  And the first page of Exhibit 1 is the chart

6    you filed out when you first saw Mr. Smego in

7    December, 2005; right?

8         A.  Yes.

9         Q.  And according to this chart you diagnosed

10   Mr. Smego on December 13th, 2005, with 12 cavities;

11   correct?

12        A.  Yes.

13        Q.  And those 12 cavities were in teeth 2 --

14            THE COURT:  Marchal, could you dim the

15   center lights, please.

16        Q.  Those 12 cavities were in teeth 2, 6, 7, 8,

17   9, 10, 18, 20, 21, and 31; right?

18        A.  Yes.

19        Q.  And Mr. Smego had multiple cavities in two

20   of those teeth, teeth 8 and 9; right?

21        A.  He had two different sides of the tooth;

22   yes.

23        Q.  And as you can see on that chart, dentists

24   use a numbering system so they can keep track of

25   which teeth have issues or need services; right?

1      A.  Yes.

2      Q.  And on Mr. Smego's dental chart you see an

3  example of that dental chart here with the

4  numbering; right?

5      A.  Yes.

6      Q.  I'm just going to blow this up so we can

7  walk through the chart here.

8      So here we can see how the dentist's tooth

9  numbering system works; right, Dr. Mitchell?

10     A.  Yes.

11     Q.  So over here we start with tooth No. 1.  And

12 these teeth over here are meant to represent the

13 patient's top teeth; right?

14     A.  Yes.

15     Q.  On the top of their mouth?

16     And then down here we have what are the

17 patient's lower teeth; right?

18     A.  Yes.

19     Q.  Okay.  And then tooth 1 over here starts on

20 the left-hand side and that's gonna be the back,

21 right side of a patient's mouth; right?

22     A.  Yes.

23     Q.  Those are the teeth back here?

24     A.  The upper right, yes.

25     Q.  Okay.  And then it goes, as we move toward

MITCHELL - DIRECT                    276

1    the middle of this chart, tooth 8 and tooth 9 are

2    their upper front teeth; right?

3        A.  Yes.

4        Q.  Okay.  And as we move across this chart and

5    then we can see tooth No. 16 up here would be the

6    furthest back on the top left side of patient's

7    mouth; correct?

8        A.  Yes.

9        Q.  And then on the bottom here, we circle that,

10   17 would be the tooth that's the furthest to the

11   back on the lower part of a patient's mouth;

12   correct?

13       A.  It's on the lower left, yes.

14       Q.  The lower left.  And then we move towards

15   the middle and teeth 25 and 24 are the front lower

16   teeth; right?

17       A.  Correct.

18       Q.  Okay.  And then we move back over to the

19   left and tooth 32 is a -- the back lower right side

20   of the patient's mouth; right?

21       A.  Yes.

22       Q.  Okay.  And if we look back at Mr. Smego's

23   dental chart for December 13, 2005, you see the list

24   of cavities that you diagnosed Mr. Smego with;

25   right?

MITCHELL - DIRECT                    277

1          A.  Yes.

2          Q.  And for all of the tooth numbers you put,

3    you also had a letter there; right?

4          A.  Yes.

5          Q.  And the first tooth is 2B; right?

6          A.  Yes.

7          Q.  And that's what you mentioned before, B

8    means buccal; right?

9          A.  Yes.

10         Q.  And buccal means the cheek side of a tooth;

11   correct?

12         A.  That's correct.

13         Q.  And 2B means that the cavity that you found

14   on Mr. Smego on that day was on tooth 2, but the

15   cheek side of that tooth; right?

16         A.  Yes.

17         Q.  And M on this chart means mesial; right?

18         A.  Yes.

19         Q.  Okay.  Mesial means the side of the tooth

20   that faces closest to the opening of the mouth;

21   right?  Or the front of the mouth?

22         A.  Toward the center, because it can be -- but

23   it's mesial when it's the side closest to the

24   midline of your mouth.

25         Q.  And then with D, distal, that would be the

MITCHELL - DIRECT                              278

1    side of the tooth that's furthest to the back or

2    away from the center?

3         A.  The backside, yes.

4         Q.  Okay.  And then we also mentioned O earlier,

5    occlusal, which you said is the top of the tooth;

6    right?

7         A.  Yes.

8         Q.  Okay.  So looking back at the cavities that

9    you found on Mr. Smego in 2005, we have 2B, which we

10   already talked about; right; is the tooth No. 2,

11   cheek side; right?

12        A.  Yes.

13        Q.  Okay.  Then I'm gonna show you another chart

14   where I've noted the -- on the tooth chart where we

15   can see Mr. Smego's cavities.  And the first one we

16   see is the 2B; right; that we just talked about?

17        A.  Yes.  It's just a little exaggerated,

18   because if you look at my diagram on my drawing, I

19   have a small circle on it and you have the whole

20   side filed in.

