1          IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
2               SPRINGFIELD DIVISION

3
RICHARD M. SMEGO,                   )
4                                   )
              PLAINTIFF,            )  08-3142
5                                   )
        VS.                         )  JURY TRIAL
6                                   )
DR. JACQUELINE MITCHELL,            )  SPRINGFIELD, ILLINOIS
7                                   )
            DEFENDANT.              )  VOL. II
8

9          TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SUE MYERSCOUGH
10          UNITED STATES DISTRICT JUDGE

11

FEBRUARY 25, 2015
12

A P P E A R A N C E S:
13

FOR THE PLAINTIFF:          MATTHEW CHARLES CROWL
14                          ANN H. MacDONALD
                            BRIAN O'CONNOR WATSON
15                          KAITLIN GRACE KLAMANN
                            SCHIFF HARDIN LLP
16                          233 SOUTH WACKER DRIVE
                            CHICAGO, ILLINOIS
17

18  FOR THE DEFENDANT:       ROBERT P. VOGT
                            BETHANY SUE CAMPBELL
19                          WELDON LINNE & VOGT
                            20 SOUTH CLARK STREET
20                          CHICAGO, ILLINOIS

21

22

23  COURT REPORTER:      KATHY J. SULLIVAN, CSR, RPR, CRR
                        OFFICIAL COURT REPORTER
24                      600 E. MONROE
                        SPRINGFIELD, ILLINOIS
25                      (217)492-4810

1                          I N D E X

2    WITNESS             DIRECT   CROSS   REDIRECT   RECROSS
     JACQUELINE MITCHELL   294     357      457        479
3    CAROL VANCE           488     508      525
     HUGHES LOCHARD        530     550
4

5

6

7

8

9

10                       E X H I B I T S

11   PLAINTIFF'S EXHIBIT
     NUMBER                    IDENTIFIED    ADMITTED
12
     Exhibit 10                   258          259
13   Exhibit 13                   322          322
     Exhibits 38 & 39             549          550
14   Exhibits 40 thru 47          549          549
     Exhibit 85                   329          331
15   Exhibit 97                   504          505

16

17
     DEFENDANT'S EXHIBIT
18   NUMBER                    IDENTIFIED    ADMITTED

19

20

21

22

23

24

25

```
1               P R O C E E D I N G S

2       *    *    *    *    *    *    *    *    *    *    *

3           THE COURT:  Court is reconvened.  Do we

4   have our full jury, Terry?

5           COURT SECURITY OFFICER:  Yes, ma'am.

6           THE COURT:  Okay.  If you will bring them

7   in.

8       Do we have a witness in the gallery?  Does

9   anybody know?

10          MR. CROWL:  No witnesses in the gallery,

11  Judge.

12          THE COURT:  Okay.  Thank you.

13      (Defendant Jacqueline Mitchell resumed the

14       witness stand.)

15      (The jury entered the courtroom.)

16          COURT SECURITY OFFICER:  One of the jurors

17  has a question.  You want me to bring it up to you?

18          THE COURT:  Yes.

19      Okay, I will mark this as Court's 1.  And I

20  will ask this after the attorneys have finished

21  their questioning.

22      Unless you wish me to -- do you wish to address

23  it now?

24          MS. MacDONALD:  Can we just see it, Your

25  Honor.
```

1          (The following sidebar discussion was held at

2      the bench, out of the hearing of the jury.)

3          MS. MacDONALD:  I think they flipped

4      further through the chart than we are yet.

5          MR. VOGT:  We'll get to it, in other

6      words, you think?

7          MS. MacDONALD:  Maybe we will --

8          MR. VOGT:  I understand the question.

9      They want to know what the marks are.

10          MS. MacDONALD:  We can --

11          THE COURT:  I don't let them ask

12      questions during --

13          MS. MacDONALD:  Maybe we will hold it.

14          THE COURT:  It probably makes more

15      sense if you can explain it now.

16          MS. MacDONALD:  With those other

17      pages.

18          MR. VOGT:  It may be cleared up in

19      today's testimony.

20          THE COURT:  Well, I'll still go ahead

21      and ask it.  And if -- I'll admonish them I

22      want the questions at the end.

23          MS. MacDONALD:  Right, yes.  A lot of

24      this will be more clear at the end.  Yeah,

25      right.

1           THE COURT:  Okay.  She told me she was

2       a French and English teacher.

3           MS. MacDONALD:  I'm a lawyer.

4           MR. VOGT:  I ain't nothing, Judge,

5       so --

6           THE COURT:  So who are the people in

7       the gallery?

8           MS. MacDONALD:  That's Mr. Smego's

9       parents.  And I believe that Mr. Crowl's

10      wife and mother.

11          MR. VOGT:  This is the cheering

12      section, Judge.

13        Judge, I talked to Brian Watson about

14      the fact that I worried -- I don't want any

15      reference made to Mr. Smego's parents being

16      here.

17          THE COURT:  No, absolutely.

18          MR. VOGT:  They're just people in the

19      gallery watching.

20          MS. MacDONALD:  Right.

21          MR. VOGT:  Thank you, Judge.

22      (The jury left the courtroom.)

23          THE COURT:  Well, we took care of a number

24      of things there.

25        Thank you for your question.  Ordinarily we

MITCHELL - DIRECT                    294

1    don't ask the questions during the examination

2    because many of these answers will be coming out as

3    the day progresses.  I'm not objecting to asking it

4    right now, I'm going to go ahead, I'm just telling

5    you that's how ordinarily we do it, because usually

6    these questions get asked.

7         So this is Court's No. 1.

8         Doctor, there are marks on 28, 29, 30, but no

9    mention of those have been made.  Are they cavities?

10             DR. MITCHELL:  Those were existing

11   fillings.

12             THE COURT:  Thank you.

13             DR. MITCHELL:  You're welcome.

14                  DIRECT EXAMINATION

15   BY MS. MacDONALD: (Cont'd)

16        Q.  Marchal, could we have the overhead on,

17   please.

18        Dr. Mitchell, when we left off yesterday we had

19   gone through the first page of Plaintiff's

20   Exhibit 1, which is Mr. Smego's dental chart, as of

21   December 13th, 2005; correct?

22        A.  Yes.

23        Q.  And Mr. Smego's dental chart on

24   December 13th, 2005, reflects that he had 12

25   different cavities in 10 different teeth; right?

MITCHELL - DIRECT                    295

 1        A.  Yes.

 2        Q.  And if we turn to the next page of

 3   Plaintiff's Exhibit 1, we see your progress note

 4   entry for that same visit; right?

 5        A.  Yes.

 6        Q.  And this progress note was written by you on

 7   December 13th, 2005?

 8        A.  Yes.

 9        Q.  And the note reads, "Exam, FMX clean."  And

10   then "medical update.  Next visit fill No. 31B,

11   sched. 2/22/05."  Right?  That's what the note says?

12        A.  No.

13        Q.  Let's go line by line.  The first line says

14   "exam FMX clean;" correct?

15        A.  Yes.

16        Q.  That means that December 13th, 2005, you did

17   an exam of Mr. Smego; right?

18        A.  Yes.

19        Q.  You did full mouth x-rays of Mr. Smego?

20        A.  Yes.

21        Q.  And that you cleaned Mr. Smego's teeth?

22        A.  Yes.

23        Q.  The next line says "medical update;" right?

24        A.  That's correct.

25        Q.  And that means that on December 13th, 2005,

MITCHELL - DIRECT                    296

1    you went through the area that we noted on the first

2    page of the chart going through the medical history;

3    right?

4         A.   That's correct.

5         Q.   And then in parenthesis here on the third

6    line we have 'NV;' right?

7         A.   Yes.

8         Q.   And NV means next visit?

9         A.   Yes.

10        Q.   And this means that your notation is your

11   plan?  Your plan for -- your plan for your next

12   visit; right?

13        A.   Yes.

14        Q.   And on the next visit -- and then you wrote

15   "fill No. 31B;" right?

16        A.   That's correct.

17        Q.   Okay.  And that means on the next visit you

18   were planning to fill No. 31B; right?

19        A.   That's correct.

20        Q.   And then what's that last word on the third

21   line?

22        A.   That says scale.

23        Q.   Scale.  And that was your plan for the next

24   visit?

25        A.   Correct.

MITCHELL - DIRECT                    297

1        Q.  Okay.  And then on the fourth line of this

2   note you say 2/22/05; right?

3        A.  Yes.

4        Q.  Okay.  And what you meant there is February

5   the 22nd, 2006?

6        A.  That would be correct.

7        Q.  So you were planning to fill Mr. Smego's

8   tooth 31B on February 22nd, 2006?

9        A.  Yes.

10       (The court reporter requested clarification.)

11           THE COURT:  Even though that appointment is

12   2/13/05?

13       Q.  No, the appointment is 12/13/05.  It got a

14   little cut off.

15           THE COURT:  Oh, okay.

16       Q.  Dr. Mitchell, that's your understanding?

17   That's what this note is, right?  The date was

18   12/13/2005?

19       A.  Yes.

20       Q.  Even though the left hand portion of that

21   one on the 12 is a little cut off on this copy?

22       A.  That's correct.

23       Q.  Okay.  And then notation at the bottom says

24   2/22/05?

25       A.  That's what it saws.

MITCHELL - DIRECT                    298

1       Q.  Okay, but the '05 was a typo?

2       A.  It was a written error, yes.

3       Q.  Written error.  Yes.

4       So what you meant was that in December of 2005,

5  your next visit with Mr. Smego would be on

6  February 22nd of 2006?

7       A.  Correct.

8       Can I just make one correction?  You said scale

9  and there's an LR next to it.  That means lower

10  right.

11       Q.  Thank you.

12       A.  You're welcome.

13       Q.  But you did not see Mr. Smego in February of

14  2006, did you?

15       A.  No.

16       Q.  You didn't see Mr. Smego for treatment at

17  all in 2006; right?

18       A.  That is correct.

19       Q.  You didn't see Mr. Smego between December of

20  2005 and June of 2007; right?

21       A.  That would be correct.

22       Q.  You didn't provide any dental care

23  whatsoever to Mr. Smego in 2006?

24       A.  Correct.

25       Q.  You didn't fill any of Mr. Smego's 12

MITCHELL - DIRECT                    299

1    cavities in 2006; right?

2         A.  That is correct.

3         Q.  The next time you saw Mr. Smego for dental

4    treatment was an appointment on June 24th, 2007?

5         A.  That is correct.

6         Q.  And if we flip to page 4 of Plaintiff's

7    Exhibit 1 we can see your notation for your visit

8    for Mr. Smego on June 24th, 2007; right?  It's the

9    second entry on the fourth page of Exhibit 1?

10        A.  Yes.

11        Q.  And this entry was 18 months after you first

12   diagnosed Mr. Smego with 12 cavities?

13        A.  Yes.

14        Q.  And when you saw Mr. Smego on June 24th,

15   2007, you didn't fill any of Mr. Smego's cavities;

16   right?

17        A.  No.

18        Q.  You filled other residents' cavities on

19   June 24th, 2007; right?

20        A.  I don't know, but probably.

21        Q.  Do you remember another resident by the name

22   of Mr. Stanbridge?

23        A.  Yes.

24        Q.  You filled two of his cavities when you saw

25   him on June 24th, 2007; right?

MITCHELL - DIRECT                    300

1        A.  I don't remember, but if you say so, yes.

2        Q.  Do you remember talking about this at your

3    deposition, Dr. Mitchell?

4        A.  Not really, but...

5        Q.  If we look back at the deposition you gave

6    in this case.

7        A.  Okay.

8        Q.  I asked you about an affidavit that you had

9    written about Mr. Stanbridge and I asked you

10    Paragraph 22 says: (As read)  "On June 24th, 2007, I

11    saw Mr. Stanbridge again.  I placed a filling in

12    teeth No. 6 and 7."

13        And you said yes.  That was your answer; right?

14        A.  If it says yes, yes, that was my answer.

15        Q.  On June 24th, 2007, all you did for

16    Mr. Smego was an exam and then four bitewings;

17    right?

18        A.  That's correct, that's what it says.

19        Q.  If we look at this note here, the first line

20    of the note here says exam; right?

21        A.  Yes.

22        Q.  And then this second where it says 4 BWGS,

23    means four bitewings; right?

24        A.  Yes.

25        Q.  And those are x-rays?

MITCHELL - DIRECT                    301

1          A.  Yes.

2          Q.  And then the next line of this note says

3     next visit fill No. 2 and 31; right?

4          A.  Correct.

5          Q.  And just like on your other note when you

6     wrote NV fill 2 and 31, that means you were planning

7     to fill tooth 2 and 31 on your next visit with

8     Mr. Smego; correct?

9          A.  Yes.

10         Q.  And then you noted you wanted your next

11    visit to be July 1st, 2007; right?

12         A.  Correct.

13         Q.  You didn't see Mr. Smego on July 1st, 2007

14    though, did you?

15         A.  No.

16         Q.  You next saw Mr. Smego on July 23rd, 2008;

17    right?

18         A.  Yes.

19         Q.  And we can see your notation for that visit

20    is the next one on page 4 of Exhibit 1; is that

21    right?

22         A.  Yes.

23         Q.  Okay.  And here we can see your notation for

24    that visit 7/23/07, and then you wrote 31B,

25    medicated fill; right?

MITCHELL - DIRECT                    302

1        A.  Yes.

2        Q.  And that means you did a temporary medicated

3   filling of Mr. Smego's tooth No. 31 on that date?

4        A.  Yes.

5        Q.  So you again did not do a permanent filling

6   of any of Mr. Smego's teeth on July 23rd, 2007?

7        A.  That is correct.

8        Q.  And the medicated filling you gave was a

9   temporary filling.  And those temporary fillings

10  you're always planning to do a permanent filling

11  later; right?

12       A.  That is correct.

13       Q.  And the point of a temporary filling is to

14  prepare a tooth to ultimately place that permanent

15  filling in it later?

16       A.  That's not true.

17       Q.  The point of the temporary filling is to

18  calm a tooth down so that you can place the

19  permanent filling in; right?

20       A.  That is correct.

21       Q.  And calming that tooth down allows you to

22  then more effectively place that permanent filling;

23  right?

24       A.  No.

25       Q.  Calming the tooth down is a necessary first

1  step before you place that permanent filling; right?

2      A.  That's correct.

3      Q.  And typically that temporary filling takes

4  about eight weeks to calm a tooth down before you

5  place the permanent filling; right?

6      A.  That's the time, yes.

7      Q.  And when you noted that you did the

8  temporary filling on tooth No. 31, you also noted

9  that the cavity was very close to the mesial nerve;

10 correct?

11     A.  Correct.

12     Q.  And we can see that notation right here,

13 very close to mesial nerve?  Right?

14     A.  Yes.  Could you move the screen a little bit

15 so I can read the entire thing.

16     There you go.  Thank you.

17     Q.  And then going back to that second line

18 there, it said B, medicated fill.  And then can you

19 read the last three words on the second line of that

20 notation?

21     A.  It says with Dycal and ZOE.

22     Q.  And that's the type of medicated filling you

23 did on that date?

24     A.  Yes.

25     Q.  And then we go to the fourth line of the

MITCHELL - DIRECT                    304

1    note -- I'm sorry, the third line of your note.  You

2    finished scale LR; right?

3         A.  Correct.

4         Q.  And that reflects that you scaled

5    Mr. Smego's teeth on that day?

6         A.  Yes.

7         Q.  And when you say scale, that means scraping

8    plaque off the tooth?

9         A.  Not plaque.  Plaque comes off without

10   scaling.  That was tartar and it was under the gums,

11   so I wanted to do that once he was numb.

12        Q.  And then the next line of July 23, 2007, in

13   parentheses is NV, which is next visit; right?

14        A.  Yes.

15        Q.  Fill No. 2?

16        A.  Yes.

17        Q.  And then DOB?  Right?

18        A.  Correct.

19        Q.  And those were the surfaces of No. 2 that

20   you planned to fill?

21        A.  Correct.

22        Q.  Okay.  And then you put next planned to see

23   Mr. Smego on August 6, 2007; correct?

24        A.  Correct.

25        Q.  And on July 23rd, 2007, you weren't planning

MITCHELL - DIRECT                    305

1    to pull tooth No. 2; right?

2        A.  No.

3        Q.  As we see in this note, you were actually

4    planning to fill tooth No. 2 with a cavity -- or

5    with a filling; right?

6        A.  Yes, that was the plan.

7        Q.  Okay.  And you also noted again that you

8    planned to see him August 6, 2007; right?

9        A.  Correct.

10       Q.  You didn't see Mr. Smego on August 6th,

11   2007, did you?

12       A.  No.

13       Q.  The next time you saw Mr. Smego was

14   August 25th, 2007?

15       A.  Yes.

16       Q.  And on August 25th, 2007, you determined the

17   decay in Mr. Smego's tooth had gone so far that it

18   was impossible to fill that tooth on that date;

19   right?

20       A.  Yes.

21       Q.  And therefore that tooth needed to be

22   pulled?

23       A.  Yes.

24       Q.  And here if we look at page 4 on Exhibit 1

25   we see your entry for August 25th, 2007; correct?

MITCHELL - DIRECT                    306

1          A.  Yes.

2          Q.  And the first line this says, it references

3     tooth 2; right?

4          A.  Yes.

5          Q.  Then is says e-x-t?

6          A.  Yes.

7          Q.  That's stands for extraction?

8          A.  Yes.

9          Q.  And again, extraction means the tooth was

10    pulled?

11         A.  Yes.

12         Q.  And then it says caries exposure?

13         A.  Yes.

14         Q.  And what does that mean, Dr. Mitchell?

15         A.  That the decay had entered into the pulp

16    when we were excavating the decay.

17         Q.  And then the next line says RX Motrin

18    600 milligrams?

19         A.  Correct.

20         Q.  And that means that on that date you

21    prescribed Mr. Smego Motrin to address any pain he

22    might have with the extraction of tooth No. 2?

23         A.  That's correct.

24         Q.  And then the third line.  Could you read the

25    third line for us?

MITCHELL - DIRECT                307

1        A.  Q6H.

2        Q.  What does Q6H mean?

3        A.  Every six hours.

4        Q.  That's when he's suppose to take the Motrin?

5        A.  Yes.

6        Q.  And then can you read the rest of that line?

7        A.  By mouth is PO.  PRN is as needed for pain.

8   Times seven days.

9        Q.  Those notes refer to your prescription for

10  Mr. Smego of Motrin?

11       A.  Yes.

12       Q.  And then your note here says, next visit

13  fill number 31B; right?

14       A.  Correct.

15       Q.  And so you prescribed Motrin to Mr. Smego on

16  this day to address the pain of having his tooth

17  pulled even though Mr. Smego had told you that he

18  was allergic to Motrin?

19       A.  Yes.

20       Q.  And you continued to prescribe Mr. Smego

21  Motrin even though there were other painkillers

22  available that you could have prescribed on that

23  day; right?

24       A.  I could have prescribed him something

25  different; correct.

MITCHELL - DIRECT                    308

1        Q.   You could have prescribed him Tylenol?

2        A.   I could have prescribed him Tylenol.

3        Q.   You could have prescribed him aspirin?

4        A.   That's correct.

5        Q.   But you didn't?

6        A.   No.

7        Q.   You just prescribed him Motrin?

8        A.   Correct.

9        Q.   The next note on your chart, page 4 of

10   Exhibit 1, is dated November 25th, 2007; right?

11        A.   Yes.

12        Q.   And this is an entry reflecting that you

13   actually saw Mr. Smego on November 25th, 2007;

14   right?

15        A.   That's correct.

16        Q.   You didn't see Mr. Smego on November 25th,

17   2007?

18        A.   No, I did not.

19        Q.   The note states:  (As read)  "Sent response

20   to Smego's therapist regarding dental services;"

21   right?

22        A.   Yes.

23        Q.   It was your understanding that Mr. Smego's

24   therapist had a concern in November of 2007, about

25   Mr. Smego not receiving dental services; correct?

                          MITCHELL - DIRECT                    309

1        A.  I don't know if it was a concern or how he
2   could access dental services.  That's why I said
3   dental services.
4        Q.  Well, we're gonna go back to your
5   deposition, Dr. Mitchell.
6        A.  Okay.
7        Q.  On page 213 of your deposition I asked you:
8   (As read)  "What was your entry on Mr. Smego's chart
9   on 11/25/07?"
10       And you said:  "It says sent response to
11  Smego's therapist regarding dental services."
12       And then I asked you:  "Do you know what that
13  note relates to?"
14       And you said:  "At this time I think he had a
15  concern about Mr. Smego not receiving dental
16  services."
17       That was your answer on that date; right?
18       A.  Okay, I did say I think he had a concern.  I
19  don't know.
20            THE COURT:  Could we have the jury taken
21  out please, Terry.
22       (The jury left the courtroom.)
23            THE COURT:  The jury is out of the room.
24       Mr. Vogt, did you talk to the doctor about not
25  volunteering additional responses when she's being

1    questioned and impeached by Ms. MacDonald?

2            MR. VOGT:  Yes, Judge, I did.

3            THE COURT:  Doctor, I want you to just

4    answer the question, not explain your answer.

5    Mr. Vogt will have the opportunity when he questions

6    you to allow you to explain further.  Ms. MacDonald

7    is entitled to the answer to the question she

8    possesses.  Do you understand?

9            THE WITNESS:  Yes.

10           MR. VOGT:  Doctor -- if I may, Judge.

11        The same rules apply to everyone, Doctor.  So

12   even though you may feel restricted or whatever the

13   words are, everyone else is the same way.  It's just

14   how the system works.  It will be fine, just like we

15   talked about.  All right, ma'am?

16           THE WITNESS:  Sure.

17           THE COURT:  Mr. Vogt is a very skilled

18   attorney and I'm sure he will elicit what you want

19   to say when it is his turn to question.  All right?

20           THE WITNESS:  I have a question?

21           THE COURT:  Yes.

22           THE WITNESS:  The statement said dental

23   services.  I answered her.

24           THE COURT:  Yes, and you went ahead and

25   volunteered I don't know.

1              THE WITNESS:  Well, I don't know,

2    because --

3              THE COURT:  The answer was given, you're

4    not to add on to it.  Do you understand?  Apparently

5    you don't understand.

6         We're gonna take a ten minute recess so

7    Mr. Vogt can talk to his client.  Court is in

8    recess.

9              MR. VOGT:  Thank you, Judge.

10        (A recess was taken.)

11             THE COURT:  Back on the record.  Mr. Vogt,

12   you've had a conversation with the doctor?

13             MR. VOGT:  Yes, Judge.

14             THE COURT:  Because I will stop in the

15   middle in front of the jury if it continues.  I

16   don't want to do that.

17             MR. VOGT:  No.  Doctor.  Dr. Mitchell,

18   okay, just answer the questions, okay.  We'll get

19   everything through today.  All right.

20             THE WITNESS:  Sure.

21             THE COURT:  And I apologize, Ms. MacDonald,

22   for interrupting your examination.

23             MS. MacDONALD:  Thank you.

24        (The jury entered the courtroom.)

25             THE COURT:  Please continue, Ms. MacDonald.

1        MS. MacDONALD:  Thank you, Your Honor.

2   BY MS. MacDONALD:

3        Q.  Dr. Mitchell, before we move on, I forgot to

4   ask you about something.  The visit before you

5   extracted Mr. Smego's teeth, the July 23rd, 2007,

6   visit, do you recall that?

7        A.  No.

8        Q.  If you look back up here at your note, you

9   noted that you did a medicated temporary filling on

10  tooth 31B on July 23rd, 2007; right?

11       A.  Yes.

12       Q.  But you didn't fill -- do a permanent

13  filling on any of Mr. Smego's teeth on July 23rd,

14  2007; right?

15       A.  Yes.

16       Q.  And -- but you did fill another resident at

17  Rushville's cavity on July 23rd, 2007; right?

18            MR. VOGT:  Judge, I object to this.  May we

19  approach?

20            THE COURT:  Yes, you may.

21       (The following sidebar discussion was held at

22       the bench, out of the hearing of the jury.)

23            MR. VOGT:  Judge, this is gonna

24       involve an entire trial into another

25       resident's teeth.  Patients are treated

1      based on their needs.  The fact that on

2      this occasion she provided a temporary

3      medicated filling on somebody else, that

4      she did another filling, that demands an

5      inquiry into the condition of the other

6      patient's teeth.

7           Now, when they told us about these

8      affidavits, Judge, it was for the purpose

9      of trying to assert that during periods of

10     time when Dr. Mitchell said she couldn't do

11     work because of machinery or equipment

12     failures she in fact did work on somebody

13     else.  That was the whole idea.  It was

14     Stanbridge and Lewis during the period of

15     time of August, 2006 to December, 2006.

16     And I remember the Court and I talking

17     about that we were very careful we didn't

18     want this case to spin off into a

19     comparison between this patient and other

20     patients.  Because how could I possibly do

21     it, I don't have their charts with me.

22     And the point is that Dr. Mitchell has no

23     ability to explain, well, I had to do the

24     permanent filling on the other person's

25     teeth because of A, B, C and D.  This

MITCHELL - DIRECT                    314

 1    patient is different from the other

 2    patient.

 3        There's no issue here with regard to her

 4    ability to do it.  She could have done a

 5    permanent filling if she felt it was

 6    medically or dentally necessary, but she

 7    did not.

 8        MS. MacDONALD:  At various times

 9    throughout this case some of the times when

10    she didn't do a filling they have blamed it

11    on supplies or a compressor being down or

12    something else like that.  The doctor is

13    going to testify that one of the reasons

14    Dr. Mitchell couldn't treat Mr. Smego at

15    certain times was because of a lack of

16    supplies.

17        This is the last one I'm gonna do.  I'm

18    entitled to block off that area and make

19    sure that they cannot argue that there was

20    a supply issue on that date.  That's all

21    that.  I'm not --

22        MR. VOGT:  She hasn't said anything

23    about that.  She said she did a medicated

24    filling and she was questioned by

25    counsel --

1          MS. MacDONALD:  You haven't questioned

2      her.

3          MR. VOGT:  I know, but -- again, if

4      she says, I did a medicated filling only

5      because there wasn't permanent filling

6      material available, perhaps that might be

7      something they can inquire.  But there's

8      been no evidence of that, there's going to

9      be no evidence of that.

10         THE COURT:  The objection is

11     overruled.

12         MR. VOGT:  All right, Judge.  Thank

13     you.

14     (The following proceedings were held in open

15     court.)

16         THE COURT:  Do you want that question read

17 back?

18         MS. MacDONALD:  That would be great.

19 Kathy, would you mind reading it.

20     (The requested material was read.)

21 BY MS. MacDONALD:

22     Q.  You may answer, Doctor.

23     A.  Yes.

24     Q.  And July 23rd, 2007, was the last time you

25 saw Mr. Smego before August 25th, 2007, when you

MITCHELL - DIRECT                     316

1    pulled his tooth No. 2?

2         A.  Yes.

3         Q.  Before we took a break we were looking at

4    the entry in your notes for November 25th, 2007,

5    when you did not see Mr. Smego but you sent a

6    response to his therapist regarding dental services;

7    right?

8         A.  Yes.

9         Q.  After you -- or after Mr. Smego's therapist

10   contacted you, you still didn't see Mr. Smego for

11   another nine months after that; right?

12        A.  Yes.

13        Q.  You next saw Mr. Smego on May 4th, 2008;

14   right?

15        A.  Yes.

16        Q.  And if you turn to the sixth page of

17   Exhibit 1, you can see your chart entry for that

18   visit; right?

19        A.  Yes.

20        Q.  And so even though the therapist contacted

21   you in November, 2007, expressing a concern that

22   Mr. Smego was not receiving dental services, you

23   waited another nine months to see him; right?

24        A.  Yes.

25        Q.  But you didn't do any permanent fillings on

MITCHELL - DIRECT                    317

1   May 4th, 2008, did you?

2        A.  No.

3        Q.  We can see on your note here you have tooth

4   31, medicated fill, B; correct?

5        A.  Yes.

6        Q.  And again, that's a reference to a temporary

7   filling on the B surface of tooth 31?

8        A.  Yes.

9        Q.  B is buccal; right?  As we discussed

10  yesterday.

11       A.  Yes.

12       Q.  That means the cheek side of the tooth?

13       A.  Yes.

14       Q.  Could you please read the next line of your

15  note there?

16       A.  It says electrosurgery.

17       Q.  And then the third line of your notes say RX

18  Motrin 600 milligrams; right?

19       A.  Correct.

20       Q.  That means that on March 4th, 2008, you

21  again prescribed Mr. Smego Motrin?

22       A.  Correct.

23       Q.  And then the fourth line of that note is

24  just your PRN order for him as to when he can take

25  the Motrin?

MITCHELL - DIRECT                    318

1       A.   Yes.

2            THE COURT:   What does it say?

3       Q.   Would you read it for everyone.

4       A.   (As read)  "One tab by mouth times seven

5   days PRN on as needed basis."

6            THE COURT:   Thank you.

7       Q.   The next time you saw Mr. Smego was on

8   June 22nd, 2008; right?

9       A.   Correct.

10       Q.   And there's a note here on the chart for

11   May 25th, 2008, but you did not actually see

12   Mr. Smego on that date; right?

13       A.   Incorrect.

14       Q.   You saw Mr. Smego, but you didn't do a

15   filling; right?

16       A.   That's correct.

17       Q.   And could you please read the note here on

18   May 25th, 2008, to the jury?

19       A.   (As read) "Check area, healing within normal

20   limits, wants --" that's all I can see.

21       Q.   Oh, I'm sorry.  I apologize.

22            MR. VOGT:  Could you read it again, ma'am.

23       Q.   Dr. Mitchell, could you read your note from

24   the beginning.  I'm sorry about that.

25       A.   (As read)  "Check area, healing within

1   normal limit, wants filling, unable to do, no

2   compressor."

3        Q.  And then on May 25th, 2008, you said you

4   couldn't fill Mr. Smego's tooth because the

5   compressor was broken?

6        A.  Correct.

7        Q.  But then -- and then you noted that your

8   next visit you were going to fill tooth No. 31B on

9   June 21st, 2008; right?

10       A.  Correct.

11       Q.  And then you ended up seeing Dr. -- or

12  Mr. Smego on June 22nd, 2008; right?

13       A.  Yes.

14       Q.  That's the note that's on the right-hand

15  side of page 6 of Plaintiff's Exhibit 1?

16       A.  Correct.

17       Q.  And on June 22nd, 2008, you placed a

18  permanent filling in Mr. Smego's tooth No. 31?

19       A.  Correct.

20       Q.  And that was the first permanent filling you

21  placed in any of Mr. Smego's tooth since 30 months

22  before when you diagnosed him with 12 cavities;

23  right?

24       A.  Correct.

25       Q.  You also did two permanent fillings on teeth

1    29 and 30; right?

2        A.  Correct.

3        Q.  That's what these notations mean?  31B,

4    that's the type of filling you did; right?

5        A.  Yes.

6        Q.  Could you read that to the jury?

7        A.  (As read)  "31 buccal amalgam, Dycal ZOE and

8    Varnish."

9        Q.  That's the material you actually used to

10   fill the cavity on that date?

11       A.  Yes.

12       Q.  And then the same for tooth No. 29.  Could

13   you read the note there next to 29?

14       A.  (As read)  "29 DO amalgam, Dycal, ZOE."

15       Q.  And that's the material you used to fill

16   that tooth?

17       A.  Yes.

18       Q.  And then for 30, would you read the notation

19   next to that entry?

20       A.  (As read)  "MO buccal, amalgam, Dycal ZOE."

21       Q.  And again, that was the material you used to

22   place a permanent filling in Mr. Smego's tooth 30?

23       A.  Yes.

24       Q.  And then in your parenthesis you note next

25   visit, right?  NV?

MITCHELL - DIRECT                    321

1      A.  Yes.

2      Q.  On the next visit you planned to fill tooth

3  No. 7 on the mesial and distal side.  The D,

4  correct?

5      A.  Correct.

6      Q.  That's the center side as we talked about

7  yesterday, the mesial is the -- the side of the

8  tooth that's to the front of the mouth or center

9  line of the mouth; right?

10     A.  Correct.

11     Q.  And the distal side is the side of the tooth

12  that's on the back side or closest to the rear of

13  your mouth?

14     A.  Correct.

15     Q.  Okay.  And then tooth 8, can you read your

16  note there for tooth 8?

17     A.  (As read)  "8 mesial and distal composites."

18     Q.  And so this note reflects that on the next

19  visit you planned to fill Plaintiff's cavities in

20  tooth No. 7 and tooth No.8?

21     A.  Yes.

22     Q.  And that you planned to do that on

23  September 21st, 2008?

24     A.  Correct.

25     Q.  And on June 22nd, 2008, you again prescribed

1    Mr. Smego Motrin; right?

2         A.  Doesn't say that.

3         Q.  I'm gonna show you what's been marked as

4    Plaintiff's 13.  Do you recognize Plaintiff's

5    Exhibit 13, Dr. Mitchell?

6         A.  Yes.

7         Q.  Plaintiff's Exhibit 13 are medication orders

8    for Mr. Smego; right?

9         A.  Yes.

10            MS. MacDONALD:  Your Honor, we offer

11   Exhibit 13 into evidence.

12            THE COURT:  Any objection?

13            MR. VOGT:  No, Judge.

14            THE COURT:  13 is admitted.  May I see it

15   so that I may mark it.

16        (Plaintiff's Exhibit 13 admitted.)

17            THE COURT:  Do you need this back?

18            MS. MacDONALD:  No, you may keep it, Your

19   Honor.

20   BY MS. MacDONALD:

21        Q.  And so Exhibit 13 are medication orders for

22   Mr. Smego; right, Dr. Mitchell?

23        A.  Yes.

24        Q.  And these medication orders at Rushville are

25   just like prescriptions; right?

MITCHELL - DIRECT                    323

1    A.  Yes.

2    Q.  Where a juror gets a small paper

3  prescription from their doctor, this is the

4  Rushville equivalent of that; right?

5    A.  Correct.

6    Q.  And here we see on the entry at the top

7  left-hand side this is your prescription of Motrin

8  for Mr. Smego.  You see his name over here, for

9  June 22nd, 2008; right?

10    A.  Yes.

11    Q.  And again you prescribed him Motrin,

12  600 milligrams; right?

13    A.  Yes.

14    Q.  And can you read the second line of your

15  prescription?

