```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                    SPRINGFIELD DIVISION

 3
   RICHARD M. SMEGO,                )
 4                                  )
                 PLAINTIFF,         )  08-3142
 5                                  )
           VS.                      )  JURY TRIAL
 6                                  )
   DR. JACQUELINE MITCHELL,         )  SPRINGFIELD, ILLINOIS
 7                                  )
                 DEFENDANT.         )  VOL. III
 8

 9             TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE SUE MYERSCOUGH
10            UNITED STATES DISTRICT JUDGE

11
   FEBRUARY 26, 2015
12
   A P P E A R A N C E S:
13
   FOR THE PLAINTIFF:          MATTHEW CHARLES CROWL
14                             ANN H. MacDONALD
                               BRIAN O'CONNOR WATSON
15                             KAITLIN GRACE KLAMANN
                               SCHIFF HARDIN LLP
16                             233 SOUTH WACKER DRIVE
                               CHICAGO, ILLINOIS
17

18  FOR THE DEFENDANT:         ROBERT P. VOGT
                               BETHANY SUE CAMPBELL
19                             WELDON LINNE & VOGT
                               20 SOUTH CLARK STREET
20                             CHICAGO, ILLINOIS

21

22

23  COURT REPORTER:      KATHY J. SULLIVAN, CSR, RPR, CRR
                         OFFICIAL COURT REPORTER
24                       600 E. MONROE
                         SPRINGFIELD, ILLINOIS
25                       (217)492-4810
```

1                          I N D E X

2   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS
    HUGHES LOCHARD                611     647/661    654
3   DANIELLE WALKER      669      701     731/749    748/750
    RICHARD SMEGO       754

4

5

6

7

8

9                      E X H I B I T S

10  PLAINTIFF'S EXHIBIT
    NUMBER                   IDENTIFIED    ADMITTED
11
    Exhibit 98                 677          750
12  Exhibit 108                691          750
    Exhibit 110                768          769
13

14

15  DEFENDANT'S EXHIBIT
    NUMBER                   IDENTIFIED    ADMITTED
16
    Exhibit 1                  595          595
17  Exhibit 2                  595          595
    Exhibit 4                  593          593
18  Exhibit 7                  596          596
    Exhibit 8                  595          595
19  Exhibit 12                 594          595
    Exhibit 14                 594          594
20  Exhibits 17A & 17B         593          594
    Exhibit 18                 593          593
21  Exhibits 19A & 19B         594          594
    Exhibit 20                 593          593
22  Exhibits 21A & 21B         596          609
    Exhibit 39                 593          593
23

24

25

1               P R O C E E D I N G S

2        *    *    *    *    *    *    *    *    *    *    *

3        The following proceedings were held outside

4        the presence of the jury.)

5             THE COURT:  This is 08-3142, Smego versus

6    Adams.  Cause is reconvened for purposes of jury

7    trial.  It is 9:00.  And Mr. Smego is present by

8    video.  I need to make a record of what has

9    transpired and your objections.

10        I've been on the phone since 7:00 this morning,

11   I guess, with my jury clerk and my clerk -- or my

12   courtroom clerk and the Circuit Clerk and the County

13   Clerk in Schuyler County, Rushville.

14        Apparently, Mr. Greg Scott, who is the warden?

15   No, excuse me.

16             THE CLERK:  Director.

17             THE COURT:  Director of the Rushville

18   facility made the unilateral decision to cancel all

19   writs, which he does not have the authority to do.

20        Given the fact that he did not notify us until

21   after 8:00 that he had cancelled all writs, we did

22   not have the ability to order him to bring Mr. Smego

23   immediately because we have a jury that has driven

24   from all over these 30 some counties to get here on

25   time, endangering their lives perhaps.

1           However, after talking with the County Clerk

2     and the Circuit Clerk in Rushville and the State's

3     Attorney of Brown County; I did not talk to him

4     directly, my clerk did; everybody in their

5     courthouses made it from Quincy from Springfield.

6     Mr. -- the director actually made it from

7     Springfield to Rushville.  He did have several

8     incidents of sliding.

9           And I do realize that the plaintiff would have

10    been transported in a van, which I've driven vans

11    for years and I know they're not the -- in terms of

12    my employment in my father's business, they're not

13    the safest with the most safety features.

14          However, the director does not have the

15    authority to cancel writs.  And so I had directed

16    the director to make sure that Mr. Smego is here by

17    1:30.  And I assume that he will do so as best he

18    can, given the roads.

19          Mr. Smego is present right now by video on a 10

20    by 12 video screen in the courtroom, which we use

21    for purposes of testimony.  We have used it already

22    in this case.  Have we in this case?  That was last

23    week in another case.  For purposes of testimony.

24    We have him on one, two, three, four, five, six,

25    seven, eight screens.  I thought there were nine

1    screens in here.

2        The view is very good on the video screen.  The

3    screen, I understand from Mr. Smego, is not as good

4    as it is here in the courtroom.

5        Would you like to make your objections known?

6            MS. MacDONALD:  Yes, Your Honor.  Plaintiff

7    objects to moving forward with Mr. Smego's trial at

8    this time.  Mr. Smego has a right to be present in

9    court for his trial --

10            THE COURT:  What does that right arise

11    from?

12            MS. MacDONALD:  Sorry?

13            THE COURT:  What does that right arise

14    from?  This is a civil case.

15        (The court reporter asked the attorney to move

16        to a microphone.)

17            MS. MacDONALD:  Your Honor, it's a

18    constitutional right to be present in the courtroom

19    as the plaintiff in this case.

20            THE COURT:  Could you give me some case law

21    for that?

22            MS. MacDONALD:  We have folks looking into

23    it right now, Your honor.  We'll provide that to you

24    as quickly as we can.

25        But we believe it is prejudicial for Mr. Smego

1    to appear in this fashion.  The screen that we see

2    right now is Mr. Smego at the end of a long table in

3    a room with white cinderblocks.  He's unable to have

4    his jacket on, his tie on.

5        We understand that once trial gets started

6    he'll only be able to see either an exhibit --

7                THE COURT:  Does he have a jacket there?

8                MS. MacDONALD:  He does not, Your Honor.

9                THE COURT:  Okay.

10               MS. MacDONALD:  In light of the concerns

11   about how -- ensuring that he would have it here, we

12   have brought it to court every day for him.

13       We also understand that Mr. Smego is having

14   trouble seeing us.  If an exhibit is on the Elmo,

15   Mr. Smego will only be able to see that exhibit and

16   then the Court, I believe, in a small corner box

17   down there.  He will not be able to see the jury, he

18   will not be able to see his lawyers, he will not be

19   able to communicate with his lawyers during trial.

20               THE COURT:  There is an order that he was

21   to be given a cellphone so that he could communicate

22   directly.  And I will allow the use of your

23   cellphone throughout this trial.  And I assume since

24   you have four lawyers here, one of you can have the

25   cellphone to the ear.

1      I do intend to explain to the jury what's going

2   on and why Mr. Smego is not here.

3          MS. MacDONALD:  We appreciate that, Your

4   Honor, but we believe that it is prejudicial and

5   that Mr. Smego should be here in the courtroom

6   today.

7          THE COURT:  Well, I agree with you.

8   However, my writ was apparently ignored.

9      And I will quote to you from as long ago as

10  1976, Ivy versus Harney.  "There is no federal right

11  that entitles a prisoner to be present in the

12  courtroom to present his own civil case."

13         MS. MacDONALD:  He is not --

14         THE COURT:  That is a prisoner, this is a

15  detainee.  And I understand the difference.

16     However, Federal Rule of Civil Procedure

17  permits a court for good cause shown and compelling

18  circumstances and upon appropriate safeguards to

19  permit presentation of testimony in open court by

20  contemporaneous transmission from a different

21  location.

22     And I will say that the video has been used in

23  civil and criminal cases and actually approved in

24  certain criminal matters.

25         MS. MacDONALD:  I would also note, Your

1    Honor, that this is a case that Mr. Smego prosecuted

2    pro se until the summer of last year and he is

3    intimately involved in the facts and the witnesses

4    of this case.  And that even though we have the

5    ability to call him on our cellphones, or in that

6    manner, it's not the same as him being here in

7    person judging the credibility of the witnesses and

8    reacting to the events as they unfold in the

9    courtroom.

10         THE COURT:  Okay.  Mr. Vogt, do you have

11    any objection to proceeding?

12         MR. VOGT:  No, I have no objection to

13    proceedings, Judge.  May I ask one question?

14    You said 1:30.  Is there any possibility that

15    Mr. Smego can get here earlier than that?

16    And I don't know, asking because, I don't know.

17    I thought --

18         THE COURT:  You have to be by a microphone

19    or Mr. Smego can't hear.

20         MR. VOGT:  I apologize.

21    No, Judge, I was simply asking whether there

22    was any possibility that Mr. Smego could be gotten

23    here, for example, at eleven or something.  I don't

24    know anything about that, I'm just throwing that out

25    as an idea.

1          I know 1:30 is after the morning break; I

2   understand that; but it's about 9 or so, 9:10.

3          That's the only suggestion I had.

4               THE COURT:  Mr. Vogt, I have eight jurors

5   who endangered their lives potentially to get here.

6   And I would like to proceed with the evidence.

7               MR. VOGT:  Judge --

8               THE COURT:  We also have the additional

9   problem apparently Dr. Lochard isn't here.  Is that

10   right, Mr. Vogt?

11               MR. VOGT:  I don't know.

12               MS. MacDONALD:  I have not seen him.

13               THE COURT:  I don't understand why.  Have

14   you attempted to contact him?

15               MS. MacDONALD:  I have not this morning,

16   Your Honor.

17               THE COURT:  Do we have another witness we

18   can take out of order?

19               MS. MacDONALD:  We do, Your Honor.

20               THE COURT:  Who would that be?

21               MS. MacDONALD:  Ms. Walker-Lowe is here

22   right now.  She was to be called after Dr. Lochard.

23               THE COURT:  Where did she come from?  I'm

24   curious.

25               MS. MacDONALD:  Havana.

1          THE COURT:  So she made the trip with no

2     problem.

3          MS. MacDONALD:  Yes, Your Honor.

4          THE COURT:  I will be addressing this with

5     the director after we continue with the trial.  I

6     find no excuse for what has transpired today.  I

7     bend over backwards to make life easier for those at

8     Rushville and allow testimony by video.  I have

9     requested repeatedly that there be a telephone in

10    the video room for purposes of communicating with

11    you.

12          MS. MacDONALD:  Mr. Smego, do you have a

13    telephone that you -- a cellphone?

14          MR. SMEGO:  I don't.  The STA may have one.

15       I have one now.

16          MS. MacDONALD:  Which phone number is that?

17          MR. SMEGO:  I have no idea.

18          THE COURT:  Why don't you call the

19    cellphone.

20          MS. MacDONALD:  Can you call the number

21    (314)304-4242.

22          MR. SMEGO:  What was the last four digits?

23          THE COURT:  Here, we have the cellphone

24    number.  We will go ahead and give it to you.

25          MS. MacDONALD:  Is this it right here?  I

1    will try to call you, Mr. Smego.

2              THE COURT:  We will make sure -- where is

3    the CSO?

4              MS. GLEASON:  He went into the hallway.

5              COURT SECURITY OFFICER:  Judge, just

6    checking to see if the doctor had come in.

7              THE COURT:  Will you tell the jury that we

8    had a glitch and we're trying to get it all set up

9    by video.

10             MS. MacDONALD:  Can they hear?

11             THE CLERK:  He has the microphone turned

12   off on his side.

13             THE COURT:  Except is the security agent

14   there?

15             MR. SMEGO:  Yes.

16             THE COURT:  I'd ask that you step out for

17   purposes of his communicating with his attorney.

18             SECURITY THERAPY AIDE:  Yes, ma'am.

19             THE COURT:  All right.  I'm going to take a

20   short recess and then I'll be back.

21        Appropriately Dr. Lochard is still not here, so

22   why don't we --

23             MR. VOGT:  We will call him.

24             THE COURT:  You'll call Dr. Lochard and

25   you'll go ahead and get Ms. Vance on the stand.

1            MR. CROWL:  Yes.  The next witness will be

2    on the stand, Judge, yes.

3         (A recess was taken.)

4            MS. MacDONALD:  Your Honor, before we bring

5    in the jury can we have a minute, please?

6            THE COURT:  Mr. Vogt.

7            MR. VOGT:  Forgive me, Judge.  Dr. Lochard

8    just told us he is about five minutes away.  So it's

9    up to the Court if you want to proceed with this

10   witness.  I will do whatever you want.

11           THE COURT:  Why is he five minutes away?

12           MR. VOGT:  I didn't get into it, I just

13   wanted to ascertain where he was at.

14           THE COURT:  Yeah, we're not suppose to talk

15   on cellphones.

16        Ms. MacDonald.

17           MS. MacDONALD:  Your Honor, I've just spoke

18   with Mr. Smego and he is --

19        (Court reporter asked the attorney to move to

20         a microphone.)

21           THE COURT:  He's not going to be able to

22   hear you, you have to go by a microphone.

23           MS. MacDONALD:  Your Honor, I've just spoke

24   with Mr. Smego.  And he has requested that rather

25   than participate in a fashion that he believes is

1   prejudicial to his case, he would prefer that

2   Rushville be ordered to start bringing him here now.

3   And that way he can get here sooner and participate

4   in person more quickly.

5       He is having a lot of trouble hearing and

6   seeing what's going on here and doesn't feel like

7   participating in this way is beneficial and instead

8   is highly prejudicial.  So he's asked whether he

9   could be brought down now.  He could start making

10  his way here.

11          THE COURT:  The reason that I took the

12  decision upon myself to have him brought over the

13  noon hour is in hopes that the roads have been

14  cleared off.  I was told that the roads in Schuyler

15  County had not been cleaned yet.  And that was about

16  8:30.  So that's the hope that we will not endanger

17  anyone's safety and he will be here by 1:30.

18          MS. MacDONALD:  May we have one moment to

19  confer?

20          THE COURT:  Yes.  We'll take a break.

21      (A recess was taken.)

22          THE COURT:  Court is reconvened.  We have a

23  witness on the stand.  Are we ready for the jury?

24      No.  We don't have the plaintiff's attorneys.

25          MS. GLEASON:  I believe they're talking to

1    Mr. Smego.

2           THE COURT:  Please bring the jury in.

3           MS. MacDONALD:  Hold on one moment, Your

4    Honor.

5       If -- Mr. Smego has elected to, in light of the

6    Court's ruling to proceed at this time, he's elected

7    to waive his video presence in order to prevent

8    undue prejudice to the jury.

9       Instead, I believe Your Honor was gonna make a

10   comment that Mr. Smego was unable to be here in

11   light of the snow conditions and the facility's

12   order and we'll proceed at this time with these

13   witnesses and then he will be here at 1:30 in

14   person.

15          THE COURT:  Can he -- does he have his

16   microphone on right now?

17          MS. MacDONALD:  I believe it's off.  Can

18   you turn it on.  There you go.

19          THE COURT:  Mr. Smego, quite frankly I

20   think you're making a mistake.  I think it's more

21   prejudicial that you choose not to be here by video.

22      I think the very fact that the director refused

23   to bring you today is prejudicial to --

24          MR. SMEGO:  I can't hear you.

25          THE COURT:  That's very unusual, because

1    you've always been able to hear me before.  Why can

2    you hear counsel and you can't hear me?

3        I think you're setting up an appeal, is what

4    you're doing, Mr. Smego.  And feel free.  What?

5            MR. SMEGO:  The STA is sitting here, he can

6    tell you whether or not you're breaking up, Your

7    Honor.

8            THE COURT:  Well, that's true at times with

9    the internet, if it malfunctions, that it does

10   become -- if you speak as fast as I was speaking,

11   that it does break up.  Can you hear me now?  May I

12   speak to the STA?

13           MR. SMEGO:  Yes, I can hear you now.

14           SECURITY THERAPY AIDE:  Yes, ma'am, I can

15   hear you now.

16           THE COURT:  Was it a question of the

17   internet breaking up because I was talking fast?

18           SECURITY THERAPY AIDE:  No, ma'am, I can

19   hear you pretty clear right now.  At times it will

20   break up just a little bit.

21           THE COURT:  Is the picture breaking up at

22   all?

23           SECURITY THERAPY AIDE:  Not at the moment.

24   But it has.

25           THE COURT:  You mean it has this morning?

1          SECURITY THERAPY AIDE:  Yes, ma'am.  Right

2     now it's pretty clear.

3          THE COURT:  I want to talk to the Director.

4     Would you please bring him into the room?

5          SECURITY THERAPY AIDE:  Yes, ma'am.

6          THE COURT:  I'm going to bring the jury in

7     and explain what's going on, but I don't know what's

8     going on until I talk to the director, so...

9          MS. MacDONALD:  Could we cut the video feed

10    just for the moment, Your Honor?

11         THE COURT:  Why?

12         MS. MacDONALD:  Because Mr. Smego doesn't

13    feel that this view of him -- he feels like it's

14    prejudicial, Your Honor.

15         THE COURT:  Well, he's not on the video

16    right now.

17         MS. MacDONALD:  Is it still showing a room

18    with cinderblocks --

19         THE COURT:  So are you going to object to

20    my asking the director questions in that room?

21         MS. MacDONALD:  No, Your Honor.  If we

22    could just have Mr. Smego maybe step off the line of

23    sight there.

24         THE COURT:  Well, I'm not going to bring

25    the jury in because of your objection at all when

1    we're on the video.

2              COURT SECURITY OFFICER:  Your Honor,

3    Mr. Lochard is here, just for your information.

4              THE COURT:  That's the doctor?

5              MR. WATSON:  Your Honor, do we want the

6    witness, Ms. Danielle Walker-Lowe, to be present for

7    this?

8              THE COURT:  No.  You may step down.

9              MR. WATSON:  Thank you, Your Honor.

10             MR. VOGT:  May I ask another question?  In

11   light of Dr. Lochard's arrival, may we complete his

12   questioning?

13             THE COURT:  I don't know.  We're going to

14   talk to the director, see what he has to say.

15        And Mark, would you tell the jury we're having

16   technical difficulties again and I apologize.

17             COURT SECURITY OFFICER:  Yes, ma'am.

18             THE COURT:  If you'll advise me when the

19   director arrives.

20        (A recess was taken.)

21             THE COURT:  Director, I've asked you to be

22   here because I'm not happy with the cancellation of

23   the writ of Mr. Smego.

24        I realize that the roads are bad.  I've been on

25   the roads.  I've spoken to the Circuit Clerk and the

1   County Clerk in Schuyler County.  All their staff

2   made it.  Our witness made it from Havana, who was

3   just on the stand.

4       Our understanding is while the roads in

5   Schuyler County are not the best, they are passable

6   and that everybody made it to work in Schuyler

7   County from as far as away as Quincy.

8       And I was going to proceed by video with

9   Mr. Smego this morning.  His attorneys and he have

10  objected to so proceeding.  I was going to have you,

11  as you know, bring Mr. Smego at the lunch hour in

12  hopes that the roads were better.

13      However, under the circumstances, the view that

14  Mr. Smego is objecting to is how he is seated right

15  now at this long table with the cinderblocks behind

16  him.  I'm going to order that you bring him now.

17      I'm not happy about ordering this, especially

18  because I'm going to have to make eight people,

19  jurors who have come from Greene County, Christian

20  County, and further, to be here this morning on time

21  at 9:00, in spite of the roads.  And they're going

22  to have to sit here and wait for an hour and a half

23  until you get Mr. Smego here.

24      I'm very seriously considering issuing a rule

25  to show cause why you shouldn't be held in contempt

1    for having made this unilateral decision.  My office

2    wasn't notified until after 8:00.  We were told by

3    the officers yesterday that they leave before

4    5:00 -- before 6:00 in the morning.  And they

5    obviously hadn't left at 8:00.

6        We need to have better communication.  I feel

7    like I bend over backwards to accommodate Rushville.

8    I have so many cases with them and I know you have

9    to deal with the cases too.  And your -- I have to

10   compliment Lynn Shelton, she's a wonderful

11   communicator.  And I'm -- I'm sure she was not a

12   participant in this decision.

13       We have so many of these cases and we have

14   jurors who come in for these cases.  And to

15   discommode them in this fashion just makes me angry.

16   We have all these people who have come; Dr. Lochard

17   is here, Ms. Vance came from Havana; and you chose

18   not to bring Mr. Smego.

19       I know these vans that they drive are not fancy

20   and I know they have to go slow, but there should

21   have been a decision -- I was up all night checking

22   the weather.  You should have been up all night

23   checking the weather.

24       We were on the phone this morning before 6:00

25   with our jurors communicating with them.

1  Communication has got to be better.  This is costing

2  everybody money.

3      These attorneys, I have four attorneys and a

4  paralegal who have volunteered their time pro bono,

5  who can charge over $500 an hour, and they're here.

6  They're taking their time from their practice in

7  Chicago to be here to represent the plaintiff.  This

8  is costing them an enormous fortune to be here and

9  you have delayed this, costing them the additional

10  half day.  It's just unacceptable.

11      Do you understand?

12          DIRECTOR SCOTT:  Yes, Your Honor.

13          THE COURT:  Can you get Mr. Smego here

14  within a reasonable period of time if he leaves now?

15          DIRECTOR SCOTT:  Yes.

16          THE COURT:  All right.  Court's going to be

17  in recess until we have Mr. Smego.

18      I am going to; if you agree, counsel; bring the

19  jury and explain to the jury that he's on his way.

20  That there's been a delay and that the director had

21  cancelled all writs.

22          MS. MacDONALD:  Yes, that's fine.

23          THE COURT:  I'm going to cut the feed at

24  your request, Mr. Smego.  Is that right?

25          MR. SMEGO:  Correct, Your Honor.

1          THE COURT:  All right.  We're disconnecting

2    at this time.

3          MS. MacDONALD:  Thank you, Judge.

4          MR. CROWL:  Thank you, Judge.

5          THE COURT:  Go ahead, bring the jury in.

6          MR. WATSON:  Your Honor, just in terms of

7    procedure, since we have been staying seated

8    throughout the trial, I assume we're gonna stay

9    seated.

10          THE COURT:  Yes.  I know Mr. Vogt has a

11    hard time.

12          MR. VOGT:  I do, Your Honor.

13          THE COURT:  It's like my clerk reminding me

14    to allow questions.  Or my court reporter.

15      (The jury entered the courtroom.)

16          THE COURT:  Don't unpack.  Don't unpack

17    your envelopes.

18      I'm sorry, we've had technical difficulties

19    this morning.  And I appreciate tremendously the

20    efforts you made to get here on time and to be here

21    in spite of the roads.

22      I'm going to ask ████████████, how were the

23    roads coming your way?

24          ████████████:  In Green and Morgan County

25    they were not so good, but -- and then the wind was

1    pretty bad coming on 72, so...

2              THE COURT:  But you didn't slip or slide?

3              ██████████:   I have 4-wheel drive and I

4    was determined not to let these fellow jurors down.

5              THE COURT:  I appreciate your efforts.

6         Unfortunately what I have to tell you is that

7    the director of the facility canceled all writs.

8    The plaintiff was suppose to have been brought here

9    at 6:00 in the morning.  I got a phone call -- I was

10   on the phone with my clerk talking about you; and I

11   know you were good enough to text in, ██████████,

12   by 6:30.

13        So I've been on the phone, I've been up most of

14   the night checking the weather and determining

15   whether it's safe for you to drive.  And

16   nonetheless, the warden -- or director, excuse me,

17   made the decision not to bring Mr. Smego.

18        I've just had an tete-a-tete with him and

19   directed him to bring him at this time.  We have

20   attempted video and the video was not working very

21   well today.  The internet, when there's bad weather,

22   tends to make it choppy, and his viewing was not

23   good.  Our's was not bad.  But we worked on it with

24   our I.T. people and we couldn't solve the problem.

25        So I apologize to you.  It will be an hour and

1    a half before we begin with testimony.

2         You have a choice.  I will go get you some

3    lovely pastries or you may be excused for that hour

4    and a half if you wish.

5         Do you want to raise your hands if you want me

6    to go get pastries from the bakery?

7         Do you wish to be excused for an hour and a

8    half?

9         All right.  We'll break for an hour and a half.

10   Again, don't talk about the case amongst yourselves

11   or with be anybody else.

12        So that will put us reconvening -- why don't

13   you have an early lunch and we'll reconvene at noon

14   to make sure he is here and there are no problems.

15        I did talk to the Circuit Clerk and County

16   Clerk in Schuyler County.  All their staff made it

17   in from all over.  They did say that the Schuyler

18   County roads were icy, so it may be a little longer.

19   So we'll reconvene -- we'll have an early lunch and

20   then reconvene and go straight through the lunch

21   hour.

22             MR. VOGT:  Judge, may I ask one question?

23             THE COURT:  Hm-mmm.

24             MR. VOGT:  Is it the Court's intent then to

25   go from 12 to 4:30 straight?

1          THE COURT:  Yes.  I mean we will take

2    breaks.

3          MR. VOGT:  I understand.

4          THE COURT:  All right.  Court is in recess.

5    You're excused.  Thank you for your patience and

6    thank you all for being here.

7       (The jury left the courtroom.)

8          THE COURT:  Back on the record outside the

9    presence of the jury.  Was my explanation

10   acceptable?

11         MS. MacDONALD:  Yes, Your Honor.

12         MR. VOGT:  Yes, Judge.

13         THE COURT:  You need to talk to Dr. Lochard

14   about what I've just done.  I know I saw his face.

15         MS. MacDONALD:  We will do that.

16         MR. VOGT:  Judge, if I might; prior to this

17   afternoon could we; not right now, but whenever is

18   good for the Court; address the exhibits for the

19   defense.

20         THE COURT:  Hm-mm.

21         MR. VOGT:  Okay.  Whatever is good for the

22   Court.  Come back at 11:30 or do it now?

23         THE COURT:  No, let's do it now.  I'll take

24   a five minute recess while you get ready.

25      (A recess was taken.)

 1          THE COURT:  Are you ready?

 2          MR. VOGT:  Yes, Judge.

 3          THE COURT:  On the record, court is

 4   reconvened outside the presence of the jury.

 5          MR. VOGT:  May I approach the bench, Judge?

 6          THE COURT:  You may.  You don't have to ask

 7   that in my courtroom.

 8          MR. VOGT:  I'm sorry.

 9          THE COURT:  Don't be sorry.

10          MR. VOGT:  Well -- our question relates to

11   this issue; several of the exhibits that were shown

12   to the jury we had highlighted certain portions of

13   the exhibits.

14      I intended to have them admitted into evidence

15   in the manner in which they were shown to the jury,

16   but plaintiff's attorneys have brought up the issue

17   that they would like non-highlighted exhibits.

18      That's fine with me, but -- I'll do it either

19   way.  I just don't want to get in any problems from

20   that prospective.

21          MR. CROWL:  And our position, Judge, is

22   it's fine for an attorney to point to things or do

23   callouts or whatever they might do through

24   technology, but to have documents go back to the

25   jury that have the attorney's mental impressions;

1    this is really important, so I've put this in

2    yellow, and that sort of thing on an original

3    exhibit, is improper.

4        And there's no objection by Mr. Vogt to have

5    these same exhibits, but just give a clean copy for

6    the jury, as to ones that have his attorney comments

7    on them.

8              THE COURT:  Well, I was curious, because it

9    looked like there were highlights on other

10   medications as well, not just the medications that

11   we were talking about, the Motrin and the Naproxen.

12             MR. VOGT:  They're gonna be talked about

13   today, Judge; the other medications.  I have yellow

14   and orange questions.

15             THE COURT:  May I see it?

16             MR. VOGT:  Sure, of course, Judge.

17        And they're different type of medications,

18   which is why we highlighted them in different

19   colors.

20             THE COURT:  So there's nothing about the

21   nature of the medications that you're objecting to,

22   you're just objecting to highlights?

23             MR. CROWL:  Right.  We're not objecting to

24   the exhibit coming into evidence, we're just

25   objecting to sending back an exhibit with the

1   attorney notes basically on them.

2          THE COURT:  I don't think they're attorney

3   notes.  They're simply highlights of what he's

4   focused the testimony on.  So I will allow it to go

5   back.

6          MR. VOGT:  All right, Judge.  Thank you.

7          MR. CROWL:  Very well, Judge.  Thank you.

8          THE COURT:  Now, that's exhibit what?

9          MR. VOGT:  This is Exhibit --

10          MS. CAMPBELL:  Exhibit 4.  There's multiple

11   pages of it.

12          THE COURT:  Group Exhibit 4.

13          MR. VOGT:  Group Exhibit 4; correct, Judge.

14          THE COURT:  You need a sticker on there so

15   I can mark it as admitted.  Do you have stickers?

16          MR. VOGT:  And then, Judge, will we still

17   be able to use these exhibits with the witnesses

18   after --

19          THE COURT:  Yeah.  Off the record.

20      (A discussion was held off the record.)

21          THE COURT:  All right.  Back on the record.

22          MR. VOGT:  Group Exhibit 4, Judge.

23          THE COURT:  Any other objections?

24          MS. MacDONALD:  No, Your Honor.

25          THE COURT:  Okay, 4 is admitted and so

 1    marked.  Today is the 26th, is it not?

 2         (Defendant's Exhibit 4 was admitted.)

 3              MR. VOGT:  Defendant's Group Exhibit 21.

 4              MS. MacDONALD:  That one is not -- we still

 5    have an objection to that.  The redactions were made

 6    in pen and you can see through them.  We'll address

 7    that.

 8              MR. VOGT:  Defense Exhibit 39, Judge.

 9              THE COURT:  Any objection?

10              MS. MacDONALD:  No, Your Honor.

11              THE COURT:  39 is admitted and so marked.

12         (Defendant's Exhibit 39 was admitted.)

13              THE COURT:  And the reason I'm giving these

14    to Marchal, she keeps a list also.

15              MR. VOGT:  For the record, Your Honor,

16    that's Defense Exhibit 20.

17              THE COURT:  20 is admitted and so marked.

18    No objections?

19              MS. MacDONALD:  Correct.

20         (Defendant's Exhibit 20 was admitted.)