21        Q.  That is the right surface for the tooth?

22        A.  That is the buccal, but it just -- the

23   cavity based on mine is smaller, because you

24   generally try to represent how large the cavity is

25   and the location by your drawing or your charting.

MITCHELL - DIRECT                    279

1        Q.  And I apologize if that's a little off.  I'm

2   just trying to make sure the jury understands

3   exactly -- some of these charts are a little old, so

4   we're trying to make sure the jury understands the

5   surface where that tooth is going to be --

6        A.  No problem.

7        Q.  So if you go down the list on the first page

8   of Plaintiff's Exhibit 1, the next tooth is 6M;

9   right?

10        A.  Yes.  I wanted to just point something else

11   out.  If you look at the record on mine, if you look

12   where I have my dark lines for No. 6, it's on the

13   buccal surface.  And that's important because the

14   cavity is on the outside of his mouth versus, if you

15   were to look at 9 and 10, the cavity is on the

16   inside of his mouth.

17        So it actually -- the drawing is not through

18   and through, especially when you're doing anterior

19   teeth.  It's saying the mesial, but it's saying on

20   the buccal side of the mesial.  That's what it's

21   telling me.

22        Q.  You're saying you were able to note even

23   though it only says 6M on your chart --

24        A.  Right, because it's where I draw it.

25        Q.  Okay.  Then we move on to 7D.  And again,

MITCHELL - DIRECT                              280

1    this is just so the jury understand which side of
2    the tooth we're talking about here.
3         A.  Okay, yes.
4         Q.  7D would be the distal side you see there,
5    which is the backside of tooth 7; right?
6         A.  Right.
7         Q.  Okay.  And then we move on to tooth 8, which
8    is the next one you listed.  And it has mesial and
9    distal, which means on both the center and rear part
10   of that tool; right?
11        A.  Right, mm-hmm.
12        Q.  Okay.  And then tooth 9 you also noted had a
13   cavity on both the mesial and distal side, which is
14   the more center side as well as the rear side of
15   that tooth; right?
16        A.  Yes.
17        Q.  And then 10M would be the mesial side of 10,
18   which is the side of the tooth closer to the center;
19   right?
20        A.  Yes.
21        Q.  Okay.  And then moving around, the next one
22   you have is 18; right?
23        A.  Yes.
24        Q.  And 18B is again the buccal side of tooth
25   18?

1    A.  Yes.

2    Q.  This diagram shows the surface of 18, the

3  buccal side?

4    A.  Yes.

5    Q.  Okay.  And then we move on to the next

6  cavity was 200 on the occlusal side, which is the

7  top of tooth 20, this shows the surface where that

8  cavity was?

9    A.  Yes.

10   Q.  And then the next one is tooth 220, which is

11  again the top side.  This diagram shows the surface

12  of tooth 21 where Mr. Smego's cavity was?

13   A.  Yes, on 21.

14   Q.  Okay.  And then finally you noted a cavity

15  on tooth 31B; right?

16   A.  Yes.

17   Q.  And 31B here on this diagram we see is the

18  cheek side surface of tooth 31; right?

19   A.  Correct.

20   Q.  And again, these were all the cavities that

21  you diagnosed Mr. Smego with in 2005; right?

22   A.  Yes.

23   Q.  And if we look back at the first page of

24  Plaintiff's Exhibit 1 where you listed all these

25  cavities, they're in a section entitled services

1    planned; right?

2         A.  Yes.

3         Q.  And so this reflects different services, the

4    different cavities that as of December 13th, 2005,

5    you planned to fill for Mr. Smego; right?

6         A.  Yes, those were the services that -- the

7    cavities that he had; correct.

8         Q.  And it says services planned right on there.

9    Those are the cavities and fillings you planned to

10   do in the future for Mr. Smego?

11        A.  Yes.

12        Q.  And where you wrote comp on this chart,

13   that's an abbreviation for composite; right?

14        A.  Composite.  Yes.

15        Q.  Composite.  And that's a white filing?

16        A.  Yes.

17        Q.  And where you just wrote in a B or an M or a

18   D, those were going to be silver fillings?

19        A.  No.  I just -- anterior teeth I always put

20   composites in if I can.

21        Q.  And where you did write composite?

22        A.  9 and 10 would automatically be composites,

23   I just didn't write it.  But they are automatically,

24   because they're write anterior teeth.  You don't put

25   silver fillings in the front of a person's mouth.

MITCHELL - DIRECT                    283

1          Q.  Either way that means you're going to do a

2     filling?

3          A.  Yes.

4          Q.  Okay.  This first page of Exhibit 1 though

5     doesn't show that you actually did any fillings of

6     Mr. Smego's teeth on December 13th, 2005; right?

7          A.  That's correct.

8          Q.  You did not actually fill any of Mr. Smego's

9     teeth on December 13th, 2005?

10         A.  No, I did not.

11         Q.  And at this point you also hadn't planned on

12    extracting or pulling any of Mr. Smego's teeth

13    either; correct?