16    A.  (As read)  "Take one tablet by mouth, TID,

17  PRN, times seven days."

18    Q.  And again, you're prescribing Mr. Smego

19  Motrin in June 22nd, 2008, even though he told you

20  he was allergic to it?

21    A.  Yes.

22    Q.  If we turn to the second page of Exhibit 13,

23  we see your prior order for Motrin for Mr. Smego;

24  right?

25    A.  Yes.

MITCHELL - DIRECT                          324

1          Q.   This was the prescription you wrote after
2     you saw him on May 4th, 2008?
3          A.   Correct.
4          Q.   And again, you prescribed him Motrin?
5          A.   Yes.
6          Q.   Even though he was -- he told you he was
7     allergic to it?
8          A.   Yes.
9          Q.   If we turn to the third page of Exhibit 13,
10    we have your other prescription for Motrin; correct?
11         A.   Yes.
12         Q.   And this was the prescription you wrote on
13    August 25th, 2007?
14         A.   Correct.
15         Q.   That was the date that you pulled
16    Mr. Smego's tooth No. 2?
17         A.   Yes.
18         Q.   And again you prescribed him Motrin?
19         A.   Yes.
20         Q.   Again, that was even though Mr. Smego told
21    you he was allergic to it?
22         A.   Correct.
23         Q.   You next ended up seeing Mr. Smego after
24    your June 22nd, 2008 visit on September 22nd, 2008;
25    right?

1      Do you have Plaintiff's Exhibit 1 in front of

2  you, Dr. Mitchell?

3      A.  Yes, but I was waiting for you to put it on

4  the screen.  I'm sorry.

5          THE COURT:  It tends to blur, I don't know

6  if it's electromagnetic.

7      Q.  I'm sorry.  Let's talk about the entry here

8  on September 7, 2008.  Mr. Smego -- you did an exam

9  of him on that date; is that right?

10     A.  Correct.

11     Q.  But you did not fill any of his cavities on

12  September 4th, 2008?

13         THE COURT:  Do you mean September 4th?

14     Q.  I'm sorry, September 7th.

15     A.  No, I did not.

16     Q.  Okay.  The next time you filled a cavity for

17  Mr. Smego was on September 22nd, 2008?

18     A.  That's correct.

19     Q.  You filled cavities on Mr. Smego's front

20  teeth, which are teeth 6, 7 and 8; correct?

21     A.  Yes.

22     Q.  And we see on your note here your entry for

23  one filling on tooth 7; right?

24     A.  Correct.

25     Q.  Would you please read your entry there?

MITCHELL - DIRECT                    326

1        A.  (As read)  "No. 7 buccal distal lingual
2   composite shading 2 Dycal."
3        Q.  That's your procedure for filling tooth No.
4   7?
5        A.  Yes.
6        Q.  It includes the material you used to fill
7   tooth No. 7?
8        A.  Yes.
9        Q.  The next entry here is for tooth No. 7 as
10  well; correct?
11       A.  Yes.
12       Q.  And this reflects a filling you did on the
13  mesial side of the tooth or the front or center side
14  of the tooth 7?
15       A.  Correct.
16       Q.  Again you describe the procedure and
17  material you used on that date to fill tooth 7 on
18  the M side?
19       A.  Yes.
20       Q.  And then the next entry here is for tooth 8?
21       A.  Yes.
22       Q.  And can you read your entry next to tooth
23  No. 8?
24       A.  (As read)  "Facial composite shade A2
25  Dycal."

MITCHELL - DIRECT                  327

1      Q.  And what's facial composite mean?

2      A.  It's the same as buccal, but it's in the

3   front teeth.

4      Q.  So this reflects both the place of the

5   cavity that you filled and the procedure you did and

6   the material you used?

7      A.  Correct.

8      Q.  Then we see the next entry for tooth No. 8.

9   And again we have the surface, the mesial surface

10  that you filled the cavity on; correct,

11  Dr. Mitchell?

12     A.  Correct.

13     Q.  And then we have the procedure you did?

14     A.  Correct.

15     Q.  And the same thing for this entry for 8, we

16  again see this distal side of the tooth there?

17     A.  Correct.

18     Q.  And then the procedure that you did to fill

19  that cavity?

20     A.  Correct.

21     Q.  And then the same for tooth No. 6 on this

22  date.  You see the surface of the tooth that you

23  filled; correct?

24     A.  Correct.

25     Q.  And then the procedure that you followed;

MITCHELL - DIRECT                    328

1    correct?

2        A.  Correct.

3        Q.  And then your notation at the end here again

4    says NV, next visit; right?

5        A.  Yes.

6        Q.  Finish 6/28 -- or I'm sorry, 9/28/08; right?

7        A.  Correct.

8        Q.  So you were planning to finish Mr. Smego's

9    fillings on December 28th, 2008?

10       A.  Not sure.

11       Q.  I'm sorry?

12       A.  I don't know what finish meant.

13       Q.  That was your notation on September 27th,

14   2008; correct?

15       A.  Correct.

16       Q.  And the cavities that you filled on

17   September 22nd, 2008, were cavities that you first

18   diagnosed Mr. Smego with on December 13th, 2005;

19   right?

20       A.  Correct.

21       Q.  And that was 33 months before you filled

22   them on September 22nd, 2008; right?

23       A.  Correct.

24       Q.  Between December 2005, when you diagnosed

25   Mr. Smego with 12 cavities, and September 22nd,

MITCHELL - DIRECT                329

1   2008, when you put in the first permanent filling,

2   you had seen Mr. Smego six times; right?

3        A.  Yes.  I guess.

4        Q.  You had seen Mr. Smego on June 24th, 2007?

5        Is that right, you saw Mr. Smego on June 24th,

6   2007?

7        A.  Yes.

8        Q.  You saw Mr. Smego on July 23rd, 2007?

9        A.  Yes.

10       Q.  You saw Mr. Smego in August of 2007?

11       A.  Correct.

12       Q.  You saw Mr. Smego May 4th, 2008?

13       A.  Correct.

14       Q.  You saw Mr. Smego May 25th, 2008?

15       A.  Correct.

16       Q.  And you saw Mr. Smego on June 22nd, 2008?

17       A.  Correct.

18       Q.  But you didn't fill the cavities in teeth 6,

19  7 or 8 until September 22nd, 2008?

20       A.  Correct.

21       Q.  You had certainly worked many hours at

22  Rushville between December, 2005 and September,

23  2008, hadn't you?

24       A.  Correct.

25       Q.  I'm gonna show you what's been marked as

1    Plaintiff's Exhibit 85, which are your answers to

2    interrogatories in this case.

3         During the course of this case Mr. Smego sent

4    you questions and then you provided answers to them,

5    right, Dr. Mitchell?

6         A.  Pardon me?  I didn't understand.

7         Q.  During the course of this case Mr. Smego

8    sent you written questions and then you provided

9    your written answers; right?

10        A.  I guess, yes.

11        Q.  Okay.  I'll let you take a look.

12        Plaintiff's Exhibit 85 are your answers to

13   Mr. Smego's interrogatories; right?

14        A.  Correct.

15        Q.  And those are written questions that

16   Mr. Smego sent to you and then you provided written

17   answers; right?

18        A.  Correct.

19        Q.  And if we look at the second page of

20   Exhibit 85 we see one of the questions --

21        Your Honor, may I submit Exhibit 85 into

22   evidence?

23             THE COURT:  Any objection?

24             MR. VOGT:  No, Judge, that's okay.

25             THE COURT:  Please proceed.  It is

1    admitted.

2        (Plaintiff's Exhibit 85 admitted.)

3    BY MS. MacDONALD:

4        Q.  Here we can see on the second page the

5    question that Mr. Smego asked you.  Asked you to

6    identify the dates and hours works at TDF from

7    January, 2006 through January, 2009, including the

8    hours worked while at the FTD in the HCU.

9        And then you have a list of the -- and then

10   your answer at the top says: (As read)  "Dr.

11   Mitchell doesn't have any information regarding the

12   hours that she worked from January, 2006 through mid

13   September, 2007.  The dates and hours that I was at

14   Rushville TDF from mid September, 2007 through

15   January, 2009, are set out forth below.  I do not

16   possess any records from August, 2008."

17       That was the first part of your written answer,

18   Dr. Mitchell?

19       A.  Yes.

20       Q.  And then you provided a list of the days and

21   hours that you worked from September, 2007.  And

22   then the list goes on and continues on the second

23   page, March, 2008 through December, 2008.  And then

24   it ends on January, 2009.  Right?

25       A.  Yes.

MITCHELL - DIRECT                    332

1          Q.  And this list that you compiled shows that

2     you worked over 60 shifts at Rushville between

3     September of 2007 and December -- I'm sorry, January

4     of 2009; right?

5          A.  Yes.

6          Q.  And you in fact worked other shifts between

7     January, 2006 to September, 2007, you just don't

8     have the records of exactly which shifts those were;

9     right?

10         A.  That's correct.

11         Q.  And you compiled this list from the records

12    you kept, Dr. Mitchell?

13         A.  Yes.

14         Q.  But you know that you did work other shifts

15    from January, 2006 until September, 2007; right?

16         A.  I answered.

17         Q.  Oh, I'm sorry, I didn't hear it.

18             THE COURT:  Did you say yes?

19         A.  I told her correct.

20         Q.  Okay, thank you.

21    Your hours -- you were working -- your hours at

22    that time were 12 hours a week from January, 2006 to

23    September, 2007; correct?

24         A.  Correct.

25         Q.  But you did not do a permanent filling for

1    Mr. Smego from January, 2006 to September, 2007;

2    right?

3        A.  Correct.

4        Q.  The last notation that we talked about on

5    the fourth page of Plaintiff's Exhibit 1 was an

6    entry you made on September 22nd, 2008; right?

7        A.  Yes.

8        Q.  The next time you saw Mr. Smego after

9    September 22nd, 2008, was October, 2010; right?

10       A.  Yeah, I guess.

11       Q.  If you would like to take a look at the

12   chart to confirm, Doctor, that's fine.

13       A.  Yes.

14       Q.  So you did not keep the follow-up

15   appointment that you planned for Mr. Smego on

16   September 28th, 2008; right?

17       A.  No.

18       Q.  You didn't see Mr. Smego at all in 2009, did

19   you?

20       A.  No.

21       Q.  And that's even though Mr. Smego had filed a

22   lawsuit against you in 2008?

23           MR. VOGT:  Objection, Judge.

24           THE COURT:  Objection is overruled.

25       Q.  You got a copy of Mr. Smego's lawsuit in

1    2008; right?

2        A.  Yes.

3        Q.  You acknowledged in May of 2009, that you

4    had received a copy of Mr. Smego's lawsuit where he

5    complained that he had not received dental care;

6    correct?

7        A.  Yes.

8        Q.  But you didn't read Mr. Smego's complaint

9    when you got it, did you?

10       A.  I don't remember.

11       Q.  You didn't read Mr. Smego's copy of his

12   lawsuit before May of 2009, did you?

13       A.  No, I didn't.

14       Q.  You had been served with a lawsuit where

15   Mr. Smego was complaining that you hadn't filled his

16   cavities, but you didn't care what he had to say in

17   that lawsuit?

18       A.  I can't say I don't care, so I don't know

19   which answer.  That would be correct, ma'am.

20       Q.  You didn't read the complaint?

21       A.  That's correct.

22       Q.  Isn't it kind of a big deal to be sued?

23           MR. VOGT:  Objection, Judge.

24           THE COURT:  The objection is sustained.

25       Q.  And you didn't -- did you eventually read

1    the complaint?

2         A.  Yes.

3         Q.  Your lawyer filed an answer on your behalf

4    to Mr. Smego's complaint on September 1st, 2009;

5    right?

6         A.  Yes.

7         Q.  Did you review that answer before your

8    lawyer filed it on your behalf?

9         A.  Yes.

10        Q.  During your deposition I think you were a

11   little unsure about whether you had actually

12   reviewed that answer before it was filed.

13             MR. VOGT:  Objection, Judge.

14             THE COURT:  Sidebar.

15        (The following sidebar discussion was held at

16        the bench, out of the hearing of the jury.)

17             MR. VOGT:  Judge, I don't know where

18        we're going with this.  Whether the answer

19        was filed, whether she saw it or not, is

20        immaterial to the case.  It's not relevant

21        to her treatment.

22             MS. MacDONALD:  It's material, Your

23        Honor.  It shows that Dr. Mitchell was not

24        responding or caring about Mr. Smego's

25        complaints about her.  And they're going to

1    argue repeatedly that he didn't complain

2    enough and that she didn't know.  She

3    received a copy of this lawsuit and she

4    didn't read it.  We don't know exactly when

5    she read it.  It's very relevant.

6         THE COURT:  Well, where are we going

7    with whether she reviewed the answer?  I

8    don't know what the answer says.

9         MS. MacDONALD:  I'm going with it that

10   she, at her deposition, rolled her eyes and

11   didn't know whether she had actually

12   reviewed the answer before they filed it.

13   And then she lied about whether she rolled

14   her eyes at the deposition.

15        MR. VOGT:  Judge, I don't know

16   anything about this rolling her eyes.  This

17   was a characterization of her of something

18   she claims Dr. Mitchell did, but then she

19   said I didn't roll my eyes.

20        MS. MacDONALD:  We have it on video,

21   Your Honor.

22        MR. VOGT:  Where is this going whether

23   she roles her eyes or not?

24        MS. MacDONALD:  It goes to her

25   credibility as to whether she actually

1        reviewed this stuff and whether she lied at

2        her deposition when she told me that.

3            THE COURT:  The objection is overruled.

4        (The following proceedings were held in open

5        court.)

6  BY MS. MacDONALD:

7        Q.  Dr. Mitchell, when we took the break we were

8  talking about whether you had reviewed your answer

9  to Mr. Smego's complaint before your lawyer filed it

10 on your behalf.  And during your deposition I think

11 you were not sure as to whether you had actually

12 reviewed that answer.  Do you recall that?

13       A.  Yes.

14       Q.  And when I asked you about it you kind of

15 rolled your eyes and then looked at your lawyer?

16           MR. VOGT:  Objection.  Could we have --

17       A.  I don't recall that, ma'am.

18           MS. MacDONALD:  Page 237 to 238.

19       Marchal, can we switch to the video.

20           THE COURT:  Let's give the jury five

21 minutes while we arrange this.

22           MS. MacDONALD:  Sure.

23       (The jury left the courtroom.)

24           THE COURT:  Court is in recess.

25       (A recess was taken.)

MITCHELL - DIRECT                    338

```
 1          THE COURT:  If you will bring the jury
 2   back, please.  Court is reconvened.
 3       (The jury entered the courtroom.)
 4          THE COURT:  Please proceed.
 5       (Video recording played in open court.)
 6          MR. VOGT:  Your Honor, may I approach on
 7   this issue?
 8          THE COURT:  Why don't we take the jury out.
 9   We're gonna give you your exercise today.
10       (The jury left the courtroom.)
11          THE COURT:  The jury is in the jury room.
12   Please proceed, Mr. Vogt.
13          MR. VOGT:  Judge, I don't -- I mean whether
14   the witness rolled her eyes, whatever, is immaterial
15   to this case.  I would move to strike it.
16       In the alternative, if the Court is going to
17   allow that to stay in, under the rule of
18   completeness I would like the next couple of
19   questions to be read so that the witness's full
20   answer, the jury can see that, too.
21          MS. MacDONALD:  Your Honor, I would just
22   suggest that Mr. Vogt could address this when he has
23   a chance to question Dr. Mitchell.
24          THE COURT:  Well, let me read it first.
25       Could I have it played back.  I missed the roll
```

MITCHELL - DIRECT                    339

1    of the eyes.

2        (Video recording played in open court.)

3            THE COURT:  The objection is overruled.

4    And I will allow you to read the rest of the

5    deposition -- or have your client after.

6            MR. VOGT:  During my --

7            THE COURT:  Yes.

8            MR. VOGT:  All right.  Thank you.

9            THE COURT:  Let's bring the jury back.

10       (The jury entered the courtroom.)

11           THE COURT:  Please proceed.

12           MS. MacDONALD:  Thank you, Your Honor.

13   BY MS. MacDONALD:

14       Q.  Dr. Mitchell, when I asked you at your

15   deposition whether you had read your answer to

16   Mr. Smego's complaints, you rolled your eyes, didn't

17   you?

18           MR. VOGT:  Objection again, Judge, on this

19   subject.  It's been asked and answered.

20           THE COURT:  The objection is overruled.

21       A.  No.

22       Q.  Let's play it one more time.  Will you dim

23   the lights please, Marchal.

24       (Video recording played in open court.)

25       Q.  You rolled your eyes, didn't you, Dr.

1    Mitchell?

2        A.  No.  A roll of an eye is (witness

3    demonstrates).  I didn't do that.  I glanced up and

4    I answered you.

5        Q.  And you made that facial expression because

6    you hadn't read the answer your lawyer filed for

7    you; right?

8        A.  That is not correct, ma'am.

9        Q.  So your testimony here today is that as of

10   September 1st, 2009, you knew Mr. Smego was

11   requesting your dental services in his lawsuit;

12   right?

13       A.  Yes.

14       Q.  You didn't see Mr. Smego again until

15   October 24th, 2010, did you?

16       A.  That's correct.

17       Q.  On October 24th, 2010, you didn't fill any

18   of his cavities, did you?

19       A.  No.

20       Q.  If we look at Plaintiff's Exhibit 1, page

21   12, you can see your entry for the October -- I'm

22   sorry, Marchal, could we switch back.

23       We can see your entry for October 24th, 2007;

24   right?

25       A.  Yes.

MITCHELL - DIRECT                    341

1        Q.  Your entry on October 24th, 2010, says,
2    annual exam, four bitewings; right?
3        A.  Correct.
4        Q.  Four bitewings, that refers to the x-rays;
5    right?
6        A.  Yes.
7        Q.  And then it says, recurrent decay on, then
8    can you read that note there?
9        A.  Distal lingual.
10       Q.  Distal lingual, that's the side of the
11   tooth; right?
12       A.  Yes.
13       Q.  The back, tongue side of the tooth?
14       A.  Yes.
15       Q.  Okay.  Number 8, recurrent decay on, then
16   can you read that?
17       A.  Mesial lingual.
18       Q.  Mesial lingual side.  That's the front or
19   the center, tongue side of the tooth No. 7; right?
20       A.  Correct.
21       Q.  And then you wrote plaque present?
22       A.  Correct.
23       Q.  But you didn't fill any of Mr. Smego's
24   cavities?
25       A.  No, I did not.

1      Q.  You're the person who decides how long

2   you're going to spend with a patient; right?

3      A.  No, I do not.

4      Q.  We're gonna go back to your deposition

5   again, Dr. Mitchell.  On page 187, I asked you:  (As

6   read)  "Who determines how long a dental visit will

7   last?"

8      And your answer was:  "I guess the actual

9   dentist.  Once the person is in and how many people

10  are on the schedule.

11     "That would be you; right?

12     "It would be me."

13     A.  Yes.

14     Q.  So you are the person who decides how long a

15  visit will last?

16     A.  Yes.

17     Q.  But on October 24th, 2010, you didn't fill

18  any of Mr. Smego's cavities; right?

19     A.  Correct.

20     Q.  And the next time you actual filled any of

21  his cavities was on March 27th, 2011; right?

22     A.  Correct.

23     Q.  And that was 18 months since the last time

24  you filled a cavity for Mr. Smego; right?

25     A.  Correct.

1    Q.  And March 27th, 2011, was 63 months since

2  you diagnosed Mr. Smego with 12 cavities in 2005;

3  right?

4    A.  Correct.

5    Q.  And March 27th, 2011, is also during the

6  pendency of this lawsuit; right?

7    A.  I don't understand your question.

8    Q.  March 27th, 2011, is over two years after

9  Mr. Smego filed his lawsuit; right?

10   A.  I guess, yes.

11   Q.  I'm gonna show you now what's been marked as

12 Plaintiff's Exhibit 10.  In the middle of

13 Plaintiff's Exhibit 10 is a progress note that you

14 wrote for Mr. Smego on March 27th, 2011; right?

15   A.  Yes.

16   Q.  And there is a note by another doctor above

17 it that you can see part of; right?

18   A.  Yes.

19       MS. MacDONALD:  Your Honor, we offer

20 Plaintiff's Exhibit 10 into evidence.

21       MR. VOGT:  No objection, Judge.

22       THE COURT:  10 is admitted.  I'll need to

23 mark 10 and our last exhibit.

24       MS. MacDONALD:  85.

25       THE COURT:  85, yeah.  10 and 85 are

MITCHELL - DIRECT                    344

1    admitted and so marked.

2         (Plaintiff's Exhibits 10 and 85 admitted.)

3    BY MS. MacDONALD:

4         Q.  Dr. Mitchell, your note on March 27th, 2011,

5    states:  (As read)  "Dental note.  Resident seen for

6    annual exam."

7         That's the first line of that note, dental

8    note, resident seen for annual exam; right?

9         A.  Correct.

10        Q.  And x-rayed?

11        A.  Correct.

12        Q.  And filling?

13        A.  Right.

14        Q.  And then that's your signature; right?

15        A.  Correct.

16        Q.  So on March 27th, 2011, you did an annual

17   exam for Mr. Smego?

18        A.  Correct.

19        Q.  And you filled cavities for Mr. Smego on

20   that day?

21        A.  That's correct.

22        Q.  Can we look back at Mr. Smego's dental

23   chart.  Page 13.  We can see the -- I'm sorry, it

24   starts on page 12.  The bottom of page 12.  You can

25   see your chart entry for the March 27th, 2011,

MITCHELL - DIRECT                                345

1    visit; right?

2        A.   Yes.

3        Q.   This is the first part of it here?

4        A.   Yes.

5        Q.   And then it continues on the other page?

6        A.   Correct.

7        Q.   And this note on March 27th, 2011, reflects

8    that you did five permanent fillings for Mr. Smego

9    on March 27th, 2011?

10       A.   Yes.

11       Q.   And it also shows that you did six temporary

12   fillings on that date; right?

13       A.   Correct.

14       Q.   And again, those temporary fillings were

15   fillings that you would need to make permanent

16   eventually; right?

17       A.   Correct.

18       Q.   They were teeth that would eventually still

19   need a permanent filling; right?

20       A.   Correct.

21       Q.   And when you filled those cavities on March,

22   2011, that was the first time you placed a permanent

23   filling in one of Mr. Smego's teeth since September

24   of 2008; right?

25       A.   Yes.

MITCHELL - DIRECT                    346

1        Q.   You next saw Mr. Smego about one year later;

2   right?

3        A.   Yes.

4        Q.   On March 11th of 2012?

5        A.   No, that's not correct.

6        Q.   It's not correct?

7        A.   No.

8        Q.   Will you look at page 14 of your chart.  We

9   see two entries; right?  And you're suggesting that

10  you actually saw Mr. Smego on April 3rd of 2011?

11       A.   Yes.

12       Q.   Do you remember seeing Mr. Smego on that

13  date?

14       A.   Yes.

15       Q.   Independently, apart from your notes?

16       A.   To say that I remember -- yes.

17       Q.   The next time you filled a cavity for

18  Mr. Smego was March 11th, 2012?

19       A.   Correct.

20       Q.   You admit you did not fill a cavity for

21  Mr. Smego on April 3rd, 2012 --

22       A.   Correct.

23       Q.   -- or 2011?

24       A.   Correct.

25       Q.   Let me ask that question.  You did not fill

MITCHELL - DIRECT                    347

1    a cavity for Mr. Smego on April 3rd of 2011; right?

2         A.  That's correct.

3         Q.  The next time you filled a cavity for

4    Mr. Smego is March 11, 2012; right?

5         A.  Correct.

6         Q.  And we see that notation here on page 13 of

7    Exhibit 1; correct?

8         A.  Correct.

9         Q.  And the first line there says, patient seen

10   for annual exam; right?

11        A.  Yes.

12        Q.  Three bitewings.  Correct?

13        A.  Yes.

14        Q.  And again that means x-rays, right?

15        A.  Correct.

16        Q.  And then can you read the second part of

17   that --

18        A.  3 PA x-rays.

19        Q.  PA x-rays offer you a slightly different

20   view of the tooth than the bitewings?

21        A.  Correct.

22        Q.  Okay.  Then we have notation for the filling

23   you did in tooth No. 3; right?

24        A.  Correct.

25        Q.  And again, this note describes the procedure

MITCHELL - DIRECT                    348

1    and the material you used to fill that tooth?

2         A.   Correct.

3         Q.   And then again you have your notation for

4    tooth 7; right?

5         A.   Correct.

6         Q.   And again the notation next to tooth 7 is

7    the procedure and material you used; right?

8         A.   Correct.

9         Q.   And it appears this copy is a little smudged

10   on some of those lines there; right?

11        A.   Yes.

12        Q.   But you know that this is your entry

13   relating to fillings of Mr. Smego's tooth 7; right?

14        A.   Yes.

15        Q.   And then the next line you see three entries

16   related to tooth 8; right?

17        A.   Correct.

18        Q.   And those entries reflect the procedure and

19   type of filling you did for Mr. Smego on March 11,

20   2012?

21        A.   Correct.

22        Q.   For those teeth?

23        A.   Yes.

24        Q.   March 11, 2012, was the last time you filled

25   any cavities for Mr. Smego; right?

MITCHELL - DIRECT                    349

1        A.  Correct.

2        Q.  You saw Mr. Smego in October, 2013; right?

3        A.  Correct.

4        Q.  But you did not fix any of Mr. Smego's

5   cavities then?

6        A.  No, I did not.

7        Q.  You saw Mr. Smego again in November of 2014;

8   right?

9        A.  Correct.

10        Q.  But you did not fill any of Mr. Smego's

11   cavities then either, did you?

12        A.  Correct.

13        Q.  In November of 2014, is actually the last

14   time you saw Mr. Smego for a dental appointment;

15   right?

16        A.  Correct.

17        Q.  You last saw Mr. Smego on Sunday,

18   November 23rd, 2014?

19        A.  Correct.

20        Q.  You saw him for an annual exam and x-rays?

21        A.  Correct.

22        Q.  You did not provide any fillings or other

23   treatment at that time?

24        A.  Yes.

25        Q.  You went over his dental problems on that

MITCHELL - DIRECT                    350

1   date?

2        A.  Yes.

3        Q.  And you talked about what he needed in terms

4   of dental care?

5        A.  Correct.

6        Q.  But you didn't fill any of his cavities?

7        A.  No, I did not.

8        Q.  And Mr. Smego's dental needs that you

9   discussed on that day was that he had cavities still

10  that need to be filled; correct?

11       A.  Correct.

12       Q.  And you recognize that he has four cavities

13  right now; right?

14       A.  Yes.

15       Q.  And three of those cavities are cavities

16  that you first diagnosed in December of 2005; right?

17       A.  Correct.

18       Q.  And they still have not been filled?

19       A.  Correct.

20       Q.  Dr. Mitchell, from 2005 to the present you

21  have worked three jobs; right?

22       A.  Yes.

23       Q.  You've worked at Stateville Correctional

24  Center as a dentist there?

25       A.  Yes.

MITCHELL - DIRECT                    351

1        Q.  You've worked at Stateville from 2005 to the
2   present?
3        A.  Yes.
4        Q.  And you work every week at Stateville;
5   right?
6        A.  Yes.
7        Q.  Monday to Friday, nine to five; right?
8        A.  Incorrect.
9        Q.  Did your hours change recently,
10  Dr. Mitchell?
11       A.  No.
12       Q.  You work 37.5 hours a week at Stateville;
13  right?
14       A.  Correct.
15       Q.  Monday to Friday?
16       A.  Monday to Friday.
17       Q.  You start at 9:00 a.m.?
18       A.  Incorrect.
19       Q.  What time do you start?
20       A.  8:00 a.m.
21       Q.  And then you're done by 4:00 p.m.?
22       A.  Correct.
23       Q.  And you've had that same schedule since
24  2005?
25       A.  Correct.

MITCHELL - DIRECT                    352

1        Q.  So at least from 2005 to the present you've

2   worked 37.5 hours a week at Stateville?

3        A.  Correct.

4        Q.  Monday through Friday?

5        A.  Correct.

6        Q.  And from 2005 to the present you've also

7   maintained your own private practice in Hyde Park in

8   Chicago; right?

9        A.  That's correct.

10       Q.  You're one of the owners of that practice?

11       A.  Yes.

12       Q.  And you work there about 15 to 20 hours a

13  week?

14       A.  Correct.

15       Q.  And you've kept that schedule since 2005?

16       A.  Correct.

17       Q.  You're also the dentist for Rushville

18  Treatment and Detention Facility?

19       A.  Correct.

20       Q.  And your current schedule there is you work

21  15 hours a week at Rushville; right?

22       A.  Correct.

23       Q.  And you've been at the treatment and

24  detention facility located at Rushville since 2006;

25  right?

MITCHELL - DIRECT                              353

1        A.  Correct.

2        Q.  And 2005 and early 2006, the treatment and

3   detention facility was in Joliet; right?

4        A.  Correct.

5        Q.  And Stateville required that you work Monday

6   to Friday; right?

7        A.  Correct.

8        Q.  They required that you have those hours

9   during the day eight to five?  Or eight to four;

10  right?

11       A.  Correct.

12       Q.  And if you -- and unless there was a

13  holiday, therefore the only days that you had

14  available to work at Rushville were Saturdays and

15  Sundays; right?

16       A.  That's correct.

17       Q.  Okay.  If you hadn't been working at

18  Stateville you could have scheduled your hours for

19  Rushville on a different day of the week; right?

20       A.  It would have been desirable, yes.

21       Q.  Last year you made approximately $200,000

22  from your three jobs, didn't you?

23       A.  Yes.

24       Q.  Your salary at Stateville, in 2014, was

25  $138,000?

MITCHELL - DIRECT                    354

1      A.  Yes.

2      Q.  And you made about 20 to $30,000 working in

3  private practice?

4      A.  Correct.

5      Q.  And you made about 40 to $60,000 working at

6  Rushville?

7      A.  Correct.

8      Q.  So last year from those three jobs and those

9  three salaries you made $200,000?

10      A.  Yes.

11      Q.  When you are working at Rushville you're

12  employer is Wexford Health Sources; right?

13      A.  Yes.

14      Q.  And Wexford is the company that the State of

15  Illinois hired to provide medical and dental staff

16  to Rushville?

17      A.  Yes.

18      Q.  So you are an employee of Wexford?

19      A.  Yes.

20      Q.  And Wexford has a contract with the State of

21  Illinois; right?

22      A.  Correct.

23      Q.  And so the State of Illinois pays Wexford;

24  right?

25      A.  Yes.

MITCHELL - DIRECT                           355

1        Q.   And then Wexford pays you?

2        A.   Yes.

3        Q.   And before Wexford was your employer another

4   company had that contract for the State of Illinois;

5   right?

6        A.   Correct.

7        Q.   That company was Addus Healthcare?

8        A.   Yes.

9        Q.   And that arrangement was the same; the state

10  would pay Addus and then Addus would pay you?

11       A.   Correct.

12       Q.   You were first hired by Wexford for your

13  work at Rushville in 2007; right?

14       A.   Yes.

15       Q.   And under that contract you were paid $72.50

16  an hour for your work at Rushville?

17       A.   Correct.

18       Q.   Under that contract you were paid $72.50 an

19  hour regardless of what type of dental services you

20  provided during that period?

21       A.   Could you clarify?

22       Q.   You were paid $72.50 an hour regardless of

23  whether you were doing a filling or an x-ray or an

24  exam or a cleaning; right?

25       A.   That's correct.

MITCHELL - DIRECT                          356

1          Q.  As long as it was some kind of dental

2    services you got paid that hourly rate; right?

3          A.  Correct.

4          Q.  And you signed a new contract with Wexford

5    in 2009; right?

6          A.  Correct.

7          Q.  And under that second contract you were paid

8    $75 an hour for your work at Rushville; right?

9          A.  Correct.

10         Q.  And again, you were paid $75 an hour for

11    your work at Rushville under the new contract

12    regardless of what specific type of dental service

13    you were providing?

14         A.  That's correct.

15         Q.  You got that $75 whether you did a filling

16    or an exam; right?

17         A.  That's correct.

18         Q.  And in May, 2010, you became an employee of

19    Wexford; right?

20         A.  Yes.

21         Q.  Your contract for 2010 provided that your

22    hourly rate remained $75 an hour?

23         A.  I think so, I'm not sure.

24         Q.  And again, you were paid $75 an hour for any

25    dental services --

MITCHELL - CROSS                    357

1        A.  Correct.

2        Q.  -- regardless of whether it was a filling

3   or an exam?

4        A.  Correct.

5            MS. MacDONALD:  I have no further questions

6   at this time.  We would -- plaintiffs would move to

7   enter the video into evidence as the next exhibit in

8   order.

9            THE COURT:  Any objection?

10           MR. VOGT:  Just for the prior reasons,

11  Judge.

12           THE COURT:  All right.  It is admitted and

13  I'll need to have it so I can mark it, too.

14           MS. MacDONALD:  Yes, thank you.

15           THE COURT:  Cross, Mr. Vogt.

16           MR. VOGT:  Thank you, Judge.

17                      CROSS EXAMINATION

18  BY MR. VOGT:

19       Q.  Good morning, Dr. Mitchell.

20       A.  Good morning.

21       Q.  One question that you weren't asked about at

22  all, I don't think the words were even used, was

23  healthcare request.  Do you know what a healthcare

24  request is?

25       A.  Yes.

MITCHELL - CROSS                          358

1       Q.  Tell the ladies and gentlemen of the jury in

2   connection with Rushville and the 550 residents that

3   are at Rushville, how does the healthcare request

4   system work?

5           MS. MacDONALD:  Objection, compound.

6           THE COURT:  The objection is overruled.

7       Q.  Go ahead, Doctor.  I'm sorry.

8       A.  Okay.  The residents have request forms on

9   the floors or they can get it from the nurses.  And

10  they're allowed to put their name, what unit they're

11  on and what their specific concern is.  And those

12  are forwarded down to the healthcare unit through

13  the nurses, et cetera.

14      Q.  And -- go ahead?

15      A.  That's all.

16      Q.  Okay.  If a resident wishes to see you, one

17  of the 550 at Rushville, do they fill out a

18  healthcare request form?

19      A.  For the most part, yes.

20      Q.  Okay.  And healthcare request forms are

21  picked up and triaged by who?