21              MR. VOGT:  Defendant's Exhibit 18, Judge.

22              THE COURT:  18 is admitted and so marked.

23              MS. MacDONALD:  No objection.

24         (Defendant's Exhibit 18 was admitted.)

25              MR. VOGT:  Defense Exhibits 17A and 17B,

1    Judge.

2         THE COURT:  Any objection?

3         MS. MacDONALD:  No, Your Honor.

4         THE COURT:  Admitted, 17A and 17B, and so

5    marked.

6       (Defendant's Exhibits 17A and 17B were

7       admitted.)

8         MR. VOGT:  Defendant's Exhibit 19A and 19B.

9         THE COURT:  Any objection?

10        MS. MacDONALD:  Could I see what those are?

11        THE COURT:  Wexford contracts.

12        MS. MacDONALD:  No, Your Honor.

13        THE COURT:  19A and B are admitted and so

14   marked.

15      (Defendant's Exhibits 19A and 19B were

16      admitted.)

17        MR. VOGT:  Defense Exhibit 14, Judge.

18        THE COURT:  Any objection?

19        MS. MacDONALD:  No, Your Honor, no

20   objection.

21        THE COURT:  14 is admitted and so marked.

22      (Defendant's Exhibit 14 was admitted.)

23        MR. VOGT:  Defendant's Exhibit No. 12,

24   Judge.

25        MS. MacDONALD:  No objection.

1            THE COURT:  12 is admitted and so marked.

2        (Defendant's Exhibit 12 was admitted.)

3            MR. VOGT:  Defendant's Exhibit No. 8,

4    Judge.

5            THE COURT:  Any objection?

6            MS. MacDONALD:  No objection.

7            THE COURT:  Admitted and so marked.

8        (Defendant's Exhibit 8 was admitted.)

9            MR. VOGT:  Defendant's Exhibit No. 12,

10   Judge.

11           THE COURT:  Any objection?

12           MS. MacDONALD:  No objection.

13           THE COURT:  Admitted and so marked.

14       (Defendant's Exhibit 12 was admitted.)

15           MR. VOGT:  Defendant's Exhibit No. 2.

16           THE COURT:  2 is admitted and so marked.

17           MS. MacDONALD:  No objection.

18       (Defendant's Exhibit 2 was admitted.)

19           MR. VOGT:  Defendant's Exhibit No. 1.

20           MS. MacDONALD:  No objection, Your Honor.

21           THE COURT:  1 is admitted and so marked.

22   Off the record.

23       (Defendant's Exhibit 1 was admitted.)

24       (A discussion was held off the record.)

25           MR. VOGT:  This is Defendant's Exhibit

1    No. 7.

2            THE COURT:  Defendant's No. 7.  Any

3    objection?

4            MS. MacDONALD:  No objection, Your Honor.

5            THE COURT:  7 is admitted and so marked.

6        (Defendant's Exhibit 7 was admitted.)

7            MR. VOGT:  All right, then.  And Judge,

8    Defendant's Exhibit No. 21, that is going to be

9    admitted without objection.  They want to color it

10   more.

11           THE COURT:  Do you need a copy machine?

12           MS. MacDONALD:  Yes, that would be great

13   actually, Your Honor.

14           THE COURT:  Why don't you just do it and

15   give it to Marchal.  She's got a copy machine and

16   she can bring it right back and that would be

17   quicker.

18           MS. MacDONALD:  Okay.

19           MR. CROWL:  We also have a couple of

20   things, Judge, that might speed up this afternoon,

21   if you want to hear them now, or we can wait.

22           THE COURT:  No, let's hear it now.

23           MR. CROWL:  Okay.  One of the things

24   relates to grievances.  And I just want to make sure

25   before we do an extensive sidebar when Mr. Smego is

1    cross examined.  Your Honor had ruled that he can be

2    cross examined as to the fact that he made medical

3    grievances, but not all of the grievances in the

4    case.

5        Defense Exhibit 6 is a stack of all of the

6    grievances in the case.  And so I just think, rather

7    than asking for a sidebar when the G word is raised,

8    I think it's helpful to at least explore that so

9    Your Honor understanding the contours of the

10    testimony.

11        MR. VOGT:  I have no intent to go into any

12    particular grievance with Mr. Smego.

13        THE COURT:  Not even medical grievances?

14        MR. VOGT:  No, all -- now, being fair, as

15    long as he doesn't raise his ability, opportunity

16    and knowledge to do so.  That he does it, that he's

17    done it, that he's familiar with it, all the general

18    questions relating to it.  But I'm not gonna talk

19    about how many he's done or -- you know, in

20    accordance with the Court's order, and all that

21    stuff.

22        And if I -- if I feel that for some reason I

23    have to, then I'll make sure I come and talk to

24    them.  Otherwise I'm gonna I stay broad stroke like

25    I understand we're suppose to.

1          MR. CROWL:  And just so Your Honor

2    understands how the testimony is gonna come out, he

3    will say that he did not believe that he could

4    grieve a medical grievance because there's that

5    language.  And he'll put that in.

6          MR. VOGT:  Well, that's fine for that

7    period of time.  Whatever he wants.  He can say

8    that.

9          MR. CROWL:  And Ms. Klamann --

10         MR. VOGT:  One thing; I apologize; to make

11   sure we're clear on.  Before and after though, I'm

12   gonna talk about that, because --

13         MR. CROWL:  Right.  You can explore that he

14   didn't file grievances relating to this at all and

15   that's pretty much what you want in the record.

16         MR. VOGT:  Okay.

17         MR. CROWL:  Okay.

18      Then Ms. Klamann was gonna argue, because we

19   also have another issue which I think might save us

20   some time now as well.

21         MS. KLAMANN:  We have a number of --

22         MR. CROWL:  Just wait one second.

23      Are you ready, Bob?

24         MR. VOGT:  Yes.  I was just getting my

25   copy.

1          MR. CROWL:  Okay, no worries.

2      This one relates to the therapy notes.  You

3  recall that --

4          THE COURT:  Hm-mm.

5      (A discussion was held off the record.)

6          MR. VOGT:  Judge, Defense Exhibit 46 is a

7  summary of various therapist progress notes from

8  Mr. Smego's chart.

9      What we did here, Judge, was this.  We -- the

10  therapy progress notes, as you may recall, are some

11  of Mr. Smego's evidence with regard to his

12  complaints to his therapist.

13      In accordance with the Court's order what we

14  did was we identified those therapy notes that were

15  consistent with our defense theme, taking out and

16  simply identifying everything that we believed was

17  neutral, and made sure that way, by doing it that

18  way, it's a summary document like the Federal Rules

19  of Evidence provide us to do.  And then it

20  eliminates the possibility of any prejudicial

21  information coming in that might be contained in the

22  therapy notes itself.

23      What we also do as you can see is we identified

24  the exact page number on the far left-hand side, as

25  well as the contact date.  So that what we did, we

1  have all of them available, but I did not want to

2  use them for a variety of reasons, including the

3  fact that these are just the specific information

4  from the therapy notes that we were hoping to

5  question Mr. Smego about.

6          THE COURT:  And you object?

7          MS. KLAMANN:  Yes, Your Honor.  We would

8  disagree that these excerpts are neutral.  There are

9  a number of these excerpts that misrepresent the

10 underlying document.  And there are a number of

11 these that also discuss Mr. Smego's diagnosis and

12 his treatment.

13     If I could direct your attention to 166, 165,

14 175, and 168 specifically.

15          THE COURT:  I'm sorry, you said 166 --

16          MS. KLAMANN:  165, 175, and 168.  They're

17 all in a row right there, Your Honor.

18          THE COURT:  I agree.  I think those should

19 be stricken.

20          MR. VOGT:  Judge, may I address that issue?

21          THE COURT:  Yeah.

22          MR. VOGT:  Our theory of defense, Judge, is

23 exactly this; that he contends he is entitled to

24 things that he asserts he's entitled to.  This is

25 his own definition of his view of entitlement.

1       There is -- now, I'll concede, of course,

2   Judge, it is prejudicial to the plaintiff.  But

3   that's why I'm seeking to introduce it.  This is

4   exactly how he describes his behavior with

5   entitlement.  It's not unfairly prejudicial because

6   that's what he is.

7       There's no references, you know, sexually

8   violent person or anything like that.  It's a

9   neutral statement of what he said to the therapist,

10  just like, Judge, they're trying to use the other

11  therapy notes --

12          THE COURT:  Go ahead, I'm listening.

13          MR. VOGT:  I'm sorry.

14      The other therapy notes against us with regard

15  to his teeth pain.

16          MS. KLAMANN:  Your Honor, we haven't

17  introduced any therapy progress notes up to this

18  point.  And we would argue this entire document

19  should be excluded.  If Mr. --

20          MR. VOGT:  Well -- I apologize.

21          MS. KLAMANN:  If Mr. Vogt --

22          THE COURT:  Don't let him interrupt you.

23          MS. KLAMANN:  If Mr. Vogt would simply like

24  to point out the dates that he spoke to his

25  therapist.  But this content is prejudicial.  And

1   many of the other entries also are taken out of

2   context and misrepresent the underlying document.

3   We would argue that the entire summary is

4   prejudicial.

5           THE COURT:  Well, show me how it

6   misrepresents.

7           MS. KLAMANN:  Sure.

8       Number 42, Your Honor.  I'm sorry, I'm citing

9   to the source page.

10          THE COURT:  I know.

11          MS. KLAMANN:  Okay.  If I could just show

12  Your Honor the underlying documents.  So that note

13  is discussing an assignment of a new therapist.

14          THE COURT:  Well, that certainly is taken

15  out of context.

16          MS. KLAMANN:  Yes, Your Honor.

17      There's also no witness to sponsor this

18  summary.

19          THE COURT:  I assume you're arguing an

20  exception?

21          MR. VOGT:  Yes -- well, I'm arguing it is a

22  summary exception; that's why we did it so

23  specifically, Judge.  Again, every -- we made sure

24  that every statement in here --

25      Now, the context issue is something different.

1    If they want to introduce -- show Mr. Smego the

2    entire document, they can.  The whole purpose of

3    this was to identify only the non-objectionable

4    material is my goal.  The ideas of what he said.

5            THE COURT:  Well, I'm sure this took quite

6    a bit of preparation and work.

7            MR. VOGT:  And we were --

8            THE COURT:  I assume Ms. Campbell deserves

9    the credit for doing this.

10           MR. VOGT:  She does.

11           THE COURT:  But I am concerned.  Are you

12   going to call the therapist?

13           MR. VOGT:  No, the therapist is not a

14   witness.  What I was going to do is just use it in

15   the same way I did with Mr. Smego.  Ask him, did you

16   say this to your therapist.  Then if he objects I

17   can present to him the actual therapy note if he

18   wants to look at it.

19       That was the whole idea behind getting this to

20   counsel, I think it was last week or two weeks ago,

21   so they would know where we were coming from in

22   connection with this summary.

23           MS. KLAMANN:  Your Honor, this opens a door

24   to a series of mini trials on every single one of

25   these therapy progress notes.  And potentially

1    prejudices -- excuse me.

2        And potentially prejudices Mr. Smego in opening

3    the door to his therapy treatment.  Again, we have

4    not offered any therapy progress notes.

5            MR. CROWL:  And may I add one more thing,

6    Judge?

7            THE COURT:  Sure.

8            MR. CROWL:  Thank you.

9        What Mr. Vogt wants to show is Mr. Smego was

10   seeing a therapist on numerous occasions and only X

11   number of times did he raise this.  Once with his

12   therapist.

13       To put the context of what he said in all those

14   unduly prejudices him because it all requires

15   context as to what was the conversation about.

16       We've got a proposed alternative exhibit which

17   allows him to say, on all of these occasions you met

18   with your therapist and there's a therapist note,

19   isn't there.  That's the same exhibit.

20       He can -- it's the same exhibit that he had but

21   it doesn't inaccurately or even attempt to summarize

22   his therapy, which isn't the issue in this case and

23   which Your Honor has done a great job of keeping out

24   his psychological state from what's a dental case.

25       He has the argument he needs, which was, there

1    are all these instances when you met with your

2    therapist and there's only one time or X number of

3    times when you ever complained about pain.  Yes.

4         THE COURT:  I'm going to side with the

5    plaintiffs on this one.  I think -- quite frankly,

6    I'm surprised you're agreeing to let the fact of 46

7    therapist progress notes in because it does focus on

8    the fact that he's seeing a therapist very

9    regularly.  But I think that's the reality of the

10   situation.

11        I will allow you to use the redacted, and I'll

12   call this Defendant's 46-001 as redacted by

13   plaintiffs.  I can't write that on there though, it

14   will go back to the jury.

15        MR. CROWL:  We'll get you another one,

16   Judge.

17        THE COURT:  Okay.

18        MR. VOGT:  Judge, one more -- may I throw

19   one more thought out?

20        They're using the therapist notes offensively

21   against us.  The evidence will show the therapy --

22   therapist doesn't provide dental treatment.  On a

23   couple of occasions Mr. Smego complained about his

24   teeth to the therapist and the therapist recorded

25   it.  Now they're using it offensively as a sword

1    against Dr. Mitchell.  I should be just as entitled

2    to go back and say, well, you did it on those

3    occasions, but all these other occasions you did

4    not.

5              THE COURT:  You can.  You can.

6              MR. VOGT:  All right.

7              THE COURT:  And you can say, you complained

8    on this date and this date, but you didn't complain

9    on all these dates.

10             MR. VOGT:  All right.  I don't want to say

11   all right.  I do object to the Court's ruling, but I

12   understand what I'm suppose to do, Judge.

13             THE COURT:  And I'm going to take

14   Defendant's 46 as originally submitted and mark it

15   for the record as refused admission.  And we'll make

16   sure that we also have the original notes,

17   unredacted, for the record.

18             MR. VOGT:  Right, Judge.

19        And then one last thing, Judge.  Just to be

20   sure we're clear with you guys.  Mr. Smego is not

21   gonna suggest that on these occasions he did

22   complain about his teeth.  He's gonna stay

23   restricted.

24             MR. CROWL:  He's only gonna talk about the

25   instances -- that's right.  He's not gonna say there

1    are other instances that --

2              MR. VOGT:  Okay, Judge.  Thank you very

3    much.

4              MR. CROWL:  You already -- you already have

5    the therapist notes where he did complain, and he'll

6    say --

7              MR. VOGT:  Yeah, between June and --

8              MR. CROWL:  Whatever it is, two or three

9    times.  He's not gonna say --

10             MR. VOGT:  All right.

11             THE COURT:  Okay.  Who is going to give me

12   the original therapy notes as an exhibit for the

13   record?

14             MS. CAMPBELL:  I have them right here.

15             THE COURT:  Do you have other copies?

16             MS. CAMPBELL:  I have another copy, yes.

17             THE COURT:  Off the record.

18        (A discussion was held off the record.)

19             MR. VOGT:  This is Exhibit 46 as well as

20   the supporting documents for Exhibit 46, Judge.

21             THE COURT:  Okay.  Original, unredacted

22   therapy notes, I'm marking on this, for comparison

23   to Defendant's 46.

24        I'm going to label this one 46B, not tendered

25   for admission.  And I will mark this one 46A.  So

1    clip this to 46A.  It is not entered into evidence.

2            MS. GLEASON:  Is 46A the Defendant's

3    version that they want?

4            THE COURT:  No.  Defendant's --

5            MS. GLEASON:  46B is the --

6            THE COURT:  Is the original, unredacted

7    notes.  And we will mark this as 46A, which is the

8    redacted notes that we refused --

9        Wait a minute, I thought 46A was the one I gave

10   you that you were going to use, which was just the

11   dates of the therapy.

12           MS. CAMPBELL:  I'm sorry, I wasn't --

13           MS. GLEASON:  I heard you say --

14           THE COURT:  What's your 46 marked as?  Is

15   it 46A, the one that plaintiff --

16           MS. CAMPBELL:  Yes, it is.

17           THE COURT:  Okay.  That's 46A.

18       So this is the original 46.  46A is what will

19   be used, the therapy progress notes that plaintiff

20   tendered with only dates.

21           MR. VOGT:  All right.  Thank you, Judge.

22           THE COURT:  Okay.  This is 46 that's

23   refused.

24           MR. CROWL:  Does this come out in a minute

25   order, Judge, the exhibit part, or --

1          THE COURT:  Not usually.

2          MR. CROWL:  That's fine.  Ms. Scatterberg

3     is keeping up with you as well.  We just wanted to

4     make sure.

5          MR. VOGT:  Defendant's Exhibit 21A and 21B,

6     Judge.  These are the cleaned up versions of what

7     was --

8          MS. MacDONALD:  To be clear, plaintiffs did

9     have an original objecting in our motion in limine

10    about this and we maintain it.  But we understand

11    the Court overruled it.

12         THE COURT:  Okay.  21A admitted and so

13    marked.  21B admitted and so marked.

14        (Defendant's Exhibit 21A and 21B were

15        admitted.)

16         THE COURT:  I'll give you back the others.

17    There's are all your's.

18         MR. VOGT:  All right, Judge.  Thank you.

19         THE COURT:  Just in terms of scheduling,

20    I'm suppose to go to a funeral tomorrow at ten.  Is

21    there any bad weather predicted?

22        I think what I'll do is I'll -- off the record.

23        (A discussion was held off the record.)

24         THE COURT:  Back on the record.

25         MR. VOGT:  We were talking about a

1   proximate cause instruction, Judge.  And what I did

2   was I looked at the, I think it's the Whitlock case

3   that the Court had referred us to.

4        And all I've done there, Judge, is put together

5   what I believe is a definition of cause consistent

6   with what the 7th Circuit's decision in Whitlock

7   says.

8        That's all I want is to give it to the Court

9   for consideration.

10            MS. MacDONALD:  Your Honor, we haven't had

11  a chance to see this, so we'll take a look at it.

12            MR. VOGT:  That's fine, I just wanted to

13  pass it on.

14            THE COURT:  Do you need the Whitlock case?

15            MS. MacDONALD:  I think we have copy of it,

16  Your Honor.  Mr. Watson had looked into it and has

17  stepped away.

18            THE COURT:  All right.  We will try to

19  address it before the jury, or we can do it after.

20            MS. MacDONALD:  I don't think it will come

21  up today.  Thank you.

22            THE COURT:  Okay.

23       (A recess was taken.)

24            THE COURT:  Court is reconvened.  Is our

25  jury back?

1          COURT SECURITY OFFICER:  Yes, they are,

2     Judge.

3          THE COURT:  All right.  We need to get a

4     witness on the stand first.  Do we have any matters

5     to take care of before I bring the jury in?

6          Off the record.

7          (A discussion was held off the record.)

8          THE COURT:  All right.  Bring the jury in,

9     please.

10         (The jury entered the courtroom.)

11         THE COURT:  Please be seated.

12         You may unpack this time.  Court is reconvened.

13         Dr. Lochard, you're still under oath.  You may

14    proceed.

15         MR. VOGT:  Thank you, Judge.

16                  CROSS EXAMINATION

17    BY MR. VOGT:

18         Q.  Good afternoon, Dr. Lochard.  Sir, thank you

19    for coming back today.

20         Doctor, as you may recall, I had asked you some

21    questions yesterday, but I wanted to make sure that

22    I covered certain points and I'm not sure if my

23    notes reflected that.

24         But as I understand things, you've been working

25    for Wexford since 1997?

LOCHARD - CROSS                    612

1          A.   That is correct.

2          Q.   And you've been working at Rushville since

3     2007?

4          A.   Yes.

5          Q.   Prior to working at Rushville when you

6     worked for Wexford can you tell us where you were

7     working?

8          A.   I was working at the Department of

9     Corrections in various facilities.  I was at the

10    Taylorville Correctional Center for seven and a half

11    years, then went to Logan for four and a half

12    months.  Then I went to the Jacksonville

13    Correctional Center for maybe a year.  Then went

14    back to Taylorville for a year and a half.  Then

15    went back to Jacksonville around 2006.  And then

16    2007, I started working in Rushville permanently.

17         Q.   And at each of the facilities that you just

18    mentioned, including Rushville, you're a primary

19    care physician; is that correct, sir?

20         A.   Yes.

21         Q.   And as a primary care physician you take

22    care of matters like hypertension, diabetes, weight

23    problems, pains and aches and things of that nature?

24         A.   Yes.

25         Q.   And in all of your experience, sir, in

LOCHARD - CROSS                                    613

1  working for Wexford, has the approach that you've

2  taken as a physician always been the same?  In other

3  words, you arrive at the facility and the nurses

4  provide you with a list of residents to see?

5          MS. MacDONALD:  Objection, form; compound.

6          THE COURT:  The objection is sustained.

7      Q.  Doctor, I'd like to ask you about the manner

8  in which the lists are prepared of the patients that

9  you see on a daily basis.  Okay, sir?

10     A.  What happens is patients will put in a

11  request to see health care for any particular

12  reason; say an earache, sore throat, muscle pain.

13  And the nurse will evaluate the patient.  And if it

14  is something that the nurse can address based on the

15  protocols that the nurses use, the nurses will take

16  care of it.  If it is something that they cannot

17  take care of, they will put that patient in to see

18  me.

19          And every day there is a list of patients that

20  I see.  These lists are compiled by the nursing

21  staff.  And when I start the day the nurses will

22  call down each patient and I will go down the list

23  and see everyone.  Unless there's an emergency which

24  precludes me from seeing everyone.

25     Q.  And you rely on and trust the nurses to

1   perform their function?

2       A.  Correct.

3       Q.  And at Rushville the nurses have always

4   performed the function that you've just described?

5       A.  Correct.

6       Q.  And do the nurses also, in connection with

7   performing the function that you've described here

8   today, do they also triage the patients?  In other

9   words, get those patients that need the most urgent

10  care or attention first?

11      A.  Yes.

12      Q.  And is that a standard practice for you,

13  sir, in your career with Wexford?

14      A.  Yes.

15      Q.  And to -- sir, to your knowledge --

16      (The court reporter requested clarification.)

17      Q.  I apologize.  I'll slow down.

18      Sir, to your knowledge, do all of the

19  physicians at Wexford follow that same approach?

20      A.  Yes.  To my knowledge, yes.

21      Q.  You mentioned a few moments ago the

22  healthcare request?

23      A.  Yes.

24      Q.  That's a policy at Rushville?

25      A.  Yes.

1      Q.   And it applies to all residents there?

2      A.   Yes.

3      Q.   And it tells the nurses what the resident's

4  problem is?

5      A.   Correct.

6      Q.   And the nurses take that, like you

7  mentioned, they take that healthcare request and try

8  to first see if the nurse can resolve the problem?

9      A.   Yes.

10      Q.   And if they can, everything is fine.  And

11  then if they can't, the nurse will move the resident

12  to the particular physician that may help the

13  patient?

14      A.   Yes.

15      Q.   And the healthcare request that's submitted

16  by the residents is the starting point of medical

17  care at Rushville?

18      A.   Correct.

19      Q.   The medication administration record, are

20  you familiar with that, sir?

21      A.   Yes.

22      Q.   And what the medication administration

23  record does is it identifies the medications that a

24  particular patient has been ordered?

25      A.   Correct.

LOCHARD - CROSS                    616

1      Q.  It identifies the type of medication, the

2  dose, how often the patient is to receive it?

3      A.  Yes.

4      Q.  And then the jurors heard the words PRN used

5  during the trial, sir.

6      A.  Yes.

7      Q.  What does PRN mean?

8      A.  It's Latin, pro re nata.  It means as

9  needed.  The patient would ask for their patient if

10  he felt like -- the patient would ask for the

11  medication if he felt that he needed it; say

12  something for pain.  If he doesn't feel like he

13  needs it then he would not ask for it.

14      Q.  And with a PRN medication; just to make sure

15  I'm clear; what that allows the resident to do is if

16  he needs that PRN medication at any time, he can

17  simply ask the nurse?

18      A.  Correct.

19      Q.  So for example, if there was an order for a

20  resident to receive a PRN medication of Motrin, in

21  order to receive the Motrin the patient would simply

22  ask the nurse may I have some Motrin?

23      A.  Correct.

24      Q.  The nurse would check to see if that

25  medication has been ordered on a PRN basis by the

LOCHARD - CROSS                           617

1    doctor?

2         A.  Yes.

3         Q.  And if it has, the nurse would then dispense

4    the Motrin or the medication to the patient?

5         A.  Yes.

6         Q.  And in connection with your work at

7    Rushville, you have ordered PRN medications for

8    patients?

9         A.  Yes.

10        Q.  And the MAR; now going back to the

11   medication administration record; you rely on that

12   as a treating physician?

13        A.  Yes.

14        Q.  Because you often check the MAR, the

15   medication administration record, to verify how well

16   or how often the patient is taking a particular

17   medication?

18        A.  Yes.

19        Q.  You want to confirm that the medication is

20   being given to the patient and that the patient is

21   taking the medication?

22        A.  Yes.

23             MS. MacDONALD:  Objection, Your Honor;

24   foundation.

25             THE COURT:  Could we have some foundation.

LOCHARD - CROSS                          618

1        Q.   Sir, one of the reasons that you rely on a

2   medication administration record is to confirm for

3   you that the medications are being distributed to

4   the patient?

5        A.   Correct.

6        Q.   And in your career, sir, have there always

7   been medication records -- medication administration

8   records available for every patient?

9        A.   Yes.

10       Q.   It's a standard in the industry?

11       A.   Yes.

12       Q.   Is it an important document that you rely

13   on, for example, for the past 18 years with Wexford?

14       A.   Yes.

15       Q.   And, sir, is it your understanding from

16   working with medication administration records that

17   the medication administration record will have the

18   name of the medication and a full month of boxes for

19   each date?

20       A.   Correct.

21       Q.   And on each occasion that the nurse

22   administers the medication to the patient the nurse

23   will fill in her initials in the box underneath the

24   date?

25       A.   Yes.

1        Q.  And if the nurse on the other hand attempts
2   to give a medication to the patient and the patient
3   refuses the medication, the nurse puts her initials
4   in and circles the box?
5        A.  That is correct.
6        Q.  And that is the system that you have
7   followed with regard to the MAR for your entire
8   career?
9        A.  Yes.
10       Q.  That is a standard in the industry?
11       A.  Correct.
12       Q.  Because that tells by looking at MAR, you
13  can see right away, for example, how often a patient
14  has asked for pain medication?
15       A.  Correct.
16       Q.  You could verify immediately how often the
17  patient is being administered certain chronic pain
18  medication or chronic medications?
19       A.  Yes.
20       Q.  And from your prospective as a treating
21  physician it's very important to know is the patient
22  taking medications and when?
23       A.  Yes.
24       Q.  And when you prescribe medications, sir,
25  could you tell us -- let's assume that you've

LOCHARD - CROSS                          620

1   examined the patient and you've talked to the

2   patient and decided that a particular medication,

3   say a pain medication, might help the patient.

4        Do you have a conversation with the patient

5   about the medication you are ordering?

6        A.  Yes.  I tell the patient exactly what I plan

7   to do and I will tell them the medication that I'm

8   going to order and how often the patient can receive

9   that medication.

10        Q.  You have a conversation with the patient?

11        A.  Yes.

12        Q.  Because from the patient's prospective, he

13   needs to know what the medication is also?

14        A.  Correct.

15        Q.  Because you need to make sure; and tell me

16   if I'm wrong; you need to make sure the patient

17   knows what the medication is so, for example, when

18   the nurses come down to distribute medications the

19   patient knows what he's going to take?

20        A.  Yes.

21        Q.  And he needs to know why he's taking it?

22        A.  Correct.

23        Q.  And with a PRN medication he needs to know

24   what medication you believe is appropriate for him

25   to take if he has any particular pain?

1      A.  Correct.

2      Q.  And is the conversation that you just had,

3   sir, is that your regular course of practice as a

4   physician?

5      A.  Yes.

6      Q.  Something you've done your entire career?

7      A.  Correct.

8      Q.  Now, Motrin, sir, you're familiar with that?

9      A.  Yes.

10      Q.  What is Motrin?

11      A.  It's a non-steroidal anti-inflammatory

12   medication.  The generic name is ibuprofen.  And I

13   believe everyone will know that as Advil.  It is

14   sold over-the-counter as Advil.

15      Q.  And we'll go over in a few moments here, but

16   do you recall you prescribed Motrin for Mr. Smego on

17   a couple of occasions?

18      A.  Yes, I recall that I have done that.

19      Q.  And at the time that you issued your order

20   prescribing Motrin for Mr. Smego, did you have a

21   conversation with him similar to what we just

22   discussed?

23      A.  Yes.

24      Q.  Could you tell us what would you tell

25   Mr. Smego when prescribing him Motrin?

1        A.  I would tell Mr. Smego that I found that he

2    has pain in a particular joint and I'm going to

3    prescribe anti-inflammatory medication for him.  In

4    this case it would have been -- it would be Motrin.

5        Q.  During your -- during the occasions when you

6    discussed Motrin with Mr. Smego, did he ever raise a

7    complaint to you that he was allergic to Motrin?

8        A.  I do not recall if that is the case.  I do

9    not.

10       Q.  Did you ever diagnose Mr. Smego as being

11   allergic to Motrin?

12       A.  No, I do not recall having done that.

13       Q.  Did you ever treat Mr. Smego for suffering

14   from an allergic reaction due to Motrin?

15       A.  No, I do not recall that.

16       Q.  In your career as a physician have you ever

17   seen any studies suggesting that there's an allergy

18   to Motrin?

19       A.  Well, there have been some studies where a

20   patient would develop a rash to a particular drug.

21   But in medications such as ibuprofen or Naprosyn or

22   Aleve, in the over-the-counter, patients may have

23   dyspepsia or heartburn or stomachache from taking a

24   non-steroidal medication and some patients would

25   call that an allergy, but that is not an allergy,

1    it's just a stomachache from taking a pill.  Which

2    one can develop from taking any number of drugs,

3    such as antibiotics.

4        Q.  You mentioned ibuprofen and Naprosyn.  Are

5    those the same type of medication?

6        A.  They're both non-steroidals, but not exactly

7    the same kind.  They're different.