14         A.  That's correct.

15         Q.  To the left of the services planned area

16    there's an area with a few of your notes; correct?

17         A.  Under what?  I'm sorry.

18         Q.  To the left of the services planned area?

19         A.  Right.

20         Q.  There are a few of your notes.  In the left

21    most part of that area the first thing it says is

22    chief complaint; right?

23         A.  Yes.

24         Q.  And there it says "few cavities?"

25         A.  Yes.

MITCHELL - DIRECT                      284

1         Q.  That was what Mr. Smego was complaining of

2    on December 13th, 2005?

3         A.  Right.  What that area under chief complaint

4    is what the patient tells you when you ask the

5    patient what dental problems are you having.  They

6    have a right at that time to say, I have pain, I

7    have whatever.  At that time Mr. Smego said he had a

8    few cavities.

9         Q.  And that -- but that notation is also

10   consistent with the part of the chart that you

11   filled out after doing your examination that he did,

12   in fact, have cavities; right?

13        A.  That's correct.

14        Q.  And then a few lines down towards the

15   right-hand side there's a section entitled

16   allergies; right?

17        A.  Yes.

18        Q.  And in that section you wrote PCN and

19   Motrin; right?

20        A.  That's correct.

21        Q.  PCN stands for penicillin?

22        A.  Yes.

23        Q.  And Motrin is Motrin the painkiller?

24        A.  Yes.

25        Q.  And Motrin contains ibuprofen; right?

1        A.  Motrin and ibuprofen are synonymous.  One is

2   a trade number, one is a brand name.

3        Q.  Ibuprofen is the active ingredient in --

4        A.  Yes.

5        Q.  So Mr. Smego reported to you on

6   December 15th, 2005, that he was allergic to Motrin;

7   right?

8        A.  Mr. Smego said he was allergic to Motrin,

9   but he also followed with -- because the question is

10  penicillin is a documented allergy that people

11  always know about.  I mean if you have an allergy to

12  penicillin you have to have had a reaction; you've

13  broke out into hives, you've had some problem with

14  penicillin.

15      Motrin generally is a hypersensitivity to the

16  particular medication, not a real documented

17  allergy.  Mr. Smego said he had an allergy, but in

18  further discussion, it was a hypersensitivity.  It

19  irritated his stomach.

20          MS. MacDONALD:  Your Honor, I would move to

21  strike the last part of the witness's answer --

22          THE WITNESS:  I'm sorry.

23          MS. MacDONALD:  And direct the witness to

24  answer my question.

25          THE COURT:  I will do so.  Can I get my

MITCHELL - DIRECT                    286

1    court reporter to read the question back.

2        I will instruct the jury to disregard at this

3    time.

4        (The requested material was read.)

5    BY MS. MacDONALD:

6        Q.  You can answer the question, Mr. Mitchell.

7        A.  I'm not quite sure what I can say.

8        Q.  Can you read the question one more time,

9    Kathy?

10       (The requested material was read.)

11       A.  He said he had an allergy to Motrin.

12           THE COURT:  Counsel, would this be a good

13   time to stop, it's just about 4:30.

14           MS. MacDONALD:  That's fine with me, Your

15   Honor.

16           MR. VOGT:  Yes, Judge.

17           THE COURT:  All right.  If you'll take the

18   jury out.  This excuses you for the day.  Be sure

19   and leave your notebooks on your chairs.

20       And again, do not talk about the case amongst

21   yourselves or anybody else or do any research or any

22   other attempt to find out anything about the case.

23       We will reconvene at 9:00 tomorrow.

24       Thank you.

25       (The jury left the courtroom.)

MITCHELL - DIRECT                    287

1              THE COURT:  And Mr. Vogt, and Doctor, I
2      have to ask you to answer the questions without
3      adding to them.  Ms. MacDonald was very polite in
4      not objecting.  But she'll ask you a question and
5      ordinarily it's a yes or no response.  Sometimes
6      it's not, but you're not suppose to be your own
7      cross examiner, correcting your statements when
8      you've been impeached by opposing counsel.
9          So you'll explain that to Dr. Mitchell?
10             MR. VOGT:  I will, Judge.  We want to
11     finish this week.
12             THE COURT:  Pardon me?
13             MR. VOGT:  We want to finish this week.
14             THE COURT:  Susan, will you see if the jury
15     is gone.
16         We have windows in the courtroom so we want to
17     always make sure the jury is not in the hallway.
18         You may step down, Doctor.  If you want to
19     leave your exhibit there, you can.
20         All right.  We will see you shortly before nine
21     tomorrow morning.
22         (Court was recessed for the day.)
23
24
25

1

2

3    I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

4    Reporter, certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11                    This transcripts contains the

12                    digital signature of:

13

14                    Kathy J. Sullivan, CSR, RPR, CRR

15                    License #084-002768

16

17

18

19

20

21

22

23

24

25