22      A.  The nurses.

23      Q.  Okay.  Now, before we go any further on that

24  line of questioning I want to back up and ask you

25  some follow-up questions to the questions that

MITCHELL - CROSS                     359

1    Ms. MacDonald asked you.  Okay, Doctor?

2        A.  Okay.

3        Q.  You mentioned the existing fillings in

4    December of 2005, that Mr. Smego had.  Can you tell

5    us about those, ma'am?

6        If you can look at the chart, can you tell from

7    the chart or would you --

8        A.  Yeah.  Okay, what do you want me -- what do

9    you want me to say?  What do you want me to talk

10   about?

11       Q.  Could you tell us what existing fillings

12   Mr. Smego had in December of 2005, when you first

13   examined him?

14       A.  Okay.  When Mr. Smego came in he had

15   fillings on tooth No. 2, an occlusal, on No. 3 he

16   had an occlusal, on No. 12 he had an occlusal, on

17   No. 14 he had an occlusal, on No. 18 he had an

18   occlusal, on 28 he had an occlusal, on 29 he had an

19   occlusal, and on 30 he had an occlusal, and 31 he

20   had an occlusal.

21       So all of them were like on the tops of his

22   teeth.

23       Q.  All right.  Now, if you could just -- I

24   apologize, Doctor, I should have been writing them

25   down.

1      Could you tell us the numbers of the teeth -- I
2  don't care whether they're occlusal or anything,
3  just the numbers of teeth that Mr. Smego had
4  cavities on when he walked in the door to see you.
5      A.  You want cavities or fillings?
6      Q.  Fillings.  I apologize.  Existing fillings;
7  you're right.
8      A.  Okay, one, two -- you want the numbers?
9      Q.  Just the numbers, Doctor, please.
10     A.  Okay.  That would be tooth 2, 3, 12, 14, 18,
11 28, 29, 30, and 31.
12     Q.  Now, you mentioned scaling during your
13 testimony.
14     You mentioned scaling during your testimony
15 earlier today.  What is scaling?  Can you explain
16 that to us?
17     A.  Scaling is a procedure that dentists use
18 when you have hard deposits on your teeth.
19 Generally speaking, it takes a little bit more
20 effort, you have to use either a mechanical device
21 or a hand-scaler to get the hard deposits off of
22 your teeth.
23     Q.  How do hard deposits on your teeth develop?
24 How do they get there?
25     A.  Well, the initial stages for most

MITCHELL - CROSS                    361

1    periodontal issues are it starts with plaque, which

2    is a soft area that starts on your teeth.  It's like

3    a film.

4        Calculus develops over a period of time when

5    you have the bacteria from your teeth, the soft

6    deposits, all of that.  If you don't remove it, it

7    eventually becomes hard and you require scaling.

8        Q.  And the plaque that you mentioned initially

9    that turned into a need for scaling, is that simply

10   a result of not taking care of your teeth?

11       A.  That and possibly not having a professional

12   cleaning over a period of time.  But in general it

13   develops -- it's a cumulative effect.  It develops

14   over a period of time.  Like I said, initially it's

15   going to be soft.  If you don't remove it, it

16   eventually gets hard.

17       Q.  And plaque builds up because the teeth are

18   not properly cleaned?

19       A.  Correct.

20           MS. MacDONALD:  Objection; form.  Leading.

21           THE COURT:  The objection -- yes, you're

22   correct, but I'll allow it.

23       Q.  Is that correct, ma'am?

24       A.  Yes.

25       Q.  Okay.  Again, I'm just trying to clear up

MITCHELL - CROSS                         362

1    some things on your testimony.

2        You initially saw Mr. Smego, as you've

3    testified, on December 13th, 2005?

4        A.  Yes, that's correct.

5        Q.  And at that time you testified earlier that

6    he told you that he had some cavities?  That was his

7    chief complaint?

8        A.  Correct.

9        Q.  Did Mr. Smego tell you about any other

10   complaints at that time other than he knew that he

11   had some cavities?

12       A.  He just said he has a few cavities.

13       Q.  If he had complained to you, if he was in

14   pain, if there was any type of debilitating pain or

15   anything like that, would you have charted that into

16   your notes?

17           MS. MacDONALD:  Objection; leading.

18           THE COURT:  The objection is overruled.

19       A.  Generally when you write chief complaint,

20   that's specifically what the inmate or the resident

21   tells you about their teeth.  It's the same thing in

22   a private office.  If you go to your dentist and the

23   dentist said, what problems are you having,

24   generally people tell them specifically what

25   problems they have and that's literally what you

MITCHELL - CROSS                  363

1    write, what they say.  You don't write what you

2    think they have, you write what they say.

3        Q.  Okay.  Now, after you examined Mr. Smego and

4    you identified these cavities, do you speak with the

5    patient after you do your exam?

6        A.  Yes.

7        Q.  And did your exam on December 13th, 2005,

8    was that his initial exam as part of his Rushville

9    stay or his DHS stay?

10       A.  Yes.

11       Q.  And after taking x-rays like you've

12   testified and doing your exam, did you speak with

13   Mr. Smego as you would in the ordinary course of

14   practice?

15       A.  Yes.  We actually move over to the viewing

16   box because we have the x-rays and we actually can

17   show you where the cavities are, et cetera.

18       During the clinical exam I usually give them a

19   mirror, they actually get to look in their mouth and

20   see what we're talking about.  Things that are

21   specific on the radiographs, I move over to the

22   viewer and I actually show them, you have a cavity

23   here, here, and here, if it can not be seen with

24   just your visual -- you know, with your eyes.

25       Q.  And you did that with Mr. Smego?

MITCHELL - CROSS                    364

1     A.  Yes.

2     Q.  You do that with all the patients?

3     A.  Yes.

4     Q.  After you did that -- now your notes, you

5   talked earlier about how it indicated that you had

6   put down NV or next visit in February of '06.  Do

7   you recall testifying about that earlier?

8     A.  Yes.

9     Q.  Tell us about that?  What -- why did you put

10   that note down?

11     A.  Generally speaking when I assess a person's

12   mouth I'm looking to see areas that could

13   potentially be a problem.  The location of that

14   particular tooth; and again, it's on my drawing; if

15   you look at tooth No. 31, it's down close to where

16   the end of the tooth is on the facial surface.

17   That's an area that's very close to the nerve,

18   because now the tooth is -- the further down you go,

19   the closer proximity to the actual nerve.

20     And so that's the reason I picked that

21   particular tooth, because of proximity of the cavity

22   to the actual nerve.  The rest of the decay in his

23   mouth was not that extensive, but that was the one

24   that I was most concerned about.

25     Q.  And that's tooth No. 31, Doctor?

MITCHELL - CROSS                365

1      A.  Yes.

2      Q.  Mr. Smego still has tooth No. 31 today?

3      A.  Yes.

4      Q.  And as you mentioned; I just want to make

5  sure I clarify this; the reason you were concerned

6  about tooth No. 31 was -- amongst all the other

7  teeth, was what?

8      A.  The location of the cavity.

9      Q.  Okay.  Now, you've already testified and the

10  records tell us that you did not see Mr. Smego in

11  February, 2006?

12      A.  Correct.

13      Q.  In fact, you didn't see Mr. Smego at all of

14  2006?

15      A.  No, I did not.

16      Q.  Okay.  Well, tell us about that.  Now,

17  you've examined Mr. Smego, as you've said.  You've

18  taken the x-rays, you've talked with him.  You've

19  put down in your chart next visit February, '06.

20  Then your day ends.  What happens to your chart, or

21  Mr. Smego's chart, I'm sorry, what happens to the

22  dental chart after you write your notes?

23      A.  Orders go to the nurses station for them to

24  take off whatever directions I've left with them.

25      Q.  Okay.  And the nurses would then record your

1    next visit note into their logging system?

2        A.  Yes.

3        Q.  Now, when February -- I think the note said

4    February 22nd, 2006.  Now, Doctor, on that date --

5    tell us what happens when you come into Rushville on

6    any given day?  It's a Saturday morning or Sunday

7    morning, you come into Rushville; how do you know

8    what patients to see?

9        A.  The nurses have advised me of these are the

10   people who have the problems, the most problems, et

11   cetera.  And they're the ones who've put in requests

12   in the time that I haven't been there.  So I walk in

13   and they say, these are most urgent people.  They

14   give me a list.  A lot of times there might be 40

15   people on the list.  And we work off the list.

16       Q.  The nurses are there Monday through Friday?

17       A.  No.

18       Q.  I'm sorry.  Nurses are there 24/7?

19       A.  Correct.

20       Q.  I apologize.  And you are not there Monday

21   through Friday?

22       A.  No.

23       Q.  And when you walk in, they give you -- you

24   are given a list of the patients to see based on

25   what?

MITCHELL - CROSS                    367

1        A.   People who are -- have expressed pain,

2   problems, whatever, whatever.  Then they will go

3   back and if there's people that I have left for them

4   that I'd like to see, they put them on.  If it's a

5   filling or if prosthetic cases have come in.  So

6   they actually add -- fill the list up with

7   everything else that needs to be seen.  But first is

8   always the people with pain or people who have

9   expressed problems in the time that I wasn't there

10  to the next visit.

11       Q.   Doctor, are you familiar with the term

12  triage?

13       A.   Yes.

14       Q.   What does triage mean?

15       A.   That's a system that they use to determine

16  people with the most severe issues or -- for

17  instance, if it's a medical emergency, they go with

18  the person with the most severe and they triage

19  backwards to the person with the least severe issue.

20       Q.   The nurses who prepare your list of patients

21  to see at Rushville, do they triage the patients?

22       A.   Yes.

23       Q.   And they put the patients with the most

24  severe problems on the top of the list and they move

25  on down to the least severe?

MITCHELL - CROSS                          368

1      A.   Correct.

2      Q.   Is that what triage means?

3      A.   Yes.

4      Q.   Okay.  On February 22nd of 2006, when you

5  arrived at Rushville that day you had a list of

6  patients?  Is that correct?

7      A.   Yes.

8      Q.   And did you go through your list like you

9  did on any other day at Rushville?

10     A.   Yeah.

11     Q.   Now, if Mr. Smego is not on your list on

12 February 22nd, 2006, whose decision was that?

13     A.   The nurses.

14     Q.   And based on what you've already testified

15 regarding the triage system, tell us why Mr. Smego

16 would not be on that list on February 22nd, 2006?

17     A.   Like I said, they schedule me about 40

18 people for the time that I'm there.  People get

19 removed for various reasons.  The biggest reason is

20 there are too many people that have expressed

21 problems with pain, et cetera, before I got back.

22 And so those are the people you see.

23     Q.   Doctor, today is February the 2015, of

24 course.  If I asked you who are you scheduled to see

25 in June of 2015, would you be able to tell me at

1    all?

2         A.  No.

3         Q.  If I asked you who residents -- which

4    residents at Rushville were going to have dental

5    problems in the next five days, would you be able to

6    tell me?

7         A.  No.

8         Q.  The people who are onsite 24/7 are the

9    nurses?

10        A.  Yes.

11        Q.  Is anyone else onsite with the nurses?

12   Medically that is?

13        A.  No.

14        Q.  Do you trust the nurses to prepare your list

15   for you?

16        A.  Yes.

17        Q.  Do you rely on them?

18        A.  Yes.

19        Q.  Is that the system that is in place and has

20   been in place at Rushville for your entire career

21   with the DHS?

22        A.  Yes.

23        Q.  And you've been working at the DHS facility

24   since when?

25        A.  2000.

MITCHELL - CROSS                          370

1      Q.  You've been working on DHS patients pursuant

2  to that system that we just discussed of the nurses

3  preparing you a list since 2001?

4      A.  Yes.

5      Q.  And that was for both Addus and then

6  Wexford?

7      A.  Yes.

8      Q.  The other doctors at the -- at Rushville, do

9  they follow the same system?

10      A.  Yes.

11      Q.  One of the notes; and we'll go over it in a

12  little more detail, but again, I just wanted to pick

13  up things.  You mentioned electrosurgery today?

14      A.  Yes.

15      Q.  Could you explain to us what electrosurgery

16  is?

17      A.  Actually it's a machine that we use that has

18  an electrical current.  It actually burns away

19  tissue without a lot of bleeding, et cetera.  It's

20  just a surgical technique to clear an area so that

21  you can work in that particular area.

22      Q.  One other thing, Doctor, that hasn't been

23  mentioned yet.  Going back; and forgive me; going

24  back to your December 13, 2005 exam of Mr. Smego.

25  All right, ma'am?

1      A.   Sure.

2      Q.   Had Mr. Smego already had teeth extracted?

3      A.   Yes.

4      Q.   How many?

5      A.   Three.

6      Q.   And where -- now, I know the numbering

7   system and I'll show you a drawing in a few minutes,

8   but what were the teeth?  Do you recall the number

9   of teeth that were extracted from Mr. Smego's mouth

10  before he came to Rushville?

11     A.   Yes.  He had his wisdom tooth No. 1, which

12  is on the upper right.  He had tooth No. 15, which

13  is on the upper left.  16, your wisdom teeth on the

14  upper left.

15     Q.   So that -- so he had three teeth that were

16  extracted.  15 and 16 on the left-hand side?

17     A.   Yes.

18     Q.   And then No. 1 on the right-hand side?

19     A.   Correct.

20     Q.   And No. 2, the one that was ultimately

21  extracted by yourself in August of 2007, was right

22  next to No. 1 way in the back upper?

23     A.   Yes.

24     Q.   Now, medicated fillings, Doctor, tell us

25  about medicate fillings.  What's the advantage of

MITCHELL - CROSS                    372

1    using a medicated filling and why do you use it?

2        A.  Generally speaking, and try not to be too

3    technical, a medicated filling does not allow

4    conductivity of cold or hot.  So that if you were to

5    drink something hot or cold on it, it will not

6    conduct the temperature changes to the tooth.

7        If you have a filling that is extremely deep,

8    et cetera, you don't want to put metal or a

9    composite because it will conduct the temperatures

10   and that will give you a false reading as to whether

11   the person is really still symptomatic, et cetera.

12       So I hope I broke it down easy.

13       So a medicated filling is a tool that we use to

14   really calm the tooth down and make sure that

15   there's not gonna be any pulpal problems with the

16   tooth later on.  That's all.

17       Q.  Now, when you're talking to your patients

18   like Mr. Smego and you prescribe medication for him;

19   you were asked some questions about Motrin today, do

20   you remember that?

21       A.  Yes.

22       Q.  Tell us what you say to the patient when

23   you're going to tell them -- when you're prescribing

24   a pain medication or any medication for the patient,

25   what do you tell the patient about what you're

MITCHELL - CROSS                              373

1   doing?

2           MS. MacDONALD:  Objection; compound.

3           THE COURT:  Could you break it down.

4       Q.  Sure, Judge, I apologize.

5       You testified earlier today about prescribing

6   Motrin to Mr. Smego.  Do you recall the testimony?

7       A.  Yes.

8       Q.  When you prescribe a medication like -- any

9   medication for a patient like Mr. Smego, do you

10  speak with the patient about your medication that

11  you're prescribing?

12      A.  Always.

13          MS. MacDONALD:  Objection; leading.

14          THE COURT:  I'll allow it.

15      A.  Always.

16      Q.  Tell us what you say, for example, with

17  Mr. Smego, tell us what you would say when you are

18  prescribing a patient with a medication like Motrin?

19      A.  Well, the first thing I always ask before I

20  prescribe any medication, do you have any allergies

21  to anything.  And that is at the time of the actual

22  prescription.  From there, if the person expresses

23  an issue or a concern with the medication, then you

24  actually want to find out specifically what was the

25  issue.

MITCHELL - CROSS                           374

1           Allergies are specific symptoms and signs and

2     things that occur with a person.  If a person says

3     that, well, if I take this medication it irritates

4     my stomach on an empty stomach, then we technically

5     take the medication, but you're advised to eat, et

6     cetera, before consuming the medication.  That's

7     just standard practice.

8           Q.  When you prescribed the Motrin to Mr. Smego

9     like you talked about earlier today did you talk

10    with him about the fact that you were making a

11    prescription for Motrin?

12          A.  Yes.

13          Q.  Would the patient need to know what

14    medications you were prescribing for him so that he

15    would then he able to go to the nurses and ask for

16    it?

17          A.  Yes.  Whenever you write a PRN the person

18    has to request it it's not automatically given to

19    them.  So they have to go to the med line and in

20    order to get the medication they have to ask for

21    that specifically.

22          Q.  Now, your notes, your orders that you

23    referred to earlier today, had two different

24    components.  One was, for example, you said every

25    six hours?

MITCHELL - CROSS                    375

1        A.  Yes.

2        Q.  Okay.  What does that mean?

3        A.  That's how often it would be available.

4        Q.  Meaning that if a patient who has an order,

5    a prescription order for Motrin every six hours,

6    they could get that dosage of Motrin every six hours

7    from the nurses?

8        A.  Yes.  At Rushville they have a different

9    kind of system.  Although they have med lines three

10   times a day, they can call and a nurse will bring up

11   medication at any time they ask for it as long as it

12   is within that six hour period.

13       Q.  Now, you also mentioned PRN a moment ago.

14       A.  Yes.

15       Q.  What does PRN mean?

16       A.  As needed for pain.

17       Q.  If a patient has a prescription like you

18   mentioned, as you did for Mr. Smego here, has a PRN

19   order for pain medication, what does that mean?

20   What does it allow the patient to do?

21       A.  He's allowed to ask the nurses for that

22   medication on an every six hour basis.

23       Q.  As needed?

24       A.  As needed, yes.

25       Q.  Let's talk about tooth No. 2, Doctor.

MITCHELL - CROSS                    376

1    Again, I'm trying to clear up some of these points.

2         You already testified earlier today that tooth

3    No. 2 had to be extracted?

4         A.  Correct.

5         Q.  Okay.  Tell us about what occurred in

6    connection with tooth No. 2?  And I'd like to go --

7    take it as slowly as possible.  Tell us where decay

8    was, everything that came into play with your

9    treatment of tooth No. 2 in August of 2007?

10        A.  Okay.  Initially when Mr. Smego was seen on

11   December the 13th, if you look at your records

12   you'll see that it had a buccal cavity, which means

13   on the outer surface of the tooth closest to your

14   cheek.

15        When I saw Mr. Smego in --

16        Q.  If I may help, Doctor, I think it's

17   August 27th.

18        A.  Actually I would like to go to June 24th,

19   2007.  No, I'm sorry, it is July 23rd, 2007, I made

20   a note that his next visit was a fill No. 2, distal

21   occlusal buccal.  In the interim between when he was

22   seen in 2013 to now, he had a distal cavity that had

23   developed.  And that's your third entry down on, I

24   guess it's page 4 of the chart.

25        Q.  May I ask you this question:  Do you mean

MITCHELL - CROSS                              377

1    between -- you said 2013.  Between 2005, when you

2    initially saw him --

3        A.  I mean December 13th, 2005, and when he was

4    seen on 6/24/07, during that exam period he had

5    another cavity on the distal of No. 2 that had

6    developed.  That's why I made a note DOB amalgam,

7    because he did still have the small buccal filling,

8    but he also needed a cavity on the distal of the

9    tooth.

10       Q.  Now, the distal cavity you just mentioned of

11   tooth No. 2.  Explain to us why that is significant

12   in connection with the need to extract the tooth?

13       A.  Because he actually had a caries exposure on

14   the distal of that tooth.

15       Q.  The initial cavity that you saw in tooth No.

16   2 in 2005 --

17       A.  Was on the -- on the buccal side.

18       Q.  That was a small cavity you mentioned?

19       A.  Yes.

20       Q.  All right.  So now we're going to -- you're

21   going to -- your initial thought, you testified, was

22   to do a cavity -- I apologize, a 15 -- a filling on

23   tooth No. 2?

24       A.  Yes.  That's what he would have had on the

25   buccal surface.

MITCHELL - CROSS                          378

1          Q.   Your plan when he walked in the office that

2     day was to do a filling?

3          A.   Yes.

4          Q.   Tell us what happened when you were trying

5     to work on tooth No. 2 that day?

6          A.   Well, once you start -- once you do the

7     preparation and you start excavating the decay, he

8     ended up with a caries exposure on the distal of

9     that particular tooth.

10          Q.   And then what happened as you were going

11     along?

12          A.   The caries exposure is -- you only have two

13     options with teeth like that.  You can either do a

14     root canal, because you cannot fill it with an

15     exposed nerve, or you have to extract the tooth.

16          Q.   Did you discover that caries exposure that

17     you mentioned as you were drilling Mr. Smego's tooth

18     No. 2 to provide a filling?

19          A.   Yes.

20          Q.   And you mentioned the two options a moment

21     ago for this tooth?

22          A.   Yes.

23          Q.   Why did you have to extract it?

24          A.   Because generally they don't do molar root

25     canals there.  They take too many appointment visits

MITCHELL - CROSS                 379

1   for you to actually do.  So we really provide

2   anterior root canals and we do some bicuspids, but

3   generally the molars can be a long, protracted

4   process and so generally we have to take the tooth

5   out.

6        Q.  Now, in connection with an extraction, do

7   you talk with the patient about the need for the

8   extraction?

9        A.  Yes.

10       Q.  Do you talk to the patient about consenting

11  to the extraction?

12       A.  Yes.

13       Q.  In this case; and we'll go over this in a

14  few moments; but in this case did you go over with

15  Mr. Smego the need to extract tooth No. 2?

16       A.  Yes.

17       Q.  Did Mr. Smego consent and agree to have

18  tooth No. 2 extracted?

19       A.  Yes.

20       Q.  Did he sign a consent for that?

21       A.  Yes.

22       Q.  You mentioned also with regard to teeth

23  number 6, 7 and 8, you mentioned shade A2?

24       A.  Yes.

25       Q.  Can you explain what that means and why you

MITCHELL - CROSS                           380

1    did it?

2         A.  The shade is really trying to give him -- to

3    match up what color he has in his mouth.  You try

4    not to put something that is really way off, because

5    you do want them to look nice.

6         We have, at that particular facility, only

7    maybe five or six shades.  You try to get it as

8    close as possible to that person's natural tooth

9    color.

10        Q.  It's a cosmetic feature?

11        A.  It's a cosmetic thing, yes.

12        Q.  Okay.  Just a couple last questions, Doctor.

13        The -- there are three -- as I understand your

14   testimony, there are three teeth that you diagnosed

15   Mr. Smego as having a cavity on in 2005, that he

16   still has cavities, the same cavities today?

17        A.  Correct.

18        Q.  Are -- is that in fact true?  Based on your

19   recent examinations of Mr. Smego, are the three

20   cavities that he has on those teeth, and they're 18,

21   19 and 21?

22        A.  No.

23        Q.  Which ones were they?

24        A.  The No. 18, a buccal; No. 20, occlusal; and

25   No. 21 an occlusal.

MITCHELL - CROSS                    381

1        Q.  And are the cavities that you diagnosed in
2   2005, that you saw in 2005, are they in the same
3   condition they are today?
4        A.  Yes.
5        Q.  Now, Mr. Smego knows about the existence of
6   those cavities.  Have you talked with him about
7   that?
8        A.  At least -- at least four different
9   occasions.
10       Q.  If Mr. Smego wanted you to repair the
11  cavities, would you?
12       A.  Yes.
13       Q.  In fact, every time, Doctor, that you
14  received healthcare requests relating to dental care
15  from Mr. Smego, have you provided treatment in
16  response to that healthcare request?
17       A.  Yes.
18       Q.  The jury has heard; and we'll go over the
19  documents in a few moments; about an attempt to
20  resolve.  Are you familiar with that, Doctor?
21       A.  Yes.
22       Q.  Can you tell us what is an attempt to
23  resolve at Rushville?  What's the purpose of it?
24       A.  If a resident has an issue, a problem with a
25  particular area, they have a right to file an

MITCHELL - CROSS                               382

1    attempt to resolve.  That is forwarded to the

2    particular area in which you work.  For instance,

3    I'm in the healthcare area, that would go through

4    the site administrator or the Director of Nurses and

5    then that would be forwarded to me.

6        My options are to then look at it, see what the

7    problem is.  Generally we talk with the resident

8    about what the problem is.  And if it's a scheduling

9    issue or the person hasn't been seen, then we try to

10   make sure they get scheduled.

11       I think the -- to mind, I had one person who

12   had just received a prosthetic case and then he lost

13   it and he wanted a new one.  And in order to resolve

14   it he felt he shouldn't -- they have to pay points

15   for things.  He didn't want to pay the 20 points to

16   get the new partials.

17       Actually, the resolution was that he had to pay

18   the points, because it was his negligence.  So they

19   have a right to -- with anything like that you can

20   file an attempt to resolve and it's our

21   responsibility to try to see if we can resolve it in

22   an -- what is it, amicable way.  Sorry.

23       Q.  An attempt to resolve like you mentioned

24   would go to the Director of Nursing?

25       A.  Yes.

1      Q.   And then it goes to you?

2      A.   Yes.

3      Q.   Well, did Mr. Smego ever file an attempt to

4  resolve with you?

5      A.   No.

6      Q.   If he had filed an attempt to resolve, the

7  Director of Nursing would have known?

8      A.   Yes.

9      Q.   You would have known?

10     A.   Yes.

11     Q.   And you would have had to sit down and speak

12  with Mr. Smego; what's your problem, what can we do

13  to fix this, how do we resolve this?

14     A.   Correct.

15     Q.   Now, in addition to the healthcare request

16  and the attempt to resolve, the residents can also

17  file a grievance?

18     A.   Correct.

19     Q.   And again, a grievance is a means by which

20  the resident can try to resolve a problem?

21     A.   Correct.

22     Q.   And all -- a bunch of different people at

23  Rushville are notified when a grievance is filed?

24     A.   Right; correct.

25     Q.   In this case did Mr. Smego ever, ever file a

MITCHELL - CROSS                                384

1    grievance against you?

2        A.  No.

3        Q.  If he had -- if he had done so, you would

4    have been notified about his concern or problem?

5        A.  Correct.

6        Q.  Doctor, let me ask you something.  The jury

7    has already heard that the plaintiff's expert in

8    this case will testify that there's no way that you

9    can take care of the dental needs for 550 residents

10   in 15 hours a week.  Do you agree with that?

11           MS. MacDONALD:  Objection, Your Honor.

12   Foundation.

13           THE COURT:  The objection is overruled.

14       Q.  Do you agree with that statement, Doctor?

15       A.  That's correct.

16       Q.  Okay.  And we'll go over that more in a few

17   moments.  I just want to clear up these ideas here.

18       I'm sorry.  Again, just to clear up a couple

19   matters, Doctor.  You talked about the jobs that you

20   have.  Stateville, for example?

21       A.  Yes.

22       Q.  All right.  Let's talk right now about your

23   entire background for a few minutes.  Where did you

24   go to dental school?

25       A.  University of Illinois.

MITCHELL - CROSS                     385

1        Q.  And when did you graduate from the

2   University of Illinois?

3        A.  1975.

4        Q.  Now, prior to going to University of

5   Illinois did you have an undergraduate degree?

6        A.  Yes.

7        Q.  And where did you get that degree from?

8        A.  Western Michigan University.

9        Q.  What did you get a degree in from Western

10  Michigan University?

11        A.  Was actually an occupational therapist.

12        Q.  All right.  And after getting your

13  occupational therapist degree, where did you go

14  work?

15        A.  I worked for the VA Hospital in Chicago.

16        Q.  Veteran's Affairs?

17        A.  Westside VA Hospital.

18        Q.  Okay.  And how long did you work at the VA

19  hospital?

20        A.  Three years.

21        Q.  Then what did you do?

22        A.  I started dental school in 1975.

23        Q.  Did you graduate in '79?

24        A.  Yes.

25        Q.  What did you do next?

MITCHELL - CROSS                    386

1          A.  I worked part-time as an assistant professor
2     at the University of Illinois.
3          Q.  What did you do as an assistant professor?
4          A.  I worked in the operative dentistry
5     department.
6          Q.  What did you do?
7          A.  I actually taught second and third year
8     dental students fillings and things like that.
9          Q.  Now, when you say you taught second and
10    third year dental students fillings; make sure I
11    understand; you taught them how to do fillings?
12         A.  Correct.
13         Q.  And how long did you work as a professor at
14    University of Illinois?
15         A.  Nine years.
16         Q.  And that takes us to what year?  '88?
17         A.  '88
18         Q.  All right.  In 1988, what did you do next?
19         A.  I actually went full-time with the
20    Department of Corrections.
21         Q.  And tell us about your experience since 1988
22    with the Department of Corrections?  How long --
23    let's go -- tell us, tell us your experience, ma'am,
24    from 1988 onward?
25         A.  Well, I was working as the chief dentist at

MITCHELL - CROSS                    387

1    Pontiac Correctional Center.  It's a maximum

2    security facility with roughly 2,000 inmates.  At

3    the time we had a condemned unit which housed the

4    condemned patients.  And I think that it was kind of

5    exciting, because you never knew what you were gonna

6    get from day to day.

7        So I worked there --

8        Q.  How long did you --

9        A.  -- until '92.

10       Q.  All right.  After 1992, where did you work

11   next?

12       A.  I went to Joliet Correctional Center.

13       Q.  How long did you work at the Joliet

14   Correctional Center?

15       A.  I was there from '92 until February of 2002.

16       Q.  Okay.  Now, during this period of time,

17   what -- were you working for private companies?

18       A.  At Pontiac, yes.  I worked for three

19   different contract companies.

20       Q.  Do you remember the names of those

21   companies?

22       A.  Prison Health Services, Correctional Medical

23   Services, and I want to say Wexford.  Yes.

24       Q.  All right.  And while you were associated

25   with Wexford during this period of time with the --

MITCHELL - CROSS                     388

1    prior to 2002, did you go to other prison facilities

2    to treat patients?

3         A.  Yes.

4         Q.  Can you tell us about that?

5         A.  I worked at Dixon Correctional Center when

6    they didn't have a dentist.  I would go in on the

7    weekends and do their emergency patients.

8         I worked at Tams Correctional Center, which is

9    a super max in the southern part of the state.  Same

10   thing.  It took them a while to find a dentist, so I

11   was there; fly in and do dentistry on the weekend.

12        I worked at Illinois Rivers Medium Security.  I

13   worked at Robinson Correctional Center, a medium

14   security.  Illinois River Correctional Center,

15   medium security.  And that's about it.

16        Q.  In each of these facilities you were brought

17   in because there was no existing dentist?

18        A.  Correct.

19        Q.  And when you were brought in how did you

20   know who to work on?

21        A.  They would hand me a list of patients that

22   were having problems.

23        Q.  And you would work down the list?

24        A.  Yes.

25        Q.  And did you say you were flown around to

MITCHELL - CROSS                    389

1    certain facility tease?

2        A.  Yeah.  Tams is not -- you'd have to fly to

3    St. Louis and then go to Cape Girardeau, Missouri,

4    and then by this little biplane they would drop you

5    down into Marian.  And then I -- they would have a

6    rental car for me.

7        Q.  Okay.  And in each case you went to those

8    facilities the nurses had prepared a list of

9    patients for you to see?

10       A.  Correct.

11       Q.  Now, from 2002, when you mentioned you were

12   at Joliet?

13       A.  Yes.

14       Q.  Tell us from 2002, moving forward to today's

15   date, where you would work?

16       A.  Well, I worked at Joliet.  And I actually

17   started at the Joliet facility for the -- for this

18   program in approximately 2000.  I actually set up

19   their equipment and stuff like that.

20       Q.  That's the DHS program?

21       A.  Yes.

22       Q.  Okay.  And were you part-time -- you've

23   always been part-time with the DHS; right?

24       A.  Yes.

25       Q.  All right.  As far as your full-time job, we

MITCHELL - CROSS                    390

 1   talked about up to 2002 being at Joliet.  Where was

 2   your full-time occupation after Joliet, from 2002?

 3       A.  That facility closed and they moved me to

 4   Stateville Correctional Center.

 5       Q.  And have you been at Stateville since that

 6   time?

 7       A.  Yes.

 8       Q.  And with your schedule of working at

 9   Stateville and working at Rushville, I take it you

10   must see your private practice patients at night?

11       A.  Yes.

12       Q.  All right, Doctor.  Well, let's -- what I

13   have done here, ma'am, is typed up your actual notes

14   so that we can clearly see exactly what you said.

15   And I'd like to run through these as quickly as we

16   can.

17            THE COURT:  Which notes are you referring

18   to?

19            MR. VOGT:  I'm sorry, Judge?

20            THE COURT:  Are these the same notes the

21   jury has been given?

22            MR. VOGT:  I'm sorry, Judge?

23            THE COURT:  Are these the same notes the

24   jury has been given?

25            MR. VOGT:  Yes, Judge, but typed up.  They

MITCHELL - CROSS                        391

1    are as identical as we could make them.

2           THE COURT:  And, Ms. MacDonald, your

3    exhibit number was?

4           MS. MacDONALD:  My exhibit number was 1.

5           THE COURT:  So that's what the jury has?

6           MS. MacDONALD:  Yes, Your Honor.

7           THE COURT:  Have you shown those to

8    Ms. MacDonald?

9           MS. MacDONALD:  Your Honor, may we approach

10   on this issue?

11          THE COURT:  Why don't we give the jury a

12   break.

13       (The jury left the courtroom.)

14          THE COURT:  We'll do ten minutes.

15       Mr. Vogt, may your client step down?

16          MR. VOGT:  I'm sorry?

17          THE COURT:  May she step down?

18          MR. VOGT:  Of course.  Any time you want.

19          THE COURT:  I'm gonna take a recess.

20       (A recess was taken.)

21       (The following proceedings were held outside

22       the presence of the jury.)

23          THE COURT:  Court is reconvened.

24          MR. VOGT:  Procedurally what I would like

25   to do is, try to move things along, is go through

1    all my exhibits and admit them at the end of the

2    witness's testimony as opposed to --

3            THE COURT:  That's fine.

4       Court is reconvened outside the presence of the

5    jury.  The sidebar you wish to have we will have

6    publically now.

7            MR. VOGT:  We have taken care of it.

8            MS. MacDONALD:  We've resolved it.

9            THE COURT:  All right.  Please bring the

10   jury in.

11      (The jury entered the courtroom.)

12           THE COURT:  Please be seated.  Court is

13   reconvened.  We resolved the objection.  And I need

14   to ask everyone in the courtroom; I have on an extra

15   robe and a suit, so I'm not cold.  Are you cold?

16      Okay.  Thank you.

17      Please proceed, Mr. Vogt.

18           MR. VOGT:  Okay.

19   BY MR. VOGT:

20      Q.  All right.  Dr. Mitchell, I'm showing you

21   what we've marked as Defendant's Exhibit 1-002A.