8        Q.  Okay.  Have you ever diagnosed or ever come

9    into contact with a patient who told you that he was

10   allergic to Motrin?

11       A.  That has happened, but generally what they

12   mean is they have pain in the stomach when they take

13   the Motrin.

14       Q.  During your treatment of Mr. Smego did he

15   ever raise any complaints to you regarding dental

16   care based on the medical records that you have,

17   sir?

18       A.  I do not recall that.

19       Q.  And if he had raised a complaint about

20   dental pain, you would have reported it in your

21   chart?

22       A.  Correct.

23       Q.  I'd like to talk about a couple of occasions

24   when you spoke -- when you treated Mr. Smego, sir.

25   All right, sir, give me one moment.

1          Now, as you can see here this is Exhibit

2    No. 3-017.  Do you see the first entry that we've

3    highlighted for January 2nd, 2007?

4          A.  Yes.

5          Q.  Now, I know that's Dr. Anyanwu.  Do you see

6    that, sir?

7          A.  Correct.

8          Q.  And was he the primary care physician at

9    Rushville prior to your arrival?

10         A.  Yes.

11         Q.  All right.  Then as we come down that page,

12   the next note is you can see on a lot of that page

13   is dated 6/24/2007?

14         A.  Yes.

15         Q.  And that's a dental note by Dr. Mitchell?

16         A.  Correct.

17         Q.  All right.  The next page of records, the

18   note from Dr. Mitchell that I just showed you was

19   6/24/07.  This next note as you can see is 7/25/07.

20   Can you see that?

21         A.  Yes.

22             MS. MacDONALD:  Mr. Vogt, could you

23   identify the exhibit?

24         Q.  Yes, I'm sorry.  The first one was 3-017.

25   The second here is 3-018.  I'm sorry.

1          Then, sir, you can see that on 3/23/07 there

2    was another dental note of Dr. Mitchell?

3          A.  Yes.

4          Q.  And 8/25/07 another note by Dr. Mitchell?

5          A.  Yes.

6          Q.  And then the next note dated December 10th,

7    '07, is a note by yourself?

8          A.  Correct.

9          Q.  And I don't mean to ask a stupid question,

10   sir, but the chronology we just looked at suggests

11   that Dr. -- I mean Mr. Smego was seen by Dr. Anyanwu

12   on January 2nd, 2007, and the next time according to

13   the progress notes that a physician saw Mr. Smego

14   during 2007 was on December 10th, 2007?

15         A.  Yes.

16         Q.  Okay.  All right, sir.  So tell us about

17   your progress notes?  When you prepare a progress

18   note like this, what do you do, how do you do it?

19         A.  Basically the nurse will see the patient,

20   they will take his weight, vital signs, his blood

21   pressure, temperature.  And that will be noted in

22   the record.

23         Once that's done the nurse calls the patient

24   in, I will interview the patient, ask him what his

25   issues are.  I will note it down and then proceed to

1    examine what I find.  And once I find -- if I should

2    find any particular problem I will tell the patient

3    what I found and propose the plan of care.

4        Q.  All right.  Now, on your note here I see the

5    initial S underneath physicals exam.  Do you see

6    that?

7        A.  Yes.

8        Q.  Is that the subjective portion?

9        A.  Correct.

10        Q.  And when you write the subjective portion,

11    what does that mean?

12        A.  Well, that means this is what the patient

13    reports to the physician.

14        Q.  Could you read to us, sir, your subjective

15    portion of your note on December 10, 2007?

16        A.  On December 10th, Mr. Smego stated he was

17    41 years old.  He smoked half a pack of cigarettes

18    per day and did that for 20 years.  And he stated

19    that he had not taken diabetic medications for one

20    year.  Has not taken any medication at all this

21    year.

22        And below that is his family history.  Multiple

23    medical illnesses; diabetes, hypertension, leukemia,

24    multiple sclerosis.

25        Q.  Thank you.

1         THE COURT:  There was more to that note,

2    Mr. Vogt.  At the very bottom.

3         Q.  Okay.  Doctor, could you read the -- I

4    believe it's the objective portion?

5         A.  Yes, that is the objective portion during

6    the physical examination.  The HEENT was head, ears

7    eyes, noise and throat.  And down below that is the

8    neck.  And there should be another page to -- about

9    the lungs?

10        Q.  I'll get -- I'm sorry.  This is the next

11   page I believe of your exhibit.  I'm sorry, of your

12   note, Doctor.

13        A.  Yes.  And this is the -- this is continuing

14   the physical exam.  This concerns his lungs, his

15   heart, his abdomen, genital/urinary section and his

16   extremities.  And at the time he was also offered a

17   digital rectal exam, which he declined.

18        And the A is the assessment of diabetes,

19   hypertension.  Number 3 is physical exam and number

20   4 is dyslipidemia, which is high fats in the blood.

21        And the following part, the P below that, is

22   the blood test that I ordered for Mr. Smego.

23        Q.  Okay.  And you mentioned I think you said

24   fat in the blood, sir?

25        A.  Correct.

LOCHARD - CROSS                    628

1       Q.  What is that?  Is that high cholesterol

2  or --

3       A.  It could be high cholesterol or high

4  triglycerides.

5       Q.  All right.  And then the next page, I

6  believe, sir, is part of your physical exam.  And

7  let me see if you recognize this document here.

8       A.  Yes.

9       Q.  I'm gone see if I can enlarge it.

10      All right.  Is that part of your physical exam

11  that you performed on December 10th, 2007, for

12  Mr. Smego?

13      A.  Yes.

14      Q.  And I've highlighted -- this case is about

15  dental care, so I have tried to focus on the dental

16  care.  What did your findings in connection with his

17  mouth --

18      A.  I found things were normal.  If there's --

19  if I don't see anything such as a big hole in the

20  tooth that I can visually see; of course, I'm not a

21  dentist; I would assume the teeth are normal.

22      If I do not see any sores in the mouth then I

23  would say it is normal.  Some patients can develop

24  sores on the tongue as well as the lining of the

25  mouth.

1         Q.  I trust that if Mr. Smego had raised a

2    dental complaint during this exam you would not have

3    put that his mouth and teeth were within normal

4    limits?

5         A.  Correct.

6         Q.  All right, sir.  I'd now like to show you --

7    oh, yes, I'm sorry.  The note that you just referred

8    to, sir, had mentioned that Mr. Smego had told you

9    that he had not taken medications for a period of

10   time?

11        A.  Correct.

12        Q.  A year, I believe?

13        A.  Yes.

14        Q.  I'd like to show you some documents now,

15   some of the medication administration record for

16   Mr. Smego that have been admitted into evidence.

17   This is Defendant's Exhibit No. 4.  And I'm going

18   with a little bit --

19        Okay.  Do you see June of '07 up there, sir?

20        A.  Yes.

21        Q.  All right.  And --

22             MS. MacDONALD:  Mr. Vogt, can you identify

23   this exhibit?

24             MR. VOGT:  This is Defendant's Exhibit No.

25   4.

1          MS. MacDONALD:  What page?

2          MR. VOGT:  May I have a moment, Judge.

3      (Sotto voce discussion between attorneys.)

4   BY MR. VOGT:

5      Q.  Sorry, sir.

6      All right.  Anyway, this is -- you've seen

7   these type of records before?

8      A.  Yes.

9      Q.  And this -- by the way, I'm sorry, counsel.

10  This is Exhibit 4-114A.

11     All right.  And this is a medication

12  administration record?

13     A.  Yes.

14     Q.  The medications that are highlighted in

15  orange there, sir; do you see those?

16     A.  Yes.

17     Q.  The first one is Glipizide?

18     A.  Correct.

19     Q.  What is Glipizide for?

20     A.  Glipizide is a medication that is used

21  orally to control diabetes.

22     Q.  The medication underneath that is?

23     A.  Metformin.

24     Q.  Okay.

25     A.  That's another medication used to control

1    diabetes.  It is taken by mouth.

2        Q.  Okay.  So those are both oral diabetic

3    medications?

4        A.  Correct.

5        Q.  How about Lisinopril?

6        A.  That is a blood pressure medication.

7        Q.  And now, sir, we talked early about what the

8    indications on this form are.  As you can see, each

9    of those medications all the way across the board

10   the nurses have initialled and circled their

11   initials.  Do you see that?

12       A.  Yes.

13       Q.  What did that tell you as the treating

14   physician?

15       A.  It would tell me that the patient did not

16   take the medication.

17       Q.  And these medications now, sir, and I'd like

18   to make sure, different from a PRN, these

19   medications the nurses go up to the floor and say,

20   for example, Mr. Smego, we're here to give you your

21   diabetic medications; is that right?

22       A.  Yes, correct.

23       Q.  These are ordered on a daily basis?

24       A.  Correct.

25       Q.  And I don't know the medical term for it,

1    but PRN means as needed.  These are basically a

2    required.

3              MS. MacDONALD:  Objection, Your Honor.

4    Foundation.

5              MR. VOGT:  I can rephrase it, Judge.

6              THE COURT:  Okay.

7    BY MR VOGT:

8         Q.  These are scheduled medications?

9         A.  Correct.

10        Q.  Okay.  I'm sorry.

11        And then page -- the next exhibit, sir, is

12   Exhibit No. 4 again, page 115.  This is -- as you

13   can see is for July of 2007?

14        A.  Yes.

15        Q.  And here again the three medications are

16   highlighted in orange.  And as you can see, the same

17   circumstance occurred where Mr. Smego refused to

18   take the medication on all of the days indicated

19   according to the MAR?

20        A.  That is correct.

21        Q.  Next exhibit, Exhibit No. 4-116, also

22   reflects the same occurrence?

23        A.  Yes.

24        Q.  Just as an aside now, this here is from

25   August, '07, this is Exhibit 4-117.  And this, as

1    you can see, sir, is for ibuprofen or Motrin?

2        A.  Correct.

3        Q.  And here, as you can see, the medication was

4    administered to the patient pursuant to the

5    patient's request?

6        A.  Yes.

7            MS. MacDONALD:  Objection.  Foundation as

8    to request.

9            THE COURT:  I'm not sure what you're

10   referring to.  Which of the medications?

11           MR. VOGT:  This was the ibuprofen or

12   Motrin, Judge.  It is a PRN medication and the

13   witnesses testified earlier that PRN medication must

14   be requested.

15           THE COURT:  The objection is overruled.

16           MR. VOGT:  Thank you.

17   BY MR. VOGT:

18       Q.  Just have a few more, sir.  Okay.

19   This is September, '07.  Do you see that?

20       A.  Yes.

21       Q.  This is Exhibit No. 4-095.  And here again,

22   sir, the medications for his diabetes and his

23   hypertension were refused on every single day in

24   September of 2007?

25       A.  Correct.

LOCHARD - CROSS                    634

1          Q.  And by the way, sir, as a quick -- down on
2     the bottom, do you see the indication for Naprosyn?
3          A.  Yes, I see one there; correct.
4          Q.  That's a PRN medication according to this
5     medication administration record?
6          A.  Yes.
7          Q.  So on this occasion, as you can see, for the
8     month of September, Mr. Smego never requested, nor
9     according to the MAR was Mr. Smego ever provided
10    with any type of Naprosyn?
11         A.  Correct.
12         Q.  The other thing --
13         Again, October, 2007, this is Exhibit No.
14    4-030.  Once again, sir, same situation, diabetes
15    medication, hypertension medication not taken at
16    all?
17         A.  Yes.
18         Q.  And this is for November -- yeah, November
19    of 2007, Exhibit No. 4-107.  And once again the
20    diabetes medication and the hypertension medication
21    was offered on a daily basis and was refused by
22    Mr. Smego on a daily basis?
23         A.  Correct.
24         Q.  And then lastly I believe is December.
25    December, '07, sir.  Do you see that?

LOCHARD - CROSS                                    635

1          A.  Yes.

2          Q.  And once again in December of '07, same

3     three medications were refused all the way through

4     the month?

5          A.  Yes.

6          Q.  All right, sir.  I'd now like to show you

7     Defendant's Exhibit No. 3, page 23.  Another

8     progress note I believe that was prepared by

9     yourself?

10         A.  Correct.

11         Q.  Okay.  And that's dated looks like 12/31/07?

12         A.  Correct.

13         Q.  And could you tell us, sir, could you read

14    the -- read that note for us?

15         A.  The subjective is a chart review.  And the

16    objective was some blood pressure readings that I

17    had ordered for Mr. Smego.  And below that I ordered

18    the MAR review.  And it stated that patient has not

19    taking -- taken any medication for chronic medical

20    conditions for one year.  And therefore I

21    discontinued all of his medication.  At No. 6 I

22    wrote to see patient in clinic this Monday.

23         Q.  And the medication -- the medication review

24    that you refer to, sir, would you have gone through

25    the same process that you and I just went through

LOCHARD - CROSS                        636

1    here in this courtroom?

2         A.  Yes.

3         Q.  You would have tried to ascertain, well, is

4    Mr. Smego taking these medications?

5         A.  Correct.

6         Q.  And if you had reviewed the chart, just like

7    we did a few moments ago, you would have seen that

8    in fact as far as his diabetes medications and

9    hypertension medications, he was not taking them at

10   all?

11        A.  Correct.

12        Q.  Let me show you this now, sir.

13        I'm sorry.  This is Exhibit No. 4-209.  As you

14   can see this is for January, 2008?

15        A.  Correct.

16        Q.  Now, do you see those three same

17   medications, the Insulin -- the two for the diabetes

18   as well as the one for the hypertension.  The note

19   d-c 12/31 is written on the MAR?

20        A.  Correct.

21        Q.  What does that tell us?

22        A.  That means the medications have been

23   discontinued.

24        Q.  That was your order?

25        A.  Correct.

1          Q.  And that, by the way, was Exhibit No. 3-023.

2          All right, sir.  I'd now like to show you

3    Exhibit No. 3-205.  I believe this is another

4    progress note from yourself?

5          A.  Yes.

6          Q.  Could you tell us, sir, what that progress

7    note reflects?

8          A.  It's date 4/1/2008.  I saw Mr. Smego for the

9    diabetes, the elevated fats in the blood, and the

10   hypertension.  He stated to me that he does not want

11   medication.  Also stated that he did not exercise.

12   And he had complained of being lightheaded the night

13   before.  His blood pressure was high.  He hasn't --

14   he was feeling badly for two days.  He said he's

15   fine today.  And I discussed medication with

16   Mr. Smego.

17         Q.  Now, sir, the -- what we've just reviewed,

18   sir, is that Mr. Smego had not been taking these

19   scheduled medications for his diabetes for a long

20   period of time?

21         A.  Correct.

22         Q.  Now, just as background information, the

23   medications that you ordered for Mr. Smego, the oral

24   diabetic medication, the theory is to reduce or

25   control his blood sugar level?

1          A.  Correct.

2          Q.  Because uncontrolled blood sugar means, of

3    course, that there's extra sugar in the system?

4          A.  Correct.

5          Q.  In his saliva, his blood, the organs of his

6    body?

7          A.  Yes.

8          Q.  An uncontrolled diabetic, their teeth can be

9    greatly affected by the elevation in blood sugar?

10         A.  Correct.

11         Q.  I mean it interferes with circulation, it

12   interferes with the gums, it affects all of his

13   entire dental -- his teeth as well as other parts of

14   his body?

15         A.  Yes.

16         Q.  And I take it when you spoke with him on

17   that day in April of 2008, you told him that?

18         A.  Correct.

19         Q.  One of the things that you talked about

20   yesterday was that you had referred Mr. Smego

21   offsite from Rushville for various tests and

22   procedures?

23         A.  Yes.

24         Q.  And you went over all those that we

25   mentioned yesterday.  Do you recall that?

LOCHARD - CROSS                           639

1          A.  Yes.

2          Q.  Now, on each and every one of those

3    occasions what you were doing was you were sending

4    Mr. Smego offsite to have a test or procedure that

5    you yourself could not perform at Rushville?

6          A.  Correct.

7          Q.  Forgive me, Doctor, I don't remember all of

8    them, but the bottom line is if you could perform or

9    provide the services or treatment at Rushville, you

10   would do so?

11         A.  Yes.

12         Q.  The only time that you would send Mr. Smego

13   offsite to see a specialist or to get a test is

14   because as a primary care physician, you could not

15   provide that services at Rushville?

16         A.  That is correct.

17         Q.  Otherwise, your job is if you can do it, you

18   do it at Rushville?

19         A.  Yes.

20         Q.  You would never send somebody offsite for

21   something that you yourself could treat?

22         A.  Correct.

23         Q.  Okay.  And in your career with Wexford you

24   have never done that?  You take care of the problems

25   and health conditions that you can take care of?

LOCHARD - CROSS                    640

1    A.  Yes.

2    Q.  If you need a specialist, then you refer

3  them offsite?

4    A.  Yes.

5    Q.  If you need a particular exam or study, you

6  refer them offsite?

7    A.  Yes.

8    Q.  Sir, in your career at Rushville have you

9  come to be familiar with the attempt to resolve that

10 can be used by residents?

11   A.  I'm somewhat familiar with it.  I mean I've

12 read some reports.  But I'm not the one directly

13 involved with it.  But I am familiar with it.

14   Q.  It's a means by which if a resident has a

15 problem they can notify the person they have a

16 problem with and try to resolve it?

17   A.  Yes.

18   Q.  And are you familiar also, sir, with the

19 grievance system at Rushville?

20   A.  Yes.

21   Q.  Again, another system by which the resident,

22 if he has a problem, can notify the institution that

23 he has a complaint or problem?

24   A.  Yes.

25   Q.  In both of those; the attempt to resolve as

1   well as the grievance procedure; are communication

2   tools that a resident at Rushville can use?

3       A.  Yes.

4       Q.  And, sir, when you treat the patients at

5   Rushville I trust that you treat them all equally

6   and fairly?

7       A.  Yes.

8       Q.  And one of the things that you try to make

9   sure of is that people follow the rules with, for

10  instances, the health care system?

11      A.  Yes.

12      Q.  You don't want people to bypass the

13  healthcare request system?

14      A.  Yes, that is correct.

15      Q.  Because, I mean, while people -- don't get

16  me wrong, patients can be put on your list if they

17  talk to the nurse or if someone else refers them to

18  see you.  The general rule is that all the residents

19  should be treated the same?

20      A.  Correct.

21      Q.  All of the residents should fill out the

22  healthcare request form if they want to see the

23  doctor or dentist?

24      A.  Correct.

25      Q.  And in your career that's what you've tried

LOCHARD - CROSS                           642

1    to ensure is done?

2         A.  Correct.

3         Q.  Because filling out the healthcare request

4    is the patient's responsibility?

5         A.  Yes.

6         Q.  And I trust, of course, sir, the patient has

7    filled out a healthcare request, you have never

8    refused to treat a patient, have you?

9         A.  No.

10        Q.  I mean the whole system starts with the

11   filing of the healthcare request and then everyone

12   works in motion like you've described today?

13        A.  Yes.

14        Q.  And you treated Mr. Smego for a variety of

15   problems.  Sir, just a couple more points, sorry.

16        With regard to diabetes, you're familiar with

17   the A1C test?

18        A.  Yes.

19        Q.  That's a test that you order for your

20   diabetic patients to keep a finger on the pulse of

21   how they are doing in blood sugar level control?

22        A.  Correct.

23        Q.  It provides you a spot check of a three

24   month period of time to see how the average blood

25   sugar is during that period of time?

LOCHARD - CROSS                          643

1        A.  Yes.

2        Q.  The other thing that you do or is done at

3    Rushville is that they -- the patients are checked

4    daily, blood sugar checks; is that correct?

5        A.  Yes.

6        Q.  By Accu-Chek?

7        A.  Correct.

8        Q.  And Accu-Chek is a spot check of the blood

9    sugar level at that particular time?

10       A.  Yes.

11       Q.  Whereas an A1C test gives you a three month

12   window of the total average blood sugar level?

13       A.  Yes.

14       Q.  All right.  Sir, let me show you Defense

15   Exhibit 36-020.  This is a lab result dated

16   12/30/2009.  Do you see that, sir?

17       A.  Yes.

18       Q.  And is this the type of test that you

19   ordered for Mr. Smego?  I believe your name is on

20   there?

21       A.  Yes.

22       Q.  This A1C test result, as you can see,

23   indicates that it was 8.8?

24       A.  Yes.

25       Q.  All right.  And the -- your target range for

 1  a diabetic is 4 to 6 according to the lab result?

 2      A.  Well, that's normal value, but most

 3  diabetics can never make it back to normal.  A rare

 4  patient will.  We try to target around 7.  If we can

 5  reach that, that will be an ideal number for most

 6  patients.

 7      Q.  And one thing that you can do with an A1C

 8  test result is you can convert it to a blood sugar

 9  level to give yourself a good understanding as to

10  what his average blood sugar level is as compared

11  to, for example, the Accu-Chek?

12      A.  Yes.

13      Q.  Because the Accu-Chek will give you a

14  reading of the blood sugar on -- on the hundreds

15  basis.  I believe 80 to 120 is normal.  And then if

16  it's 160, 180, the Accu-Chek will tell you that

17  right there?

18      A.  Correct.

19      Q.  Whereas this -- the system for the A1C is a

20  little different, as you can see.  This, for

21  example, I believe says 8.8, which is a different

22  numbering system?

23      A.  Correct.

24      Q.  But there is a formula that you can use to

25  convert the A1C to the blood sugar level that's read

LOCHARD - CROSS                         645

1   by the Accu-Chek?

2       A.  Correct.

3       Q.  And, sir, with an 8.8, would you agree that

4   an 8.8 converted would be approximately a 205 blood

5   sugar level?

6       A.  It would be relatively high, yes.

7       Q.  Anything above 8 is over 200?

8       A.  According to the scale, I believe so.

9       Q.  Just a couple more of these.

10      This is Exhibit No. 36-009.  Another lab for

11  Mr. Smego.  Do you see that, sir?

12      A.  Yes.

13      Q.  And this is dated 6/13/2008, I believe?

14      A.  Yes.

15      Q.  And here again it's 8.5?

16      A.  Yes.

17      Q.  And finally, sir, another one here.  This is

18  dated, as you can see -- I'm sorry, this is Exhibit

19  No. 36-042.  This is dated 2/10/2012?

20      A.  Yes.

21      Q.  And here we have the A1C of 8.4?

22      A.  Yes.

23      Q.  And these are the type of tests, sir, as a

24  treating physician at the Rushville Treatment and

25  Detention Center, that you rely on in performing and

1    providing services to the residents?

2         A.  Yes.

3         Q.  And each of these A1Cs that I just showed

4    you show a marked elevation in Mr. Smego's blood

5    sugar level?

6         A.  Yes.

7         Q.  Consistent with someone who is not taking

8    his medications?

9         A.  Correct.

10        Q.  Sir, what I've done here -- Exhibit 42, sir,

11   just to give the jury an overview of number of

12   occasions Mr. Smego has been seen by physicians at

13   Rushville.

14        I'm sorry, best I can do there.

15        What I've done here, sir, is I've identified

16   total number of examines, as well as the particular

17   date that the appointment is on and the contact

18   date.  Do you see that?

19        A.  Yes.

20        Q.  And assuming the accuracy of this document,

21   this would confirm that Mr. Smego was examined 107

22   occasions during his stay with the Rushville

23   facility?

24        A.  Yes.

25        Q.  And you yourself have examined Mr. Smego

1    over a hundred times?

2         A.  I can't say for sure, but I have examined

3    Mr. Smego.

4         Q.  A lot of times, how about that?  All right.

5         May I have one moment, Judge.

6              THE COURT:  Yes.

7              MR. VOGT:  Thank you, Judge.  Thank you,

8    Doctor, for your time.

9              THE COURT:  Redirect.

10             MS. MacDONALD:  Thank you, Your Honor.

11                    REDIRECT EXAMINATION

12   BY MS. MacDONALD:

13        Q.  Dr. Lochard, I believe you said you had

14   never seen a patient that was allergic to Motrin; is

15   that right?

16        A.  Generally the patients, as I said, will have

17   stomachaches.  The types of allergies we look for

18   are rashes and itching and things like that.

19        Q.  I'd like to show you a bottle of Motrin

20   here.  And if you peel back the label we have a

21   warning here about allergy.  I wonder if you could

22   read that.

23             THE COURT:  Do we have an exhibit number on

24   that one?

25        Q.  Not yet, Your Honor.  We can call it

LOCHARD - REDIRECT                    648

1    Plaintiff's 115.

2              THE COURT:  Thank you.

3         A.  Yes.  It says can have an allergy to it;

4    correct.

5         Q.  Would you read the language there at the top

6    of that warning?

7         A.  Yes, it says: (As read)  "Symptoms may

8    include hives, skin reddening, facial swelling,

9    rash, asthma, blisters, and shock."

10        Q.  And, Doctor, you would agree those symptoms

11   are -- would be symptoms if someone had an allergic

12   reaction to Motrin?

13        A.  Correct.

14        Q.  And you agree that it is in fact possible

15   for someone to be allergic to Motrin?

16        A.  Oh, absolutely, yes.

17        Q.  And you haven't ever tested Mr. Smego to

18   determine whether or not he had an allergy to

19   Motrin, have you?

20        A.  No.

21        Q.  And you haven't seen anything in the record

22   that Dr. Mitchell or anyone else at Rushville has

23   tested Mr. Smego to determine whether or not he's

24   allergic to Motrin?

25        A.  As far as I knew, no.

LOCHARD - REDIRECT                    649

1          Q.  Okay.  I'll take that back.

2          I'll just put this up here for a minute so the

3     jury can see what the doctor is reading.

4          Dr. Lochard, this is the allergy warning that

5     you described for the jury?

6          A.  Yes.

7          Q.  And this is a list of symptoms that a person

8     who has an allergic reaction to Motrin can suffer;

9     correct?

10         A.  Correct.

11         Q.  Dr. Lochard, you also were shown a physical

12    examination that you did of Mr. Smego; right?

13         A.  Yes.

14         Q.  And there was a notation there, a portion of

15    your examination that noted your findings regarding

16    Mr. Smego's mouth; right?

17         A.  Sure.

18         Q.  And you're not a dentist; right?

19         A.  Correct.

20         Q.  And if a dentist, during -- at that time had

21    found that Mr. Smego had cavities that needed to be

22    filled, you would defer to that dentist's

23    determination as to a person's dental needs?

24         A.  Correct.

25         Q.  And if those cavities had been reported in

1  Mr. Smego's dental chart, then you would defer to

2  the doctor that those cavities were there and needed

3  to be filled?

4      A.  Correct.

5      Q.  Mr. Vogt also asked you a little bit about

6  how you see your patients.  Do you remember that?

7      A.  Yes.

8      Q.  And you described the procedure where nurses

9  compile lists for you; right?

10      A.  Correct.

11      Q.  There are also occasions, Doctor, where if

12  you want to see a patient, you can just request that

13  that patient be added to your list or be brought

14  down to see you; right?

15      A.  Yes.

16      Q.  And you've done that before?

17      A.  Yes.

18      Q.  If you want to see a particular patient, you

19  tell the nurse and they arrange for that patient to

20  be brought to see you?

21      A.  Yes.

22      Q.  And Mr. Vogt asked you a series of questions

23  regarding Mr. Smego's diabetes.  Do you remember

24  that?

25      A.  Yes.

LOCHARD - REDIRECT                    651

1          Q.  And when you have a patient with diabetes

2    who's having trouble controlling that diabetes, as a

3    doctor there are certain things you want to do;

4    correct?

5          A.  Correct.

6          Q.  And you want to discuss with that patient

7    their medication; right?

8          A.  Yes.

9          Q.  You want to provide education regarding the

10   diabetes?

11         A.  Yes.

12         Q.  It's important as a doctor to let a patient

13   know what their conditions are and what the possible

14   effects of a medical condition is; right?

15         A.  Yes.

16         Q.  And it's also important to continue that

17   education because the control of a diabetic's blood

18   sugar is the responsibility of both the patient and

19   the physician; right?

20         A.  Yes.

21         Q.  And when we're talking specifically about

22   the amount of blood sugar that is in a patient's

23   saliva, isn't it true that regardless of the fact

24   there might be an elevated level of blood sugar, as

25   long as that patient is brushing their teeth twice a

1    day that should take care of any elevated levels;

2    correct?

3        A.  One would hope so.  But sugar in the saliva

4    will -- it's a breeding ground for bacteria.  The

5    bacteria will cause an increase of plaques on the

6    teeth.  That in turn causes gingivitis.  So having

7    consistent elevation of sugar in the saliva is

8    detrimental to the teeth because of the plaque and

9    the potential cause of gingivitis as I mentioned

10   earlier.

11       Q.  Do you recall you gave a deposition in this

12   case, Doctor?

13       A.  Yes.

14       Q.  And you were given the same oath on that day

15   as you were given today --

16       A.  Yes.

17       Q.  -- in this courtroom?

18       A.  Yes.

19       Q.  Okay.  And on that date; I'm just going to

20   read to you the question that I asked and the

21   answers that you gave.

22       A.  Okay.

23       Q.  (As read)  "You know, if we're going to try

24   to help a juror understand what it means to have

25   more glucose in the saliva, you know, is it

1  something like eating a cookie or is it something --

2  is it something that brushing your teeth helps

3  with?"

4      And you would say:  "I wouldn't say eating a

5  cookie.  It's just higher amount of glucose floating

6  around.  And brushing the teeth would definitely

7  keep that out.  It would have less chance of

8  affecting the health of the mouth in general

9  basically."

10     And so if you -- then I asked you again:  "So

11 if you have someone who is brushing their teeth two

12 times a day, even if they have that extra glucose in

13 their saliva, that's probably going to address and

14 prevent the tooth issues here?"

15     And you said: "Sure, good dental hygiene."

16     A.  Yes, I would hope that would be the case.

17 But there are some times -- a patient may brush his

18 teeth 8:00 in the morning and by noon there's more

19 sugar.  And because we do eat throughout the day and

20 not everybody brushes their teeth after they eat

21 lunch or something like that.

22     Q.  I just want you to listen to my question

23 carefully, Doctor.