22   And what we've done here, ma'am, is we've typed up

23   your progress notes, a copy of which the jury

24   already has.  And I'd like to go through these

25   progress notes and talk with you about them.  Okay

MITCHELL - CROSS                           393

1    ma'am?

2         A.  Sure.

3         Q.  The first one is December 13th, 2005, and

4    again, some of this stuff you've already talked

5    about so I will move as quickly as we can.

6         You had an exam --

7         (The court reporter asked for clarification.)

8         Q.  I'm sorry.  An exam, full mouth x-rays, and

9    cleaning.  Now, when you say cleaning, Doctor, what

10   does that mean?

11        A.  That I did a gross clean of his entire

12   mouth.

13        Q.  And then we talked about your note for the

14   next fill on 31.  Do you see that, ma'am?

15        A.  Yes.

16        Q.  And then you next saw Mr. Smego on

17   June 24th, '07?

18        A.  Correct.

19        Q.  Now, in between December 13th, '05, and

20   June 24th, '07, did Mr. Smego submit any healthcare

21   requests to see you?

22        A.  No.

23        Q.  Did he submit any attempts to resolve

24   raising an issue with his teeth?

25        A.  No.

MITCHELL - CROSS                              394

1        Q.  When you treat patients like Mr. Smego at

2   DHS, do you tell them about if they want to see you,

3   they can submit a healthcare request?

4        A.  Yes.

5        Q.  Do all the residents at Rushville know that?

6        A.  Yes.

7        Q.  If Mr. Smego had submitted a healthcare

8   request any time between December 13th, 2005, and

9   June 24th, '07, would you have seen him?

10       A.  Yes.  The nurses would have put him on the

11  schedule.

12       Q.  If -- now, we talked about how it looks like

13  you wanted to see Mr. Smego on February 25th, 2006.

14  Do you see that, ma'am?

15       A.  Yes.

16       Q.  But you did not see him?

17       A.  No.

18       Q.  In a situation like that can the resident

19  simply say to the nurses, I should be on -- I should

20  see Dr. Mitchell?

21       A.  Yes.

22       Q.  Can they submit healthcare requests?

23       A.  Yes.

24       Q.  And of course they can submit an attempt to

25  resolve?

MITCHELL - CROSS                    395

1        A.  Correct.

2        Q.  During this period of time from December 13,

3   2005, to June 24th, 2007, did you have any idea that

4   Mr. Smego was having any type of problem or

5   complaint regarding his dental care?

6        A.  No.

7        Q.  All right.  We talked about the treatment on

8   June 24th, 2007.

9        July 23rd, 2007, also, this is tooth No. 31

10  now?

11       A.  Yes.

12       Q.  And you've got very close to mesial nerve

13  and that you scaled the lower right.  Do you see

14  that, ma'am?

15       A.  Yes.

16       Q.  Now, can you tell us, when you have a cavity

17  that's very close to the mesial nerve, how do you

18  treat that differently than another situation where

19  you have a cavity?

20       A.  Generally when I think that it's in close

21  proximity based on how deep the cavity is, then I

22  will do a sedative fill.  I put a liner, which is

23  Dycal, which kind of helps form reparative dentin

24  over the tooth.  Dentin is like the soft structure

25  inside of your tooth.  It helps to form reparative

MITCHELL - CROSS                    396

1    dentin and kind of protects the pulp.  And then I

2    put ZOE, which has eugenol in it, which kind of

3    calms the tooth down, et cetera.

4        Q.  That's what you did in connection here with

5    tooth No. 31?

6        A.  Yes.

7        Q.  And was that approach -- was your approach

8    to tooth 31 successful?

9        A.  I think so.

10       Q.  Does he still have -- does Mr. Smego still

11   have tooth No. 31 today?

12       A.  Yes.

13       Q.  Now, Motrin.  I know you were asked some

14   questions about and we talked briefly about it.

15       One second, Judge.

16       All right.  Doctor, what I'd like to show you

17   is parts of Defendant's Exhibit 8.  And as you can

18   see, Doctor, that's a medication order dated

19   September 5th, 2008, for Motrin?

20           MS. MacDONALD:  Objection, Your Honor;

21   foundation.  It's not the order.

22           THE COURT:  I thought she already testified

23   to this one.

24           MS. MacDONALD:  No, Your Honor.  I believe

25   that says discontinue Motrin, not --

MITCHELL - CROSS                          397

1              MR. VOGT:  That's right, Judge.  My

2     mistake, I'm sorry.

3              THE COURT:  Thank you.

4     BY MR. VOGT:

5         Q.  Doctor, you're familiar with physicians

6     orders?  You were asked some questions about that

7     earlier today?

8         A.  Yes.

9         Q.  All right.  What I'm showing you here as you

10    can see is a medication order.  Do you see on the

11    lower side it say 5/9, I believe '08?

12        A.  Yes.

13        Q.  And do you see the third medication down

14    indicates ibuprofen?

15        A.  Yes.

16        Q.  Is ibuprofen Motrin?

17        A.  Yes.

18        Q.  They are the same medication?

19        A.  Yes.

20        Q.  And by the way, is that your order or

21    another physician's order?

22        A.  Somebody else's.

23        Q.  Showing you another medication order dated

24    in 2008 also.

25              MS. MacDONALD:  Objection.  You need to

MITCHELL - CROSS                              398

1    remove your handwriting.

2              THE COURT:  And what exhibit are we?

3              MR. VOGT:  This is Exhibit No. 8, Judge.

4    BY MR. VOGT:

5         Q.  Okay.  Do you see that entry there, Doctor,

6    dated looks like 2/7/08 for Motrin?

7         A.  Yes.

8         Q.  Is that your order or another physician's

9    order?

10        A.  Another doctor's.

11        Q.  And then going down on the same page, do you

12   see that order there, 7/22/08 for Motrin?

13        A.  Yes.

14        Q.  Is that your order or another doctor's order

15   for Motrin?

16        A.  Another doctor.

17        Q.  And, Doctor, just to make sure, the other

18   orders for Motrin that we just reviewed issued by

19   other doctors at Rushville, that's the same

20   medication?  W-Motrin and ibuprofen is the same

21   thing?

22        A.  That's correct.

23        Q.  And that's the same medication that you

24   ordered for Mr. Smego?

25        A.  Yes.

MITCHELL - CROSS                    399

1        Q.  And why -- in your experience, Doctor, and

2    in the many years of dentistry that you've had,

3    why -- what advantage does Motrin have when it comes

4    to dental pain?

5        A.  It actually is one of the most effective

6    analgesics for dental pain.

7        Q.  Is that the medication that you typically

8    provide to patients who are suffering from dental

9    pain?

10       A.  Yes.

11       Q.  Did you ever see, Doctor, by the way, any

12   evidence in this case that Mr. Smego was diagnosed

13   as being allergic to Motrin?

14       A.  No.  It was just self-reported.

15       Q.  In your career have you ever seen a patient

16   who is allergic to Motrin?

17       A.  No.

18       Q.  All right.  Going back then to your typed up

19   notes, Doctor.  You talk about 5/4, when you gave

20   him Motrin.

21       I'm sorry, there's -- you were asked some

22   questions before about this notation on 11/25/07,

23   where it says: (As read)  "Sent response to Smego's

24   therapist regarding dental services."  Do you see

25   that?

MITCHELL - CROSS                              400

1      A.  Yes.

2      Q.  Now, the therapist that's being referred to

3  there.  The therapists at Rushville provide mental

4  health counseling or psychological services?

5      A.  I think so, yes.

6      Q.  And their records are kept confidential and

7  separate and distinct from the medical chart?

8      A.  Correct.

9      Q.  You, as the dentist, never see the

10  therapist's notes because they're kept highly

11  confidential?

12     A.  Correct.

13     Q.  Whereas the doctors' notes, like for example

14  Dr. Lochard, and your notes, the dentist notes, are

15  kept in a file that are intermingled and put

16  together?

17     A.  They're the same chart, yes.

18     Q.  Same chart, okay.

19     Now, during this period of time; again, when

20  Mr. Smego was apparently talking to his therapist;

21  could he just submit a healthcare request?

22     A.  Yes.

23     Q.  Isn't it -- under the resident Rushville

24  handbook, isn't a resident suppose to file

25  healthcare requests if they'd like to see the doctor

MITCHELL - CROSS                       401

1    or dentist?

2        A.  Correct.

3            MS. MacDONALD:  Objection; foundation.

4            THE COURT:  The objection is overruled.

5        Q.  Is that correct, ma'am?

6        A.  Yes.

7        Q.  And again, Doctor, if you had received a

8    healthcare request from Mr. Smego suggesting that he

9    wanted to see you for dental care, would you have

10   treated him?

11       A.  Yes.

12       Q.  Well, let me ask you this question:  Having

13   worked at Rushville for all these years, as well as

14   your experience at the Department of Corrections,

15   can you think of any reason, any reason, Doctor, why

16   Mr. Smego would not fill out a healthcare request if

17   in fact he had a dental problem?

18           MS. MacDONALD:  Objection, Your Honor.

19   Calls for speculation.

20           THE COURT:  The objection is overruled.

21       A.  No.

22       Q.  You never refused to see Mr. Smego, did you?

23       A.  No.

24       Q.  Okay.  And I know we've gone over these

25   already with Ms. MacDonald, so I don't want to beat

MITCHELL - CROSS                     402

1    a dead horse.

2        I guess the one question I wanted to ask you

3    about was this one here on September 7, 2008.  Do

4    you see that entry, ma'am?

5        A.  Yes.

6        Q.  It indicates that the patient wants to wait

7    until tomorrow, he wasn't feeling well?

8        A.  Yes.

9        Q.  Did you respect that request by Mr. Smego?

10       A.  Yes.  When I talked to him when he came down

11   he didn't want any fillings at that time.  He said

12   he didn't feel well.

13       Q.  And you took him at his word on

14   September 22nd?

15       A.  Yes.

16       Q.  Now, the October 12, 2013; it's the last

17   typewritten note or the last note we have in

18   connection with your care and treatment of

19   Mr. Smego, ma'am.  And this note, as you can see,

20   indicates an annual exam?  Do you see that, ma'am?

21       A.  Yes.

22       Q.  And it says, "Patient advised he has a great

23   deal of plaque on teeth."  Do you see that?

24       A.  Yes.

25       Q.  Tell us about that?  Why does someone get

1  plaque on their teeth like that?

2      A.  Not brushing.

3      Q.  That's an oral hygiene matter?

4      A.  Yes.

5      Q.  And then you've got, "Gingiva very inflamed.

6  Patient has recurrent decay on 7 and 10."

7      Now first of all, when it says on teeth --

8  gingiva very inflamed, could you tell what does that

9  mean, gingiva very inflamed?

10      A.  Okay.  Just a minor correction, it's

11  gingiva --

12      Q.  Okay, Gingiva.  Does that refer to the gums?

13      A.  Gums.  The gums are very inflamed.  And

14  generally speaking, if you're not brushing and stuff

15  like that, the gums will swell, they will start to

16  bleed, et cetera.  So when I make a notation like

17  that that means he's not really brushing properly.

18  These are front teeth and, you know, it's not that

19  they're not in the area that you can't see.

20      Q.  And then the term recurrent decay, what does

21  that mean?

22      A.  That the fillings on 7 and 10 now have more

23  decay around the margins of them.

24      Q.  All right.  Now were 7 and 10 two of the

25  teeth you had already provided fillings for?

MITCHELL - CROSS                                404

1          A.  Yes.

2          Q.  And after providing your initial round of

3    fillings, does the recurrent decay then refer to

4    decay that has occurred since the fillings were put

5    in?

6          A.  Correct.

7          Q.  And then you've got, "Patient advised put in

8    request for fills and cleans."  And you note that 21

9    and 22 are also there.  Do you see that, ma'am?

10         A.  Yes.

11         Q.  Now again, I'll ask you this:  Did Mr. Smego

12   ever put in a request simply saying "I'd like you to

13   take care of my cavities?"

14         A.  No.

15         Q.  Now, Doctor, what about that?  In your

16   experience as a dentist, can a patient choose not to

17   have their cavities repaired?

18         A.  Certainly.

19         Q.  That's a patient decision?

20         A.  Yes.

21         Q.  Now, I'd like to go back to this ibuprofen

22   issue.  You prescribed ibuprofen on other occasions

23   on -- well, on August 25th, 2007?

24         A.  Yes.

25         Q.  And by the way, Doctor, before I show this;

MITCHELL - CROSS                    405

1    are you familiar with a medication administration

2    record?

3        A.  Yes.

4        Q.  And can you tell us what is a medication

5    administration record for a patient?

6        A.  It's the record that generally is used by

7    nurses to show whether or not a patient receives

8    specific medications that have been ordered for him.

9    It lists all of the medications, it generally will

10   list the times in which they can have the

11   medication.  These are all ordered by the various

12   doctors.  And then on the -- it has all the days of

13   the month and then it shows whether or not you

14   accepted medication or whether you did not take your

15   medication.

16       Q.  All right.  Let me show you, this is

17   Defendant's Exhibit No. 4.  This is the medication

18   administration for the year August -- I'm sorry,

19   August, 2007.  Do you see that, ma'am?

20       A.  Yes.

21       Q.  And just to -- ibuprofen 600 milligrams,

22   could you read the rest of that for us, ma'am.

23       A.  It says: (As read)  "One tablet Q6H by mouth

24   PRN as needed for pain."  And then times seven days.

25   And it was started on 8/25, it had a stop date of

MITCHELL - CROSS                          406

1   9/1.

2        Q.  When you say Q6H, what does that mean?

3        A.  Every six hours.

4        Q.  And then PRN we talked about earlier --

5        A.  That's as needed for pain.

6        Q.  All right.  Then if we come down -- you can

7   see this is August, so we're moving down.  The

8   numbers there that you can see there, one, two,

9   three, four, what do those represent?

10       A.  Those are the days of the month.

11       Q.  And if we move this over we get to

12  August 25th.  Do you see that, ma'am?

13       A.  Yes.

14       Q.  And then you've got initials in the boxes as

15  you can see?

16       A.  Yes.

17       Q.  Initials are from whom?

18       A.  Those are the nurses.

19       Q.  And do the nurses put their initials in the

20  box confirming that the patient has taken the

21  medication?

22       A.  Correct.

23       Q.  Now, as you can see, Doctor, from the

24  initials there appear to be multiple different

25  nurses during this period of time who administered

MITCHELL - CROSS                           407

1    the Motrin to Mr. Smego?

2        A.  Correct.

3        Q.  And then lastly, this is the continuation.

4    Again, this is September, 2007.  You mentioned

5    earlier that it was gonna stop on September 1st?

6        A.  Yes.

7        Q.  And as you can see, this is for September,

8    the 1st of September?

9        A.  Correct.

10       Q.  And did that also reflect that Mr. Smego

11   took and was administered the Motrin?

12       A.  Correct.

13       Q.  Now, I'd like to ask you some questions

14   about the resident handbook for Rushville.  Doctor,

15   are you familiar with that, are you?

16       A.  Yes.

17       Q.  This is Defendant's Exhibit No. 12.

18       You're the dentist that's referred to in the

19   healthcare team?

20       A.  Yes, currently.

21       Q.  And this talks about -- as you can see on

22   the paragraph under the italics, it indicates all

23   medications given by the nurse.  Do you see that,

24   ma'am?

25       A.  Yes.

MITCHELL - CROSS                              408

1      Q.  Could you read the next sentence after that?

2      A.  (As read) "If you would like to see the

3  nurse, doctor, dentist, eye doctor or the foot

4  doctor, please fill out a healthcare request form.

5  The forms are available on the housing units."

6      Q.  Could you continue to read the next sentence

7  too?

8      A.  (As read)  "You may give a completed form to

9  the nurse during medication times or turn it in to a

10  staff member.  You will be called to the healthcare

11  unit when an appointment is available for you."

12      Q.  And then this was as you can see Ms. Carol

13  Vance.  Do you see that?

14      A.  Yes.

15      Q.  And then just to give the jury a flavor,

16  ma'am, let me show you Defendant's Exhibit 12.  Do

17  you recognize this document, ma'am?

18      A.  Yes.

19      Q.  And what is this?

20      A.  That's the form they would fill out.  It's a

21  healthcare request form.

22      Q.  And this is what the resident would fill out

23  if in fact the resident wanted to see a doctor,

24  dentist, podiatrist, like we just reviewed?

25      A.  Correct.

MITCHELL - CROSS                         409

1        Q.  And then down below that do you see the

2   portion where it says:  "Do not write below this

3   line?"

4        A.  Right.

5        Q.  What is the bottom portion for, ma'am?

6        A.  That if the patient were not seen, et

7   cetera, if there was a problem or whatever, that is

8   filled -- that would go to the -- I guess they have

9   a resolution person or a grievance person.  So if he

10  didn't get the services, et cetera, this form would

11  go to them for them to did a resolution on it.

12       Q.  Okay.  And if there was a response provided;

13  for example, he saw the doctor or dentist or this

14  was provided or that was provided; would that

15  information be put forth in the bottom portion?

16       A.  Not where it says "do not write below this

17  line."  Above that, if you -- I'm sorry, let me see.

18       Yes, that's -- can I see the whole form?  I'm

19  sorry.  Let me see.

20       No.  That's the part where I respond to it.

21       Q.  On the bottom portion is where the

22  healthcare professional responds?

23       A.  Right.

24       Q.  Then I want to just show you a quick --

25  okay.

MITCHELL - CROSS                           410

1            MS. MacDONALD:  For the record those were
2      pages 72 and 73 of Exhibit 12?
3            Q.  Yes.
4            Now, Doctor, you answered some questions on
5      questioning by Ms. MacDonald about Wexford.  Do you
6      recall that?
7            A.  Yes.
8            Q.  And Wexford is a large, national
9      corporation?
10           A.  Yes.
11           Q.  And you've worked for facilities that
12     Wexford has provided medical and dental services for
13     for a number of years?
14           A.  Yes.
15           Q.  And you testified I believe already that
16     what happens is DHS enters into contracts with
17     companies like Wexford and then you work or you're
18     hired by the company Wexford?
19           A.  Correct.
20           Q.  Because are you a DHS employee?
21           A.  No.
22           Q.  Okay.  Well, the one section -- in
23     connection with the Wexford contract, are you
24     familiar with the provisions that relate to dental
25     services?

MITCHELL - CROSS                    411

1          A.  For the most part, yes.

2          Q.  This is Exhibit No. 20, page 008.  I'd like

3    to ask you some questions about --

4          This is a provision, ma'am, of the Wexford

5    contract reflecting dental service.  Do you see

6    that?

7          A.  Yes.

8          Q.  The first section, A, could you describe

9    what does that reflect or relate to?

10         A.  Emergency services.

11         Q.  Okay.  How about Paragraph B, could you tell

12   us about that paragraph?

13         A.  When they're talking about laboratory

14   services, that's the service that actually does the

15   prosthetic cases like the dentures and partials and

16   things like that.

17         Q.  And that's an offsite laboratory?

18         A.  Yeah, we send the cases out.

19         Q.  The third paragraph or section of that

20   paragraph No. 13 dental services is Paragraph C.  Do

21   you see that, ma'am?

22         A.  Yes.

23         Q.  Could you read the first sentence?

24         A.  (As read)  "Vendors shall provide dental

25   checkups to facility residents within two years from

MITCHELL - CROSS                         412

1    the date of the last treatment or exam given and

2    more often if clinically indicated."

3         Q.  All right.  And that's what the contract

4    that Wexford has with DHS provides for as far as the

5    exams?

6         A.  Yes.

7         Q.  Could you read the next sentence for us?

8         A.  (As read)  "Routine care shall be provided

9    within 14 days of the facility resident's request

10   for treatment."

11        Q.  And then we are talking about request for

12   treatment there, we're talking about the healthcare

13   request?

14        A.  Yes.

15            MS. MacDONALD:  Objection; foundation.

16            THE COURT:  Foundation for this document?

17            MS. MacDONALD:  Dr. Vogt asked the witness

18   for her understanding of what the parties to the

19   contract meant when they included that language.

20            THE COURT:  The objection is sustained.

21   The response is stricken.

22        Q.  Doctor, the contract refers to a request for

23   treatment; do you see that?  In paragraph C?

24        A.  Yes.

25        Q.  At Rushville, what system of request for

MITCHELL - CROSS                           413

1    treatment is used?

2         A.  For the most part it's the request form.

3         Q.  The healthcare request?

4         A.  Yes.

5         Q.  Thank you.

6         Now, prior to Wexford, you've already

7    testified, Addus was the contract vendor who

8    provided service at the DHS?

9         A.  Yes.

10        Q.  This is Exhibit No. 18, page 018.

11        And again, Doctor, I just want to be sure that

12   we're clear about these provisions.  I believe if

13   you would take a look at this, this is the same

14   contractual language that you have just reviewed for

15   the Wexford contract?

16        A.  Correct.

17        Q.  Is that -- can you please take a look at

18   that and tell me if that's correct?

19        A.  Yes.

20        Q.  So both Addus and Wexford had the two year

21   provision as well as the fourteen day provision?

22        A.  Yes.

23        Q.  Now, in addition to the contracts that Addus

24   and Wexford entered into with DHS, you yourself had

25   contracts with Addus and Wexford?

MITCHELL - CROSS                    414

1      A.  Correct.

2      Q.  Now, what I'd like to show you now, ma'am,

3  is Defendant's Exhibit 17, the budget provisions

4  when you first started working for Addus.

5      All right.  Do you see that, ma'am?

6      A.  Yes.

7      Q.  That indicates that your hours of service

8  were going to be 24 hours per week back in July 1st,

9  2001?

10     A.  Yes.

11     Q.  How many residents did you have

12  responsibility for back in 2001, when you were

13  providing 24 hours a week to take care of those

14  residents?

15     A.  40 to 50.

16     Q.  That was in Joliet?

17     A.  Yes.

18     Q.  Now, the jury has already heard, and we'll

19  go over this in a few moments, that today you have

20  over ten times that many residents; is that correct?

21     A.  Yes.

22     Q.  I'm next gonna show you the second contract

23  with Addus.  I'm sorry, the first contract that we

24  just reviewed, as you may recall, provided you had

25  24 hours per week for the 45 or 50 residents that

1    you had.

2         A.  Correct.

3              MS. MacDONALD:  Mr. Vogt, would you

4    identify this?

5              MR. VOGT:  This is Exhibit 17.

6              MS. MacDONALD:  What page?

7              MR. VOGT:  Page 78.

8    BY MR. VOGT:

9         Q.  All right, I'm sorry.

10        All right.  Now, Doctor, can you tell us about

11   that contractual provision in 2003?

12        A.  The hours were cut in half.

13        Q.  In 2003, do you recall how many residents

14   there were at Joliet?

15        A.  About 120.

16        Q.  Now, they -- just to make sure I understand;

17   you initially said 40 to 50 residents you had

18   24 hours.  Two years later number of residents you

19   had tripled and they cut your hours in half?

20        A.  Yes.

21        Q.  And by the way, that's a decision for Addus

22   to make.  You don't decide that, do you?

23        A.  Addus and the state, I guess, decide; I

24   don't know.  Yeah.

25        Q.  Let me rephrase it.  The number of hours

MITCHELL - CROSS                          416

```
 1    that you're allowed to work at the facility is

 2    decided by Addus or DHS or someone else?

 3         A.  Correct.

 4         Q.  All right.  I'd like to now turn to Wexford,

 5    Doctor.  This is Exhibit No. 19, page 1.

 6         And, Doctor -- I'm sorry, I'd like to turn your

 7    attention to Paragraph 4.  Do you see that, ma'am?

 8         A.  Yes.

 9         Q.  You already mentioned that it was $72.50 an

10    hour.  And it says there for not more than 15 hours

11    per week.  Do you see that?

12         A.  Correct.

13         Q.  Now, in 2007, how many residents were at

14    Rushville?

15         A.  Four, four fifty.

16            THE COURT:  I'm sorry, did I miss this?  Is

17    this the 2007 contract?

18         Q.  2007 contract, Judge.  That's correct.  I'm

19    sorry.

20         Let me show you, Doctor, to make sure we're

21    clear.  Do you see the date on that contract, ma'am?

22         A.  Yes.

23         Q.  And what is that date?

24         A.  September 11, 2007.

25         Q.  And that's your letter of agreement with
```

MITCHELL - CROSS                        417

1    Wexford?

2         A.  Correct.

3         Q.  Okay.  And so now you are up ten times the

4    amount of residents when you had 24 hours and you

5    had only 15 hours to do it?

6         A.  Correct.

7         Q.  Doctor, I'm not gonna show you the contract,

8    the contract for 2009 provided the same number of

9    hours, 15 hours per week?

10        A.  Correct.

11        Q.  And today, in 2015, does Wexford, the

12   contract you have with Wexford provide that you are

13   to work:  "Not more than 15 hours per week?"

14        A.  Correct.

15        Q.  Is that what you do, Doctor?

16        A.  Yeah.

17        Q.  You're an hourly worker for 15 hours a week?

18        A.  Yes.

19        Q.  Now, in light of the population growth of

20   the residents at Rushville and you being the only

21   dentist, in addition to the reduction of your hours,

22   have you talked to Wexford about the need for

23   additional dentists?

24        A.  Yes.

25        Q.  Who have you talked to?

1        A.  I've talked to, her name is Danielle Walker,

2   and before her was Carolyn Mull.

3        Q.  And what have you told them about the need

4   for additional dental care?

5        A.  That it's almost impossible with -- they

6   want annual exams now every year.  And with 550

7   residents, that's a lot of time taken out of the

8   schedule.  Our population has burgeoned to almost

9   500 -- I think it's about 550 people.  They're

10  getting ready to open a whole new building, and it

11  may be open now, with the anticipation of another

12  300 patients coming.  For 15 hours, I'm doing as

13  many patients as I can.

14       Q.  Can you do -- can you take care of 550

15  residents yourself on 15 hours a week?

16       A.  No.

17       Q.  Now, you mentioned talking to Danielle

18  Walker-Lowe?

19       A.  Yes.

20       Q.  And before that was Carol Mull?

21       A.  Carolyn Mull, yes.

22       Q.  And she was with Addus?

23       A.  No, she was with Wexford.  She came after

24  Carol Vance.

25       Q.  Okay.  But she was before Ms. Walker-Lowe?

MITCHELL - CROSS                                419

1        A.  Yes.

2        Q.  And do you know, ma'am, have you looked into

3   what efforts Wexford is taking to try and get a

4   dentist?

5        A.  Yes.

6        Q.  And by the way, in addition, have you talked

7   to Wexford about the need for dental assistants?

8        A.  Yeah.

9        Q.  A dental assistant is essential to

10  appropriate dental care?

11       A.  Yeah.  They are actually able -- they allow

12  me to be able to see more patients.  Additionally, I

13  don't have to stay and port the models at the end of

14  the day, I don't have to develop the film after you

15  shoot them.  I do have more time available when I

16  have an assistant to actually do clinical care.

17       When I don't have an assistant I take the

18  x-rays, I develop the x-rays, I take the models, I

19  pour up all the models, I break them out, I pack the

20  cases, I clean the units, the whole nine yards.

21       Q.  And have you ever had a dental hygienist?

22       A.  No.

23       Q.  I'd like to now show you Defendant's

24  Exhibit 21.  And as you can see, ma'am --

25            MS. MacDONALD:  Your Honor, plaintiffs

MITCHELL - CROSS                         420

1    object.  There's been no foundation laid for this

2    exhibit.

3              THE COURT:  Objection is sustained.

4              MS. MacDONALD:  Before we show it to the

5    jury --

6    BY MR. VOGT:

7       Q.  We talked a few moments ago about whether

8    you have looked into what efforts Wexford was taking

9    in connection with trying to find additional

10   dentists at Rushville?

11      A.  Correct.

12      Q.  What have you done?  What have you looked

13   at?

14      A.  Well, when I talked to Danielle she said

15   they've actually posted for an as needed PRN

16   dentist.  Reason being I don't get to go to church

17   anymore because I'm working all the time.  And I

18   just need a weekend off every now and then.  And if

19   I get sick, I have no coverage, so I have to go.

20      Q.  Before we -- let me ask you about that.  Are

21   you the only dentist that's ever worked for the DHS?

22      A.  Yes.

23      Q.  Did you look at the website for Wexford in

24   connection with their dental postings?

25      A.  Yes.

MITCHELL - CROSS                          421

1          Q.  Let me show you now Defendant's Exhibit 21,

2    which is from Wexford Health.  Do you see that,

3    ma'am?

4          A.  Yes.

5          Q.  Can you see that, ma'am?  It says dentist

6    job, Rushville?

7          A.  Yes.

8          Q.  And that date was posted 11/30/2012?

9          A.  Yes.

10         Q.  And then it talks about the qualifications

11   and things like that?

12         A.  Correct.

13         Q.  That was for -- I'm sorry, this is for

14   what's called a per diem opportunity.  Do you see

15   that, ma'am?

16         A.  Yes.

17         Q.  What's a per diem opportunity?

18         A.  Hourly person.

19         Q.  There's also Exhibit 21-2, Defendant's 21-2.

20   This position, ma'am, refers to a PRN position.  Do

21   you see that?

22         A.  Yes.

23         Q.  What's a PRN position for a dentist?

24         A.  As needed.

25         Q.  So Wexford is looking for two different

MITCHELL - CROSS                          422

1  types of dentists to help you at Rushville?

2        A.  Yes.

3        Q.  We talked about the dental assistant.  Have

4  there been occasions at Rushville where you did not

5  have a dental assistant to assist you?

6        A.  Yes.

7        Q.  When was that?

8        A.  Probably 2010, starting in June, and I

9  didn't get an assistant that time until January of

10  2011.

11       Q.  During that period of time you were all by

12  yourself?

13       A.  Yeah.

14       Q.  Now, we talked earlier about tooth No. 2 and

15  your extraction of tooth No. 2 and the consent form.

16  Do you recall that conversation?

17       A.  Yes.

18       Q.  Let me show you Defendant's Exhibit No.

19  39-001.  And ask you about this attachment.

20       Do you recognize that handwriting, ma'am?

21       A.  Yes.

22       Q.  Is that your handwriting?

23       A.  Yes.

24       Q.  Okay.  And this talks about the extraction

25  for No. 2?

MITCHELL - CROSS                    423

1        A.  Yes.

2        Q.  Could you read underneath where it says "to

3   extract No. 2," could you read what it says there,

4   ma'am?

5        A.  (As read)  "This procedure and the risks

6   have been explained to me.  I have had an

7   opportunity to ask questions and I have received an

8   acceptable answer.  I'm signing this under my own

9   will and have not been forced into signing against

10  my will."

11       Q.  And then underneath that is that Mr. Smego's

12  signature?

13       A.  Yes.

14       Q.  And that's your signature underneath

15  Mr. Smego's?

16       A.  Yes.

17       Q.  And then the third signature underneath your

18  signature, who is that?

19       A.  Kelly Lawshea.  She was my assistant at the

20  time.

21       Q.  Dr. Mitchell, we had talked about tooth No.

22  2; we just mentioned it; occurred on August 25th,

23  2007?

24       A.  Yes.

25       Q.  And that's the only tooth that Mr. Smego has

1    had extracted by you?

2         A.  Yes.

3         Q.  This is Exhibit 2, page 58.

4         Doctor, I'd like you to take a look at a

5    therapy note of Mr. Smego dated, as you can see the

6    duration of time of contact was June 11th, 2007.  Do

7    you see that, ma'am?

8         A.  Yes.

9         Q.  And I've highlighted a portion of the record

10   there saying: (As read)  "Mr. Smego stated that he

11   had recently had teeth pulled and was in a lot of

12   pain and elected not to attend group."  Do you see

13   that, ma'am?

14        A.  Yes.

15        Q.  Now, ma'am, in June of 2011, had Mr. Smego

16   had any tooth -- teeth pulled?

17        A.  No.

18        Q.  In fact, he didn't have the teeth pulled

19   until several months after this?

20        A.  Correct.

21        Q.  All right.  Doctor, I've just got a few

22   more, okay?

23        We talked earlier about the medication

24   administration record.

25              THE COURT:  Mr. Vogt, I think I need a

MITCHELL - CROSS                            425

1    recess since it's noon.

2              MR. VOGT:  That's correct.

3              THE COURT:  All right.  At this time then

4    we're going to excuse you for lunch.  If you will be

5    back by 1:30, we will reconvene at that time.

6        Again, do not talk about the case among

7    yourselves or with anyone else.  And if anyone

8    approaches you to talk to you, let me know.

9        (The jury left the courtroom.)

10             THE COURT:  Will you make sure when the

11   jury is gone.

12       Has the jury gone?

13             MR. WATSON:  Your Honor, as long as we're

14   talking.  I handed Ms. Gleason a copy, just for

15   identification purposes yesterday, of the exhibits

16   that were used in opening.  We marked them as 111,

17   Plaintiff's Exhibit and for identification purposes,

18   Plaintiff's Exhibit 112, which was the

19   demonstrative.  And Plaintiff's Exhibit 113, which

20   was also a demonstrative used yesterday.

21             THE COURT:  Good.  Thank you.

22       All right.  We will go over the exhibits that

23   we need to mark as admitted.

24             MR. VOGT:  Judge, may I ask what is the

25   Court's system in actually marking them?  Do you

MITCHELL - CROSS                    426

1    manually mark them all?

2             THE COURT:  I do.

3             MR. VOGT:  Okay.  I didn't know.  I

4    apologize.

5             THE COURT:  Are they gone?

6             COURT SECURITY OFFICER:  We have five in

7    there getting out the door.

8             THE COURT:  Okay.

9        (A lunch recess was taken.)

10            THE COURT:  Please bring in the jury.

11       (The jury entered the courtroom.)

12            THE COURT:  Court is reconvened.  Mr. Vogt.

13            MR. VOGT:  Thank you, Judge.

14   BY MR. VOGT:

15       Q.  Good afternoon, Doctor.

16       A.  Good afternoon.

17       Q.  Doctor, one quick question.  During my

18   questioning of you today on several occasions I

19   asked you questions and you looked up to the right

20   when you were thinking.

21       A.  Okay.

22       Q.  Do you do that as a natural --

23       A.  I think people think I -- yeah.

24       Q.  You weren't rolling your eyes at me, were

25   you?