24     A.  Okay.

25     Q.  On -- during your deposition I asked you the

1  following question and you gave the following

2  answer: (As read)  "And so if you have someone who

3  is brushing their teeth two times a day, even if

4  they have that extra glucose in their saliva, that's

5  probably going to address and prevent tooth issues

6  there?"

7      You said:  "Sure, good dental hygiene."

8      That was your answer, right?

9      A.  Yes, that's what I said at that time;

10  correct.

11          MS. MacDONALD:  I have no further

12  questions.

13          MR. VOGT:  Judge, just a couple.

14          THE COURT:  You may.

15                  RECROSS EXAMINATION

16  BY MR. VOGT:

17      Q.  Sir, during the eight years that you have

18  taken care of Mr. Smego, you never saw Mr. Smego

19  suffer from any type of allergic reaction, have you?

20      A.  No, I have not.

21      Q.  You have never treated him for an allergic

22  reaction to Motrin?

23      A.  No, sir, I have not.

24      Q.  He's never complained to you about being

25  allergic to Motrin?

LOCHARD - RECROSS                    655

1      A.  Not that I can recall.

2      Q.  Now, let's put things in prospective here.

3  You were asked some questions about Mr. Smego having

4  trouble controlling his diabetes; do you remember

5  that?

6      A.  Yes.

7      Q.  Now, sir, not taking medications at all,

8  zero, for your diabetes, is that -- can you even

9  consider that control?

10     A.  No, in reality you cannot.

11     Q.  I mean it's not -- when you don't take your

12 medication month and month after month like you saw

13 and testified to here today, that's not trouble

14 controlling anything, is it, sir?

15     A.  Correct.

16     Q.  I mean if you're not taking your medications

17 period, carte blanche, 100 percent, your blood sugar

18 level is through the roof?

19     A.  Correct.

20     Q.  And the A1C tests tell us that you've

21 already shown that even after that his blood sugar

22 levels were on average over 200?

23     A.  Yes.

24     Q.  The thing with diabetes, sir, is that it's a

25 patient responsibility primarily, because first, the

LOCHARD - RECROSS                          656

1    patient must take the medication?

2         A.  Yes.

3         Q.  If the patient refuses to take medication,

4    the entire system fails?

5              MS. MacDONALD:  Objection, Your Honor.

6    Foundation.

7         Q.  I'll rephrase it.  No matter what you do as

8    a doctor, sir, no matter what any doctor does, if a

9    patient refuses to take their medication for

10   diabetes, there's nothing you can do to change that?

11        A.  Yes, that is correct.

12        Q.  I mean because what happens is the diabetic

13   medications control the blood sugars?

14        A.  Yes.

15        Q.  If they don't take the medications, the

16   blood sugar must go up?

17        A.  Correct.

18        Q.  And no matter what you do as a doctor, what

19   Dr. Mitchell does, what any doctor does, if the

20   patient refuses to take the diabetic medications,

21   that's all she wrote?

22        A.  Correct.

23        Q.  As far as brushing your teeth is concerned;

24   again, brushing your teeth twice a day does not

25   lower the blood sugar level?

LOCHARD - RECROSS                     657

1      A.  Correct.

2      Q.  Brushing your teeth twice a day is not

3  diabetic medication?

4      A.  Correct.

5      Q.  Brushing your teeth twice a day is like,

6  it's like an Accu-Chek, it's a spot clean?

7      A.  Correct.

8      Q.  But within moments after brushing your teeth

9  the sugar is going to be in your saliva because it's

10  always there when you're not talking your

11  medication?

12      A.  Correct.

13      Q.  It's always there when your blood sugar

14  level is over 200?

15      A.  Correct.

16      Q.  And you would never say, you would never

17  suggest to anyone, look, you don't have to take your

18  diabetes medication, don't worry about it, just

19  brush your teeth twice a day?

20      A.  No, I would never say that.

21      Q.  The suggestion would be ludicrous?

22      A.  Correct.

23      Q.  Lastly, sir, we talked earlier about the

24  medication administration records for Mr. Smego.  We

25  went over them before?

1      A.  Yes.

2      Q.  One of the things that is on the bottom of

3  each medication administration record is the adverse

4  reactions for the patient?

5      A.  Correct.

6      Q.  And when the nurses administer or go through

7  the medication administration records, they review

8  that to make sure that they're not giving the

9  patient something that he's allergic to?

10     A.  Correct.

11     Q.  And not once on any of these medication

12 records is there any reference to Motrin; correct,

13 sir?

14     A.  Correct.

15         MR. VOGT:  Thank you, sir.

16         MS. MacDONALD:  Your Honor, may we just

17 have one moment.

18         THE COURT:  You may.

19     Ms. MacDonald, do you have the Court's

20 Exhibit 5.

21         MS. MacDONALD:  I'm sorry?

22         THE COURT:  Do you still have Court's

23 Exhibit 5.  The jury question?

24         MR. VOGT:  Oh, Judge, I apologize.

25         MS. MacDONALD:  It's on the podium.

1          MR. VOGT:  May I approach?

2          THE COURT:  You may.

3     Ms. MacDonald, if you'll step up.

4     (The following sidebar discussion was held at

5     the bench, out of the hearing of the jury.)

6          MR. CROWL:  I can ask this witness

7     about the financial arrangement if that's

8     necessary.  And I guess we can ask about

9     the allergy if you like, Your Honor.

10         THE COURT:  It's Court's Exhibit 4.

11         MR. VOGT:  I apologize.

12         THE COURT:  I don't believe these

13    questions have been asked.

14         MS. MacDONALD:  I can address them.  I

15    can address the --

16         MR. VOGT:  I can ask them.

17         MS. MacDONALD:  I can ask him if he

18    knows.  Would the Court ask them?

19         THE COURT:  I can.  Sure.

20         MS. MacDONALD:  Okay.

21    (The following proceedings were held in open

22    court.)

23         THE COURT:  Doctor, I'm going to ask you a

24    couple of questions for the jury.

25    Would Dr. Mitchell be affected financially if

LOCHARD - RECROSS                          660

1  she did, in fact, refer a patient outside the

2  facility?

3          THE WITNESS:  No.

4          THE COURT:  How are allergies determined?

5  Mr. Smego, does he or does he not have an allergy to

6  Motrin?

7          THE WITNESS:  As far as I know, he does

8  not.

9          THE COURT:  How are they determined;

10  allergies?

11          THE WITNESS:  Well, if a patient has an

12  allergy; say for example, a patient takes an

13  ibuprofen, in Mr. Smego's case, for example.  If he

14  states that he has a rash, if he starts to itch, or

15  if something severe such as anaphylactic shock,

16  which would be life-threatening.  But the simple

17  things that we would deal with onsite would be rash,

18  itching, and things of that sort.

19      If the patient has that, that would be an

20  allergy.  But taking a medication like Aleve or

21  Advil, if it causes the patient to have a

22  stomachache, that would not be considered an

23  allergy.

24          THE COURT:  Is there a test?

25          THE WITNESS:  Well, there are tests that

LOCHARD - REDIRECT                    661

1    can be done to see if a patient has a particular

2    allergy to a drug, yes.  Immunologists --

3    immunologists and allergists do those tests offsite.

4            THE COURT:  Specifically for Motrin?

5            THE WITNESS:  Or it could be done --

6    multiple drugs.  I'm sure it could be done for

7    Motrin as well.  But as we've seen on the MAR,

8    Mr. Smego did take Motrin on numerous occasions and

9    had no adverse event occur.

10           THE COURT:  Is there a type of allergy to

11   Motrin that would only show up after taking several

12   doses in a row?

13           THE WITNESS:  No.  If I -- my personal

14   experience is if a person is allergic to Motrin it

15   would generally show up after a few doses, if he

16   develops a rash, or itching for that matter.

17           THE COURT:  Okay.  Follow-up questions,

18   Ms. MacDonald?

19           MS. MacDONALD:  Yes, Judge.

20               REDIRECT EXAMINATION

21   BY MS. MacDONALD:

22       Q.  Dr. Lochard, have you ever seen, with your

23   own eyes, Mr. Smego take Motrin?

24       A.  No.

25       Q.  And as you said before, there's -- as far as

LOCHARD - REDIRECT                    662

1    you know, no one has ever tested Mr. Smego to see if

2    he is actually allergic to Motrin?

3          A.  That is correct.

4          Q.  You've never determined that from a test?

5          A.  Correct.

6          Q.  You're basing your determination today on

7    the MARs?

8          A.  No.  Based on what Mr. Smego would report.

9    It's on the MAR he had been given medication which

10   was PRN.  He would have had to have asked for it.

11   And if he developed a rash or itching he would have

12   notified the nurses and the nurses would have

13   notified me on that.

14         Q.  You never had a discussion about that with

15   Mr. Smego though?

16         A.  I do not recall that.

17         Q.  Dr. Lochard, you remember Mr. Vogt showed

18   you some exhibits relating to A1C tests of

19   Mr. Smego?

20         A.  Yes.

21         Q.  And those, he showed one from 2012, one from

22   2008, and one from 2009; right?

23         A.  Correct.

24         Q.  Mr. Smego's blood sugar level was not

25   constantly elevated between 2006 and 2013; right?

LOCHARD - REDIRECT                    663

1     A.  Did you say it was not --

2     Q.  Not constantly elevated.

3     A.  With an A1C above 8 it would have to be

4  constantly elevated above normal for the A1C to be

5  8.

6     Q.  In 2006, it was not elevated at that level;

7  correct?

8     A.  Well, what would be the level?

9     Q.  If it was at 122?

10    A.  Correct.  122 is slightly elevated.

11    Q.  And Mr. Smego is taking his diabetic

12  medications today as far as you know?

13    A.  I believe so.

14         MS. MacDONALD:  No further questions.

15         THE COURT:  Mr. Vogt?

16         MR. VOGT:  Nothing further, Judge.  Thank

17  you.

18         THE COURT:  Do you have any questions for

19  the doctor?

20    No questions.  All right.

21    (The jury left the courtroom.)

22         THE COURT:  Off the record.

23    (The following sidebar discussion was held at

24    the bench, out of the hearing of the jury.)

25         MR. VOGT:  Judge, Dr. Mitchell is

1      concerned about the Court's question that

2      was provided by the jurors regarding the

3      financial issue.  And I --

4          THE COURT:  Could I have the question

5      back?

6          Are you referring to Question 1 on

7      Exhibit 4?

8          MR. VOGT:  Yes, Judge.

9          THE COURT:  What is the objection?

10         MR. VOGT:  Well, I don't have an

11     objection, Judge, it's a clarification that

12     we'd like to make in connection with the --

13         MS. CAMPBELL:  A clarification of the

14     question.  Is the question do they mean

15     like would she be charged if the patient

16     went out?  Because her impression of the

17     question is that if everybody gets sent out

18     for routine care, they would no longer need

19     her and then she would be financially

20     impacted.

21         So I think it's the wording of the

22     question.  Does it mean she has to pay

23     money to send them out; You know what I'm

24     saying?

25         MS. MacDONALD:  Well, I mean the

1      question is the question and we've already

2      asked the witness.  And if the jurors have

3      a follow-up question to clarify one of

4      those things, they can submit it.  But I

5      don't think Dr. Mitchell can ask a juror

6      what they meant by their question.

7          THE COURT:  I think the question is

8      clear.  If she's going to be affected if

9      she refers somebody out.  I mean is it

10     going to cost her money, is she going to

11     lose money.

12         MS. MacDONALD:  It's pretty clear.

13         MR. VOGT:  I will call her during our

14     case in chief and ask her --

15         MS. MacDONALD:  You can't call her,

16     she's already been on the stand.

17         MR. VOGT:  I can always call her

18     during the defense case.  So I'll address

19     that question during the defense.

20         THE COURT:  Does anyone know the

21     answer to this question, whether fluoride

22     is mandated?

23         MR. VOGT:  There is a discussion of

24     that in somebody's dep, about the presence

25     of fluoride and the impact.  I think

LOCHARD - REDIRECT                    666

1        Dr. Mitchell actually talked about it,

2        about how much fluoride there is in

3        Chicago, but she didn't think that the

4        water at Rushville was fluorinated.

5            MS. CAMPBELL:  In the big cities.

6        Like if you have well water, you're not --

7            THE COURT:  Right.  That's why I asked

8        this doctor the question.  He assumed.  He

9        assumed that fluoride is everywhere.  But I

10       know I've read about in Oregon and

11       California that there are areas where they

12       protest.

13           MS. MacDONALD:  Yeah, right.  They

14       don't want fluoride.

15           MS. CAMPBELL:  Yeah, we didn't.

16           THE COURT:  Where did you grow up?

17           MS. CAMPBELL:  In Michigan.

18           THE COURT:  You didn't have it?

19           MS. CAMPBELL:  No, we had well water.

20           THE COURT:  We -- I lived in Indiana,

21       central Indiana, when I was young.  And my

22       brother was born there and my older brother

23       and I had a ton of cavities and the little

24       ones never had any cavities.  He may have

25       just gotten the gene pool, but he died of

LOCHARD - REDIRECT                    667

1    diabetes at 50, so I don't --

2         MR. VOGT:  You say the people protest

3    adding fluoride?

4         THE COURT:  Hm-mm.  There was

5    something when I Googled it here.  They

6    think it causes cancer, among other things.

7         MR. VOGT:  Oh, fluoride causes cancer.

8         MS. CAMPBELL:  Or autism or --

9         THE COURT:  Well, we can go beyond,

10   there are 44 things.

11        MS. MacDONALD:  I'm a little concerned

12   about what Mr. Vogt said about recalling

13   witnesses.  I thought we weren't recalling.

14        MR. VOGT:  Mitchell is a party though.

15        MS. MacDONALD:  You already did your

16   direct of Dr. Mitchell.

17        MR. VOGT:  Not during the defense

18   case, that's --

19        MS. MacDONALD:  We talked about this

20   like weeks ago.

21        MR. VOGT:  Yeah, we talked about this

22   for the non-party witnesses.

23        MS. MacDONALD:  No, we never said

24   that, Bob.

25        THE COURT:  Why don't you go have a

1          conversation.  May I excuse this doctor?

2              MR. VOGT:  Yes, Judge.

3          (The following proceedings were held in open

4          court.)

5              MS. MacDONALD:  Are we waiting for the

6      jurors to come back?  If they had a question.

7              THE COURT:  They said they had no

8      questions.

9              MS. MacDONALD:  Oh, I'm sorry.

10             THE COURT:  I did ask this time.  Five

11     minute recess.

12         (The witness was excused.)

13         (A recess was taken.)

14             THE COURT:  Please bring in the jury.  Did

15     you resolve your dispute?

16             MR. VOGT:  I believe so.  Bethany is not

17     here, Judge.

18             THE COURT:  Are we ready now?

19             MR. WATSON:  I think so.

20             THE COURT:  All right.

21         (The jury entered the courtroom.)

22             THE COURT:  We apologize, we had some

23     technical difficulties again.  This witness was not

24     uninvolved.  She's been patiently waiting for us

25     since first thing this morning.  She got here I

WALKER - DIRECT                      669

1    think before you did even.

2         If you'll please swear the witness.

3         (The witness was sworn.)

4              THE COURT:  Please proceed.

5                   DANIELLE WALKER

6    called as a witness herein, having been duly sworn,

7    was examined and testified as follows:

8                   DIRECT EXAMINATION

9    BY MR. WATSON:

10        Q.  Good afternoon.  Could you please introduce

11   yourself and spell your last name?

12        A.  My name is Danielle Walker.  W-a-l-k-e-r.

13        Q.  Ms. Walker, who do you work for?

14        A.  I work for Wexford Health Sources.

15        Q.  Do you work for Wexford at the Rushville

16   Treatment and Detention Facility?

17        A.  Yes, I do.

18        Q.  How long have you worked at the Rushville

19   Treatment and Detention Facility for Wexford?

20        A.  Since March 9th, 2010.

21        Q.  Do you know Dr. Mitchell, who also works at

22   that facility for Wexford?

23        A.  Yes, I do.

24        Q.  And what is your position for Wexford at the

25   facility?

WALKER - DIRECT                    670

1        A.  I'm the Director of Nursing.

2        Q.  As the Director of Nursing for Wexford at

3    the facility, are you familiar with facility

4    directives?

5        A.  Yes, I am.

6        Q.  Could you tell the ladies and gentlemen of

7    the jury what a facility directive is?

8        A.  They are directives that the facility is to

9    follow to obey by.

10       Q.  When did you last go through and review the

11   facility directives as part of your duties with

12   Wexford?

13       A.  I believe it was the end of last year.

14       Q.  And who did you go through those facility

15   directives with, along with yourself and the folks

16   at Wexford?

17       A.  I went through with the director and the

18   quality assurance person.

19       Q.  What's the director's name?

20       A.  Greg Scott.

21       Q.  And the quality assurance individual?

22       A.  Jennifer Blazing.

23       Q.  Does Jennifer work for Wexford?

24       A.  No.

25       Q.  Does the director work for Wexford?

WALKER - DIRECT                              671

1       A.  No.

2       Q.  You were the representative for Wexford at

3   that review?

4       A.  Yes.

5       Q.  Have you also written directives for the

6   facility?

7       A.  I have not written directives, no.

8       Q.  Have you written policies and procedures at

9   the facility?

10      A.  I have written policies and procedures.

11      Q.  Your Honor, may I approach the witness?

12          THE COURT:  You may.

13      Q.  Ma'am, I've handed you a document which is

14  marked as Plaintiff's Exhibit 100.  Could you

15  identify that document for us?

16      A.  This is the facility directive for

17  healthcare titled Healthcare Policy and Procedure.

18      Q.  Your Honor, may I show the jury?

19          THE COURT:  You may.

20      Q.  And as you indicated before, does the

21  facility directive at the top identify the

22  Department of Human Services?

23      A.  Yes.

24      Q.  And underneath the Department of Human

25  Services it identifies it as a facility directive

WALKER - DIRECT                    672

1   and it has a number and a title; is that right?

2       A.  Correct.

3       Q.  On the far right-hand side it has the date

4   revised; right?

5       A.  Correct.

6       Q.  And for this particular directive that

7   identifies a date revised last in 2008; true?

8       A.  Yes.

9       Q.  And in terms of the policy that this

10  particular directive serves, could you read that for

11  the jury?

12      A.  (As read)  "The purpose of this healthcare

13  directive is to ensure that the healthcare policies

14  and procedures of the facility are communicated to

15  staff at the treatment and detention facility."

16      Q.  Are you among the staff at the treatment and

17  detention facility?

18      A.  Yes.

19      Q.  Is Dr. Mitchell among the staff at the

20  treatment and detention facility?

21      A.  Yes.

22      Q.  And at the bottom of page 1 of the facility

23  directive on health policies and procedures does it

24  identify a Director of Nursing?

25      A.  Yes.

WALKER - DIRECT                                    673

1      Q.   Who is the Director of Nursing?

2      A.   Myself.

3      Q.   Could you tell us what the Director of

4  Nursing's responsibilities are as dictated by this

5  directive?

6      A.   (As read) "Responsibile for overseeing the

7  healthcare services at the facility and interfacing

8  with DHS in the execution of these duties."

9      Q.   And when it says the responsibility for

10  overseeing healthcare services, does that include in

11  part dental?

12     A.   Yes.

13     Q.   You are then somewhat Dr. Mitchell's

14  supervisor?

15     A.   Yes.

16     Q.   Who else supervises Dr. Mitchell as part of

17  Wexford?

18     A.   The regional manager.

19     Q.   And what's the regional manager's name?

20     A.   David Freeman.

21     Q.   And is David Freeman a doctor?

22     A.   No.

23     Q.   Who in terms of a doctor supervises

24  Dr. Mitchell?

25     A.   As part of Wexford?

WALKER - DIRECT                        674

1        Q.  Does any doctor supervise Dr. Mitchell as
2   part of Wexford?
3        A.  Not as part of Wexford that I'm aware of.
4   Not at our facility.
5        Q.  In your supervision then as Director of
6   Nursing at the facility you have seen Dr. Mitchell?
7        A.  Yes.
8        Q.  You know what Dr. Mitchell does at the
9   facility?
10       A.  Yes.
11       Q.  You have been at the facility when
12   Dr. Mitchell was working?
13       A.  Yes.
14       Q.  Dr. Mitchell also works with a dental
15   assistant?
16       A.  Correct.
17       Q.  Is the dental assistant also part of the
18   healthcare staff?
19       A.  Yes.
20       Q.  So you would then somewhat supervise also
21   the dental assistant?
22       A.  Correct.
23       Q.  But you trust that Dr. Mitchell watches over
24   her dental assistant?
25       A.  Yes.

WALKER - DIRECT                675

1        Q.  In terms of what the dental assistant is
2    doing hourly/hourly, daily/daily while at that
3    facility, you would rely on Dr. Mitchell?
4        A.  Correct.
5        Q.  You rely on Dr. Mitchell to make sure that
6    the dental assistant is doing tasks correctly?
7        A.  Yes.
8        Q.  Because the dentist and the dental assistant
9    should work hand in glove?
10       A.  Correct.
11       Q.  In terms of the healthcare policy that's
12   still up on the screen, does it also provide a set
13   of procedures?
14       A.  Yes.
15       Q.  And at the top of this page does it indicate
16   that directives for healthcare shall be maintained
17   at the facility?
18       A.  Yes.
19       Q.  Does it also indicate that under E, the
20   directives shall be available to all healthcare unit
21   staff members?
22       A.  Yes.
23       Q.  And healthcare unit staff members would
24   include Dr. Mitchell?
25       A.  Correct.

WALKER - DIRECT                    676

1          Q.  And underneath that it says that Director of

2    Nursing shall assure the directives are current at

3    all times?

4          A.  Yes.

5          Q.  And that's your responsibility?

6          A.  Yes.

7          Q.  Under the facility directives it also

8    includes staff training?  On the last page; correct?

9          A.  Right.

10         Q.  Under A of staff training says: (As read)

11   "All appropriate TDF staff must have successfully

12   completed training regarding healthcare directives;"

13   right?

14         A.  Right.

15         Q.  Have you completed training on healthcare

16   directives?

17         A.  I've read them.

18         Q.  You've read them.  You've made sure that

19   others have them available to read them if they need

20   to?

21         A.  Correct.

22         Q.  And you do that in your role as a Wexford

23   employee at the facility?

24         A.  Correct.

25         Q.  If you could set that aside for a moment,

WALKER - DIRECT                    677

1    Ms. Walker, I'd appreciate it.

2        The facility also has a specific facility

3    directive on dental screening and oral healthcare;

4    right?

5        A.  Right.

6        Q.  May I approach, Your Honor?

7            THE COURT:  Yes, you may.

8        Q.  Ms. Walker, is what I've shown you now as

9    Plaintiff's Exhibit 98 the dental screening oral

10   healthcare directive at the facility?

11       A.  Yes.

12       Q.  Your Honor, may I show it to the jury?

13           THE COURT:  You may.

14       Q.  And just like the last facility directive we

15   reviewed, it falls under the Illinois Department of

16   Human Services?

17       A.  Correct.

18       Q.  And could you read for us the policy that

19   this directive provides under these policies?

20       A.  (As read)  "The purpose of this policy is to

21   ensure that each resident has access to dental care

22   as needed at the treatment and detention facility."

23       Q.  And just like the last directive we went

24   through, this directive also includes procedures;

25   Right?

WALKER - DIRECT                         678

1          A.  Right.

2          Q.  Under general procedures it says:  (As read)

3     "Within the first week of admission each resident

4     will be seen by the dentist and undergo a dental

5     screening."  Right?

6          A.  Right.

7          Q.  It also provides under B: (As read) "All

8     dental care is provided by a licensed dentist?"

9          A.  Right.

10         Q.  And the licensed dentist at the facility is

11    Dr. Mitchell under this?

12         A.  Correct.

13         Q.  And C, under the procedures, could you read

14    that for us?

15         A.  (As read)  "Referrals to a dentist are made

16    by -- for symptomatic dental problems based on

17    abnormalities identified by healthcare staff or as a

18    result of a resident request for services."

19         Q.  As you've read that procedure it includes

20    two parts; right?

21         A.  Right.

22         Q.  Could you read us the first part?

23         A.  "Referrals to a dentist are made for

24    symptomatic dental problems."

25         Q.  "Based on abnormalities identified by

 1  healthcare staff?"

 2       A.  Correct.

 3       Q.  And the second part is what, Ms. Walker?

 4       A.  "Or as a result of a resident request for

 5  services."

 6       Q.  Essentially a healthcare written request

 7  isn't required under the directive?

 8       A.  Correct.

 9       Q.  And the dental care in the facility is under

10  the purview of Dr. Mitchell; right?

11       A.  Yes.

12       Q.  The responsibility for providing proper

13  dental care is the responsibility of Dr. Mitchell?

14       A.  Right.

15       Q.  Essentially dental care in the facility

16  boils down to how Dr. Mitchell makes problems known

17  and provides treatment?

18       A.  Correct.

19       Q.  There are many ways for an individual to be

20  seen by a dentist; true?

21       A.  Yes.

22       Q.  You could submit a healthcare request, as we

23  talked about earlier?

24       A.  Yes.

25       Q.  Dr. Mitchell may have ongoing care and

WALKER - DIRECT                                680

1  treatment; right?

2      A.  Right.

3      Q.  Dr. Mitchell could trigger a person to come

4  back to her for ongoing care and treatment?

5      A.  Right.

6      Q.  Dr. Mitchell could note a resident for

7  follow-up care?

8      A.  Right.

9      Q.  Dr. Mitchell basically tells you and the

10  nursing staff who she wants to see?

11          MR. VOGT:  Objection; foundation, Judge.

12          THE COURT:  The objection is sustained.

13      Q.  Do you oversee the nursing staff as part of

14  your Director of Nursing duties?

15      A.  Yes.

16      Q.  And as part of your Director of Nursing

17  duties -- and your staff underneath you who are

18  nurses; right?

19      A.  Right.

20      Q.  Do those nurses interact with the dentist at

21  all?

22      A.  At times.

23      Q.  Do those nurses interact with residents?

24      A.  Yes.

25      Q.  If a resident provides a healthcare request,

WALKER - DIRECT                                681

1    is the healthcare request given to Dr. Mitchell?

2         A.  Yes.

3         Q.  If Dr. Mitchell wants somebody on her list

4    for follow-up care, does Dr. Mitchell talk to your

5    nurses?

6              MR. VOGT:  Objection; foundation, Judge.

7              THE COURT:  The objection is overruled.

8         A.  Yes.

9         Q.  Dr. Mitchell basically tells you and your

10   staff who she wants to see?

11             MR. VOGT:  Again, objection, Judge.  Same

12   reason as before.

13             THE COURT:  The objection is overruled.

14        A.  Or the STAs, who call the residents down.

15        Q.  And an STA, for the jury, is a security

16   therapy aide?

17        A.  Correct.

18        Q.  And so what can -- what role can a security

19   therapy aide play in getting a resident down?

20        A.  They call the unit and have the residents

21   come down from that unit.

22        Q.  So Dr. Mitchell could also tell an STA or

23   security therapy aide, "I'd like to see this

24   residents, could you call him down?"

25        A.  Correct.

WALKER - DIRECT                          682

1      Q.  And she can do that without a healthcare

2  request?

3      A.  Correct.

4      Q.  And the STA will call the resident down and

5  bring that resident to the dental office?

6      A.  Yes.

7      Q.  When an individual is scheduled for

8  follow-up treatment with Dr. Mitchell, have you or

9  your staff ever refused to bring someone down?

10         MR. VOGT:  Objection; foundation, Judge.

11         THE COURT:  Let's have some foundation.

12     Q.  Have you have seen the requests that

13  Dr. Mitchell has made periodically during your time

14  at the facility?

15     A.  Yes.

16     Q.  And you have seen, as we've talked about

17  before, residents periodically being called down for

18  treatment through a healthcare request or through an

19  STA or because she has made a request for an

20  individual; right?

21     A.  Right.

22         MR. VOGT:  Objection; foundation, Judge.

23         THE COURT:  The objection is overruled.

24     Q.  And in your time as a Wexford employee at

25  the facility, having seen that happen on occasion

 1   after occasion, have you ever had an occurrence

 2   where your nursing staff or you refused to bring the

 3   resident to Dr. Mitchell?

 4        A.   No.

 5        Q.   Are you familiar with the term triage in

 6   terms of healthcare requests?

 7        A.   Yes.

 8        Q.   The nursing staff goes through those written

 9   healthcare requests?

10        A.   Yes.

11        Q.   Those nursing staff can take healthcare

12   requests in throughout the day or at a medication

13   line; right?

14        A.   Yes.

15        Q.   And if a particular resident has an

16   emergency need, that healthcare request can be

17   directed immediately to a medical official?

18        A.   Correct.

19        Q.   In terms of the administrative sort on

20   healthcare requests, your nursing staff will send

21   some healthcare requests to the physician?

22        A.   Yes.

23        Q.   Your health -- your nursing staff will send

24   some healthcare requests to a podiatrist?

25        A.   Yes.

WALKER - DIRECT                               684

1        Q.  Your nursing staff will send some healthcare

2   request to Dr. Mitchell?

3        A.  Yes.

4        Q.  Dr. Mitchell receives the actual healthcare

5   requests that are submitted?

6        A.  Yes.

7        Q.  And Dr. Mitchell can prioritize those

8   healthcare requests and then those individuals are

9   seen?

10            MR. VOGT:  Objection; foundation, Judge.

11            THE COURT:  The objection is overruled.

12        A.  Yes.

13        Q.  For example, you have seen Dr. Mitchell come

14   in on weekends; right?

15        A.  Yes.

16        Q.  And when Dr. Mitchell arrives at the

17   facility on a weekend, she gets the actual

18   healthcare requests to prioritize those requests for

19   treatment?

20        A.  Yes.

21        Q.  As to how Dr. Mitchell prioritizes residents

22   in terms of treatment or when they're seen, is it

23   really Dr. Mitchell's decision?