MITCHELL - CROSS                      427

1        A.  No.

2        Q.  Doctor, you were asked some questions today

3    about the process that you go through when a patient

4    is put on the list of residents for you to see.  And

5    what treatment you provide to the patient when he

6    walks into the dental unit at Rushville.  Okay,

7    ma'am?

8        A.  Yes.

9        Q.  Tell us what factors come into play when you

10   are going to treat a patient who is at Rushville and

11   he's in the chair?

12       A.  First of all, if it's an emergency person or

13   person expressing pain, whatever efforts I have to

14   do to eliminate the pain is what I do.  Sometimes

15   it's medicated fillings, sometimes it's replacing a

16   filling, sometimes it's taking out teeth.  Sometimes

17   it's adjusting a partial or a denture.  Just depends

18   on what their complaint is in reference to pain.

19       Q.  Okay.  And as far as someone who's come back

20   and for example is not in pain, but is on your list.

21   How do you decide of the teeth that perhaps the

22   patient has, how do you decide what work to do?

23   Which teeth to work on?

24       A.  Well, generally, on most records, I will

25   write what I want to look at next time.  If they

MITCHELL - CROSS                              428

1    come in and express I would rather have this done or

2    that done, then that's fine.  And those are people

3    that after the nurses have put everybody on that has

4    expressed pain or some issue before I come back,

5    then those are the people who have put in for

6    fillings and things like that.

7         So if they put in for a filling usually they

8    come in, we talk about what they want done, and we

9    do the work.

10        Q.  Okay.  Now, you said they put in for a

11   filling.  Do you mean they submitted a healthcare

12   request relating to a filling?

13        A.  Yes.

14        Q.  All right.  I'd like to now ask you some

15   questions about the -- Mr. Smego's healthcare

16   requests, ma'am.  This is Exhibit -- Defense

17   Exhibit 7, page 3.

18        All right.  Do you see that, ma'am?

19        A.  Yes.

20        Q.  All right.  As you can see, that's dated

21   4/30/08?

22        A.  Yes.

23        Q.  And Mr. Smego would fill out the top section

24   as the resident, identifying what he would like to

25   have done, what his problem is?

MITCHELL - CROSS                    429

1        A.  Correct.

2        Q.  And would you fill out the bottom portion of

3   that document?

4        A.  Yes.

5        Q.  All right.  First of all, it says "received"

6   there.  Do you see that, ma'am?

7        A.  Yes.

8        Q.  What does that mean?

9        A.  That's the date that they actually gave me

10  the request.

11       Q.  And here you've got -- could you read what

12  you wrote in response where it says "resolution"

13  there?

14       A.  That the resident was seen, that he was

15  given a medicated fill No. 31, and that he got a

16  prescription for Motrin.

17       Q.  That's your signature on that document?

18       A.  Yes.

19       Q.  That all occurred on May 4, 2008?

20       A.  Yes.

21       Q.  The second healthcare -- by the way, prior

22  to that date, 4/30/08, had Mr. Smego ever submitted

23  a healthcare request regarding dental services?

24       A.  No.

25            THE COURT:  Mr. Vogt, what's the number on

MITCHELL - CROSS                      430

1    that the healthcare request?

2         Q.  Defense Exhibit 7-003, Judge.

3              THE COURT:  Thank you.

4         Q.  This next document is Defendant's

5    Exhibit 7-007.  And as you can see, Doctor, this is

6    dated August 12, 2008.  Do you see that?

7         A.  Yes.

8         Q.  And again, the patient, Mr. Smego, would he

9    fill out the top half?

10        A.  Yes.

11        Q.  The describe healthcare problem section?

12        A.  Yes.

13        Q.  And you recognize the writing on the bottom

14   half of Exhibit 7-007?

15        A.  Yes.

16        Q.  Could you tell us what that says, ma'am?

17        A.  (As read)  "Resident has a cavity, wants to

18   wait for filling, not feeling well."

19        Q.  Okay.  The last healthcare request relating

20   to any kind of dental care, that Defendant's

21   Exhibit 7-039.  And as you can see, ma'am, that's

22   dated March 28th, 2011?

23        A.  Yes.

24        Q.  Okay.  Now, earlier today we talked about

25   the services, the dental services that you provided

MITCHELL - CROSS                           431

1    to Mr. Smego on the day earlier, March 27th, 2011.

2    Do you remember that testimony?

3        A.  Yes.

4        Q.  I think you worked on a variety of different

5    cavities for Mr. Smego?

6        A.  Correct.

7        Q.  Now, this particular healthcare request

8    indicates that he wanted to -- he wanted something

9    for pain for his -- apparently for a condition after

10   the teeth work was done; is that correct?

11       A.  Correct.

12       Q.  All right.  Now, down below this, is that

13   your writing on the response to that healthcare

14   request?

15       A.  No.

16       Q.  What -- it says 3/28/11, new orders received

17   per MD.  Do you see that, ma'am?

18       A.  Yes.

19       Q.  At Rushville who is the MD?

20       A.  Dr. Lochard.

21       Q.  Other than these three healthcare requests,

22   ma'am, is there any record of any other healthcare

23   requests being submitted by Mr. Smego relating to

24   his dental care?

25       A.  No.

MITCHELL - CROSS                    432

1          Q.  We talked earlier today about the attempt to

2     resolve and I just wanted to bring home exactly what

3     this involves.  Are you familiar with this

4     provision?

5          A.  Yes.

6          Q.  This is Defendant's Exhibit 12-048.

7          Ma'am, could you read the highlighted portion

8     of that document?

9          A.  (As read)  "The resident should attempt to

10     resolve any concerns or complaints directly with the

11     persons involved before filing a formal grievance.

12     The attempt to resolve AR form shall be filed within

13     five days after the discovery of the complaint.  The

14     attempt to resolve is used when there is a complaint

15     problem with staff persons."

16          Q.  At any time, ma'am, could Mr. Smego have

17     filed an attempt to resolve as is suggested here?

18          A.  Yes.

19          Q.  Did he?

20          A.  No.

21          Q.  And then just to clarify things, this is

22     Defendant's Exhibit 12-049.  Do you recognize that

23     form, ma'am?

24          A.  Yes.

25          Q.  And that's the exact form that's used with

MITCHELL - CROSS                     433

1    regard to the attempt to resolve?

2        A.  Correct.

3        Q.  Could you read the highlighted portion where

4    it talks about Title 59, ma'am?

5        A.  (As read) "Per Title 59, Illinois

6    Administrative Code, Chapter 1 -- some kind of

7    design -- 299.800, states residents shall first

8    attempt to resolve problems or complaints.  As a

9    rule the best way to handle problems and complaints

10   is to address them at the time they occur and with

11   the person involved.  In most cases a calm, direct

12   discussion of issues will bring resolution to all

13   concerned."

14       Q.  And you never received one of these from

15   Mr. Smego?

16       A.  No.

17       Q.  Now, we talked earlier today about the

18   grievance procedure.  For example, a resident puts

19   in a healthcare request and doesn't get satisfaction

20   and fills out an attempt to resolve and that doesn't

21   cure the problem, the next step is to file a

22   grievance, ma'am?

23       A.  Yes.

24       Q.  Do you recognize this form?  This is

25   Defendant's 12-051.

MITCHELL - CROSS                              434

1          A.  Yes.

2          Q.  And that's a grievance form that a resident

3     at Rushville can file?

4          A.  Yes.

5          Q.  And what I have checked there it just says

6     medical, what is the nature of grievance if they

7     have a problem with that reason?

8          A.  Yes.

9          Q.  And Mr. Smego never filed a grievance

10    against you, ma'am?

11         A.  No.

12         Q.  Now, we've talked from time to time about

13    the medication administration record for patients?

14         A.  Yes.

15         Q.  You're familiar with that document?

16         A.  Yes.

17         Q.  And you mentioned today, you testified, and

18    the records show that you saw Mr. Smego, of course,

19    on December 13th, 2005.  And the next time that you

20    saw him was in June of 2007?

21         A.  Correct.

22         Q.  What I'd like to do is show you, this is

23    Defendant's Exhibit No. 4, page 114.  I have to show

24    this to you in pieces, all right, ma'am?

25         A.  Sure.  Yes.

MITCHELL - CROSS                        435

1      Q.  All right.  Do you recognize what this

2  document is?  This is Defendant's Exhibit 4, page

3  114.

4      A.  Yes.  It's the medication administration

5  record for June of 2007.

6      Q.  Okay.  Now, up on top highlighted you see

7  the word aspirin?

8      A.  Yes.

9      Q.  Okay.  Can you tell us, that entry on

10  Mr. Smego's medication administration record, what

11  does that tell you about his aspirin prescription?

12      A.  That he has a PRN for aspirin that's

13  available three times a day.

14      Q.  Do you see the column that says HR?

15      A.  Yes.

16      Q.  What does that mean?

17      A.  That's the hours that he could ask for it.

18  That's during med passes.

19      Q.  And that is at 8:00 a.m., 12:00 a.m., and

20  8:00 p.m.?

21      A.  Correct.

22      Q.  Now -- then across the top we see the

23  numbers 1, 2, 3, 4, 5.  Do you see those, ma'am?

24      A.  Yes.

25      Q.  What are those numbers?

MITCHELL - CROSS                    436

1      A.  Those are the days of that month.

2      Q.  Okay.  So if we look at how many times --

3  this is PRN, meaning Mr. Smego could ask for and

4  obtain the aspirin at least three days a day?

5      A.  Correct.

6      Q.  And in June of 2007, how many times,

7  according to this exhibit, did Mr. Smego ask for and

8  get provided aspirin?

9      A.  Twice.

10      Q.  Now, down here the other highlighted in

11  yellow you see the medication Naprosyn?

12      A.  Correct.

13      Q.  500 milligrams?

14      A.  Yes.

15      Q.  Could you tell us about what that order

16  provides as far as Mr. Smego's ability to get

17  Naprosyn during June of 2007?

18      A.  That's available, again, it says BID PRN,

19  which means it's an as needed medication and he can

20  get it twice a day.  The times would be 8:00 p.m.

21  8:00 a.m. and 8:00 p.m.

22      Q.  And PRN, again, meaning as needed?

23      A.  Yes.

24      Q.  During June of 2007, according to the

25  medication administration record of Mr. Smego, did

MITCHELL - CROSS                        437

1    he ever ask for or receive Naprosyn?

2        A.  No.

3        Q.  Oh, by the way, do you see down here where

4    my finger is, the drug -- adverse drug reactions?

5        A.  Yes.

6        Q.  Would allergies be listed here?

7        A.  Yes.

8        Q.  Could you read what allergies according to

9    this document does Mr. Smego have?

10       A.  It says penicillin, aspirin and

11   acetaminophen, which is Tylenol.

12       Q.  Okay.  I'd now like to show you Exhibit No.

13   4-115.  This is for the month of July, 2007, ma'am.

14   Do you see that?

15       A.  I can't see the date, but --

16       Q.  Oh, I'm sorry.

17       A.  Bring it down just a tiny bit.  Yeah, that's

18   July, 2007.

19       Q.  And once again, the top box refers to

20   aspirin being available for Mr. Smego three times a

21   day if he would like it?

22       A.  Yes.

23       Q.  During July of 2007, how many times did

24   Mr. Smego ask and get provided with aspirin?

25       A.  Twice.

MITCHELL - CROSS                          438

1          Q.   Turning again to the naproxen portion of the

2    administration medication record, how many times did

3    Mr. Smego ask for or be provided naproxen?

4          A.   None.

5          Q.   Do you see Exhibit No. 4-116, ma'am?

6          A.   Yes.

7          Q.   And what is this?

8          A.   That's August, 2007.

9          Q.   Once again the top box is for aspirin, three

10   times a day if Mr. Smego wants it?

11         A.   Correct.

12         Q.   How many times during August, 2007, does

13   Mr. Smego ask for and get provided with aspirin?

14         A.   Three times.

15         Q.   And again we turn down here to Naprosyn.

16   Did Mr. Smego ever ask for it or was he ever

17   provided with Naprosyn during the entire month of

18   August, 2007?

19         A.   No.

20         Q.   Now, August, 2007, though, was -- as I

21   recall your testimony earlier today, was when you

22   prescribed ibuprofen or Motrin for him?

23         A.   Correct.

24         Q.   I believe we looked at this earlier today.

25   As you can see, this is for August of 2007?

MITCHELL - CROSS                          439

1          A.  Yes.

2          Q.  And could you read what that box is up there

3     in connection with the ibuprofen?

4          A.  (As read)  "Ibuprofen 600 milligrams, take

5     one tablet Q6H by mouth, PRN, or as needed for pain

6     times seven days."

7          Q.  If we come down here, that was issued on

8     August 25th?

9          A.  August 25th, 2007.

10         Q.  And then down here Mr. Smego took the Motrin

11    that you had prescribed for him?

12         A.  Yes.

13         Q.  Down here, on the bottom again, do you see

14    the section referring to drug adverse reactions?

15         A.  Yes.

16         Q.  Could you tell us what's listed on there as

17    far as Mr. Smego's allergies?

18         A.  PCN which is penicillin, aspirin, and

19    acetaminophen.

20         Q.  I'd now like to show you -- I know we've

21    looked at it, but I'll be quick with it.  This is

22    the September, 2007 last day of the ibuprofen order

23    for yourself?

24         A.  Correct.

25         Q.  And again, Mr. Smego did take it on

1    September 1st?

2           MS. MacDONALD:  Objection, foundation.

3           THE COURT:  The objection is sustained.

4      Q.  According to the medication administration

5    record, ma'am, was Mr. Smego provided with a dose of

6    ibuprofen on September the 1st, 2007?

7      A.  Correct.

8      Q.  Now showing you Defendant's Exhibit 4-095.

9    Can you tell us what this document is, ma'am?

10     A.  Yes.  That's his September, 2007, it's the

11   medication administration record.

12     Q.  Okay.  And if you could take a look, ma'am,

13   is aspirin in the top box once again?

14     A.  Yes.

15     Q.  How many times during September, 2007, did

16   Mr. Smego ask for and be provided with Motrin

17   according to the medication administration record?

18          MS. MacDONALD:  Objection, foundation.

19     A.  You asked me about Motrin?

20     Q.  I apologize, my mistake.  I'm sorry.  I'm

21   asking about the top box, which was aspirin.  I'm

22   sorry.

23     According to the medication administration

24   record, how many -- for Mr. Smego during September

25   of 2007, how many times did Mr. Smego ask for and

MITCHELL - CROSS                    441

1    was he provided with aspirin?

2              THE COURT:  Hold your answer.

3              MS. MacDONALD:  Objection, foundation.

4              THE COURT:  Foundation?

5              MR. VOGT:  This is the medication

6    administration record for this particular patient,

7    Judge.  The foundation has been stipulated.

8              MS. MacDONALD:  The foundation for the fact

9    that this piece of paper is a part of the --

10   Mr. Smego's healthcare records has been, Your Honor.

11   However, the fact that initials are noted on this

12   does not mean that Mr. Smego actually received on

13   any given day this medication, nor does Dr. Mitchell

14   know or did she hand to Mr. Smego any medication on

15   that day.

16             MR. VOGT:  It's a business record kept in

17   the ordinary course of business.  The witness has

18   already explained exactly what the medication

19   administration record is, Judge.

20             THE COURT:  Does she knows whose initials

21   these are?

22             THE WITNESS:  Yeah.  They're various nurses

23   that work there.

24             THE COURT:  Can you identify them?

25             THE WITNESS:  This one is Linda.  The one

MITCHELL - CROSS                    442

1    above, I don't know that person's initials.

2         The NN, I'm not quite sure who that one is.

3         But Linda is a nurse that works with me all the

4    time on weekends.

5              MS. MacDONALD:  Your Honor, the most the

6    document shows is that someone noted on this page

7    that someone may have provided or have handed out

8    the particular drug.

9              THE COURT:  I'm sorry, I believe the

10   stipulation is enough.  You may ask.

11        Q.  Doctor?

12        A.  Yes.

13        Q.  How many times during September, 2007, was

14   Mr. Smego provided with aspirin according to the

15   MAR?

16        A.  One, two, three, four, five.

17        Q.  And then again, turning down to the Naprosyn

18   at the bottom.  Was Mr. Smego ever provided with

19   Naprosyn according to the MAR during September of

20   2007?

21        A.  No.

22        Q.  Exhibit No. 4-030 is for what month, ma'am?

23        A.  October, 2007.

24        Q.  And during October, 2007, does the report

25   reflect that Mr. Smego received any aspirin?

1      A.  No.

2      Q.  During October, 2007, does the MAR for

3  Mr. Smego reflect that he asked for and was provided

4  any Naprosyn?

5      A.  No.

6      Q.  And those are both pain medications, to make

7  sure -- right?

8      A.  Yes.

9      Q.  All right.  What document is this, ma'am?

10  This is Defendant's Exhibit No. 4-107.

11      A.  November, 2007.

12      Q.  All right.  Once again, during November,

13  2007, does Mr. Smego's medication administration

14  record reflect any aspirin being taken by him?

15      A.  No.

16      Q.  Same with naproxen.  During November, 2007,

17  did Mr. Smego ask for or was he ever provided with

18  any naproxen?

19      A.  No.

20      Q.  Okay.  December, is that the next month,

21  Doctor?

22      A.  Yes, December, 2007.

23      Q.  This is Exhibit No. 4-155.  In connection

24  with the aspirin, ma'am, do you see the notation DC?

25      A.  Yes.

MITCHELL - CROSS                        444

1      Q.  What does that mean?

2      A.  That means that the doctor discontinued the

3  medication.

4      Q.  We come down here for the naproxen, you see

5  that?

6          THE COURT:  I'm sorry, which doctor are you

7  talking about?

8          MR. VOGT:  It doesn't reflect on this

9  particular document, Judge.  I believe that will be

10 established this afternoon by Dr. Lochard.

11         THE COURT:  Okay.

12 BY MR. VOGT:

13     Q.  Ma'am, do you see the naproxen box on the

14 bottom here?

15     A.  Yes.

16     Q.  During the month of December of 2007, did

17 Mr. Smego ask for or was he provided with any

18 naproxen?

19     A.  No.

20     Q.  Last month, ma'am, that we will address

21 today at this time is January, 2008.  Do you see

22 that?

23     A.  Yes.

24     Q.  This is Exhibit No. 4-209.  Now, ma'am, as

25 you can see, the DCs with the 12/31.  In medical

MITCHELL - CROSS                    445

1  terminology when you see DC on a medication
2  administration record, what does that tell you?
3       A.  They're basically discontinuing for that
4  entire month, when he said that it was DC'd 12/31.
5  So if this is January, the month prior to that is
6  DC'd.
7       Q.  Okay.  And the only question is with regard
8  to naproxen; during January he took it a single
9  occasion?
10      A.  Yes.
11      Q.  So during all the months that we just
12 reviewed, ma'am, was both aspirin and that naproxen
13 available for Mr. Smego if he had any type of pain?
14      A.  Yes.
15      Q.  All he had to do was ask for it?
16      A.  Yes.
17      Q.  Dr. Mitchell, tell us about your schedule
18 going down to Rushville.  How do you start on Friday
19 night to get down there?
20      A.  Well, Fridays is a better day for me.  If I
21 leave from Stateville it takes me about 45 minutes
22 from Stateville to get to the train in Naperville.
23      Q.  Okay.
24      A.  And the train leaves Naperville at
25 approximately 6:30 at night.  If it's a great day

MITCHELL - CROSS                         446

1    and the train is on schedule I get into Macomb

2    around 9:20.  If it's late, then about 11:30 at

3    night.  Just depends on problems.  But most of the

4    time 9:20, 9:25 I'm in.

5         Q.  After you arrive in Macomb, from the train,

6    what do you do next?

7         A.  Well, I have to have a car parked there

8    because there's no transportation from Rushville

9    from Macomb.  I mean from Macomb to Rushville.  So I

10   leave a vehicle there.  And I drive the vehicle.

11   It's 27 miles once you get on 167 to get to

12   Rushville, but I have to get 167 and then I drive to

13   Rushville.

14        Q.  The drive from Macomb to Rushville is about

15   an hour or so?

16        A.  Roughly.  Because they got a lot of state

17   police down there.  So yeah.

18        Q.  So then where do you stay that evening?

19        A.  I have an apartment.

20        Q.  And the next morning is when you go to

21   Rushville and begin your work?

22        A.  Yeah.

23        Q.  The entire transport from when you leave

24   Stateville to when you arrive in your apartment, how

25   many hours is that?

MITCHELL - CROSS                447

1        A.   Approximately five hours.

2        Q.   And of course, forgive me, but going back is

3   the same time period?

4        A.   Actually it's a little longer because I live

5   about 45 minutes from the Stateville facility.  So

6   takes over five hours for me to actually make it

7   home.

8        Q.   And if you're going to take a train back on

9   Sunday night -- okay, you're familiar with the train

10  schedule really, I trust?

11       A.   Oh, yeah.

12       Q.   What's the latest train you can take on

13  Sunday night?

14       A.   It leaves at 6:18.

15       Q.   All right.  And by the way, all of the

16  efforts that you discussed to get to Rushville;

17  taking your car to the train station, taking the

18  train down to Macomb, taking your car from the train

19  station in Macomb to Rushville; do you pay for all

20  those transportation costs yourself?

21       A.   Yes.

22       Q.   Do you pay for the apartment in Rushville

23  yourself?

24       A.   Yes.

25       Q.   Ma'am, have you ever received any complaint

1  from Addus regarding your work at Rushville?

2      A.  No.

3      Q.  Have you ever received any complaint from

4  Wexford regarding your dental work at Rushville?

5      A.  No.

6      Q.  Has DHS ever complained to you or about you

7  regarding your dental work at Rushville?

8      A.  No.

9      Q.  Now, there's been -- I think we've mentioned

10 earlier that initially the residents under DHS were

11 housed in Joliet?

12     A.  Correct.

13     Q.  And then I believe in June of '06, there was

14 the move down to Rushville?

15     A.  That's not quite correct.

16     Q.  When was it?  I apologize.

17     A.  In May of 2007, they started moving the

18 initial residents down to get the facility prepared

19 for the major move.

20     Q.  Forgive me.  Is that '07 or '06?

21     A.  I'm sorry, 2006.  I'm sorry.

22     Q.  Okay.

23     A.  That was in May.  And I think they sent

24 maybe 20, 25 residents initially and their job was

25 to get the facility clean.  I think they put in the

MITCHELL - CROSS                    449

1   linoleum floors, things like that.

2       Then they moved an additional amount down in

3   June.  And then the finally move was around

4   August 7th of 2007.  2006, sorry.

5       Q.  Now, in connection with the dental

6   equipment, okay?

7       A.  Hm-mm.

8       Q.  Did you yourself, ma'am, physically move

9   some of the dental equipment from Joliet to

10  Rushville?

11      A.  Yes.

12      Q.  Can you explain what you did and who helped

13  you?

14      A.  Well, I think when we first reported to that

15  facility they didn't have like sterilizers, they

16  didn't have the stools that dentists sit on, the

17  assistant's stool.  We didn't have any hand pieces.

18  They didn't have the Cavitron, the ultrasonic that

19  you use to do your instrument.  The amalgamators.

20  You name it, all of that stuff, the electrosurge, no

21  supplies.

22      So my daughter and I, when we returned back up

23  there, we actually went back to the old facility and

24  loaded it all onto my truck and drove it to the

25  facility so we would have something to work with.

MITCHELL - CROSS                        450

1        Q.  You were asked some questions earlier today

2   about a permanent filling you put into another

3   resident, not Mr. Smego.  Do you recall that?

4        A.  Yes.

5        Q.  In treating the residents at Rushville, do

6   you try to treat everyone the same?

7        A.  Yes.

8        Q.  And with 550 residents and 15 hours, tell us

9   how you do that?  What do you do?

10       A.  I work non-stop.  I don't take lunch and I

11  don't take a break.

12       Q.  And you rely, again -- again, the healthcare

13  system requires just a healthcare request?

14       A.  Right.  When I enter on Saturdays the nurses

15  will prepare a list with everybody that has had

16  major concerns or issues prior to my arriving.

17  Again, the list, most of the time, is 40, 45

18  patients; just depends.

19            And when they hand me the list we start getting

20  our records ready and we start calling people down

21  probably about 8:30.  By that time the needles, all

22  of the instruments and stuff have been counted to

23  verify they're there.  When you work in facilities

24  you have to verify that your starting counts are

25  accurate and your closing counts are accurate.

MITCHELL - CROSS                        451

1        And we have two chairs, so we start calling the

2    first two emergencies first.  The assistant will

3    take x-rays in the chair that we shoot the x-rays on

4    and move that person over to me.  And we just keep

5    working.  Sometimes we have people in the holding

6    area waiting.  And we work until that day is over

7    and we come back and start all over again the next

8    day.

9        You try to get through everybody that's on the

10   list.  The list varies.  Some people are on the --

11   the bulk are emergency people.  Then there are

12   people that have asked for fillings and then the

13   people for prosthetic cases and then the people for

14   cleanings and then the annual exams.  Because we are

15   required to do all of the annual exams, you have to

16   get them done, so you just keep working.  And then

17   you come back the next time and you start over

18   again.

19        Q.  Now, you mentioned annual exams.  Earlier,

20   as you may recall, we showed you the Wexford and

21   Addus contracts that talked about exams every two

22   years.  Do you remember that?

23        A.  Yes.

24        Q.  When did Rushville undertake a process to

25   provide annual exams?

MITCHELL - CROSS                            452

1        A.  They wanted it every year starting in 2010.

2        Q.  And who puts the list of annual exams

3   together and how do they do it?

4        A.  I get the master list of people whose

5   birthdays are in every month from the secretary.

6   They leave it with the nurse and the nurse gives us

7   everybody for all 12 months.

8        And then as we see people, when they come down

9   for services or whatever, if they're there for let's

10  say a cleaning, if they haven't had their annual we

11  try to do it at that appointment so I don't have to

12  bring them back for a separate appointment.  If

13  they're there for a filling, I try to get their

14  annual done.

15       They don't have a stipulation that it has to be

16  done in their birth month, but it has to be within

17  that calendar year.

18       Q.  Now, you were asked some questions today

19  about Mr. Smego's lawsuit that he filed in 2008.  Do

20  you recall that?

21       A.  Yes.

22       Q.  Now, with 550 residents and Mr. Smego filing

23  his lawsuit, is he entitled to special care because

24  he has sued you?

25       A.  No.

MITCHELL - CROSS                           453

1        Q.  Did you continue to treat Mr. Smego in the

2   same way that every other resident at Rushville is

3   treated?

4        A.  Yes.  If he put a request in, he was seen.

5        Q.  Now, you are -- the video that we showed --

6   that was shown of you before.  Okay, ma'am?

7        A.  Yes.

8        Q.  We talked about filing the answer and things

9   like that.  I want to make sure that the jury knows

10  what your deposition -- what you said in that.  All

11  right, ma'am?

12        The one question became after this -- give me

13  one moment.

14        (Sotto voce discussion among counsel.)

15        Q.  I'm sorry, ma'am, I apologize.

16        So at least as of September 1st, 2009, you knew

17  the allegations that Mr. Smego made, including his

18  complaints about dental care; right?  And your

19  answer was yes.  And then you were asked the next

20  question:  (As read) "And you still didn't see

21  Mr. Smego again until October 24th, 2010, right?"

22        Ma'am, could you please read your answer.

23        A.  Okay.  (As read) "I didn't receive any

24  requests from Mr. Smego.  So because he filed a

25  lawsuit does not mean that he jumps over other

1    people.  It is a request service based facility.

2    Mr. Smego, to my knowledge, has only filed one,

3    unless you have another one, one request for

4    services.  This service is based upon a request.

5         So no, because he filed a lawsuit doesn't mean

6    that Mr. Smego moves to the head of the line or he

7    jumps over other people.

8         There's a process.  The process is you put in a

9    request.  If you put in a request he would be seen.

10   If he chooses to file a lawsuit that is his right as

11   a U.S. citizen.

12        Q.  We can agree if lawsuits dictated medical

13   care, anarchy would reign; right?

14        A.  Yes.

15          MS. MacDONALD:  Objection, Your Honor.  No

16   foundation, argumentative.

17            THE COURT:  Sustained.  Jury is directed to

18   disregard.

19        Q.  All right, Doctor, I just have a couple more

20   questions.

21        Mr. Smego, as you mentioned earlier, has

22   certain cavities in his mouth right now?

23        A.  Correct.

24        Q.  Whose decision is it if he wants to get the

25   cavities taken care of?

MITCHELL - CROSS                                455

1          A.  Mr. Smego's.

2          Q.  Is dental care like that, where there's no

3    pain, no problems, is it an elective procedure?

4               MS. MacDONALD:  Objection.  Compound.

5               THE COURT:  Objection sustained.  Break it

6    down.

7          Q.  Is a -- is taking care of a cavity --

8          A.  I didn't understand, I'm sorry.

9          Q.  Is taking care of a cavity, is having a

10   cavity repaired, a decision that the resident makes?

11         A.  The resident decides if he wants services or

12   not.

13         Q.  And Mr. Smego could ask you, as you

14   mentioned earlier, at any time to take care of

15   whatever cavities he may or may not have?

16         A.  Yes.  During his annual exams we go over it,

17   each annual exam, what services he still needs, et

18   cetera.  And he's advised to put in a request when

19   he wants the services to be provided.

20         Q.  Just a couple points and I'll be finished.

21         You mentioned earlier in your notes saying

22   there was an occasion when the compressor was

23   inoperable?

24         A.  Yes.

25         Q.  If a compressor is not operational, tell us

MITCHELL - CROSS                    456

1   what impact that has on your ability to do work?

2       A.  When the compressor doesn't work, it --

3   that's what actually powers your hand pieces.  It's

4   air driven, it's an air compressor.  And without a

5   compressor you can't really do fillings, so -- you

6   can't adjust partials, things like that, because you

7   require the use of a hand piece to do that work.

8       Q.  How many fillings have you provided

9   Mr. Smego during his stay with DHS?

10      A.  18.

11      Q.  And you've had one extraction?

12      A.  Yes.

13      Q.  Doctor, my last question.  You've been a

14  dentist for over 30 years?

15      A.  35.

16      Q.  35.  Did your care and treatment of

17  Mr. Smego as we have talked about here today comply

18  with the standard of care for a reasonably

19  well-qualified dentist like yourself?

20      A.  I think so.  I think I'm more than

21  well-qualified.

22          MR. VOGT:  Thank you, Judge.

23          THE COURT:  Redirect.

24

25

MITCHELL - REDIRECT                    457

1              REDIRECT EXAMINATION

2  BY MS. MacDONALD:

3      Q.  Dr. Mitchell, I just want to talk about a

4  few of the items that your counsel brought up today.

5      Since you've been at Rushville you've had a

6  number of dental assistants, haven't you?

7      A.  Yes.

8      Q.  From 2006 until 2008, your dental assistant

9  was Kelly Lawshea?

10     A.  Correct.

11     Q.  Appeared that's the dental assistant that

12  witnessed the extraction consent that we saw

13  earlier?

14     A.  That's correct.

15     Q.  And Ms. Lawshea is your daughter?

16     A.  That's correct.

17     Q.  And when Ms. Lawshea left, Ms. Williams

18  began working at Rushville as your dental assistant?

19     A.  Yes.

20     Q.  And Ms. Williams was your dental assistant

21  from 2008 until 2009?

22     A.  Correct.

23     Q.  And then when Ms. Williams left,

24  Ms. Shivers?

25     A.  That's correct.

MITCHELL - REDIRECT                    458

1          Q.  Ms. Shivers became your dental assistant and
2    Ms. Shivers was your dental assistant from 2009
3    until 2011?
4          A.  Approximately, yes.
5          Q.  Okay.  And then after Ms. Shivers a Mr. Reed
6    became your dental assistant?
7          A.  Correct.
8          Q.  And Mr. Reed was your dental assistant from
9    2011 until 2013?
10         A.  No.  I don't think so, but -- I don't know.
11         Q.  If that's what you told me in your
12    deposition, would that be correct?
13         A.  I know that he left in June and he was gone,
14    but I'm not quite sure of the year.  But it might be
15    2013.
16         Q.  Okay.  After Mr. Reed left your dental
17    assistant was Ms. Walker?
18         A.  No.  There was Jerry, I don't know her last
19    name.  That was in between Jennifer.  And her name
20    was Jerry, but I don't know her last name.
21         Q.  And then Ms. Walker was hired after that?
22         A.  Yes.
23         Q.  And then is Ms. Walker still your dental
24    assistant?
25         A.  Yes, she is.

MITCHELL - REDIRECT                    459

1        Q.  And those dental assistants help you get the

2    patient in the chair and get them ready so that you

3    can examine them or do whatever filling you need to

4    do?

5        A.  Yes.  They pour up my models, they take my

6    x-rays, things like that --

7        Q.  I'm sorry.

8        A.  I'm sorry, go ahead.

9        Q.  No, I didn't mean to cut you off.

10       A.  I said they also assist during some

11   procedures.  So they evacuate and things like that.

12       Q.  Okay.  And they help you take the x-rays;

13   right?

14       A.  Yes.

15       Q.  And we talked before about Mr. Smego's tooth

16   No. 1; right?

17       A.  No.

18       Q.  Do you recall that?  I believe your counsel

19   asked you if Mr. Smego's tooth No. 1 had been

20   extracted?

21       A.  I said it had been extracted.

22       Q.  It had been extracted.  And it was your

23   testimony that his tooth was extracted before he

24   arrived at the treatment and detention facility?

25       A.  That's correct.

 1        Q.  Okay.  And if we look back at the first page

 2   of -- and I'm sorry, you had also said that

 3   Mr. Smego's tooth 15 and tooth 16 had also been

 4   extracted before he arrived; is that correct?

 5        A.  Yes.

 6        Q.  All right.  So if we look back at the first

 7   page of Plaintiff's Exhibit 1, we can see where you

 8   marked on this graph those different teeth; right?

 9        A.  Yes.

10        Q.  And the line through means a tooth has been

11   extracted; is that right?

12        A.  Correct.

13        Q.  So we can see here that tooth 16 had been

14   extracted?

15        A.  Correct.

16        Q.  And tooth 15 had been extracted?

17        A.  Correct.

18        Q.  But here it does not show that tooth one has

19   been extracted?

20        A.  Yeah.  There was an error in my charting;

21   correct.

22        Q.  And your charting doesn't show that tooth 1

23   was extracted until 2011, isn't that right?