24            MR. VOGT:  Objection, Judge; foundation.

25            THE COURT:  Objection is overruled.

1    A.  Yes.

2    Q.  Do you really have much input as the

3  Director of Nursing as to how Dr. Mitchell makes her

4  decision on how she went through the papers that she

5  was given?

6    A.  No.

7    Q.  Dr. Mitchell already knows some of those

8  issues because she's had ongoing treatment with some

9  residents; right?

10        MR. VOGT:  Objection, again; foundation,

11  Judge.

12        THE COURT:  Can you get some foundation.

13    Q.  Sure.  You have, in your time, seen

14  residents called down for treatment by Dr. Mitchell;

15  right?

16    A.  Yes.

17    Q.  And as part of those residents getting

18  called down, your understanding is they're getting

19  called down because Dr. Mitchell needs to see them

20  for some reason?

21    A.  Yes.

22    Q.  And if Dr. Mitchell needs to see them for

23  some reason, you are, under your belief as the

24  Director of Nursing, following Dr. Mitchell's

25  direction on who is prioritized and who should be

WALKER - DIRECT                              686

1    seen for treatment?

2          MR. VOGT:  Objection, Judge; foundation.

3    Mischaracterizes the testimony.

4          THE COURT:  The objection is overruled.

5    A.  Yes.

6    Q.  You rely on Dr. Mitchell, right?

7    A.  Yes.

8    Q.  And when we're talking about the number of

9    ways that a resident can be seen for a visit with

10   the dentist, Dr. Mitchell, outside the healthcare

11   request, one of those ways is provided in the

12   healthcare directive.  And under D on healthcare

13   directive, can you read what that says?

14   A.  (As read)  "Residents will be provided with

15   annual dental care."

16   Q.  And it's your understanding that the

17   facility has annual visits with the dentist

18   Dr. Mitchell?

19   A.  Yes.

20   Q.  And those visits are triggered in some way

21   for individuals to come down and see Dr. Mitchell?

22   A.  Yes.

23   Q.  So as the Director of Nursing, do you expect

24   and is your understanding that Dr. Mitchell will

25   keep track of when the next individual's treatment

1   is scheduled for?

2           MR. VOGT:  Objection; foundation, Judge.

3           THE COURT:  Could we have some foundation.

4       Q.  Sure.  We've talked about a number of

5   different ways that residents can be seen at the

6   dentist; right?

7       A.  Yes.

8       Q.  One of those ways is with ongoing treatment

9   with the dentist; right?

10      A.  Right.

11      Q.  And the dentist can mark down NV, for next

12  visit; right?

13          MR. VOGT:  Objection, again; foundation,

14  Judge.

15          THE COURT:  Can we have some more

16  foundation.

17      Q.  Sure.  In your review and your years at the

18  facility have individuals been seen at the dentist

19  for treatment as a result of a request by

20  Dr. Mitchell?

21          MR. VOGT:  Objection; foundation.

22          THE COURT:  The objection is overruled.

23  You may answer.

24      A.  I -- yes.

25      Q.  Your nursing staff receives medical records

WALKER - DIRECT                           688

1   and dental records; right?

2        A.  Right.

3        Q.  And your nursing staff can review medical

4   and dental records in order to schedule treatment;

5   right?

6        A.  Right.

7        Q.  And in your supervision of nurses at the

8   facility as the Director of Nursing, you have seen

9   NV or your staff has seen NV written periodically on

10  dental charts; right?

11            MR. VOGT:  Objection, Judge; foundation.

12            THE COURT:  Objection is overruled.

13       A.  I can't say that they've seen NV.  I can't

14  say that as a fact.

15       Q.  Okay.  Your understanding is that there is a

16  way for the dentist to schedule a next visit by way

17  of her records; right?

18            MR. VOGT:  Objection; foundation again.

19            THE COURT:  The objection is overruled.

20       Q.  And your answer was, ma'am?

21       A.  Correct.

22       Q.  And this goes back to the directives which

23  provide residents will be provided annual dental

24  care; right?

25       A.  Yes.

WALKER - DIRECT                         689

1        Q.  And a way for a resident to be seen for
2   annual dental care is for a dentist like
3   Dr. Mitchell to write down when the next annual
4   visit will be; right?
5             MR. VOGT:  Objection; foundation.
6             THE COURT:  The objection is overruled.
7        A.  Yes.
8        Q.  Ms. Walker, let's change topics to medical
9   writs.  Are you familiar with medical writs?
10       A.  Yes.
11       Q.  Could you explain to the members of the jury
12   what a medical writ is?
13       A.  A medical writ is if somebody, a resident,
14   should have an outside medical appointment, doctor's
15   appointment, they would be transported to an outside
16   doctor.
17       Q.  A medical writ is a prescription of a type
18   written by a doctor for that resident to be seen
19   outside the facility?
20       A.  Correct.
21       Q.  You have seen Dr. Mitchell write medical
22   writs?
23       A.  Yes.
24       Q.  Dr. Mitchell has the authority to write
25   medical writs?

1      A.  Yes.

2      Q.  If a resident needs to go out for something,

3  is it your understanding that Dr. Mitchell will

4  write a medical writ?

5      A.  Yes.

6      Q.  And in your role as Director of Nursing and

7  your overseeing nurses, your nurses follow a medical

8  writ that's written by a doctor?

9      A.  Yes.

10      Q.  Have you ever seen any of your nurses refuse

11  to send someone out for treatment under a medical

12  writ at all?

13      A.  No.

14      Q.  If equipment is down for a period of time

15  and Dr. Mitchell was unable to provide dental care,

16  could she write a medical writ?

17      A.  She could.

18      Q.  If Dr. Mitchell was unable to provide

19  treatment for some reason, could she write a medical

20  writ?

21      A.  Yes.

22      Q.  And recently Wexford has changed how they

23  review medical writs; is that right?

24      A.  Correct.

25      Q.  And that change was in August of 2014?

WALKER - DIRECT                    691

1          A.  Yes.

2          Q.  And at that time Wexford moved to a

3     collegial review committee?

4          A.  Yes.

5          Q.  And since that time you have no longer been

6     involved with medical writs in terms of a review?

7          A.  Correct.

8          Q.  Before that committee review in August,

9     2014, you would see medical writs issued; right?

10         A.  Right.

11         Q.  And you saw medical writs issued for dental

12    care?

13         A.  I have.

14         Q.  You have seen Wexford's contracts for the

15    Rushville facility?

16         A.  Yes.

17         Q.  As one of your duties as the Wexford

18    Director of Nursing, you make sure that Wexford is

19    trying to comply with its contractual obligations;

20    right?

21         A.  Correct.

22         Q.  Your Honor, may I approach?

23              THE COURT:  Yes, you may.

24         Q.  Is what I've handed you as Plaintiff's

25    Exhibit 108 the contract between Wexford Health

WALKER - DIRECT                    692

1    Sources and the Illinois Department of Human

2    Services?

3         A.  Yes.

4         Q.  And for your understanding, this is a series

5    of contracts because Wexford has renewed its

6    contracts periodically with the Department of Human

7    Services; correct?

8         A.  Yes.

9         Q.  Now, the members of the jury have heard some

10   parts of the contract already.  So I'm gonna show

11   you, if I could, some other parts and see if you

12   understand them as a Wexford employee.  Fair?

13        A.  Okay.

14        Q.  Ma'am, if you could turn to page 3.  And do

15   you see up on the screen the highlighted portion of

16   the contract that says:  (As read)  "As of

17   August 1st, 2007, the residents at the facility is

18   three hundred --" and how many?

19        A.  309.

20        Q.  And if you could go to the bottom of page 3.

21   And as part of the agreement is it -- does it state

22   that:  (As read)  "All medical services shall be

23   provided according to medically accepted community

24   standards of care?"

25        A.  Yes.

WALKER - DIRECT                          693

1       Q.  And that's part of the agreement between DHS

2   and Wexford?

3       A.  Correct.

4       Q.  And I forgot to ask you; what's your

5   background in Director of Nursing?  Did you go to

6   school?

7       A.  I went to become a registered nurse, yes.

8       Q.  And you're a registered nurse, an RN, in the

9   State of Illinois?

10      A.  Yes.

11      Q.  And you're familiar with the standard of

12  care that you would provide as a nurse; right?

13      A.  Yes.

14      Q.  And then under this agreement, as a Wexford

15  employee at the facility, you would provide the

16  standard of care as a nurse that you would provide

17  under that license anywhere else; right?

18      A.  Correct.

19      Q.  Ms. Walker, if you could turn to page 4.

20  And could you read what's written under personnel on

21  paragraph letter A?

22      A.  (As read)  "All personnel shall comply with

23  the current and future state, federal, and local

24  laws and regulations, court orders, department

25  rules, administrative directives, and policies and

WALKER - DIRECT                    694

1  procedures of the Illinois Department of Human

2  Services."

3       Q.  We went over at least two administrative

4  directives earlier?

5       A.  Yes.

6       Q.  And one of those administrative directives

7  was for dental care; right?

8       A.  Right.

9       Q.  It included annual visits?

10      A.  Yes.

11      Q.  It included providing care in response to

12  identified problems that are symptomatic and in

13  response to healthcare requests; right?

14      A.  Right.

15      Q.  It also provided in that directive that we

16  talked about earlier that care should be provided by

17  a licensed dentist; right?

18      A.  Correct.

19      Q.  Who is the licensed dentist under that

20  directive that provides care?

21      A.  Dr. Mitchell.

22      Q.  I want to turn, Ms. Walker, to page 8 of the

23  contract if you could.  And there's a heading called

24  dental services; right?

25      A.  Yes.

WALKER - DIRECT                           695

1       Q.  And the dental services says:  (As read)

2   "Vendors shall provide dental check-ups to facility

3   residents within two years from the date of

4   treatment or exam given and more often if clinically

5   indicated."  Right?

6       A.  Right.

7       Q.  And we talked about an annual exam under the

8   directive; right?

9       A.  Right.

10      Q.  And that's more often than every two years?

11      A.  Correct.

12      Q.  So there are annual exams that are required

13  at the facility?

14      A.  Right.

15          MR. VOGT:  Objection, Judge, but go ahead.

16          THE COURT:  Excuse me, I didn't hear the

17  objection.

18          MR. VOGT:  Objection, Your Honor.  The

19  contract speaks for itself.

20          THE COURT:  The objection is overruled.

21  She may answer.

22      A.  Correct.

23      Q.  Ma'am, if I could show you on the overhead,

24  so that you don't have to flip through your's, it

25  might be easier.

1              THE COURT:  It may be easier for you to

2      read the screen on your right.

3          Q.  I'm showing you the contract that starts,

4      begins July 1, 2008 through June 30th, 2009.  Do you

5      see that up on the screen?

6          A.  Yes.

7          Q.  And it identifies that the resident

8      population is 308; right?

9          A.  Yes.

10         Q.  I'm also gonna show you on the overhead

11     screen so everyone can see it the cost breakdown in

12     the contract.  And under cost breakdown, it provides

13     a dentist on salary at Wexford; right?

14         A.  Right.

15         Q.  And the contract provides for an annual

16     salary of $189,056; is the right?

17         A.  Right.

18         Q.  And then it goes on to say annual costs of

19     $71,663; right?

20         A.  Yes.

21         Q.  And then it projects out for the cost of

22     possible future costs.  And that's hard to read and

23     I'll apologize, so I'll read it for you, $90,747;

24     right?

25         A.  Yes.

1      Q.   And that's greater than the $71,663; right?

2      A.   Yes.

3      Q.   That's an increased cost?

4      A.   Right.

5      Q.   And I want to show you one final thing on

6   this contract.  And I'm sorry to go through it

7   painfully, but I want to make sure we got a full

8   picture.

9       The contract includes a staffing requirement of

10  at least one licensed dentist and dental assistant

11  at a minimum of 15 hours each week across a minimum

12  of three days.  Right?

13     A.   Right.

14     Q.   And that's a minimum requirement; right?

15     A.   Right.

16     Q.   You would expect Dr. Mitchell, if she needed

17  additional hours, to request them from either

18  yourself or the regional manager at Wexford?

19          MR. VOGT:  Objection, Judge; foundation.

20          THE COURT:  The objection is overruled.

21  You may answer.

22     A.   Yes.

23     Q.   To you yourself has Dr. Mitchell ever

24  requested additional hours?

25     A.   I'm trying to recall.

WALKER - DIRECT                          698

1          Q.  Do you recall any as you sit here today of

2    Dr. Mitchell ever requesting additional hours to

3    you?

4          A.  Not that I recall.

5          Q.  You had conversations with Dr. Mitchell

6    generally about the number of hours that she does

7    work; right?

8          A.  Yes.

9          Q.  You've had conversations with Dr. Mitchell

10   that on weekends she comes because she has other

11   jobs; right?

12         A.  Yes.

13         Q.  Dr. Mitchell has a schedule where she has

14   multiple jobs and it happens that her job at the

15   Rushville facility she can only make on the

16   weekends; right?

17         A.  For the most part, yes.

18         Q.  There are some times that she can make it on

19   other days other than a weekend; right?

20         A.  Yes.

21         Q.  And you guys are -- and gals are flexible.

22   If she needs to come on a day other than the

23   weekend, that she has space available and she can

24   work; right?

25         A.  Yes.

WALKER - DIRECT                               699

1      Q.  It's your understanding that Dr. Mitchell

2  has constrained herself in how to fit multiple jobs

3  together; right?

4      A.  Yes.

5      Q.  Ms. Walker, we met last month, along with

6  Mr. Vogt, when we took your deposition?

7      A.  Yes.

8      Q.  And you know from your deposition that you

9  were disclosed as a witness by Dr. Mitchell and her

10  attorneys; right?

11     A.  Yes.

12     Q.  You haven't reviewed any documents specific

13  to Mr. Smego, have you?

14     A.  No.

15     Q.  You've only seen Mr. Smego himself at the

16  facility in the insulin line; right?

17     A.  Yeah.

18     Q.  And that's the insulin line to get

19  medication; correct?

20     A.  Yes.

21     Q.  Have you had any conversations with

22  Mr. Smego at the facility?

23     A.  No.

24     Q.  Have you ever seen Mr. Smego in a med line

25  at the facility?

WALKER - DIRECT                    700

1          A.   Just insulin line.

2          Q.   And you have other duties as the Director of

3   Nursing than standing at the med line?

4          A.   Yes.

5          Q.   And your nursing staff is at the med line

6   whenever medication is dispensed; right?

7          A.   Yes.

8          Q.   It's the nurses' responsibility and you have

9   responsibilities elsewhere; right?

10         A.   Correct.

11         Q.   Really, have you interacted with Mr. Smego

12  in his personal healthcare at all?

13         A.   No.

14         Q.   Do you have any, you know, personal

15  knowledge about the healthcare that specifically

16  Mr. Smego has received at the facility?

17         A.   No.

18         Q.   But you have a general understanding as

19  Director of Nursing of Wexford and as the directives

20  we've talked about about how health care is

21  delivered at the facility?

22         A.   Yes.

23         Q.   And you have that role as Director of

24  Nursing as a Wexford employee; right?

25         A.   Yes.

WALKER - CROSS                                701

1        Q.  And Dr. Mitchell is a Wexford employee as

2   well?

3        A.  Yes.

4            MR. WATSON:  Your Honor, no further

5   questions at this time.

6            THE COURT:  Should we take a break at this

7   time?  I'm asking the jury; do you need a break?

8        Okay.  Mr. Vogt.

9            MR. VOGT:  Thank you, Judge.

10                    CROSS EXAMINATION

11  BY MR. VOGT:

12       Q.  Good afternoon, ma'am.  I'm sorry, I

13  apologize; just a couple of clean-up questions,

14  ma'am.

15       Monday through Friday it's your understanding

16  Dr. Mitchell works at the Stateville Correctional

17  Center near Joliet?

18       A.  Yes.

19       Q.  Saturday and Sunday she comes down to

20  provide dental services to the residents at

21  Rushville?

22       A.  Yes.

23       Q.  Five days at Stateville, two days at

24  Rushville?

25       A.  Yes.

WALKER - CROSS                              702

1      Q.   How many days are there in a week, ma'am?

2      A.   Seven.

3      Q.   Can we agree Dr. Mitchell cannot work

4  eight days a week, nine days a week, ten days a

5  week?

6      A.   Correct.

7      Q.   The suggestion is ludicrous, wouldn't you

8  agree?

9      A.   Yes.

10      Q.   The number of residents at Rushville today

11  is 550?

12      A.   Yes.

13      Q.   Okay.  As Director of Nursing you perform an

14  administrative function; is that correct, ma'am?

15      A.   Yes.

16      Q.   Dr. Mitchell works on the weekends, you work

17  during the week?

18      A.   Yes.

19      Q.   Okay.  And as far as what Dr. Mitchell does

20  on the weekends when you're not there; I mean no

21  disrespect when I ask these questions; you have no

22  idea?

23      A.   Correct.

24      Q.   All right.  In fact, the jury has already

25  heard from Dr. Lochard.  You know him?

1          A.  Yes.

2          Q.  And the jury has already heard from

3    Dr. Mitchell.  Of course you know her?

4          A.  Yes.

5          Q.  And Dr. Mitchell and Dr. Lochard have both

6    testified that when they walk into the Rushville

7    facility the nurses have already prepared lists of

8    residents for each of the doctors to see.

9          Now, if I asked you, ma'am, what the system is

10   that's used by Dr. Lochard and what the system is

11   used by Dr. Mitchell in connection with seeing

12   patients, could we agree, ma'am, you would have no

13   idea?

14         A.  Correct.

15         MR. WATSON:  Objection, Your Honor.  As to

16   the testimony of those two witnesses.  And moreover,

17   Your Honor, an objection to compound.

18         THE COURT:  It certainly was compound.  But

19   the answer will stand.

20         Q.  Let me break it up, ma'am, okay.

21         I understand that you're a Director of Nursing,

22   which means you have nurses that work below you and

23   provide hands-on care to the residents?

24         A.  Yes.

25         Q.  And as far as what those nurses do, you're

WALKER - CROSS                                    704

1   aware of what they do, but how those nurses prepare

2   their lists of residents to be seen by Dr. Lochard

3   is something that you don't personally do?

4       A.  Correct.

5       Q.  You leave it to the nurses who triage

6   patients, review the healthcare requests, and put

7   all that together?

8       A.  Yes.

9       Q.  The same with Dr. Mitchell.  As far as the

10  nurses and the role they perform preparing the lists

11  for Dr. Mitchell, again, you have no idea?

12      A.  Correct.

13      Q.  As far as -- as far as sending residents

14  offsite, ma'am; you would agree that the only time

15  that Dr. Mitchell has sent patients offsite is for

16  oral surgeons or maybe anesthesia problem?

17      A.  Yes.

18      Q.  Okay.  If there's something that she can do

19  at the facility, she's suppose to do it at the

20  facility?

21      A.  Absolutely.

22      Q.  The same with Dr. Lochard; his job is the

23  primary care physician and if he can do his job at

24  the facility, he does it there?

25      A.  Yes.

1          Q.  If he or Dr. Mitchell needs to send a

2     patient to see a specialist, like an oral surgeon,

3     or perhaps for certain tests and procedures, then

4     they would send them out on a writ, like you said?

5          A.  Yes.

6          Q.  Now, sending a resident out on a writ,

7     that's a complicated procedure; true?

8          A.  True.

9          Q.  Tell us why?

10         A.  Because you have to correspond with security

11    and make sure there's no other court writs.  And you

12    have to make sure there's enough security staff that

13    can go along with to make sure that -- you have to

14    schedule their appointment.

15         Q.  And the facility where the resident is being

16    sent on the writ, you must also coordinate that

17    also?

18         A.  Yes.

19         Q.  Because residents can be disturbing?

20         A.  Right.

21         Q.  Sometimes they want the residents brought

22    off hours?

23         A.  Right.

24         Q.  Sometimes they want the residents brought in

25    the back door?

WALKER - CROSS                                706

1          A.  Yes.

2          Q.  Ma'am, you're familiar with the concept of a

3     PRN medication?

4          A.  Yes.

5          Q.  And could you tell us what is a PRN

6     medication?

7          A.  An as needed medication that the resident is

8     to ask for.

9          Q.  Okay.  And what that means is that if a

10    resident has a prescription or order for a PRN

11    medication; say for example Motrin; the resident can

12    go up to the nurse and say I would like some Motrin?

13         A.  Yes.

14         Q.  And what the patient has to do is identify

15    the medication he wants?

16              MR. WATSON:  Objection, Your Honor;

17    foundation.  The witness testified --

18              THE COURT:  The objection is sustained.

19         Q.  Ma'am, are you familiar with the manner in

20    which medications are distributed to the nurses?

21         A.  Yes.

22              MR. WATSON:  Objection, Your Honor.  Same

23    objection.

24              THE COURT:  The objection is overruled.

25    The answer may stand.

WALKER - CROSS                                   707

1          A.  Yes.

2          Q.  Okay.  And I just want to make sure that

3    you're familiar also with the medication

4    administration record?

5          A.  Yes.

6          Q.  And is the medication administration record

7    prepared by the nurses?

8          A.  The record actually comes from pharmacy,

9    which the nurses do check.

10         Q.  I apologize.  What I meant to say is the

11   medication administration record; and the jury has

12   been shown a couple of them, ma'am; has a month --

13   it has the medication and then has all of the days

14   across the top of the document?

15         A.  Correct.

16         Q.  And each column has a day for where the

17   nurse would put in their initials?

18         A.  Yes.

19         Q.  And what the nurse does is she goes along

20   and as she dispenses the medication and confirms

21   that the patient has taken the medication, she puts

22   her initials in the box?

23         A.  Yes.

24           MR. WATSON:  Objection, Your Honor;

25   foundation.

1          THE COURT:  The objection is sustained.

2      Q.  Ma'am, could you explain to us how are

3   medications at Rushville dispensed to patients?

4          MR. WATSON:  Objection, Your Honor.  The

5   witness testified to this.

6          THE COURT:  Go ahead.  The objection is

7   overruled.

8      Q.  Ma'am?

9      A.  The residents have to come to the window at

10  med line and they get their medication there.  If

11  they need PRN medication then they ask for it.

12     Q.  And how do the nurses verify in fact that

13  the medication has been taken by the resident?

14     A.  They watch the resident take it or they can

15  do mouth checks.

16     Q.  Okay.  And as far as PRN medications like

17  you mentioned for pain, that's a patient's

18  responsibility?

19     A.  Yes.

20     Q.  If the patient wants the medication, if

21  they're in pain, they ask for it?

22     A.  Yes.

23     Q.  And as the Director of Nursing you expect

24  the resident to express themselves when they have a

25  painful situation?

WALKER - CROSS                                    709

1           A.  Yes.

2           Q.  The system of a PRN medication is based on

3      the idea that the resident can take the medication,

4      but they have to ask for it?

5           A.  Correct.

6           Q.  If they don't need the medication, they

7      won't ask for it?

8           A.  Right.

9           Q.  And this is something that you have learned

10     and you've been trained on during your entire

11     nursing career?

12          A.  Yes.

13          Q.  Because the nurses under you -- you rely on

14     the patients to be responsible to ask the nurses for

15     the medications that the patients need?

16          A.  Right.

17          Q.  And it's been your experience that a patient

18     at Rushville, if they have any type of pain, they

19     will express themselves?

20          A.  Yes.

21          Q.  Patients -- the residents at Rushville are a

22     vocal lot, wouldn't you agree?

23               MR. WATSON:  Objection.

24               THE COURT:  The basis of the objection?

25               MR. WATSON:  It is argumentative.

WALKER - CROSS                          710

1          THE COURT:  It is.  The objection is

2     sustained.

3          Q.  I'll rephrase it.  In your experience;

4     you've been at Rushville for some five years or so?

5          A.  Yes.

6          Q.  Can we agree that residents at Rushville

7     tend to make sure that their positions are known to

8     the nursing staff?

9          MR. WATSON:  Objection, Your Honor; same

10    objection.

11         THE COURT:  The objection is overruled.

12         A.  Yes.

13         Q.  Turning to the medication administration

14    record, ma'am.  In your years as a nurse, that's a

15    standard form for nursing?

16         A.  Yes.

17         Q.  And is the manner in which the nurse puts

18    her initials in the box, again, a recognized

19    standard procedure for a nurse?

20         A.  Yes.

21         Q.  And if a patient refuses a medication,

22    putting the initials in the box and then circling

23    it, again a standard, recognized system in nursing?

24         A.  Yes.

25         Q.  And certainly, ma'am, if a resident must ask

WALKER - CROSS                              711

1   for a PRN medication by name, the nurse -- I mean

2   the patient knows what he's asking for?

3            MR. WATSON:  Objection, Your Honor;

4   foundation.

5            THE COURT:  Objection is overruled.

6        A.  Yes.

7        Q.  And if a resident was ever to tell one of

8   your nurses, look, I can't take that medication, I'm

9   allergic to it, your nurses would respond to that

10  appropriately and not give the medication; correct?

11       A.  Correct.

12       Q.  You've trained them to do that as Director

13  of Nursing?

14       A.  Yes.

15       Q.  If you have to train them.  I mean that's

16  common sense, isn't it, ma'am?

17       A.  Correct.

18       Q.  You -- you know, the healthcare request

19  system, ma'am, as Director of Nursing, you're

20  familiar with that?

21       A.  Yes.

22       Q.  And that's the system at Rushville where if

23  a patient wants to obtain medical care, dental care,

24  they simply fill out a request?

25       A.  Correct.

WALKER - CROSS                          712

1      Q.  If I could have your attention, ma'am, I'd
2  like to show you Defendant's Exhibit 14.
3      Do you see the paragraph -- first of all,
4  medications are distributed to the residents at
5  Rushville four times a day?
6      A.  Yes.
7      Q.  And then blood sugar level checks are two
8  times a day?
9      A.  Four.
10     Q.  Oh, four times a day, I'm sorry.  So there's
11 four times a day when the nursing staff is on the
12 floor?
13     A.  Yes.
14     Q.  Now, sir -- I'm sorry, ma'am, do you see the
15 paragraph beginning with "all medications?"
16     A.  Yes.
17     Q.  "All medications given by the nurse," do you
18 see that?
19     A.  Yes.
20     Q.  What's the next line after that.  Could you
21 read that for us?
22     A.  (As read)  "If you would like to see the
23 nurse, doctor, dentist, eye doctor, or the foot
24 doctor, do please fill out a healthcare request
25 form."

1      Q.  And that's the policy at Rushville; correct,

2  ma'am?

3      A.  Yes.

4          MR. WATSON:  Objection, Your Honor.

5          THE COURT:  The objection is overruled.

6      Q.  I mean this is the resident handbook for

7  Rushville; right?

8      A.  Yes.

9      Q.  That's what the residents are suppose to do?

10     A.  Yes.

11     Q.  Now, don't get me wrong, if -- I mean

12 obviously at all times a resident could come up to

13 the nurse and say, look, I've got this problem, I've

14 got that problem, I would like to see the doctor;

15 right?

16     A.  Right.

17     Q.  And the nurse, doing her job, would then

18 take and put the resident on the list?  If -- or she

19 could say fill out a healthcare request form?

20         MR. WATSON:  Objection, compound.

21         THE COURT:  The objection is overruled.  It

22 will stand.

23     A.  Correct.

24     Q.  I'm sorry, ma'am.  Because what you have

25 told your nurses to do is if a resident comes up and

1   asks verbally for some type of treatment, your

2   nurses are told have them fill out a healthcare

3   request form?

4        A.  Yes.

5        Q.  And the whole theory behind that is that

6   look, how can you keep track of things without a

7   healthcare request form?

8        A.  Right.

9        Q.  I mean it takes about 30 seconds to fill one

10  out?

11       A.  Right.

12       Q.  And that way, if you've got the healthcare

13  request form, then the nurse can go down and assess

14  the patient?

15       A.  Right.

16       Q.  Figure out if the nurse can take care of the

17  problem?

18       A.  Correct.

19       Q.  And if the nurse can't do it, then she can

20  sign the patient up to see the appropriate doctor?

21       A.  Correct.

22       Q.  And that's why you tell your nurses, look,

23  in the absence of an emergency, ask the residents to

24  fill out a healthcare request form and follow the

25  manual?

1          A.  Correct.

2          Q.  Because for the most part if somebody comes

3     to a nurse and has an issue we tell them to submit a

4     healthcare request form?

5          A.  Yes.

6          Q.  Okay.  And you try to treat all of the

7     residents at Rushville equally?

8          A.  Yes.

9          Q.  Everybody fairly?

10         A.  Yes.

11         Q.  And the healthcare request system is a means

12    by ensuring that everyone is being treated fairly?

13         A.  Yes.

14         Q.  And it avoids any type of favoritism or who

15    knows who or anything like that; right, ma'am?

16         A.  Right.

17         Q.  Because with 550 residents, there's no way

18    any of the nurses could remember who told them what

19    and who wanted what; is that right?

20              MR. WATSON:  Objection; form, foundation,

21    vague as to timeframe.

22              THE COURT:  Let's have the timeframe on it.

23         Q.  Okay.  During your term at Rushville,

24    ma'am -- there's now 550 residents?

25         A.  Correct.

WALKER - CROSS                          716

1        Q.  Every year, in fact, the population has

2   increased since you've been there?

3        A.  Yes.

4        Q.  And I think we saw earlier that 300 or so

5   when you first started, or 380 or something like

6   that?

7        A.  Yes.

8        Q.  And now we're up to 550?

9        A.  Yes.

10       Q.  By the way, going from 300 or so residents

11  to 550 residents, there's been no increase in the

12  number of dental hours for Dr. Mitchell; is that

13  correct?

14       A.  Correct.

15       Q.  Because -- I mean with that many residents,

16  550; we'll just use that number now; there's no way

17  that any of your nurses could ever remember all of

18  the verbal requests that might be made?

19       A.  Right.

20       Q.  And it doesn't cost anything or prejudice

21  anyone to fill out a healthcare request form, does

22  it?

23            MR. WATSON:  Objection; form, foundation,

24  argumentative.

25            THE COURT:  The objection is overruled.

1          A.  No, it doesn't.

2          Q.  Because you guys, nurses yourself, you

3     encourage the residents to fill out a healthcare

4     request so we know what you want?