24        A.  I'm not quite sure, but if you want, I'll

25   look.

MITCHELL - REDIRECT                    461

1          Q.  Could you turn to page 11, I believe, of
2    Plaintiff's Exhibit 1, is the chart that you filled
3    out in March of 2011; is that right?
4          A.  Yes, that's correct.
5          Q.  And that's the first time that you note that
6    tooth No. 1 has been extracted?
7          A.  Yes.
8          Q.  You also discussed tooth No. 2 with
9    Mr. Vogt; right?
10         A.  I did discuss tooth No. 2, yes.
11         Q.  And tooth No. 2 is the one that in
12   December 13, 2005, you diagnosed Mr. Smego with a
13   cavity on the buccal or cheek side of that tooth?
14         A.  Yes.
15         Q.  And I believe you testified that sometime
16   between December 13th, 2005, and the date tooth No.
17   2 was pulled, August 25th, 2007, that tooth No. 2
18   developed cavities on the distal and occlusal side
19   of the tooth?
20         A.  Well, when you write DO, it's distal, but
21   you have to include the occlusal surface when you're
22   doing the filling.
23         Q.  So it was one additional cavity that you
24   noted had developed on the tooth?
25         A.  Yes.

MITCHELL - REDIRECT                    462

1          Q.  And if we look at page 4 of Plaintiff's
2     Exhibit 1 is your progress note --
3          A.  Okay.
4          Q.  -- for June 24th, 2007.  And then July 23rd,
5     2007?
6          A.  Correct.
7          Q.  And on June 24th, 2007, your note was next
8     visit fill No. 2; right?
9          A.  I said fill No. 2 and No. 31.
10         Q.  And No. 31.  And there's no reference to D
11    or O to that entry of June 24th, 2007; right?
12         A.  Correct, there's no reference of D or O on
13    that.  That's correct.
14         Q.  And the first and only reference we see in
15    your dental charting for Mr. Smego to D and O as it
16    pertains to tooth No. 2 is in the July 23rd, 2007
17    entry?
18         A.  That's correct.
19         Q.  You testified earlier today that you
20    prescribed Mr. Smego Motrin even though he reported
21    an allergy; right?
22         A.  Correct.
23         Q.  Mr. Smego told you he was allergic to Motrin
24    the first time you saw him?
25         A.  Correct.

MITCHELL - REDIRECT                    463

1        Q.  And you decided not to believe Mr. Smego's
2    report that he was allergic to Motrin; right?
3        A.  Yes.
4        Q.  As a dentist, you rely on your patients all
5    the time for them to report issues about their
6    medical history to you; right?
7        A.  Yes.
8        Q.  But you chose not to rely on Mr. Smego's
9    reporting in this case?
10       A.  Correct.
11       Q.  You just decided you didn't believe him?
12       A.  No.
13       Q.  Well, you just said that you did not believe
14   Mr. Smego when he told you he was allergic to
15   Motrin; isn't that right?
16       A.  I'm gonna answer I did not accept that he
17   was allergic to Motrin.
18       Q.  He told you he was allergic to Motrin;
19   right?
20       A.  Correct.
21       Q.  And you did not believe that he was actually
22   allergic to Motrin; right?
23       A.  Correct.
24       Q.  Dr. Mitchell, you are a member of the ADA;
25   right?

MITCHELL - REDIRECT                    464

1        A.  Not currently, no.

2        Q.  You have been in the past though; right?

3        A.  Yes, I have.

4        Q.  Okay.  And you're familiar with the ADA code

5   of ethics?

6        A.  Yes.

7        Q.  You testified today about healthcare

8   requests at Rushville; right?

9        A.  Yes.

10       Q.  And you also testified that the nurses at

11  Rushville put together a list of patients for you;

12  right?

13       A.  Correct.

14       Q.  Do you actually review the healthcare

15  requests to determine the priority of the patients,

16  or do the nurses?

17       A.  The nurses have already established the

18  priority, but they give me the requests so I know

19  what they're coming for.

20       Q.  Do you get all of the healthcare requests

21  that have been submitted in your absence for you to

22  look through?

23       A.  I get all of the healthcare requests after

24  they have given me a list.  So yes, when a person

25  comes I have to know what they're coming for, so I

MITCHELL - REDIRECT                465

1    actually read what they have.

2        Q.  So the nurses give you a list; right?

3        A.  Yes.

4        Q.  And they give you all the healthcare

5    requests that have come in since the last time you

6    were at Rushville; right?

7        A.  Yes.

8        Q.  And so it is your job to look at that list

9    and the requests and prioritize your patients;

10   right?

11       A.  I think they've already prioritized by pain.

12   But yes, if they put a request in and if I can fit

13   them in too, I will see them.

14       Q.  But you are the one that prioritizes the

15   patients; right?

16       A.  No, the nurses do.

17       Q.  Dr. Mitchell, you testified in another case

18   about this healthcare request procedure, haven't

19   you?

20       A.  Yes.

21           MR. VOGT:  Objection, Judge.  Can we

22   approach on this?

23           THE COURT:  You may.  Why don't we give the

24   jury a break, we've been at it about an hour.

25       (The jury left the courtroom.)

MITCHELL - REDIRECT                    466

1          (Whereupon a break was taken.)

2            THE COURT:  Court is reconvened.

3        And I note for the record, Mr. Vogt, your

4    client is facing the jury and I can't see her face.

5    And I could not tell, I think she was tearing up and

6    perhaps needed Kleenex.  So if you face a little --

7    Marchal, did you get that Kleenex for her?

8        All right.  Normally there is no Kleenex there.

9        All right.  Mr. Vogt.

10           MR. VOGT:  Judge --

11           MR. CROWL:  Your Honor, one moment,

12   Ms. MacDonald stepped out for just one second and

13   she is arguing this one.

14           THE COURT:  All right.  Off the record.

15       (A discussion was held off the record.)

16           THE COURT:  For your information, I know

17   you're in court on a regular basis, but I'm up here

18   working on other orders that have to be entered in

19   other cases, in case you wonder what I'm doing with

20   all these papers that keep coming back and forth.

21           MR. VOGT:  Can we address one issue of

22   scheduling?

23       All we were trying to do -- Judge, we have two

24   witnesses here for the afternoon.

25           THE COURT:  You do?

1          MR. VOGT:  No, the plaintiff does.

2          MR. CROWL:  We do.

3          MR. VOGT:  Tomorrow we have Mr. Smego and

4     two experts.

5          THE COURT:  Who are the two this afternoon?

6          MR. CROWL:  We have Carol Vance and Dr.

7     Lochard.

8          MR. VOGT:  I'm worried about being able to

9     finish tomorrow, so -- with all the witnesses that

10    we have remaining.  That's all I wanted to -- you

11    know, you had indicated that you were hoping we

12    would finish by Friday because you had another

13    matter I believe scheduled -- on Friday.  And that's

14    the only reason I'm here.  I talked with counsel

15    before and we were both concerned about that

16    occurring.

17          THE COURT:  I also have a funeral.

18       So we'll have to see how far we can get.

19          MR. CROWL:  We will move as quickly as we

20    can.

21          MR. VOGT:  I just wanted to tell you, your

22    Honor.

23       Apparently they want to use a transcript from

24    the Stanbridge trial of Dr. Mitchell's testimony at

25    the Stanbridge trial.

MITCHELL - REDIRECT                    468

1          Now, we had addressed this issue in the

2     pre-trial conference and the Court's order was very

3     clear that they could only use these affidavits to

4     demonstrate the treatment or something like that,

5     whatever they wanted to do with that.

6          This has never been disclosed in this case.

7     It's not listed as a document that they're going to

8     use at trial.  I have never seen the transcript for

9     the trial.

10          I don't think it's impeaching, but more

11     important, it's going to again infuse this issue of

12     another trial.  The jury is going to get the

13     impression that Dr. Mitchell has been sued by other

14     residents.  And I think it's inappropriate,

15     especially since it's never been disclosed to use

16     before, it's not listed in the pre-trial order, and

17     the Court has previously barred them from doing it.

18               THE COURT:  Well, I'm not sure, I don't

19     know what it is you're going to be eliciting.  What

20     is this transcript from?

21               MS. MacDONALD:  Your Honor, this is a

22     transcript from the Stanbridge trial.  I'm not going

23     to speak about Mr. Stanbridge or any of his

24     treatment.  I won't have to refer to the trial at

25     all.  Dr. Mitchell, in that -- at trial in this

1  case --

2           THE COURT:  Was that my case?

3           MS. MacDONALD:  Yes, it was.

4           MS. GLEASON:  You had appointed Ellen Bruce

5  in that case, I believe.

6           THE COURT:  Yes.  I just was making it sure

7  it's the same Stanbridge trial.

8           MS. MacDONALD:  Yes, Your Honor.

9      And in that case Dr. Mitchell gave some

10 testimony about her responsibility in reviewing the

11 healthcare requests and prioritizing her patients.

12 And that's an important issue in this case.  And

13 it's not about Mr. Stanbridge, it's about what she

14 does when she's at Rushville.  And it's critical to

15 show that she is involved in this process.

16          THE COURT:  And why wasn't it disclosed

17 before?

18          MS. MacDONALD:  It's impeachment material,

19 Your Honor.  It's a prior statement of the witness.

20 It's not required to be on an exhibit list.

21          THE COURT:  Well, that's true --

22          MS. MacDONALD:  And Mr. Vogt was

23 Dr. Mitchell's counsel, so presumably he has this

24 transcript, Your Honor.

25          THE COURT:  So certainly you're not

1    surprised.  I will tell you I remember the

2    differences in the testimony myself; not that that

3    has anything to do with it.

4         MS. MacDONALD:  If you would like to see

5    the two pages regarding the healthcare request.

6         THE COURT:  I'll look at it.

7         MS. MacDONALD:  Starting at line 17.

8         THE COURT:  I'm going to allow it.

9         MR. VOGT:  Well --

10         THE COURT:  So do you want some kind of

11   limiting instruction or --  I mean make a

12   proposition if you have a suggestion.

13         MS. MacDONALD:  I'm not going to say trial

14   of Mr. Stanbridge.  I'll just say in prior

15   testimony.

16         MR. VOGT:  I mean the other thing, Judge;

17   the reason it's also unfair is -- granted, I do not

18   deny that I was the trial attorney at the case, as

19   you were the trial judge, but this was whatever

20   years ago.

21         THE COURT:  How many years ago was it?

22         MS. MacDONALD:  It was May of 2012.

23         MR. VOGT:  Judge, there's no way -- your

24   memory is much better than mine.  I'm never gonna

25   remembered this.  If I had been alerted to this I

MITCHELL - REDIRECT                              471

1    would have at least had the opportunity to review

2    the balance of the transcript.  I have no idea -- an

3    just being honest, I did not know about this until

4    moments ago.  Not even during the direct or anything

5    was I ever told this was going to be used.  And I

6    have -- I think it's an ambush, Judge.  It's unfair.

7              MS. MacDONALD:  It's impeachment --

8              THE COURT:  Can you print that off easily?

9              COURT REPORTER:  Yes.

10             THE COURT:  Okay.  We're gone go get you a

11   copy of the transcript.

12             MR. VOGT:  Well, wait, wait, Judge.  I mean

13   -- I mean that's going to take a delay, Judge.  I

14   know that --

15             THE COURT:  We have very fast printers.

16             MR. VOGT:  I know.  But it's a couple

17   hundred pages of testimony.  Hang on, Judge.

18        All right.  Judge, I don't want to cause any

19   problems, I want to move the trial along.

20             THE COURT:  I don't want you to be caught

21   in an ambush.

22             THE WITNESS:  I'm not ambushed, I'm fine.

23             THE COURT:  All right.  Bring the jury.

24             MR. VOGT:  She's not ambushed.  So if she's

25   not ambushed, I'm not ambushed.  We're all ambush

MITCHELL - REDIRECT                472

1    free.

2        Could I ask whenever possible to get a copy of

3    the transcript.  Just in case.

4        (The jury entered the courtroom.)

5            THE COURT:  You may proceed now.

6    BY MS. MacDONALD:

7        Q.  Marchal, we can turn the lights back on.

8        Dr. Mitchell, you gave testimony previously

9    about the healthcare request procedure; correct?

10       A.  Yes.

11       Q.  I'm gonna read that now.  Mr. Vogt posed a

12   question to you: (As read)  "Now, in connection with

13   when you arrive on a Saturday morning at Rushville.

14   When you arrive, were you provided with the

15   healthcare requests that had been submitted by the

16   residents?

17       "Yes.

18       "Tell us about that.  How does that work when

19   you get there?  You walk in the door, what happens?

20       "Normally they've been put in my box.  All the

21   medical providers have boxes and like an office in

22   the break room.  And I normally go and pull the

23   requests out at that time.  So they just -- the

24   nurses have kind of been pushing them in the box

25   until I get there.  Okay.

1          "Question:  Once you get all the requests --

2     first of all, how many requests typically would be

3     there on a Saturday morning waiting for you:

4          "Answer:  Fifty, sixty.

5          "Question:  Okay.  After you get those 50 or

6     60, what do you do next with the requests in your

7     hand?

8          "Answer:  I actually, while the assistant is

9     opening cabinets and setting up the developer and

10    things, I usually go through the requests.  I start

11    out with individuals that have pain, I put those to

12    one side.  There will be people who say that they

13    want their teeth cleaned, that goes into another

14    pile.  People who want fillings in another file.

15    People who have prosthetics or want prosthetics,

16    they go in a fourth pile.  And then there's people

17    who just say, I want to come down for an exam,

18    that's another pile.

19         "Question:  Once you have those various piles

20    established, you then prioritize them in order of

21    need?

22         "Yes."

23         That was your testimony; correct?

24    A.  That's my testimony; correct.

25    Q.  Mr. Vogt asked you about how many healthcare

MITCHELL - REDIRECT                474

1    requests Mr. Smego had submitted; right?

2         A.  I don't know.  Prior to this or for that

3    trial?

4         Q.  Today.  Today.

5         A.  Yes.

6         Q.  And you looked at I believe three healthcare

7    requests that Mr. Smego had submitted; correct?

8         A.  Yes.

9         Q.  And to your understand those are the only

10   healthcare requests relating to dental care that

11   Mr. Smego has submitted?

12        A.  Correct.

13        Q.  And it's your testimony that a resident

14   should submit a healthcare request if they want to

15   be seen; right?

16        A.  Correct.

17        Q.  You've seen Mr. Smego 14 times since 2005;

18   right?

19        A.  Correct.

20        Q.  You saw him on December 13th, 2005?

21        A.  That's correct.

22        Q.  You saw him on June 24th, 2007?

23        A.  That's correct.

24        Q.  You saw him on July 23rd, 2007?

25        A.  Correct.

MITCHELL - REDIRECT                    475

1      Q.  You saw him on August 25th, 2007.

2      A.  That's correct.

3      Q.  You saw him on May 4th, 2008?

4      A.  That's correct.

5      Q.  You saw him on May 25th, 2008?

6      A.  That's correct.

7      Q.  You saw him on September 7th, 2008?

8      A.  What was that date?  I'm sorry.

9      Q.  September 7th, 2008?

10     A.  Yes.

11     Q.  You saw him on September 22nd, 2008?

12     A.  Correct.

13     Q.  You saw him on October 24th, 2010?

14     A.  Yes.

15     Q.  You saw him on March 27th, 2011?

16     A.  Yes.

17     Q.  You saw him on March 11th, 2012?

18     A.  That's correct.

19     Q.  You saw him in October of 2013?

20     A.  That's correct.

21     Q.  And you saw him in November of 2014?

22     A.  That's correct.

23     Q.  That's fourteen times; right?

24     A.  Correct.

25     Q.  And he only submitted three healthcare

MITCHELL - REDIRECT                    476

1    requests?

2         A.  Correct.

3         Q.  And actually, you only saw him after he

4    submitted two of those healthcare requests; right?

5         A.  Correct.

6         Q.  And that's because there are other ways to

7    see a dentist than submitting a healthcare request;

8    right?

9         A.  That's correct.

10        Q.  A resident can tell a nurse when they're on

11   the floor that they need dental or medical care;

12   right?

13        A.  That's correct.

14        Q.  The nurses make rounds throughout the day

15   and they see residents throughout the day; right?

16        A.  That's correct.

17        Q.  A resident can just let them know, let the

18   nurse know they have an issue?

19        A.  Correct.

20        Q.  A resident can really tell any person that

21   works at the facility that they need to a see a

22   dentist or a doctor; right?

23        A.  That's correct.

24        Q.  A resident can let any staff person in the

25   facility know that they have a dental issue and that

MITCHELL - REDIRECT                    477

1    person can report it to the dental clinic?

2        A.   That is correct.

3        Q.   And then as we saw as we went through your

4    chart, a dentist can then schedule the resident for

5    a follow-up visit by noting NV or next visit in

6    their chart; correct?

7        A.   That's correct.

8        Q.   And you as the dentist also try to get

9    residents into your schedule when you know they need

10   a lot of fillings; right?

11       A.   I try to make sure that the nurses are aware

12   that he needs a filling and this is an appointment I

13   would recommend; yes.

14       Q.   And we talked about the case with one of the

15   residents at Rushville where you knew that he needed

16   a lot of fillings and so then you tried to work him

17   in once a month, once every two months to do a

18   filling to make sure he is getting something?

19       A.   I would always make sure that his name was

20   left with the chart for them to put him on the

21   record -- on the list, yes, if they could.

22       Q.   Because you have a responsibility to see

23   those residents that have serious dental needs;

24   right?

25       A.   If they want the services, yes.

1      Q.  You have a responsibility to see those

2    residents that have serious dental needs versus

3    those that just yell the loudest?

4      A.  I have a responsibility to see everyone.

5    The people who yell the loudest are seen because

6    they're constantly putting in requests.

7      Q.  That wasn't my question, Dr. Mitchell.  My

8    question was do you have a responsibility to see

9    those residents that have serious dental needs

10   versus those that just scream the loudest?

11     A.  Yes.

12     Q.  You actually see Mr. Smego almost every time

13   you're at Rushville, don't you?

14     A.  I see Mr. Smego almost every time I'm there,

15   yes.

16     Q.  He cleans the floors in the healthcare unit?

17     A.  Yes.

18     Q.  So he's outside in the hall while you're

19   seeing residents?

20     A.  Yes.

21         MS. MacDONALD:  No further questions at

22   this time.

23         THE COURT:  Anything further, Mr. Vogt?

24         MR. VOGT:  Just a couple, Judge.

25

MITCHELL - RECROSS                    479

1              RECROSS EXAMINATION

2    BY MR. VOGT:

3        Q.  The policy at Rushville is that if a

4    resident wants to see the doctor or nurse or the

5    dentist, the resident should fill out a healthcare

6    request form?

7        A.  Correct.

8        Q.  But the resident can, like Ms. -- like the

9    attorney for the plaintiff mentioned, Ms. MacDonald,

10   they could ask the nurse or therapist or anybody

11   else and if the nurses put him on the list for

12   patients for you to see, then you see them?

13       A.  Correct.

14       Q.  And the same if you have a next visit

15   scheduled, or hopefully scheduled, for Mr. Smego, he

16   doesn't need a healthcare request then?

17       A.  I put down next visit so the nurses know

18   that if they can fit him in, then he's seen.

19       Q.  And the same for annual exams, there's no

20   health care request for that because that's set up

21   by Rushville?

22       A.  Yes.  That's -- everybody has to get in, so

23   they schedule as many as they can fit on to the

24   schedule after everybody else that needs services

25   are done, yes.

1      Q.  In the end, the healthcare request system is

2  a means of communication?

3      A.  Correct.

4      Q.  No different than the attempt to resolve?

5      A.  No different than the attempt to resolve.

6      Q.  And no different than the grievance?

7      A.  Correct.

8          MR. VOGT:  Thank you, Doctor.

9          THE COURT:  All right.  If you will take

10  the jury out.

11      I'm sorry, do you have questions?  Do you wish

12  to take a few minutes to decide if you have

13  questions?

14      All right.  We'll give you a five minute

15  recess.

16      (The jury left the courtroom.)

17      (Witness excused.)

18      (A break was taken.)

19          THE COURT:  I'm gonna have the jury back

20  and ask if they have any questions.  I will explain

21  the procedure if we have to have a delay.

22      It appears there may be somewhere between one

23  and six inches in the counties in our division.  So

24  what I'm going to tell them is that we have a system

25  whereby we can make an automated call to them when

1    the decision is made.  We can also have e-mails sent

2    and we can have a direct telephone call made if the

3    number isn't picked up and confirmed.

4         What the phone call does, it goes to the

5    person's house, it says this is the Federal Court,

6    we are cancelling court for X period of time,

7    whether it's the morning, the whole day, and you are

8    to call in, hit a number; I can't remember if it's 1

9    or 2, if you received this, and you are so and so.

10   And they do it.  And my jury clerk can do that from

11   her home in the event it has to be done at 3:00

12   tonight.

13        So what I'm considering doing, if you agree, is

14   just going ahead and have everybody report tomorrow

15   at ten.  And then if there is snowfall, send notice

16   that it may be later than that, depending on how bad

17   the snowfall is.

18        Is that acceptable, Mr. Crowl?

19             MR. CROWL:  That's fine, Judge.

20             THE COURT:  Mr. Vogt?

21             MR. VOGT:  Yes, Judge.

22             THE COURT:  Okay.

23        So we have Ms. Vance in the witness chair.

24   We're going to let the jury, if they have questions,

25   submit them to me and I will ask them of the doctor

1    from her seat at counsel table.  So we can speed

2    things up.

3            MS. MacDONALD:  Your Honor, may I give you

4    the copy of Plaintiff's Exhibit 114.

5            THE COURT:  Plaintiff's 14, you said?

6            MS. MacDONALD:  114.  Is the video from

7    earlier today.

8            THE COURT:  Okay.

9            MS. MacDONALD:  We just didn't have -- we

10   admitted it into evidence; we didn't have a copy for

11   the Court at the time.

12           THE COURT:  Do you have -- a sticker is

13   fine, I just need something to mark on.

14           MR. VOGT:  And then, Judge, with regard to

15   the questions; as I recall, you are going to ask us

16   to comment about them or something like that first?

17           THE COURT:  Yes, you will come up for

18   sidebar.  Why don't you just stay up here now, speed

19   things up.

20       Mr. Oney.

21       (The jury entered the courtroom.)

22           THE COURT:  Thank you.  Okay.  I'm labeling

23   these Court's 2 and 3.

24       (The following sidebar discussion was held at

25       the bench, out of the hearing of the jury.)

1          MR. VOGT:  We don't have any evidence

2     of that.

3          MS. MacDONALD:  I think they want to

4     ask Dr. Mitchell a question of that.  I

5     have no objection to that.

6          THE COURT:  No objection to --

7          MR. VOGT:  She's not going to know

8     about what the nurses have to fill out

9     because it's -- you know, there's

10    nursing -- I'm sorry.  I mean Dr. Mitchell

11    doesn't know what the nurses have to fill

12    out.

13         THE COURT:  The question as written is

14    "does the nurses make out a list for the

15    doctor."

16         MS. MacDONALD:  I think the question

17    is getting -- at the end Dr. Mitchell said

18    that a resident can ask a nurse to see a

19    doctor.  And so this question appears to be

20    asking, if that happens, does the nurse

21    have to make a note?

22         THE COURT:  Okay.

23         MS. MacDONALD:  So that's the

24    question.  Can we just ask the question.

25    If she doesn't know, she doesn't know.

1              THE COURT:  All right.

2              MR. VOGT:  Okay.

3              THE COURT:  Court's 3.

4              MR. VOGT:  That's fine, Judge.

5              MS. MacDONALD:  Yeah.  Okay.

6              And maybe you could ask Ms. Vance if

7      she would like to hand us her purse and I

8      can put it down.  I think she actually

9      brought her purse on the stand.  Or we can

10     put --

11             THE COURT:  Okay.

12     (The following proceedings were held in open

13     court.)

14             THE COURT:  All right.  Court's Question 2,

15     which is actually the jury's question.  This is of

16     you, Doctor.

17         What kind of documentation does the nurse have

18     to fill out when the resident makes the verbal

19     request to see dentist, et cetera?

20             DR. MITCHELL:  That I don't know.  I think

21     that the only thing they do is they'll just put them

22     on the list.  Sometimes they'll leave a note for me

23     if it's something specific.  They do have the option

24     of calling me at home if there's a major problem.

25         But in terms of documenting in their progress

1    notes, I don't know.  I just know that if they ask

2    someone to be seen or -- they will just put them on

3    the list, even if they don't have a written request.

4              THE COURT:  Okay.  And then Court's 3.

5         Does every resident on that weekend list, is he

6    seen, or does time run out and some residents get

7    shifted to the next weekend?

8              DR. MITCHELL:  Yes.  For the most part we

9    try to see everybody, but if you can't -- and again,

10   the people that are last seen are people for exams

11   and things like that.  So everyone that needs

12   anything like major, major, that's having pain,

13   they're always seen and they're always prioritized

14   in the beginning of the day.

15        Did I answer the question?

16             THE COURT:  Any additional questions from

17   the jury?

18        Okay.  Follow-up questions, Ms. MacDonald?

19             MS. MacDONALD:  No, Your Honor.

20             THE COURT:  Mr. Vogt?

21             MR. VOGT:  Yes, Judge, just one quick

22   thing.  I want to clear up that last question,

23   Doctor.

24        If you're not able to get through the list of

25   residents that you're provided on a particular

1   weekend, what happens to the people who are still on

2   the list when you run out of hours?

3          DR. MITCHELL:  They actually will -- they

4   move over to the next date if they can.  So

5   generally they're constantly trying to move

6   patients.  I guess especially if it's a specific

7   things.  Like the annuals are things that are

8   required and they have to be done within the year.

9       If let's say Bethany is a person that's a

10  January person and I don't get to her exam, they're

11  going to put her back on the list at some point

12  during the course of that year.  It's not -- I mean

13  it doesn't mean that she displaces an emergency

14  patient, that just means she will get on a list.

15  Because they're gonna keep working off their list of

16  annuals.  Things like that.  Is that the question.

17         MR. VOGT:  And each week is a triage system

18  by the nurses?

19         DR. MITCHELL:  Yes.

20         MR. VOGT:  Thank you, Judge.

21         THE COURT:  Let me talk to the jury for

22  just a second before you begin, Mr. Crowl.

23      We have a winter storm advisory as of 4:00.

24  And I have been checking your counties and the

25  storm.  There are varying predictions.  There's a

1    band that's coming through our region which appears

2    that we may get tonight one to two inches.  There

3    may be, as you know, variations on that.

4        We have a system set up so that you will

5    receive a phone call from my jury clerk

6    automatically.  It's automated and you'll have to

7    press buttons and say you received it.

8        What we may do is move back court to start

9    later.  It may be that you come in at ten, it may be

10   noon, depending on what the weather is doing.  It

11   may be that you get the call at three in the

12   morning; I apologize to you.  But I stay up and

13   watch the weather because I don't want to endanger

14   anyone coming in.

15       And it may be that you have to follow-up and

16   call back in and see the status later.  Because as

17   you know, weather prediction is tough.  We were

18   suppose to get four inches and we got twelve.

19       So I'm showing right now that there is some

20   precipitation in Macomb going down.  Doesn't get to

21   Quincy.  So I'm going to have my clerk call up to

22   Peoria and see what the weather is doing up there

23   just to give us an idea what the storm is like,

24   because it's in the same band, it's just -- it's

25   already hit there.  And it shouldn't hit here for a

1    period of time.

2         But I will keep watching this as I sit up here.

3    And if necessary, if we think it's going to hit

4    soon, we'll send you home.

5         Unless you wish to spend the night.  That's

6    always an option.  I know one of you is spending the

7    night.  So we will consider that as well.

8         All right.  Mr. Crowl.

9              MR. CROWL:  Judge, the plaintiff calls

10   Carol Vance.

11             THE COURT:  All right.  Ms. Vance, if you

12   will raise your right hand, my clerk will swear you.

13        (The witness was sworn.)

14             THE COURT:  Before you begin.  The weather

15   advisory is actually for four to nine in the morning

16   in Cass, Mason, Morgan, and Scott.  But as you know,

17   those are all so close to many of your counties that

18   I'm concerned.  So I will keep you posted.

19                        CAROL VANCE

20   called as a witness herein, having been duly sworn,

21   was examined and testified as follows:

22                   DIRECT EXAMINATION

23   BY MR. CROWL:

24        Q.  Good afternoon, Ms. Vance.

25        A.  Hello.

VANCE - DIRECT                    489

1          THE COURT:  Ms. Vance, excuse me.  I'm

2    gonna move this, it has a short in it.  Are you

3    comfortable there?

4          A.  Yes.

5          Q.  Would you please state your full name?

6          A.  Carol Ann Vance.

7          Q.  And can you tell the members of the jury

8    what you do for a living?

9          A.  I'm a registered nurse.

10         Q.  I want to talk a little bit about your

11   background.  But you were the healthcare director

12   both at Joliet and then also Rushville Treatment and

13   Detention Facility; is that right?

14         A.  Yes.

15         Q.  Okay.  Before we talk about that; tell us

16   about your professional background?  You're a

17   registered nurse; is that right?

18         A.  Yes.

19         Q.  When did you become a registered nurse?

20         A.  1984.  1984.

21         Q.  So you've been a registered nurse for --

22         A.  A long time.

23         Q.  -- about 30 years now?

24         A.  Yes.

25         Q.  How do you like the job?

VANCE - DIRECT                                490

1          A.  Oh, I love it.

2          Q.  What are you doing right now?

3          A.  I work for a company that provides in-home

4    care for seniors.

5          Q.  And what training do you have as a

6    registered nurse?

7          A.  Well, I have a -- I have an Associates

8    Degree from Joliet Junior College in applied

9    science.  I have an associates degree from Moraine

10   Valley Community College in science.  I have a

11   Bachelor's Degree with a major in science from

12   Governor's State University.  And I have a Masters

13   Degree with a focus in nursing from Lewis

14   University.

15         Q.  And we talked at the beginning that you were

16   the healthcare director both at Joliet and then also

17   as Rushville at the treatment and detention

18   facilities; is that right?

19         A.  Yes.

20         Q.  What time frame were you the healthcare

21   director at the Joliet Treatment and Detention

22   Facility?

23         A.  From about March of 2000, and then we moved

24   the facility from Joliet to Rushville somewhere

25   mid-2006 perhaps.

VANCE - DIRECT                                491

1        Q.  And then when you -- when the facility moved

2   from Joliet to Rushville, did you go to the new

3   Rushville facility as the healthcare director?

4        A.  I did.

5        Q.  And whom did you work for when you were the

6   healthcare director in both of these facilities?

7        A.  The first company I was contracted with was

8   Integrated Health Services.  And then the next

9   company that took over the contract was Addus

10  Healthcare.  And I worked for them for the rest of

11  the time in Joliet and in Rushville.

12       Q.  And then you worked for Addus in Rushville

13  until what year, Ms. Vance?

14       A.  Until about September of '07.

15       Q.  And what happened in December -- I'm sorry,

16  in '07?

17       A.  The contract was up for renewal and Addus

18  was not renewed, the contract went to Wexford.

19       Q.  And did you stay with Wexford or did you

20  then shift to a different job after that?

21       A.  Well, I had to go home because of my mother.

22  My mother was ill and this was a long way from home;

23  I use to commute.  So I had to leave the job.

24       Q.  So you were in the position as a healthcare

25  director through 2007; is that right?

1    A.  Yes.

2    Q.  Okay.  And can you tell the members of the

3  jury what your responsibilities were as the

4  healthcare director at the treatment and detention

5  facility, please?

6    A.  Basically I was in charge of overseeing how

7  the healthcare unit worked.  I would hire nurses,

8  counsel them, terminate people.  We contracted with

9  various healthcare clinicians.  I ordered things

10  that needed to be ordered.  Almost anything you

11  could think of to run a healthcare unit.

12    In Rushville we had to order all the basic

13  equipment that was already there when I got to

14  Joliet.

15    Q.  And was Dr. Jacqueline Mitchell employed at

16  both Joliet and then also at Rushville Treatment and

17  Detention Facility while you were there?

18    A.  Yes.

19    Q.  What was her position?

20    A.  She was a dentist.

21    Q.  And with whom was she contracted?  Who did

22  she work for?

23    A.  I'm not quite sure about Integrated, whether

24  she worked for them or not, because they had the

25  contracts then before I came.  But she did work for

1    Addus Healthcare in Joliet and Rushville.

2         Q.  And what was Dr. Mitchell's responsibility

3    both at Joliet and at the Rushville Treatment and

4    Detention Facility?

5         A.  She was responsibile for dental care for the

6    residents there.

7         Q.  Did Dr. Mitchell, by the way, have an

8    assistant?

9         A.  She did.

10        Q.  Who was that assistant, do you recall?

11        A.  Kelly Lawshea.

12        Q.  And what were your responsibilities with

13   regard to Dr. Mitchell while you were working with

14   her at Joliet and mainly at the Rushville Treatment

15   and Detention Facility?

16        A.  I monitored hours according to contract.  If

17   Dr. Mitchell needed something she would let me know

18   or either I or someone in the healthcare unit would

19   place orders for her.  We signed off orders.  We

20   refer to them as orders, it would be a prescription,

21   and we would sign those off.

22        Q.  Let's talk first, Ms. Vance, about the

23   hours.  Do you recall how many hours Dr. Mitchell

24   was contracted for at the Rushville Treatment and

25   Detention Facility?

VANCE - DIRECT                              494

1          A.  I don't.  It was quite a while ago.  But I

2     seem to think somewhere 14, 16, 18 hours.  But I'm

3     not sure.

4          Q.  And was that per week?

5          A.  Yes.

6          Q.  Okay.  And who determined when she worked

7     those hours?

8          A.  Dr. Mitchell.  We let her -- we were very

9     flexible and she could determine what hours she

10     wanted to work and then she came in and worked those

11     hours.

12          Q.  If she wanted to work more hours, could she

13     ask for them?

14          A.  She could have requested such an event.

15          Q.  And do you ever recall Dr. Mitchell ever

16     asking for additional hours?

17          A.  No, I don't.

18          Q.  If she had asked for additional hours what

19     would you have done?

20          A.  I would have asked why she felt she needed

21     them and then I would have reported to my

22     supervisor, who was not on premises, at Addus

23     Healthcare that there was a request for additional

24     hours.

25          Q.  And what were your responsibilities with

VANCE - DIRECT                          495

1    regard to supplies and Dr. Mitchell?