5          A.  Yes.

6          Q.  And you're familiar, ma'am, with the attempt

7     to resolve procedure at Rushville?

8          A.  Yes.

9          Q.  And the whole idea there is that, look, if a

10    Rushville resident has a problem with someone, a

11    staff member, the resident can fill out an attempt

12    to resolve?

13          MR. WATSON:  Objection, Your Honor.  Form,

14    foundation, vague, time frame.

15          THE COURT:  The objection is overrule.  If

16    we could have a time though.

17          Q.  In your five years that you've been there,

18    from 2010 to the present date, have you become

19    familiar during that period of time with the attempt

20    to resolve procedure?

21          A.  Yes.

22          Q.  And the theory -- again, ma'am, I'm not

23    gonna ask you any questions about before you got to

24    Rushville; so I apologize, I should have said that

25    initially.  All I'm asking you about is your

1  experience at Rushville from 2010 to the present

2  date.  Fair enough?

3      A.  Yes.

4      Q.  And again, an attempt to resolve is that,

5  look, if a resident has a problem with someone, they

6  fill out the attempt to resolve and submit it?

7      A.  Correct.

8      Q.  And that then goes to the patient -- I'm

9  sorry, the person with whom the resident has a

10  problem?

11      A.  It can, yes.

12      Q.  And then they have to sit down and work it

13  out?

14      A.  Yes.

15      Q.  It's a means for the resident to

16  communicate, in fact, they have a problem?

17      A.  Right.

18      Q.  And if the resident uses the attempt to

19  resolve process and it doesn't work, the resident

20  can then file a grievance?

21      A.  Yes.

22      Q.  And again, that's a system of communication,

23  they can say, "Hey, I've got this problem.  I tried

24  the attempt to resolve, it didn't work, I'm now

25  filing a grievance."

WALKER - CROSS                          719

1          A.  Right.

2          Q.  And both of those techniques, both of those

3     tools are available at Rushville for the entire

4     purpose of trying to avoid ending up right here;

5     isn't that right?

6          A.  Yes.

7               MR. WATSON:  Objection, Your Honor.

8     Argumentative.

9               THE COURT:  The objection is sustained.

10    The answer is stricken.  Struck.

11         Q.  Because if problems are resolved inhouse at

12    Rushville, then there's gonna be no lawsuits,

13    wouldn't you agree?

14              MR. WATSON:  Objection, Your Honor.  Same

15    objection.

16              THE COURT:  Same ruling.

17         Q.  The dental assistant, ma'am.  There were

18    periods of time during your experience at Rushville

19    when there was no dental assistant to assist

20    Dr. Mitchell?

21         A.  Correct.

22         Q.  In fact, I believe there was a couple of

23    years for that?

24         A.  I don't recall the length of time, but yes,

25    there was.

WALKER - CROSS                              720

1      Q.  Okay.  And what you do is you put an ad at

2   various sources and try to get a dental assistant to

3   come in?

4      A.  I speak with the HR department at Wexford

5   and they do all that, yes.

6      Q.  Okay.  Because Wexford is a pretty big

7   company, isn't it, ma'am?

8      A.  Yes.

9      Q.  I told the jury in the opening statement and

10  Dr. Mitchell has also testified that there is no way

11  that Dr. Mitchell can provide dental care to all of

12  Rushville's residents in 15 hours a week.  Do you

13  agree with that?

14     A.  Yes.

15     Q.  In fact, Wexford knows that, don't they?

16     A.  Yes.

17     Q.  You have been trying for several years to

18  get another dentist to help Dr. Mitchell?

19     A.  Yes.

20     Q.  And the reason that you've been trying to do

21  that, and Wexford has been trying to do that, is

22  because everyone knows 15 hours a week for 550

23  residents is ludicrous?

24     A.  Yes.

25     Q.  Well, tell us, you've been trying for

WALKER - CROSS                            721

1   several years to get a dentist to help Dr. Mitchell.

2   Have you been successful?

3        A.  No.

4        Q.  In fact, if Dr. Mitchell quit, there would

5   be no dentist there; isn't that true?

6             MR. WATSON:  Objection, Your Honor.  Motion

7   in limine.

8             THE COURT:  Yes.  Objection sustained.

9        Q.  Other than Dr. Mitchell, is there any other

10  dentist that wants to work at Rushville?

11            MR. WATSON:  Objection, Your Honor;

12  foundation.

13            THE COURT:  Objection sustained.

14       Q.  And you were asked some questions earlier

15  about the contract, by Mr. Watson, with Wexford?

16       A.  Yes.

17       Q.  I'll try to move quickly, if that's all

18  right.  I'll put things in prospective here.

19       This is the initial contract, one page of it,

20  I'm sorry, for Wexford.

21            THE COURT:  Which exhibit is it?

22            MR. VOGT:  Brian, what exhibit is it?

23            MR. WATSON:  Plaintiff's 108.

24            MR. VOGT:  Plaintiff's 108.

25            THE COURT:  Thank you.

WALKER - CROSS                              722

1  BY MR. VOGT:

2       Q.  All right, ma'am.  Do you see the

3  highlighted portion of that document there?

4       A.  Yes.

5       Q.  It indicates the cost of the contract was

6  $1,673,747 back in 2007?

7       A.  Yes.

8       Q.  And I'll show you another page, page 34 of

9  that document.  As you can see, it's a renewal, it

10  says renewal term from July 1st, 2008 through June

11  30th, 2009?

12      A.  Yes.

13      Q.  And there the contract costs are -- what

14  Wexford is going to receive is $1,937,557?

15      A.  Yes.

16      Q.  Another page from that same exhibit, ma'am.

17  And as you can see the renewal term is July 1st,

18  2009 through June 30th, 2010?

19      A.  Yes.

20      Q.  And here the contract cost paid Wexford

21  $2,550,000?

22      A.  Yes.

23      Q.  And then lastly this is the renewal for

24  2015.  And you can see, ma'am, the contract price

25  there is $3,833,095?

WALKER - CROSS                               723

1        A.  Yes.

2        Q.  Now, as far as staffing is concerned, you

3   were asked about Dr. Mitchell's 15 hours.  But let

4   me show you this on staffing, just to make sure

5   we're on the same page here.

6        Could you read the highlighted portion under

7   staffing and schedules, Paragraph A?

8        A.  (As read)  "Vendor shall ensure that

9   staffing and staff schedules are sufficient in

10  number and hours which ensure adequate and timely

11  services to facility residents."

12       Q.  And that's Wexford's obligation under the

13  contract that they signed with the State of

14  Illinois?

15       A.  Yes.

16       Q.  And what that says, ma'am, as you can see,

17  is that the vendor, Wexford, is to ensure that the

18  staffing is sufficient?

19       A.  Yes.

20       Q.  And we know it's not in connection with

21  dentistry?

22       A.  Yes.

23       Q.  And then, ma'am, I'd like to show you

24  Dr. Mitchell's contract.  This is Exhibit No. 19A

25  Defendant admitted into evidence.

1          And you see Paragraph 4 there, ma'am?

2          A.  Yes.

3          Q.  That indicates that Wexford shall reimburse

4     the provider, Dr. Mitchell, for not more than

5     15 hours per week.  Do you see that?

6          A.  Yes.

7          Q.  Now, that language is very specific; not

8     more than 15 hours per week; correct?

9          A.  Correct.

10         Q.  Now, ma'am, there's also -- Defendant's

11    Exhibit 21A also admitted into evidence.  Wexford

12    has posted two different jobs for dentists.  The

13    first, a per diem opportunity.  Do you see that?

14         A.  Yes.

15         Q.  And that is on an hourly basis?  Is that

16    what per diem means?

17         A.  As needed.

18         Q.  As needed, okay.  So the bottom line is that

19    if a dentist wanted to apply for this job, as

20    Wexford needed the dentist to work the dentist could

21    work whatever the dentist wanted?

22         A.  Yes.

23         Q.  I mean -- as needed is as -- as flexible as

24    possible, I suppose?

25         A.  Yes.

WALKER - CROSS                           725

1          Q.  Then here's the other position that Wexford

2    is trying to fill.  And this is for -- also for a

3    dentist, a PRN dentist.  Do you see that?

4               MR. WATSON:  Objection; foundation, Your

5    Honor.

6               THE COURT:  Mr. Vogt, foundation?

7          Q.  Oh, ma'am, there are -- you're familiar with

8    the jobs, these are the dentist jobs that Wexford is

9    trying to fill?

10              MR. WATSON:  Same objection, Your Honor.

11              THE COURT:  She may answer.

12         A.  This is the first time I've seen it, but

13   yeah.

14         Q.  All right.  And no one at Wexford has ever

15   complained to you about the job that Dr. Mitchell is

16   doing, have they?

17         A.  No.

18         Q.  And as the Director of Nursing, you agree

19   that Dr. Mitchell does a very good job at Wexford?

20         A.  Yes.

21         Q.  She works very hard?

22         A.  Yes.

23         Q.  You have no complaints or criticisms of

24   Dr. Mitchell's work?

25         A.  No.

1      Q.  I'm sorry, ma'am.  One of the documents

2  reflected the dentist was a salary of 190,000 a

3  year.  Do you remember seeing that number up there?

4      A.  Yes.

5      Q.  Now, I'm not sure where that number comes

6  from, but Dr. Mitchell is paid on an hourly basis

7  for 15 hours a week; correct?

8           MR. WATSON:  Objection, Your Honor;

9  foundation.

10          THE COURT:  The objection is overruled.

11     A.  Correct.

12     Q.  Now, I apologize --

13          THE COURT:  Mr. Vogt, I'm gonna go ahead

14  and let the jury have a break.  My court reporter

15  certainly needs one.

16          MR. VOGT:  Okay.

17          THE COURT:  If you would take the jury out,

18  please, Bobbi.

19     (The jury left the courtroom.)

20          THE COURT:  All right.  Court is in recess

21  for ten minutes.

22     (A recess was taken.)

23          THE COURT:  All right.  Please bring the

24  jury in.  And you may look at the causation that

25  I've tendered over -- we're not gonna talk about it

1    today.

2              MS. MacDONALD:  Thank you, Your Honor.

3         (The jury entered the courtroom.)

4              THE COURT:  Court is reconvened.  Mr. Vogt,

5    your finally questions.

6              COURT SECURITY OFFICER:  Judge, a couple of

7    the jurors need a mint.  Can I grab them and give

8    them to them now?

9              THE COURT:  I'm going to give them my

10   mints.

11             JUROR:  I would love a mint, please.

12             THE COURT:  I'm kidding.  They are my

13   clerk's mints.  We also have yellow lemon drops if

14   you would like a lemon drop instead.

15        At judges seminars they recommend that about

16   4:00 in the afternoon that judges pop peppermint

17   because it awakens you.  However, I've since read

18   that it also raises your blood pressure.

19        You did know you can bring your waters in with

20   you, too?  Okay.

21             JUROR:  Thank you.

22             THE COURT:  You're welcome.  If you need

23   another, speak up.

24        Mr. Vogt.

25   BY MR. VOGT:

WALKER - CROSS                    728

1        Q.  All right.  Judge, I have just a couple
2    questions.
3        Is it a fair statement to say, ma'am, that you
4    and Wexford have done everything you can to get
5    another dentist to come join Dr. Mitchell at
6    Rushville?
7        A.  Yes.
8        Q.  You were asked and shown some documents
9    previously, one being the DHS directive referring to
10   a one year annual exam.  Do you recall that?
11       A.  Yes.
12       Q.  Now, in 2010, in fact, Rushville -- I'm
13   sorry, the DHS started the one year program; is that
14   your understanding?
15           MR. WATSON:  Objection, Your Honor.
16       Q.  Or do you have any understanding about that?
17           MR. WATSON:  Objection, Your Honor.
18   Misstates the direct.
19           THE COURT:  The objection is sustained.
20       Q.  Ma'am, since -- I'm sorry.  Go ahead, I
21   apologize.
22       The directive states residents will be provided
23   annual dental care.  Do you recall seeing that
24   today?
25       A.  Yes.

WALKER - CROSS                              729

1      Q.  Since 2010, are you aware of any initiative
2  at Rushville to get these annual exams done?  Or is
3  that something beyond your knowledge?
4           MR. WATSON:  Objection, Your Honor;
5  foundation.  Maybe it is a foundation question.
6           THE COURT:  Well, he's asked whether if she
7  has any knowledge.  I'll allow --
8      Q.  Do you have any knowledge one way or the
9  other about that program?
10     A.  No.
11     Q.  Okay.  I'm sorry.
12     I'd like to show you Defendant's Exhibit 20,
13 which I think you were shown, talked about earlier
14 today.
15     This relates to -- this is -- I'm sorry, this
16 is the part of the Wexford contract with DHS, ma'am.
17 Do you see that?
18     A.  Yes.
19     Q.  Now, DHS and Wexford, of course, have agreed
20 to what the DHS wants in its contract; right?
21     A.  Yes.
22     Q.  Your job as a Wexford employee, of course,
23 and as the Director of Nursing, is to make sure that
24 Wexford follows the Wexford contract that it has
25 with DHS?

 1        A.  Correct.

 2        Q.  Dr. Mitchell's job also is to follow the DHS

 3   contract that's set forth right there under dental

 4   services?

 5        A.  Yes.

 6        Q.  Because the directive that DHS prepared is

 7   what the DHS may want to do, but in fact, ma'am, the

 8   contract that DHS entered into with Wexford is what

 9   the DHS asked Wexford to in fact do?

10              MR. WATSON:  Objection, Your Honor.

11   Misstates the contract and the foundation.

12              THE COURT:  Objection is overruled.

13        Q.  Ma'am?

14        A.  Yes.

15        Q.  Because the contract has been renewed every

16   year?  We went over it before; every year, every

17   year it's been renewed again and again and again?

18        A.  Yes.

19        Q.  And that provision requiring two years, just

20   like you see there, has been in the contract that

21   the DHS has signed with Wexford every single year?

22        A.  Yes.

23        Q.  And it also refers to, as you can see,

24   routine care shall be provided within 14 days of the

25   facility resident's request for treatment?

WALKER - REDIRECT                    731

1      A.  Yes.

2      Q.  And that's the healthcare request that we've

3  been talking about with you today?

4      A.  Yes.

5          MR. VOGT:  Thank you, Judge.  Thank you,

6  ma'am.

7          THE COURT:  Redirect.

8                  REDIRECT EXAMINATION

9  BY MR. WATSON:

10     Q.  Ms. Walker, you remember when you were shown

11 before Defendant's Exhibit 189, the contract between

12 Wexford and Dr. Mitchell?

13     A.  Yes.

14     Q.  Does the contract between Wexford and

15 Dr. Mitchell also provide, in addition to the hourly

16 rate we talked about before, provider agrees that if

17 he/she determines that a patient requires care

18 beyond that possible to be provided during an onsite

19 visit, he or she will work with the site medical

20 director to request a referral to contracted offsite

21 providers for services?

22     A.  Yes.

23     Q.  To your knowledge has Wexford ever refused

24 to provided offsite care when Dr. Mitchell has

25 requested it?

WALKER - REDIRECT                    732

1          A.  Not to my knowledge.

2          Q.  We talked earlier on your examination

3     about -- you had given a deposition; right?

4          A.  Yes.

5          Q.  Mr. Vogt was there, right?

6          A.  Yes.

7          Q.  A court reporter was there that took down

8     the transcript?

9          A.  I believe so.

10         Q.  She asked you to take an oath?

11         A.  Yes.

12         Q.  It's the same oath you took today?

13         A.  Yes.

14         Q.  During that deposition were you asked the

15    following question, did you give the following

16    answer?

17              MR. VOGT:  Objection, Judge.

18              THE COURT:  Page?

19              MR. WATSON:  Page 13, Line 20:  (As read)

20    "Question:  Would you agree that the responsibility

21    for providing proper dental care is the

22    responsibility of Dr. Mitchell?

23       "Answer:  Yes."

24              MR. VOGT:  Judge, I move to strike that

25    answer.  It's not impeaching.

1          THE COURT:  Sidebar, please.

2     (The following sidebar discussion was held at

3     the bench, out of the hearing of the jury.)

4          THE COURT:  I assume this is going to

5     be impeaching?

6          MR. WATSON:  Your Honor, the witness

7     has already contradicted herself during

8     cross examination.

9          THE COURT:  On what issue?

10         MR. WATSON:  On this issue.

11         MR. VOGT:  I don't think so, Judge.

12    She testified -- she's already answered

13    these questions under direct.

14         THE COURT:  Can I see the transcript?

15         MR. WATSON:  She testified earlier she

16    doesn't recall.  And here's her answer.

17         THE COURT:  I'll allow it.

18         MR. VOGT:  Just overrule the

19    objection, Judge?

20         THE COURT:  Yes.

21         MR. WATSON:  Do you need me to re-read

22    the question or answer, or given the

23    objection, just allow the witness's

24    testimony to stand?

25         THE COURT:  I'll allow it to stand.

1          MR. WATSON:  Thank you.

2      (The following proceedings were held in open

3      court.)

4          THE COURT:  I have overruled the objection

5  and I will allow the response of the witness to

6  stand.

7  BY MR. WATSON:

8      Q.  Mr. Vogt also asked you a number of

9  questions about how healthcare requests are

10 submitted; right?

11     A.  Yes.

12     Q.  And during your deposition you were asked

13 the following question and you gave the following

14 answer about Dr. Mitchell.

15         MR. VOGT:  Again, I object as to the form

16 of the question.

17         THE COURT:  Do you want the page and line?

18         MR. VOGT:  I mean that would help, Judge.

19         MR. WATSON:  Page 49, line 6.

20         MR. VOGT:  I think this has already been

21 covered, Judge, during his direct.

22         THE COURT:  All right.  You may ask.

23 BY MR. WATSON:

24     Q.  Beginning at page 49, Line 6 of your

25 deposition, in regards to Dr. Mitchell you were

WALKER - REDIRECT                          735

1   asked the following question and you gave the

2   following answer:  (As read)  "Question:  She ticks

3   off the names of the individuals that she wants to

4   see that day and you guys follow that direction?"

5        And your answer was yes; right?

6        A.  Yes.

7        Q.  And you were also asked this question and

8   you gave the following answer:  (As read)

9        "Does your nursing staff who is underneath you

10  have any input on how Dr. Mitchell prioritizes

11  dental care and treatment?

12       And your answer was:

13       "No, not necessarily.  I mean she already knows

14  the issues that have occurred and she will

15  prioritize them."

16       Was that your answer?

17       A.  She does prioritize, yes.

18       Q.  Has Dr. Mitchell to you ever requested

19  additional hours?

20            MR. VOGT:  Objection, asked and answered,

21  Judge.

22            THE COURT:  Well, it certainly has been,

23  but I'll allow it.

24       A.  Not that I can recall.

25            MR. WATSON:  Thank you very much.

WALKER - REDIRECT                    736

1              THE COURT:  Mr. Vogt?

2              MR. VOGT:  Nothing further, Judge.  Thank

3     you.

4              THE COURT:  Oh, excuse me.  Does the jury

5     have a question?

6          Thank you.  If you wave those at us, we stand a

7     better chance of remembering.

8          (The following sidebar discussion was held at

9          the bench, out of the hearing of the jury.)

10             THE COURT:  This will be Court's 5 and

11         Court's 6.  Court's 5 has multiple parts.

12         "Have the dental issues Mr. Smego

13         complained about suing for been treated or

14         resolved by another dentist?"

15         Any objection?

16             MR. VOGT:  Well, is it have they been?

17             THE COURT:  Hm-mmm.

18             MR. VOGT:  I mean she's not gonna

19         know, Judge.

20             THE COURT:  I don't doubt that.

21             MR. WATSON:  No objection.

22             MR. VOGT:  I would objection, there's

23         no foundation for it.

24             THE COURT:  Well, I don't know.  She's

25         Director of Nursing, she might.

1          MR. VOGT:  All right.

2          THE COURT:  "Is Dr. Mitchell solely

3     responsible for keep and maintained

4     Mr. Smego's treatment or is she more

5     responsible than Mr. Smego, the nurses, et

6     cetera, to raise concerns about Mr. Smego's

7     wellbeing?"

8          MR. VOGT:  That's what the ultimate

9     issue is, Judge.

10         MR. WATSON:  No objection.

11         MR. VOGT:  I object to that.  That's

12    the whole case.

13         MR. WATSON:  We could break that

14    apart, Your Honor, in my view.  We could

15    break that apart, especially given

16    deposition testimony that would be

17    impeaching about whether she is solely

18    responsible.

19         MR. VOGT:  I object to the question,

20    Judge.  That's the ultimate issue in the

21    case right there.

22         THE COURT:  Law clerk.  Ms. Gleason.

23    I'm going to read the next one.

24    "How many residents may be seen safely per

25    weekend that Dr. Mitchell works?"

1        MR. VOGT:  This witness has testified

2    she's not even there on the weekends,

3    Judge, and she has no knowledge about that.

4        THE COURT:  Well, she may have

5    knowledge about how many residents are

6    seen.

7        Do you object to the question about the

8    weekend?

9        MR. WATSON:  I have no objection.

10        MR. VOGT:  I object to it.

11        THE COURT:  "Is Dr. Mitchell required

12    in any way to request more hours to work in

13    order to get through the lists presented at

14    Rushville?"

15        MR. VOGT:  I'm sorry --

16        MR. WATSON:  No objection, Your Honor.

17        THE COURT:  "Is Dr. Mitchell required

18    in any way to request more hours to work in

19    order to get through the lists presented at

20    Rushville?"

21        MR. VOGT:  I object to that question

22    too.

23        THE COURT:  On the basis of?

24        MR. VOGT:  This witness has no

25    foundation of what Dr. Mitchell is suppose

1   to do.  She has no dental training, no

2   dental anything.

3       MR. WATSON:  This witness has

4   testified that she would expect that if

5   Dr. Mitchell needed additional hours, she

6   would either put that request to this

7   witness, Ms. Walker-Lowe, or to the

8   director.  And she has no knowledge that

9   Dr. Mitchell has ever made that request, so

10  she has a foundation to answer.

11      MR. VOGT:  She also testified, Your

12  Honor, that it was ludicrous for

13  Dr. Mitchell to try to work more than seven

14  days a week.

15      THE COURT:  I thought that was a great

16  choice of words.

17      Will ask it.

18      "Do all new residents of Rushville have

19  to read the resident manual?

20      MR. VOGT:  Yes, that's a fine

21  question, Judge.

22      MR. WATSON:  No objection, Your Honor.

23      THE COURT:  "Is Dr. Smego literate?"

24      MR. VOGT:  Oh, yes.  Well, she's not

25  gonna now because she's never talked to him

WALKER - REDIRECT                    740

1          MR. WATSON:  If she knows, Your Honor.

2     We need to re-form that question as all.

3     Obviously a juror has an interest in a

4     factual issue, although the question as

5     written goes to an ultimate issue.

6          THE COURT:  Let's hope the

7     instructions and the evidence will answer

8     the questions.  I'm not gonna give it.

9          MR. WATSON:  Okay.  Thank you very

10    much, Your Honor.

11         THE COURT:  All right.  Court's 6.

12    "Do you recall any resident sent out for

13    fillings by Dr. Mitchell?"

14         MR. WATSON:  No, objection, Your

15    Honor.

16         MR. VOGT:  No objection, Judge.

17         THE COURT:  Okay.

18         Is there any objection to my

19    explaining to the jury I'm not asking one

20    of the questions because it is the ultimate

21    issue in the case?

22         MR. VOGT:  Well, I hate to say the

23    ultimate issue.  One of the issues in the

24    case.

25         THE COURT:  One of the issues.

1          MR. VOGT:  For them to decide.

2          MR. WATSON:  Yes, Your Honor.

3          MR. VOGT:  Thank you, Judge.

4     (The following proceedings were held in open

5     court.)

6          THE COURT:  Gentlemen, can I have you back

7  a minute.

8     (The following sidebar discussion was held at

9     the bench, out of the hearing of the jury.)

10         THE COURT:  The question that I'm

11    concerned about, sole responsibility or

12    shared responsibility; is that going to be

13    testified to by your expert?

14         MR. WATSON:  Yes, Your Honor.

15         THE COURT:  Is it going to be

16    testified to by your expert?

17         MR. VOGT:  May I have the question

18    again, Judge?

19         THE COURT:  Whether it's

20    Dr. Mitchell's sole responsibility to keep

21    and maintain Mr. Smego's treatment or is

22    she more responsible than Mr. Smego or the

23    nurses to raise concern about Mr. Smego's

24    wellbeing.

25         Your expert is gonna testify about that?

1          MR. VOGT:  No, I mean I don't know

2      about this responsibility stuff.  Don't get

3      me wrong, Judge.

4          THE COURT:  Responsibility, duty.

5          MR. VOGT:  I'm not trying to mince

6      words.  I mean -- I apologize.  The point

7      is is that -- I mean that is one of the

8      ultimate issues in the case.  It cuts to

9      the chase.  Is it the patient's

10     responsibility to say I need help or is it

11     the dentist's responsibility to hunt him

12     down?

13         THE COURT:  Well, and she --

14         MR. VOGT:  She's not gonna know that.

15         THE COURT:  Well, she's the Director

16     of Nursing --

17         MR. VOGT:  She has --

18         THE COURT:  -- it's the Director of

19     Nursing who is in charge of Dr. Mitchell.

20         MR. VOGT:  No, but she's not.  She's

21     not in charge of Dr. Mitchell, Judge.  She

22     never worked there.  She has --

23         THE COURT:  Dr. Mitchell reports to

24     her.

25         MR. VOGT:  No.  I mean --

1          THE COURT:  I thought the contract

2    said that?

3          MR. VOGT:  No, I don't think it does,

4    Judge.  I don't think it does.

5          MR. WATSON:  She did testify to that,

6    Your Honor.  She testified that she has

7    dual reporting.  She testified that she

8    reports to somebody else at Wexford and

9    onsite she reports to this person, the

10   Director of Nursing.  This Director of

11   Nursing is responsibile for delivery of

12   healthcare at the facility.

13         THE COURT:  That's what she said.

14         MR. VOGT:  But, Judge, she also said

15   she has no idea how Dr. Mitchell does her

16   work in the dentist's office.  No idea.

17         MR. WATSON:  She has an idea and she

18   talked about that --

19         THE COURT:  She did.

20         MR. WATSON:  It's an important

21   question.

22         THE COURT:  I'm gonna ask it.

23         MR. VOGT:  For this witness, Judge?

24         THE COURT:  I don't think she will

25   know.  Mr. Watson.

1        MR. VOGT:  Judge, this witness is a
2    little -- I mean she --
3        MR. WATSON:  Credibility is a factor
4    to be sure, Your Honor.
5        MR. VOGT:  But the point is that she
6    doesn't know these things.  I mean I don't
7    think -- I think the Court should exercise
8    some discretion here.  The more important
9    the question, the more important it is that
10   the person who is going to answer the
11   question -- I mean I have no idea what
12   she's gonna say.  And she has no idea how
13   Dr. Mitchell does her work at all.
14       THE COURT:  She's testified she does.
15       MR. WATSON:  Credibility is a fact
16   issue.  Very important question.
17       THE COURT:  It is.
18       MR. VOGT:  All right, Judge.  Well,
19   for the record, I object.  But I appreciate
20   that.
21   (The following proceedings were held in open
22   court.)
23       THE COURT:  I'm sorry.  White noise.
24 Counsel, step up.
25   I keep finding myself talking to myself in the

WALKER - REDIRECT                    745

1    white noise.

2         (The following sidebar discussion was held at

3         the bench, out of the hearing of the jury.)

4              THE COURT:  I just wanted you to

5         understand that I'm going to ask the

6         question, but that you can point out with

7         this witness what you're objecting to -- I

8         mean that is that's not your

9         responsibility, you don't know, et cetera.

10             MR. VOGT:  I understand, Judge.

11             MR. WATSON:  If defense wants to open

12        up a line of questioning about that, we can

13        handle that.

14             THE COURT:  You can what?

15             MR. WATSON:  We can both go into that.

16        If there are additional questions, we can

17        both go and flesh that out for the jury?

18             THE COURT:  Yes.  Absolutely.

19             MR. VOGT:  All right, Your Honor.

20        Thank you.

21        (The following proceedings were held in open

22        court.)

23             THE COURT:  Court's No. 5, have -- these

24   are questions for you.  I'm going to be asking these

25   since they came to the jury.  From the jury to me.

1          Have the dental issues Mr. Smego explained

2    about, suing for, been treated or resolved by

3    another dentist?

4               THE WITNESS:  I'll be honest, I don't know

5    what the dental issues were.

6               THE COURT:  Counsel, would it be fair to

7    say unfilled cavities?

8               MR. VOGT:  Well, if she doesn't know what

9    the dental issues are --

10              THE COURT:  Well, I'm just clarifying that.

11              MR. WATSON:  It would be, Your Honor.

12              THE WITNESS:  If there was an order written

13   for him to go out to an outside dentist, then they

14   would have been --

15              THE COURT:  So you're saying you're

16   unaware?

17              THE WITNESS:  I'm unaware.

18              THE COURT:  Okay.  And that's a fine

19   answer.  Don't offer if you don't know.

20          Is Dr. Mitchell solely responsible to keep and

21   maintain Mr. Smego's treatment?  Dental treatment?

22              THE WITNESS:  Dental treatment, yes.

23              THE COURT:  Or is she -- is she more

24   responsible than Mr. Smego, the nurses, et cetera,

25   to raise concerns about Mr. Smego's wellbeing?

1        THE WITNESS:  The healthcare staff

2  collaboratively is responsible for his wellbeing.

3  As well as himself.

4        THE COURT:  But the question is is

5  Dr. Mitchell more responsible?

6        THE WITNESS:  No more responsible than

7  anybody else.

8        THE COURT:  How many residents may be seen

9  safely per weekend that Dr. Mitchell works?

10        THE WITNESS:  She sees so many throughout

11  the weekend that I'm unaware of how many she does

12  see.

13        THE COURT:  Okay.  Is Dr. Mitchell required

14  in any way to request more hours to work in order to

15  get through the lists presented at Rushville?