2        A.  We ordered all the supplies for everything

3    that was needed in the facility; for the dentist,

4    the podiatrist, the optometrist, all of them.

5        Q.  Was Dr. Mitchell authorized to order any

6    supplies that she needed?

7        A.  By authorized, you mean turn in a list to me

8    or --

9        Q.  Yes?

10       A.  Yes, yes.

11       Q.  And whenever Dr. Mitchell gave you a list of

12   supplies she needed, what did you do with it?

13       A.  I would place the order with various

14   companies, depending on what it was she wanted.

15       Q.  Now, I know that you had an issue with one

16   supply, which I think was dental floss; is that

17   right?

18       A.  Dental floss.

19       Q.  Can you tell us about that?

20       A.  Well, she wanted dental floss.  And

21   honestly, I wanted dental floss also.  And the

22   facility director who oversaw everything said

23   absolutely not, there would be no dental floss

24   allowed.

25       And I tried to investigate other ways of having

1    something similar to dental floss, but absolutely

2    that was not allowed.

3         Q.  Apart from dental floss, Ms. Vance, was

4    there ever an instance when Dr. Mitchell requested

5    any supply, while you were there at Rushville or

6    Joliet, when you weren't able to provide her with

7    those supplies?

8         A.  No.  I might have questioned her about one

9    thing, but I -- no, that didn't happen.

10        Q.  Okay.  And what did you question her about?

11        A.  Sensodyne toothpaste.  She wanted Sensodyne

12   toothpaste and I questioned why we needed to have

13   Sensodyne toothpaste.  And she told me and I said

14   okay and then we ordered it.

15        Q.  Okay.  So as far as you know, any supply

16   that she requested, other than the dental floss, you

17   provided at the facility; is that right?

18        A.  Yes.

19        Q.  And with regard to medications, was

20   Dr. Mitchell authorized to prescribe any medications

21   that her patients needed?

22        A.  Yes.

23        Q.  And did you provide every medication that

24   she requested?

25        A.  As far as I know we did.  If she ordered

1  something that was not formulary, it would be

2  exchanged for another drug similar.

3      Q.  And with regard to Motrin, there's been some

4  testimony in this case about Motrin.  What is

5  Motrin?

6      A.  It's ibuprofen.  It's a pain reliever.

7  Non-steroidal anti-inflammatory medication.

8      Q.  If a person said that they were allergic to

9  Motrin, were there alternatives to that medication

10  in the facility?

11      A.  Yes.

12      Q.  What were those alternatives?

13      A.  Acetaminophen, Tylenol.

14      Q.  As a nurse, if a person said that they were

15  allergic to Motrin, would you ever give or

16  prescribed that to them?

17      A.  I'm sorry?

18      Q.  As a nurse, if a person said they were

19  allergic to Motrin, would you ever give or prescribe

20  that to them?

21      A.  No, not if someone told me they were

22  allergic to something.  No.

23      Q.  And are you familiar with the medication

24  cart?

25      A.  Yes.

VANCE - DIRECT                    498

1        Q.  Tell us what that is?

2        A.  Medication cart is a large, box-like device

3   on wheels and it holds inside all the medication

4   that a nurse uses to pass to patients.

5        Q.  And if a patient said they were allergic to

6   Motrin and that was noted somewhere on the chart,

7   was the nurse to give that person Motrin or not?

8        A.  No.

9        Q.  Now, we've seen some records where I think

10  they're called an MAR report where nurses have

11  initialled certain things on a chart indicating that

12  medications were given.  Just because a nurse

13  indicates that a person was handed Motrin, does that

14  necessarily mean that the nurse sat there and

15  watched to see whether or not the person actually

16  took the medication?

17       A.  Usually it does mean that.

18       Q.  Okay.  Tell us how that works?

19       A.  The medications were individually sorted by

20  each nurse.  And that was a big job, because there

21  were many medications and they all came in their own

22  little container.  So they had to be opened

23  individually and put in a little cup for each person

24  that wanted medication.

25       And as the nurse gave medication, they

VANCE - DIRECT                    499

1  marked -- they marked it off on the record so -- and

2  that was the record who got what medication.

3      Q.  And do you know Mr. Smego at all?  Have you

4  ever seen him or met him?

5      A.  Is Mr. Smego -- is he here?

6      Q.  He's actually in the courtroom.  He is

7  sitting right next to Ann MacDonald.

8      A.  I'm sorry, I just don't remember him.  I'm

9  sorry.

10     Q.  So you personally don't know about what

11 medications he may or may not have taken while he

12 was at Rushville?

13     A.  Oh, I would have no way of knowing unless I

14 looked at -- there were many, many people.  I didn't

15 know what every single person took.  The nurses took

16 care of that.

17     Q.  And tell us, Ms. Vance, what is the

18 procedure for how residents at Rushville are able to

19 be treated by a dentist?  What's the process for

20 that?

21     A.  Well, the first way would be to turn in a

22 healthcare request.  And that was just a simple form

23 where they would put down their name and their room

24 number and what they wanted to see the dentist or

25 what they wanted to see the person about.

VANCE - DIRECT                                    500

1        Q.  Were residents required to fill out a
2    healthcare request form in order to see a dentist?
3        A.  In later time they were.  In the beginning
4    at Joliet, no; there were so few people, it wasn't
5    necessary.  But as the facility grew then it became
6    hard to take a verbal, can I see the dentist or
7    whatever.  So then we went to a form, a piece of
8    paper.
9        Q.  Okay.  And when you say at the later time
10   they were required to, was it -- was the healthcare
11   request form the only way that someone could see a
12   dentist while you were there or were there other
13   ways as well they could see a dentist?
14       A.  There were other ways.
15       Q.  Tell us about those other ways?
16       A.  The dentist could prepare her own list of
17   people that she wished to see.  Or perhaps she had
18   seen someone already and wanted them to come back
19   because they needed something else or whatever and
20   she could so mark the form.  Usually they would
21   write RTC, return to clinic, might be one week, two
22   weeks, and then they would -- we would prepare a
23   list from that.
24       Q.  And how did that process work?  If the
25   dentist wrote RTC, what was to happen next?

1      A.  Well, those things would frequently be

2  written on a prescription order, which was a

3  triplicate order.  And it had three parts, but the

4  middle part pulled out; if that's clear.

5      And she would write her order on there,

6  whatever it was, for whatever medication they were

7  to get or when she wanted to see them back.  And

8  then all the charts of everyone seen in a particular

9  day would be returned to the nursing office and a

10  nurse would sign off those orders.  She would then

11  look at the orders, see what it was, and then pull

12  out the center part.  If it was for pharmacy, it

13  would go to the pharmacy; wherever it had to go.  So

14  it could be done that way.

15      Q.  And if a -- if a nurse -- I'm sorry, if a

16  dentist wrote "return to clinic," that was a way to

17  get a patient back to see the dentist without the

18  person having to fill out a healthcare request form;

19  is that right?

20      A.  That's right.

21      Q.  You also mentioned that a dentist could just

22  tell the nurse any patient they wanted to see; is

23  that right?

24      A.  Yeah, she could prepare her own list.

25      Q.  And do you know whether or not Dr. Mitchell

VANCE - DIRECT                           502

1   did that?

2       A.  I believe she did at times, yes.

3       Q.  And was there ever an instance that you can

4   recall when Dr. Mitchell said I want to see a

5   particular patient and the nurses didn't provide

6   that patient to her for a visit?

7           MR. VOGT:  Objection.  Foundation, Judge.

8       A.  Not that I can recall, they could --

9           THE COURT:  Ma'am, I apologize.  When they

10  object, I have to make a ruling.  I don't mean to

11  interrupt you.

12          THE WITNESS:  I'm sorry.

13          THE COURT:  The objection is overruled.

14  You may answer, ma'am.

15      Q.  So the question was was there ever a time

16  while you were working with Dr. Mitchell where she

17  ever provided one of these lists and nurses didn't

18  provide that patient as required?

19      A.  I don't recall an event like that, unless

20  the resident were not in the facility that day.

21  That happened occasionally.

22      Q.  Was Dr. Mitchell also authorized to refer

23  patients outside of Rushville for dental care?

24      A.  Yes.

25      Q.  Tell us how that process worked?

VANCE - DIRECT                                           503

1          A.  She would write an order, send patient to

2     wherever, whatever clinic, whatever.

3          Q.  Is that also known as a medical writ?

4          A.  Yes, it is a writ.

5          Q.  Okay.  And then if she said I want a

6     particular patient to see an outside dentist, what

7     was the process then for fulfilling that?

8          A.  Well, in the early days at Joliet and right

9     through the end days of Joliet, our people were sent

10    to the University of Illinois.  And if we had an

11    order saying to send someone to University of

12    Illinois, we would call the University of Illinois;

13    perhaps the clerical person in our unit would call

14    the University of Illinois and say we have a patient

15    who has to be seen and we'd say why.  And they would

16    take down the information.

17         And then they would call us back when they had

18    an appointment.  They would call back and say, you

19    have an appointment for this man on such a date.

20    And then we would prepare the writ to go to security

21    so that the person could be taken out on that day.

22         Q.  And was there also a local dentist in

23    Rushville that you also used at times if a person

24    needed to be seen by a dentist other than

25    Dr. Mitchell?

VANCE - DIRECT                                504

1          A.  Well, I had to arrange for that because we

2     had a problem in Rushville shortly after we moved.

3     So I arranged with a local dentist to see our

4     resident, which he did, after hours, and took care

5     of the problem.

6          Q.  Do you ever recall an instance when

7     Dr. Mitchell made a request for outside treatment of

8     a patient and the nursing staff refused that

9     request?

10         A.  No.

11         Q.  Did you ever recall any instance when

12    Dr. Mitchell told you that she wasn't able to do her

13    job in the amount of hours that were allocated for

14    it?

15         A.  No.

16         Q.  If Dr. Mitchell had said, I can't do my job,

17    I need more hours, what would you have done?

18         A.  I would have notified Addus Healthcare that

19    there was a problem that we couldn't take care of

20    and see if we could get her more hours.

21         Q.  I want to show you, Ms. Vance, Plaintiff's

22    Exhibit No. 97.

23         Is this the Illinois Department of Human

24    Services Treatment and Detention Facility directive

25    effective March 1st of 2003?

VANCE - DIRECT                                   505

1         A.  Yes.

2              MR. CROWL:  May I show the jury, Judge?

3              THE COURT:  You may.

4         Let me make sure there are no objections.

5              MR. VOGT:  No objections.

6              MR. CROWL:  We will offer this, Judge.  May

7    we offer it into evidence as well, Judge?

8              THE COURT:  Yes.  I'll show it as admitted

9    and so marked.

10        (Plaintiff's Exhibit 97 admitted.)

11   BY MR. CROWL:

12        Q.  So you'll see at the top it says Illinois

13   Department of Human Services Treatment and Detention

14   Facility.  Do you see that?

15        A.  Yes.

16        Q.  And it shows an effective date here of

17   March 1st of 2003; is that right?

18        A.  Yes.

19        Q.  And then it has a policy and references and

20   some definitions.  And then here are some general

21   procedures.  Do you see that?

22        A.  Yes.

23        Q.  And one of the procedures is C here.  And

24   would you read that for the members of the jury,

25   please?

VANCE - DIRECT                           506

1      A.  I see it.

2      Q.  Could you read that for the members of the

3  jury?

4      A.  Oh, I'm sorry.

5      (As read)  "Referrals to a dentist are made for

6  symptomatic dental problems based on abnormalities

7  identified by healthcare staff or as a result of a

8  resident request for services."

9      Q.  Does that reflect what we talked about

10  earlier, that there are two ways to see the dentist?

11      A.  Yes.

12      Q.  And what are those two ways?

13      A.  One is by filling out a request and the

14  other is the dentist requesting to see the person

15  for whatever reason.

16      Q.  Then let's turn to the second page,

17  Ms. Vance.  At the top of the second page there's a

18  1D.  Do you see that?

19      A.  Yes.

20      Q.  And what does 1D state?

21      A.  That they'll be provided annual dental care.

22      Q.  And was that the policy that you understood

23  to be in effect while you were both at Joliet and

24  then also at Rushville?

25      A.  Yes.

1      Q.  And then if you would look, we've got 3A.

2  Do you see 3A here?

3      A.  Yes.

4      Q.  And would you read that for us too, please?

5      A.  (As read)  "All appropriate TDF staff must

6  have successfully completed training on dental

7  screening and oral healthcare procedures."

8      Q.  And who did that apply to, Ms. Vance?

9      A.  Appropriate TDF staff would be the dentist

10  and/or her assistant.

11      Q.  So that would be Dr. Mitchell and her

12  assistant, which at one time was her daughter, Kelly

13  Lawshea Mitchell; is that right?

14      A.  Yes.

15      Q.  By the way, there are a couple of names at

16  the bottom here.  Do you know who this individual

17  is?

18      A.  Yes.

19      Q.  Who is that?

20      A.  Dr. Jovita Anyanwu.

21      Q.  And he was the medical director at

22  Rushville; is that right?

23      A.  Yes.

24          MR. CROWL:  Judge, can I have one moment,

25  please?

VANCE - CROSS                                   508

1            THE COURT:  Yes, you may.

2            MR. CROWL:  No further questions for

3    Ms. Vance.

4            THE COURT:  Thank you, Ms. Vance.

5        Mr. Vogt, you have questions?

6            MR. VOGT:  Thank you, Judge.

7                    CROSS EXAMINATION

8    BY MR. VOGT:

9        Q.  Good afternoon, Ms. Vance.

10       A.  Hello.

11       Q.  Now, just a couple of questions.  You were

12   an administrative positions; is that correct, ma'am?

13       A.  Yes.

14       Q.  And just to -- I'd like to ask you some

15   questions you've already taken up.

16       First of all, the commute.  Do I understand

17   what you did for a couple of years or so is you

18   drove from the Chicago area down to Rushville?

19       A.  I commuted.  When we moved from Joliet, I

20   commuted to Rushville; yes.

21       Q.  And then you stayed in an apartment down

22   there?

23       A.  I did.  I had an apartment in the square.

24       Q.  And you worked, if I recall; and maybe I'm

25   mistaken; was it Monday through Thursday?

1          A.   Monday through Thursday, yes.

2          Q.   And then you turned around and came back to

3     Chicago?

4          A.   Yes.

5          Q.   And what happened in the end was that became

6     simply too much on you?

7          A.   Yes.  My family needed me at home.

8          Q.   Okay.  But as I recall your testimony in

9     this case, one thing that was unique is that you

10    actually helped move the charts from Joliet down to

11    Rushville?

12         A.   Yes, I did.

13         Q.   Okay.  And do you recall Dr. Mitchell

14    actually moved a lot of the dental equipment from

15    Joliet down to Rushville?

16         A.   She may have.

17         Q.   Okay.  As far as dental care is concerned,

18    ma'am, my concern -- am I correct you're not a

19    dentist and you don't know anything about dentistry?

20         A.   Nothing.

21         Q.   Okay.  And since you worked Monday to

22    Thursday, do you remember Dr. Mitchell typically

23    worked on the weekends?

24         A.   In Rushville?

25         Q.   At Rushville.  I apologize.

VANCE - CROSS                                    510

1        A.  Yes.

2        Q.  Okay.  So when Dr. Mitchell was working on

3   the weekends, as I understand the schedule, you were

4   not there?

5        A.  That's right.

6        Q.  Okay.  Now, if I -- if the evidence in this

7   case would show that Dr. Mitchell was contracted by

8   Addus to provide 12 hours of dental care per week,

9   would you have any reason to disagree with that?

10       A.  To dispute it?

11       Q.  Yes.

12       A.  No.  She marked her time in, I checked on

13  her hours all the time.

14       Q.  Maybe I can help you along, ma'am.  I know

15  it's been about eight years.

16       A.  Yes, it has.  And I'm not getting any

17  younger.

18       Q.  All right.  May I approach the witness,

19  Judge?

20          THE COURT:  Yes, you may.

21       Q.  I'm referring to Defendant's Exhibit

22  No. 18-014.

23       Ma'am, I will represent to you this is a page

24  from the DHS-Addus contract.  And I've highlighted

25  the one portion.

VANCE - CROSS                                    511

1        A.  Yes.

2        Q.  Okay.  Does that refresh your recollection,

3   ma'am, that Dr. Mitchell was hired by Addus to

4   provide 12 hours of dental care per week at

5   Rushville?

6        A.  Yes.

7        Q.  And do you recall, ma'am, and I -- when you

8   guys were at Joliet and you had a lesser number of

9   residents, Dr. Mitchell had actually been providing

10  24 hours of dental care?  It was cut in half when

11  they came to Rushville?

12       A.  I don't recall, I'm sorry.

13       Q.  No problem.  And one of your jobs, by the

14  way, was to monitor the hours that Dr. Mitchell did?

15       A.  Yes.

16       Q.  And Dr. Mitchell always fulfilled her

17  contract?

18       A.  Yes.

19       Q.  And would you agree that Dr. Mitchell worked

20  very hard at Rushville?

21       A.  Yes.

22       Q.  And as you answered already, she wanted the

23  residents at Rushville to have tooth -- floss;

24  right?

25       A.  Oh, dental floss.  Yes.

1        Q.  Dental floss, I'm sorry.  As you can see,

2   I'm losing half my mind.

3        She wanted the residents to have dental floss;

4   right?

5        A.  Yes.

6        Q.  It's because it would help them keep their

7   teeth healthy?

8        A.  Yes.

9        Q.  But dental floss was a contraband?

10        A.  Absolutely.

11        Q.  And she also wanted those residents to have

12   Sensodyne toothpaste, those residents that were

13   sensitive to hot, cold, pain, things like that?

14        A.  Yes.

15        Q.  Okay.  And as I understand your testimony

16   you were initially reluctant to that?

17        A.  I questioned her about it.

18        Q.  Right.  That's no problem.

19        One way or the other was she able to convince

20   you to do that?

21        A.  Absolutely, there was no problem.  It didn't

22   matter what I wanted, if she ordered it, if she

23   wanted it prescribed, I would get it.

24        Q.  No, I understand.  I understand.

25        And as far as -- I'm sorry.

1          And as far as the contract is concerned on

2     that, you recall Addus had a contract with DHS to

3     provide services at Rushville?

4          A.  Yes.

5          Q.  And the contract, you would agree, would be

6     the document that would control the parties'

7     relationship?  That's why they had it?

8          A.  Yes.

9          Q.  And if the contract said, for example, that

10    the -- that exams of residents was going to be

11    conducted every two years, then the contract would

12    tell Addus what it was suppose to do; correct?

13         A.  Yes.

14         Q.  And Addus was responsible for staffing and

15    staff schedules and a sufficient number of hours,

16    everything to do with healthcare, that was Addus's

17    job?

18         A.  That was their contract, yes.

19         Q.  And the job -- the idea was that DHS did not

20    want to have to deal with dentists and doctors and

21    nurses, so they hired Addus to do it?

22         A.  For whatever reason, yes.

23              MR. CROWL:  I'm going to object to her

24    being asked questions about DHS's understanding,

25    Judge.

1          THE COURT:  The objection is sustained.

2      Q.  Okay.  Did -- after Addus had the contract

3  with the DHS, did Addus provide all the doctors and

4  nurses and dentists and things like that?

5      A.  As far as I know, yes.

6      Q.  And Addus was a very large company; isn't

7  that true, ma'am?

8      A.  I don't know about that.  I don't think they

9  were at the time I worked there.

10      Q.  All right.  Let me show you something,

11  ma'am, that you testified about earlier in this

12  case.  This is part of Defendant's Exhibit 18, page

13  55.  Can you see that, ma'am?

14      A.  I can see it.

15      Q.  I think you have one right there.  I'm

16  sorry.

17          THE COURT:  Now, don't touch the screen

18  unless he asks you to because it actually makes a

19  mark if you touch it with you finger.

20          THE WITNESS:  Oh, okay.

21          THE COURT:  It's magic.

22  BY MR. VOGT:

23      Q.  This is Defense Exhibit 18, page 055.

24      Ma'am, as you can see, this document reflects

25  that Addus's annual sales were $163 million.  Do you

1    see that?

2         A.  Yes.

3         Q.  They had 9,000 employees?

4         A.  Yes.

5         Q.  And then as far as referrals offsite, and

6    I'll just read this to you, would you agree that the

7    contract said this: (As read)  "All routine

8    referrals shall be approved by the DHS medical

9    director or designee, and outside referrals shall be

10   made when appropriate?"

11        A.  Yes.

12        Q.  And what Dr. Mitchell would have to do is

13   she would submit a prescription order and then the

14   medical director would approve it?

15        A.  You mean to go outside?

16        Q.  Yes, huh-uh.

17        A.  Yes.

18        Q.  Okay.  Because what Dr. Mitchell did was she

19   referred patients offsite, for example, for oral

20   surgeons?

21        A.  Yes.

22        Q.  Specialty care?

23        A.  Yes.

24        Q.  She was responsible for doing all of the

25   general dentistry; cavities, things, onsite?

1          A.  Yes.

2          Q.  You have no knowledge of the utilization

3    review committee at Addus; correct?

4          A.  None.

5          Q.  And you were asked some questions about the

6    healthcare request system.  You're familiar with

7    that, ma'am?

8          A.  Yes.

9          Q.  All right.  In fact, let me show you

10   something here.  This is Exhibit -- Defendant's

11   Exhibit 12, page 072.  I think you might recognize

12   this document.  Can you see that, ma'am?

13         A.  Yes.

14         Q.  Is your name on there?

15         A.  Yes.

16             THE COURT:  I don't think the jury can see

17   that, Mr. Vogt.  I can't.  Can you read it,

18   Ms. Vance?

19         A.  I can read it here.

20         Q.  All right.  Ma'am, this is the welcome

21   health care unit -- it's part of the resident

22   handbook; is that correct, ma'am?

23         A.  Yes.

24             THE COURT:  What exhibit is it, I'm sorry.

25         Q.  This is Exhibit 12-072.

1          Anyway, ma'am, I'd like to refer you to the

2     line that's underneath the highlights where it

3     begins:  "All medication is given by nurses?"

4          A.  Are you talking about "medication is passed

5     three times a day?"

6          Q.  Below that it says it's your responsibility

7     to go to the med line --

8          (The reporter asked for clarification.)

9          Q.  Okay.  Do you see the point there where

10    there were three med lines?

11         A.  Yes.

12         Q.  And the med line is the medicine line where

13    the nurses go and distribute medications like you've

14    talked about?

15         A.  Yes.

16         Q.  Okay.  And underneath that, could you read

17    that next line that's in italics?

18         A.  (As read)  "It is your responsibility to go

19    to the med line when it is called if you need any

20    medication."

21         Q.  And that was a big theme at Rushville,

22    wasn't it, ma'am; responsibility?

23         A.  Yes.

24         Q.  You were trying to teach the residents that

25    they have to be responsible for their own

VANCE - CROSS                                518

1    healthcare?

2         A.  Without much success.

3         Q.  Could you read the next line underneath the

4    one you just read, ma'am, where it begins with "all

5    medication?"

6         A.  (As read)  "All medication is given by the

7    nurse.  If you would like to see the nurse, doctor,

8    dentist, eye doctor, or the foot doctor, please fill

9    out a healthcare request form.  The forms are

10   available on the housing units."

11        Q.  That's the form that you mentioned earlier

12   that you began to utilize in earnest once you got

13   down to Rushville?

14        A.  Yes.

15        Q.  Because as the years went by the population

16   that were under the DHS umbrella grew and grew and

17   grew?

18        A.  Yes.

19        Q.  In fact, when you left in 2007, there were

20   about 300 residents?

21        A.  Approximately.

22        Q.  And the idea was is that what the healthcare

23   request system does is it allows the nursing staff

24   and everyone at the facility to know what the

25   resident's problem is?

1          A.  Yes.

2          Q.  It's a communication tool?

3          A.  Yes.

4          Q.  I mean it's a means by which the resident

5    can express, I have a problem, I would like to have

6    this taken care of?

7          A.  It is one of the ways to do it.

8          Q.  Sure.  And by having a nice paper trail, it

9    kicks the system into operation?

10         A.  Well, it helped.  Because there were so many

11   people and so many medications being passed that the

12   nurses could no longer take a verbal, put me on the

13   dental list or whatever list, because they were just

14   too busy.

15         Q.  And that's why in this system in this

16   handbook you said if you want to see the doctor,

17   please submit a healthcare request?

18         A.  Yes.

19         Q.  It helped keep things in order?

20         A.  Mm-hmm, yes.

21         Q.  But don't get me wrong, the resident, if

22   they had a real problem, could always go up to a

23   nurse and say, I need to see the dentist, can you

24   put me on this list?

25         A.  Well, all their problems were real.  They

1    perceived them all as real.

2        Q.  Of course, but that was one other method in

3    addition to the healthcare request system that the

4    resident might use to seek the professional?

5        A.  You mean by the request?

6        Q.  Yeah?

7        A.  Yes, that was one of the ways.

8        Q.  Okay.  And Dr. Mitchell was always worried

9    about making sure everyone at Rushville was covered?

10       A.  I hope so.  I was not with her, I didn't

11   oversee her dental work.  I'm not a dental authority

12   by any means.

13       Q.  No, I understand, I understand.

14       Would you agree, ma'am, that as far as

15   Dr. Mitchell is concerned, she was very, very good

16   and she was very flexible?

17       A.  Yes.  One nice thing is that she was

18   flexible and we were too.  If she had to work more

19   hours one day, she could work less another.  Or she

20   had -- she was behind hours, she could pick them up.

21   We were both flexible as long as the work got done.

22       Q.  All right.  And she worked very hard to take

23   care of the patients there?

24       A.  Yes.

25       Q.  And then as far as the outpatient

1    utilization review committee that we talked about,

2    ma'am.  I'd like to show you Plaintiff's Exhibit 17.

3    This is part of Dr. Mitchell's contract.

4        Could you read the highlighted portion of that,

5    ma'am?

6        A.  I'm sorry.

7        Q.  Could you read the highlighted portion, the

8    portion in yellow.

9        A.  (As read)  "All requests for non-emergency

10   and outpatient services must be initiated by an

11   Addus primary care dentist who completes the

12   consultation request form.  These requests are

13   approved by Addus onsite medical director prior to

14   scheduling."

15       Q.  That was the system that was employed by

16   Addus?

17       A.  When was that written, I didn't --

18       Q.  Oh, this was Dr. Mitchell's contract in

19   2001?

20       A.  Was this part of the contract?

21       Q.  Yes, it was, ma'am.

22       A.  All right.

23           MS. MacDONALD:  Mr. Vogt, could you

24   identify that exhibit?

25       Q.  That's Exhibit 17.

1          All right.  Just a couple more, ma'am.  Motrin

2     and Tylenol, those were two medications that were

3     available at Rushville?

4          A.  By prescription.

5          Q.  Okay.

6          A.  We didn't have any -- everything had to be

7     by prescription.

8          Q.  Everything had to be -- and a medication

9     that was PRN meant that the resident could ask for

10    that medication any time they wished?

11         A.  It's Latin for pro re nata; as needed.

12         Q.  Okay.

13         A.  And they can, if it's written Q, Q meaning

14    every, six hours, they could have PRN medication

15    every six hours, or eight or whatever the doctor

16    wrote.

17         Q.  And that would mean that the resident, every

18    six hours, could ask to get that medication if the

19    resident desired?

20         A.  They could.

21         Q.  Now, the -- and the medication now, you

22    mentioned about the method of the MAR, the

23    medication administration record.

24         A.  Yes.

25         Q.  Now, at Rushville, the process that the

VANCE - CROSS                    523

1   nurses followed was one to ensure that the patient

2   took their medication?

3        A.  Yes.

4        Q.  And the way to do that was they would give

5   the medication to the resident, give the resident a

6   cup of water, the resident then would put the

7   medication in her mouth -- in his mouth, drink the

8   water and then open up his mouth to confirm?

9        A.  They had to open their mouth for

10  psychotropics, but not for regular drugs.

11       Q.  Okay.  And psychotropics, in fact, then had

12  security doing that function; correct?

13       A.  I'm sorry?

14       Q.  They had security staff administering those

15  medications?

16       A.  No.

17       Q.  Oh, okay.  Otherwise the nurses did it, they

18  wanted to make sure that the resident actually

19  ingested the medication?

20       A.  The nurse checks, yes.

21       Q.  And during your career at Rushville you

22  never had any knowledge of nurses giving a resident

23  medication that the resident was allergic to, did

24  you?

25       A.  Not that I remember.

VANCE - CROSS                              524

1          Q.  And you would -- you would be the person who
2     would learn about that?
3          A.  If they told me about it, yes.  I just don't
4     remember any such event.
5          Q.  Okay.  And then the nurses, after they would
6     get the healthcare request and other information,
7     would prepare lists --
8          A.  I'm sorry, we're back on the request forms?
9          Q.  Yes.
10         A.  Okay.  Now what --
11         Q.  I apologize.
12         The nurses would prepare lists of residents for
13     the doctors to see when the doctors arrived at the
14     institution?
15         A.  Yes.
16         Q.  And they would -- one of the means of them
17     preparing those lists would be to have the
18     healthcare requests?
19         A.  Yes, that was one of the ways they did it.
20             MR. VOGT:  Okay.  Thank you for your time,
21     ma'am.  Thank you, Judge.
22             THE COURT:  Cross.
23             MR. CROWL:  Yes, Judge.
24
25

VANCE - REDIRECT                        525

1                    REDIRECT EXAMINATION

2    BY MR. CROWL:

3        Q.  Ms. Vance, Mr. Vogt asked you about the

4    number of hours that was in the contract between

5    Addus and Dr. Mitchell.  Do you remember him asking

6    you about some of those questions?

7        A.  Yes.

8        Q.  And the question was, you know, was it

9    14 hours or was it 12 hours.  And he indicated that

10   the contract said 12 hours?

11       A.  Yes.

12       Q.  Do you recall that?

13       A.  Yes.

14       Q.  I want to show you Plaintiff's Exhibit 74 on

15   the screen.  And look at that particular provision

16   in the contract.  And do you see where it says hours

17   of service there?

18       A.  Yes.

19       Q.  It says:  (As read)  "12 hours per week.

20   Additional hours may be worked if available and

21   first approved by the Addus regional manager."  Do

22   you see that?

23       A.  Yes.

24       Q.  Okay.  And you don't have any recollection

25   of Dr. Mitchell ever telling you I want some more

1    hours, I need more hours to work at Rushville, do

2    you?

3        A.  Not that I recall.

4            MR. CROWL:  Okay.  No further questions,

5    Judge.

6            THE COURT:  Anything further?

7            MR. VOGT:  No, Judge.

8            THE COURT:  All right.  Let me just advise

9    the jury that the storm on the radar appears to be

10   going north of us.  The prediction is that in our

11   area there be perhaps one inch tonight and one inch

12   in the morning at most.  Ms. ████████, excuse me for

13   singling you out; are you driving today with your

14   husband?

15           JUROR:  No.

16           THE COURT:  Okay.  And could I get, by way

17   of note when you come back in, the juror who is

18   staying in a hotel, the number of the hotel and the

19   hotel name so that we have a backup phone number for

20   you in case we have to call.

21       At this point it doesn't look as if we will

22   have to come in late, but who knows what will happen

23   later this evening.

24       So if you will take the jury out.

25       (The jury left the courtroom.)

1          THE COURT:  May this witness be excused at
2   this time?
3          MR. CROWL:  Yes, Judge, thank you.  Thank
4   you, Ms. Vance.
5          THE COURT:  Thank you, Ms. Vance.
6      (The witness was excused.)
7      (A discussion was held off the record.)
8          THE COURT:  Please bring in the jury.
9      (The jury entered the courtroom.)
10          THE COURT:  So there should be a note for
11   me that should go to my CSO to hand to me.
12      And I neglected to ask you whether you had any
13   questions of that last witness.
14      Is that last witness available.
15          MR. CROWL:  Let me check.
16          THE COURT:  She was going to spend the
17   night so we may need to bring her back tomorrow.
18   But why don't you go ahead and check and see if
19   she's in the building.
20      Do you know if Ms. Vance was still in the
21   hallway when you walked in?
22          THE WITNESS:  Yes, she was.  But I'm not
23   sure where she went.
24          THE COURT:  If you will step up, counsel, I
25   think that this witness can probably answer the

1    question I'm going to mark as Court's Exhibit 4.

2    But I don't know.

3        (The following sidebar discussion was held at

4        the bench, out of the hearing of the jury.)

5        MS. MacDONALD:  And the question was

6        for Ms. Vance?  The question is do we ask

7        Ms. Vance or Dr. Lochard?

8        THE COURT:  Do we bring her back or

9        would this witness be able to answer that

10       question.

11       MR. VOGT:  The second one I don't

12       believe so.  That's a medical decision; how

13       an allergies determined.

14       THE COURT:  You mean you don't

15   think --

16       MR. VOGT:  I don't think she has the

17       foundation.

18       THE COURT:  Ms. Vance?

19       MR. VOGT:  Yes, yes, I apologize.

20       THE COURT:  Do you think Dr. Lochard

21   could answer both of these questions?

22       MR. VOGT:  I don't know about the

23   financial issue, Judge.

24       THE COURT:  Do you think the last witness

25   would be able to answer that?

1          MS. MacDONALD:  No.

2          THE COURT:  Okay.  So why don't we see if

3   we can ask these two questions of this witness.  And

4   if he doesn't know, would it be acceptable if I

5   simply explained that Ms. Vance would not know the

6   answers to the questions?

7          MR. CROWL:  Yes.

8          MR. VOGT:  Yeah.  I mean the allergy

9   question I'm confident this witness can take care

10  of.

11         THE COURT:  Okay.  Is that all right?

12         MS. MacDONALD:  Yes.  So you want me to ask

13  the question later, or you will take care of it.

14         THE COURT:  You should take care of

15     it.

16         MS. MacDONALD:  Can I see it one more

17     time?

18         THE COURT:  You can take it.

19     Just the second one?

20         THE COURT:  No, actually both parts.

21         MS. MacDONALD:  The first question

22     too?

23         THE COURT:  Yes.  I don't think any of

24     these witnesses will know.

25         (The following proceedings were held in open

LOCHARD - DIRECT                         530

1          court.)

2              THE COURT:  And I will tell the jury there

3      has been no snow yet in our area.  There's been none

4      in Peoria, which was suppose to get it first.