16        THE WITNESS:  She can request more hours,

17  yes.

18        THE COURT:  Do all new residents of

19  Rushville have to read the resident manual?

20        THE WITNESS:  They all -- yes, they all get

21  the resident manual on admission.

22        THE COURT:  Is Mr. Smego literate?

23        THE WITNESS:  Yes.

24        THE COURT:  Court's No. 6.

25     Do you recall any resident sent out for

1    fillings by Dr. Mitchell?

2              THE WITNESS:  I don't recall.

3              THE COURT:  Okay.  Follow-up questions,

4    Mr. Watson.

5              MR. WATSON:  None at this time, Your Honor.

6              THE COURT:  Mr. Vogt.

7                    RECROSS EXAMINATION

8    BY MR. VOGT:

9         Q.  Ma'am, with regard to the responsibility

10   issue.  Mr. Smego has a responsibility to take care

11   of his own teeth?

12        A.  Yes.

13        Q.  Mr. Smego has a responsibility to ask for

14   dental care if he feels he needs it?

15        A.  Yes.

16        Q.  Mr. Smego has a responsibility to fill in a

17   healthcare request form to see the dentist?

18        A.  Yes.

19        Q.  If Mr. Smego's problems are not being

20   resolved, Mr. Smego has a responsibility to submit

21   an attempt to resolve?

22        A.  Yes.

23        Q.  If the attempt to resolve does not work,

24   Mr. Smego has the responsibility to file a

25   grievance?

WALKER - REDIRECT                    749

1          A.  Yes.

2          Q.  What Dr. Mitchell's responsibility is to do

3     is if Smego files a request, that request is

4     processed through the nursing staff, he's placed on

5     her list, then Dr. Mitchell's obligation or

6     responsibility is to treat him as every other

7     resident at Rushville?

8          A.  Yes.

9               MR. VOGT:  Thank you, ma'am.

10              THE COURT:  Any further questions,

11    Mr. Watson?

12                   REDIRECT EXAMINATION

13    BY MR. WATSON:

14         Q.  Ms. Walker, you rely on Dr. Mitchell?

15         A.  Yes.

16         Q.  You rely on Dr. Mitchell to raise issues for

17    you and your staff so that residents can be provided

18    proper dental treatment?

19         A.  Yes.

20              MR. WATSON:  Nothing further, Your Honor.

21         Plaintiff does, before the witness is excused,

22    offer Exhibit 108, which is the Wexford contract.

23              THE COURT:  108 is admitted without

24    objection?

25              MR. VOGT:  No objection, Judge.

1          (Plaintiff's Exhibit 108 admitted.)
2                MR. VOGT:  I have just one last question,
3    Judge.
4                THE COURT:  You may.
5                    RECROSS EXAMINATION
6    BY MR. VOGT:
7        Q.  As far as raising issues is concerned; for
8    several years now Dr. Mitchell has expressed to you
9    and to Wexford that Rushville needs more dentists?
10       A.  Yes.
11               MR. VOGT:  Thank you.
12               THE COURT:  All right.  And Plaintiff's 98
13   and 100 have already been admitted; is that right?
14   Have they?
15        They have not.  Do you wish to move their
16   admission as well?
17               MR. WATSON:  We offer them, Your Honor.
18               THE COURT:  Any objection?
19               MR. VOGT:  No objection, Judge.
20               THE COURT:  98 is admitted and so marked.
21        (Plaintiff's Exhibit 98 admitted.)
22               THE COURT:  And we admitted a number of
23   defendant's exhibits this morning.  We probably need
24   to make a record of that in front of the jury.
25        Why don't I pull those together and we'll do

1  that.  If you'll take the jury out, Larry.  Thank

2  you.

3      (The jury left the courtroom.)

4          THE COURT:  Mr. Vogt, you have those

5  exhibits, so you'll have to give those to me so I

6  can make a record.

7      You may step down, your excused.

8      (The witness was excused.)

9      (Discussion off the record.)

10          THE COURT:  I'm going to, while Mr. Smego

11  is eating his orange, I'm going to go through these

12  exhibits and make sure we've got all of the defense

13  exhibits in order.

14      My court reporter --

15          MS. CAMPBELL:  They wanted to take a look

16  at it.  This is 18 that was missing out of the

17  stack.

18          MR. WATSON:  Your Honor, may I?

19          THE COURT:  May you want?

20          MR. WATSON:  The exhibit that was just

21  handed --

22          THE COURT:  Oh.

23      My court reporter gave me the following list;

24  and these are not in order, but this is the order we

25  dealt with them.

1          Group 4, which is Defendant's all of these.

2     21, 39, 20, 18, 17A and B, 19A and B, 14, 12, 2, 1

3     and 7.

4               MS. CAMPBELL:  And 18.

5               THE COURT:  I said 18.  So I will simply

6     give you back your documents, because I don't want

7     you to be disorganized.  We have to make sure --

8               MS. CAMPBELL:  I'm trying, I'm trying.

9               MS. GLEASON:  Did you say Defendant's 8?

10              MS. CAMPBELL:  Yeah.

11              THE COURT:  I did not.

12         This shows 83826 and 828.

13         (A discussion was held off the record.)

14              THE COURT:  The ones yesterday we told the

15     jury were admitted, did we not?

16              MR. VOGT:  Not the defendant's.  We didn't

17     admit them until today.

18              THE COURT:  So 8 should be included in the

19     list.  Okay.

20              MS. CAMPBELL:  12, 14, 20, 18, 8 --

21              THE COURT:  Hold on a second.  12, 14, 20.

22              MS. CAMPBELL:  18, 8, 17A and B, 19A and B,

23     18 that I just gave you, 21, 39, 2, 1, 7, 12 and 4.

24              THE COURT:  All right.  So Mr. Smego, are

25     you doing better?  Can we bring the jury in?

1          All right.  We're going to break at 4:30.

2          Susan, would you go see if they want me to take

3     that plea this afternoon?

4               MS. GLEASON:  Yes.

5               THE COURT:  Off the record.

6          (A discussion was held off the record.)

7               THE COURT:  All right.  Bring the jury in,

8     please.  Do you want to bring Mr. Smego's water up,

9     please.

10               MR. WATSON:  Yes, Judge.

11          (The jury entered the courtroom.)

12               THE COURT:  Court is reconvened.  And we

13     worked on a lot of technical matters while you were

14     gone this morning.  And I went ahead and admitted

15     Defendant's Group 4, 21, 39, 20, 8, 18, 17A and B,

16     19A and B, 14, 12, 2, 1, and 7.  So those have been

17     admitted.

18          (Defendant's Exhibits 1, 2, 4, 7, 8, 12, 14,

19              17A and B, 18, 19A and B, 20, 21, and 39 were

20              admitted.)

21               THE COURT:  Mr. Crowl, I need to have the

22     witness sworn.  If you would raise your right hand,

23     Mr. Smego.

24          (The witness was sworn.)

25

1                   RICHARD SMEGO

2     called as a witness herein, having been duly sworn,

3     was examined and testified as follows:

4                   DIRECT EXAMINATION

5     BY MR. CROWL:

6          Q.   Good afternoon, Mr. Smego.

7          A.   Good afternoon.

8          Q.   Would you state your full name, please, for

9     the jury?

10         A.   Richard Michael Smego.

11         Q.   And old are you, sir?

12         A.   48.

13         Q.   Where were your born and raised?

14         A.   I was born in McHenry, Illinois.  I was

15    raised in Fox Lake, Illinois.

16         Q.   And tell us about your family?

17              MR. VOGT:  Objection, Judge.

18              THE COURT:  The objection is overruled.

19         Q.   What was the size of your family?

20         A.   Well, my parents, my mother, my father.

21    (Witness gestured.)

22              MR. VOGT:  Objection, Judge, may I

23    approach?

24              THE COURT:  You may.

25         (The following sidebar discussion was held at

1       the bench, out of the hearing of the jury.)
2           MR. VOGT:  I approached this issue
3       before, when he said -- he waved his hand
4       to his mother and father in the back of the
5       courtroom.  Now we raised this issue
6       exactly about this the other day with
7       counsel.
8               THE COURT:  Absolutely.
9           MR. VOGT:  I mean I don't even know
10      what to say, Judge.
11              THE COURT:  I'm gonna take the jury
12      out.
13      (The following proceedings were held in open
14      court.)
15              THE COURT:  Where did Larry go?
16              COURT SECURITY OFFICER:  Right here.
17              THE COURT:  I can't see you.
18      Could you take the jury out.  We're gonna have
19      a conference, I need you to take the jury out.
20          (The jury left the courtroom.)
21              THE COURT:  I did not see what Mr. Vogt
22      just described, which was Mr. Smego waving at his
23      parents in the courtroom, which was not to have been
24      referenced.  Did you see it, Mr. Crowl?
25              MR. CROWL:  I think he did reference,

SMEGO - DIRECT                    756

1    Judge, as if his parents were here.  I saw that.

2          THE COURT:  When he was responding to where

3    he was raised?

4          MR. CROWL:  Right, right.

5          THE WITNESS:  He asked me about my family.

6          MR. VOGT:  He said my parents and --

7          THE COURT:  What was the specific question

8    that was asked?  Let me ask my court reporter.

9      (The requested material was read.)

10          THE COURT:  And my court reporter confirms

11   that he did gesture to his parents.

12     Mr. Vogt, plaintiffs are entitled to have their

13   families in the courtroom for purposes of viewing

14   the case.  Just like Mr. Crowl had his parent or his

15   mom and his wife in the courtroom to watch his

16   prowess.

17          MR. VOGT:  I agree, Judge, but -- now, I of

18   course am not suggesting anything inappropriate by

19   intention.  The point is that it's a prejudicial

20   issue to the defense.  It's trying to pull an

21   emotional issue into it.

22          THE COURT:  Well, if Dr. Mitchell

23   testifies -- is she going to testify?

24          MR. VOGT:  She's not going to testify in

25   the defense case, but she testified already.

SMEGO - DIRECT                              757

1           MR. CROWL:  And her daughter was in the

2     courtroom.

3           THE COURT:  And her daughter was in the

4     courtroom.  She may make reference to the fact her

5     daughter was here.

6           MR. VOGT:  Well, Judge, I -- all right.

7           THE COURT:  I am offended that it was done

8     because it was a violation of the Court order.  I

9     don't think Mr. Crowl did it intentionally.

10          MR. VOGT:  No, I don't blame Mr. Crowl.

11          THE WITNESS:  I didn't know it was --

12          THE COURT:  We did it at a sidebar and you

13    forgot to admonish him, I'm sure.

14          THE WITNESS:  I apologize, Your Honor,

15    nobody told me.  I didn't know.  It was just

16    natural.

17          THE COURT:  Okay.  So I suggest we just

18    proceed on and make no further reference.

19          MR. VOGT:  That's fine, Judge.

20          THE COURT:  But as I said, if Dr. Mitchell

21    wants to testify that her daughter was here or is

22    here, that's fair game, too.

23          MR. CROWL:  All right.  Thank you, Judge.

24    I'm sorry.

25          THE COURT:  All right.  Bring the jury

SMEGO - DIRECT                              758

1   back.

2        (The jury entered the courtroom.)

3          THE COURT:  Please be seated.  Court is

4   reconvened.  The witness has been sworn, if you'll

5   continue, Mr. Crowl.

6   BY MR. CROWL:

7        Q.  Mr. Smego, how many children were there in

8   your family or are there in your family?

9        A.  There were nine children altogether.

10       Q.  And can you tell us about your education

11  after high school, please?

12       A.  After high school?  I have three years of

13  college and various certificate programs such as

14  business management, computer programs, computer

15  programming, stuff like that.

16       Q.  Can you tell us about your employment?

17       A.  I've owned a couple of my own businesses.

18  And I did ten years with a company called Direct

19  Marketing Technology, which was bought and sold a

20  couple times, and it's now -- it's now Experian.

21       Q.  And in December of 2005, sir, did you enter

22  the Joliet Treatment and Detention Facility that

23  then later became the Rushville Treatment and

24  Detention Facility?

25       A.  Yes.

SMEGO - DIRECT                         759

1      Q.  And are you a full-time, live-in resident of

2  those facilities, originally at Joliet and now at

3  Rushville?

4      A.  I am.

5      Q.  Approximately when was -- were the folks

6  moved from the Joliet Treatment and Detention

7  Facility to the Rushville Treatment and Detention

8  Facility?

9      A.  Well, I was moved in June of 2006.

10     Q.  Now, since you have been at the Joliet and

11 then the Rushville Treatment and Detention Facility

12 have you had issues with the treatment of your

13 teeth?

14     A.  I have.

15     Q.  I want to draw your attention, first of all,

16 to when you entered the program in 2005.  Do you

17 recall that there was an intake screening?

18     A.  Yes.

19     Q.  Approximately when was that intake

20 screening; do you know?

21     A.  There were a couple of them.

22     Q.  And was there one screening where you met

23 with nurses and they asked you about some of your

24 medical history?

25     A.  There was one that took place initially

SMEGO - DIRECT                    760

1    right when I arrived at the facility.  And it was, I
2    would say generally went over everything.  It wasn't
3    very intrusive, it was kind of, you know, generally
4    just covered everything.
5         Q.  And was that when you were seen by
6    Dr. Mitchell or at that point were you seen
7    initially by a nurse and a doctor?
8         A.  That was nursing staff and the doctor.  It
9    was almost ten years ago now.
10        Q.  And do you recall telling the nursing staff
11   or the doctor at that point anything about
12   allergies?
13        A.  I do.
14        Q.  What did you tell them?
15        A.  I told them that I was allergic to
16   penicillin and Motrin or ibuprofen.
17        Q.  And then later, Mr. Smego, did there come a
18   time when you were seen by Dr. Mitchell?
19        A.  Yes.  I'd say that was about a week later.
20        Q.  And that would have been -- I know you've
21   looked at some of the documents and records and
22   we've seen some in court --
23        A.  Yes.
24        Q.  -- do you remember the date it was you were
25   first seen at the detention facility and the

SMEGO - DIRECT                              761

1    treatment facility by Dr. Mitchell?

2        A.   December 13, 2005.

3        Q.   And tell us where you saw Dr. Mitchell on

4    December 13th of 2005?

5        A.   It was in the healthcare unit of the Joliet

6    facility.

7        Q.   And was anybody else present besides you and

8    Dr. Mitchell?

9        A.   I remember a dental assistant working.  I

10   believe it was Kelly Mitchell or Kelly Mitchell

11   Lawshea.

12       Q.   And do you know if that's any relation to

13   Dr. Mitchell?

14       A.   I didn't then.  It was within the last year

15   I learned that it was Dr. Mitchell's daughter.

16       Q.   And when you met with Dr. Mitchell on

17   December 13th of 2005, at the Joliet Treatment and

18   Detention Facility, tell us what happened during

19   that screening?

20       A.   There were -- it was a standard first visit;

21   I've had other first visits at dentists; where

22   you're introduced to the dentist and you're asked a

23   series of questions, you know, starting with your

24   name; general introduction.

25       Q.   And what did you tell Dr. Mitchell about the

1  condition of your teeth?

2       A.  Told her I had a few cavities.

3       Q.  Do you recall what she said?

4       A.  That's what she's there for.

5       Q.  And then what happened during that initial

6  screening?

7       A.  Well, in the initial screening we went over

8  a form, a chart.  We went over a bunch of

9  information.

10      Q.  Did you have any conversation with her about

11  any of your allergies?

12      A.  I did.

13      Q.  What did you tell Dr. Mitchell about your

14  allergies?

15      A.  That I was allergic to penicillin and

16  Motrin.

17      Q.  When you mentioned to her that you had a

18  concern about your cavities, what if anything did

19  she say to you?

20      A.  She told me that we were gonna fix the

21  cavities.

22      Q.  And then do you recall anything about the

23  examination that she gave?

24      A.  It was thorough.  It was a very pleasant

25  encounter.  Dr. Mitchell was very engaging, very

1  talkative, she was very nice.  I was very taken with

2  her in my first visit.

3      Q.  Did she say anything about when she would --

4  well, before I ask you that; did she identify how

5  many cavities she had diagnosed in your mouth in

6  December of 2005?

7      A.  She had a column of numbers and, you know,

8  teeth numbers and stuff written down on the chart.

9  And I can't say for certain if -- if -- I can't say

10 for certain if I could say that -- I think she told

11 me I had twelve cavities, but I'm not sure exactly

12 how it was put.

13     Q.  Okay.  Did Dr. Mitchell tell you anything

14 about when she planned to see you next at this

15 December 13th of 2005 meeting?

16     A.  Well, I discussed concerns with two teeth in

17 particular, because I had a tooth upfront where I

18 could see that it was turning colors in the crack.

19 So I could see it, so I knew there was something

20 wrong, and there was sensitivity there.

21     And I had a tooth in the upper part in the back

22 of my mouth that sometimes would hurt, sometimes it

23 wouldn't.  And there was a sensitive spot on it, so

24 I knew I had a problem.  So I wanted to get that

25 taken care of right away.

SMEGO - DIRECT                          764

1        And she told me that the holidays are coming up
2   and they don't do a lot between Christmas and, you
3   know, New Years and what not, but that she'd get me
4   in sometimes in January, no later than February.
5   And she'd, you know, schedule an appointment.
6        Q.  When she told you that she would see you in
7   January, 2006, no later than February, 2006, did you
8   see her either in January or February, 2006?
9        A.  I did not.
10        Q.  Tell the members of the jury when the next
11   time it was when Dr. Mitchell saw you?
12        A.  June of 2007.
13        Q.  So that was 18 months later; is that right?
14        A.  That sounds about right, yes.
15        Q.  And during that 18 months you had moved from
16   the Joliet Treatment and Detention Facility to
17   Rushville.  You did that in what, you said June of
18   2006?
19        A.  Yes.
20        Q.  What was the condition of your teeth during
21   that 18-month period?
22        A.  The first half of the 18 months wasn't all
23   terribly bad; it was manageable.  The second half
24   was pretty bad.  Especially as it related to the
25   molar in back.  Because it kept decaying, it kept

SMEGO - DIRECT                                        765

1  getting smaller and it kept hurting more and

2  consistently.  I mean the first part of that time

3  period, you know, it wasn't -- it wasn't a constant

4  pain.  At the end of that time period it was a

5  constant pain.

6      And it was almost two years, so it's not like I

7  can remember each day of that entire time period.

8  And it's kind of like I have a collective memory of

9  it.  The last half of that time period was the worst

10  half though.

11      Q.  And there's been some discussion about how

12  you're able to get painkillers while you're at -- I

13  guess during that last time period that you would

14  have been at Rushville; is that right?

15      A.  Yes.

16      Q.  Can you tell the members of the jury how the

17  process of you getting painkillers worked?

18      A.  Well, the first way, which is the most

19  easiest way, is if you're standing there in

20  healthcare and you see a nurse and you say, "I'm in

21  pain, can I have some medication," and they just

22  give it to you.  That's the easiest way.

23      The second way would be off of a medication

24  cart.  And the medication cart is, oddly enough,

25  roughly the size of this -- is this a podium?  Is

1    that what they call this?  And it's on wheels and

2    it's about this size.  And all the medications for

3    each patient are on a cart.

4         And the facility is basically broken down into

5    two halves.  And there's two nurses that go out and

6    cover the facility.  And so whatever nurse covers

7    the side you live on, all your prescribed

8    medications are already in a cup in a tray on this

9    cart.

10        And then on the top of the cart, across the top

11   of it, again, in little white pill cups, there's

12   rows of Tylenol, rows of ibuprofen or Motrin, and

13   Naprosyn and, you know, a series of what they call

14   PRNs.  And you can ask for a PRN and if you have a

15   prescription you can get it and if you don't you

16   usually don't.

17        Q.  And did you have a prescription for

18   medications during that 18-month period?

19        A.  Different medications at different times;

20   yes.

21        Q.  And were you able to get painkillers for

22   your dental pain?

23        A.  Sometimes yes and sometimes no.

24        Q.  When you say sometimes no, why was that?

25        A.  Well, either I didn't have a prescription or

SMEGO - DIRECT                    767

1    the nurse I asked checked and wouldn't give you

2    anything.  I mean early on the policy on PRNs was a

3    lot stricter than it is today.

4         Q.  How so?

5         A.  Well, it use to be you had to have a

6    prescription for even Tylenol.  And it was very --

7    it use to be you had to see a doctor before you

8    could get like over-the-counter, like cold

9    medication if you had a cold.  And now they just

10   have a protocol cold medication that you can ask

11   for.

12        So they now have protocol PRNs.  So it's not as

13   strict as it use to be.

14        Q.  And during that 18-month period, Mr. Smego,

15   tell the members of the jury how you made your

16   requests to see the dentist known?

17        A.  Well, I guess the first time was when I was

18   called down in December of 2013, and spoke to her

19   and said I'd like to have my cavities fixed.

20        There were a few times when I was in the

21   healthcare unit for other business that I saw the

22   dentist and I reminded her that I was waiting for

23   services.  And told her that I was still wanting my

24   teeth fixed, that I was waiting.

25        And I had talked to my primary therapist and

SMEGO - DIRECT                    768

1    informed my primary therapist that I was trying to

2    get a visit and couldn't.  Or wasn't being seen, not

3    couldn't.

4        Q.  And there's been discussion in this case

5    about healthcare request forms.  Did you fill out

6    healthcare request forms?

7        A.  I filled out a couple.

8        Q.  Okay.  There was also some discussion in

9    this case about whether or not you filed a

10   grievance.  And it sounds like you did not file a

11   grievance; is that right?

12       A.  That would be correct.

13       Q.  And why did you not file a grievance?

14       A.  I didn't -- I didn't believe that I could.

15       Q.  I want to show you what we have marked as

16   Plaintiff's Exhibit 110.  Ask you to examine it,

17   please.

18       Is Plaintiff's Exhibit 110 the treatment and

19   detention facility -- is that the treatment and

20   detention facility resident grievance procedures

21   effective June of 2006?"

22       A.  Yes.

23       Q.  Judge, we offer Plaintiff's 110 into

24   evidence?

25            THE COURT:  Any objection?

SMEGO - DIRECT                    769

1           MR. VOGT:  No.

2           MR. CROWL:  May we show the jury, Judge?

3           THE COURT:  You may.  110 is admitted and

4    so marked.

5       (Plaintiff's Exhibit 110 admitted.)

6    BY MR. CROWL:

7       Q.  So you see at the top it says, "Treatment

8    and detention facility, resident grievance

9    procedures effective June, 2006?

10      A.  Yes.

11      Q.  And you indicated you didn't file a

12   grievance because you didn't think that medical

13   decisions could be grievable at that time; is that

14   right?

15      A.  That's correct.

16      Q.  If you would turn to page 2 and look at

17   that, sir.

18          THE COURT:  Can you turn down the center

19   lights, please.

20      Q.  The top says, "resident formal grievance,"

21   do you see that right here?

22      A.  Yes.

23      Q.  Okay.  And then it says, "The following

24   issues may be grieved."  Do you see that?

25      A.  Yes.

SMEGO - DIRECT                              770

1          Q.  And then it says, "The following issues may

2    not be grieved."  Do you see that?

3          A.  Yes.

4          Q.  And Number 3 there says medical decisions;

5    is that right?

6          A.  Yes.

7          Q.  Was this part of your understanding, or your

8    belief at least, that you didn't think that this was

9    a -- your dental condition was a grievable issue?

10         A.  Correct.

11         Q.  So you mentioned then that it was 18 months

12   before you saw Dr. Mitchell in the dental chair

13   again.  Was that June 24th of 2007?

14         A.  That sounds right.

15         Q.  And where did you see Dr. Mitchell in June

16   of 2007; did this take place also in the healthcare

17   unit in the dental office?

18         A.  Yes.  In Rushville.

19         Q.  Now, was this visit in response to you

20   having submitted a health care request form?

21         A.  I don't believe so, no.

22         Q.  In fact, you hadn't submitted a healthcare

23   request form yet at this time; is that right?

24         A.  Correct.

25         Q.  And what -- what is the process, what's your

1    understanding of the process for how you were able

2    to see the dentist on that occasion?

3         A.  I was called down by the dentist.

4         Q.  And what was the condition of your teeth

5    when you went to -- or when you were called down to

6    see Dr. Mitchell on June 24th of 2007?

7         A.  I had the same teeth, they were just in

8    worse shape.  And they were causing me more pain

9    because they hadn't been treated yet.

10        Q.  And you mentioned something about a back

11   molar at one point.  Have you later come to learn

12   what that number was?

13        A.  Yes.

14        Q.  What was the number for that tooth?

15        A.  That was tooth No. 2.

16        Q.  And what was the condition of tooth No. 2

17   18 months before compared to on June 24th, 2007?

18        A.  The condition of tooth No. 2, I can only

19   give you a layperson understanding, because that's

20   all I have.  It was -- it was all there, it was

21   intact.  And it had a rough spot almost like an

22   abrasion on the cheek side of the tooth.  I could

23   feel it, if I'd feel around back there with my

24   finger it would almost feel like maybe a crack or an

25   imperfection.

SMEGO - DIRECT                          772

1          And by this time, by this dental visit, there
2    was a piece of it gone.  It was no longer -- it
3    wasn't a whole tooth anymore.  It had been degraded
4    to the point where there was part of it that was
5    gone.  And it was -- and it was at a point where it
6    hurt constantly at that point.
7          Q.  Now, there was a note that doctor -- I'm
8    sorry, that was shown yesterday by a therapist that
9    indicated that you had some concern about pain and
10   had recently had a tooth pulled.  Do you remember
11   seeing that note up there?
12         A.  Yeah.  Basically remember, yes.
13         Q.  At that point had you actually had a tooth
14   pulled?
15         A.  No.
16         Q.  Okay.  And do you remember what the
17   conversation was with that therapist on that date?
18         A.  It was -- the Ms. Coleman note or --
19         Q.  Yes.
20             MR. VOGT:  Judge, I object to this.  May I
21   approach?
22             THE COURT:  You may.
23         (The following sidebar discussion was held at
24         the bench, out of the hearing of the jury.)
25             MR. VOGT:  None of the therapists are

SMEGO - DIRECT                          773

1      going to testify, Judge.  The Court allowed

2      them to use their -- the therapist's notes

3      under, I believe it was the business

4      records exception or something of that

5      nature.

6          But the bottom line is is his

7      conversation with the therapist both ways

8      is all hearsay.  It has nothing to do with

9      this case.  And since the witness is not

10     being called, I have no ability to cross

11     examine them.

12     It's one thing for them to rely on a

13     record; I respect the Court's decision on

14     that.  But he can't talk about what he said

15     to the therapist and the therapist said

16     back to her -- to him.  I'm sorry.

17         MR. CROWL:  The only therapist note

18     that anybody has offered so far was offered

19     by Mr. Vogt --

20         THE COURT:  Right.

21         MR. CROWL:  -- where it said in there

22     that he said his tooth was pulled.  He's

23     entitled to say what he said instead.  All

24     he's doing is saying here's what I said to

25     the therapist.

SMEGO - DIRECT                    774

1      THE COURT:  He's allowed to tell what

2  he told the therapist.

3      MR. CROWL:  Right.

4      MR. VOGT:  Well, the only thing is,

5  Judge; now I respect the idea that if it's

6  reflected in the record, okay.  That's one

7  thing.  But anything else that he told the

8  therapist is immaterial and it is hearsay.

9      MR. CROWL:  Only relating to the

10  tooth.

11      THE COURT:  Right.  Nothing beyond

12  what was in the note.

13      MR. VOGT:  Just the note, that's the

14  point.

15      MR. CROWL:  Right.  He's gonna say

16  that he did not say that, here's what he

17  said.  He's gonna say that he told the

18  therapist that he had tooth pain and he

19  thinks he might have to have the tooth

20  pulled.

21      THE COURT:  What does the record

22  reflect?

23      MR. CROWL:  The record reflects --

24  says that he said that he had already had a

25  tooth pulled.

SMEGO - DIRECT                    775

1        MR. VOGT:  That's grossly

2   impermissible, Judge, because -- if I

3   might.  The point is the Court allowed them

4   to bring in these therapist notes without

5   having the therapists come and testify so

6   the therapist can not defend themselves --

7        THE COURT:  You offered them.

8        MR. VOGT:  Yes, but wait.  They're

9   gonna offer other ones, too.  The --

10        MR. CROWL:  We're offering no

11   therapist notes.  The only note that was

12   been introduced was done by Mr. Vogt to

13   suggest that he's a liar.

14        THE COURT:  You're going to ask him,

15   with the preface that there was a note

16   presented that indicated your tooth had

17   already been pulled?

18        MR. CROWL:  Right.

19        THE COURT:  You're going to say, was

20   your tooth pulled at that time and he will

21   say no.  Did you tell the therapist that?

22   Yes or no.

23        MR. CROWL:  Right, hm-mmm.

24        MR. VOGT:  And that's it, Judge.

25        THE COURT:  Hm-mm.

SMEGO - DIRECT                    776

1          MR. VOGT:  Okay.  Thank you.

2      (The following proceedings were held in open

3      court.)

4  BY MR. CROWL:

5      Q.  Mr. Smego, we're talking about that

6  therapist note that Mr. Vogt had shown and put on

7  the screen yesterday that indicated that your tooth

8  had already been pulled.  Did you tell the therapist

9  your tooth had already been pulled?

10      A.  No, I did not.

11      Q.  Okay.

12      So now we're in Dr. Mitchell's office, it's

13  June 24th of 2007, like we had said, 18 months after

14  you had first seen her.  Can you tell the members of

15  the jury what you remember about that particular

16  visit to the dentist?

17      A.  Well, I was called down to the dentist's

18  office and I was told that I was there for an

19  annual -- for an annual checkup.  And I started

20  asking questions because I was told that all I would

21  be getting that day was an annual checkup.

22      And it seemed really odd to me, because one, it

23  had been way more than a year since I had seen the

24  dentist.  And two, it's like we'd already had my

25  services planned and I had all these cavities and I

SMEGO - DIRECT                    777

1   had teeth that now hurt and what is there to check

2   up on.