5              MS. MacDONALD:  Plaintiff calls Dr. Hughes

6      Lochard to the stand.

7              THE COURT:  Please proceed.

8              MS. MacDONALD:  Has the witness been sworn?

9              THE COURT:  No.  I need to sit back so you

10     can be sworn.

11         (The witness was sworn.)

12                      HUGHES LOCHARD

13     called as a witness herein, having been duly sworn,

14     was examined and testified as follows:

15                    DIRECT EXAMINATION

16     BY MS. MacDONALD:

17         Q.  Good afternoon, Dr. Lochard.

18         A.  Good afternoon.

19         Q.  You are a doctor at the Rushville Treatment

20     and Detention Facility?

21         A.  That is correct.

22         Q.  I would like to start off this afternoon

23     with a little bit of your background if that's all

24     right.

25         A.  Sure.

LOCHARD - DIRECT                          531

1        Q.   You went to the University of Illinois in

2    Chicago for college?

3        A.   Correct.

4        Q.   And then you attended medical school in the

5    Dominican Republic?

6        A.   That's correct.

7        Q.   I believe you went to the Central University

8    of the East --

9        A.   Correct.

10       Q.   -- in the Dominican Republic?

11       A.   Yes.

12       Q.   And you graduated from medical school in

13   1989?

14       A.   That is correct.

15       Q.   And as a physician working at the Rushville

16   Treatment and Detention Facility, Wexford is your

17   employer?

18       A.   Yes.

19       Q.   And you've worked at Rushville since 2007?

20       A.   Correct.

21       Q.   And if I understand it correctly, you're

22   basically the staff physician at Rushville?

23       A.   Yes.

24       Q.   And you work four days a week there, Tuesday

25   through Friday?

LOCHARD - DIRECT                                  532

1        A.  Correct.

2        Q.  And your job is to take care of patients

3   generally for their medical issues?

4        A.  Yes.

5        Q.  You help manage patients' whatever medical

6   needs may come up?

7        A.  Yes.

8        Q.  That could include high blood pressure or

9   diabetes?

10       A.  Yes.

11       Q.  And you also evaluate patients to determine

12  whether they need to be seen outside of Rushville

13  for medical treatment?

14       A.  Correct.

15       Q.  And if necessary, you arrange for them to

16  have treatment elsewhere?

17       A.  Yes.

18       Q.  So basically, you are the primary care

19  physician for Rushville Treatment and Detention

20  Facility?

21       A.  Yes.

22       Q.  And you know the defendant Dr. Mitchell in

23  this case?

24       A.  Yes.

25       Q.  She's the dentist at Rushville?

LOCHARD - DIRECT                                533

1          A.  Yes.

2          Q.  And she's been the only dentist since you

3    started working at Rushville in 2007?

4          A.  That is correct.

5          Q.  You've never had any dental training as

6    such, have you?

7          A.  No.

8          Q.  But in light of your medical training,

9    experience as a medical doctor, you're generally

10   familiar with some of the affects that tooth decay

11   can have on other areas of the body?

12         A.  That's correct.

13             MR. VOGT:  Your Honor, I object.  May I

14   approach.

15             THE COURT:  You may.

16        (The following sidebar discussion was held at

17         the bench, out of the hearing of the jury.)

18             MR. VOGT:  Judge, I have no problem

19        with her leading for the background

20        information, but I don't want to have to

21        keep objecting.  Now that the witness is

22        their witness --

23             MS. MacDONALD:  Your Honor, the

24        witness is not our witness, we've called

25        Dr. Lochard adversely.  He was formerly a

1          defendant in this case and he's co-worker

2          of the defendant.

3                 THE COURT:  I'll allow it.

4                 MS. MacDONALD:  Thank you, Judge.

5                 THE COURT:  Please proceed.

6          (The following proceedings were held in open

7          court.)

8    BY MS. MacDONALD:

9          Q.  We were talking a little bit about tooth

10   problems somebody could have; right?

11         A.  Yes.

12         Q.  And you know what a cavity is?

13         A.  Yes.

14         Q.  And you know what tooth decay is?

15         A.  Yes.

16         Q.  And you're aware that cavity or tooth decay

17   can cause jaw pain?

18         A.  Yes.

19         Q.  And that it can also cause pain in other

20   areas of the head or around the ear?

21         A.  Yes.

22         Q.  And when a tooth becomes infected that can

23   also cause jaw pain?

24         A.  Yes.

25         Q.  And in the case of a tooth where the decay

LOCHARD - DIRECT                    535

1    progresses such that the structure of the tooth

2    begins to fall apart or is broken, that would be a

3    serious medical need; right?

4         A.  Yes.

5         Q.  If a resident had a broken tooth, that would

6    be something that would concern you?

7         A.  Yes.

8         Q.  And that would be something you would try to

9    get treated as quickly as possible?

10        A.  Yes.

11        Q.  And that's because a broken tooth can be

12   jagged in a person's mouth?

13        A.  Yes.

14        Q.  Can cause bleeding?

15        A.  Yes.

16        Q.  And a patient isn't going to die from a

17   broken tooth; right?

18        A.  No.

19        Q.  But it's still important to address because

20   it can be painful to a person?

21        A.  Correct.

22        Q.  And it's important to have a dentist take a

23   look at a tooth like that to see if it could be

24   salvaged or determine what treatment was necessary?

25        A.  Yes.

1      Q.  And you're familiar with how dental services

2  are provided generally at Rushville?

3      A.  Yes, I believe so.

4      Q.  And there are multiple ways at Rushville

5  that a patient can be seen by a dentist?

6      A.  Yes.

7      Q.  And you know that a patient can submit a

8  healthcare request?

9      A.  Yes.

10      Q.  But that Rushville doesn't require that the

11  healthcare request be submitted in order to see a

12  patient?

13      A.  Not necessarily.

14      Q.  There are other ways that a resident could

15  be seen by the dentist?

16      A.  Yes.

17      Q.  A resident could tell the nurse at the

18  medication line?

19      A.  Yes, the resident could do that.

20      Q.  A resident could tell you during a visit

21  that they were having a dental issue and ask you and

22  you could refer them to the dentist; correct?

23      A.  Yes, that is a possibility.

24      Q.  And if a resident is complaining that they

25  are having severe dental pain or their tooth is

LOCHARD - DIRECT                    537

1    falling apart, that is something you could relay to

2    the dentist?

3        A.  Yes.

4        Q.  Also, a dentist or doctor can simply

5    schedule a patient for a follow-up visit; right?

6        A.  Yes.

7        Q.  That doesn't require submitting a healthcare

8    request?

9        A.  No.

10       Q.  And if a patient complains of pain to you at

11   Rushville, whether because of a tooth or another

12   issue, it's feasible for you to order some kind of

13   over-the-counter painkiller; right?

14       A.  Yes.

15       Q.  And that could be Tylenol, aspirin,

16   acetaminophen, ibuprofen, naproxen; any of those

17   drugs?

18       A.  Yes.

19       Q.  Okay.  And if a patient objected to a

20   particular medication that you were recommending he

21   take, you could discontinue that medication and

22   prescribe something else; right?

23       A.  Yes.

24       Q.  And that's especially true when it comes to

25   over-the-counter painkillers; right?

LOCHARD - DIRECT                    538

1        A.  Yes.

2        Q.  There are multiple different types of

3   painkillers available for common ailments?

4        A.  Yes.

5        Q.  Doctors and dentists at Rushville have the

6   ability to prescribe Tylenol or acetaminophen to

7   residents; right?

8        A.  Yes.

9        Q.  They have the ability to prescribe aspirin?

10       A.  Yes.

11       Q.  Naproxen?

12       A.  Yes.

13       Q.  And all of those drugs are basically

14   interchangeable for pain; right?

15       A.  Yes.

16       Q.  And if a patient comes to you in the course

17   of your practice and says, Doc, you know, this

18   Motrin, it's causing me some discomfort, it's

19   hurting my stomach, it's giving me some kind of

20   reaction, you would stop the Motrin and give them

21   something else; right?

22       A.  Yes.

23       Q.  And in fact, you have changed Mr. Smego's

24   painkiller before when he was having an issue with a

25   painkiller; right?

LOCHARD - DIRECT                    539

1          A.  I believe so, yes.

2          Q.  In September, 2008, do you remember treating

3     Mr. Smego for some shoulder pain he was having?

4          A.  Yes, possibly.

5          Q.  And you initially prescribed him some

6     Motrin, but then when he complained, you changed his

7     prescription to naproxen?

8          A.  Yes, I believe so.

9          Q.  I'm gonna show you what's been marked as

10    Plaintiff's Exhibit 39.  Could we have the screen.

11               THE COURT:  Could you lower the lights too,

12    please.

13         Q.  And Exhibit 39, you can see these are two

14    medication orders by you, Dr. Lochard?

15         A.  Yes.

16         Q.  And we see the one at the top says d-c

17    Motrin; right?

18         A.  Correct.

19         Q.  And that means discontinue Motrin?

20         A.  Yes.

21         Q.  And so this is an example of a time when you

22    discontinued a Motrin prescription for Mr. Smego?

23         A.  Yes.

24         Q.  And then instead you have the prescription

25    around that same time for Naprosyn, right?

LOCHARD - DIRECT                               540

1          A.  Correct.

2          Q.  And Naprosyn is an over-the-counter

3    painkiller?

4          A.  In that does it's prescription.

5          Q.  Prescription?

6          A.  The over-the-counter is Aleve, but this

7    is -- has to be written by a physician.

8          Q.  Okay.  But the purpose of prescribing it,

9    Naprosyn in this case is to address Mr. Smego's

10   pain?

11         A.  Correct.

12         Q.  And you're familiar with the procedures that

13   nurses follow when they're handing out medication on

14   the medication cart at Rushville?

15         A.  I believe I am, yes.

16         Q.  The nurse brings around a cart; right?

17         A.  Yes.

18         Q.  And it has the little cups on top of the

19   cart?

20         A.  Yes.

21         Q.  With the different medications in those cups

22   divided up?

23         A.  Yes.

24         Q.  And then if a resident would like PRN

25   medication such as aspirin or Naprosyn, they would

LOCHARD - DIRECT                    541

1    ask the nurse at that time and they would be
2    provided that cup; right?
3        A.  Yes.
4        Q.  And patients come up to the cart, the nurse
5    hands them the medication, and then they walk away;
6    right?
7        A.  Yes.
8        Q.  And then after the nurse has made the rounds
9    with the medication, they go back to the healthcare
10   unit; right?
11       A.  Yes.
12       Q.  And then once they're back to the healthcare
13   unit, that's when they fill out that medical
14   administration record, the MAR?
15       A.  Yes, that's what I believe takes place.
16       Q.  And that MAR does not go out on the cart
17   with them during the rounds, that stays back in the
18   healthcare unit?
19       A.  I believe that is correct.
20       Q.  And as you mentioned before, Dr. Lochard,
21   residents of Rushville can be sent outside of
22   Rushville for treatment if necessary?
23       A.  Yes.
24       Q.  And when you decide to send a patient
25   offsite, you first examine that patient?

LOCHARD - DIRECT                    542

1          A.  Yes.

2          Q.  Then you determine that patient's needs?

3          A.  Yes.

4          Q.  And if something is beyond your capabilities

5     at Rushville then you would refer the patient to an

6     outside treater?

7          A.  Correct.

8          Q.  If you were confronted with a medical

9     condition that you could not address at Rushville,

10    you would send a patient offsite?

11         A.  Yes.

12         Q.  And if a patient needed a treatment that

13    Rushville, for whatever reason, couldn't provide on

14    a given date, you can request that that patient be

15    sent out; right?

16         A.  Correct.

17         Q.  And as a dentist, Dr. Mitchell can send

18    patients offsite for treatment; right?

19         A.  Correct.

20         Q.  And there's been some testimony in this case

21    about the utilization review board.  Are you

22    familiar with that?

23         A.  Yes.

24         Q.  And that was something that was started at

25    Rushville in 2014; right?

LOCHARD - DIRECT                    543

1        A.  Correct.

2        Q.  And from the time you started at Rushville

3    in 2007 until 2014, there was no utilization review

4    board procedure; right?

5        A.  That is correct.

6        Q.  During that time if a doctor or dentist

7    wanted to send a patient offsite they would merely

8    write the prescription for it and then it would

9    happen?

10       A.  Correct.

11       Q.  No one else was determining whether you

12   could or could not send a patient out during that

13   time?

14       A.  Correct.

15       Q.  And that was also true for dentists from

16   2007 to 2014?

17       A.  Yes.

18       Q.  And how that process would work is that you

19   would write a medication order prescribing the

20   treatment that that patient needed outside of

21   Rushville; right?

22       A.  Correct.

23       Q.  Then you would give that to a nurse; right?

24       A.  Yes.

25       Q.  And she would give it to an assistant who

LOCHARD - DIRECT                    544

1    would handle coordinating that appointment with the

2    outside provider?

3         A.  Yes.

4         Q.  And you've actually sent Mr. Smego offsite

5    for medical treatment in this -- from Rushville;

6    right?

7         A.  Yes.

8         Q.  I'd like to talk a little bit about a few of

9    those offsite referrals.  I'm gonna show you what's

10   been marked as Plaintiff's Exhibit 40.

11        We will start at the top here.  Do you --

12   Plaintiff's Exhibit 40 is a medical writ for an

13   offsite treatment for Mr. Smego; right?

14        A.  Yes.

15        Q.  And this is an example of a time in October

16   of 2009.  See the date right up here, right?

17        A.  Yes.

18        Q.  When you sent Mr. Smego to a hospital

19   outside of Rushville?

20        A.  Yes.

21        Q.  And why did you send Mr. Smego out on that

22   date?

23        A.  It was for him to have a test called an ENG

24   nerve conduction study of his upper extremities to

25   see if he had any nerve damage to his arms.

LOCHARD - DIRECT                                    545

1      Q.  And you sent him offsite after you met with

2    him and determined that you could not address that

3    issue at Rushville; right?

4      A.  Correct.

5      Q.  I'll show you what's been marked as

6    Plaintiff's Exhibit 41.  This is another writ

7    that -- order that -- by you, Dr. Lochard, to send

8    Mr. Smego offsite from Rushville Treatment and

9    Detention Facility?

10     A.  Yes.

11     Q.  And it's dated May 19th of 2010?

12     A.  Correct.

13     Q.  And here you ordered that Mr. Smego be sent

14   to visit a surgeon at Culbertson Memorial Hospital?

15     A.  Yes.

16     Q.  We can see at the bottom here that the

17   reason was to discuss surgery for carpal tunnel

18   release?

19     A.  Yes.

20     Q.  And then we see your name at the bottom as

21   ordering physician?

22     A.  Yes, yes.

23     Q.  And again, no one other than you was

24   required in order to approve this offsite treatment;

25   right?

1          A.  Correct.

2          Q.  Show you what's been marked as Plaintiff's

3   Exhibit 42.  Exhibit 42 is another order that you

4   issued for Mr. Smego to be treated outside of

5   Rushville Treatment and Detention Facility?

6          A.  Yes.

7          Q.  Dated April 18th of 2011?

8          A.  Correct.

9          Q.  And on that day you sent Mr. Smego to the

10  Culbertson Memorial Hospital?

11         A.  Yes.

12         Q.  Why did you send him there on that date?

13         A.  It was for him to have an examination for

14  the nerves of his lower extremities.

15         Q.  And we see your name on the bottom here?

16         A.  Yes.

17         Q.  I'm gonna show you what's been marked as

18  Plaintiff's Exhibit 43.  This is another order from

19  you to send Mr. Smego to receive treatment outside

20  of Rushville?

21         A.  Yes.

22         Q.  It's dated November 22nd of 2011?

23         A.  Yes.

24         Q.  And on this date you sent Mr. Smego offsite

25  to the hospital to have a CT of his neck?

LOCHARD - DIRECT                         547

1           A.  Correct.

2           Q.  And again, this was because you had met with

3    Mr. Smego and determined that it wasn't feasible for

4    you to treat Mr. Smego onsite at the time?

5           A.  Yes.

6           Q.  And we can see at the bottom here that --

7    your name as the ordering physician?

8           A.  Yes.

9           Q.  I'll show you what's been marked as

10   Plaintiff's Exhibit 44.  This is another writ that

11   you ordered for Mr. Smego to be sent and seen

12   outside of Rushville?

13          A.  Yes.

14          Q.  And this is dated February 15th, 2012?

15          A.  Correct.

16          Q.  And on that date you ordered that Mr. Smego

17   be seen for an evaluation at Springfield Clinic?

18          A.  Yes.

19          Q.  And again, no further approval was required

20   other than from you in order to send Mr. Smego out

21   for this visit; right?

22          A.  Correct.

23          Q.  Show you what's been marked as Plaintiff's

24   Exhibit 45.  This is another order that you wrote

25   for Mr. Smego to be seen outside of Rushville?

LOCHARD - DIRECT                    548

1        A.  Yes.

2        Q.  And this is on May 14th of 2012?

3        A.  Correct.

4        Q.  And on that date you sent Mr. -- or you

5   ordered that Mr. Smego should be sent offsite to

6   have an ultrasound of his thyroid?

7        A.  Yes.

8        Q.  Again, this is because you met with

9   Mr. Smego and determined that his needs couldn't be

10   meet at Rushville at that time?

11        A.  Yes.

12        Q.  And again we see your name at the bottom of

13   this order?

14        A.  Correct.

15        Q.  Show you what's been marked as Plaintiff's

16   Exhibit 46.  Exhibit 46 is another order that you

17   wrote for Mr. Smego to be seen outside of Rushville?

18        A.  Yes.

19        Q.  It's dated July 27th of 2012?

20        A.  Yes.

21        Q.  And on that date you sent him out to have a

22   biopsy of his thyroid at a hospital?  Or a medical

23   center?

24        A.  Yes.

25        Q.  And again, you made this determination after

LOCHARD - DIRECT                    549

1    meeting with Mr. Smego and determining that it

2    wasn't feasible for you to address this issue

3    onsite?

4         A.  Correct.

5         Q.  And no further approval was needed for you

6    to send Mr. Smego out for this procedure?

7         A.  Correct.

8         Q.  I want to look at one more of these.  We

9    have Plaintiff's Exhibit 47.  This is another order

10   that you wrote for Mr. Smego to be seen outside of

11   Rushville Treatment and Detention Facility?

12        A.  Yes.

13        Q.  And it's dated January 4th of 2013?

14        A.  Yes.

15        Q.  And on that date you ordered that Mr. Smego

16   should be sent out for a CT of his soft neck tissue?

17        A.  Yes.

18        Q.  And then we see at the bottom here that

19   you're the ordering physician; right?

20        A.  Correct.

21           MS. MacDONALD:  Your Honor, I would move to

22   admit these medical records, 40 through 47, into

23   evidence.

24           THE COURT:  Any objection?

25           MR. VOGT:  No, Judge.

1              THE COURT:  I will admit them and I will

2      mark them after we're done.

3          (Plaintiff's Exhibits 40 thru 47 admitted.)

4              MS. MacDONALD:  All right, I'm not sure if

5      I did initially, but Plaintiff's 38 was also

6      offered.  And I'm sorry, Plaintiff's 39 is also

7      offered into evidence.

8              THE COURT:  Any objection?

9              MR. VOGT:  No objection, Judge.

10             THE COURT:  Okay, it will be admitted.

11         (Plaintiff's Exhibits 38 and 39 admitted.)

12     BY MS. MacDONALD:

13         Q.  So these medical writs that we walked

14     through show that eight times in five years you sent

15     Mr. Smego outside of Rushville for treatment; right?

16         A.  Yes.

17             MS. MacDONALD:  I have no further questions

18     at this time.

19             THE COURT:  Cross?

20             MR. VOGT:  Thank you, Judge.

21                  CROSS EXAMINATION

22     BY MR. VOGT:

23         Q.  Good afternoon.  I will try to move quickly,

24     okay?

25         A.  Okay.

LOCHARD - DIRECT                    551

1        Q.  The medical writs that you were just talking

2    about, sir, those all involved services that you

3    could not provide at Rushville?

4        A.  Correct.

5        Q.  They required specialty equipment --

6        A.  Yes.

7        Q.   -- or a specialty physician?

8        A.  Yes.

9        Q.  All of the physicians -- all of the services

10   that you yourself, as a primary care physician, that

11   you can provide, you do in fact provide at

12   Rushville?

13       A.  Yes.

14       Q.  You don't send somebody offsite from

15   Rushville for something that you yourself do?

16       A.  Correct.

17       Q.  And your job is the primary care physician

18   at Rushville and you provide primary care services?

19       A.  Yes.

20       Q.  And just like -- and as far as primary care

21   services are concerned, bottom line is you do the

22   best you can in the time that you have to take care

23   of the residents that are there?

24       A.  Yes.

25       Q.  And what you do, as I understand, is you

LOCHARD - DIRECT                              552

1    work typically Monday to Thursday?

2         A.  Tuesday through Friday.

3         Q.  Tuesday to Friday, I'm sorry.  And what

4    happens is that when you come in on Tuesday, for

5    example, the nurses will have prepared a list of

6    residents for you to see?

7         A.  Correct.

8         Q.  And what you will do is you will start

9    moving down the list trying to examine and touch

10   base with each of the patients on your list?

11        A.  Yes.

12        Q.  You've actually done that for your entire

13   career with the DHS?

14        A.  Yes.

15        Q.  And prior to the DHS, sir, you worked with

16   Wexford at the Department of Corrections at various

17   facilities?

18        A.  Yes.

19        Q.  And at those facilities also the process was

20   the same.  The nurses would prepare a list of

21   patients for you to see and you would come in and

22   would begin examining and treating the patients down

23   the list?

24        A.  Yes.

25             MS. MacDONALD:  Objection.  Leading, Your

1    Honor.

2              MR. VOGT:  It is cross, Judge.

3              MS. MacDONALD:  May we approach on this

4    issue, Your Honor?

5              THE COURT:  You may.

6         (The following sidebar discussion was held at

7         the bench, out of the hearing of the jury.)

8              MS. MacDONALD:  As Your Honor is

9         aware, when he -- it's not a true cross if

10        it's a friendly witness to his client.

11             THE COURT:  I don't know that.

12             MR. VOGT:  Your Honor --

13             MS. MacDONALD:  We do know that they

14        both have the same employer and they work

15        at the same facility.  And they were

16        chatting right when he got on the stand.

17             THE COURT:  For the record my clerk

18        advised me of that.  And my law clerk

19        advised the two they were not to be

20        speaking.  I don't like any discussion like

21        that here.

22        But under the circumstances -- who

23        dismissed this defendant?

24             MS. MacDONALD:  The judge.

25             MR. VOGT:  No, it -- well, I don't

1        know if --

2            MS. MacDONALD:  Summary judgment.

3        There was no --

4            MR. VOGT:  I'm sorry, I can't recall.

5            THE COURT:  So it was judicially

6        ordered; it was not by agreement or

7        settlement?

8            MS. MacDONALD:  That's correct.

9            THE COURT:  Limited.  Limited cross.

10           MR. VOGT:  Limited cross in what

11       respect, Judge?

12           THE COURT:  Limited leading in cross.

13           MR. VOGT:  Judge, he is not my

14       witness.  I'm in no way aligned with this

15       witness.  He is not my client's witness.

16       My client is just an employee at the

17       facility where he works.  I am in no way

18       aligned with him.  She called him on direct

19       and the Court allowed her to cross, but

20       still, I'm now cross examining a witness

21       that she has tendered as her witness.  I

22       have no alignment with this fellow.

23           MS. MacDONALD:  The advisory committee

24       notes to Rule 611 specifically note that

25       even -- that a cross that is a cross of

LOCHARD - DIRECT                              555

1   informal is not a true cross and this is a

2   co-worker of the client and a former

3   defendant and your friendly witness.

4       MR. VOGT:  It's not my friendly

5   witness.  I met him one time at his

6   deposition.

7       MS. MacDONALD:  It's not about you,

8   it's about your client.  Your client is the

9   only dental and Dr. Lochard is the main

10  doctor at this facility.

11      MR. VOGT:  And my client is a dentist,

12  but she's not Wexford.  If she was Wexford

13  they might have --

14      MS. MacDONALD:  She is Wexford.

15      (Court reporter requested that

16       the attorneys stop speaking

17       simultaneously.)

18      MR. VOGT:  She is not Wexford, Judge.

19  If it was Wexford, there might be something

20  in what she is saying.  My client is an

21  employee, does a completely different job

22  than this fellow.  She has nothing to do

23  with him.

24      THE COURT:  Does Dr. Lochard have any

25  supervisory powers over the dentist?

1          MR. VOGT:  No.

2          MS. MacDONALD:  Yes, he does.  The

3    contract, the 2010 contract from Wexford

4    provides that Dr. Lochard is her boss.

5          MR. VOGT:  No, that is not true,

6    the --

7          MS. MacDONALD:  It is true --

8    (The court reporter requested that the

9    attorneys stop speaking simultaneously.)

10   (The following proceedings were held in open

11   court.)

12         THE COURT:  We're going to take a short

13   recess.

14       In checking the radar, I don't believe we have

15   any snow yet either.  We don't here obviously, but I

16   mean in Quincy.

17       (The jury left the courtroom.)

18       (A break was taken.)

19         MS. MacDONALD:  I wanted to correct that

20   the 7th Circuit did not dismiss Mr. Lochard,

21   Mr. Smego did.  It was Dr. Bednarz who the 7th

22   Circuit dismissed.

23         THE COURT:  Okay.  Thank you.

24         MR. VOGT:  Management.  Are you the medical

25   director there?  No, I am not.  There's no

1   supervisory.

2        MS. MacDONALD:  But contract which is

3   Plaintiff's Exhibit 80 does indicate that

4   Dr. Mitchell does report to Dr. Lochard.

5        MR. VOGT:  All I can do is tell you --

6   again, Judge.

7        THE COURT:  You may cross.

8        MR. VOGT:  Judge, how long do you want to

9   go today?

10       THE COURT:  How much do you think you have

11  for the doctor.

12       MR. VOGT:  Maybe 45 minutes, Judge.

13       THE COURT:  I can't keep them that long.

14  They're gonna hit this ice and snow.  As are you,

15  are you back to Rushville.

16       DR. LOCHARD:  No, I will be here.

17       THE COURT:  You can stay?

18       DR. LOCHARD:  Yes, I live here.

19       THE COURT:  Oh, that makes it much easier.

20  I forgot that.

21     All right.  Please bring in the jury.  I'm

22  going to go ahead and excuse them at this time.  And

23  I apologize for having to bring you back.  I had

24  already promised -- because that's what I have been

25  looking at, is the storm.

1        We're suppose to get who knows, four to six

2   inches, but the worry I have is there's a band that

3   Peoria is gonna get, but in the band below that

4   which is where Rushville is, where they're going and

5   where a couple of my jurors are going, Green and

6   Adams County, it's ice and snow.

7        (The jury entered the courtroom.)

8            THE COURT:  Court is reconvened.

9        We have resolved our issues, but since it's

10  4:30 and I told you you would be allowed to leave

11  then given the weather, we are going to break.  And

12  the doctor has graciously agreed to come back

13  tomorrow morning.

14       So we will proceed in the morning.  Drive

15  carefully.  It doesn't look like any snow or ice is

16  on your roads, but as you know, our weather is not

17  usually reported accurately.  So be very careful.

18       What we're going to do is plan on convening at

19  9:00.  But if the weather does change this evening

20  you'll receive a phone call from Cathy Cathcart

21  telling you that either -- I apologize, it may be

22  late.  I will try to make the decision before

23  10:00 at night if there's going to be a late

24  reporting.  But if necessary, if the snow hits late

25  in the morning, we'll call you early, early in the

1    morning.

2         Does anyone live more than two hours away?  No.

3    Okay.  All of you within an hour, correct?  Hour,

4    hour and a half.

5              JUROR:  Yeah.

6              THE COURT:  Okay.  Especially if there's

7    snow.  So I will keep that in mind and do my best to

8    monitor the weather.

9         And feel free, as you check out downstairs, get

10   Cathy Cathcart's number.  And I would feel better if

11   you had her number so you could call her if there's

12   a specific issue that you have.  Okay?

13        The storm doesn't look like it's going to be

14   too bad here.  I just hope that that's correct.

15   You're excused at this time.

16        (The jury left the courtroom.)

17              THE COURT:  Doctor, could we get your

18   contact information in the event we do start late so

19   we can also call you?

20        All right.  Can we take care of anything else?

21   We need to have our exhibits admitted.  I believe

22   plaintiffs had a number I admitted and defense

23   hasn't moved for admission yet.

24              MR. VOGT:  Yes, Judge.

25              THE COURT:  Be sure.

1          MR. VOGT:  May I do it first thing in the

2    morning?

3          THE COURT:  Why don't I go ahead and mark

4    them now.  But you can move them in front of the

5    jury and I'll admit them in front of the jury.

6          MR. VOGT:  Okay.  Judge, once --

7          THE COURT:  Who is the next witness after

8    Dr. Lochard, Ms. MacDonald?

9          MS. MacDONALD:  Either Mr. Smego or

10   Ms. Walker-Lowe.

11      Ms. Walker-Lowe was subpoenaed for early

12   tomorrow morning so we'll have to figure out how

13   we're going to coordinate that.

14         THE COURT:  Is she at Rushville?

15         MS. MacDONALD:  She lives in Rushville.

16         THE COURT:  Okay.

17         MS. MacDONALD:  But she's coming here in

18   person in the morning.

19         MR. WATSON:  Your Honor, she lives in

20   Havana.  She is under subpoena to come tomorrow

21   morning.

22         THE COURT:  Do any of the officers have her

23   contract information with you?

24         MS. MacDONALD:  I have her contact

25   information.

```
 1            THE COURT:  As in cellphone, e-mail?

 2            MS. MacDONALD:  Yeah.

 3            THE COURT:  Why don't you advise her not to

 4    be here before ten tomorrow.  You're gonna call

 5    Dr. Smego before you call her?

 6            MS. MacDONALD:  We are not sure in light of

 7    some of the scheduling.

 8            THE COURT:  All right.  Have her be here at

 9    ten, in the event Havana looks like it may get it

10    quicker than we do.

11            MS. MacDONALD:  Okay, we'll talk amongst

12    ourselves and then reach out to her and let her know

13    she will be here at ten.

14            THE COURT:  Let me have the exhibits and I

15    will mark them.

16        And, Doctor, you may go.

17        All right.  I have Plaintiff's 39.  Yes,

18    Plaintiff's 39 is admitted and so marked today's

19    date.

20        There was no objection, correct, Mr. Vogt?

21            MR. VOGT:  What's 39, Judge, if I could

22    ask?

23            THE COURT:  39 is the Motrin prescriptions.

24            MR. VOGT:  No, Judge.

25            THE COURT:  And Naprosyn.
```

1          MR. VOGT:  Yes, Judge, no objection.

2          THE COURT:  And PDT skin test.

3      (Plaintiff's Exhibit 39 admitted.)

4          THE COURT:  Plaintiff's Exhibit 40 is

5  Culbertson referral to neurology.  Any objection?

6          MR. VOGT:  No, the -- are these the

7  individual referrals, Judge?

8          THE COURT:  Mm-hmm.

9          MR. VOGT:  No objection.

10     (Plaintiff's Exhibit 40 admitted.)

11         THE COURT:  41 is another referral to

12 surgeon.

13         MR. VOGT:  No objection, Judge.

14         THE COURT:  They're admitted and so marked.

15     (Plaintiff's Exhibit 41 admitted.)

16         THE COURT:  42 is referral to Mira cull

17 Burton, ENG.

18         MR. VOGT:  No objection, Judge.

19     (Plaintiff's Exhibit 42 admitted.)

20         THE COURT:  43 radiology CT neck,

21 Culbertson.

22         MR. VOGT:  No objection.

23         THE COURT:  It's admitted and so marked.

24     (Plaintiff's Exhibit 43 admitted.)

25         THE COURT:  Plaintiff's Exhibit 44 is

1   referral, Springfield Clinic, Garcia.  And only

2   because I know, he's my doctor, he's an ENT.  Any

3   objection?

4           MR. VOGT:  No, Judge.

5           THE COURT:  44 is admitted so marked.

6       (Plaintiff's Exhibit 44 admitted.)

7           THE COURT:  45 admitted for the thyroid?

8           MR. VOGT:  No objection.

9           THE COURT:  It's admitted and so marked.

10      (Plaintiff's Exhibit 46 admitted.)

11          THE COURT:  46, referral surgery biopsy,

12  thyroid.  Any objection?

13          MR. VOGT:  No, Judge.

14          THE COURT:  Admitted and so marked.

15      (Plaintiff's Exhibit 46 admitted.)

16          THE COURT:  47, referral CF soft tissue

17  Culbertson.  Any objection?

18          MR. VOGT:  No objection, Judge.

19          THE COURT:  47 is admitted and so marked.

20      (Plaintiff's Exhibit 47 admitted.)

21          THE COURT:  Will you need these back?

22          MS. GLEASON:  I just want to make sure my

23  notes are correct, Your Honor.

24          MS. MacDONALD:  No, Your Honor.

25          THE COURT:  All right.  Do we have

1   defendant's exhibits?

2          MS. CAMPBELL:  I had them separated for

3   Dr. Lochard.  I'm sorry.

4          THE COURT:  It's okay.  I have an agent

5   waiting, I can swear him in and take testimony,

6   that's fine.

7          MS. GLEASON:  Your Honor, I've been meaning

8   to ask, the demonstrative exhibits that have been

9   used really, those three were brought up to me.  How

10  do you want to deal with those?

11         THE COURT:  I simply want them listed as

12  demonstrative exhibits in the record and kept in the

13  file, okay?  It's what the jury saw.  It is not

14  admitted into evidence, but it needs to be in the

15  record.

16         MS. GLEASON:  Okay.

17         THE COURT:  Okay.

18         MS. GLEASON:  So we will docket them.

19         THE COURT:  Yes.  Can I take care of

20  anything else at this time?

21         MS. MacDONALD:  No, Your Honor.

22         MR. VOGT:  Thank you, Judge.

23         THE COURT:  Court is in recess.

24      (A recess was taken.)

25

1

2

3

4    I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

5    Reporter, certify that the foregoing is a correct

6    transcript from the record of proceedings in the

7    above-entitled matter.

8

9

10

11

12                    This transcripts contains the

13                    digital signature of:

14

15                    Kathy J. Sullivan, CSR, RPR, CRR

16                    License #084-002768

17

18

19

20

21

22

23

24

25