3        And Dr. Mitchell told me that I don't get to

4   pick and choose what services get done when; that

5   she was the dentist and that day I was there for an

6   annual checkup and a cleaning.

7        Q.  Did she fill any of your 12 cavities when

8   she had you in the chair on June 24th of 2007?

9        A.  No.

10       Q.  Do you recall approximately when the next

11  time was that you were called to the dental office?

12       A.  It would have been the following week.

13       Q.  So that would have been early July of 2007?

14       A.  Yeah.  I think it was right around the 1st

15  of July.

16       Q.  And who was there around the 1st of July,

17  2007, in the dental office?

18       A.  I couldn't tell you.

19       Q.  Okay.  Do you recall who you spoke with?

20  Whether you spoke with Dr. Mitchell or someone else?

21       A.  I spoke with Kelly Mitchell.

22       Q.  She is the dental assistant; is that right?

23       A.  That is correct.

24       Q.  And what did you say and what did she say?

25            MR. VOGT:  Objection, Judge.

SMEGO - DIRECT                          778

1           THE COURT:  The objection is sustained.

2           MR. CROWL:  Judge, goes to state of mind.

3  Could I be heard on this, please?

4           THE COURT:  Whose state of mind?

5           MR. CROWL:  Mr. Smego's state of mind.

6           THE COURT:  I will allow it for that

7  limited purpose.

8  BY MR. CROWL:

9      Q.  What did Kelly Mitchell, the dental

10  assistant say, and what did you say?

11     A.  Well, Ms. Mitchell, the dental assistant,

12  told me that there was -- they didn't have any

13  filling material and it would be a waste of time for

14  the dentist to see me.  And told me to go back to my

15  living unit.

16     Q.  What did you tell her when she said that it

17  would be a waste of time?

18     A.  I complained.  And I told her that --

19          MR. VOGT:  Objection to this.  It's no

20  longer state of mind.

21          MR. CROWL:  It is, Judge.

22          THE COURT:  All right.  I'll allow it.

23  BY MR. CROWL:

24     Q.  And after you complained to her, what did

25  Kelly Mitchell tell you about your complaints?

SMEGO - DIRECT                    779

1       A.  That becoming a pest or making my pest --

2   myself a pest wouldn't help get me seen.

3           MR. VOGT:  Objection, Judge; move to

4   strike.  Hearsay.

5           MR. CROWL:  That goes right to his state of

6   mind, Judge.

7           THE COURT:  It does.  I'll allow it.

8   BY MR. CROWL:

9       Q.  So you saw Kelly Mitchell in the beginning

10  part of July.  When was it that you next saw

11  Dr. Mitchell?

12      A.  A couple, two, three weeks later.

13      Q.  That would have still been in approximately

14  July of 2007; is that right?

15      A.  Towards the end of July, yeah.

16      Q.  And again, are we back in the dental room at

17  Rushville?

18      A.  Yes.

19      Q.  And it's you and Dr. Mitchell; is that

20  right?

21      A.  That's correct.

22      Q.  Tell the members of the jury what occurred

23  during that dental visit?

24      A.  Well, obviously I get in the chair and I got

25  the -- the dental bib; I don't know what you call

1    the dental bib.  That paper thing that they put on

2    with the clips.

3         And Dr. Mitchell explained to me that she was

4    gonna provide a temporary filling for tooth 31.  And

5    tells me that tooth 31 is a tooth towards the bottom

6    right of my mouth.

7         And I was a little shocked, because I had been

8    complaining about the tooth on top of that, tooth

9    No. 2, that at this point was now half of a tooth.

10   The right half of this tooth was missing.  It was

11   just -- it was gone.  There wasn't nothing to the

12   right half of the tooth.

13        And I complained.  And Dr. Mitchell again

14   reminded me that she's the one who picks what gets

15   done and when.  And told me we were gonna put a

16   filling in tooth 31 and then she would call me back

17   down in a week or so and we would put -- we would

18   fix tooth 2.

19        Q.  And did Dr. Mitchell do anything for that

20   upper right molar, that tooth No. 2 that at that

21   point had been broken in your mouth?

22        A.  Nothing.

23        Q.  What did she do -- where is tooth No. 31?

24        A.  Bottom, I think it's the -- it's way in the

25   back on the bottom right.

SMEGO - DIRECT                    781

1        Q.  So like a bottom right molar?

2        A.  Yes.

3        Q.  Okay.  What did she do for tooth No. 31?

4        A.  Well, she had told me that she found a

5   cavity on an x-ray and it was a cavity that I didn't

6   even know I had.  And apparently it was inside the

7   tooth.

8        And so she drilled and she put in a temporary

9   filling.  It was explained to me that it was a

10  medicated filling and that when I got called down to

11  put the temporary filling in tooth No. 2, we would

12  put a permanent filling in tooth No. 31 then.  And

13  it seemed reasonable at the time.

14       Q.  And then I want to draw your attention to

15  August 25th of 2007.  Is that the next date when you

16  saw Dr. Mitchell?

17       A.  Yes.

18       Q.  And who was present for that dental visit?

19       A.  I remember there being -- Dr. Mitchell was

20  there, I was there, I remember there being a dental

21  assistant.  I remember there were people moving

22  about.  There were a lot of residents in and out, a

23  lot of staff in and out.  It was a fairly busy day.

24       Q.  And did you have a conversation with

25  Dr. Mitchell about your teeth during that visit?

1        A.  Yes.

2        Q.  What did you tell her?

3        A.  Well, one of the things that I pointed out

4   was that the temporary filling in tooth No. 31 had

5   fallen out; that I now had an opening in tooth No.

6   31.

7        Q.  And did you say anything about tooth No. 2,

8   that upper right molar?

9        A.  Yeah, I told her that tooth was still bad

10  and it hurt and that's the tooth she said we were

11  gonna begin working on.

12       Q.  And then what happened next, Mr. Smego?

13       A.  Well, I got a couple of injections for the

14  numbing process.  I don't know what that is,

15  Novocaine or whatever they use for that.  I really

16  don't know.  And I got that done and then

17  Dr. Mitchell went and did some work on the person in

18  the chair next to me.

19       Q.  Then when she came back what did she do?

20       A.  She began drilling on tooth No. 2.

21       Q.  And what happened with regard to tooth No.

22  2?

23       A.  After she drilled on it for a while she told

24  me that the tooth was too far gone to be saved.

25       Q.  And did you -- how did you respond to that?

SMEGO - DIRECT                          783

1      A.  I really didn't want to hear that.  That

2  was -- that was -- that was beyond disappointing.

3  To have to live with that in my mouth for 18 months

4  or whatever it was at this point, 20 months or -- to

5  just have it pulled anyway.  I mean we could have

6  done that in the first place and saved me all the

7  trouble.

8      I mean it was -- I mean by the last four or

9  five months, that tooth, that area, constantly hurt.

10  And there was just this constant odor, the smell of

11  decay.  And it's like, you know, anybody that I

12  talked to or whatever like as far as staff, you

13  know, they could -- you know, just a horrible smell.

14      Q.  Did you ultimately have tooth No. 2 pulled

15  then?

16      A.  I did.

17      Q.  Okay.  And tell us a little bit about the

18  authorization form we saw yesterday, the

19  authorization form that you had signed.  Tell us

20  about that?

21      A.  Well, I got presented with a form.  And

22  it's -- it's kind of really a bad situation, but

23  it's a simple decision.  You have a tooth that's

24  been drilled into.  It hurt before you had it

25  drilled into.  And now it's been drilled into and

SMEGO - DIRECT                              784

1    there's even less tooth there.

2        And I couldn't really feel it at that point

3    because it was -- it was numbed up from that

4    medication.  But if I didn't sign the form, the

5    tooth wasn't gonna be extracted, and I was gonna go

6    back to where I live and that medication that numbed

7    up the tooth, made the pain stop, was gonna wear off

8    and I didn't know what shape that was gonna leave me

9    in.

10       So in my mind I didn't have a choice on whether

11   or not I had tooth No. 2 filled.  Or pulled.

12       Q.  So you signed the form and Dr. Mitchell then

13   pulled the tooth that she had indicated could be

14   filled some 18 months before; is that right?

15       A.  Correct.

16       Q.  So that was August 25th of 2007.

17       By the way, was anything done with tooth No. 31

18   that had the filling that had fallen out?

19       A.  No.  We didn't put another medicated filling

20   in it or do anything.  So I had one tooth pulled,

21   which I don't know, in some way I guess alleviated

22   pain, but I'm left with a hole in a tooth that was

23   still causing pain.

24       Q.  So then from August 25th of 2007, when she

25   pulled tooth 2, when was the next time that you saw

SMEGO - DIRECT                    785

1    the dentist?

2         A.  It was April or May of 2008.  I think May.

3         Q.  So that would have been about nine months

4    after the extraction; is that right?

5         A.  That sounds about right; yes.

6         Q.  And what was the condition of your teeth

7    during that nine months?

8         A.  They continued to decay.

9         Q.  And, sir, did you, at that particular visit

10   on May 4th of 2008, see Dr. Mitchell again?  Was

11   that the date when you saw her?

12        A.  Yes.

13        Q.  Okay.  Tell us about that particular visit,

14   please?

15        A.  Well, on that visit I go down to the --

16   called down to the healthcare unit again.  And it

17   was just me and Dr. Mitchell that was in the

18   dentist's office at that time.  I don't remember

19   there being anybody else there that time.

20        Q.  And in this instance you had filled out a

21   healthcare request form; is that right?

22        A.  Correct.

23        Q.  Or do you remember?

24        A.  I believe I did.

25        Q.  Okay.  And so you're in the chair and what

SMEGO - DIRECT                    786

1  did -- what did you say and what did Dr. Mitchell

2  say?

3      A.  Well, I think about the first thing

4  Dr. Mitchell told me was that she didn't think the

5  tooth was gonna be salvageable because I had been so

6  long without a -- I had been so long without a

7  filling.  So she thought the tooth was gonna be

8  pretty well gonna.

9      Q.  And this is tooth 31, which is the bottom --

10      A.  Tooth 31.

11      Q.  -- right molar that the cap had fallen out

12  of?

13      A.  Right, the filling came out.

14          THE COURT:  I'm sorry.  Was it a cap or a

15  filling?

16      Q.  I'm sorry.  Was it a medicated filling?

17      A.  It was a medicated filling.

18      Q.  So what did you say?

19      A.  Well, I complained.  I wanted to put a

20  filling in the tooth.

21      Q.  What did Dr. Mitchell tell you?

22      A.  We went through -- there was a bit of a

23  conversation.

24      One of the things she told me was she showed me

25  an x-ray that she told me was tooth No. 31.  And

1   she's asking me to look at the tooth and look at the

2   space under the tooth, and she said there was a dark

3   area and she said that that was abscess where the

4   tooth had pulled away from the bone and that the

5   tooth was dead.

6       And the -- as soon as I heard that, I rejected

7   that in my mind, because it was just -- it didn't

8   make any sense, because anything that hurt that much

9   just had to be alive.  To me, if it was dead, if it

10  wasn't viable, it shouldn't feel pain.  I don't know

11  if that's true or not, it's just what my belief was.

12      Q.  So on May 4th of 2008, when she had you in

13  the chair and you were discussing that tooth No. 31,

14  did she end up working on that particular tooth?

15      A.  Yeah, she did.

16      Q.  What did she do?

17      A.  Well, before she could do any drilling or

18  working in the cavity itself, because the filling

19  was gone for so long and the cavity got so big, it

20  had grown to where it was now under the gum line.

21  So she had to do electric surgery and cut away the

22  gum.

23      And so that was the first thing she had to do.

24  She had to expose the area of the cavity.  And then

25  once she did that, she drilled it all out and then

SMEGO - DIRECT                              788

1    put in a medicated filling.

2        Q.  And then after that; this would have been

3    May 4th of 2008; when did you see Dr. Mitchell

4    again?

5        A.  Later that month.

6        Q.  And was that in response to any health care

7    request form?

8        A.  No, she just called me back down for a

9    follow-up.

10        Q.  And on that particular date in May of 2008,

11    did she fill any of the remaining 10 or so cavities

12    in your teeth?

13        A.  No.  There was -- she told me the compressor

14    was broken.

15        Q.  Did she tell you when she would see you

16    next?

17        A.  She told me she'd call me down in a few

18    weeks.

19        Q.  And then when was it you saw her next,

20    Mr. Smego?

21        A.  I think it was June.

22        Q.  So in June of 2008 -- by the way, in June,

23    2008, was that in response to any healthcare

24    request?

25        A.  No, I don't think it was.

1    Q.  Okay.  In June of 2008, what work did she do

2  on your teeth?  If you remember?

3    A.  I think it was permanent fillings in

4  teeth -- in tooth 31 and the adjacent teeth.

5    Q.  And tooth 31 again is that lower right molar

6  that had the temporary filling --

7    A.  That's right.

8    Q.  -- is that right?

9    A.  That's correct.

10   Q.  Okay.  By the way, in each of these

11  instances after she saw you, what did she prescribe

12  for you?

13   A.  Motrin.

14   Q.  I'm sorry, say what?

15   A.  Motrin.

16   Q.  So now then, after she has filled those

17  teeth, you still have a number of untreated

18  cavities; is that right?

19   A.  Correct.

20   Q.  Approximately how many?

21   A.  I don't know.  Probably about six at this

22  point that were --

23   Q.  And what was the condition of your front

24  teeth at the time?

25   A.  Tooth No. 7, the one that I had really

SMEGO - DIRECT                    790

1    complained about initially in December, that one,

2    like tooth No. 31 and 2, was about gone.  It was --

3    it was just falling apart.  It was crumbling.  And

4    from the backside of like the front two teeth they

5    were turning a dark color.

6         And the front teeth were sensitive, but that

7    one smaller tooth right off to the side, it -- it

8    would ache.  And it would throb.  I -- it didn't

9    make any sense, but I swear I could feel it going up

10   through my eye.  I mean it would really get to

11   hurting.

12        Q.  And in that June, 2008 visit with

13   Dr. Mitchell, did she perform any work on those

14   front teeth, 6, 7, or 8?

15        A.  No.  I believe that was again another exam,

16   if I remember right.  And she planned services then.

17        Q.  And so then after June of 2008, you still

18   had those cavities including those in your front

19   teeth, is that when you filed the lawsuit in this

20   case?

21        A.  Yes, it was.

22        Q.  And when you filed that lawsuit did you have

23   counsel or did you represent yourself?

24        A.  I was completely on my own.

25        Q.  When was it that you saw Dr. Mitchell again?

1      A.   The beginning of September.

2      Q.   And in that instance you had filed a

3  healthcare request form; is that right?

4      A.   That's right.

5      Q.   So that was about three months later, after

6  you had been -- after she had filled tooth No. 31,

7  but not your front teeth; is that right?

8      A.   Correct.

9      Q.   I mean that was after you filed the lawsuit

10  in the case; is that right?

11      A.   Yes.

12      Q.   So tell us what happened during that visit

13  with Dr. Mitchell in September of 2008?

14      A.   Well, I got called down to the dentist's

15  office.  And I go.  And I -- when I got in the

16  chair, I wasn't feeling good before I got there, and

17  I had a head cold.  And I just wasn't able to sit in

18  the chair and lean back and deal with the drainage

19  and stuff.

20      And I asked Dr. Mitchell if we could schedule

21  this and try to do this the next day, and I was

22  gonna talk to nursing and try to get something to

23  dry up my sinuses and stuff, at least to deal with,

24  you know, the runny nose and stuff.  Especially with

25  being in the chair; the dentist doesn't want you

SMEGO - DIRECT                    792

1    breathing through your mouth.

2         And she agreed and said she'd put me in to see

3    her the next day.

4         Q.  And did you see her then later in September?

5         A.  It was later on in the month, yes.

6         Q.  And was that in response to a healthcare

7    request form or were you simply just called back to

8    the dental office?

9         A.  No, I was called back.

10        Q.  And tell us what happened then later in

11   September of 2008, when you were called back after

12   the time when you weren't able to be treated?

13        A.  Well, I was called back down to the dental

14   office.  And Dr. Mitchell drilled out the front

15   three teeth for I don't know what you would call it,

16   I'm just gonna say drilled out.  And removed all the

17   bad spots or whatever.

18        And there wasn't much of anything left of tooth

19   No. 7.  That's what prompted me to file the request

20   on -- because it had -- it was just crumbling, it

21   was almost down to the gum line.  And --

22        Q.  And then after she did some drilling on

23   tooth 6, 7, and 8; and again, those are your two

24   front teeth and the one to one side; is that right?

25        A.  Yes, yes.

SMEGO - DIRECT                               793

1        Q.  After she did the drilling, what did she do

2    to those teeth?

3        A.  She made fillings out of a liquid material

4    that was hardened with like a UV light or something.

5    And it was applied like a liquid, like an epoxy or

6    something like that and then it was hardened with a

7    light.  And it was a whole series of applications.

8    And the teeth were filled in that fashion.

9        Q.  And I know you knew more the next day once

10   the Novocaine had worn off, but describe for the

11   members of the jury what that felt like the next day

12   in terms of the condition of those teeth with that

13   filling material in them?

14       A.  Well, I didn't notice it at first.  I mean I

15   could tell the front was pretty well flat.  The back

16   felt funny, but you know, when I was in the office,

17   you know, my tongue felt funny and everything felt

18   funny anyway because I was numbed up for so long.

19       But as that wore off I became more and more

20   aware of the fact that -- I don't know, at least my

21   teeth; I don't know what anybody else's teeth are

22   like; but the back sides of the front of your teeth

23   are kind of shaped like the letter C or something.

24   And like the bottom teeth of my jaw will slide up

25   and down the backside of my front teeth.

1          And after these fillings, the teeth now came

2     out.  There were likes globs of stuff and chunks of

3     material back there.  And my teeth didn't fit

4     together no more back there.  And I didn't have any

5     spaces between my teeth.  So like if I -- I couldn't

6     floss because I couldn't put nothing between my

7     teeth.

8          Q.  And so getting back to that day when she put

9     in that filling material.  In your view, had she

10    actually finished those fillings?

11         A.  No, I don't believe she did.  And she told

12    me that she hadn't finished.

13         Q.  What did she say?

14         A.  She told me that she'd call me down the next

15    weekend to finish.

16         Q.  Did she tell you why she had to leave?

17         A.  Well, at that time she told me she had to

18    leave because she wanted to catch a train.

19         Q.  And this was September of 2008; is that

20    right?

21         A.  Correct.

22         Q.  Tell the members of the jury when it was the

23    next time that you saw Dr. Mitchell?

24         A.  October, 2010.

25         Q.  That was more than two years later; is that

1  right?

2      A.  Yes.

3          MR. CROWL:  Judge, are we gonna take our

4  break at 4:30 or would you like me to keep going?

5          THE COURT:  I think we should take a break

6  at this point.

7      If you'll be back tomorrow.  Can you all be

8  back tomorrow at 9:00?

9      All right.  I have checked the weather and

10  there is no prediction of snow.  It is going to be

11  very cold.  I don't whether those of you who have to

12  travel, if that will affect your vehicles at all.

13      Everybody all right?  Okay.

14      It is possible we may go late tomorrow night

15  for deliberations.  So be sure and make arrangements

16  if you need to to have backup with the children.  I

17  know you don't all have children, but many of us do.

18  And I don't include myself.  I have children, but

19  they're not children.

20      You may take the jury.

21      And once again, thank you very much for your

22  services and being here on time today.  I really

23  appreciate it.

24          JUROR:  What time?

25          THE COURT:  9:00.

1        (The jury left the courtroom.)

2            THE COURT:  So let's go over how many

3    witnesses we have tomorrow.  We have the rest of

4    Mr. Smego, which I assume will take for you,

5    Mr. Crowl, half an hour?

6            MR. CROWL:  Yes, Judge.

7            THE COURT:  And for you, Mr. Vogt?  I know

8    you don't know.

9            MR. VOGT:  I'll try to move as quick as I

10   can.  An hour perhaps, Judge.

11           THE COURT:  Okay.  And then you have an

12   expert?

13           MS. MacDONALD:  Yes, Your Honor.  We have

14   an expert to testify after that.

15           THE COURT:  How long was his deposition, do

16   you remember?

17           MS. MacDONALD:  Our expert's deposition?  I

18   think it was about three and a half hours.  Yeah.

19           THE COURT:  I assume you don't anticipate

20   taking that long with him here?

21           MR. WATSON:  No, Your Honor.

22           THE COURT:  Do you have an estimate?

23           MR. WATSON:  We would expect to have it

24   under an hour and a half.

25           THE COURT:  Okay.  And you'll be?

```
 1            MR. VOGT:  I'll try to keep it to an hour

 2     again, Judge.

 3            THE COURT:  All right.  Then your expert

 4     and briefly Dr. Mitchell?

 5            MR. VOGT:  Correct.  And Judge, I will, you

 6     know, try to pare down our expert as much as

 7     possible.  I really will.

 8            THE COURT:  And did you get the order I

 9     entered today?

10            MR. VOGT:  Not yet.  Does it help in paring

11     down the testimony of my witness?

12            THE COURT:  It does.

13            MR. VOGT:  Let me read that.  But the

14     bottom line is I'm going to remove things because I

15     think a lot of things have been established.

16        But I -- I hope and pray that I can get done,

17     cross, direct, everything with my expert in two

18     hours.  And Dr. Mitchell won't be more than 15

19     minutes, I don't think.

20            THE COURT:  Okay.  Well, we know you can

21     talks fast and that will speed things up.

22     Mr. Watson doesn't talk as fast as you do, so, Mr.

23     Watson, try and speed it up.

24            MR. WATSON:  I can --

25            THE COURT:  Ms. MacDonald could do this,
```

1    she talk fast.

2          MR. WATSON:  I apologize for my deliberate

3    way.

4          THE COURT:  No, it's a fine, fine attribute

5    when it's not a long jury trial.  We're trying to

6    get them out by the evening.

7          MR. WATSON:  I apologize for that.

8       I would expect; I haven't seen the Court's

9    ruling if there's one that's issued, I just have --

10   I just haven't looked.

11         THE COURT:  Why don't you have access here?

12         MS. GLEASON:  I can print it off.

13         MR. VOGT:  We do, just not in the

14   courtroom.

15         THE COURT:  We have access for you here in

16   the courtroom.

17         MS. CAMPBELL:  Okay.  We didn't know that.

18         MR. WATSON:  My goal would be to get

19   Dr. Dovgan off and in cross examination very

20   quickly.

21         THE COURT:  Okay.  So do I need to get

22   Dustin up here to tell them how to have access or

23   can you tell them.  Kathy can, Kathy can.

24         MS. GLEASON:  I'm gonna print it off and

25   I'll bring copies in.

1          THE COURT:  But Kathy, as soon as I shut

2    up, will tell you how you can access the wireless

3    here in the courtroom.  Okay.

4          MR. WATSON:  Thank you, Judge.

5          THE COURT:  We have a visitor in the back

6    of the room.  Do we know who this visitor is?

7          MR. CROWL:  Yes, Your Honor.  He's an

8    employee at DHS, he is just watching.

9          THE COURT:  Okay.

10          MR. CROWL:  I think he was here yesterday,

11   Your Honor.

12          THE COURT:  I thought I had seen him

13   before.  But I just wanted to make sure that it was

14   not someone for a case I may be taking a plea this

15   afternoon, that's why I didn't want to leave the

16   courtroom if that's what I was suppose to be doing.

17   I had received a message I'm not gonna take the plea

18   this afternoon.  They're hoping I can take it

19   tomorrow afternoon, which --

20          MR. VOGT:  Judge, may I approach on one

21   other issue?

22          THE COURT:  You may.

23          MR. VOGT:  May we meet with the Court

24   before we start tomorrow morning?  There are some

25   things I want to address with the Court before I

1  walk down paths with Mr. Smego's cross examination.

2      That was the only thing I wanted to make sure

3  that I don't do something inappropriate without --

4          THE COURT:  Can you do that now?

5          MR. VOGT:  Oh, sure, Judge.

6      I mean couple of points.

7      He testified that he's a live-in resident and

8  that he entered the program.

9      Now, I mean the jury is gonna be left with the

10  impression that -- I have to be able to cross

11  examine him on the fact that he is detained and that

12  DHS detained him.

13          MR. CROWL:  Judge, it's already abundantly

14  clear that he is civilly committed.  So if we're

15  going into that anymore -- it is clear he can't go

16  anywhere else to get dental care.

17          THE COURT:  Well, certainly he can,

18  Mr. Vogt can clarify that this was not a voluntary

19  entering.  But briefly.

20          MR. CROWL:  He should say he's civilly

21  committed, as opposed to going through the process

22  of it.

23          THE COURT:  Yes.

24          MR. VOGT:  Well, forgive me; I can use the

25  word detained.

1          THE COURT:  Yes, you may.

2          MR. VOGT:  Okay.  Now the other thing --

3          THE COURT:  Civilly detained.

4          MS. MacDONALD:  But we're not going into

5    how he came to be civilly detained.

6          MR. VOGT:  Well, now that's my next

7    question.

8          THE COURT:  No.

9          MR. VOGT:  Hang on.  The answer to that is

10   no, but there's a footnote.  Before he came into

11   DHS, he went to DOC.  And he was examined by a

12   dentist at the DOC.  And I need to get into that.

13         THE COURT:  Well, you don't have to get

14   into the fact it was a DOC dentist.  You can simply

15   say --

16         MR. VOGT:  As part of your detention or

17   something like that.  All right, I can do that.

18         THE COURT:  That's fine.

19         MS. MacDONALD:  I would -- well, Your

20   Honor, do you have to say prior detention.  I think

21   you could say, you received care by a dentist

22   before.  I don't think you have to say where that

23   dentist is.

24         MR. VOGT:  I'm not going to say, I just --

25         THE COURT:  I'm concerned, because we -- is

1      the jury out of here?

2          I don't want to give the impression that he was

3      under DHS's care when the other dental work was

4      done.

5              MS. MacDONALD:  Right.  Before -- I mean I

6      think that could be made clear if he says before you

7      were under DHS's care you, you know, received dental

8      treatment elsewhere.

9              MR. VOGT:  Okay, wait.  Perhaps -- forgive

10     me if I get the wrong suggestion.  He was detained

11     at DHS in Joliet; okay.  What if I just say, prior

12     to being detained at Joliet, you were detained at

13     some other facility.

14             MS. MacDONALD:  No, you can't say before --

15     anything about that before.  That's part of the

16     Judge's motion in limine.

17         He wasn't detained before, he --

18             MR. VOGT:  He was incarcerated.

19             MS. MacDONALD:  -- had been incarcerated

20     and that was part of the motion in limine.  You

21     don't have to say where the dental treatment

22     happened, you can just say you received dental

23     treatment.

24             MR. VOGT:  No, except that I can't give the

25     impression that he received private dental treatment

1   that he himself sought out and got.  That's one of

2   my points, Judge.  He has to make sure this was

3   provided to him and he was told certain things at

4   that particular time.

5           THE COURT:  For the record, I'm not rolling

6   my eyes.

7           MR. VOGT:  I've had judges roll their eyes

8   at me.  I won't get offended.

9           THE COURT:  I need eyedrops.

10          MR. VOGT:  I appreciate --

11          THE COURT:  Hold on.  Let me think a

12  minute.

13          MS. GLEASON:  The jury is gone.

14          THE COURT:  Thank you.

15      If you say while in custody previously were

16  treated, does that solve your problems?

17          MS. MacDONALD:  No, Your Honor.  Custody

18  suggests a crime.

19          MR. VOGT:  May I suggest simply that rather

20  than refer to the dentist being with DOC, I refer to

21  the dentist as being with DHS?

22          THE COURT:  No, I don't want them to have a

23  misconception DHS previously treated him.  I mean

24  that's not true.

25          MR. VOGT:  Before Dr. Mitchell?

1          THE COURT:  Yeah.

2          MR. VOGT:  Okay.  Well, again, Judge, I'm

3     trying to work on some theories here.  We know --

4          THE COURT:  How about you've had

5     institutional dentistry before.

6          MR. VOGT:  I'll try and work on it, Judge.

7          THE COURT:  Okay.

8          MS. MacDONALD:  I'm just not -- I'm not

9     sure why there has to be any reference to where --

10         THE COURT:  Well, I see a difference

11    between, you know, me going to my fancy dentist

12    across on the west side and being treated by someone

13    in the Army or at the VA.

14         MS. MacDONALD:  But why is that relevant to

15    the dental claims that are being presented in this

16    case?  I understand that there may be some

17    situations where that is relevant, but this care --

18    how does it tie into issues in this case?

19         THE COURT:  Well, I assume it's because he

20    came into Dr. Mitchell with caries already.

21         MR. VOGT:  Yes, with periodontal disease

22    Type 3 and having been told that if he wanted to get

23    treatment all he had to do was submit a request.  It

24    goes right to the heart of the matter.

25      I'll try to work with counsel about it --

1          THE COURT:  Okay.

2          MR. VOGT:  That's why I'm here.  I didn't

3    want to offend anybody --

4          THE COURT:  I appreciate.

5          MR. VOGT:  -- and run off into tangents

6    here.  I would like to simply say he was in DOC for

7    violating parole and things like that, but I know

8    that wouldn't be a good thing to do.

9          THE COURT:  You should have been an actor.

10          MR. VOGT:  Well, no -- I'll see if we can

11    work something out.

12          THE COURT:  See if you can.  Mr. Watson.

13    Mr. Vogt, was there something else.  Is that all

14    your issues?

15          MR. VOGT:  Yes, Judge, that's what I wanted

16    to make sure I addressed.

17          THE COURT:  Okay.  And I told you I was --

18    off the record.

19      (A discussion was held off the record.)

20      (Court was recessed for the day.)

21

22

23

24

25

1    I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

2    Reporter, certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8

9                    This transcripts contains the

10                   digital signature of:

11

12                   Kathy J. Sullivan, CSR, RPR, CRR

13                   License #084-002768

14

15

16

17

18

19

20

21

22

23

24

25

KATHY J. SULLIVAN, CSR, RPR, CRR
OFFICIAL COURT REPORTER