```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
2                   SPRINGFIELD DIVISION

3
   RICHARD M. SMEGO,                )
4                                   )
                 PLAINTIFF,         ) 08-3142
5                                   )
            VS.                     ) JURY TRIAL
6                                   )
   DR. JACQUELINE MITCHELL,         ) SPRINGFIELD, ILLINOIS
7                                   )
               DEFENDANT.           ) VOL. IV
8

9              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE SUE MYERSCOUGH
10            UNITED STATES DISTRICT JUDGE

11
   FEBRUARY 27, 2015
12
   A P P E A R A N C E S:
13
   FOR THE PLAINTIFF:          MATTHEW CHARLES CROWL
14                             ANN H. MacDONALD
                               BRIAN O'CONNOR WATSON
15                             KAITLIN GRACE KLAMANN
                               SCHIFF HARDIN LLP
16                             233 SOUTH WACKER DRIVE
                               CHICAGO, ILLINOIS
17

18 FOR THE DEFENDANT:          ROBERT P. VOGT
                               BETHANY SUE CAMPBELL
19                             WELDON LINNE & VOGT
                               20 SOUTH CLARK STREET
20                             CHICAGO, ILLINOIS

21

22

23 COURT REPORTER:      KATHY J. SULLIVAN, CSR, RPR, CRR
                        OFFICIAL COURT REPORTER
24                      600 E. MONROE
                        SPRINGFIELD, ILLINOIS
25                      (217)492-4810
```

```
 1                      I N D E X

 2   WITNESS               DIRECT   CROSS   REDIRECT   RECROSS
     RICHARD SMEGO          821      837
 3   JAY SHULMAN            883      957
     JOHN DOVGAN           1021     1045     1079
 4
```

```
 8                    E X H I B I T S

 9   PLAINTIFF'S EXHIBIT
     NUMBER                    IDENTIFIED     ADMITTED
10   Exhibit 14                   894           895
     Exhibit 34                   828           828
11   Exhibit 35                   824           825
     Exhibit 36                   826           825
12   Exhibit 116A                 899           900
     Exhibit 116B                 901           901
13   Exhibit 117A                 934           934
     Exhibit 117B                 935           939
14
     DEFENDANT'S EXHIBIT
15   NUMBER                    IDENTIFIED     ADMITTED
     Exhibits 3-17 thru 3-21     1090          1090
16   Exhibit 3-23                1091          1091
     Exhibit 3-25                1091          1091
17   Exhibits 3-39 thru 3-42     1092          1092
     Exhibit 14-43               1092          1092
18   Exhibit 20                  1092          1093
     Exhibit 36-9                1089          1090
19   Exhibit 36-20               1089          1089
     Exhibit 36-42               1089          1089
20   Exhibit 42                  1090          1090
```

```
 1                P R O C E E D I N G S

 2        *    *    *    *    *    *    *    *    *    *    *

 3          (The following proceedings were held outside

 4          presence of the jury.)

 5             THE COURT:  Court is reconvened.  I

 6   understand we had an few glitches again this

 7   morning.  Thank you very much for bringing Mr. Smego

 8   timely.  I really appreciate the extra work you had

 9   to do to get him here.

10             SECURITY THERAPY AIDE:  No problem, ma'am.

11             THE COURT:  I'm glad we're not starting

12   today like yesterday.

13      And we apparently have had a computer glitch

14   which apparently has been fixed?

15             THE CLERK:  Yes, ma'am.

16             THE COURT:  Did Dustin say what it is?

17             THE CLERK:  He had to remote in.  It was

18   just something with the password.  I made an error

19   and then it locks you out.

20             THE COURT:  Are we ready?

21             MR. CROWL:  We are, Judge.

22             THE COURT:  I have a few jury instructions,

23   which -- let's just go ahead and get these out of

24   the way so we know where we are.

25      Jury Instruction 24B, Court's.  Any objection
```

```
1    to the Court's 24B?  Do you have it?

2              MR. WATSON:  No objection, Your Honor.

3              MR. VOGT:  No, Judge.

4              THE COURT:  Okay.  Given, no objection.

5         4A, demonstrative exhibits, was not yet ruled

6    on.  It's modified slightly.  Given, no objection?

7              MR. WATSON:  No objection, Your Honor.

8              MR. VOGT:  I'm sorry, Judge?

9              THE COURT:  Do you have an objection to the

10   demonstrative exhibits?

11             MR. VOGT:  No, Judge.

12             THE COURT:  All right.  We have Plaintiff's

13   7, written interrogatories.

14             MR. VOGT:  Judge, I don't think there

15   was --

16             MS. MacDONALD:  Yes, there was, with

17   Dr. Mitchell.

18             MR. WATSON:  No objection, Your Honor.

19             MR. VOGT:  In light of that then, Judge, no

20   objection.

21             THE COURT:  Given, no objection.

22        Plaintiff's 17.

23             MR. WATSON:  Your Honor, we had reserved

24   Plaintiff's 17 subject to the expected testimony of

25   Dr. Dovgan.  And we're gonna need to approach the
```

1    issue sooner or later about how Dr. Dovgan is

2    determining the standard of care in this case.

3        Previously he had testified that he reviewed 27

4    states' correctional institution policies, including

5    the Illinois correctional institution policies.

6        We have taken great care during this case to

7    avoid prison and correctional policies.  And we

8    would withdraw this instruction as long as the

9    expectation continues that there will still be no

10   evidence about correctional institution policies.

11       THE COURT:  Are we talking about the same

12   one?  This is about state administrative directives?

13       MR. WATSON:  Correct.  So the state

14   administrative directive, the IDOC directive from a

15   correctional institution.

16       We had proposed this instruction because we

17   were very concerned with Dr. Dovgan's testimony when

18   we first heard it, before any Court ruling, that he

19   was relying entirely on IDOC directives.

20       And our expectation is that there will not be

21   testimony about IDOC directives at all in this case.

22   And as long as that is true, there's no need and we

23   would withdraw this instruction.

24       THE COURT:  But there was testimony about

25   compliance with state administrative directives of

1    DHS.

2         MR. WATSON:  There would be.

3         THE COURT:  So do you still wish to present

4    it?

5         MR. WATSON:  We would withdraw it.  Our

6    only concern was with the prejudice of the IDOC

7    directives.

8         THE COURT:  Okay.  Do you --

9         MR. VOGT:  Well, Judge, I'm not going to --

10   Dr. Dovgan is not going to be asked any questions,

11   nor do I believe he will testify, about any IDOC

12   directive.

13       But I do want to approach one issue because it

14   was brought up and I just want to make sure I'm

15   clear, Judge.

16       We've talked throughout this case about how the

17   DHS is a unique institution in the sense that there

18   are no other DHS institutions, at least to the

19   knowledge of the two experts that have testified in

20   this case.

21       Both experts in turn have looked to policies

22   and procedures that are followed in correctional

23   care situations and considered those as part of the

24   establishing the standard in the industry.

25       My questions today are simply going to be about

1    the standards in the industry, without going in

2    particular about corrections or non-corrections,

3    because I believe witnesses have both testified that

4    they're all the same.  And that's what I'm trying to

5    make sure I do.  If I just say these are the

6    standards in the industry, we both -- both experts

7    have agreed on what they are.

8              MR. WATSON:  Your Honor, our expert,

9    Dr. Shulman, will not be relying on IDOC or any

10   other correctional directive in this case.  He will

11   be offering testimony; and I think this is common

12   language that we could use; on institutional care or

13   institutional dental care.  Care that deals with a

14   large population base.  It's actually in the

15   literature.

16       And so that would be our way of setting the

17   standard of care in this case.  And with what I hear

18   from Mr. Vogt, we would be withdrawing Plaintiff's

19   17.

20             THE COURT:  Okay.  So we're all on the same

21   page.

22       All right.  Then the jury verdict form we have

23   not ruled on yet.  I said we; I get to rule, you

24   don't.

25       Jury verdict, any objection?

1          MS. MacDONALD:  None from plaintiffs, Your

2  Honor.

3          MR. VOGT:  No, Judge, that's fine.

4          THE COURT:  Given, no objection.

5      Then we have the civil commitment instruction,

6  No. 19.

7          MS. GLEASON:  I had not -- I just realized

8  that this morning, so it's not in the packet.  It's

9  not been ruled on yet.  It's the Youngberg, it's

10  based on the Youngberg more considerate treatment

11  proffered by plaintiff.  And you had reserved ruling

12  on it, Judge.

13      Do you understand what I'm talking about?

14          THE COURT:  Are you talking to me?

15          MS. GLEASON:  No, Your Honor.  To counsel.

16          MS. CAMPBELL:  I guess we had -- it's in

17  the hotel.

18          THE COURT:  So I need to get you a copy, is

19  that what you're --

20          MS. CAMPBELL:  I believe she's doing that

21  now.

22          THE COURT:  All right.  We'll rule on that

23  later then.

24          MS. GLEASON:  Okay.

25          THE COURT:  And so I'm going to show the

1    causation instructions of plaintiffs and

2    defendants -- Plaintiff's 18 and Defendant's

3    unnumbered, just called Whitlock, I'm going to show

4    them as refused.

5             MR. VOGT:  All right.  Thank you, Judge.

6             THE COURT:  Are we ready for the jury?

7             MR. CROWL:  We are, Judge.

8             THE COURT:  If you'll bring in the jury,

9    Terry.

10        (Plaintiff Richard Smego resumed the witness

11        stand.

12        (The jury entered the courtroom.)

13             THE COURT:  Terry, there's a piece of paper

14    that I need you to get from the juror.

15        Rather than have a sidebar and go over these,

16    what number am I on?

17             THE CLERK:  On the questions, Judge?

18    Court's 7.

19             THE COURT:  Is there -- excuse me, we need

20    the white noise.

21        (The following sidebar discussion was held at

22        the bench, out of the hearing of the jury.)

23             THE COURT:  "Is there any record of

24        Mr. Smego having an allergic reaction to

25        the Motrin he took of his own accord?  Why

1      did he take the Motrin when he said he was

2      allergic to it?"

3      Any objection?

4           MR. CROWL:  No objection, Judge.

5           MR. VOGT:  No objection, Judge.

6           THE COURT:  Now --

7           MR. VOGT:  These are for Mr. Smego

8      himself?

9           THE COURT:  Yes.

10          Now, the alternative is you could ask

11     them.

12          MR. CROWL:  I'm fine either way,

13     Judge.

14          THE COURT:  Okay.  I'll just go ahead

15     and ask them.  This is Court's No. 8.

16      "How is it that Mr. Smego became a

17     full-time resident of Rushville?  Was

18     Mr. Smego a part-time resident?"

19          MR. VOGT:  I think it's a fine

20     question.

21          MR. CROWL:  I think Your Honor should

22     simply say that he was civilly committed.

23     And you should answer that yourself.

24          THE COURT:  Any objection?

25          MR. CROWL:  And say he wasn't a

1   part-time resident, he was a full-time
2   resident.
3        MR. VOGT:  I didn't get that last
4   part.  It's only full-time, right?
5   Okay.  The civilly committed is fine.
6   That's consistent with the prior
7   instruction.
8        Again, Judge, if you want me to go into
9   it, I can and clarify this for the jury.
10       THE COURT:  I'll just go ahead.
11       MR. CROWL:  Mr. Vogt is being
12   sarcastic.
13       THE COURT:  At which point?
14       MR. VOGT:  I am, Judge.
15       THE COURT:  This is Court's 8.
16   "Why did Mr. Smego not complain or log
17   paperwork to see the dentist each week
18   until he was seen?"
19       MR. CROWL:  You can ask that question
20   too, Judge.
21       MR. VOGT:  No objection.
22       THE COURT:  Okay.  Court's 9.  "Dr.
23   Mitchell, why do you work seven days a
24   week?  Why do you work at Rushville?"
25       MR. VOGT:  Well, those are a little

```
 1    bit late, I would think.  That is --
 2         THE COURT:  But you're gonna call her
 3    again.
 4         MR. VOGT:  I may or may not.  So if we
 5    could hold those.
 6         THE COURT:  Yeah -- we'll hold that.
 7         MR. VOGT:  I just don't know how
 8    things go today.
 9         THE COURT:  Okay.  Court's 10.  "Has
10    any other resident both at Rushville and
11    Joliet filed a grievance against
12    Dr. Mitchell."
13         MR. VOGT:  Can't ask, that's been
14    barred by the Court.
15         THE COURT:  Second part.  "Has any
16    other resident experienced a similar
17    experience with Dr. Mitchell?"
18         MR. VOGT:  Objection.  May I ask the
19    Court, could you tender an instruction to
20    the jury that the only person whose
21    complaints are at issue in the case is
22    Mr. Smego, to address that concern?
23         MR. CROWL:  That would be fine.  You'd
24    have to say that --
25         THE COURT:  Simply say that --
```

1      MR. VOGT:  In connection with one of

2  your questions.

3      MR. CROWL:  Just say that's a question

4  that cannot be answered and that the

5  only --

6      MR. VOGT:  The only person whose

7  rights are at issue are Mr. Smego's.

8  That's all.  Without reading the questions.

9      THE COURT:  Hm-mm.

10      MR. VOGT:  I'm sorry, Judge.

11      THE COURT:  The question can not be

12  answer.  The only person whose rights are

13  at issue are Mr. Smego's.

14      MR. CROWL:  Yes, Judge.

15      THE COURT:  All right.

16      Why did Mr. Smego not complain -- oh,

17  that's Court's 8.  Sorry.

18      Now I've got two Court's 8.  Okay,

19  Mr. Smego full-time resident was 8.  And

20  this would be 11, "Why did Mr. Smego not

21  complain or log paperwork to see the

22  dentist each week until he was seen."

23  Okay?

24      MR. VOGT:  All right.

25      THE COURT:  And I'll ask them now

1         before we begin, if that's acceptable.

2              MR. CROWL:  That's fine.

3              MR. VOGT:  Yes, Judge.

4              THE COURT:  But for the --

5              MR. CROWL:  I think it's important

6    when they ask a question it be answered right

7    away.

8              THE COURT:  I do too.  Except I'm not

9         going to ask the one question.  I will hold

10        it

11             MR. VOGT:  And the other one you're

12   gonna give --

13             THE COURT:  Yes.

14   (The following proceedings were held in open

15        court.)

16             THE COURT:  Mr. Smego, I'm going to ask you

17   a couple of questions for the jury.  And you may or

18   may not be able to answer.

19        Is there any record of Mr. Smego having an

20   allergic reaction to the Motrin he took of his own

21   accord?

22             THE WITNESS:  I don't think so, no.

23             THE COURT:  Why did he take the Motrin when

24   he said he was allergic to it?

25             THE WITNESS:  I don't think I ever

SMEGO - DIRECT                    821

1    knowingly took Motrin at the facility.

2              THE COURT:  How is it that Mr. Smego became

3    a full-time resident of Rushville?  And I will

4    answer this one.  He was civilly committed.

5         Was Mr. Smego a part-time resident?  He was

6    always a full-time resident.

7         There are two questions that cannot be answered

8    and that is because the only person whose rights are

9    at issue here are Mr. Smego's.

10        Why did Mr. Smego not complain or log paperwork

11   to see the dentist each week until he was seen?

12             THE WITNESS:  Did you say each week?

13             THE COURT:  Hm-mm.

14             THE WITNESS:  Well, I -- that would be

15   hounding staff.  That would just be making a

16   nuisance of myself.  And I had already been warned

17   about doing that.  And to further annoy the dentist,

18   I didn't see that making my situation any better.

19             THE COURT:  All right.  Follow-up,

20   Mr. Crowl.

21             MR. CROWL:  Okay.  Thank you, Judge.

22                  DIRECT EXAMINATION

23   BY MR. CROWL:  (CONT'D)

24        Q.  And in response to one of the juror's

25   questions, Mr. Smego, they were asking about Motrin.

SMEGO - DIRECT                              822

1    And you said you didn't knowingly take Motrin.

2         Tell the members of the jury about how it

3    worked with regard to Motrin?  I know there was some

4    records there where the staff at least had indicated

5    that you had been given Motrin.  Can you explain

6    that, please?

7         A.  Well, when you're -- when you're given a

8    couple of pills, if you're not a pharmacist or if

9    you don't know what they are, I mean you just take

10   the cup.  You trust in the person that's giving you

11   the cup.  They're not labeled or -- a lot of times

12   on a weekly basis the pharmacy that the facility

13   uses, or however that works, they're always changing

14   color and shape.  And whenever I ask they tell me

15   it's because it's a generic version or we've got a

16   different supplier or whatever.

17        So it's like you have to have faith in the

18   people that are giving you medication that they're

19   doing the right thing for you.

20        Q.  And explain when was the last time that you

21   believe you had an allergic reaction to Motrin?

22        A.  I wouldn't remember the exact date.

23        Q.  Was it -- was it before or while you were at

24   the Rushville treatment and detention facility?

25        A.  I have had reactions while at the Rushville

SMEGO - DIRECT                    823

1    facility.  And the last one was not more than a year

2    ago.

3         Q.  And another -- the jurors also asked a

4    question about why didn't you fill out paperwork

5    each week throughout the process of the last nine

6    years between December, 2005, and now.

7         Can you explain what you did do to make the

8    staff know that you had these dental issues, I guess

9    starting in December 13th, 2005?  Like what did you

10   do to ensure that Dr. Mitchell knew what the state

11   of your mouth was?

12        A.  Well, the -- starting December, 2005, the

13   first thing I did was saw Dr. Mitchell.

14        Q.  And that was the December 13th, 2005 visit

15   where she had identified 12 cavities; is that right?

16        A.  That's right.  And moving forward from them,

17   during medication line and stuff I would be

18   communicating with the nurses.  And I would agree

19   that filling out a healthcare request and alerting

20   like the foot doctor if I had, say, athlete's feet

21   and he needed to know about it because my feet were

22   itching, that I needed treatment to alert the foot

23   doctor that something was going on with my feet,

24   that would a prudent move that I should do that.

25        But if I was already seeing the foot doctor and

SMEGO - DIRECT                          824

1    he knew that I had an issue, I can just tell staff

2    that I need more cream or I need -- you know, it's

3    an ongoing problem, it's an ongoing condition,

4    everyone already knows about it.

5        Q.  And over those nine years you actually were

6    in the chair with Dr. Mitchell what, fourteen times;

7    is that right?

8        A.  Many occasions.

9        Q.  And obviously all of those weren't in

10   reaction to a healthcare request form because you

11   filled out three of those forms; is that right?

12       A.  Correct.

13       Q.  Okay.  In fact, why don't we look at the

14   three that you did fill out, just to see -- in

15   addition to how she diagnosed you in December of

16   2005, the other ones that you had filled out.

17       And again, we've already established all the

18   different times you were in her chair over these

19   years.

20       Let me hand to you Plaintiff's Exhibit 35 if I

21   may.

22       We'll offer 35.  This is a healthcare request

23   form that you filled out; is that right, Mr. Smego?

24       A.  That's correct.

25           MR. CROWL:  We would offer Plaintiff's

SMEGO - DIRECT                          825

1    Exhibit 35, Judge.

2            THE COURT:  Any objection?

3            MR. VOGT:  No, Judge, no objection.

4            MR. CROWL:  May we show the jury?

5            THE COURT:  You may.  It's admitted and so

6    marked.

7        (Plaintiff's Exhibit 35 admitted.)

8    BY MR. CROWL:

9        Q.  So you'd already been seen numerous times by

10   Dr. Mitchell at this time; is that right?

11       A.  That's correct.

12       Q.  And this particular healthcare request form

13   was on August 12th of 2008.  Do you see that up

14   there in the corner?

15       A.  Yes.

16       Q.  Okay.  And in this form you say, "I would

17   like --" actually, can you read it since it's your

18   handwriting, sir.

19       A.  Yes.  (As read)  "I would like to keep and

20   get an order for a painkiller to handle the pain of

21   a tooth that is now literally falling apart.  The

22   dentist has already told me she could not see me

23   again until September sometime.  I cannot take

24   Motrin as I indicated in the past and as is listed

25   on my dental charts."  And then I signed it.

SMEGO - DIRECT                           826

1      Q.  Then you signed it.  And when you said your

2  tooth was falling apart, which tooth were you

3  referring to there?

4      A.  That was tooth No. 7, the one right under my

5  eye by my nose.

6      Q.  Okay.  And then I want to show you another

7  healthcare request form that you completed.  This is

8  Plaintiff's Exhibit 36.

9      Is this another healthcare request that you

10  completed?

11      A.  Yes, it is.

12          MR. CROWL:  Judge, we offer Plaintiff's

13  Exhibit 36.

14          THE COURT:  Any objection.

15          MR. VOGT:  No objection.

16          THE COURT:  It's admitted and so marked.

17      (Plaintiff's Exhibit 36 admitted.)

18  BY MR. CROWL:

19      Q.  And this one is March 28th of 2011; is that

20  right?

21      A.  That's correct.

22      Q.  Okay.  And this is a form that we haven't

23  gotten to time-wise yet, because if I recall, when

24  we -- when we finished yesterday it was September of

25  2008, and she had just put the packing in on your

SMEGO - DIRECT                              827

1    front teeth and left it unfinished; is that right?

2        A.  Correct.

3        Q.  Okay.  So this is a healthcare request form

4    that then comes later; we'll talk about it in

5    context in a second.  But would you tell the members

6    of the jury what this one says?

7        A.  (As read)  "Seen dentist for five hours on

8    3/27/2011.  Today I requested Security Therapist

9    Aide Markley call healthcare for me and he did.  I

10   reported that last night and still ongoing my face

11   is swollen and painful.  This included my upper lip,

12   nose area around my eyes.  And there is a constant

13   discharge of clear liquid or blood from my nose.  I

14   was not given any prescription for pain and this

15   condition is painful and easy to see.  The

16   suggestion offered to STA Markley of cold rags is

17   something I've been doing since last night, cold,

18   wet towels, and it has not fixed anything.  This

19   condition is painful and it has not eased up yet.  I

20   need to get the swelling down, do something about

21   the pain and numbness, and get something -- get some

22   relief for the constant discharge that has kept me

23   up all night.  It is also painful to move my jaw and

24   movement is limited."  And then I signed it.

25       Q.  And there's actually another healthcare

SMEGO - DIRECT                                    828

1    request form that you filled out.  And this one was

2    even earlier than that last one.  Let me show you

3    this one as well, this is Plaintiff's Exhibit 34.

4        Is this yet another healthcare request form

5    that you filled out, sir?

6        A.  Yes, it is.

7        Q.  Judge, we will offer Plaintiff's Exhibit 34

8    also, please.

9            THE COURT:  Any objection?

10           MR. VOGT:  No, Judge.

11           THE COURT:  It's admitted and so marked.

12       (Plaintiff's Exhibit 34 admitted.)

13       Q.  And so this one was actually back on

14   April 30th of 2008.  And that's your signature there

15   as well; is that right?

16       A.  Yes.

17       Q.  Okay.  And if you would read for the members

18   of the jury what this one says?

19       A.  It's addressed to the dentist.  The very top

20   line says dentist.  This says: (As read) "Temp

21   filling done 7/23/07 fell out, still missing.  You

22   never called me back to put permanent filling in.

23   Have been having a lot of pain in that area.  When

24   you put in temp filling you told me it was medicated

25   and you would call me back in for permanent filling

SMEGO - DIRECT                    829

1   in a few weeks.  It has been almost a year and the

2   tooth now seems to be at risk of loss like the other

3   and is painful all the time."

4       Q.  And what tooth were you referring to there?

5       A.  That was tooth No. 31, the one that was on

6   the bottom.

7       Q.  And so you had your session with

8   Dr. Mitchell in December of 2005, and you spoke with

9   her each time on the fourteen instances when she had

10  you in the chair; is that right; over the years?

11      A.  That's correct.

12      Q.  Okay.  And have your cavities still been

13  filled?

14      A.  Not all of them, no.

15      Q.  So let's go back to where we had left off

16  yesterday, Mr. Smego, it was September of 2008.  Do

17  you recall?

18      A.  Yes.

19      Q.  And you had told the jury that she had put

20  in the filling materials in the back of your front

21  teeth, but it hadn't been finished; is that right?

22      A.  Correct.

23      Q.  And what did she tell you when she left that

24  evening?

25      A.  Well, she told me she had to leave, but that

SMEGO - DIRECT                    830

1    she'd finish it up the next weekend.  She'd call me

2    back down.

3         Q.  Okay.  That was September of 2008.  And then

4    when was it the next time that you saw Dr. Mitchell?

5         A.  October, 2010.

6         Q.  So that was two and a half years later; is

7    that right?

8         I'm sorry, it was more than two years later.

9    Not quite two and a half?

10        A.  Yeah, I was trying to do the math.  But it

11   was over two years, yes.

12        Q.  And explain what the condition was of those

13   unfinished front teeth during that two year period?

14        A.  Misshapen, with globs of stuff.  I

15   couldn't -- like I said, I couldn't floss between

16   them because nothing would fit between them.

17        And there was catches.  I don't know -- I don't

18   mean to be crud, but anybody that's ever had

19   anything stuck to your teeth while you're eating, it

20   almost like a natural reflex you use your tongue to

21   try to move things along.  And if I would do that I

22   would either scuff up or cut my tongue.

23        And the backside of the one tooth between the 7

24   tooth and I guess it would be 8, it was really

25   sensitive to touch.

SMEGO - DIRECT                      831

1        And it was just really awkward to eat with them

2   because -- your teeth fit together.  I never really

3   paid attention to it before I had that work done.

4   But when you close your mouth, you know, your

5   front -- the bottom teeth fit in your bottom teeth.

6   And my teeth didn't do that no more because there

7   was that extra buildup back there.

8        Q.  And you mentioned you attempted to floss,

9   but it wasn't easy.  While at Rushville did you

10  actually get access to dental floss?

11       A.  Yes, I did.

12       Q.  And while you were at Rushville did you

13  attempt to brush and floss regularly?

14       A.  Yes.

15       Q.  So at -- as of October, 2010, the front

16  teeth are not finished yet.  What is the state of

17  your cavities in your mouth?  Like how many do you

18  have or can you recall?

19       A.  I'd have to sit down and figure it out.  I

20  had at least a half a dozen.

21       Q.  And so then tell us what happened in October

22  of 2010?

23       A.  I get called back down to the dentist for, I

24  think it was an annual exam.

25       Q.  So you see Dr. Mitchell for the annual

1   examination.  What do you recall her saying and what

2   did you say?

3        A.  Well, I complained about my teeth,

4   especially the front teeth.  And I had mentioned

5   again that I was expecting to see her a lot sooner,

6   you know, a couple years sooner, because she was

7   gonna call me back down almost, you know, was the

8   next week I was expecting to see her.

9        And I mentioned that the teeth had been a

10  problem for me.  And over that two year period it

11  was really hard to eat with the teeth.  I was very

12  careful when I ate because it seemed like they could

13  break.  It was one of the fears I had, was breaking

14  the teeth off.  And I had a fear of being able to

15  get to a dentist if that were to happen.

16       But she looked at me, conducted an annual exam,

17  and then told me she wouldn't be able to see me

18  until March of the next year because she was gonna

19  be gone for medical leave and she wasn't gonna be at

20  the facility.

21       Q.  When Dr. Mitchell had you in the chair in

22  October of 2010, did she fill any of your cavities?

23       A.  No.

24       Q.  Did she finish the job that she had said she

25  would finish that went back two years on your front

SMEGO - DIRECT                    833

1    teeth?

2         A.  No, she did not.

3         Q.  Oh, by the way, the entire time that you

4    were under Dr. Mitchell's care, did she ever give

5    you any even simple directions on brushing and

6    flossing?

7         A.  No.

8         Q.  Did she ever instruct you on how to improve

9    your oral hygiene?

10        A.  Never.

11        Q.  Did she ever give you any educational

12   pamphlets or instructions on oral hygiene?

13             MR. VOGT:  Objection, Judge.

14             THE COURT:  The objection is overruled.

15        A.  No.

16        Q.  Did she ever give you any diet or

17   nutritional counseling regarding your dental care?

18        A.  No.

19        Q.  Did she ever give you any oral hygiene

20   instructions at all?

21        A.  No.

22        Q.  Did she ever counsel you in the role that

23   diabetes can play in dental issues?

24        A.  Never.

25        Q.  So we just talked about the October, 2010

SMEGO - DIRECT                    834

1  time when you were in her chair.  When was the next

2  time you were in Dr. Mitchell's chair?

3       A.  It was March of 2011.

4       Q.  So that was approximately four months later;

5  is that right?

6       A.  Yes.

7       Q.  And over five years since she had first

8  diagnosed your 12 cavities; is that right?

9       A.  Correct.

10      Q.  And tell us what happened during that dental

11 visit.

12      A.  That was an odd visit.  It began like most

13 visits, you sit in the chair.  There were people

14 there.  Dr. Mitchell was there, I was there, I

15 remember other residents, I remember there being a

16 dental assistant.

17      Mostly I remember Dr. Mitchell.  She looked at

18 my teeth first and then there was another patient

19 that she was working on.  And she had made some

20 comments about my pain.  And they -- they were kind

21 of odd comments, but they were about pain.

22      And then she had told me that she was gonna

23 replace the fillings up front and take a look at

24 some other teeth.  And told me she was gonna numb me

25 up.

SMEGO - DIRECT                    835

1          Q.  And did she in fact give you numbing, some

2    sort of novocaine?

3          A.  Yeah, she did some injections of novocaine

4    or lidocaine or whatever it is they inject you with.

5          Q.  And what happened next?

6          A.  After the injections?

7          Q.  Yes.

8          A.  She removed all my filings up in the front

9    and took out a bunch of fillings in the back and the

10   side of my mouth.

11         Q.  And when she did that did she replace those

12   front fillings in a different way than how she had

13   done over two years before?

14         A.  Yeah, she did.

15         Q.  How did she do it this time?

16         A.  There much like normal teeth now.  I mean

17   they're -- they're, you know, greatly improved from

18   what they were.

19         Q.  And so they were, in your eyes, finished; is

20   that right?

21         A.  Yeah, these are acceptable.  I could live

22   with these.

23         Q.  And we saw one of the healthcare request

24   forms that you filled out relating to some pain that

25   took place right after that visit?

SMEGO - DIRECT                    836

1          A.  Yes.

2          Q.  Okay.  And have you received annual

3    examinations from Dr. Mitchell since then?  Since

4    this visit --

5          A.  Yes.

6          Q.  -- you had in March of 2011?

7          A.  Yes.

8          Q.  Has she ever filled the remaining cavities

9    in your mouth?

10         A.  No.

11         Q.  How many unfilled cavities do you believe

12   you have in your mouth still?

13         A.  I think it's three, maybe four.  Three for

14   sure, I think.

15         Q.  And those were three of the original

16   cavities that she had diagnosed in 2005; is that

17   right?

18         A.  Correct.

19         Q.  Which is now over nine years ago; is that

20   right?

21         A.  Yes.

22         Q.  And Mr. Smego, would you please tell the

23   members of the jury what you want to accomplish in

24   this lawsuit?

25         A.  I want --

1            MR. VOGT:  Objection, Judge.

2            THE COURT:  The objection is sustained.

3            MR. CROWL:  Okay.  No further question,

4    Judge.

5            THE COURT:  Mr. Vogt.

6            MR. VOGT:  Thank you, Judge.

7                    CROSS EXAMINATION

8    BY MR. VOGT:

9       Q.  Good morning, Mr. Smego.

10      A.  Good morning.

11      Q.  How are you today?

12      A.  I'm well.

13      Q.  Now, Mr. Smego, I want to make sure we're

14   clear about your situation.  You are being detained

15   by Department of Human Services; is that correct?

16      A.  Correct.

17      Q.  One quick thing, by the way.  On multiple

18   occasions today I note that when you were asked

19   questions; and yesterday too, I apologize; when you

20   were asked questions, you would look up when you

21   were thinking?

22      A.  Sure.

23      Q.  And as you saw, that's the same thing

24   Dr. Mitchell does when she testified?  Do you

25   remember seeing that?

SMEGO - CROSS                          838

1           A.  I wasn't able to see all the way from over
2     there.
3           Q.  I apologize, I apologize.  If someone should
4     happen, as a reaction, just to look up when they're
5     thinking, nothing wrong with that; right, sir?
6           A.  I would imagine not.
7           Q.  Because you're not rolling your eyes at me,
8     are you?
9           A.  I haven't rolled my eyes at you, no.
10          Q.  Okay.  Just want to make sure.
11          Now, going back to your situation, you are
12    detained by the state; correct?
13          A.  Correct.
14          Q.  That's against your will?
15          A.  Yes.
16          Q.  You cannot leave the DHS?
17          A.  No.
18          Q.  Is it a secure facility?
19          A.  Yes.
20          Q.  Now, we've heard throughout the course of
21    this trial that the Rushville facility is entitled
22    the Rushville Treatment and Detention Facility; is
23    that your understanding?
24          A.  Yes.
25          Q.  Okay.  So I'd like to just clear something

SMEGO - CROSS                    839

1   up.  You're a high school graduate, are you?

2       A.  I have a GED.

3       Q.  Okay.  Did you get that GED after you

4   arrived at Rushville?

5       A.  No.

6       Q.  Okay.  You got it before then?

7       A.  Yes.

8       Q.  All right.  You mentioned that you have

9   three years of college education?

10      A.  Yes.

11      Q.  Did you take those courses at Rushville?

12      A.  No.

13      Q.  Did you take any of the courses at

14  Rushville?

15      A.  No.

16      Q.  You've taken paralegal courses at Rushville?

17      A.  I've taken -- I took a correspondence course

18  at Rushville.

19      Q.  Okay.  And all I'm trying to do, sir, you

20  have -- I recall seeing that you have your paralegal

21  certificate from the State of Illinois?

22      A.  I don't think it's from the State of

23  Illinois or have anything to do with the State of

24  Illinois.

25      Q.  All right.

1          A.  I took a correspondence course through the

2    Stratford Institute, but it's not a college or any

3    kind of an accredited school of higher learning or

4    anything.  It's was just where you get books and

5    fill out tests and mail them in.

6          Q.  I'm sorry, sir, I apologize for referring to

7    the State of Illinois.  But what I meant to simply

8    say is while at Rushville, in an effort to increase

9    your knowledge, you read some books and took a test

10   in connection with becoming some type of paralegal;

11   is that fair enough?

12         A.  I've taken multiple studies.

13         Q.  Tell me about them.  In connection with your

14   stay at Rushville, what courses do you recall

15   taking?  Studies, that is.

16         A.  I've also become an ordained reverend.

17         Q.  Okay.

18         A.  I did do the paralegal think.  I have

19   completed safety and sanitation licensing for food

20   services for running a restaurant.  I'm certified in

21   floor maintenance.  And matter of fact, I've been

22   the lead floor care worker in the health department,

23   healthcare unit, since I think January of 2010.

24         Q.  Okay.  The bottom line is that while at

25   Rushville, it's very good, you've taken a variety of

SMEGO - CROSS                                    841

```
 1   different courses trying to expand your knowledge in

 2   a variety of different areas?

 3        A.  Correct.

 4        Q.  Okay.  And prior to coming to Rushville you

 5   had mentioned you took business courses in college?

 6        A.  Yes.

 7        Q.  And you ran a business for some ten years?

 8        A.  Yes.

 9        Q.  Okay.  Now, you're not taking any type of

10   psychotropic medications, are you?

11        A.  No.

12        Q.  You take no mental health medications;

13   correct?

14        A.  No, I do not.

15        Q.  The bottom line is the treatment that you

16   receive at the facility involves counseling you?

17   Talking?  You know -- I'm sorry.  Therapy,

18   counseling therapy where you talk to someone; is

19   that correct?

20            MR. CROWL:  Judge, I'm going to object to

21   going into any of his treatment apart from the

22   dental care.

23            THE COURT:  The objection is sustained.

24        Q.  Sir, you agree with me you suffer from no

25   mental illness or mental condition that affects your
```

SMEGO - CROSS                    842

1    thinking; true?

2          MR. CROWL:  Objection, Judge.  This case is

3    about the dental care he received and not about

4    anything related to other treatment.

5          THE COURT:  Well, that's true, but that's

6    not what this question is.  I'm going to overrule

7    the objection and allow him to answer.

8       Q.  Sir?

9       A.  One more time, please.

10      Q.  Sure, sure.  All I'm trying to establish,

11   sir, so the jury understands, is that as far as your

12   mental faculties are concerned, you suffer for no

13   mental illness or mental health condition that would

14   affect your thinking, do you?

15         MR. CROWL:  And again, Judge --

16         THE COURT:  Let's have a sidebar.

17      (The following sidebar discussion was held at

18         the bench, out of the hearing of the jury.)

19         MR. CROWL:  So my objection, Judge, is

20         he's diagnosed with generalized paraphilia.

21         And this is designed to invoke that.

22         MR. VOGT:  No, it is not.

23         MR. CROWL:  He can not give a truthful

24         answer to that question, Judge, without --

25         THE COURT:  I agree.  You need to

1          rephrase it.  I think you can go where

2          you're going.

3              MR. VOGT:  All right.  I'm just trying

4          to make sure that the jury doesn't believe

5          that he's any type of mentally ill or

6          anything like that.

7              THE COURT:  Well, there is a

8          diagnosis.  I think what you need to ask

9          him is whether he can -- he knows the

10         difference between right and wrong.

11         Whether he understand.

12             MR. CROWL:  The questions and that

13         sort of thing.

14             MR. VOGT:  All right.

15             MR. CROWL:  And it should be limited,

16         Judge.

17             THE COURT:  He's right?

18             MR. CROWL:  It shouldn't be --

19             MR. VOGT:  I don't want to go into --

20             THE COURT:  Right.

21         (The following proceedings were held in open

22         court.)

23             THE COURT:  If you'll rephrase the

24    question, please.

25    BY MR. VOGT:

SMEGO - CROSS                              844

1          Q.  Sure, Judge.

2          Sir, I ask you this question:  Would you agree

3     that the jury should look at you just like any other

4     normal person?

5          A.  Correct.

6          Q.  Okay.  Because you're not entitled to any

7     type of special consideration here, are you?

8          A.  No.

9          Q.  And you are responsible for your own

10     decisions and you can make your own decisions?  And

11     you always at Rushville have made your own

12     decisions.  True, sir?

13          A.  Sure.

14          Q.  Okay.  Now, as far as the defendants in this

15     case, sir, you agree DHS is not a defendant?

16          A.  Correct.

17          Q.  Addus is not a defendant?

18          A.  Correct.

19          Q.  Wexford is not a defendant?

20          A.  Correct.

21          Q.  And the nurses at the Rushville facility who

22     prepare the lists for the doctors, both Dr. Lochard

23     and Dr. Mitchell, none of them are defendants?

24          A.  Correct.

25          Q.  The only defendant in this case is

SMEGO - CROSS                                    845

1   Dr. Mitchell; correct, sir?

2        A.  That would be correct.

3        Q.  Now, the healthcare requests; I know the

4   advantage of having you testify now is you've seen

5   all the exhibits, so I'll try to move quickly

6   without having to show them.

7        Let me ask you this, sir:  With all of the

8   residents at Rushville, the only way the healthcare

9   staff is going to know about a problem that you

10  might be suffering from or that you might have

11  developed is if you fill out a healthcare request

12  and alert them to it; correct?

13       A.  If it's a new problem that would be correct.

14       Q.  Sir, have you ever testified differently?

15       A.  I don't think I have.

16       Q.  Okay.  May I have a moment, Judge?

17            THE COURT:  You may.

18       Q.  All right, I'm sorry, sir.

19       You recall you and I met previously at your

20  deposition at Rushville?

21       A.  At least twice.

22       Q.  All right, I'm sorry.

23       And the deposition was taken with a court

24  reporter and you were sworn under oath to tell the

25  truth?

SMEGO - CROSS                          846

1        A.  On two occasions, yes.

2        Q.  Yes, sir, I'm sorry.

3        And when you testified under oath, did you tell

4   in fact the truth when your were asked questions

5   under oath?

6        A.  Yes, I did.

7        Q.  All right.  Well, at that deposition at page

8   72, I asked you the following question and you gave

9   the following answer:  (As read)

10       "Because the idea is that, you know, with all

11  of the residents, the only way the healthcare staff

12  is going to know about a problem that you might be

13  suffering from or that might have developed is if

14  you fill out a healthcare request and alert them to

15  that, right?"

16       And your answer was:  "Correct."

17       Do you remember giving that testimony, sir?

18       A.  Yes, I do.

19       Q.  Okay.  Because your experience at Rushville

20  has always been that you will fill out a request;

21  true?

22       A.  For each new occurrence, yes.

23       Q.  Do you remember giving this testimony, on

24  page 73.  Same deposition: (As read)

25       "My experience here has always been that you

SMEGO - CROSS                           847

1    fill out a request."

2         Do you remember saying that, sir?

3              MR. CROWL:  Objection.  He should read the

4    entire response, not just the first sentence.

5         Q.  Sure, I'll do that, Judge.

6         Your testimony was -- I asked you: (As read)

7         "What's been your experience?"

8         And you said:  "My experience here has always

9    been that you fill out a request.  You know, you can

10   fill out the request or you can tell the nurse at

11   medical line because there's med lines that are on

12   your unit.  The nurses are present on the units at

13   8:00 a.m. in the morning, 1:00 in the afternoon,

14   4:00 in the afternoon, and 8:00 at night."

15        Do you recall giving that testimony, sir?

16        A.  Yes, I gave you that answer.

17        Q.  Okay.  And once you filled out a healthcare

18   request, sir, it has been your experience at

19   Rushville that after filling out the healthcare

20   request form you are run down to the medical unit

21   and in fact examined by the doctor; true?

22        A.  Yes.

23        Q.  That's happened in your situation; correct,

24   sir?

25        A.  Yes.

1      Q.  And we agree you have an obligation to

2   submit a healthcare request form if you have a

3   problem, don't you?

4      A.  Yes.

5      Q.  Okay.  Now, you mentioned a few moments ago

6   a podiatrist and things like that.  Let me ask you

7   this:  Do you agree, sir, that if you're suffering

8   from a medical or dental problem, you should take

9   steps to try to get help for that problem?

10     A.  Of course.

11     Q.  All right.  With a vision -- for example, I

12  saw you were wearing glasses.  If you have a problem

13  with your vision, you would ask to be seen by the

14  optometrist; correct?

15     A.  Sure.

16     Q.  And you mentioned the podiatrist.  If you

17  have a problem with your feet, you would submit a

18  healthcare request asking to be seen by the

19  podiatrist?

20     A.  Yes.

21     Q.  Now, you saw Dr. Lochard testify you have

22  diabetes, hypertension.  If you have a problem with

23  one of those things you would ask to be seen by Dr.

24  Lochard by submitting a healthcare request form?

25     A.  Yes.

1        Q.  And the same with the dentist.  If you had a

2   dental problem, you know, of course, that you would

3   submit a healthcare request form to be seen by the

4   dentist; correct?

5        A.  That's an option, yes.

6        Q.  Because you've seen the resident handbook

7   many times, have you not, sir?

8        A.  Yes, I've seen them all.

9        Q.  Okay.  And you know -- you know what the

10  resident handbook says and I'll just read it to you.

11  (As read)  "If you need to see the doctor, nurse,

12  dentists, eye doctor, or foot doctor, please fill

13  out a healthcare request form."  Correct, sir?

14       A.  Yes.

15       Q.  And that's the policy that applies to all

16  residents at Rushville, wouldn't you agree?

17       A.  Those that are literate, yes.

18       Q.  All right, I'm sorry.  Again, sir, forgive

19  me, but as far as we're concerned in your case,

20  you're fully literate; right?

21       A.  Yes.

22       Q.  You understand all of the policies and

23  procedures in this case; correct, sir?

24       A.  Yes.

25       Q.  You have no difficulty grasping all of the

1    requirements that are made upon you as a resident at

2    Rushville; correct, sir?

3          A.  That's correct.

4          Q.  So going back to this.  All of the residents

5    at Rushville, if they would like to see the doctor,

6    nurse, dentists, eye doctor, or foot doctor, should

7    fill out a healthcare request form; true?

8          A.  True.

9          Q.  Okay.  And you've -- now, from 2002 to 2005,

10   you were not in the DHS; is that correct, sir?

11         A.  Yes.

12         Q.  And during that period of time you didn't

13   see anyone -- you didn't seek out and receive any

14   dental care, did you?

15         A.  Just on one occasion.

16         Q.  That was for an exam I think you said?

17         A.  Correct.

18         Q.  All right.  Do you remember when that was

19   between that area of time?

20         A.  I can't remember, no.

21         Q.  Okay.  But during that period of time from

22   2002 to 2005, when you were not with the DHS, if you

23   needed to see the dentist you would have to make an

24   appointment; correct, sir?

25         A.  Correct.

SMEGO - CROSS                         851

1          Q.  And out in the outside world, if you will,

2     if you wanted to make an appointment with a dentist

3     you would probably pick up the phone and make a

4     phone call; right?

5          A.  Yeah.

6          Q.  That was -- that's the recognized mode of

7     communication to reach out to a dentist is a phone

8     call; right?

9          A.  Yeah, you just talk to them, yes.

10         Q.  Now, at Rushville the recognized mode of

11    communication that you should use as a resident

12    there, as we just discussed, is the healthcare

13    request form; correct, sir?

14         A.  Yes.

15         Q.  Now, sir, you suggested a few moments ago

16    that Dr. Mitchell should have done something in

17    connection with your diabetes; do you remember that?

18    Education or something I think you said.

19         A.  I remember I answered a question about it;

20    yes.

21         Q.  Okay.  Now, sir, you are fully aware of

22    diabetes, correct?  You've had it for many years,

23    correct?

24         A.  Well, I've been -- I've been taking insulin

25    and actually eating as a diabetic probably since

1    2008.  Summer, I don't know.

2        Q.  Initially, sir, as you saw Dr. Lochard

3    testify, you were on oral diabetic medications;

4    right?

5        A.  At the very beginning, yes.

6        Q.  Yes.  And then as you recall from seeing the

7    medical records and seeing -- hearing Dr. Lochard's

8    testimony, there was a period of time when you

9    decided not to take your oral diabetic medications.

10   Do you recall --

11       A.  That's true, yes.

12       Q.  And then -- and that was a lengthy period of

13   time; over a year; wasn't it, sir?  16 months, I

14   believe?

15       A.  I don't remember the period, but I

16   remember -- yes.

17       Q.  Okay.  And then when you got back on the

18   track with regard to diabetes, you then became an

19   insulin dependent diabetic; isn't that true?

20       A.  Yes.

21       Q.  In fact, your condition has worsened because

22   you had failed to take your medication for so long;

23   isn't that true, sir?

24       A.  I can't confirm or deny that.  I've never

25   had nobody tell me that.  That's your statement.

SMEGO - CROSS                                853

1         Q.  Well, what we can say, and I think what we

2    can agree on, is that you stopped taking your

3    diabetic medication for a lengthy period of time and

4    then subsequent to that you became insulin

5    dependent; true?

6         A.  Yes.

7         Q.  Okay.  And you also, as you saw from Dr.

8    Lochard's testimony and you saw on the MAR, the

9    medication administration record, you also stopped

10   taking your hypertension medication for a lengthy

11   period of time.  Do you remember that?

12        A.  Yes.

13        Q.  All right.  Now, sir, those decisions were

14   your's?

15        A.  True.

16        Q.  You decided that you didn't want to take

17   your diabetic medications so you stopped taking

18   them, free and voluntary decision by yourself;

19   correct?

20        A.  Correct.

21        Q.  The same with the hypertension medication,

22   free and voluntary decision by yourself?

23        A.  Yes.

24        Q.  And you know that by not taking your

25   diabetes medication your blood sugar would have went

SMEGO - CROSS                            854

1    through the roof; correct, sir?

2         A.  I can't say what it did.

3         Q.  All right.  Let me ask you this:  We can

4    agree that when you're a diabetic, if you don't take

5    your medication your blood sugar level is going to

6    rise?  Certainly we can agree on that; correct, sir?

7         A.  It's possible, yes.

8         Q.  And you know that when you have all that

9    sugar in your system, all that sugar in your mouth,

10   we can agree that sugar is not good for your teeth;

11   right, sir?

12        A.  Yes.

13        Q.  All right.  And again, the decision not to

14   take diabetes and to have that negative impact on

15   yourself was solely and exclusively your decision;

16   correct, sir?

17        A.  Yes.

18        Q.  And can we agree, sir, to treat diabetes,

19   for any doctor to do anything for diabetes,

20   Dr. Mitchell could have told you anything on earth,

21   it would have made no difference if you didn't take

22   your medication; correct?

23        A.  That would be true, yes.

24        Q.  Okay.  Now, you saw Dr. Mitchell in

25   December 13th, 2005, and during all of 2006 you

SMEGO - CROSS                              855

1    never saw her; correct?

2        A.  Yes.

3        Q.  And, sir, just to make sure we're clear, you

4    can fill out a healthcare request at any time;

5    correct?

6        A.  Yes.

7        Q.  All of the doctors, all of the nurses, all

8    of the medical professionals at the facility are

9    fully aware that the policy at Rushville is that

10   residents can submit healthcare requests; right?

11       A.  Yes, they can.

12       Q.  And -- because you mentioned something about

13   being a pest or something; I can't remember what you

14   said.  But the bottom line is you're not suggesting

15   anyone at Rushville ever told you that you couldn't

16   submit a healthcare request if you were having a

17   problem, are you?

18       A.  Yes, I am.

19       Q.  All right.  Well, let's talk about that

20   then.  During 2006, we'll start there, you could

21   have prepared and submitted a healthcare request to

22   see the dentist; right?

23       A.  I could have.

24       Q.  And during 2007, you could have submitted a

25   healthcare request to see the dentist; right?

SMEGO - CROSS                          856

1          A.   Yes.

2          Q.   Any time during 2008, you could have

3     submitted a healthcare request to see the dentist;

4     right?

5          A.   Could have and did.

6          Q.   And in 2009, you could have submitted a

7     healthcare request?

8          A.   Could have.

9          Q.   In 2010?

10         A.   I could have.

11         Q.   During 2011, '12, '13, '14, and '15;

12    correct, sir?

13         A.   Yes, correct.

14         Q.   At any time during any of those years you

15    had the absolute right at Rushville to submit a

16    healthcare request saying, "I would like to see the

17    dentist?"

18         A.   True.

19         Q.   And it's your obligation; right?

20         A.   I don't know if I would say obligation on a

21    condition that's already been diagnosed.  But I

22    could have filed a healthcare request.

23         Q.   The resident handbook that we've gone over;

24    I'm sorry; a hundred times in this trial, says if

25    you need to see the dentist, simply fill out a

SMEGO - CROSS                          857

1    healthcare request form; right, sir?

2        A.  Yes, it does.

3        Q.  There's nothing in here about any other

4    proposition.  If you need it, do it; right?

5        A.  That's what it says, yes.

6        Q.  And it takes only a few seconds, what 30

7    seconds.  "My teeth hurt," is all you'd have to say;

8    right?

9        A.  Yes.

10       Q.  Doesn't cost anything?

11       A.  No.

12       Q.  It's not a burden?

13       A.  No.

14       Q.  You can give them to a nurse, you can put it

15   in a lockbox, you can do all kinds of things to

16   communicate the need through a healthcare request

17   form?

18       A.  There's many avenues of communicating it;

19   you're correct.

20       Q.  Okay.  Now, a couple quick things.  You're

21   not disputing any of the records in this case, are

22   you, sir?

23       A.  I think the way they've been presented here

24   is accurate; yes.

25       Q.  Okay.  And now every time -- you mentioned

1    the three healthcare request forms; we saw them

2    today; with regard to dental care.  Do you recall

3    talking about them with your attorney?

4         A.  These requests right here?

5         Q.  Yeah.

6         A.  Yes.

7         Q.  And on each occasion when you submitted

8    healthcare requests, in fact your concerns were

9    addressed in response to your healthcare request;

10   right?

11        A.  Those that were on the paper, yes.

12        Q.  Okay.

13        A.  Sort of.

14        Q.  Every time you submitted a healthcare

15   request regarding a dental issue, you were seen by

16   Dr. Mitchell; isn't that true?

17        A.  Yes.

18        Q.  Okay.  So let's -- let's talk about this,

19   sir.  If you had submitted a healthcare request in

20   2006, we can agree Dr. Mitchell may have seen you;

21   right?

22        A.  She may have.

23        Q.  If you had submitted a healthcare request in

24   2007, Dr. Mitchell may have seen you; right?

25        A.  She may have.

SMEGO - CROSS                    859

1        Q.  If you submitted a healthcare request in

2    2008, '9, '10, '11, '12, '13, '14, '15, any of those

3    years, if you had submitted a healthcare request,

4    Dr. Mitchell may have seen you; correct?

5        A.  All of those things may have been possible.

6        Q.  Right.  And we can only say may as being

7    fair because you didn't do it; right?

8        A.  Correct.

9        Q.  Okay.  And we talked, as you saw on the

10   forms; and I'm trying to move as quickly as I can --

11       A.  Okay.

12       Q.  The attempt to resolve.  Did you see the

13   forms for that, sir?

14       A.  The actual attempt to resolve?

15       Q.  Yes.  You're familiar with --

16       A.  Just hold it up so I can see it.

17       Q.  May I approach the witness?

18          THE COURT:  You may.

19       Q.  Let me refresh your recollection.

20       A.  This.  Yeah, okay.

21       Q.  This is resident attempt to resolve problems

22   complaint forms, Step 1?

23       A.  Yes.

24       Q.  You're familiar with that, are you not?

25       A.  Yes, I am.

SMEGO - CROSS                                    860

1          Q.  You have filed many of those in your day,

2     have you not?

3          A.  I've filed a few, yes.

4          Q.  Okay.  So you know how to fill out the form

5     and everything like that; right?

6          A.  Yes, I do.

7          Q.  And you have followed that process; correct?

8          A.  Yes, I have.

9          Q.  And you recognize that under, again, the

10    Rushville policy, the resident should attempt to

11    resolve any concerns or complaints directly with the

12    person involved before filling a formal grievance;

13    right?

14         A.  True.

15         Q.  Okay.  And the whole idea behind the attempt

16    to resolve is to resolve a problem; right, sir?

17         A.  Right.  The whole concept is to talk with

18    the person to make sure that that person knows what

19    the problem is.

20         Q.  All right.  Let me show you something, sir.

21         Okay, I'm sorry, sir.  This, by the way --

22         Okay, this is Defendant's Exhibit 12, sir.  And

23    this is the form we just discussed a moment ago, the

24    resident attempt to resolve problems complaints

25    forms.  Do you see that, sir?

SMEGO - CROSS                        861

1        A.  Yes.

2        Q.  And it says this form must be completed

3   before filling a grievance.  Do you see that?

4        A.  Yes, I do.

5        Q.  And you have filled this form out yourself

6   on several occasions; correct, sir?

7        A.  The newer version of the form, but it has

8   the same language; yes.

9        Q.  Okay.  And now you'll note on there, sir,

10  you see the reference to Illinois Statute, Title 59,

11  Illinois Administrative Code?

12       A.  Yes.

13       Q.  It says:  (As read)  "Resident," that's

14  yourself, "shall first attempt to resolve problems

15  or complaints."

16       Do you see that, sir?

17       A.  Yes.

18       Q.  Now, this whole lawsuit is about a problem

19  or complaint you have with Dr. Mitchell; right?

20       A.  Yes.

21       Q.  And you know that under Rushville's policy

22  what you should do, and under the law of Illinois by

23  the way, what you should do is residents shall first

24  attempt to resolve problems or complaints.  Isn't

25  that what the policy says, sir?

SMEGO - CROSS                                    862

1        A.  That is I believe just before filling a

2    formal grievance.

3        Q.  Sir, I don't care if it's for a bird flying

4    across the sky.  I'm asking you if that's what the

5    policy requires you to do?

6        A.  That's what that says, yes.

7        Q.  All right, I'm sorry.

8        So again, the reason we're standing in this

9    courtroom is because you have a problem or complaint

10   with Dr. Mitchell; isn't that true?

11       A.  That is true.

12       Q.  And isn't it also true that the resident

13   attempt to resolve problems or complaints is for the

14   very specific purpose of trying to resolve that

15   issue?

16       A.  That is true.

17       Q.  And isn't it also true, sir, that if you had

18   filed one of these before, we wouldn't be here

19   today?

20           MR. CROWL:  Objection.

21           THE COURT:  Objection sustained.

22       Q.  Sir, if you had filed an attempt to resolve,

23   like the law required you to do, Dr. Mitchell may

24   have responded; right?

25       A.  It's possible.

SMEGO - CROSS                      863

1          Q.  Well, we don't know because you didn't file

2     it; right?

3          A.  I didn't filed one.

4          Q.  Right.  Just -- just to make sure; I'm

5     sorry.  You never filed a request to resolve with

6     Dr. Mitchell ever?

7          A.  No.

8          Q.  Okay.  So just to make sure we're clear; if,

9     in fact, the Illinois Administrative Code and the

10    attempt to resolve had been submitted by you,

11    Dr. Mitchell may have responded and may have taken

12    care of the whole issue; correct, sir?

13              MR. CROWL:  Objection, sir.  Same

14    objection.

15              THE COURT:  Objection is sustained.

16         A.  It's possible.

17         Q.  Okay.  Oh, by the way, same with the

18    grievance.  From 2008 until today's date, have you

19    ever filed a grievance against Dr. Mitchell?

20         A.  No.  Just this lawsuit.

21         Q.  Okay.  And you know that the purpose of

22    filling a grievance is to solve a problem; correct,

23    sir?

24         A.  Yes.

25         Q.  And again, just like we talked about the

SMEGO - CROSS                    864

1    attempt to resolve, if you had filed a grievance

2    against Dr. Mitchell earlier, she would have been

3    alerted to your problem and she would have maybe

4    taken care of your problem; correct, sir?

5        A.  Maybe, yes.

6        Q.  Okay.  In your -- in the complaint that you

7    filed in U.S. District Court, sir -- excuse, Judge.

8        I'm sorry, sir.  In the complaint that you

9    filed in United States District Court you stated:

10   (As read)  "DHS has an affirmative duty to provide

11   plaintiff with such care as is needed by the

12   plaintiff."

13       Do you remember saying that?

14       A.  I did.

15       Q.  Okay.  And sir, at Rushville right now there

16   are 550 residents?

17       A.  Roughly, yes.

18       Q.  Okay.  And you agree as far as the other

19   residents are concerned you are not entitled to

20   special or unique care, are you?

21       A.  No, I am not.

22       Q.  You are not entitled to be exempt from

23   Rushville's policies and procedures that we have

24   been talking about in this case, are you?

25       A.  I am not.

SMEGO - CROSS                          865

1        Q.  You should be treated the same as everyone
2   else?
3        A.  Yes.
4        Q.  And that's the great thing about the
5   healthcare request system, is that everyone gets
6   treated the same; isn't that true, sir?
7        A.  True.
8        Q.  Okay.  And, sir, as far as the nurses in
9   this case are concerned; we talked about how you
10  have no complaints about the nurses regarding dental
11  services; correct?
12       A.  True.
13       Q.  Okay.  And you agree that the nurses -- let
14  me make sure.  When it comes to dental care, do you
15  agree that the staff should prioritize the need for
16  treatment?
17       A.  Yes.
18       Q.  The most serious patients with the most
19  urgent concerns should be seen by the dentist first?
20       A.  Yes.
21       Q.  That's triage?
22       A.  Yes.
23       Q.  You understand that, don't you?
24       A.  Yes, I do.
25       Q.  So as a general rule of thumb you agree that

SMEGO - CROSS                                 866

1    the nurses should prioritize the patients at

2    Rushville and make sure that the residents with the

3    most serious needs are seen first; correct?

4         A.  Yes.

5         Q.  That's what they're suppose to do?

6         A.  Yes.

7         Q.  And the nurses have done that at Rushville

8    for both Dr. Mitchell and Dr. Lochard as you've seen

9    in this courtroom?

10        A.  To the best of my knowledge.

11             MR. CROWL:  Objection as to what they did

12   as to other particular residents at the facility.

13             THE COURT:  The objection is sustained.

14        Q.  And then the PRN medications, sir.  You're

15   familiar with what a PRN medication is?

16        A.  Yes.

17        Q.  PRN means you can take the medication as

18   needed; correct?

19        A.  Yes.

20        Q.  What you need to do in that instance is go

21   up and simply ask the nurse, may I have medication

22   A, medication B, or medication C, whatever it might

23   be; correct?

24        A.  Correct.

25        Q.  And you saw, sir, on the medication

1   administration record that we went over with Dr.

2   Lochard, there were months and months when you had a

3   PRN for aspirin and a PRN for Naprosyn.  Do you

4   recall that?

5        A.  Yes, I do.

6        Q.  And do you recall that during that period of

7   time you rarely if ever asked for those medications;

8   correct?

9        A.  Yes.

10       Q.  All right.  Now, sir, can we agree that if

11  you have pain, you would ask for pain medication?

12       A.  Yes.

13       Q.  And as you recall from reading -- watching

14  the MARs; I'm sorry; the only medication that you in

15  fact took for pain during that period of time, as

16  you saw yourself, was Motrin; isn't that right?

17       A.  That's what the chart said, yes.

18       Q.  Okay.  And again, you're not disputing the

19  records, are you, sir?

20       A.  I didn't hear you, I'm sorry.

21       Q.  You're not disputing the records, are you?

22  We talked about that already?

23       A.  The records?  One more time?

24       Q.  You're not disputing any of your medical

25  records or anything like that, are you, sir?

1    A.  No.

2    Q.  Okay.  So now one thing you mentioned a few

3  moments ago was that I thought you said something

4  about how you had an allergic reaction to Motrin in

5  2000 -- last year, you said.  Am I mistaken?

6    A.  I said I had an allergic reaction.

7    Q.  Oh, I'm sorry, I apologize.  I

8  misunderstood.

9    A.  Yes.

10    Q.  Your testimony today is that you've never

11  had an allergic reaction to Motrin at Rushville;

12  correct?

13    A.  Not that I know of.

14    Q.  Well, that's all I can ask, is what you

15  know, sir.

16    And you have no complaints or criticism about

17  Dr. Lochard, do you?  In connection with this case?

18    A.  No.

19    Q.  Now, the other thing was you mentioned with

20  regard to taking the Motrin that there were a bunch

21  of pills or something like that.  Am I mistaken; did

22  I misunderstand that?  Because Motrin was the only

23  pill you took that time; remember that?

24    A.  It depends on what date you're talking about

25  and what cup and --

SMEGO - CROSS                    869

1        Q.  All right, sir.  Well, let me show you the

2    medication administration record.  This is part of

3    Defense Exhibit 4 that was previously discussed by

4    Dr. Lochard, sir.  This is for the period August,

5    2007.  Do you see that, sir?

6        Are you able to see that, sir?

7        A.  I can see it, yes.

8        Q.  Okay.  The top medication as you can see is

9    aspirin, 325 milligrams?

10       A.  Okay, yeah.

11       Q.  And the bottom medication also highlighted

12   in yellow is Naprosyn.  Do you see that?

13       A.  Yes, I do.

14       Q.  And you've testified, sir, in this case,

15   that Naprosyn helps you with your dental pain if you

16   have dental pain; correct, sir?

17       A.  Yes, I've taken Naprosyn.

18       Q.  Okay.  Now, the entire month, as you can

19   see, you asked for the aspirin on three occasions.

20   Do you see that?  The 2nd, 3rd, and 4th of August?

21       A.  I see the marks there, yes.

22       Q.  And down on the bottom there is no marks in

23   connection with Naprosyn.  Do you see that, sir?

24       A.  I see that, yes.

25       Q.  All right.  Now, if we come over on the

SMEGO - CROSS                          870

1  second page of the medication administration record

2  in August, 2007, we have Motrin or ibuprofen.  Do

3  you see that?

4      A.  Yes.

5      Q.  And as you can see, you took it on the 25th,

6  26th, 27th, 28th, 29th, and 30th.  Do you see that,

7  sir?

8      A.  I see the initials, yes.

9      Q.  And the initials on the 30th, in fact,

10  reflect that you were administered ibuprofen or

11  Motrin three times?

12      A.  I see that, yes.

13      Q.  And there were no other medications at that

14  time that you were taking, sir; correct?  You

15  refused the others?

16      A.  Yes, I don't see anything else on that page.

17      Q.  Okay.  Well, here, let me just show you.

18  The orange medications, sir, are medications for

19  your diabetes and hypertension.  And as you can see

20  and as you've heard in this case, where the nurse

21  puts her initials in the box and circles it, that

22  reflects that you refused the medication; correct?

23      A.  I don't -- yeah, sure.  I don't know.  Yes.

24      Q.  And to get the Motrin then you'd have to go

25  up and say, "can I have some of my Motrin that Dr.

1    Lochard ordered for me;" correct?

2        A.  Sometimes -- yes, yes.  If it's a PRN you

3    have to request it; yes.

4        Q.  It was a PRN.  Just like Motrin was,

5    correct, sir?

6        A.  Yes, if that was a PRN you were looking at,

7    yes.

8        Q.  Okay.  Now, you mentioned something about --

9    today, about how you -- it was hard for you to eat.

10   Do you remember that testimony today?

11       A.  I remember testifying at some point today,

12   yes.

13       Q.  Okay.  Well, let's just make sure.  In 2005,

14   you weighed 223.1 points; correct, sir?

15       A.  I don't know what I weighed in 2005.  Sure,

16   yes.

17       Q.  Okay.  And again, sir, I asked you these

18   questions in your deposition.  If you'd like --

19       A.  When was this?

20       Q.  In 2010, I asked you about your weight for

21   2005, and you said that you -- you admitted you

22   weighed 221 points when you came in?

23       A.  Okay.  That was a while ago.  Yes.

24       Q.  I understand.  I understand.

25       By 2007 you weighed -- by 2007 you weighed 242.

1   And recently, in 2014, you weighed 248 pounds.  Do

2   you remember that?

3        A.  Yes.

4        Q.  Okay.  I mean, you know -- well, all right.

5        One of the major goals of the therapy that you

6   go through at Rushville is to impress upon you the

7   need for responsibility; isn't that true, sir?

8        A.  Sure, yes.

9        Q.  And do you agree that it is your

10  responsibility to submit a healthcare request if you

11  have a dental problem?

12       A.  It's my your responsibility to alert staff

13  to any problem; yes.

14       Q.  And it's responsibility to alert the staff

15  so they can respond to you; correct, sir?

16       A.  Yes.

17       Q.  You saw when you were sitting in the

18  courtroom the consent form that you signed for tooth

19  No. 2?

20       A.  Yes.

21       Q.  Now, tooth No. 2, sir, do you recall that

22  you developed two cavities in that tooth before it

23  was extracted?

24       A.  You said there were two cavities before it

25  was extracted?

SMEGO - CROSS                    873

1      Q.  Yes, correct.  You had the first small

2  cavity in 2005, you've testified?

3      A.  Right, right, right.

4      Q.  Now, do you understand, and you watched the

5  testimony in this case, that between 2005 and when

6  it was extracted, you developed a second cavity in

7  tooth No. 2; right?

8      A.  Correct.

9      Q.  All right.  And then Dr. Mitchell tried

10  drilling the cavity, tried to save tooth No. 2;

11  right?

12      A.  Yes.

13      Q.  And while she was trying to save it, trying

14  to fix it, trying to put a filling in it, the tooth

15  broke apart; true?

16      A.  True.

17      Q.  Okay.  And as a result of that she talked to

18  you about the need to extract the tooth and you

19  signed a consent form; correct, sir?

20      A.  Yes.

21      Q.  Okay.  Now, as far as the -- as far as

22  Tylenol is concerned, sir, are you allergic to

23  Tylenol?

24      A.  No, I'm not.

25      Q.  All right.  May I have a moment, Judge?

SMEGO - CROSS                    874

1              THE COURT:  Yes.

2         Q.  All right, sir.  Previously in this case,

3    back on May 9th, 2010, do you recall submitting an

4    affidavit?

5         A.  When?

6         Q.  May I approach the witness, Judge?

7              THE COURT:  You may.

8         Q.  Let me show you, sir.  First of all, it

9    says:  Affidavit of Plaintiff Richard M. Smego.

10        Here, take a look, take a look, I'm sorry.  See

11   if that's what I think it is.

12        A.  Oh, this is from summary judgement, I

13   believe.

14        Q.  All right.  May I see it, sir?  I just want

15   to ask you one quick question -- oh, by the way,

16   this last page, that's your signature; correct?

17        A.  Yes.

18        Q.  All right.  And what you said here is:  (As

19   read)  "I do hereby verify and certify that all

20   statements set forth herein are true and correct to

21   the best of my knowledge and belief both in

22   substance and in fact."

23        And then you had it notarized?

24        A.  Correct.

25        Q.  All right.  Now, in Paragraph 7 of that

1    affidavit you state, and I'll quote: (As read) "From

2    the very first day here at this facility at the

3    Department of Human Services it was reported that I

4    am allergic to Motrin, ibuprofen, Tylenol, and

5    penicillin.  This information was maintained and

6    constantly readily reviewable by anyone who cared to

7    look at it."

8         Do you remember that, sir?

9         A.  Yes.

10        Q.  Now, sir, why would you swear under oath in

11   the affidavit that you were allergic to Tylenol when

12   in fact you knew you were not?

13             MR. CROWL:  Objection, Judge.  The record

14   says that it was recorded in the record as that, not

15   that he said he was --

16             THE COURT:  The objection is sustained.

17        A.  Actually, that's exactly what I was gonna

18   say.  If you look at --

19             MR. CROWL:  Judge, I'm sorry.  I don't

20   think Mr. Smego understands that when the objection

21   is sustained, he doesn't have to answer.

22             THE COURT:  You don't have to answer.

23        A.  I'm sorry, I had it backwards.  Sorry about

24   that.  Me and this microphone aren't getting along.

25   Sorry.

SMEGO - CROSS                    876

1          THE COURT:  Would this be a good time to

2     give the jury a break?

3          MR. VOGT:  Yes, Judge.

4          THE COURT:  If you'll take the jury out.

5        (The jury left the courtroom.)

6          THE COURT:  Does Mr. Smego need a break?

7        Officers, can you take him, please.  We'll take

8     a ten minute recess.

9          MR. VOGT:  Thank you, Judge.

10       (A recess was taken.)

11          THE COURT:  If you'll bring the jury back.

12    We're going to break at five to twelve; I have a

13    class at noon; then we will reconvene at 1:30.

14       (The jury entered the courtroom.)

15          THE COURT:  Please be seated.  Court is

16    reconvened.  Please continue, Mr. Vogt.

17          MR. VOGT:  Thank you, Judge.

18    BY MR. VOGT:

19       Q.  Mr. Smego, I have a couple more questions,

20    all right?

21        The first thing I'd like to do; I know you

22    talked a great deal about the treatment that's been

23    provided or was provided between 2005 and 2015.

24    What I'd like to do is talk about this decade alone,

25    2010 onward.  Okay, sir?

SMEGO - CROSS                              877

1          A.  Okay.

2          Q.  All right.  Since 2010, have you submitted

3     any healthcare requests asking for dental treatment?

4          A.  No.

5          Q.  Since 2010, have you asked a nurse for

6     assistance in obtaining dental treatment?

7          A.  I don't think so, no.

8          Q.  Since 2010, have you asked your primary

9     therapist to get you assistance to obtain dental

10    treatment?

11         A.  I'm not sure.  I can't recall.

12         Q.  May I approach the witness, Your Honor.

13             THE COURT:  You may.

14         Q.  Perhaps I could refresh your recollection,

15    sir.

16         A.  Where am I at here?

17         Q.  I'm sorry.

18             MR. CROWL:  Mr. Vogt, what page are you on?

19         Q.  I'm sorry.  Page 46.

20             MR. CROWL:  Which deposition?

21         Q.  Deposition No. 2.

22         A.  Yeah, I don't think I did, no.

23         Q.  And I asked you in your deposition if you

24    had asked your primary therapist to get you

25    assistance to get dental treatment since 2010, and

SMEGO - CROSS                          878

1    you had answered no.  Do you remember --

2         A.  Yeah, I don't really remember that.  I don't

3    think so, no.  I don't know if we were talking about

4    somebody specific, but I don't think so, no.

5         Q.  Okay.  And then since 2010, have you asked

6    any of the security people at Rushville for

7    assistance in obtaining dental treatment?

8         A.  No.

9         Q.  All right.  Then, sir, brushing your teeth.

10   I mean, sir, you do know how to brush your teeth,

11   right?

12        A.  I brush my teeth.

13        Q.  Do you know how to brush your teeth?

14        A.  I know how I brush my teeth.

15        Q.  Okay.  Do you know how to floss your teeth?

16        A.  I floss my teeth.

17        Q.  And you know how to take care of your own

18   oral hygiene yourself; right, sir?

19        A.  I brush my teeth and I floss.  That's what I

20   know.

21        Q.  And that's what you've done your whole life?

22        A.  Yes.

23        Q.  Okay.  Do you feel that you don't know how

24   to brush your teeth, floss, or take care of your

25   oral hygiene?

SMEGO - CROSS                          879

1          A.  I know what I know.

2          Q.  Well, I asked you in your deposition; this

3   is page 898, on January 20th, 2015.  I asked you:

4   (As read)  "Do you feel that you don't know how to

5   brush, floss, or take care of your oral hygiene?"

6   And you said, "I don't."

7          Right?

8          A.  One more time, please.

9          Q.  Do you think you know how to do that and you

10  said, "I know how to do it;" right?

11         A.  Yeah, I brush my teeth and floss.

12         Q.  Because you've taken care of your teeth and

13  your oral hygiene and brushing and flossing your

14  entire life; correct, sir?

15         A.  I've always brushed my own teeth, yes.

16         Q.  All right.  The last thing I'd like to ask

17  you about is that March 27th visit with

18  Dr. Mitchell.  You went over her treatment on that

19  date, do you recall, in -- I'm sorry, 2011.  Do you

20  remember that today?

21         A.  Yes.

22         Q.  And that's when the next day you woke up and

23  you had some pain and you filled out the healthcare

24  request form dated March 28th, 2011?

25         A.  Yes.

SMEGO - CROSS                        880

1        Q.  And do you recall, sir, Dr. Lochard ordered

2   Bactrim, an antibiotic, as well as some pain

3   medication for you?

4        A.  I don't know.  It was ordered by an MD.

5        Q.  All right.  Dr. Lochard is the MD at the

6   facility; correct?

7        A.  Yes.

8        Q.  And you didn't see a doctor or anything on

9   that date.  You had submitted a healthcare request,

10  some steps were taken, and you were given the

11  prescription medication; correct, sir?

12       A.  Yes.

13       Q.  All right.  And then on April 3rd, 2011,

14  Dr. Mitchell saw you to follow-up; correct, sir?

15       A.  One more time?  A little --

16       Q.  On April 3rd, 2009, Dr. Mitchell followed up

17  with you and checked on your teeth?

18       A.  Yes.

19            MR. VOGT:  Thank you very much.  I

20  appreciate your time, sir.

21       A.  You're welcome.

22            THE COURT:  Redirect.

23            MR. CROWL:  No redirect.

24            JUROR:  Judge, we have a question.

25            THE COURT:  I'm glad you said that.  Could

SMEGO - CROSS                    881

1    you get the question from the juror.

2            MR. CROWL:  Do you want us to approach,

3    Judge?

4            THE COURT:  Yes.

5        (The following sidebar discussion was held at

6        the bench, out of the hearing of the jury.)

7            THE COURT:  "What oral hygiene

8        products does Mr. Smego have access to?"

9          Any objection?

10            MR. CROWL:  No objection.

11            MR. VOGT:  No objection.  Is that the

12        only one, Judge?

13            THE COURT:  Yes.

14            MR. CROWL:  Thank you.

15        (The following proceedings were held in open

16        court.)

17            THE COURT:  What oral hygiene products does

18    Mr. Smego have access to?

19            THE WITNESS:  Typically, since 2005 through

20    today, I get my oral hygiene products through either

21    my family through a care package from home or I

22    order it from an outside company.  There are

23    companies, Walkenhorst is one, Jack L. Marcus is

24    another.  They're mail order catalogues.

25        And I usually use Colgate Reach toothbrushes.

SMEGO - CROSS                        882

1    I've been using this Colgate toothpaste, it has --

2    it's a liquid toothpaste, it's got built-in

3    mouthwash and stuff in it, but the company quit

4    carrying it so I don't know what I'm going to go to

5    next.

6        On a couple occasions I've bought toothpaste at

7    the facility.  Some time a few years back the

8    facility decided to start selling and allowing floss

9    loops.  They're like -- they're like a transparent

10   rubber band.

11       But for the most part all my hygiene products I

12   buy the same stuff that everybody else buys.  You

13   know, soap, shampoo, stuff like that, all that stuff

14   I buy and it comes in a UPS package and I go down to

15   property and they issue it to me.

16       Does that answer the question?

17           THE COURT:  Thank you, Mr. Smego.

18   Any further questions?

19           MR. CROWL:  No, Judge.

20           THE COURT:  Any other questions of the

21   jury?

22       All right.  If you'll take the jury out.

23   Please.

24       I'm sorry, Mr. Vogt, no more questions?

25           MR. VOGT:  No, Judge, that's fine.

SHULMAN - DIRECT                        883

1        (The jury left the courtroom.)

2        (The witness was excused.)

3        (A discussion was held off the record.)

4             THE COURT:  Who is your next witness?

5             MR. CROWL:  Our next witness is Jay

6    Shulman.

7             THE COURT:  Is he here?

8             MR. CROWL:  He's here, Judge.

9             THE COURT:  All right.  Would you have him

10   step in.  Off the record.

11       (A discussion was held off the record.)

12            THE COURT:  Are we ready?

13       (The jury entered the courtroom.)

14            THE COURT:  Court is reconvened in the

15   presence of the jury.

16            MR. WATSON:  Your Honor, plaintiff calls

17   Dr. Jay Shulman.

18            THE COURT:  Doctor, if you'll be sworn.

19       (The witness was sworn.)

20                    JAY SHULMAN

21   called as a witness herein, having been duly sworn,

22   was examined and testified as follows:

23                 DIRECT EXAMINATION

24   BY MR. WATSON:

25       Q.  Good morning, sir.

SHULMAN - DIRECT                    884

1          A.   Good morning.

2          Q.   Could you introduce yourself and spell your

3     last name for the jury?

4          A.   Jay Shulman.  S-h-u-l-m-a-n.

5          Q.   Dr. Shulman, what kind of work do you do?

6          A.   I'm a dentist.  I have been in dentistry for

7     44 years.  I spent 22 years in the Army, taught

8     dental school for about 14 years, and now I'm an

9     expert dental consultant.

10         Q.   You mentioned the Army.  Could you tell us a

11    little bit more about that?

12         A.   I had assignments in Germany, in Okinawa,

13    and in the United States.  And I was the Army

14    Surgeon General's consultant in dental public

15    health.

16         I commanded the 86th Medical Detachment in

17    Giessen, Germany, which was responsible for dental

18    care for 25,000 soldiers and their families in north

19    central Germany.

20         Q.   After you left the service what particular

21    areas of dentistry did you go on to study in depth?

22         A.   Well, I studied dental public health while I

23    was in the military.  They sent me for two years

24    post-graduate training.  And I received a Masters of

25    Science Degree in public health.  I studied dental

SHULMAN - DIRECT                    885

1    public health.

2         Q.   What is dental public health?

3         A.   Dental public health is that dental

4    specialty that deals with population-based care.

5    It's the dental equivalent to preventative medicine,

6    which deals with preventing disease in large

7    populations, designing programs for communities or

8    institutions and how to monitor and evaluate disease

9    progression.

10        Q.   Could you describe for the jury the subjects

11   that you're prepared to discuss today?

12        A.   Well, I'm prepared to discuss dental

13   anatomy, dental disease and treatment, Mr. Smego's

14   treatment, the policies and procedures of the

15   institution, the professional standard of care, and

16   my conclusions based on all the material I reviewed.

17        Q.   And based on your review and your training,

18   your experience, your education, did you reach

19   conclusions to a reasonable degree of dental

20   probability in this case?

21        A.   I did.

22        Q.   Are you able today to a reasonable degree of

23   dental probability to express opinions?

24        A.   I am.

25        Q.   Do you have an opinion about Dr. Mitchell's

SHULMAN - DIRECT                      886

1  conduct?

2       A.  Yes, I do.

3       Q.  What is that opinion, Doctor?

4       A.  I believe Dr. Mitchell was clinically

5  reckless.

6            MR. VOGT:  Objection, Judge.

7            THE COURT:  The objection is overrule.

8       Q.  If you could -- Your Honor, may I ask the

9  question again?

10           THE COURT:  No.

11      Q.  Dr. Shulman, continue.

12      A.  That she knew of a risk of harm to

13 Mr. Smego's dental health and disregarded known risk

14 by failing to take appropriate measures to deal with

15 that risk.

16           MR. VOGT:  Objection, Your Honor.  Move to

17 strike.  Can we approach, Judge?

18           THE COURT:  You may.

19      (The following sidebar discussion was held at

20       the bench, out of the hearing of the jury.)

21           MR. VOGT:  Judge, it was my

22       understanding from the Court's previous

23       orders that the expert witnesses could not

24       talk about the subject of knowledge of any

25       of the defendants.

SHULMAN - DIRECT                    887

1    The Court was very clear with regard to my

2    expert that testifying about what someone

3    knew is not something that an expert should

4    do.  And he just said that Dr. Mitchell

5    knew something.  He doesn't know what's

6    going on in her mind, he has no idea what

7    she knows or doesn't know.

8        MR. WATSON:  In the records we know

9    what she knew.  She wrote things down.  And

10   based on his review of the records we know

11   that she diagnosed things at certain

12   periods of time.  And as we'll flesh out

13   later, that's how we establish knowledge.

14   It's an element of our deliberate

15   indifference claim and that's how we

16   marshal the facts through this expert.

17       MR. VOGT:  But, Judge, your order was

18   very clear that the experts cannot talk

19   about the subjective knowledge --

20       MR. WATSON:  This is objective

21   knowledge.

22       MR. VOGT:  No, he said she knew and

23   then blah, blah, blah, and that's telling a

24   jury what she was thinking and that's

25   inappropriate for an expert.

SHULMAN - DIRECT                              888

1           THE COURT:  The objection is

2     overruled.

3           MR. VOGT:  All right, Judge.  Thank

4     you.

5     (The following proceedings were held in open

6     court.)

7  BY MR. WATSON:

8     Q.  Dr. Shulman, could you tell us again what is

9  your opinion?

10    A.  My opinion is Dr. Mitchell was clinic --

11          MR. VOGT:  Objection, asked and answered.

12          THE COURT:  Objection sustained.

13    Q.  All right.  When you left off before the

14 objection you were telling us about your opinion.

15 And you had told us that Dr. Mitchell disregarded

16 risks by failing to take reasonable measures.  What

17 else and what other conclusions did you make?

18    A.  That she departed from accepted professional

19 standards by not addressing -- by not addressing

20 those risks.  And her decisions were really so

21 extreme as not to fall within the realms of clinical

22 judgement.

23    Q.  And as a result, what happened?

24    A.  As a result, Mr. Smego lost tooth structure

25 and tooth No. 2, that was preventible.

SHULMAN - DIRECT                    889

1          Q.  Dr. Shulman, let's take a step back and talk

2     a little bit more about your background and

3     education.  Where did you get your degrees?

4          A.  I have an undergraduate degree in biology

5     from New York University, a dental degree from the

6     University of Pennsylvania, a Masters in Science

7     degree in public health from University of North

8     Carolina, and a Masters Degree in education from

9     George Washington University.

10         Q.  Where have you practiced as a dentist in

11    addition to the military experience you talked about

12    before?

13         A.  I practiced in the Dallas County Juvenile

14    Detention Center where I treated detained youth and

15    also supervised dental students.  And I taught for

16    16 years supervising dental students.

17         Q.  And where have you taught as a professor?

18         A.  Baylor College of Dentistry.  In Dallas.

19         Q.  And you teach what year students at Baylor

20    College?

21         A.  Well, I teach second year students --

22    second, third, and fourth, and also I'm a

23    director -- I was a director of a dental public

24    health residency, which trains graduate dentists in

25    the specialty of dental public health.

SHULMAN - DIRECT                              890

1        Q.  Have you written peer-reviewed publications?

2        A.  I've written 56 peer-reviewed publications.

3        Q.  What are the general topics of the

4    publications and presentations that you make?

5        A.  Dental disease, to include periodontal

6    disease, caries, and oral cancer, as well as

7    institutional dental care.

8        Q.  We talked about public health and

9    institutional care.  How --

10       (The court reporter asked for clarification.)

11       Q.  How did you develop that interest?

12       A.  Well, in the Army -- I entered the Army

13   right after dental school and I realized after a few

14   years that the clinical practice was not

15   substantially different from the clinical practice

16   that we did in dental school, but the administrative

17   overlay, the entire bureaucratic structure was very

18   different.

19       And as I got more senior and I rose in the

20   organization, I realized that the -- the

21   institutional care was very different from regular

22   clinical care.  And my training at University of

23   North Carolina would reinforce that.  And when I

24   retired and got into academics that was one of the

25   areas of my research.

SHULMAN - DIRECT                    891

1      Q.  Do you enjoy it?  Do you have --

2      A.  Very much, very much I do.

3      Q.  Are you certified in any specialty?

4      A.  Yes, I am.  I'm certified in the dental

5  specialty of public health.

6      Q.  Have you also served as an expert

7  consultant?

8      A.  I have.

9      Q.  For whom have you served and worked for as

10  an expert consultant?

11      A.  I've worked for the federal government,

12  Department of Justice Civil Rights Division Special

13  Litigation Section.  I've worked for the state --

14  Federal Courts in California, a federal case in

15  Ohio, State Attorney General in Wisconsin, and other

16  plaintiffs' attorneys.

17      Q.  In Ohio; generally describe what you were

18  doing as a role in your expert work there?

19      A.  I was retained by a monitor who was

20  appointed by a federal judge to oversee a settlement

21  agreement between plaintiff's organization and the

22  state involving health -- institutional health care.

23      Q.  You mentioned California as well.  What was

24  your role there?

25      A.  My role was a bit different because in

SHULMAN - DIRECT                        892

1    California I was working directly for the Federal

2    Court.  In addition to being the court expert

3    monitoring -- monitoring the settlement, I was a

4    court representative helping the court coordinate

5    remedies between one -- between the dental case and

6    other healthcare cases.

7        Q.  And also you mentioned our near north

8    neighbor, Wisconsin.  What were you doing there?

9        A.  I was retained by the Wisconsin Department

10   of Justice in a matter involving an -- dental care

11   in an institution there.

12       Q.  Which side of the V was Wisconsin on in that

13   case?

14       A.  Wisconsin was the defendant.

15       Q.  You've also mentioned that you served as a

16   consultant for the federal government.  Can you tell

17   us what you've done there?

18       A.  I have -- I was asked to and I did go to an

19   institution and evaluate the dental program and

20   determine whether the care was -- well, to assess

21   the care and write a report.

22       Q.  What were you asked to do in this case?

23       A.  I was asked to evaluate -- evaluate the

24   records and form an opinion.

25       Q.  And could you generally describe the

SHULMAN - DIRECT                    893

1   materials that you reviewed?

2        A.  I reviewed Mr. Smego's health records.  I

3   reviewed institution records.  I reviewed the

4   report -- transcript, deposition transcripts.  The

5   scientific literature.  And other records that I was

6   provided.

7        Q.  Okay.  Did you also interview Mr. Smego?

8        A.  I did.

9        Q.  Did you ask him questions about his

10  well-being and his care?

11       A.  Right.  I asked him about access to care, I

12  asked him about access to ways to clean his teeth,

13  things like that.

14       Q.  Were you encouraged to do your own research?

15       A.  I was.

16       Q.  What type of research did you undertake?

17       A.  Well, I'm fortunate because I am on the

18  faculty of a dental school, so I have electronic

19  access to their library, which makes research very

20  comfortable.

21       And I researched the area of diabetic

22  complications, Motrin hypersensitivity and allergy,

23  institutional care issues, and standards of care.

24       Q.  All right.  Do you charge for your time and

25  energy you spent researching and testifying?

SHULMAN - DIRECT                    894

1          A.  Yes, I do.

2          Q.  Do you also charge for your time in

3    court-appointed expert work, work for the

4    government, would for plaintiffs, work for

5    defendants in lawsuits?

6          A.  I do.

7          Q.  Does your payment affect your opinions at

8    all?

9          A.  It does not.  In fact, the retention

10   agreement that I insist on specifies that my -- my

11   compensation is totally unrelated to my opinions and

12   my testimony.

13         Q.  Your Honor, may I approach?

14             THE COURT:  You may.

15         Q.  Dr. Shulman, I've handed you what's marked

16   as Plaintiff's Exhibit 14.  Do you recognize it?

17         A.  I do.

18         Q.  What does this document show?

19         A.  It is what we call an academic curriculum

20   vitae, which really is my professional biography.

21         Q.  Is it a complete, up-to-date summary of your

22   voluminous publications, professional background,

23   education and training?

24         A.  It is.

25         Q.  Would your resume, or as you called it CV,

1   Plaintiff's Exhibit 14, be helpful for anyone

2   looking for a summary in detail of your experience,

3   your education, your qualifications?

4        A.   I think so, yes.

5             MR. WATSON:  Your Honor, we offer

6   Plaintiff's Exhibit 14 as a summary.

7             THE COURT:  Any objection?

8             MR. VOGT:  No objection.

9             THE COURT:  It is admitted and I will so

10  mark it.  Doctor, if you will.

11       (Plaintiff's Exhibit 14 admitted.)

12            THE COURT:  Please proceed.

13            MR. WATSON:  Your Honor, we also offer

14  Dr. Shulman as a qualified expert.

15            THE COURT:  Any objection?

16            MR. VOGT:  No, Judge, no objection.

17            THE COURT:  He's accepted.

18  BY MR. WATSON:

19       Q.   Dr. Shulman, if you could put your CV aside

20  for a moment --

21            THE COURT:  May I see it, Doctor.  Thank

22  you.

23       Q.   Let's talk next about dental anatomy.  Do

24  you have a few brackets that would be helpful to the

25  jury in understanding your testimony today?

SHULMAN - DIRECT                    896

1        A.  Yes, I do.

2        Q.  Your Honor, could we switch the presentation

3    mode to a slide show view that a computer has.

4            THE COURT:  Yes.  If you'll turn lights

5    down, please.  Is that resolved enough for you, is

6    it crisp enough for you?

7            MR. WATSON:  Your Honor, may I approach?

8            THE COURT:  You may.  Are those lights too

9    dim?  Can you still see to write and read, counsel

10   table?

11           MR. CROWL:  We can, Your Honor.

12           THE COURT:  Counsel table?  Mr. Vogt, are

13   you all right?

14           MR. VOGT:  Yes, Judge.  Thank you.

15   BY MR. WATSON:

16       Q.  Dr. Shulman, I've handed you what is marked

17   as Plaintiff's Exhibit 116; is that right?

18       A.  That's correct.

19       Q.  Is that the graphic and summary that we

20   talked about before?

21       A.  It is.

22       Q.  Your Honor, we offer this for demonstrative

23   purposes.

24           THE COURT:  Any objection?

25           MR. VOGT:  No, Judge.

1           THE COURT:  All right.

2      Q.  On this first slide, Dr. Shulman, what does

3  it show?

4      A.  Well, this slide shows a section as if

5  someone cut directly through a tooth.  And it shows

6  what's inside the tooth as well as what's outside

7  the tooth.

8      Q.  And if you could identify the teeth that are

9  shown in a general --

10     A.  Generally speaking the tooth that we're

11 looking at, the tooth that's cut in half, is a lower

12 molar; we call it a mandibular molar, a lower molar.

13         And behind it, as we go into the distance, you

14 have a premolar, premolars.  You have a canine,

15 which is the eyetooth.  Then you have the front

16 teeth.

17         But more particularly, the tooth that we're

18 looking at, the reason this particular graphic is so

19 good is it shows that tooth is actually a living

20 part of the body.  If we look inside the tooth

21 you'll see blood vessels.  And we even see a nerve.

22 That yellow -- that yellow stripe is representative

23 of a nerve, which is why a tooth feels pain.  Blood

24 vessels are in there and the blood vessels will

25 nourish the nerve and the tooth.

SHULMAN - DIRECT                898

1      The inner -- the inner most layer is called

2  dentin, which we have -- let's see if this will

3  work.  The pointer -- not a great pointer, but the

4  pointer is in the dentin, the light brown material.

5  Dentin is a hard material, but it is softer than

6  enamel.  It is softer than the outer layer.

7      Do you want to copy this?

8          THE COURT:  We'll wait until you're

9  finished marking on it in full.

10     A.  The next layer, the -- going outside, the

11 next layer is enamel.  Enamel is the hardest tissue

12 in the body.  It's the white layer that is the outer

13 layer of our tooth.  Enamel is even harder than

14 bone.

15     So we have the dentin, then we have the enamel.

16 Then as we go underneath the gum; and this -- the

17 pink is gingiva or gums.  As we go underneath the

18 gum there's a layer that's difficult to see, but

19 it's sort of a dark -- well, I moved that, I

20 shouldn't have moved that.  It's here to the left of

21 this red square.  It's call cementum.  Cementum is

22 the layer that goes directly outside the tooth.  It

23 lines the tooth.  Cementum is relatively soft.

24     So those are the three basic tissues -- hard

25 tissues around the tooth.

SHULMAN - DIRECT                    899

1        We also have, we have bone, the tooth sits in

2    bone.  And we have soft tissue or the gums.  And the

3    soft tissue, the gums, is what becomes initially

4    affected by periodontal disease, periodontal

5    inflammation.  And when periodontal inflammation

6    progresses, gradually effects the bone.  And the

7    bone tends to -- we call is resorb, but basically it

8    just goes away.  Which is why people with advance

9    periodontal disease have loose teeth.  They have

10   loose teeth because the bone is gradually resorbing

11   and there's very little left to support the tooth.

12       Q.  Dr. Shulman, anything else that you would

13   like to show us on this slide before we move to the

14   next?

15       A.  No, I think we're fine here.

16           THE COURT:  We'll print this at this time.

17   And it will be, marked as?

18           MR. WATSON:  116A.

19       Your Honor, may we also offer 116A.

20           THE COURT:  You may.  Any objection?

21           MR. VOGT:  No, Judge.

22           THE COURT:  Did you print that?  We have to

23   wait and make sure it's visible.  This is a small

24   jet printer that has it's limitations.  I apologize

25   for holding things up.

SHULMAN - DIRECT                      900

1          Would you like to step up, counsel, and take a

2     look at it.  Mr. Vogt.  I believe it's accurate and

3     visible.

4               MR. WATSON:  I agree.

5               MR. VOGT:  Very nice, Judge.

6               THE COURT:  Could I have a yellow

7     plaintiff's sticker, please.  It is admitted and so

8     marked.

9          (Plaintiff's Exhibit 116A admitted.)

10    MR. WATSON:

11         Q.  Dr. Shulman, I'm also showing you what is

12    page 2 of 116.  What does this graphic show?

13         A.  What this graphic shows is really an

14    open-mouth view of the tops of all the teeth.  And I

15    wanted to show this just to give an illustration of

16    the numbering system.  The teeth are numbered from 1

17    to 32.  There are generally 32 teeth.  And it starts

18    from the upper right third molar or wisdom tooth, it

19    goes around to 16, which is the upper left third

20    molar wisdom tooth, goes down to 17 and comes back

21    around to 32.

22         So that's the reason I wanted that graphic.  So

23    you'll be hearing about tooth numbers and this helps

24    you put it in context.

25         Q.  We've heard particularly a lot about tooth

SHULMAN - DIRECT                901

1   No. 2 and tooth No. 31.  Where does that show on

2   that graph?

3       A.  Tooth No. 2 is there.  And tooth No. 31 is

4   is there.

5       Q.  That's the back of the mouth, right?

6       A.  Right.  That is on the -- on the right side

7   towards the back.

8           MR. WATSON:  Your Honor, may we mark this

9   as 116B?

10          THE COURT:  You may.  The Court will do so.

11  I assume there's no objection to 116B, Mr. Vogt?

12          MR. VOGT:  I have no objection to it,

13  Judge.

14          THE COURT:  Would you step up and take a

15  look at it.  Resolution could be clearer, but it's

16  legible.

17      Plaintiff's 116B is marked and admitted.

18      (Plaintiff's Exhibit 116B admitted.)

19  BY MR. WATSON:

20      Q.  Anything else you'd like to discuss on this

21  slide, Dr. Shulman?

22      A.  No.

23      Q.  In order to keep things moving I'm resisting

24  the temptation to use the tele-strator so that we

25  can get through.  And I appreciate your help so far,

1    Dr. Shulman.

2         A.  Okay.

3              THE COURT:  I apologize for the speed of

4    the printer.

5         Q.  I'm showing you now a graphic that says

6    "Tooth Numbering System Chart," which looks like a

7    chart that only a dentist could love.  Could you

8    tell us what this shows?

9         A.  Yes.  This is the way that dentists for the

10   last 30 or 40 years have -- have looked at teeth and

11   charted on paper.

12        So this is simply a way of indicating -- we

13   have different surfaces of tooth and you can put

14   typically red for decay and blue for fillings that

15   have been done already.  Every institution has some

16   protocol.  But this is what we used in the military,

17   this is used in the VA and public health service and

18   many other institutional settings.

19        Q.  And I know the jury has seen this graphic

20   shown a lot.  What I'd like to use this for is tell

21   us what makes charting so important?

22        A.  Well, charting is important for several

23   reason.  One is it's a document of what the dentist

24   actually saw.  That's the first thing.

25        And the second is it provides the basis for the

1    dentist's decision on what to do.  We call it a

2    treatment plan.

3         So the charting is the first step.  And the

4    second step is deciding what needs to be done and

5    what's the appropriate sequence to do it.

6         Q.  Is charting within the standard of care?

7         A.  Absolutely.

8         Q.  In terms of this graphic, anything else that

9    you'd like to discuss, Dr. Shulman?

10        A.  No.

11        Q.  I'd like to change topics from dental

12   anatomy to dental diseases, as you mentioned before.

13        What types of dental diseases are you prepared

14   to discuss with the jury?

15        A.  Caries, the tooth decay.  Periodontal

16   disease or gum disease.  And to a lesser extent,

17   oral cancer.

18        Q.  Have you published on these subjects?

19        A.  I have.  I've published chapters in 2008,

20   chapters on periodontal disease, caries, and oral

21   cancer in a book on clinical preventive dentistry.

22        Q.  Are -- is one example of associated problem

23   with diseases plaque that you are prepared to

24   discuss about?

25        A.  Yes.  Because plaque is a common thread, a

SHULMAN - DIRECT                                904

1    common theme in both dental decay, caries, and

2    periodontal disease.

3         Q.  How can plaque be controlled or treated?

4         A.  Well, first of all, what plaque is.  Plaque

5    is a film that adheres to the teeth.  The film

6    contains millions of bacteria.  Bacterial colonies.

7    And bacteria live and thrive my taking the sugars

8    from the foods we eat and turning them into acid.

9    So they eat the sugar and they excrete the acids.

10   And the acids from the bacteria in the plaque is

11   what starts the process of tooth decay.  The enamel

12   gets demineralized, gets broken down by the acid.

13        So the way you control dental carries, dental

14   disease, is to control the plaque.

15        Q.  And it sounds like bacteria and a lot of

16   complicated things.  How do you teach a patient how

17   to control their plaque?

18        A.  It's a challenge.  I say that because I --

19   in my academic career I would -- I directed a course

20   orienting second year dental students to the clinic.

21   And second year dental students don't really have

22   the manipulative skills yet to do drilling on

23   patients, they do have the skills, once they're

24   taught, to teach patients how to brush teeth and

25   teach patients about oral disease.

SHULMAN - DIRECT                905

1          So I bring them to the clinic, but I tell them

2      that before -- before you come to the clinic I want

3      you to brush your teeth as best you can.  Do the

4      best job brushing your teeth.

5          And so we have 90 students coming into the

6      clinic and we have about eight faculty members.  We

7      have them broken up into pods of four or five.  They

8      come in and then we give them; many of you are

9      probably familiar with it; a little -- we put a

10     little dye in their mouth or have them chew on a

11     tablet and they swish it around.  And then we give

12     them a mirror.

13         And they hold up a mirror and they're amazed.

14     They see red stains in their mouth and the red

15     stains represent plaque.  And these are

16     well-motivated dental students who are accustom

17     to -- they're very high achievers and they see they

18     failed the test.  And they fail the test and then

19     we, once they do that, we teach them about

20     techniques of brushing.  And then bring them back in

21     a few weeks and do the same thing and it gets better

22     and better.

23         The point -- a long answer to your short

24     question is it is not easy to teach a patient how to

25     brush their teeth, but it is critical because

SHULMAN - DIRECT                    906

1    patients, especially patients in a higher risk for

2    disease, can develop disease faster than we can

3    treat it.  So the key is the patient is responsible

4    for his own therapy once we achieve our

5    responsibility by teaching the patient how to take

6    care of themself.

7         Q.  And again, what happens when plaque builds

8    up when the patient doesn't know how to take care of

9    themself?

10        A.  Well, when plaque builds up then the amount

11   of bacteria increase.  And the more bacteria

12   metabolizing or processing sugars and turning it

13   into acid increases and you have an increased

14   likelihood of tooth decay, caries, and also the

15   plaque can begin a gingivitis inflammation of the

16   gums.

17        Q.  You mentioned caries.  What are caries?  Or

18   what is caries?

19        A.  Caries is the process of dental decay.  So

20   caries is the overall disease.  And we call it a

21   caries lesion is the same things as -- as a decay

22   lesion.  So caries is the disease process and tooth

23   decay or cavity is a result of the caries process.

24        Q.  So cavities are related to caries?

25        A.  Right.  Caries is the disease process that

SHULMAN - DIRECT                    907

1    results in cavities.

2        Q.  What's the primary cause of cavities?

3        A.  Acid -- the primary cause would be acid from

4    bacteria.

5        Q.  Dr. Shulman, I'm showing you what was

6    previously marked in this case as Exhibit 112 with

7    Dr. Mitchell's testimony.

8        What does this slide show us?

9        A.  Well, this is actually a very nice slide

10   that illustrates progression of a caries lesion, a

11   progression of a cavity.

12       So number one is the very initial stage where

13   you can see the enamel has just been breached.  The

14   black area is an area of void.  The decay is not

15   through the enamel, it's just into the enamel.

16       And at that point actually the caries lesion is

17   potentially reversible.  And we found that out in

18   the last 20 or 30 years, that at this point we don't

19   have to drill; in fact, we don't want to drill.  We

20   want to teach the patient how to take -- remove the

21   plaque from his teeth and then we use a high

22   concentration fluoride on it and attempt to

23   remineralize it, attempt to get the enamel to

24   reform.

25       So, caught at this stage, there's a good chance

SHULMAN - DIRECT                    908

1    that the lesion would not progress with patient --

2    patient compliance and fluoride therapy and we

3    wouldn't have to go any further.

4         Q.  What should a dentist do to deal with a

5    surface cavity?

6         A.  Dentist should simply watch it.  And in the

7    charting then -- so we have the tooth chart, we'd

8    have over a particular -- we'd have a W or an O for

9    observe, or when we write our treatment plan you'd

10   say tooth No. 2-watch or tooth No. 2-observe.

11        The reason we do that is because we want --

12   every time we see the patient we want to go back to

13   that particular tooth and see how that lesion has

14   progressed.  Every time we take an x-ray, the next

15   year or the year after, we want to see is it going

16   in the right direction.

17        Q.  And that's important, as you said before,

18   because it's preventable for --

19        A.  Yes.

20        Q.  -- the progress is preventable.  And

21   sometimes --

22        A.  It's potentially preventable.  Not always

23   preventable, potentially preventable.  Yes.

24             THE COURT:  And what exhibit is this?

25        Q.  Your Honor, this is Plaintiff's Exhibit 112.

SHULMAN - DIRECT                    909

1          THE COURT:   Thank you.

2      Q.   How about a moderate cavity?  How should a

3  dentist treat a moderate cavity?

4      A.   Well, that is going to be a filling, what we

5  call filling or restoration, which involves drilling

6  into the tooth, creating a shape that's appropriate

7  to contain a filling material, removing -- removing

8  decay, and placing the filling material.

9      Q.   And a moderate cavity has now entered the

10  dentin; right?

11      A.   That's correct, that's correct.  In fact,

12  you see that it's -- you have a V, almost a V going

13  in there, an inverted V coming out.  And it's

14  expanding into the dentin.  In fact, it will

15  progress, it will keep going, progressing side to

16  side and undermine the tooth.

17      Q.   What happens when a moderate cavity that has

18  entered the dentin goes untreated?

19      A.   It generally progresses to a severe cavity

20  or advanced caries.

21      Q.   And that's the third indication on this

22  chart that shows a severe cavity that the decay has

23  actually reached into the pulp; right?

24      A.   Right.

25      Q.   What happens when a severe cavity occurs and

SHULMAN - DIRECT                    910

1    the decay is into the pulp?

2        A.  Well, typically when that happens there are

3    really two practical alternatives.  One is root

4    canal therapy, endodontic treatment.  And the other

5    is extract the tooth.

6        Q.  You mentioned before a term called pulpitis.

7    What is pulpitis?

8        A.  Pulpitis is simply an inflammation of the

9    pulp.  Looking at this -- looking at this graphic,

10   as the decay progresses, the pulp of the tooth, the

11   living tissue within the tooth, often becomes

12   disturbed or over -- it starts causing pain.

13       Typically the first sign of an early cavity

14   would be sensitive to cold.  Sometimes sensitive to

15   sweets.  But -- and as that progresses, the symptoms

16   will become more extreme.  And which seems

17   reasonable, because as there's less and less tooth

18   structure between the outside the mouth environment

19   and the inside, the pulp, there's less buffering,

20   there's less thermal buffering.

21       So as we develop -- as it goes deeper, the pain

22   gets more extreme and that's pulpitis.  At this

23   point the pulpitis is probably reversible.  As it

24   progresses, as it -- the pulp of the tooth gets

25   inflamed and inflamed and inflamed, at some point

SHULMAN - DIRECT                      911

 1    it's irreversible.

 2         Q.  Do patients always know that they have

 3    pulpitis?

 4         A.  No.  I mean early pulpitis they wouldn't

 5    know that.  However, as it progresses, yes.  There'd

 6    be pain.  Typically it starts off intermittent pain

 7    when you drink something cold or have something

 8    sweet.  And as it progresses you might have more of

 9    a constant pain or sensitivity to things that are

10    warm.  Or throbbing, which is really a sign that

11    things are really going downhill fast.

12         Q.  Should a dentist do something to treat

13    pulpitis?

14         A.  Well, the -- the way to treat pulpitis would

15    be to remove the source of the irritation, which

16    typically is putting a restoration in.

17         Q.  And you also mentioned periodontal disease.

18    What is periodontal disease?

19         A.  Periodontal disease is a disease of the gums

20    and the bone that surrounds the tooth.

21         Q.  People in their ordinary life have heard

22    terms like gingivitis and things like that.  Is that

23    associated with periodontal disease?

24         A.  Yes, gingivitis is one of the periodontal

25    diseases, yes.

SHULMAN - DIRECT                    912

1        Q.   How is periodontal disease treated?

2        A.   Well, gingivitis, early gingivitis could be

3    treated very simply.  All the patient -- has to be

4    done is to teach the patient how to brush and floss.

5    And that can control early gingivitis.

6        There was a study in Sweden with dental

7    students 50 years ago where they had them not brush

8    their teeth for several weeks and they developed

9    gingivitis.  And then they -- they had them brush

10   and floss for several weeks more and the gingivitis

11   resolved.  So the gingivitis is reversible just with

12   good oral care at that stage.

13       Q.   And if a patient doesn't know what to do and

14   gingivitis goes untreated, what ultimately can

15   happen?

16       A.   Well, very often the gingivitis will

17   progress and will progress to a more severe

18   infection affecting the bone.  And the bone would

19   start to resorb.

20       Q.   And if it starts affecting the bone do you

21   expect a patient to start feeling pain sensations or

22   more pain?

23       A.   No.  Interestingly enough, unlike caries, as

24   a cavity develops the amount of pain typically

25   escalates; periodontal disease is fairly

SHULMAN - DIRECT                    913

1    asymptomatic.  It's fairly -- it doesn't cause much

2    pain.  Which of course is a problem because very

3    often you'll have patients come into our clients not

4    having pain, they'll come in for a toothache

5    involving cavities, and we'll look at them and we'll

6    see they have advanced periodontal disease and they

7    really didn't know it from the standpoint of pain.

8        Q.  When a patient is feeling pain from

9    something like a cavity, how should a dentist manage

10   pain for their patients?

11       A.  Well, first identify the source of the pain.

12   And having done that, assuming that the source of

13   pain can't be resolved at that time, prescribe some

14   kind of, we call them analgesic, you'd call them a

15   painkiller.

16       Q.  What medication, painkiller, analgesic,

17   whatever term we attach to it, do dentists commonly

18   prescribe?

19       A.  Well, Motrin I would say is -- I would say

20   is the first line of anti -- of analgesics for

21   dentists.  It's an anti-inflammatory, it's not a

22   narcotic, it's readily available, and has relatively

23   few side effects.

24       Q.  What other medications aside from Motrin are

25   available?

SHULMAN - DIRECT                    914

1        A.  Tylenol.  Tylenol probably is a good -- a

2    good second choice if a patient, for whatever

3    reason, can't take Motrin.

4        Q.  When a patient reports to you or someone in

5    the clinic that they have an allergy or a

6    sensitivity to medication, like Motrin, and Tylenol

7    is available, what do you teach your students in the

8    clinic to do?

9        A.  Well, I teach them first when a patient

10   comes in, and typically one of the things we do in

11   our -- in our school is there is an entrance medical

12   history that students -- that students will preside

13   over the patients filling out.  And then we'll

14   supervise the student as they ask follow-up

15   questions.  So the question may be, do you have any

16   allergies, and the answer may be, yes, I'm allergic

17   to penicillin, I'm allergic to Motrin.

18       Well, we know -- we teach our students in

19   pharmacology that most people who say they're

20   allergic to penicillin aren't allergic to

21   penicillin.  They took penicillin and they had some

22   other event; some gastritis; that wasn't really

23   related to the allergy to penicillin.  Allergies to

24   penicillin are potentially life-threatening.  So we

25   ask -- we have them ask follow-up questions and then

SHULMAN - DIRECT                    915

1   just note it on the chart.

2       Now, fortunately, with the penicillin allergy,

3   if someone -- if you think someone is allergic to

4   penicillin, obviously you don't want to give it to

5   them.  There are sufficiently -- there are enough

6   other antibiotics that accomplish the same purpose

7   that we don't have to worry about someone's allergic

8   to penicillin, we simply don't give them penicillin.

9       Q.  You said gastritis.  What is gastritis?

10      A.  Inflammation of the stomach.  We all have

11  it.  And some people have it more frequently than

12  others.  But if you take certain medications -- in

13  fact, any medication that you take there will be a

14  little sticker on it that will say "take with water"

15  or "take with food."  And the reason that sticker is

16  on there, one of the reasons, is some medications,

17  if there's not a lot of volume of fluid in the

18  stomach, will irritate the stomach.

19      Q.  Are some patients sensitive to Motrin?

20      A.  Some -- very -- yes, there -- some people

21  have hypersensitivity to Motrin.  It's not that

22  common.  Most of the time people who think they're

23  allergic to Motrin have probably had gastritis.

24      Q.  And when a patient reports a problem that

25  they've experienced with Motrin, and Tylenol is

1    available, what would you expect a dentist to give

2    or write a prescription for?

3         A.  Tylenol.

4         Q.  You mentioned oral cancer before.

5         A.  Yes.

6         Q.  What's oral cancer?

7         A.  Oral cancer is -- well, cancer is a

8    development of -- of abnormal cells that grow very

9    quickly and don't -- and can very often invade other

10   cells in the body.  Certain oral cancers can be very

11   life-threatening.

12        Q.  How does a dentist diagnose oral cancer?

13            MR. VOGT:  Judge, may I be heard on this?

14   I have objection.

15            THE COURT:  Yes.

16       (The following sidebar discussion was held at

17        the bench, out of the hearing of the jury.)

18            MR. VOGT:  Judge, this is a case about

19        fillings.  Going into oral cancer is way

20        out of line and confuses the jury.  And I

21        don't even know why we're doing this.

22            MR. WATSON:  This goes to patient

23        care.  Doctor will testify that one of the

24        procedures that somebody should do in an

25        exam, and it's the standard of care, is to

1    take someone's tongue, move it side to side

2    and check for oral cancer, part of an

3    annual exam, and make a notation in the

4    chart.  Nothing in his entire history shows

5    that he has received that.

6          MR. VOGT:  Even if that is case; and

7    that wasn't disclosed in any testimony or

8    anything that I've seen in this case; but

9    even if that's the case, it's not an

10   issue -- it's not an issue in the case.

11   It's like asking if he checked her ears.

12   I mean the point is cancer is a very

13   inflammatory subject.  It has nothing to do

14   with this case.  And I don't want to get

15   into that, it's very inappropriate.

16         MR. WATSON:  It's part of the standard

17   of care for the -- that a dentist should

18   perform when their patient comes in.  And

19   the fact that it can become serious is --

20   if there's a limiting way to do this, but

21   part of an annual exam is to move the

22   tongue side to side, check for it, make a

23   notation.  It's mentioned in the

24   publications that are cited and mentioned

25   in the expert report that he's provided.

SHULMAN - DIRECT                    918

1           THE COURT:  It was mentioned?

2           MR. WATSON:  It's mentioned in the

3      publications that he's cited.

4           MR. VOGT:  That's different.

5           THE COURT:  Is it mentioned in his

6      report?

7           MR. VOGT:  No.

8           MR. WATSON:  I can go back and check.

9           THE COURT:  Yes.

10          MR. WATSON:  Okay.

11     (The following proceedings were held in open

12     court.)

13          MR. WATSON:  Your Honor, I'll move on from

14     this topic just so that we can speed things along,

15     knowing this is Friday.  And we will check on the

16     objection that Mr. Vogt raised.

17          THE COURT:  All right.  Thank you.

18          MR. VOGT:  Thank you, Judge.

19     BY MR. WATSON:

20      Q.  Dr. Shulman, you also mentioned before that

21     you were prepared to talk about the treatment or

22     lack of treatment that Mr. Smego received; correct?

23      A.  That's true.

24      Q.  Did you research Mr. Smego's treatment at

25     the facility?

SHULMAN - DIRECT                    919

1        A.  I did.

2        Q.  How did you go about researching Mr. Smego's

3   treatment?

4        A.  I went through his healthcare record and

5   looked at his dental charts, but I also looked at

6   all the other entries in the medical portion of his

7   record that mentioned teeth or dental care.

8        Q.  Your Honor, may I approach?

9            THE COURT:  You may.

10       Q.  Dr. Shulman, I've handed you what's marked

11  as Plaintiff's Exhibit 1.  Do you recognize that

12  document?

13       A.  I do.

14       Q.  What is Plaintiff's Exhibit 1?

15       A.  It is a dental chart -- a dental charting.

16  Looks like it was done 12/13/2005.

17       Q.  Your Honor, could we have the document

18  camera.  Thank you very much.

19       And I think the ladies and gentlemen on the

20  jury have seen this exhibit before.  And often.

21  Could you describe for us what occurred based on

22  your review of Plaintiff's Exhibit 1, which is the

23  dental chart, on that December day?

24       A.  Okay.  Well, it appears that there was a

25  medical history, brief medical history done.  And

SHULMAN - DIRECT                920

1    there is a notation -- let's see here.  Then there's

2    a notation under allergies as p-c-n, which is I take

3    to be penicillin; that's a fairly standard medical

4    abbreviation of penicillin; and Motrin.

5         And then to the right there's a column called

6    service plan.  And service plan is what we could

7    call treatment plan.  That is to say those things

8    that, based on the charting, based on the

9    examination, the things that should be done in the

10   order the things should be done in.

11        So typically the first thing we put in the

12   treatment plan is priority one for our treatment and

13   it's sequenced.

14        Q.  And in this chart we see that it's a listing

15   of teeth; right?

16        A.  Yes.  So we have tooth numbers.  And again,

17   this goes back to the numbering system that I showed

18   you.  And then there's the -- the surface.  The

19   surfaces of the teeth have -- we have the mesial

20   surface, which is the surface toward the midline.

21   The distal surface, which is the surface -- do we

22   have a graphic that has -- I think it has the

23   surfaces of the tooth.

24        Actually, this one, if we just move that one --

25   yeah, that's good.  That's good.

SHULMAN - DIRECT                    921

1          So if we look at it and we just take a look.

2     The tooth has basically two sides.  Has one side

3     that's toward the midline, one side that's away from

4     the midline.  The side that's toward the midline is

5     called the mesial.  The side that's away from the

6     midline is called the distal.

7          The side that touches our lips or touches our

8     checks is called the facial or the buccal.  The side

9     that touches our tongue are called the lingual,

10    which is L.  And then the biting surface is called

11    the occlusal.

12         So those are our -- so here then we have No. 2

13    buccal.  That is the cavity was on the portion of

14    the tooth that's closest to the face, the outside

15    portion of the tooth.

16         The next one would be No. 6 mesial.  And

17    c-o-m-p I take to be composite, which is

18    tooth-colored filling material.  So here the plan is

19    for 6, do a tooth-colored material on the mesial of

20    No. 6, and so on.

21         Q.  And if you total that up there are twelve

22    cavities diagnosed on that first visit?

23         A.  That's correct.

24         Q.  Should the fact that twelve cavities are

25    diagnosed at the first visit affect his treatment

SHULMAN - DIRECT                    922

1   plan at all?

2       A.  It should, for several reasons.  One is it

3   says -- it suggests that someone is at high risk for

4   caries, which means that he's developing decay fast,

5   which puts more of an urgency for getting in there,

6   removing decay, perhaps giving an antimicrobial

7   rinse to reduce the bacterial count, and starting

8   therapy very quickly.  And also teaching him to

9   control his plaque very soon.

10      Q.  And on page 1 and 2 of the chart, in your

11  review, what treatment was provided on that first

12  day in December --

13      A.  On the first day I do not see a record of

14  any treatment provided on the first page.

15      Oh, on the second page it says exam.  F-m-x,

16  which stands for full mouth x-rays, which means an

17  x-ray series taking small x-rays at different

18  portions of the mouth.

19      And so that's exam, full mouth x-rays,

20  cleaning, medical update.  And it says:  "No" -- it

21  says "no fill No. 31B scale."  I'm -- it's difficult

22  for me to read.

23      Q.  Looking at this and based on the testimony

24  we've heard, is it NV?

25      A.  NV I take to be next visit.  It's not

1    uncommon in an institutional situation to -- for a

2    dentist to put down NV meaning at the next visit.

3    Sometimes it will be NV fill No. 3.  And in this

4    case we have the NV, it will say fill No. 31 buccal

5    and then it gives a date.

6         So the -- I take that to be it's a plan to do

7    that procedure on that date.

8         Q.  And based on your testimony before about

9    charting, where does tooth 31 fall in the service

10   plan?

11        A.  It's the last -- it's the last tooth.  If we

12   look at a sequence, tooth No. 2 is first priority,

13   tooth No. 31 is the last priority.

14        Q.  And looking back at page 2 of Exhibit --

15   Plaintiff's Exhibit 1, what patient education was

16   provided?

17        A.  None.

18        Q.  And how do you know that?

19        A.  It's not in the chart.

20        Q.  And in your experience in auditing, in your

21   experience in -- as a court-appointed monitor, would

22   you expect a dentist, if that dentist provides

23   patient education, to chart it?

24        A.  Yes, typically there would be something like

25   OHI, which stands for oral health education.  So

SHULMAN - DIRECT                924

1   commonly it would be OHI in the chart, which will

2   tell me as an auditor that they -- they performed

3   some kind of instruction with the patient.

4       Q.  And it sounds real quick when you say OHI.

5   You just write OHI on the chart?

6       A.  I mean that's our -- the standard

7   representation for oral health instruction.

8       Q.  Besides patient education, what would you --

9   what else would you expect to see charted here?

10      A.  Well, I would expect to see what's called

11  the periodontal screening record or sometimes called

12  PSR.

13      PSR is -- again, it's a standard -- standard of

14  care.  It's part of every oral -- every basic oral

15  exam, which is a way of assessing whether a patient

16  needs further investigation about his periodontal

17  health.

18      Q.  In reviewing all these dental charts --

19      A.  I did not see it.

20      Q.  -- of Mr. Smego?

21      A.  That's correct.

22      Q.  In reviewing all Mr. Smego's dental chart --

23      A.  I saw no mention of the PSR, no mention of

24  periodontal probing.  No mention of assessing

25  bleeding on probing.

SHULMAN - DIRECT                          925

1          Q.  If we could switch back over to the

2     computer, Your Honor.

3               THE COURT:  You may.

4          Q.  Dr. Shulman, we have up on the screen the

5     next page of the slide.  Could you tell us what this

6     slide shows?

7          A.  This slide is a representation of what the

8     PSR or the periodontal screening recording index is.

9          Again, this was developed by the American

10    Dental Association and the American Academy of

11    Periodontology about 20 years ago as their standard

12    for a dentist to screen for and assess early

13    periodontal disease.

14         So there is a special periodontal probe which

15    we see illustrated there that has different color

16    bands.  And the bands will tell you how many

17    millimeters -- how many millimeters the probe is.

18         And you take the probe and you run it around

19    teeth, the teeth, and you divide the math -- this

20    slide doesn't show it too well, but there are six --

21    there are six segments of the mouth.  And each

22    segment, you would run the probe around, and you

23    chart the number in this -- in this little box, is

24    the deepest probing of each segment.

25         So we end up with six numbers.  And these

SHULMAN - DIRECT                926

1   numbers will tell you whether a patient has

2   sufficient periodontal disease that warrants -- he

3   warrants a full probing.  That's a very -- otherwise

4   periodontal disease will get ignored.

5       Q.  How could a periodontal screening and

6   recording, or PSR as you've testified before, help

7   Mr. Smego?

8       A.  Well, it will identify his periodontal

9   disease, if in fact he has it.  I can't tell from

10  the records I looked at.  I don't have x-rays and

11  there's no -- there's no record of it.  But it would

12  tell a dentist whether further treatment is needed,

13  further diagnosis is needed.

14      Q.  If a dentist on the outside got Mr. Smego's

15  chart and for the first time that dentist saw

16  Mr. Smego, what would that dentist see in regards to

17  PSR or periodontal screening and recording?

18      A.  He'd see nothing.

19      Q.  What impact would that have on healthcare or

20  dental care?

21      A.  Well, he'd have to do it.  I mean -- so he

22  would have to start de novo.

23      Q.  And based on your court-appointed expertise

24  and your education and your experience working in

25  the clinic yourself, is your conclusion that

SHULMAN - DIRECT                    927

1   Dr. Mitchell failed to give Mr. Smego any patient

2   education and failed to provide periodontal

3   screening and recording?

4       A.  Based on the records, that's correct.

5       Q.  Going back to the treatment that was

6   provided.  You've got Plaintiff's Exhibit 1 before

7   you.  Do you also have a summary that would be

8   helpful to the jury in understanding the dental

9   records?

10      A.  Yes.

11      Q.  Your Honor, may I approach?

12          THE COURT:  Hm-mm.

13      Q.  Dr. Shulman, I've handed you a series of

14  slides that are marked as Plaintiff's Exhibit 117.

15  Is this the summary?

16      A.  Yes, it is.

17      Q.  Does this summary, which is marked as

18  Plaintiff's Exhibit 117, accurately summarize the

19  records?

20          MR. VOGT:  Judge, may I be heard on this; I

21  have an objection.

22          THE COURT:  Yes.

23      (The following sidebar discussion was held at

24      the bench, out of the hearing of the jury.)

25          MR. VOGT:  Judge, we were provided

1    with these for the first time yesterday.
2    I've never seen them prior to his
3    deposition, I never had an opportunity to
4    examine the witness about them.
5    They had all the ones at the deposition
6    that are attached to the deposition.  I
7    don't have a problem with them using those
8    because those are the ones that I had at
9    the time.  But I got these yesterday in the
10   middle of the trial.
11       MR. WATSON:  Following Dr. Dovgan's
12   deposition we prepared these.
13       THE COURT:  So tell me are they
14   different substantially than the deposition
15   exhibits?
16       MR. WATSON:  Mr. Vogt didn't ask him
17   about any demonstrative exhibits or
18   summaries that he had prepared at his
19   deposition.  So following Dr. Dovgan's
20   deposition, based on Dr. Dovgan's
21   testimony, we had Dr. Shulman prepare a
22   summary.
23       THE COURT:  Are they different than
24   Dr. Dovgan's?
25       MR. WATSON:  Dr. Dovgan didn't prepare

SHULMAN - DIRECT                        929

1    a summary, he just discussed summary of the
2    treatment that was provided.  And we
3    thought it would be helpful in order to --
4        THE COURT:  Well, it's certainly
5    helpful to have demonstrative exhibits.  Is
6    there anything in these exhibits, Mr. Vogt,
7    that is in inaccurate or new to the case?
8        MR. VOGT:  Well, yes, Judge.  Okay.
9    Right from the get-go, the first page,
10   you'll see, does not note the teeth that
11   have -- that are missing.  On the first day
12   Mr. Smego came there are three teeth
13   missing; I believe it's 15, 16 and 1.  They
14   are not there.  And they show those teeth
15   being present.
16       I mean there are -- I think there's
17   other problems, too.  And if I would have
18   had the opportunity to review these I could
19   have gone over --
20       MR. WATSON:  Plaintiff's Exhibit 1
21   doesn't show the teeth are missing.  I can
22   have the witness explain the fact that this
23   is a standard open mouth view.
24       THE COURT:  Okay.  It is about eight
25   to twelve.  I'll allow you to question as

SHULMAN - DIRECT                    930

1    to the first page with that clarification.

2    And then we will address the rest of the

3    pages after lunch, when he's had a chance

4    to go through them.

5         MR. WATSON:  Okay.

6         MR. VOGT:  Judge, can I ask one other

7    question.  Well, I'm just worried, Judge,

8    about getting finished today.

9         MR. WATSON:  I'm gonna offer these.

10   They're not -- these are summaries, 1006

11   summaries.  We plan to offer them.

12        MR. VOGT:  No, I don't care -- I'm

13   talking about timing of the whole

14   enchilada, Judge.  I'm worried about that.

15   I'm just expressing concern.

16        THE COURT:  What do we have besides

17   the rest of this doctor's testimony?

18        MR. WATSON:  We expect to go quickly

19   through this summary.  And then we expect

20   to go to standard of care and conclusions.

21   We will start moving more quickly.

22     I'd like to give the general education,

23   but once we get into the actual

24   conclusions, it will get moving quickly.

25        THE COURT:  So fifteen minutes?

SHULMAN - DIRECT                    931

1          MR. WATSON:  I think it's more like a

2     half hour.

3          THE COURT:  How long will you be?

4          MR. VOGT:  I'll go as fast as I --

5     hopefully not more than half hour.

6          THE COURT:  And then any other

7     evidence?

8        Any other evidence?

9          MR. WATSON:  That we -- no.

10          THE COURT:  And then you'll have your

11     doctor maybe and Dr. Dovgan?

12          MR. VOGT:  Yes, I'm gonna try to pare

13     down Dr. Dovgan extraordinarily, Judge.

14          THE COURT:  We should get done.

15          MR. VOGT:  I hope so.

16          THE COURT:  I hope so, too.

17     (The following proceedings were held in open

18     court.)

19          THE COURT:  All right.  The objection is

20     sustained.  We need some clarification on

21     Plaintiff's Exhibit 117.

22     BY MR. WATSON:

23        Q.  Dr. Shulman, in your review of the records,

24     when Mr. Smego first presented on December 13th,

25     2005, did he have previous extractions?  And if you

SHULMAN - DIRECT                    932

1    need to look at Plaintiff's Exhibit 1, please let us

2    know.

3         A.  I recall he had previous extractions.

4         Q.  And could you look at Plaintiff's Exhibit 1

5    to identify the teeth that were extracted?

6         A.  Looks like No. 17, No. 16, No. 15.  It's

7    faint, but that's what it looks like to me on this.

8              THE COURT:  Could we switch to Plaintiff's

9    Exhibit 117 and have the doctor point to those on

10   this diagram?

11        Q.  Absolutely.  May I publish so that --

12             THE COURT:  Yes.

13        A.  Okay.  So I said -- I said 15 -- okay, 16,

14   15 and 17.  Those are the three that I can see that

15   had been extracted.

16             THE COURT:  All right.  Mr. Watson, we're

17   going to break at this time.

18        If you'll take the jury out.  If you'll be back

19   by 1:30.  We hope to then complete the evidence with

20   this doctor and then the defense doctor and then we

21   will have closing argument and you'll be allowed to

22   deliberate.

23        Okay.

24        (The jury left the courtroom.)

25             THE COURT:  Court is in recess.

1      Do we have any additional matters we can take
2   up over the lunch hour?
3           MR. VOGT:  Just the exhibits if you would
4   like, Judge.
5           MR. WATSON:  Before we do this, can we mark
6   as 117 --
7           THE COURT:  Yes, I was going to direct
8   Marchal to print that.
9           MR. WATSON:  I apologize.
10          THE COURT:  All right.  And you have
11   exhibits --
12          MR. VOGT:  From yesterday, Judge.  That's
13   all.  And I don't think there's any objection.  So
14   if you want to do it when we get back; whatever is
15   easiest for the Court.
16          THE COURT:  I have a 1:30 phone conference
17   in a case that I'll conduct from the courtroom.  So
18   feel free to be here.  It's nothing confidential,
19   it's just a housekeeping matter I need to take care
20   of.
21      Thank you.
22      (A lunch recess was taken.)
23          THE COURT:  Court is reconvened in Smego
24   versus Adams.
25      Would you will bring the jury.

SHULMAN - DIRECT                    934

1        Wait.  On the one -- the one final instruction,

2   Plaintiff's 19.  I don't know if I misspoke, I

3   apparently was not clear; I'm not going to give the

4   civil commitment and for several reasons.

5             MS. MacDONALD:  Your Honor, I think we --

6   not to interrupt you, we're withdrawing it.

7             THE COURT:  You withdrew it, all right.  I

8   had not marked it.

9             MS. MacDONALD:  Thank you.

10            THE COURT:  Okay.  And Susan, as we speak,

11  is doing the finally proofread on the jury

12  instructions.

13       (The jury entered the courtroom.)

14            THE COURT:  Court is reconvened in the

15  presence of the jury.  Please continue, Mr. Watson.

16            MR. WATSON:  Your Honor, could we mark as

17  Exhibit 117A, a copy of the --

18            THE COURT:  Plaintiff's 117A.  Any

19  objection other than those previously stated?

20            MR. VOGT:  No, Judge.  Other than those --

21  yes.

22            THE COURT:  All right.  I'll show those

23  admitted.

24       (Plaintiff's Exhibit 117A admitted.)

25            THE COURT:  Please proceed.

1    BY MR. WATSON:

2        Q.  Mr. Shulman, I'm showing you what has been

3    marked as Plaintiff's Exhibit 117B.  Do you

4    recognize what's marked as 117B?

5        A.  Yes.  That's what we discussed before,

6    except the tooth -- the teeth that have been

7    extracted before Mr. Smego came to Rushville have

8    been identified.

9        Q.  And Plaintiff's 117B, page 1, shows a date

10   of visit of December 13th, 2005; right?

11       A.  That is correct.

12       Q.  And it shows cavities in the locations that

13   are shown in the dental chart for Mr. Smego on that

14   date; right?

15       A.  That is correct.

16       Q.  And in terms of the month since diagnosis,

17   it shows that this is month zero because the

18   diagnosis was made on December 13th, 2005?

19       A.  That's correct.  That's the first charting

20   that I reviewed.

21       Q.  And then as you move down on that chart it

22   shows cavities in red; right?

23       A.  That's correct.

24       Q.  Is red a standard for showing cavities?

25       A.  We typically use red for decay, yes.

SHULMAN - DIRECT                936

1        Q.   Underneath cavities is temporary fillings;

2    right?

3        A.   Yes.

4        Q.   And it's shown in blue; right?

5        A.   Yes.

6        Q.   And temporary fillings also is a medicated

7    filing?

8        A.   Sometimes they are, yes.

9        Q.   Underneath temporary filling is permanent

10   filling.  And it doesn't show on the screen very

11   well, but it's green; right, Dr. Shulman?

12       A.   Could be.  I mean it is --

13       Q.   As you look to your right, is it green?

14       A.   It is.

15       Q.   And then black on your summary is for a

16   tooth that's been extracted; right?

17       A.   Right.

18       Q.   And you have indicated in black circle with

19   a line through it on each of these slides to show

20   the extracted teeth at the time of the first visit

21   on December 13th, 2005?

22       A.   That's correct.

23       Q.   And does the summary that's marked as

24   Plaintiff's Exhibit 117B accurately summarize the

25   voluminous records that are the dental charts?

SHULMAN - DIRECT                    937

1          MR. VOGT:  Objection, Judge.  May I be

2     heard on this?

3          THE COURT:  You may.

4     (The following sidebar discussion was held at

5         the bench, out of the hearing of the jury.)

6          MR. VOGT:  The one problem is, Judge,

7         this does not show Mr. Smego's existing

8         cavities when he came into the facility.

9         Testimony in evidence in this case is that

10        there were -- there were existing cavities.

11        These are only cavities that Dr. Mitchell

12        diagnosed, not what also -- and that's what

13        I'm worried about misrepresenting the

14        status of his teeth --

15         MR. WATSON:  It's summarizing the

16        records, Your Honor.

17         THE COURT:  That's fine.  The

18        objection is overruled.

19     (The following proceedings were held in open

20        court.)

21         THE COURT:  The objection is overruled, but

22     you will clarify.

23         MR. VOGT:  Yes, Judge.

24     BY MR. WATSON:

25        Q.  Dr. Shulman, as you look at the exhibit

SHULMAN - DIRECT                    938

1   that's marked as Plaintiff's Exhibit 117B, the red

2   circles show the cavities that were diagnosed by

3   Dr. Mitchell; right?

4        A.   That is correct.

5        Q.   And the diagnosis is shown in the dental

6   record?

7        A.   That is correct.

8        Q.   And so the summary that is marked as 117B

9   shows the accurate records translated into date of

10  visit, cavities, months since diagnosis, and a

11  diagram to show where cavities, temporary fillings

12  and permanent fillings or extracted tooth is?

13       A.   That is correct.

14       Q.   And it's a review of a voluminous amount of

15  dental charts; right?

16       A.   It's a consolidation, yes.

17            MR. WATSON:  Your Honor, we offer

18  Plaintiff's 117B.

19            THE COURT:  Any other objections?

20            MR. VOGT:  None other than we've already

21  made, Judge; that's correct.

22            THE COURT:  All right.

23            MR. WATSON:  I will bring up a copy if I

24  may, Your Honor, just to show him the last page.

25  And then I will bring it up.

SHULMAN - DIRECT                    939

1          THE COURT:  That's fine.

2     BY MR. WATSON:

3          Q.  Dr. Shulman, I'm showing you the last page,

4     which is page 14 of the summary of 117B.  And it

5     shows a date of visit November 23rd, 2014; right?

6          A.  That is correct.

7          Q.  And it shows there are three cavities that

8     still remain that were diagnosed; right?

9          A.  Yes.

10         Q.  And which teeth are those cavities still

11    remaining as shown in the record?

12         A.  On No. 18, 20, and 21.

13         Q.  Do you have any information that those

14    cavities have even been filled today?

15         A.  The last information I have is the last

16    chart that was produced.  So to my knowledge they

17    have not been.

18         Q.  May I approach, Your Honor?

19              THE COURT:  You may.  117B is admitted and

20    so marked.

21         (Plaintiff's Exhibit 117B admitted.)

22         Q.  Dr. Shulman, let's move forward and talk

23    about the professional standards of care which you

24    mentioned earlier.

25         Are you familiar with the term professional

SHULMAN - DIRECT                     940

1    standard of care?

2        A.  I am.

3        Q.  What's the definition of a professional

4    standard of care as best you can put it to the

5    members of the jury?

6        A.  What a reasonable and prudent dentist would

7    be expected to do under a given set of

8    circumstances.

9        Q.  How would the professional standard of care

10   differ, if at all, between institutional care and

11   private practice?

12       A.  It differs not at all.

13       Q.  Now, why is a professional standard of care

14   important?

15       A.  Because society gives professionals a

16   certain set of privileges and with those privileges

17   come responsibilities.  Responsibility to comport

18   oneself to behave to treat patients in a certain

19   way.

20       Q.  Let's talk about specific conduct that falls

21   within those professional standards or

22   responsibilities as best you describe them.

23       Does the standard of care require timely

24   treatment?

25       A.  It does.

1      Q.  Did Dr. Mitchell violate the standard of
2    care requiring timely treatment?
3      A.  Yes, her treatment was untimely.
4      Q.  In what ways, if you could summarize?
5      A.  Well, Mr. Smego arrived with twelve cavities
6    in December of 2005.  And his first -- his first
7    actual treatment was, I believe, 18 months later.
8    And even after almost -- over a hundred months, he
9    still had three cavities that were not taken care
10   of.
11     Q.  And that lack of timely treatment or that
12   delay is shown in 117B; right?
13     A.  That's correct.
14     Q.  Did Dr. Mitchell also violate the standard
15   of care which requires patient education?
16     A.  Yes.  One of the standards is that the
17   patient needs to understand what his problem is and
18   what he can do to take care of himself.
19     Q.  In your review of the dental chart did you
20   see any indication of Mr. Smego receiving patient
21   education?
22     A.  I did not.
23     Q.  And you talked about patient education and
24   the need for patient education earlier today; right?
25     A.  I did.

SHULMAN - DIRECT                942

1      Q.  Does the standard of care require complete
2  and accurate records?
3      A.  It does.
4      Q.  Did Dr. Mitchell violate the standard of
5  care requiring complete and accurate records?
6      A.  Yes.
7      Q.  How so?
8      A.  Well, the records were -- were not complete.
9  There was no periodontal screening.  There was no
10  mention of -- of the status of gingiva, of whether
11  there was bleeding on probing.  There was no mention
12  of oral health education.  There was no mention of
13  oral cancer exam.  It just -- the records were very
14  minimal.
15      Q.  And I'm gonna show you what was marked as
16  Plaintiff's Exhibit 1.  And you talked about this
17  before.  The -- you said the standard would be for a
18  dentist in the services plan to work down the chart
19  from the top priority to the lowest priority; right?
20      A.  That is correct.
21      Q.  And here you see that it begins with tooth 2
22  and ends with tooth 31?
23      A.  If it's being done numerically.  When -- in
24  the -- the standard of care is documenting the
25  treatment sequence.  So the first procedure is the

1   most important, it's treated first, et cetera.  And

2   this is just a numerical list.

3        Q.  And that's the difference we see here, is

4   that the standard of care would require a dentist to

5   identify the tooth that's most in need of treatment

6   top of the pile and then in terms of the lowest

7   would be the care that would be furthest off?

8        A.  That is correct.

9        Q.  And here you see it's just listed in

10  numerical order?

11       A.  Correct.

12       Q.  Does the standard of care require treatment

13  options?

14       A.  Where there are treatment options.  It's --

15  the standard of care requires a patient be informed

16  of the options and be -- and be informed of the

17  advantages and disadvantages of each option.  And

18  have informed consent and decide which treatment he

19  prefers.

20       Now, where there are no options, the patient

21  needs to be informed that there are no options.  And

22  why.

23       Q.  Did Dr. Mitchell violate the standard of

24  care in this case requiring treatment options for

25  the information given to the patient about treatment

SHULMAN - DIRECT                    944

1   options?

2       A.  Well, she -- according to the record no

3   treatment options were given as far as oral health

4   education.

5       Q.  We've heard in this case about medical writs

6   or sending a patient out of the facility.  If it's

7   an option to send a patient outside of the facility

8   in this case and Dr. Mitchell chose not to write a

9   medical writ, would that be a violation of the

10  standard of care?

11      A.  Yes.

12      Q.  Did you see anything in the record to show

13  that Dr. Mitchell tried in Mr. Smego's case to issue

14  a medical writ or a prescription for outside

15  treatment?

16      A.  I did not.

17      Q.  Does the standard of care require notice to

18  the patient of changes to their treatment plan?

19      A.  It does.

20      Q.  How did Dr. Mitchell violate this standard?

21      A.  She -- there's no evidence in the record

22  that she informed Mr. Smego that there was the

23  opportunity to be sent out on a writ and -- at least

24  the record doesn't show it.

25      Q.  Dr. Shulman, we've heard some testimony

SHULMAN - DIRECT                          945

1   yesterday about contracts or agreements between a

2   dentist and a higher level provider like a

3   corporation.  How does the contract or agreement

4   affect the dentist's standard of care?

5       A.  Not at all.

6       Q.  And why not?

7       A.  Because the dentist's relationship is with

8   the patient.  And any business relationship a

9   dentist has with a corporation is totally unrelated

10  to the patient care.

11      Q.  Do contracts that the dentist enters into

12  with a third party, like a company, excuse the

13  dentist from meeting the standard of care?

14      A.  No.

15      Q.  In your review of the records in this case

16  have you seen any document in the record about

17  Dr. Mitchell expressing concerns to Addus or Wexford

18  about violating the professional standards?

19      A.  I did not.

20      Q.  In fact, what did Dr. Mitchell choose to do

21  with Addus and Wexford?

22      A.  Sign the contract every year.

23      Q.  Did you see any document or hear any

24  testimony in your review of this case about

25  Dr. Mitchell ever refusing to sign a contract with

SHULMAN - DIRECT                    946

1    Addus or Wexford?

2          A.  I saw nothing about that.

3          Q.  We've heard about an agreement that

4    Dr. Mitchell had with Addus on June 28th, 2001.

5    What did Dr. Mitchell choose to do with this

6    agreement?

7          A.  Sign it.

8          Q.  We've seen an agreement with Addus and

9    Dr. Mitchell on June 15th, 2003.  What did

10   Dr. Mitchell choose to do with that agreement?

11         A.  She signed it.

12         Q.  We have seen Dr. Mitchell's agreement with

13   Wexford on September 11, 2007.  What did Dr.

14   Mitchell choose to do with that agreement?

15         A.  She signed it.

16         Q.  We have seen Dr. Mitchell's agreement with

17   Wexford on October 1, 2008.  What did Dr. Mitchell

18   choose to do with this agreement?

19         A.  She signed it.

20         Q.  We have seen Dr. Mitchell's agreement with

21   Wexford on April 27th, 2009.  What did Dr. Mitchell

22   choose to do with this agreement?

23         A.  She signed it.

24         Q.  We have seen Dr. Mitchell's agreement with

25   Wexford making her an employee on May 4, 2010.  What

SHULMAN - DIRECT                    947

1    did Dr. Mitchell choose to do with that agreement?

2         A.  She signed it.

3         Q.  Have you formed any opinions about a dentist

4    who repeatedly commits herself to practice below the

5    standard of care?

6         A.  The dentist has his head in the sand.

7              MR. VOGT:  Objection, Judge.  Move to

8    strike.

9              THE COURT:  The objection is overruled.

10        Q.  What's your opinion in this case,

11   Dr. Shulman?

12        A.  The same.

13        Q.  Dr. Shulman, we've heard testimony yesterday

14   and before about Dr. Mitchell's patient load at the

15   facility.  How does Dr. Mitchell's patient load

16   affect the standard of care?

17        A.  In at least two ways.  One is that if she

18   treats very few patients, then there are a lot of

19   patients who need treatment who won't be treated.

20   And if she treats more patients than she's really

21   capable of treating, then some people will not be

22   treated well.  I can't tell which one -- which one

23   applies.

24        Q.  We heard in opening statements that

25   plaintiff's expert will tell you that a dentist

SHULMAN - DIRECT                    948

1    can't provide enough care for 550 residents at the

2    facility.  Could you explain your full opinion,

3    Dr. Shulman?

4        A.  Well, if -- without having looked at the

5    health records of all -- all the residents at the

6    facility, I couldn't tell you exactly what their

7    needs are.  But generally speaking in institutional

8    care, 500 patients require generally .8 FTEs, that's

9    32 hours of dentist time, maybe a little bit less,

10   with a full-time assistant, a full-time hygienist.

11   That's a rough estimate.

12       Q.  FTE is what?

13       A.  Full time equivalent.  I'm sorry.

14       Q.  And in this case, having not seen any record

15   of Dr. Mitchell's communications from her to Wexford

16   or Addus, do you have an opinion about

17   Dr. Mitchell's conduct?

18       A.  It was deficient in that she should have

19   notified her employer that she was working under a

20   situation that was below -- causing her to provide

21   care below the standard of care.

22            MR. VOGT:  Objection, Judge.  Move to

23   strike.

24            THE COURT:  The objection is overruled.

25   The answer may stand.

SHULMAN - DIRECT                    949

1      Q.  Was Addus or Wexford ever required to meet

2   the standard of care when Dr. Mitchell has never

3   raised the issue?

4          MR. VOGT:  Objection, Judge.  Again,

5   disclosure issue.

6          THE COURT:  I'm not sure I understand the

7   question to begin with.  Can you rephrase.

8      Q.  Sure.

9      Did you see any written records from

10  Dr. Mitchell to Addus or Wexford about her

11  practicing below the standard of care?

12     A.  I saw no communication between Dr. Mitchell

13  and Addus or Wexford.

14     Q.  Do you have an opinion about the failure to

15  communicate the fact that Dr. Mitchell was

16  practicing below the standard of care to Addus and

17  Wexford?

18          MR. VOGT:  Objection, Judge.  Can we be

19  heard on this?

20          THE COURT:  Yes, you may.

21     (The following sidebar discussion was held at

22      the bench, out of the hearing of the jury.)

23          MR. VOGT:  None of this is in his

24      report, Judge.  None at all.  He never

25      disclosed any of these opinions.

SHULMAN - DIRECT                    950

1           THE COURT:  Which opinions?

2           MR. VOGT:  The ones he is talking

3      about now.

4           THE COURT:  Between Addus and Wexford

5      and Dr. Mitchell?

6           MR. VOGT:  Yes.

7           MR. WATSON:  This is in response to

8      Dr. Dovgan.  This is --

9           THE COURT:  Well, you still have a

10     duty to timely disclose it.

11          MR. VOGT:  They're undisclosed.

12          MR. WATSON:  In -- rebuttal.  We've

13     heard Dr. Dovgan's opinions for the first

14     time most recently within the rebuttal

15     period.

16          MR. VOGT:  Judge, I don't --

17          THE COURT:  That was certainly

18     partially in response to my ruling on the

19     limitation of his testimony.

20          MR. WATSON:  If Dr. Dovgan does not

21     testify that the contracts at all limited

22     Dr. Mitchell in her requirement to meet the

23     standard of care, I don't have to ask these

24     questions.  But if he's gonna testify about

25     that, I need to be able to rebut it with my

1    expert.

2        THE COURT:  Well, that would be in

3    rebuttal.

4        MR. VOGT:  Judge, there is no

5    testimony that any company is -- in

6    standard of care, is --  everyone has

7    agreed that Dr. Mitchell did the 15 hours

8    per week.  Now he's saying that

9    Dr. Mitchell should have sent letters and

10   all this stuff.  Those opinions were never

11   disclosed.  They have to do something, they

12   have to tell us about it somehow.  It can't

13   come up during the direct of the expert for

14   the first time.

15       MR. WATSON:  If you read the direct

16   exam that counsel performed at the end of

17   Dr. Dovgan's last deposition you will see

18   the opinions that I need to be able to

19   rebut.  And the fact that they were

20   provided by a direct exam in a deposition

21   that occurred a few weeks ago is why I'm

22   asking my expert these questions.

23       THE COURT:  So this is the deposition

24   that I ordered that was conducted late.

25   Not because of you.

1          MR. VOGT:  I have never seen any

2     testimony by this expert in the report or

3     anywhere else that disagrees with what he

4     told us in his deposition, Judge.  He told

5     us very clearly that -- about all of this.

6     But not this subject here, not sending

7     letters up the stream and all that.  That's

8     a completely unrelated and different issue

9     that's never been disclosed.  And my expert

10    is not gonna say anything about that

11    either.  He agrees strictly with this

12    expert on things, that's all.  He's not

13    going beyond that at all, Judge.

14         THE COURT:  Not going into this?

15         MR. VOGT:  Not going beyond what this

16    expert has already disclosed with regard to

17    staffing.  That's exactly what he's doing.

18         MR. WATSON:  If Dr. Dovgan is going to

19    testify that the limitations placed on

20    agreements was the cause or the reason for

21    Dr. Mitchell falling below the standard of

22    care or those limitations were placed on

23    her, this is the rebuttal testimony to that

24    opinion.

25         MR. VOGT:  He's not gonna say anything

SHULMAN - DIRECT                    953

1        like that, Judge.

2            THE COURT:  Can this expert stick

3        around?

4            MR. WATSON:  If he's -- if -- my

5        understanding, he could stick around, but

6        my understanding is he's not gonna testify

7        to that.

8            MR. VOGT:  Who's this?

9            MR. WATSON:  Dr. Dovgan.

10            MR. VOGT:  No, he's not gonna say that

11        the contract caused her to breach the

12        standard of care.

13            THE COURT:  Then we're not going any

14        further with this.

15            MR. WATSON:  Okay.

16        (The following proceedings were held in open

17        court.)

18            THE COURT:  Please proceed.

19   BY MR. WATSON

20        Q.  Dr. Shulman, changing topics.  To a

21   reasonable degree of dental probability did

22   Dr. Mitchell's conduct cause harm to Mr. Smego?

23        A.  Yes.

24        Q.  What harm did Dr. Mitchell's conduct cause?

25        A.  It was responsible for the avoidable loss of

SHULMAN - DIRECT                    954

1    tooth structure and the loss of tooth No. 2.

2        Q.  Dr. Shulman, are you more likely right than

3    wrong about that?

4        A.  Yes, I am.

5        Q.  And your conclusion lies within a reasonable

6    degree of dental probability; right?

7        A.  It does.

8        Q.  Is there any information that you could have

9    that you don't have to point to a particular tooth

10   in Mr. Smego's mouth and say definitively that that

11   tooth condition is worse now?

12       A.  If I had the radiographs, if I had the

13   x-rays, that would certain help.  But we were

14   informed that the x-rays weren't available.

15       If I had a periodontal charting, if I had a

16   more complete documentation in the record, that

17   would have helped me too, but they were not

18   available.

19       Q.  So that's why you express your opinion in a

20   reasonable degree of dental probability?

21       A.  Yes.  Just more right than wrong.

22       Q.  May I have a moment, Your Honor?

23          THE COURT:  You may.

24       Q.  Dr. Shulman, to wrap up, what's the lesson

25   here?

SHULMAN - DIRECT                    955

1          MR. VOGT:  Objection, Judge.

2          THE COURT:  I'm sorry, I didn't hear the

3   question.

4     Q.  What's the lesson here?

5          THE COURT:  The objection is overruled.

6     A.  Don't kick the can down the road.

7     Q.  Now, the jury will have to decide serious

8   medical and dental need.  To a reasonable degree of

9   dental probability, did Mr. Smego have a condition

10  that required treatment?

11    A.  Yes.

12    Q.  The jury needs to decide if Dr. Mitchell was

13  deliberately indifferent.  To a reasonable degree of

14  dental probability did Dr. Mitchell know of a

15  substantial risk of serious harm to Mr. Smego's

16  dental needs?

17         MR. VOGT:  Objection, Judge.  It's a legal

18  conclusion.

19         THE COURT:  It is.  The objection is

20  overruled -- excuse me, the objection is sustained.

21    Q.  Based on a review of the records and

22  Dr. Mitchell's own handwriting on her own chart,

23  does the record from Dr. Mitchell's own handwriting

24  show a substantial risk of serious harm to

25  Mr. Smego's dental needs?

SHULMAN - DIRECT                    956

1          MR. VOGT:  Again, Judge, objection.  Legal

2     conclusion.

3          THE COURT:  The objection is overruled.

4     A.  Yes, it does.

5     Q.  Did Dr. Mitchell, based on a review of the

6     records, disregard that risk by failing to take

7     reasonable measures to deal with it?

8     A.  Yes.

9     Q.  Did Dr. Mitchell delay in providing

10    effective treatment to Mr. Smego?

11    A.  Yes.

12    Q.  Was Dr. Mitchell's conduct clinically

13    reckless?

14         MR. VOGT:  Objection, Judge.

15         THE COURT:  The objection is overruled.

16    A.  Yes.

17    Q.  Did Dr. Mitchell, as we have discussed

18    today, substantially violate accepted professional

19    standards?

20    A.  Yes.

21    Q.  Since how long did Dr. Mitchell

22    substantially violate accepted professional

23    standards?

24    A.  From the records I reviewed, since the 13th

25    of December, 2005.

SHULMAN - CROSS                      957

1          MR. WATSON:  No more questions at this

2   time, Your Honor.

3          THE COURT:  Cross examination, Mr. Vogt.

4          MR. VOGT:  Thank you, Judge.

5                 CROSS EXAMINATION

6   BY MR. VOGT:

7      Q.  Good afternoon, Doctor.

8      A.  Good afternoon.

9      Q.  You and I met previously in Dallas?

10     A.  We have.

11     Q.  You worked for 22 years in the United States

12  Army?

13     A.  Correct.

14     Q.  Thank you for that service, sir.

15     A.  You're welcome.

16     Q.  Regarding Mr. Smego.  The healthcare system

17  at Rushville is a healthcare request system; right,

18  sir?

19     A.  Not necessarily.  There are other ways to

20  achieve -- to get healthcare --

21     Q.  I know, but the system, the formal system in

22  place; let's put it that way; the formal system in

23  place at Rushville is a healthcare request system?

24          MR. WATSON:  Objection, Your Honor.  Vague

25  as to the formal system.

SHULMAN - CROSS                          958

1              THE COURT:  The objection is sustained.
2         Q.  The system that was recognized in the
3    Rushville handbook; how about that, sir?  Do you
4    recall reading the Rushville handbook?  I think it's
5    quoted in your report, in fact, where it says,
6    quote:  "If you need to see the nurse, doctor,
7    dentist, eye doctor, or foot doctor, please fill out
8    a healthcare request form."
9         A.  It says that, yes.
10        Q.  All right.  And you've seen all the
11   testimony in this case, the healthcare request form
12   system was used at Rushville?
13        A.  That's correct.
14        Q.  And that is a standard in the industry?
15        A.  It is.
16        Q.  And at all times, sir, we can agree, at all
17   times Mr. Smego could have filled out a healthcare
18   request form if he had a dental problem or concern?
19        A.  He could have, yes.
20        Q.  And if he had filled out that healthcare
21   request form he may have been seen by Dr. Mitchell?
22        A.  He may have been seen, but --
23        Q.  Yes.  Well, the first thing is that
24   Dr. Mitchell must know of the concern that Mr. Smego
25   has; right?

SHULMAN - CROSS                959

1      A.  But not -- he could be seen, but not
2  treated.
3      Q.  Well, we don't know.  I mean every time
4  Mr. Smego -- there were three healthcare requests
5  relating to dental care; is that correct, sir?
6      A.  That's my recollection.
7      Q.  And it's your understanding that after every
8  single request of those three, he was seen by
9  Dr. Mitchell?
10      A.  That's true.
11      Q.  Okay.  So if we keep walking down that path
12  then, if Mr. Smego had submitted additional
13  healthcare requests, based on the evidence that we
14  have, Dr. Mitchell would have likely seen him;
15  correct, sir?
16      A.  It's likely.
17      Q.  Okay.  And if Dr. Mitchell would have seen
18  Mr. Smego in response to healthcare requests, she
19  could have addressed and taken care of whatever
20  problem he had?
21      A.  She possibly could have.
22      Q.  Right.  And then if she had taken care of
23  the problem he had, we may not be here today;
24  correct?
25      A.  It's not knowable.

SHULMAN - CROSS                    960

1      Q.  Right.  Because -- we don't know it because
2   in fact Mr. Smego did not submit the requests; true?
3      A.  We do not know it; yes.
4      Q.  Okay.  And again, you saw the attempt to
5   resolve procedure in the handbook at Rushville?
6      A.  Which handbook are we talking about?  The
7   2005 handbook?
8      Q.  Give me one second, okay, sir.
9      I'm sorry, sir.  I'll come back to it in a
10  moment while Beth looks for that, sir.
11     Did you understand from reviewing the materials
12  that there was a two-step grievance process at
13  Rushville?  First was an informal attempt to resolve
14  process and the second was a formal grievance
15  process?
16     A.  Well, there was a period at Rushville where
17  there was no grievance process.
18     Q.  Well -- all right.  My question, sir, is a
19  little different.  Did you understand there was two
20  separate steps?  Did you have that understanding at
21  all?
22     A.  I believe so.
23     Q.  Okay.  And the attempt to resolve, you could
24  always file an attempt to resolve during Mr. Smego's
25  entire term at Rushville?

SHULMAN - CROSS                    961

1          A.  It's my understanding healthcare issues were

2     not grievable up to a certain point.  Up to 2008.

3          Q.  Do you know -- well, all right, sir.

4          Let me show you, sir -- all right.  Sir, I'll

5     go on and come back.

6          The bottom line with a healthcare request and

7     the grievance procedure and all that stuff is to

8     notify the staff at Rushville that the patient has a

9     concern?

10         A.  Has a concern that the staff doesn't know

11    about; yes.

12         Q.  Right.  Because -- all right.  One of the

13    theories of the healthcare request system is that a

14    person, in fact, has a problem, he will fill out a

15    healthcare request?

16         A.  Yes.

17         Q.  And you have no objection to requiring

18    residents to fill out healthcare requests if they

19    have a problem?

20         A.  I have no objection to allowing them to.

21         Q.  I'm talking about requiring them.

22         A.  No, I have an objection to making that the

23    only way a resident can seek care.  But I have no

24    objection to making that a preferable way or an

25    alternative way.

SHULMAN - CROSS                    962

1          Q.  All right.  I'm sorry.  Page 67.  You and I

2    met at your deposition in Dallas; do you recall

3    that, sir?

4          A.  Yes.

5          Q.  And I asked you a series of questions about

6    your opinions in this case?

7          A.  Okay.

8              MR. WATSON:  Mr. Vogt, page number?

9          Q.  67.

10         And I asked you the following questions, you

11   gave the following answers:  (As read) "The purpose

12   of the healthcare request is for the resident to

13   state what the resident's problem is?"

14         And your answer was:  "Yes."

15         "To alert the staff that a resident has -- I

16   have this problem or I have this need?

17         "Yes.

18         "And it's a system to alert the medical and

19   dental staff of the resident's need?

20         "Yes.

21         "And the health care system --

22             MR. WATSON:  Mr. Vogt, which line are you

23   on?

24         Q.  I'm on page 66.  67, I'm sorry.

25             MR. WATSON:  Which line were you reading

1    from just now?

2         Q.  65.  Line 23.

3         Then page 67, sir, I asked you: (As read)  "And

4    you have no objection to requiring residents or

5    requesting residents to fill out a healthcare

6    request if they have a problem?"

7         And you said:  "That's typically done in

8    situations, yes."

9         Right?

10        A.  I said -- could you read that, is that

11   requesting or requiring?

12        Q.  It says both.  It say requiring residents or

13   requesting residents to fill out a healthcare --

14        A.  Yeah, I certainly have no problem with

15   requesting them.  And I believe later on in my

16   testimony I said for problems the staff did not --

17   were not aware of.

18        Q.  Well, I'll address that in a few moments,

19   okay?

20        A.  Okay.

21        Q.  And, sir, you understand in addition, at

22   Rushville, in addition to the healthcare request

23   system, they have a triage system that's performed

24   by the nurses?

25        A.  My understanding is that the nurses look at

1   healthcare requests and sort them into piles

2   basically and give the pile, the dental pile to the

3   dental service, the medical pile to the medical

4   service, and the mental health pile to the mental

5   health service.  That's the sorting, the triage or

6   the sorting that I understand happens.

7        Q.  All right.  Page 47, then.

8        All right, I'm sorry, sir.  Do you recall me

9   asking you this question --

10            MR. WATSON:  Mr. Vogt, what page and --

11       Q.  Line 5, page 48.  (As read)  "The nurses

12  prepare a list of patients or residents that both

13  the medical doctor and the dentist are going to see

14  when they arrive at the facility?"

15       And your answer is:  "That is one way they do

16  that.  Yes, that occurs."

17       Do you recall giving that testimony, sir?

18       A.  I do.

19       Q.  Then on page 50, you stated, on line 4: (As

20  read)  "It's my understanding that the nurses make

21  an assessment and then create a list."

22       Do you remember that testimony, sir?

23            MR. WATSON:  Your Honor, could we have the

24  question read that was responded to on page 50.

25            THE COURT:  Yes.  What was the question.

SHULMAN - CROSS                              965

1          Q.  Sure.  It's on page 49.  Here's the

2     question:  (As read)  "And at least -- but at least

3     from the evidence that we have, the depositions and

4     records in this case that you've seen, the nurses

5     prepare a list for both the medical doctor and the

6     dentist of the residents that those two individuals

7     need to see upon their arrival at Rushville?"

8          And your answer is:  "It's my understanding

9     that the nurses make an assessment and then create a

10    list?"

11         Correct, sir?

12         A.  Correct.  And my understanding --

13              MR. VOGT:  Objection, Judge.

14              THE COURT:  He may answer.

15         A.  That's correct.  And I said it was my

16    understanding.  My understanding is now incorrect

17    because of the testimony Ms. Walker-Lowe and the

18    testimony of Ms. -- of Carol Vaughan, who said that

19    the nurses do not do -- do not make a list.

20         Q.  All right, sir.  Well, did you consider --

21    now, you had the deposition testimony of those two

22    individuals before you gave your deposition;

23    correct, sir?

24         A.  I did.

25         Q.  You did?

SHULMAN - CROSS                    966

1        A.  And it was reinforced by the testimony; yes.

2        Q.  I guess all I'm trying to say, sir, is I

3   traveled to Dallas and took your deposition for the

4   single and soul purpose of understanding what your

5   opinions are; right?

6        A.  Correct.

7        Q.  And you testified under oath to those

8   opinions?

9        A.  And that was my understanding at the time;

10  correct.

11       Q.  And prior to giving me those opinions you

12  had looked at everybody's depositions in this case;

13  right?

14       A.  I had -- I had not looked at Dr. Lochard's

15  deposition.  Several depositions arrived to me a day

16  before my deposition.

17       Q.  Okay.  Well, let me just ask you this then:

18  Do you agree that residents at Rushville should be

19  prioritized so that those residents with the most

20  serious needs are seen first?

21       A.  Yes.  Absolutely.

22       Q.  And the nurses perform that function?

23  You've seen that?

24       A.  I have not seen that.  You're representing

25  that.

SHULMAN - CROSS                    967

1        Q.  All right, sir -- all right.  I mean the

2    predominate way, the model way, according to your

3    testimony --

4        A.  Modal.

5        Q.  I'm sorry?

6        A.  Modal.

7        Q.  Modal.  The modal way, the predominate way

8    that patients are seen, are through the lists;

9    correct, sir?

10       A.  That was my understanding.

11       Q.  Okay.  And you have found that same system

12   is used in many correctional facilities; isn't that

13   correct?

14       A.  That is true.

15       Q.  I mean that is a standard in the industry?

16       A.  That is true.

17       Q.  Okay.  So just make sure we understand.  If

18   Rushville; hypothetically, of course; if Rushville

19   follows a system whereby patients submit healthcare

20   requests, the nurses take those healthcare requests,

21   prioritize the list, and provide that list to the

22   medical doctor or dentist, that would be the system

23   that is consistent with all of the cases that you've

24   looked at in your career?

25            MR. WATSON:  Objection, Your Honor.  May I

1  approach?

2       THE COURT:  You may.

3  (The following sidebar discussion was held at

4  the bench, out of the hearing of the jury.)

5       MR. WATSON:  Your Honor, we had agreed

6  this morning that we would be referring to

7  institutional care and not referring or

8  injecting correctional care.  And we have

9  heard now the insert of correctional care

10  and now industry and a question now based

11  on that.

12       And I'm concerned about Mr. Vogt's

13  having gone back on the agreement that we

14  would be referring to institutional care

15  and not injecting correctional into the

16  case.

17       MR. VOGT:  I have no desire to do

18  that, Judge, but I'm very worried about

19  this witness's testimony now.  I thought I

20  could rely on the dep and now I'm going to

21  have to impeach left and right.

22       THE COURT:  Well, excuse me, Mr. Vogt,

23  but the witness explained why his answer

24  changed.  And he also indicated; you may

25  not have caught it; that his prior

SHULMAN - CROSS                              969

1      testimony was in keeping with the
2      depositions of those two witnesses,
3      Vaughn -- Vance, I think it was, and
4      Walker.
5          MR. VOGT:  All right.  Well, I'll stay
6      away from this, Judge -- I'll use industry.
7      Industry is what we agreed to
8          MR. WATSON:  We agreed to
9      institutional this morning.
10          THE COURT:  Institutional was agreed
11      to.
12          MR. VOGT:  All right.  I'll try --
13          Wait a minute, there's -- there's a --
14      institutional is a single entity.  An
15      industry is wide.  The point is that the
16      witness has testified that it an industry
17      standard.  That's why I'm using that.
18      It's much more than just one facility.
19      This is all the facilities he's looked at.
20      That's why I need to go into it.
21          THE COURT:  He used the term
22      institutions and institutional.
23          MR. VOGT:  Well, he used the word,
24      when I asked him, I said is it an industry
25      standard, he said yes.

1        THE COURT:  Well, he may have said

2    that, but we agreed we would stick with

3    institution.

4        MR. VOGT:  Okay.

5        MR. WATSON:  Thank you, Your Honor.

6    (The following proceedings were held in open

7    court.)

8  BY MR. VOGT:

9    Q.  All right.  The use -- the nurse making the

10  list for the doctors and dentists, those doctors and

11  dentists to see the patients upon their arrival, is

12  a standard in the institutional area; is that

13  correct, sir?

14   A.  Not necessarily.  Certainly in the military.

15   Q.  No, sir, I'm sorry, you've looked at several

16  states, I think -- well, let's talk about that.

17      Now, the Rushville Treatment and Detention

18  Facility, you have never worked at a facility like

19  that, have you, sir?

20   A.  I've worked at a detention facility.

21   Q.  That was for minors though; correct?

22   A.  That's correct.

23   Q.  It was a juvenile detention facility?

24   A.  That's correct.

25   Q.  Essentially a prison for minors; right?

SHULMAN - CROSS                    971

1       A.  No, a detention facility.

2       Q.  All right.  Well, it's just -- it's not a

3  treatment and detention facility, those are two

4  different things, sir?  You understand that?

5       A.  Well, yes.  But it was detention facility.

6       Q.  All right.  But I'm asking you something

7  different.  Have you ever worked at a treatment and

8  detention facility like Rushville?

9       A.  I have not.

10      Q.  And have you looked at -- in your career

11  you've not looked at any policies and procedures or

12  practices by another treatment and detention

13  facilities like Rushville?

14      A.  That is correct.

15      Q.  Okay.  In fact, the only person in this case

16  who knows about how Rushville operates as a

17  treatment and detention facility for dental purposes

18  is Dr. Mitchell?

19      A.  That's correct.

20      Q.  When you say, is it modal?

21      A.  Modal.

22      Q.  What does that mean?

23      A.  Mode -- there are three measures of central

24  tendency; the mean, the median, and the mode.  The

25  mode is the -- the number of observations that are

SHULMAN - CROSS                           972

1    the greatest.  So it's basically the center of a

2    distribution.  Mode is the most frequently occurring

3    number.

4         Q.  All right.  So may I ask this question:  So

5    the list is perhaps the most frequently occurring

6    methodology in this area?  The nurses preparing the

7    list for the doctors --

8         A.  No.  For the doctors, not for the dentists.

9         Q.  Okay.  And did you consider, sir, there are

10   two doctors at Rushville, right?  Dr. Mitchell is,

11   of course, the dentist, and then did you consider

12   the testimony of the medical doctor, Dr. Lochard?

13   Did you consider his testimony, sir?

14        A.  To what -- specifically which area of

15   testimony?

16        Q.  Well, I mean here's what -- Dr. Lochard

17   testified before the jury and he told us, without

18   any equivocation, that the nurses prepare the lists

19   that are then submitted to the physician upon

20   arrival and that he works right down the list?

21        A.  Well, I don't -- I don't dispute that's the

22   way the physician did it.

23        Q.  Okay.  Did you consider also Dr. Mitchell's

24   testimony; again, right here in front of this jury,

25   that the lists are prepared by the nurses and she

SHULMAN - CROSS                      973

1   works right down the list of nurses -- the patients

2   that are prepared by the nurses?

3        A.  I wasn't present for her testimony.

4        Q.  Okay, I guess that's my question.  Did

5   you -- in forming your opinions did you consider

6   either the testimony of Dr. Lochard or the testimony

7   of Dr. Mitchell in connection with the lists that

8   are prepared by the nurses?

9        A.  Well, Dr. Lochard's testimony has to do with

10  the list for physicians.

11       Q.  Well, wait.  It has to do with -- the

12  testimony also in this case is that the lists are

13  prepared for all of the doctors at Rushville.  All

14  of the doctors at Rushville come in part-time;

15  podiatrists, psychiatrists, medical physician,

16  dentist, and eye doctor.

17       And the nurses -- the testimony indicates, the

18  evidence in this case has been that in each instance

19  the list is prepared for the professional and when

20  the professional arrives at the facility the nurse

21  says, "Here are the people you need to see."

22       And that's -- your experience has been that,

23  isn't it, sir?

24       A.  My experience has been that the -- in dental

25  area -- in medical area it's true, in dental area it

SHULMAN - CROSS                    974

1    varies.  But it certainly -- it could be.

2         Q.  Okay.  If that is the system at Rushville,

3    sir, you have no complaint about it, do you?

4         A.  Well, if -- if that's the system, then I

5    have no -- no complaint about it.

6         Q.  Okay.  Fair enough.

7         A.  Especially if -- if a dentist has -- is able

8    to make adjustments to it.

9         Q.  Okay.  I mean the bottom line is is that if

10   that's -- that's what Dr. Mitchell should do, is

11   Dr. Mitchell provides dental care to the residents

12   on the list prepared by the nurses, would that be

13   appropriate?

14        A.  Yes.

15        Q.  Okay.  Because that's the policy; right?

16        A.  It's the policy, whether it's the practice

17   or not I don't know, but it certainly is policy.

18        Q.  Well, all right.  That's what she should do,

19   is make sure -- let's make sure.  If Dr. Mitchell

20   provides dental care to the residents on the list

21   prepared by the nurses, that would be the policy.

22   Correct, sir?

23        A.  No, that would be the practice.  The policy

24   would be a written statement saying that nurses have

25   to do the -- have to --

SHULMAN - CROSS                    975

1          The policy tells people what they have to do.

2     The practice is what people do.  So that would be

3     the practice.

4          Q.  All right.  It's on page 60.

5          You remember me asking you these questions,

6     sir?  I said:  (As read)  "Now, if Dr. Mitchell

7     provides dental care to the residents on the list

8     prepared by the nurses, would that be appropriate?"

9          And your answer was:  "That's the -- that would

10    be the -- that's the policy."

11         Then I said:  "That's what she should do?"

12         And you said:  "That's the policy, that's the

13    policy, she should follow policy, that's what she

14    should do, yes."

15         Is that your testimony, sir?

16         A.  Yes.  If that is the policy.  But we haven't

17    established if it is the policy, but -- I was

18    responding to a hypothetical.  But yes, if that's

19    the policy, that's what she should do.

20         Q.  All right.  Just hang on, sir.  And again, I

21    don't want to spend too much time on this.

22         Let me ask you this:  Your understanding from

23    reviewing the materials in this case is that

24    Dr. Mitchell walks into Rushville on a given day and

25    she has a list of patients that the nurses have put

SHULMAN - CROSS                                  976

1    together.  Is that true?

2        A.  That was my understanding.

3        Q.  And would you agree that she should then

4    begin to undertake and treat each of the residents

5    that the nurses have put on that list?

6        A.  If she's given a list that has priorities;

7    yes.

8        Q.  Your answer in your deposition was, if she

9    has a list --

10           MR. WATSON:  Your Honor, could I have a

11   page and line.

12       Q.  This is page 61.  I'm sorry.

13       I asked you --

14           MR. WATSON:  Objection, Your Honor.  Can I

15   have page and line?

16       Q.  61 line 23.  I'm sorry.

17       I asked you:  (As read) "And then would you

18   agree that she should then begin to undertake to

19   treat each of the residents that the nurses have put

20   on the list?"

21       And you said:  "If she has a list, assuming a

22   list is a prioritized list of dental needs, then

23   that would be a reasonable thing to do."

24       Correct, sir?

25       A.  Correct.

SHULMAN - CROSS                977

1          Q.  All right.  And you have no complaint or

2    objection about the nurses in this case; right, sir?

3          A.  No complaint at all.

4          Q.  You're not gonna suggest that the nurses

5    preparing the list for Dr. Mitchell have done

6    anything wrong, are you?

7          A.  No, if in fact they are preparing a list, I

8    have no objection.

9          Q.  That's what their job is; right?

10         A.  Correct.

11         Q.  Okay.

12         A.  If that's what the policy is.

13         Q.  Okay.  And all of the institutions that you

14   have monitored or reviewed, sir, all of them have a

15   healthcare request system in place; correct?

16         A.  That's correct.

17         Q.  It is standard in the industry; correct?

18         A.  Yes.

19         Q.  And the healthcare request is prepared by

20   the residents?

21         A.  Correct.

22         Q.  And the purpose of the healthcare request is

23   for the resident to state what the resident's

24   problem is?

25         A.  Yes.

SHULMAN - CROSS                    978

1        Q.  To alert the staff that as a resident, I

2   have a problem or I have this need?

3        A.  That is true.

4        Q.  And it's a system to alert the medical and

5   dental staff of the resident's need?

6        A.  Of needs that the staff does not know about,

7   correct.

8        Q.  Sir, my question is, and it's the system to

9   alert the medical and dental staff of the resident's

10  need?

11       A.  Yes.

12       Q.  And the healthcare request system is used in

13  all of the institutions that you're familiar with?

14       A.  That is true.

15       Q.  Because filling out a healthcare request is

16  a simple process; right?

17       A.  Yes.

18       Q.  And certainly Mr. Smego knew how to do it?

19       A.  Yes.

20       Q.  Takes about 30 seconds?

21       A.  It is not complex.

22       Q.  Is there any reason, sir, that Mr. Smego

23  could not have filled out a healthcare request form

24  at any time?

25       A.  I'm not aware of any.

SHULMAN - CROSS                    979

1      Q.  He was always physically and mentally able
2  to do it; correct?
3      A.  That's my assumption.  That's my
4  understanding.
5      Q.  And it's a resident's decision to fill out a
6  healthcare request; correct, sir?
7      A.  Yes.
8      Q.  If a resident decides not to fill out a
9  healthcare request form, do you believe that someone
10  other than the resident is responsible for the
11  resident's decision to not fill out a healthcare
12  request form?
13      A.  Could you repeat the question, please?
14      Q.  Sure.  Put it this way:  A decision to do
15  something or not to do something is the
16  responsibility of the individual?
17      A.  That is true.
18      Q.  Mr. Smego is an adult and knows how to fill
19  out the request form?
20      A.  Yes.
21      Q.  Mr. Smego is responsible for whether he
22  fills out a healthcare request form or not?
23      A.  Yes.
24      Q.  And if Mr. Smego fails to fill out a
25  healthcare request, that is his decision?

SHULMAN - CROSS                    980

1          A.  Yes.

2          Q.  Mr. Smego, he decided when to fill out a

3   healthcare request form?

4          A.  True.

5          Q.  No one prevented him from doing so?

6          A.  To my knowledge that's correct.

7          Q.  Mr. Smego knew what to do and how to do it

8   as far as healthcare request forms are concerned?

9          A.  Yes.

10         Q.  Because one of the theories of the

11  healthcare request system is that residents need to

12  make their needs known to staff?

13         A.  That is true.

14         Q.  And you would expect if someone is truly in

15  pain, you would expect the resident to request care;

16  right?

17         A.  Yes.

18         Q.  And the nurses, you understand, sir, from

19  review of the materials in this case, that the

20  nurses who prepare the list of residents for

21  Dr. Mitchell to see rely on the healthcare requests

22  in preparing that list?

23         A.  I've not seen -- I've not seen a list, but

24  if a list is produced, that's my understanding; yes.

25         Q.  That's your understanding, okay.

SHULMAN - CROSS                                    981

1        One of the theories underlying the healthcare

2    request system is that if a resident truly has a

3    need, he will prepare and submit a healthcare

4    request; right?

5        A.  Yes.

6        Q.  Nurses will then get the healthcare request,

7    assess the patient's need, and if necessary, put the

8    patient on the list for Dr. Mitchell to see?

9        A.  That's my understanding of the process; yes.

10       Q.  And that process is consistent with other

11   institutions that you've looked at?

12       A.  Some, yes.

13       Q.  And again, we agree that Mr. Smego is

14   responsible for his decision to fill out or not fill

15   out a healthcare request?

16       A.  Yes.

17       Q.  Now, there were occasions, as you may

18   recall, when perhaps a resident was scheduled for a

19   next visit.  Do you recall that?

20       A.  I do.

21       Q.  And even though Dr. Mitchell planned to see

22   Mr. Smego on a given date as reflected in the

23   records, if other residents at Rushville had greater

24   needs on those dates than Mr. Smego, you would agree

25   Dr. Mitchell should see the residents with greater

SHULMAN - CROSS                          982

1    needs; correct?

2        A.  If that was the case, yes.

3        Q.  And you have no knowledge whatsoever as to

4    what conditions the other residents have on those

5    dates?

6        A.  That is true.

7        Q.  That was the function of the nursing staff

8    preparing the list?

9        A.  From what you represent, yes.

10       Q.  And from what you've read in the case;

11   right?

12       A.  Not -- it's conflicting -- there are

13   conflicts.  I mean it's not clear.

14       Q.  Well, do you have any knowledge whatsoever

15   as to what the conditions of the other residents

16   were on any given date?

17       A.  I do not.  I do not.

18       Q.  Because you agree that Dr. Mitchell should

19   treat the residents at Rushville who have the most

20   serious needs first?

21       A.  Absolutely.

22       Q.  And do you have any evidence to suggest that

23   Dr. Mitchell did not, in fact, do that?

24       A.  I have no evidence to -- one way or the

25   other.

SHULMAN - CROSS                    983

1         Q.  And you would expect, sir, that if a patient
2    is suffering from pain, the patient would express
3    that by submitting a healthcare request?
4         A.  Yes.
5         Q.  Because we agree, sir, that a resident like
6    Mr. Smego cannot sit back, do nothing, and then say,
7    I've been in pain for a year; right?
8         A.  Residents are responsible for identifying
9    pain and reporting it to staff; yes.
10         Q.  Certainly a resident like Mr. Smego
11    certainly needs to tell someone about his pain or do
12    something about it; correct?
13         A.  Yes.
14         Q.  And that was your testimony I just read.
15    And twice you've used the word certainly?
16         A.  Yes.
17         Q.  And then as far as his dental pain is
18    concerned, is there any evidence, sir, that
19    Mr. Smego ever complained to the nurses about a
20    dental problem?
21         A.  I've not seen anything, complaints to
22    nurses.  I've seen complaints to counselors, but not
23    nurses.
24         Q.  You've seen -- the jury has heard Dr.
25    Lochard, the primary care physician, testify in this

SHULMAN - CROSS                          984

1   case.  Can we agree, sir, there is no evidence of

2   Dr. Lochard's records of Mr. Smego ever complaining

3   to Dr. Lochard of suffering from a dental problem?

4       A.  That is true.

5       Q.  And by the way, sir, during Mr. Smego's

6   entire nine years with the DHS, he has lost a single

7   tooth, No. 2; correct?

8       A.  Yes.

9       Q.  Now, how many cavities do you think tooth

10  No. 2 had at the time of the extraction?

11      A.  When you say how many cavities.  How many

12  caries lesions or how many manifestations of the

13  lesion?

14      Q.  Tell me, what is your understanding of the

15  condition of tooth No. 2 --

16      A.  It's my understanding that it was charted

17  for three cavities.

18      Q.  Tooth No. 3 had --

19      A.  Tooth No. 2, I believe.

20      Q.  I'm sorry, that's right, my mistake, I'm

21  sorry.  Tooth No. 2 had three different --

22      A.  At least two, perhaps three.  I'd have to

23  look at the chart again.

24      Q.  And do you understand that what Dr. Mitchell

25  tried to do is she began drilling that tooth 2 with

SHULMAN - CROSS                          985

1  the intent to fill it?

2      A.  Yes.

3      Q.  And then while attempting to do that the

4  tooth broke apart and disintegrated?

5      A.  Yes.

6      Q.  And, sir, in your career as a dentist there

7  have been occasions when you've started a filling

8  with the goal of trying to repair the tooth?

9      A.  Yes.

10     Q.  And then while attempting to do that the

11 tooth has broken apart?

12     A.  Yes.

13     Q.  Did you commit malpractice when you did

14 that?

15     A.  No, nor did she by -- when she drilled in

16 tooth No. 2.

17     Q.  All right.  The bottom line is sometimes you

18 go in, you try to drill the tooth, try to do the

19 best you can, but if because of the decay in the

20 tooth in breaks apart, then you have to take the

21 next step right?

22     A.  Absolutely.  Without a doubt.  I have no

23 argument with that.

24     Q.  Okay.  And you don't know how long tooth No.

25 2 had a cavity before 2005, do you?

SHULMAN - CROSS                     986

1        A.  Well, I know it was at least 18 months.  How

2   much before that, I don't know.

3        Q.  Now, why do you say 18 months?

4        A.  Because it was charted in 2005 and it was

5   taken -- it was taken out approximately 18 months

6   later.

7        Q.  I apologize.  Mr. Smego, between 2002 and

8   2005, when he was out in the free world, did you see

9   any evidence in the record to suggest that he saw a

10  dentist during that period of time?

11       A.  The records I looked at started at

12  Rushville.

13       Q.  Okay.  I guess my question then is, as far

14  as any dental treatment before 2005, you have no

15  knowledge?

16       A.  That is true.

17       Q.  Can we agree, sir, as far as how long

18  Mr. Smego had his cavity before 2005, you have no

19  idea?

20       A.  It's not knowable.

21       Q.  Certainly Dr. Mitchell is not responsible

22  for the decay of Mr. Smego's teeth prior to 2005?

23       A.  No.  We take our patients as they come.

24       Q.  And certainly if Mr. Smego was suffering any

25  type of pain or discomfort between 2002 and 2005,

SHULMAN - CROSS                    987

1   you would expect him to seek out the assistance of a

2   dentist?

3        A.  Yes.

4        Q.  I mean from a common sense prospective, sir,

5   is it a fair statement to say, in other words, that

6   if a patient truly has pain or discomfort, the

7   patient will seek out dental care; right?

8        A.  Yes, that's true.

9        Q.  And if the patient is suffering from dental

10  pain or discomfort, the patient will try to take

11  some type of medication for it; right?

12       A.  Yes.

13       Q.  Have you looked at Mr. Smego's medication

14  administration record in this case?

15       A.  Yes, I did.

16       Q.  You saw then for a great period of time he

17  unilaterally stopped taking his diabetes medication.

18  Did you see that, sir?

19       A.  I saw -- I wasn't monitoring his diabetes

20  medication, but I know there were issues with

21  control.

22       Q.  Well now, the jury has seen and heard the

23  testimony in this case, sir.  Issues of control.

24  Now, can we agree that --

25            THE COURT:  Issues of what kind of control?

SHULMAN - CROSS                    988

1      Q.  Diabetes control, I apologize.

2      Can we agree, sir, in connection with diabetes,

3  if a diabetic does not take their medication, that's

4  not control; right?

5      A.  Well, diabetic who doesn't take his

6  medication will become an uncontrolled diabetic.

7      Q.  Okay.

8      A.  Any more than that I'm poaching into

9  medicine.

10      Q.  I understand that.  But you know -- we can

11  agree you know enough to say that uncontrolled

12  diabetes is going to harm the teeth and gums;

13  correct, sir?

14      A.  Uncontrolled diabetes will harm the gums,

15  not necessarily the teeth.

16      Q.  Okay.  Because what happens with

17  uncontrolled diabetes, obviously, is there's an

18  elevation in the sugar level throughout the body;

19  correct?

20      A.  Yes.

21      Q.  And sugar, of course, is one of the worst

22  things for someone's teeth; right?

23      A.  But the literature does not -- in fact, I

24  just did some research before I came here.  The

25  literature does not support the association between

1   salivary sugar and caries.

2       Q.  Okay.

3       A.  But the association between uncontrolled

4   diabetics and periodontal disease is quite clear.

5       Q.  All right.  Because certainly an elevated

6   blood sugar level complicates a patient's dental

7   status; you would agree with that?

8       A.  What complicates his dental status is the

9   dry mouth that diabetes causes.  The lack of

10  salivary flow.

11      Q.  All right.  Did you consider, in forming

12  your opinions, the fact that Mr. Smego had gone over

13  a year without taking any of his medications for

14  diabetes?

15      A.  I did not.

16      Q.  Did you consider the fact that Mr. Smego

17  never requested pain medications that were available

18  to him?

19      A.  I did.

20      Q.  Because we agree -- we would agree, sir,

21  that if you looked at a patient's medication

22  administration record; you're familiar with that?

23      A.  I am.

24      Q.  It's a standard document in the industry?

25      A.  Yes.

SHULMAN - CROSS                    990

1    Q.  Records all of the medications that are

2    available to a patient?

3    A.  Yes.

4    Q.  What -- then it records what the patient in

5    fact ingests?

6    A.  Well, it depends on the medication.  For

7    controlled medications ingestion is monitored.  For

8    PRN -- for medications that the patient may -- for

9    analgesics, for Tylenol and Motrin, the patient is

10   given it, but the patient is not supervised in

11   ingesting it.

12   Q.  Well, sir, did you -- put it this way, sir;

13   the jury in this case has heard that when

14   medications are administered the nurses confirm that

15   the patient has swallowed the medication at

16   Rushville.  All right, sir?

17   A.  All medications?

18   Q.  All medications, sir.

19   A.  All right.

20   Q.  Accepting that as being true --

21        MR. WATSON:  Objection, Your Honor;

22   misstates the testimony.

23        THE COURT:  Sidebar.

24   (The following sidebar discussion was held at

25        the bench, out of the hearing of the jury.)

SHULMAN - CROSS                           991

1        THE COURT:  My recollection of the

2   testimony, there were two options that the

3   nurses used.

4        MR. WATSON:  For psychotropic

5   medications, that they confirmed the

6   diagnosis -- the ingestion because it's a

7   security risk for people to not take their

8   psychotropic medications.  For

9   non-psychotropic they dispense and when the

10  cart goes around, they just dispense, they

11  don't confirm the swallowing.

12       MR. VOGT:  I asked that of the nurse

13  and the Director of Nursing directly,

14  Judge.  That's what she said.

15       THE COURT:  I don't think they

16  specified psychotropic.

17       MR. VOGT:  No, they didn't.

18       THE COURT:  But there were two

19  different ways.  There was one they watched

20  them take it; two, they looked in their

21  mouths; is that right?

22       MR. VOGT:  The PRNs were --

23       MR. WATSON:  They watched -- they

24  watched them dispense it.  And then there

25  was another --

1         MR. VOGT:  No --

2         MR. WATSON:  We've heard testimony in

3    this case that they watched them dispense

4    it and then there are other times where

5    they would watch ingestion and they would

6    document ingestion.

7         MR. VOGT:  Judge, I tell you what.

8    The -- Mr. Smego confirmed that he is not

9    contesting what the medication

10    administration reports show.  So I will

11    just ask the witness that.

12         THE COURT:  Okay.

13    (The following proceedings were held in open

14    court.)

15  MR. VOGT:

16    Q.  Sir, Mr. Smego testified today that he

17  has -- he's not contesting and there's no dispute

18  about the medication administration records for

19  Mr. Smego in this case.  Okay, sir?

20    A.  Okay.

21    Q.  And that would tell us what medications were

22  administered to Mr. Smego?

23    A.  That's true.

24    Q.  And if you're concerned about pain you would

25  look to see what medications the patient was

1    actually being provided; right?

2        A.  Yes.

3        Q.  Because the patient who is in dental pain

4    especially, you would expect the patient to obtain

5    medication if he has it available for him to take?

6        A.  Yes.

7        Q.  Okay.  Now, as far as you being able to

8    testify about other teeth being affected, we can

9    agree that you can't tell which teeth, if any, of

10   Mr. Smego's, were if any way affected by the delay;

11   correct, sir?

12       A.  I can't tell which teeth particularly.

13       Q.  Because as to Mr. Smego, which teeth have

14   suffered from any such progression particularly,

15   you're not able to say; correct?

16       A.  Correct, because I didn't have -- I didn't

17   have the x-rays and I didn't have a detailed chart.

18       Q.  You would be speculating to do that;

19   correct, sir?  Without the x-rays?

20       A.  I'd be speculating about specific teeth, but

21   not about the likelihood that teeth would degenerate

22   in general.

23       Q.  I know, but you can't tell us which teeth --

24       A.  That is true.  That is quite true.

25       Q.  They may or they may not; right?

SHULMAN - CROSS                              994

1          A.  That is true.

2          Q.  Okay.  Now, would you agree, sir, that most

3    people with access to dental care will seek it out

4    when the pain really gets their attention?

5          A.  Typically that's true.

6          Q.  Because people don't like going to the

7    dentist?

8          A.  I don't like going to the dentist.

9          Q.  I know, I know.  And that's why with

10   cavities, it's an elective procedure; isn't that

11   true, sir?

12         A.  I'm sorry?

13         Q.  It's an elective procedure?

14         A.  Yes.

15         Q.  The person must choose to have the cavity

16   repaired; right?

17         A.  Yes.  No one is forcing him to do it, yes.

18         Q.  Right.  And that's the whole idea.  In this

19   case, as you know and as the records have shown

20   here, Mr. Smego has had the same three cavities for

21   his entire stay at Rushville; correct, sir?

22         A.  That is true.

23         Q.  And just to make sure, I believe that's

24   No. 18, 20, and 21?

25         A.  I believe I identified them, yes.

SHULMAN - CROSS                          995

1          Q.  I apologize.  And sir, we can agree that at

2     any time, if Mr. Smego wanted those cavities

3     repaired, he could simply suggest or submit a

4     healthcare request saying, "I'd like the cavities

5     taken care of;" right?

6          A.  He could.

7          Q.  Because the evidence that the jury has heard

8     today, that for the last five years at least,

9     Mr. Smego told us he has not submitted a healthcare

10    request at all, he has not asked a nurse, he has not

11    asked his therapist, he has not asked the doctor, he

12    has done nothing in connection with trying to get

13    the cavities repaired.  All right, sir?

14         A.  I'm sorry, the question was?

15         Q.  All right.  If it's true, sir, that

16    Mr. Smego testified that for the last at least five

17    years he has done nothing to request that the

18    cavities 18, 20, and 21 be repaired, that's a

19    decision for him?

20         A.  Absolutely.

21         Q.  Okay.  If he wants to get the teeth

22    repaired, the process for him to follow is to simply

23    take 30 seconds and submit a healthcare request?

24         A.  That's the process, yes.

25         Q.  Thank you.  And as far as his pain, there's

SHULMAN - CROSS                    996

1   no nursing notes reflecting that Mr. Smego
2   complained of dental pain, is there?
3        A.  I have not seen nursing notes to that
4   effect.
5        Q.  I'm sorry?
6        A.  I have not seen nursing notes that stated
7   that; correct.
8        Q.  Okay.  And there's no doctor's progress
9   notes suggesting that Mr. Smego was ever complaining
10  of dental pain; correct?
11       A.  No physician's progress notes, yes.
12       Q.  Right.  Now, with regard to the offsite
13  dental care, sir.  You saw Dr. Lochard's testimony
14  in this case.  He sent Mr. Smego offsite to receive
15  services that Dr. Lochard could not provide onsite?
16       A.  That's true.
17       Q.  And wouldn't you agree that's what
18  Dr. Mitchell's obligation is, too?  Send the
19  patients offsite for services required offsite that
20  she cannot provide onsite; correct?
21       A.  That's true.
22       Q.  Okay.  And just -- forgive me, but the
23  healthcare request system is the principle method of
24  notifying staff of patient's requests?
25       A.  True.

1        Q.  And if a patient does not submit a

2   healthcare request, it's reasonable to assume that

3   he certainly doesn't have a severe problem; correct?

4        A.  Yes.

5        Q.  Now, the -- I'm not sure what exhibit this

6   is, I'm sure -- I love these, by the way, this

7   exhibit here?

8        Exhibit 117, sir, I'm sorry.  One -- one issue

9   about these drawings is you do not show Mr. Smego's

10  existing cavities when he came into the facility?

11       A.  That's true.  That wasn't my purpose in

12  drawing that; yes.

13       Q.  Okay.  In addition, this does not show the

14  teeth that were extracted to Mr. Smego prior to his

15  arrival?

16       A.  I believe the very -- we amended a version.

17  There are black lines through those three teeth.

18       Q.  Okay.  Was tooth No. 1 extracted prior to

19  Mr. Smego's arriving at Rushville?

20       A.  We have to go back and check that graphic.

21       Q.  Okay.  You don't know one way or the other

22  offhand?

23       A.  Not off -- I haven't memorized it, no.

24       Q.  Okay.

25       A.  I think it was 15, 16, and maybe 1, but I'm

1    not sure.

2         Q.  And as far as grievances are concerned --

3         All right, sir, let me show you Defendant's

4    Exhibit 14, sir.

5              MR. WATSON:  May I see it?

6         Q.  I'm sorry.  We were talking about this and I

7    apologize for not having -- not being more

8    organized, sir.

9         This is from August of 2008.  Let me just show

10   you.  You see that date on the bottom, sir?

11        A.  I do.

12        Q.  Okay.  And as you can see, sir, this is

13   identified, Attempt to Resolve Grievances Behavior

14   Committee.  Do you see that, sir?

15        A.  I do.

16        Q.  And as you can see, it's highlighted at the

17   top, says: (As read) "The residents should attempt

18   to resolve any concerns or complaints directly with

19   the persons involved before filling a formal

20   grievance."  Do you see that, sir?

21        A.  I do.

22        Q.  And that suggests there's a two-step

23   process; correct?

24        A.  Yes.

25        Q.  All right.  And the idea of the attempt to

SHULMAN - CROSS                    999

1   resolve is to try to resolve a problem; right?

2       A.  Yes.

3       Q.  And the whole idea is that if a patient has

4   a problem or an issue with a staff member, the

5   patient can submit the attempt to resolve and then

6   the parties can address the matter and hopefully

7   address the matter?

8       A.  That's the presumption, yes.

9       Q.  Okay.  That's the purpose of it?

10      A.  Yes.

11      Q.  Do you have any reason -- do you believe

12  Mr. Smego is exempted from that policy?

13      A.  No.

14      Q.  Do you believe Mr. Smego should -- is

15  obligated to follow the attempt to resolve policy

16  that applies at Rushville?

17      A.  Well, it says should, not shall, but --

18      Q.  You tell me?

19      A.  It says residents should, it doesn't say

20  residents shall.

21      Q.  Okay.  Well, my question, sir, do you

22  believe that Mr. Smego should follow that?

23      A.  I think, yes.  Unless he has reason to

24  believe that Dr. Mitchell knew about it.

25      Q.  Well, hang on, sir.  Maybe this will help.

SHULMAN - CROSS                    1000

1    This is Exhibit 12.  And we were talking with

2    Mr. Smego about this this morning.  As you can see,

3    this is a resident's attempt to resolve complaint

4    form.  Do you see that, sir.

5        A.  Yes.

6        Q.  And there is -- now, you talked about the

7    language here.  You'll see the citation to Illinois

8    law there, Title 59?

9        A.  Yes.

10       Q.  And that says, states, "residents shall --

11       A.  It does indeed.

12       Q.  "-- first attempt to resolve problems or

13   complaints."  Do you see that, sir?

14       A.  It does, yes.

15       Q.  So we can agree that Mr. Smego had an

16   obligation to submit an attempt to resolve if he had

17   a problem or complaint regarding Dr. Mitchell; true?

18       A.  Yes.

19       Q.  And he did not; correct?

20       A.  That's my understanding.

21       Q.  Okay.  And again, if he had submitted a

22   request to resolve, Dr. Mitchell would have received

23   it, she could have gone to see him; right?

24       A.  It's possible.

25       Q.  And she could have taken care of his

SHULMAN - CROSS                      1001

1    problem; right?

2         A.  It's possible, yes.

3         Q.  And we would not be here today?

4         A.  Perhaps.

5         Q.  One of -- if the attempt to resolve did not

6    resolve things, he could have filed a grievance

7    after August of 2008?

8         A.  In 2008, yes.

9         Q.  Sure.  All right.

10        Because he could have filed a grievance if

11   he -- regarding the dental care.  You would expect

12   him to do that; right?

13        A.  Yes.

14        Q.  You would expect that if he had a dental

15   need or dental concern that was not being addressed,

16   he should file a grievance, shouldn't he?

17        A.  Yes.

18        Q.  I mean if he's not receiving dental care

19   that he think he's entitled to, the grievance system

20   exists so that he can raise that to the

21   administration's attention; isn't that correct?

22        A.  Yes.

23        Q.  Do you know of any reason why Mr. Smego

24   would not file a grievance, if he could, relating to

25   his dental care?

1   A.  I do not.

2   Q.  And again, if he had filed a grievance,

3  Dr. Mitchell would have been made aware of it?

4   A.  I believe so.

5   Q.  She could have addressed his problem?

6   A.  Had she chosen to, yes.

7   Q.  And we would not be here today?

8   A.  Perhaps.

9   Q.  Okay.  Now, you've reviewed cases involving

10  Dallas County, Cook County, and Lake County?

11   A.  I have not reviewed it.  I've read

12  reports -- reports by the Department of Justice.

13   Q.  I'm sorry, I apologize, sir.

14   Those reports were part of the basis for your

15  opinions in this case?  You cited them in your

16  report?

17   A.  I cited them as a basis that the federal

18  government defines appropriate care as being timely

19  care.

20   Q.  All right.  And in each of those instances

21  the defendants in those cases was the governmental

22  entity responsible for providing the residents with

23  dental care?

24   A.  That is true.

25   Q.  And in each case the final order provided

SHULMAN - CROSS                        1003

1   that the governmental entity responsible for

2   providing dental care would take steps to increase

3   dental staffing?

4        A.  That is true.

5        Q.  Now, at Rushville, DHS is the governmental

6   entity that's responsible for providing dental care

7   to the residents?

8        A.  Is that -- are you asking me a question?

9        Q.  I say again, now at Rushville, the DHS is

10  the governmental entity responsible for providing

11  dental care to the residents?

12       A.  Yes.

13       Q.  We can agree, though, that the dental

14  staffing at Rushville, based on conversations today,

15  is not appropriate?

16       A.  True.

17       Q.  And then as far as this whole Motrin issue,

18  sir, is concerned.  Let me just ask you this

19  question:  Is there any evidence in this entire case

20  at any time that Mr. Smego ever suffered an allergic

21  reaction to Motrin?

22       A.  No.

23       Q.  In fact, absolutely none; right?

24       A.  I said no.  Yes.

25       Q.  In your deposition you said "no, absolutely

SHULMAN - CROSS                          1004

1   none?"

2        A.  Yeah, there's no evidence.  I said there's

3   no evidence.

4        Q.  No problem, I'm sorry.

5        Because -- and you agree that Dr. Mitchell

6   timely treated Mr. Smego when he put in healthcare

7   requests?

8        A.  She timely saw him, yes.

9        Q.  Well, let me just read your answer.

10       (As read) "Dr. Mitchell also timely treated

11   Mr. Smego when he put in healthcare requests, I

12   won't dispute that."

13       A.  Well, what I meant was she timely saw him.

14   We have to go back to the record to see if there was

15   any treatment provided.  But she timely saw him.

16       Q.  Okay.  And as far as the other teeth are

17   concerned; just one last question, sir; are you able

18   to point to any particular tooth in Mr. Smego's

19   mouth and say that this tooth's condition is worse

20   now than it was before as a result of an alleged

21   delay in treatment?

22       A.  No.

23       Q.  Okay.  Dr. Mitchell testified in this case,

24   sir.  I asked her if she agreed that the number of

25   residents -- with the number of residents at

1    Rushville there is no way Dr. Mitchell can provide

2    all the dental care that's needed on 15 hours a

3    week.  Dr. Mitchell said that's true.

4        I asked the Director of Nursing:  "With the

5    number of residents at Rushville, there is no way

6    Dr. Mitchell can provide all the dental care that's

7    needed on 15 hours a week?"  And the Director of

8    Nursing also said that's true.

9        Now I'm gonna ask you.  We agree that with the

10   number of residents at Rushville, there is no way

11   Dr. Mitchell can provide all the dental care as

12   needed on 15 hours a week?

13       A.  That's true.

14       Q.  And you testified -- your testimony in this

15   case is that, in fact, with the number of residents

16   that Rushville has, you need a full-time dentist?

17       A.  Well, I said .8 FTE -- .8 full-time

18   equivalent or full-time -- or full-time dentist, but

19   that's -- that's without doing a detailed analysis

20   of needs.  But yes, it needs more dental FTEs.

21       Q.  I'm just asking what your testimony --

22       A.  It's -- I said .8 FTEs --

23       Q.  You said .8 to 1?

24       A.  That's correct.

25       Q.  Okay.  And the .8 to 1 dentist meaning; now

SHULMAN - CROSS                              1006

1   forgive me; 32 to 40 hours of dental care?

2       A.  Yes.

3       Q.  That would be your starting point?

4       A.  That would be a place I'd see which way to

5   go from there.

6       Q.  And you would need a full-time dental

7   assistant --

8       A.  No -- Im sorry, full-time -- part-time

9   hygienist.  That's correct.

10      Q.  And Rushville has never had a dental

11  hygienist?

12      A.  That's my understanding.

13      Q.  And Rushville has never had a full-time

14  dental assistant?

15      A.  That's not my understanding.  I thought

16  there was a full-time dental assistant for certain

17  periods.

18      Q.  You did?

19      A.  Yes.

20      Q.  All right.  Rushville has never had a

21  full-time dentist?

22      A.  That's true.

23      I'm sorry, when I said full-time dental

24  assistant, I meant a dental assistant working with a

25  dentist full-time.

1      Q.  That's what I'm trying to say.  If the

2  dental assistant -- the evidence in this case is the

3  dental assistant has only been there 15 hours a

4  week?

5      A.  Okay, with the dentist.  That's fine.

6      Q.  And if we use 40 hours as the benchmark for

7  what Rushville needs, DHS, Wexford, and Addus are

8  only providing three-eighths of what is required?

9      A.  True.

10     Q.  And that's not Dr. Mitchell's fault?  You're

11 not suggesting that, are you?

12     A.  I'm not suggesting that DHS understaffing is

13 Dr. Mitchell's fault?  No, I'm not.

14     Q.  Okay.  Because what happens is DHS

15 determines how many hours of dental care they would

16 like at the facility?

17     A.  Right.

18     Q.  Then DHS hires a contractor like Wexford or

19 Addus and says, we would like you to put 15 -- this

20 number of hours of dental care at the facility?"

21 Right?

22     A.  Right.

23     Q.  And then Wexford or Addus then contacts a

24 dentist like Dr. Mitchell and says, "We would like

25 you to work this number of hours at the facility."

SHULMAN - CROSS                           1008

1    And then Dr. Mitchell's job is to go there and work

2    that number of hours at the facility?

3         A.  Correct.

4         Q.  And she has done that?

5         A.  Correct.

6         Q.  You have no -- there's no evidence in this

7    case that she has not done her job of 15 hours per

8    week during the entire term of her contract?

9         A.  That is correct.

10        Q.  And Wexford and Addus and DHS, none of them

11   have any complaints regarding Dr. Mitchell; correct?

12        A.  I've not seen complaints.

13        Q.  All right.  And what Dr. Mitchell should do

14   when she gets there is take the list of residents

15   that is prepared by the nurses and work right down

16   that list of residents?  That's her job?

17        A.  If, in fact, there's a list.

18        Q.  Okay, I'm sorry, I know that -- assuming the

19   nurses prepare the list like we've been talking

20   about, Dr. Mitchell's job then is to take that list

21   and move right down the list; correct?

22        A.  Correct.

23        Q.  Because that would be the fair thing to do;

24   treat all the residents equally?

25        A.  Yes.

SHULMAN - CROSS                          1009

1      Q.  Okay.  You were talking about -- I mean if

2  Dr. Mitchell did not work there, sir, based on

3  everything you know, who would?

4           MR. WATSON:  Objection, Your Honor.  This

5  was the motion in limine.

6           THE COURT:  Sidebar.

7      (The following sidebar discussion was held at

8       the bench, out of the hearing of the jury.)

9           MR. VOGT:  Judge, they were very

10      critical of Dr. Mitchell again and again

11      and again for signing her contracts with

12      these companies.  They were all over her

13      for -- this expert was.

14      I'm more than entitled to bring up that

15      the consequence of her not signing the

16      contract that they have opened the door on

17      is that no one would be there.  I have to

18      be able to respond to that attack by this

19      expert.

20           THE COURT:  How does he know?

21           MR. VOGT:  Because no one else has

22      ever been there.

23           MR. WATSON:  There's no foundation for

24      this question and --

25           MR. VOGT:  I'll lay foundation.

1      MR. WATSON:  -- the reason for this
2  motion in limine was that there was no
3  foundation throughout this entire case.
4  And at the last moment Mr. Vogt tried to
5  put up a few ads and suggest that because
6  there were ads placed, despite the fact
7  that no one has testified about whether
8  Wexford has actually brought in candidates,
9  interviewed candidates, who they've
10  interviewed, who they've rejected, any
11  foundation to suggest that there is not a
12  dentist willing to take that position, Your
13  Honor, is the reason for this Court's
14  motion in limine.
15      This question that was just asked is a
16  violation of this Court's orders.
17      THE COURT:  Yes, but that was before
18  we got into this information.  Wasn't the
19  -- what were the dates on those two ads?
20      MR. VOGT:  They were three or four
21  years ago, Judge.  I asked --
22      MR. WATSON:  -- those two ads in the
23  motion in limine.  We had argument on that
24  and part of that argument was there was no
25  foundation to whether there was an actual

SHULMAN - CROSS                    1011

1    hiring.
2        You could place hundreds of ads and if
3    you never undertake to hire someone or any
4    of the candidates or make a decision, you
5    never know whether anybody else would take
6    that position.
7        And that was the problem, is there's no
8    foundation for Mr. Vogt's question.
9            THE COURT:  Are you almost done?
10           MR. VOGT:  Yes, I'm almost done,
11   Judge.
12           MR. WATSON:  There's going to be some
13   redirect based of his examination.
14           THE COURT:  I'm going to sustain the
15   objection.
16   (The following proceedings were held in open
17   court.)
18   BY MR. VOGT:
19       Q.  Doctor, from your review of materials in
20   this case and your review of the depositions and the
21   testimony, you're aware that Wexford has been trying
22   to get another dentist at Rushville for several
23   years?
24           MR. WATSON:  Objection, Your Honor;
25   foundation.

1              THE COURT:  Objection is sustained.

2         Q.  Are you critical of Dr. Mitchell for

3    agreeing to go to Rushville, sir?

4         A.  For agreeing to go to Rushville?

5         Q.  Yes.

6         A.  No.  I'm critical for her agreeing to

7    practice under conditions that don't allow her to

8    practice to the standard of care.

9         Q.  Okay.  Well, let's talk about that then.

10   First of all, she's not DHS, she's not Wexford, and

11   she's not Addus; correct?

12        A.  That's true.

13        Q.  Okay.  Wexford decides -- DHS and Wexford

14   decide the number of hours they want a dentist

15   there?

16        A.  Yes.

17        Q.  They say to Dr. Mitchell, "We want you to

18   provide 15 hours of work;" right?

19        A.  Yes.

20        Q.  She has two options.  Now, based on all the

21   records in this case, all the evidence, the only

22   dentist that's ever worked at Rushville is

23   Dr. Mitchell; correct?

24        A.  That's true.

25        Q.  If Dr. Mitchell said, "No, I'm not working

1    there, I'm not gonna go there and help these

2    people," do you have any idea who might go there?

3             MR. WATSON:  Objection, Your Honor.  This

4    is the motion in limine sidebar we just had.

5             THE COURT:  The objection is sustained.

6       Q.  Sir, you're aware that Dr. Mitchell travels

7    five hours from Chicago down to Rushville to see

8    residents at Rushville?

9       A.  That's what I believe you stated at my

10   deposition.

11      Q.  Okay.  Have you ever, sir, in your career in

12   private life, travelled five hours to treat a

13   patient?

14      A.  Not since I was out of the Army.

15      Q.  Okay.  That's why I asked you about private

16   life.  In the Army it's a little unique; right?

17      A.  Correct.

18      Q.  Okay.  Since leaving the Army have you ever

19   traveled five hours to treat patients?

20      A.  I have not.

21      Q.  Are you critical of Dr. Mitchell for

22   traveling five hours down to Rushville to help the

23   patients there?

24      A.  Those are two questions.  One, am I critical

25   of her going to Rushville.  No.  Am I -- I'm

SHULMAN - CROSS                    1014

1    critical of her for agreeing to practice under

2    conditions where she can't practice the standard of

3    care.

4          Q.  I agree.  Now, what should she have done?

5          A.  Not signed the contract.

6          Q.  All right.  Then would there be no dentist

7    then?

8          A.  No, then Wexford would be forced to find

9    one.  In any market there's a price that gets a

10   services.

11         Q.  Okay.  So what is happening then; tell me if

12   I'm wrong; what you're saying is that going on

13   strike, if you will, would force Wexford's hand?

14         A.  Well, they're legal responsible to provide

15   dental care.  Yes, they would -- I mean they would

16   find a dentist.

17         Q.  Okay.

18         A.  We found that in California after a court

19   order.

20         Q.  Okay.  What you found in California, as I

21   understand things, is by increasing the amount of

22   pay, the dentists would flock to the job?

23         A.  Yes.  Absolutely.

24         Q.  And can we agree, sir, that perhaps one of

25   the reasons dentists are not flocking to the job

SHULMAN - CROSS                    1015

1   with Wexford is that they're not offering a

2   sufficient amount of pay?

3       A.  That's probably a good part of it, yes.

4       Q.  And can we -- but sir, again, forgive me, if

5   Dr. Mitchell's goal and purpose is to try to help

6   these people, she should go there and do that,

7   wouldn't you be agree?

8       A.  You're assuming a goal.  I'm simply

9   saying -- that's not -- that's not my issue.  I mean

10  if her goal is to help those people, my position is

11  she is not helping those people by practicing below

12  the standard of care.

13      Q.  She's doing what she can on 15 hours a week

14  though we agree; correct?

15      A.  She's there 15 hours a week.

16      Q.  Okay.  And that's Wexford and Addus and DHS

17  wants her to do?

18      A.  That's true.

19      Q.  And she has done that, in fact; correct?

20      A.  That is true.

21      Q.  And by the way, all of Mr. Smego's dental

22  care are routine matters; correct?

23      A.  Well, they're -- by routine matter --

24  they're routine matters until they become serious

25  matters.

SHULMAN - CROSS                          1016

1     Q.  But at this point he's just got routine

2   cavity matters; correct?

3     A.  Well, he -- he has dental decay.  He has

4   cavities.  When you say routine, how do you define

5   routine.

6     The problem with cavities is they tend to get

7   worse if not treated.

8     Q.  My simple question, sir:  Would you agree

9   that Mr. Smego's dental concerns were routine

10  matters that general dentists could handle?

11    A.  Yes.  Absolutely.

12    Q.  All right.

13    A.  General dentists handle routine -- sure,

14  absolutely.

15    Q.  And obviously Dr. Mitchell is a general

16  dentist; correct, sir?

17    A.  That's true.

18    Q.  Mr. Smego testified today before -- in front

19  of this jury that he knows how to brush and floss

20  his teeth; right, sir?

21    A.  I didn't hear the testimony, but I'll accept

22  that representation.  Although my dental students

23  claimed they knew how to brush and floss their teeth

24  before we humbled them.

25    Q.  And you understand, you have heard of the

SHULMAN - CROSS                          1017

1  concept of drill and fill?

2      A.  I have indeed.

3      Q.  Okay.  And that's a theory of dentistry that

4  sometimes people have cavities and it's best not to

5  drill them, to let them wait and see?

6      A.  Absolutely.  You put --

7      Q.  And in this case we know, in fact, that

8  that's exactly what happened with teeth 18, 20 and

9  21, because Mr. --

10     A.  No --

11     Q.  -- Smego had these cavities in 2005, he has

12  them ten years later, and their condition has not

13  deteriorated?

14     A.  You're representing something that I can't

15  prove.  I don't have the x-rays.  So you're stating

16  that they haven't gotten worse, but the teeth may

17  even be non-vital by now.

18     Q.  If Dr. Mitchell, who sees -- she knows

19  Mr. Smego's dental concerns much better than you;

20  correct, sir?

21     A.  Absolutely.

22     Q.  She's taken the x-rays?

23     A.  Absolutely.

24     Q.  She's examined and treated him?

25     A.  Sure.

SHULMAN - CROSS                              1018

1        Q.  All right.  If Dr. Mitchell has testified

2    before this jury that the condition of teeth 18, 20

3    and 21 has not worsened since 2005, you would have

4    no basis to contest that?

5        A.  That's true.  I have no data.

6        Q.  Okay.  And periodontal disease can be

7    assessed on a clinical exam; correct, sir?

8        A.  With -- with probing and a PSR, absolutely.

9        Q.  You know Dr. Dovgan, the other expert in

10   this case?

11       A.  I know of him.

12       Q.  You know of him.  You and he have been on a

13   case before this?

14       A.  We have.

15       Q.  You agree both yourself and he have

16   excellent credentials as experts?

17       A.  No.

18       Q.  Do you agree that he has sufficient

19   credentials to act as an expert in a dental case

20   involving general dentistry?

21       A.  Yes.

22       Q.  Okay.  May I have one moment, Judge?

23           THE COURT:  Hm-mm.

24           MR. VOGT:  Thank you, Judge.  I appreciate

25   your time, Doctor.

1           MR. WATSON:  Your Honor, no redirect.

2     Although if the jurors do have questions.

3           THE COURT:  Okay.  Do you have any

4     questions?

5        No questions at this time.  All right.  Then we

6     will take a five minute recess.

7        (The jury left the courtroom.)

8           THE COURT:  Thank you, Doctor.  You may

9     step down.

10       (The witness was excused.)

11          THE COURT:  So, this is your expert?

12          MR. VOGT:  Correct.

13          THE COURT:  Has the jury --

14          MR. VOGT:  Judge, I move for a directed

15    verdict.  No reasonable jury on this earth could

16    every find in the plaintiff's favor and the Court

17    should award a directed a verdict to Dr. Mitchell.

18          THE COURT:  On this earth.

19       Denied.

20       If you'll bring the jury in.

21          MR. WATSON:  Your Honor, before we bring

22    the jury in I just want to make sure counsel that

23    has spoken to this witness about our agreement that

24    we've already discussed.

25          MR. VOGT:  Let's do it right here so I can

1    make sure.  I don't want to get in trouble.

2         (The following sidebar discussion was held at

3         the bench, out of the hearing of the jury.)

4             MR. WATSON:  I want this witnesses to

5         be admonished by counsel that we are

6         avoiding the terms about correctional and

7         prisons --

8             MR. VOGT:  The prohibition --

9             MR. WATSON:  -- and this is about

10        institution --

11            THE COURT:  Right.

12        (A discussion was held off the record.)

13        (The following proceedings were held in open

14        court.)

15            THE COURT:  Mr. Vogt.

16            MR. VOGT:  Good afternoon, could --

17            THE COURT:  Mr. Vogt, we have to swear the

18    witness.  And I just -- there you are.

19        (The witness was sworn.)

20            MR. VOGT:  Judge, the defense calls Dr.

21    John Dovgan.

22            THE COURT:  Please proceed.

23

24

25

DOVGAN - DIRECT                           1021

1                    JOHN DOVGAN

2   called as a witness herein, having been duly sworn,

3   was examined and testified as follows:

4                  DIRECT EXAMINATION

5   By MR. VOGT:

6       Q.  All right.  Sir, could you tell us your

7   name?

8       A.  My name is John W. Dovgan.

9       Q.  And sir, what do you do as an occupation or

10  profession?

11      A.  I'm a general dentist in Phoenix, Arizona.

12      Q.  How long have you been a general dentist?

13      A.  I've been a general dentist for 26 years.

14      Q.  Can you tell us, sir, can you give us a

15  rundown of your education in this field?

16      A.  My education includes 2900 hours of

17  continuing education in the field of everything from

18  removable to fixed prosthodontics.  It also includes

19  pretty much every facet of dental care, including

20  advanced training in lasers, implants, full mouth

21  reconstructions.  Just about ever field of

22  dentistry.

23      Q.  Did you go to undergraduate -- where did you

24  go to undergraduate?

25      A.  I went to undergraduate at Creighton

DOVGAN - DIRECT                              1022

1    University in Omaha, Nebraska.

2         Q.  And did -- what year did you graduate from

3    Creighton?

4         A.  I graduated from undergraduate in 1985.  I

5    graduated from dental school in 1989.

6         Q.  After graduating from dental school in 1989,

7    what did you do next?

8         A.  I went out to Arizona.  I got my license in

9    dentistry in Arizona.  I proceeded to work for a

10   corporation for about three months.  And then I was

11   able to facility and get my own practice going in

12   1989 'til present.

13        Q.  All right.  And when you say your own

14   practice, what dental practice do you have?  What

15   type of dentistry do you serve, sir?

16        A.  My dental practice does general dentistry,

17   it does full-mouth reconstructions.  Also involves a

18   lot of technology.  We use lasers, digital

19   radiography and CBCT scanners.  A CBCT scanner is

20   similar to a CAT scan that you might get in the

21   hospital.  It divides -- instead of 454 lines we

22   have 354 lines.  It's very helpful in implant

23   placement in bone grafting and making sure you don't

24   hit any structures you're not suppose to hit.

25        Q.  In your day-to-day practice as a dentist do

DOVGAN - DIRECT                    1023

1   you care for patients?

2       A.  I do.

3       Q.  And do you repair and address and take care

4   of cavities?

5       A.  Yes, I do; on a daily basis.

6       Q.  Can you give us a flavor, sir, how many

7   cavities have you repaired in your career?

8       A.  Wow.  I would say, well, probably over a

9   hundred thousand cavities in the last 26 years.

10      Q.  Now in addition to your work as a general

11  dentist, are you affiliated with the Arizona Dental

12  Board?

13      A.  Yes.  I've been a consultant with the

14  Arizona State Board of Dental Examiners for 26 -- or

15  for 20 years.  I -- generally the things that you do

16  as an Arizona State Board Dental Examiner consultant

17  is to help define the standard of care and

18  deviations from the standard of care.

19      Q.  Excuse me, sir.  Could you slow down.  Even

20  I can't hear you and I talk fast.  I apologize.

21      A.  I apologize for that.

22      Q.  I'm sorry.  I'm the worst of the guilty

23  parties.  But just so -- unlike me, you have

24  technical language, so if you could just slow down

25  so we can all understand.

1          A.  Sorry about that.

2          Q.  That's okay.  I know the feeling.

3          A.  The general responsibilities include finding

4    deviations from the standard of care in dentistry.

5    And if we find a deviation from the standard of care

6    we generally find recommendations that include

7    continuing education, probation, censure,

8    restitution, or restriction of practice.  We also

9    can send them for formal hearing for revocation of a

10   license.

11         We also -- one of my responsibilities also is

12   to do what they call 1303 permit examinations.  I'm

13   a 1303 examiner for sedation.  So if you've ever had

14   sedation dentistry, oral sedation dentistry, you

15   know that that requires generally more knowledge

16   about what to do.

17         My responsibilities are to do an onsite

18   facility inspection.  I'll also give the oral

19   examination to the dentist; make sure that they can

20   handle emergencies in the dental office.

21         Q.  And these -- working with the Arizona Dental

22   Board and putting it in prospective, what occurs is

23   someone would will file a complaint against a

24   dentist?

25         A.  That is correct.  Generally they will file a

DOVGAN - DIRECT                              1025

1    complaint against a dentist.  If it's an unwarranted

2    complaint it can be terminated by the executive

3    director without any further progression of the

4    complaint.

5         Generally if the complaint has some type of

6    merit to it, it will go into -- now it will go into

7    what they call a formal report where someone like

8    myself will go through the case itself and file a

9    report similar to the medical board now.  And that

10   report would include a chronological of what

11   occurred.  It will include deviations from the

12   standard of care.  It will actually list the

13   standard of care.  It will have aggravating

14   circumstances, mitigating circumstances, and a

15   consultant signs.

16        Q.  And what you're doing there, sir, could you

17   tell us, how does what your work with Arizona Dental

18   Board, how does that relate or take into account the

19   standard of care like you described?

20        A.  Well, the standard of care is what a

21   reasonable and prudent dentist would do in a like or

22   similar situation in a similar locale.  Meaning if

23   you have someone who does a crown prep in Arizona,

24   it's pretty much the same as it would be in Florida

25   or any other state.  But there are certain

DOVGAN - DIRECT                           1026

1  procedures that a state would have that wouldn't
2  necessarily be in another state.
3      So I'll give you an example.  New Mexico allows
4  you to give Botox to an individual for cosmetic
5  purposes as a dentist.  In Arizona we do not.  The
6  only way you could administer Botox is for dental
7  therapeutic purposes.  One of the uses is TMJ.  I
8  don't know if any of you have had TMJ, but if you
9  had TMJ they can administer that into the condyle
10 for some therapy.
11     Q.  And do you -- as working with the dental
12 board, is one of your jobs to determine, help
13 determine whether the dentist involved complied with
14 the standard of care?
15     A.  That's exactly the responsibility of the
16 consultant.
17     Q.  And then do you issue decisions based on
18 your review and analysis of the evidence in the
19 case?
20     A.  I do.  I generally look at the entire case,
21 I hear all the evidence presented, and then come up
22 with the deviations from the standard of care.
23     If we find a deviation from the standard of
24 care, generally we give everything from; and I
25 mentioned it a little bit before; continuing

DOVGAN - DIRECT                              1027

1  education, probation, restriction of practice,

2  censure.  Our state allows for restitution.  So that

3  if you had a dentist who fell below the standard of

4  care, we can find that the money that you paid the

5  dentist can be refunded to you.

6        Q.  Now, one of the cases that you've worked on

7  as an expert witnesses is entitled Parsons versus

8  Ryan.  Are you familiar with that?

9        A.  Very familiar with that case.

10       Q.  And Parsons versus Ryan involved an

11  institutional case; is that correct?

12       A.  That is correct.

13       Q.  And as part of your work on that case did

14  you review the policies and procedures of other

15  states in connection with the provision of dental

16  care in institutions?

17       A.  I read the policies and procedures of 27

18  states.  I also read 85,000 pages of documents, as

19  well as toured ten different facilities in the case.

20       Q.  And one of the goals of your work in that

21  case was to ascertain the practices that were

22  followed in institutions like you were dealing with?

23       A.  That is correct.

24       Q.  And are you familiar, sir, with a healthcare

25  request system?

DOVGAN - DIRECT                              1028

1       A.  Yes, I am.

2       Q.  In the 27 states whose policies and

3   procedures that you reviewed, did all of those

4   states involve or include a healthcare request

5   system?

6       A.  To the best of my knowledge all of the

7   states did have a healthcare request; that is

8   correct.

9       Q.  And tell us, sir, when a state -- by the

10  way, I'm sorry.  Rushville in this case, is it your

11  understanding that they have a healthcare request

12  system?

13      A.  That is correct.

14      Q.  Okay.  Well, tell us, sir, based on your

15  experience and your review of all those states, how

16  does the healthcare request work?

17      A.  Generally the healthcare request is a

18  written document where a person involved would

19  submit a written document to the personnel; it could

20  be nurses, generally they have a facility pickup

21  where the -- the healthcare requests are picked up

22  on a daily basis.  They go into, usually a nurse.  A

23  nurse triages the complaints based on the most

24  serious needs first and then schedules the patient.

25      Q.  Okay.  Now, let me step back for a second.

DOVGAN - DIRECT                    1029

1    You've been retained by the defense to offer some

2    opinions in this case; is that correct, sir?

3         A.  That's correct.

4         Q.  And in connection with the formation of your

5    opinions did you review a variety of depositions?

6         A.  Yes, I have.

7         Q.  Did you review the dental records for

8    Mr. Smego?

9         A.  Yes, I have.

10        Q.  Did you review some other documents and

11   papers that have been collected in connection with

12   this matter?

13        A.  Yes, I have.

14        Q.  And have you formed your opinions, sir, to a

15   reasonable degree of dental certainty?

16        A.  Yes, I have.

17        Q.  All right.  Going back then to the

18   healthcare request system.  Is it a means of where

19   the resident simply fills out a request and starts

20   the process?

21        A.  Yes, that's generally the way the process

22   works.

23        Q.  Now, in a case like this, or in the policies

24   that you reviewed, where the professional involved,

25   like Dr. Mitchell, is there on a part-time basis,

DOVGAN - DIRECT                              1030

1    could you explain how does the healthcare request

2    system work as far as nurses triaging the patients

3    and things like that?

4        A.  Well, generally when you have a triage

5    system that works like that you have a dentist who

6    in this case is only there a couple of days a week.

7    The nurses are there 24 hours a day, seven days a

8    week.  So the nurses can get the complaint, or the

9    written complaint, and they would schedule the

10   patients for the most serious needs first.  Meaning

11   that if Mr. Jones has the most pain or the most

12   swelling, he would be in front of somebody who

13   simply may have a request to have a cavity filled.

14       Q.  And after the nurses obtain the requests,

15   the healthcare requests, do they go and assess the

16   patient themselves?

17       A.  Yes.

18       Q.  And that's one of the means by which they

19   triage the patients?

20       A.  Correct.

21       Q.  And then when -- under that system, sir,

22   when Dr. Mitchell arrives, what is her job in

23   connection with the list that's been prepared by the

24   nurses?

25       A.  Well, her job is to treat the patients

1   according to whatever need that particular patient

2   has that day.  So if you have pain or swelling, you

3   would address that particular care first.

4        In Dr. Mitchell's case there seems to be an

5   inordinate number of patients for a very short

6   amount of time, so her job is to basically go

7   through the list, find out which patients to treat.

8   The patient comes in, they're assessed for their

9   most serious need, and that particular need is taken

10  care of that day.

11       Q.  Okay.  And is the healthcare request, sir, a

12  method of notification to the staff of what the

13  patient's problem is?

14       A.  That is correct.

15       Q.  In this case have you reviewed the

16  healthcare requests that Mr. Smego has submitted in

17  connection with dental care?

18       A.  Yes, I have.

19       Q.  Did Dr. Mitchell respond appropriately to

20  each of the healthcare requests for dental care that

21  Mr. Smego submitted?

22       A.  Yes.  I believe there were three healthcare

23  requests and they were all responded to within a 14

24  day time period.

25       Q.  Was -- first of all, was Mr. Smego able to

DOVGAN - DIRECT                    1032

1   submit a healthcare request at any time?

2       A.  Yes.

3       Q.  And under the systems that you have

4   reviewed, all of the 27 states that you have looked

5   at, as well as Rushville, that's his obligation is

6   to submit a healthcare request if he wants to see

7   the doctor or dentist?

8       A.  That is correct.

9       Q.  Now, in addition to the healthcare request

10  system, could Mr. Smego see a nurse?

11      A.  Absolutely.

12      Q.  He could see a doctor or therapist or

13  something else too; right?

14      A.  That is correct.

15      Q.  Bottom line is that if Mr. Smego wanted to

16  see Dr. Mitchell when she came in on the weekend, he

17  would have to communicate his need so that he could

18  be put on Dr. Mitchell's list?

19      A.  That is correct.

20      Q.  At that point in time does the standard of

21  care require Dr. Mitchell to move right down that

22  list taking the patients in the order prepared by

23  the nurses?

24      A.  Certainly.

25      Q.  Is that the standard of care in the

DOVGAN - DIRECT                          1033

1   industry?

2        A.  Yes, it is.

3        Q.  Is that what Dr. Mitchell did?

4        A.  Yes, it is.

5        Q.  And moving down the list of patients

6   prepared by the nurses on the weekends that she was

7   there for the 15-hour time period, did Dr. Mitchell

8   comply with the standard of care for a dentist like

9   yourself?

10       A.  Yes, she did.

11       Q.  Now, there are a couple of occasions, I

12  believe, when Mr. Smego -- well, let me ask you

13  this:  If Mr. Smego is on -- in on the list of

14  patients for Dr. Mitchell, I mean she should see

15  him; correct?

16       A.  That is correct.

17       Q.  Regardless of how he got on the list,

18  whether it was a healthcare request or something

19  else, the bottom line is the nurses have decided

20  that he needs to be seen after assessing him, put

21  him on Dr. Mitchell's list, and she should then

22  approach and address that list?

23       A.  That is correct.

24       Q.  And if -- and should the patient with the

25  most serious needs be treated first?

1      A.  Yes, that is the --

2           MR. WATSON:  Objection, Your Honor;

3   leading.

4           THE COURT:  The objection is sustained.

5      Q.  When -- the nurses who prepare the list,

6   based on your review of these 27 states as well as

7   the evidence in this case, sir, are the residents

8   with the most serious needs placed first on

9   Dr. Mitchell's list?

10      A.  Yes.

11           MR. WATSON:  Objection, Your Honor.  Same

12   objection.

13           THE COURT:  The objection is sustained.

14      However, we could be here all day if we sustain

15   all those objections.

16      Q.  I'm sorry, Judge.  Could you explain what

17   happens with the -- how do the nurses make their

18   list, sir?

19      A.  Well, nurses are generally mid-level

20   providers.  They're generally trained to look at

21   swelling, asymmetry.  So if I was to look at you or

22   you and or anybody here and you looked asymmetrical

23   with some swelling, that I would consider a higher

24   priority than somebody who doesn't necessarily have

25   any swelling, any pain.  If you had fever, that

1    would be another indication.

2         If a patient is -- hasn't slept for two nights

3    and is in massive pain, you would certainly want to

4    treat that person before someone who necessarily

5    just needs a cavity filled.

6         Q.  Now, sir, in this case, based on your review

7    of the records, did Mr. Smego ever suffer from any

8    type of dental emergency?

9         A.  Not that I'm aware of.

10        Q.  He needed some fillings?

11        A.  Yes.

12        Q.  Now, is the repair of a filling a patient

13   decision?

14        A.  Yes.  Most definitely is.

15        Q.  Could you tell us about that?

16        A.  Well, to give you an example; if you go into

17   a dental office, a dentist is gonna examine you,

18   he's gonna look at your entire mouth and usually

19   feel around your jaw and look for swelling or pain

20   or tumors and cysts.  And then they're going to give

21   you a treatment plan.

22        The treatment plan is going to involve -- maybe

23   let's say you had five, six cavities.  They'll give

24   you the treatment plan.  And then it's your decision

25   to come in and have the treatment done.  There is --

DOVGAN - DIRECT                          1036

1          The only time that the treatment would be

2    non-elective is if you had something like a broken

3    jaw, uncontrollable bleeding, laceration that went

4    across the side of your face, that would be like an

5    emergency situation.

6          An urgent situation, which is generally seen

7    within three days, would be something like swelling

8    or pain, but you could open your mouth, you didn't

9    have trismus.  You didn't have any earth-shattering

10   emergency that would be life-threatening.

11         Q.  Now --

12              THE COURT:  Doctor, what is trismus.

13              THE WITNESS:  Trismus is where you can't

14   open your jaw.

15              THE COURT:  Thank you.  How do you spell

16   it?

17              THE WITNESS:  T-r-i-s-m-u-s.

18              THE COURT:  Thank you.

19   BY MR. VOGT:

20         Q.  Is that lockjaw; I'm just curious?

21         A.  Yeah, it would be.  Sorry.

22         Q.  Okay, I just wanted to be sure.

23         Okay.  Now in this case, sir, the jury has

24   already heard and seen the evidence that Mr. Smego

25   has had three cavities since 2005.  And Dr. Mitchell

1  has testified and told the jury that --

2       A.  I'm sorry, three cavities since 2005?

3            MR. WATSON:  Objection; that misstates the

4  testimony.

5            THE COURT:  The objection is sustained.

6       Q.  I'm sorry, sir.  My mistake.  What I meant

7  to say was is that there are three cavities that

8  Dr. Mitchell diagnosed in 2005, that Mr. Smego still

9  has today.

10      A.  Oh.

11      Q.  And that -- and Dr. Mitchell has told the

12  jury and testified that based on her examinations

13  and review of the x-rays, the condition of those

14  three teeth that she diagnosed in 2005, is the same

15  as today.  All right, sir?

16      A.  That is very possible.

17      Q.  In that instance, if -- where you've got a

18  cavity, but it's asymptomatic, not causing any

19  problems, is that a patient decision as to whether

20  they want to get the cavity repaired?

21      A.  Absolutely.  I have thousands of patients

22  that have cavities that have not been treated.  And

23  generally it's always the patient's decision to come

24  in and have treatment.  They can choose not to have

25  the treatment done.

1    Q.  And if they are asymptomatic they may not

2    want to go into the dentist.  No offense to the

3    dentist?

4    A.  Oh, I understand.  I mean there's a lot of

5    precursors that would prohibit a patient from coming

6    in.  Patients are afraid, I get that.  It could be a

7    financial issue, it could be a number of issues.

8    But it's always the patient's choice.

9    Q.  In this case, if Mr. Smego requested the

10   cavities to be done, they would be repaired?

11   A.  That is correct.

12   Q.  Tooth No. 2.  In this case, have you

13   reviewed the records in connection with the

14   extraction of tooth No. 2?

15   A.  I have.

16   Q.  Do you believe, sir, that tooth No. 2 needed

17   to be extracted?

18   A.  I do.

19   Q.  Could you tell us why?

20   A.  Well, apparently tooth No. 2, which is a

21   maxillary second molar, had a cavity on the buccal,

22   which means towards your cheek, and had a cavity on

23   the distal, which means behind the tooth.  And the

24   cavity was so big that it was into the nerve or the

25   blood supply of the tooth.  And if it gets into the

1   blood supply of the tooth; in other words, if

2   bacteria gets into the blood supply of the tooth,

3   you can not necessarily fix that tooth with just a

4   filling.

5        You have two options.  You have root canal

6   therapy, which many of you may have had; or

7   extraction, which is another thing many of you may

8   have had.  But there's no just filling the tooth.

9   That is below the standard of care to fill a tooth

10  that has bacteria that's into the nerve of the

11  tooth.

12       Q.  Did you review -- based on your review of

13  the records and the testimony in this case, was the

14  pulp exposed in tooth No. 2 when Dr. Mitchell was

15  trying to repair it?

16       A.  Yes, it was.

17       Q.  As a result of that what did Dr. Mitchell

18  have to do, based on the standard of care?

19       A.  Well, the standard of care would have

20  dictated that a root canal therapy would have been

21  done or an extraction.

22       Now, Dr. Mitchell does not do molar root

23  canals, which is the maxillary second molar that

24  needed the root canal, so an extraction was done.

25  Which is perfectly within the standard of care.

DOVGAN - DIRECT                                    1040

1          Q.   Okay.   Now, there have been occasions, sir,

2    in your career where you've begun to repair a cavity

3    and then while performing that repair lo and behold

4    the tooth has broken apart or disintegrated or

5    something like that has occurred?

6          A.   It has, yes.

7          Q.   If that occurs to a dentist is that a

8    violation of the standard of care?

9          A.   No.   It's just impossible -- when you look

10   at a two dimensional picture, such as an x-ray, you

11   don't see the three dimensions of the tooth.   So if

12   a cavity is here and this is the tooth, and it's on

13   the other side or at an angle, it could be into the

14   nerve of the tooth and you wouldn't even know it

15   until you actually work on the tooth.   Meaning that

16   a cavity that looks small may actually be in the

17   nerve the tooth and a cavity that looks big may

18   not actually be in the nerve of the tooth.

19          There's no way to tell that without -- and I

20   was talking about this earlier, a CBCT scan, where

21   we do this little three-dimensional thing that goes

22   354 lines on the tooth.   But that is generally not

23   the standard of care.   Most people do not utilize it

24   on a day-to-day basis on a new patient exam.

25   Generally it's utilized pretty much for implants, or

DOVGAN - DIRECT                    1041

1    if they do a root canal, they look for vertical root

2    fractures and things likes that.

3         Q.   Okay.   In this case with tooth No. 2, and

4    based on testimony that you've explained regarding

5    its condition, did Dr. Mitchell have any other

6    option; excluding for a moment the root canal; other

7    than an extraction?

8         A.   No.   That's the only option.

9         Q.   And do you recall seeing in this case that

10   Mr. Smego had signed a consent for that extraction?

11        A.   That is correct.

12        Q.   And can you tell us, sir, what is a consent?

13        A.   Informed consent is basically giving the

14   information to the patient, such as yourselves, what

15   the risks are of doing the treatment or not doing

16   the treatment.   So if you do the treatment you might

17   have this possible risk and if you don't do the

18   treatment you might have this possible risk.

19        Q.   And it's an agreement between the dentist

20   and the patient as to what the dentist is going to

21   do?

22        A.   That is correct.

23        Q.   Now, in connection with this case did you

24   review the points regarding offsite referrals?   When

25   patients from Rushville are sent offsite?

DOVGAN - DIRECT                    1042

1    A.  I have.

2    Q.  With regard to Dr. Lochard, the primary care

3 physician, the jury has heard that he sends patients

4 offsite to receive services that he himself cannot

5 provide onsite.  Do you recall seeing that

6 testimony?

7    A.  I do.

8    Q.  With regard to Dr. Mitchell, she has

9 testified to the jury that she sends patients

10 offsite, again, for services that she cannot provide

11 onsite, such as an oral surgeon.

12    A.  That is correct.

13    Q.  Sir, based on your review of the materials

14 in this case, the policies and practices, is

15 Dr. Mitchell's approach to that correct?

16    A.  Absolutely.

17    Q.  If a matter involves a general dentistry

18 issue, should she do it onsite?

19    MR. WATSON:  Objection, Your Honor;

20 leading.

21    Q.  I'll rephrase, Judge.

22    THE COURT:  Thank you.

23    Q.  Could you tell us, sir, in a matter

24 involving general dentistry like the matters

25 involving Mr. Smego's cavities, does the standard of

DOVGAN - DIRECT                                    1043

1   care require that Dr. Mitchell send the patient

2   offsite?

3        A.  No.  If it's something that the dentist can

4   handle and within their capability, generally the

5   dentist is going to do the procedure.  If it's

6   something that is without -- outside the scope of

7   what the dentist can do, then it's generally

8   referred offsite.

9        Q.  At your dental office, sir, do you do the

10  same thing?

11       A.  Absolutely.

12       Q.  If you can handle it you do it on site; if

13  you cannot, you refer to a specialist?

14       A.  That is correct.

15       Q.  I just have a couple more questions, sir.

16       Do you know of any reason why Mr. Smego would

17  not submit a healthcare request?

18       A.  None that I'm aware of.

19       Q.  Now, the jury has heard Dr. Mitchell,

20  Director of Nursing Walker-Lowe, and Dr. Shulman a

21  few minutes ago, all testify that with the number of

22  residents at Rushville, there is no way that

23  Dr. Mitchell can take care of the 550 residents in

24  15 hours a week.  Do you agree with that, sir?

25       A.  I totally agree with that statement.

DOVGAN - DIRECT                                    1044

1      Q.  Can you explain why?

2      A.  Generally you have a ratio of patients,

3  detainees to a dentist.  And then you need to have a

4  dental assistant help with that particular

5  procedure.

6      So if you had; I'm gonna give a generally

7  ratio; if you have a thousand patients, to have a

8  thousand patients you should have at least one to

9  two dentist, two assistants, and maybe a part-time

10  hygienist.

11      For Rushville I believe there's 550 residents.

12  I would recommend, based on that particular number,

13  one full-time dentist, one full-time assistant and

14  maybe a part-time hygienist.  I mean there's no way

15  one dentist can do all that work.  It's just

16  physically impossible.

17      Q.  Now, Dr. Shulman testified a few moments ago

18  to the same thing I believe.  He said .8 to 1.  In

19  other words, 32 to 40 hours of full-time dental

20  work, full-time dental assistant, and a part-time

21  hygienist.  Are you and he, as experts in this case,

22  basically saying the same thing?

23      A.  We are.  We agree.

24      Q.  And then as far as who decides on the

25  staffing, that would be DHS and Wexford?

1        A.  That is correct.

2        Q.  Sir, based on your review of all the

3   materials in this case, did Dr. Mitchell's care and

4   treatment of Mr. Smego comply with the standard of

5   care for a reasonably well-qualified dentist

6   practicing at Rushville for 15 hours a week?

7        A.  I would.  One of the problems that we have

8   is we don't have the x-rays to support or deny

9   anything that actually occurred.  So I would say

10  given the information I've been given, yes, she

11  certainly met the standard of care.

12       Q.  And the x-rays, sir, they're being

13  maintained at Rushville; correct?

14       A.  That is correct.

15       Q.  The only -- apparently the only dentist who

16  has seen those x-rays is Dr. Mitchell; correct?

17       A.  That is correct.

18            MR. VOGT:  Thank you, sir.  Thank you,

19  Judge.

20            THE COURT:  Mr. Watson.  Cross.

21                 CROSS EXAMINATION

22  BY MR. WATSON:

23       Q.  Dr. Dovgan, good afternoon.

24       A.  Good afternoon, Mr. Watson.

25       Q.  Welcome to Arizona.

1      A.  Welcome to Arizona?  You mean to

2  Springfield.

3      Q.  Welcome up from Arizona.

4      A.  Okay.

5      Q.  You've never practiced dentistry in the

6  military, have you?

7      A.  No, I have not.

8      Q.  You have never been a professor of

9  dentistry, have you?

10     A.  No.  I have taught live demonstrations for

11  lasers --

12     Q.  Your Honor, may I have the instruction to

13  the witness, in order of this late hour, to answer

14  the question.

15          THE COURT:  Could you read the question

16  back.

17     Q.  You have never been a professor in

18  dentistry, have you?

19     A.  At a university; no.

20     Q.  You have never been a professor in dental

21  public health, have you?

22     A.  No, I have not.

23     Q.  You are not certified by any specialties

24  recognized by the American Dental Association; true?

25     A.  That is true.

DOVGAN - CROSS                          1047

1      Q.  You have no formal education from any

2  university in dental public health; right?

3      A.  That is correct.

4      Q.  You are not certified by the Board of Dental

5  Public Health; right?

6      A.  That is correct.

7      Q.  You have never been a court-appointed

8  monitor; true?

9      A.  That is true.

10      Q.  You haven't written any books, any treatise,

11  any literature whatsoever that is relevant to the

12  opinions you're expressing in this case; right?

13      A.  I have not.

14      Q.  You have never testified at trial in a civil

15  rights or a deliberate indifference case?

16      A.  That is correct.

17      Q.  You have never been to a treatment or

18  detention facility; true?

19      A.  That is correct.

20      Q.  You have not visited the DHS facility in

21  this case?

22      A.  I have not; that is correct.

23      Q.  You have never toured the facility?

24      A.  I have not.

25      Q.  You have not spoken to anyone at the

DOVGAN - CROSS                         1048

1   facility?

2        A.  I have not.

3        Q.  You have not spoken to anyone who works at

4   the facility?

5        A.  That is correct.

6        Q.  You have not interviewed anybody that works

7   at the facility in this case; right?

8        A.  At the DHS facility; that is correct.

9        Q.  And as you said, this case involves the DHS

10  facility that houses civilly committed people; true?

11       A.  Correct.

12       Q.  You have never seen a facility at all in any

13  of your work which houses individuals who are

14  civilly committed?

15       A.  That is correct.

16       Q.  When you gave your opinions in this case

17  previously you didn't consider at all any facility

18  directives for the Illinois Department of Human

19  Services treatment and detention facilities in

20  making your opinions in this case; right?

21       A.  I'm sorry, could you repeat that.  I didn't

22  quite hear that question.

23       Q.  In giving your opinions, in forming your

24  opinions in this case, you didn't consider at all

25  any facility directives that the Illinois Department

DOVGAN - CROSS                              1049

1    of Human Services treatment and detention facility

2    in making your opinions in this case; true?

3        A.   Initially I believe I was given a lot of

4    that information after my deposition.

5        Q.   After I took your testimony under oath and

6    you expressed your opinions, then you were given the

7    DHS directives; right?

8        A.   Correct.

9        Q.   You formed your opinions before you got the

10   DHS directives; right?

11       A.   That is correct.  And they haven't changed.

12       Q.   You haven't studied any facilities where

13   individuals are civilly committed at all, have you?

14       A.   That is correct.

15       Q.   You have no knowledge of dental care

16   provided at facilities where individuals were

17   civilly committed; true?

18       A.   That is correct.

19       Q.   You considered the Journal of American

20   Dental Association to be authoritative and you rely

21   on it; right?

22       A.   Yes.

23       Q.   Most dentists agree that the American Dental

24   Association Journal is the premiere journal of all

25   dentistry; true?

DOVGAN - CROSS                          1050

1       A.   That is correct.

2       Q.   Your Honor, may I approach?

3            THE COURT:   You may.

4       Q.   Dr. Dovgan, I've handed you what is the

5  Journal of American Dental Association April, 2012;

6  true?

7       A.   That is correct.

8       Q.   This article from the American Dental

9  Association, "An Ethical Moment," asks, (as read)

10 "Who is responsibile ethically for patient care in a

11 corporate dental practice in which I am an employee

12 dentist?"  Right?

13      A.   Correct.

14      Q.   The question is: (As read) "I am a recent

15 dental school graduate with heavy debt.  I feel

16 fortunate to have found employment with my corporate

17 dental practice.  My question has to do with the

18 assignment of patients, along with prescriptive

19 treatment plan."

20           THE COURT:   Prescribed.

21      Q.   "Prescribed treatment plan.  Who is

22 responsible ethically for patient care and patient

23 treatment plans?  Where do I, as an employee

24 dentist, fit into the American Dental Association's

25 policy that the dentist is the head of the dental

DOVGAN - CROSS                          1051

1    team in this corporation setting?"

2         Did I read that right?

3         A.  Yes.

4         Q.  First line of that article?

5              MR. VOGT:  Your Honor, I object to this.

6              MR. WATSON:  803.18, Your Honor.  Learned

7    treatise by impeachment.

8              MR. VOGT:  Judge, that's a corporate.

9              THE COURT:  The objection is overruled.

10             MR. VOGT:  Thank you.

11   BY MR. WATSON:

12        Q.  First line of this article from the journal

13   that you and most dentists rely on:  (As read) "The

14   dentist-patientship relationship begins when you

15   agree to treatment the patient and the patient

16   accepts your treatment."

17        Is that what it say?

18        A.  That is correct.

19        Q.  It says:  (As read) "This is illustrated in

20   the American Dental Association Principles of Ethics

21   and Code of Professional Conduct, Section 3,

22   principle of --" I'm gonna miss this one -- "do

23   good, reminds us that the dentist has a duty to

24   promote the patient's welfare."

25        Did I read that write?

1       A.  That is correct.

2       Q.  (As read) "This principal expresses the

3   concept that professionals have a duty to act for

4   the benefit of others.  Under this principle the

5   dentist's primary obligation is service to the

6   patient and the public at large.  The most important

7   aspect of this obligation is the competent and

8   timely delivery of dental care within bounds of

9   clinical circumstances presented by the patient,

10  with due consideration being given to the needs,

11  desires, and values of the patients.

12      "The same ethical considerations apply whether

13  the dentist engages in fee-for-services, managed

14  care, or some other practice arrangement.  Dentists

15  may choose to enter into contracts governing the

16  provision of care to a group of patients.  However,

17  contract obligations do not excuse dentists from

18  their ethical duty to put their patient's welfare

19  first."

20      Did I read that right?

21      A.  That's what it says.

22      Q.  (As read)  "Your role as a dentist always

23  should be that of the head of the dental team."

24      Did I read that right on page 2?

25      A.  Hm-mm.

1        Q.  Yes?

2        A.  Yes.

3        Q.  (As read) "This means that the quality and

4    delivery of care are your responsibility and are not

5    a factor of allot time or quotas."

6        Did I read that right?

7        A.  The quality of dentistry; that is correct.

8        Q.  No, no.  Did I read that right?

9        A.  Yes.

10       Q.  (As read)  "A corporate setting should be no

11   different from a private practice when it comes to

12   the ethical delivery of care."

13       Did I read that right?

14       A.  Yes, that's true.

15       Q.  (As read)  "The dentist-patient relationship

16   is sacred and has nothing to do with third parties,

17   corporate commitments or employee contracts."

18       Did I read that right?

19       A.  Yes.

20       Q.  (As read)  "You must remember that your

21   primary obligation is the welfare of your patients

22   and you need to be an advocate for fair and ethical

23   treatment, including that rendered by auxiliary

24   personnel."

25       Did I read that right?

1       A.  That's what it says.

2       Q.  Middle of the paragraph.  (As read) "the

3   adherence to this set of ethical standards is what

4   sets our professional -- profession apart from a

5   trade.  The code clearly emphasizes the welfare of

6   our patients, the honor of the profession, and the

7   trust society places in us as the primary basis for

8   any treatment decision."

9       Did I read that right?

10      A.  That's what it says.

11      Q.  It begins:  (As read)  "Each treating

12  dentist is completely responsible for the therapy

13  rendered to the patient while under his or her

14  care."

15      Did I read that right?

16      A.  You did.

17      Q.  (As read)  "When you begin treatment for any

18  patient, under any conditions, in any setting, that

19  patient entrusts herself or himself to your care for

20  the duration of the treatment you should perform."

21      Did I read that right?

22      A.  Yes.

23      Q.  (As read)  "Outside influences should not

24  affect your professional judgement and you should

25  consider the patient's welfare sacred at all times."

DOVGAN - CROSS                    1055

1      Did I read that right?

2      A.  That's what it says.

3      Q.  And that's from the journal that you

4  consider to be the authoritative journal and you

5  rely on it; right?

6      A.  I do rely on that journal, yes.

7      Q.  And most dentists agree that the American

8  Dental Association Journal is the premiere journal

9  of all dentistry; right?

10      A.  That is correct also.

11      Q.  You're a member of the ADA?

12      A.  I am.

13      Q.  You recognize the ADA Ethics and Code of

14  Professional Responsibility?

15      A.  I personally do, yes.

16      Q.  You rely on it for your own practice?

17      A.  I do.

18      Q.  And you rely on it as one of the guiding

19  authorities for professional and ethical conduct;

20  true?

21      A.  I do personally, yes.

22      Q.  On page 7 of the ADA Ethical Guidelines it

23  states that:  (As read) "The dentist may choose to

24  enter into contracts governing the provision of care

25  to a group of patients.  However, contract

DOVGAN - CROSS                              1056

1    obligations do not excuse dentists from their

2    ethical duty to put the patient's welfare first."

3        Right?

4        A.  That is correct.

5        Q.  You agree with that statement; right?

6        A.  I do.

7        Q.  You rely on in your own practice

8    publications by the ADA; true?

9        A.  That is correct.

10       Q.  You rely on the ADA Guidelines on

11   recordkeeping; is that right?

12       A.  I do.

13       Q.  You agree that the dental records under the

14   ADA Guidelines state that accurate recordkeeping is

15   critical; right?

16       A.  It can be, yes.

17       Q.  It is; right?

18       A.  It is important.

19       Q.  It's critical; right?

20       A.  The records in and of themselves are

21   certainly a basis for forming an opinion.  After

22   doing --

23       Q.  That's not my question, Dr. Dovgan.  It's

24   critical under the ADA recordkeeping to keep

25   accurate records?

DOVGAN - CROSS                                    1057

1        A.  Oh, accurate.  That is true.

2        Q.  Dental records are essential for the dentist

3   to practice; true?

4        A.  That is true.

5        Q.  Dental records are essential for the

6   patients as well; true?

7        A.  That is true.

8        Q.  99 times out of a hundred if there's a

9   contradiction between the dental records and

10  testimony, you go with the dental records; true?

11       A.  I would say if there's a controversy, and

12  the patient and the dentist agree that there was

13  something different than what the chart stated,

14  obviously we would go with what the patient stated

15  and the dentist stated.

16       Nobody is perfect, people make mistakes.  I've

17  witnessed that hundreds of times in cases that I've

18  done for Arizona State Board of Dental Examiners.

19  We generally rely on the records to formulate

20  opinions, but if the testimony is different from the

21  doctor and the patient, then obviously I go with the

22  majority.

23       Q.  That wasn't my question, Dr. Dovgan.  My

24  question was, so 99 times out of a hundred if

25  there's a contradiction between the dental records

DOVGAN - CROSS                              1058

1    and the testimony, you go with the dental records?

2         A.  I would.

3         Q.  You do; correct?  Right?

4         A.  I do.

5         Q.  You agree that it's beneficial to have

6    complete charting; right?

7         A.  I'm sorry, I didn't hear --

8         Q.  It's beneficial to have complete charts,

9    right?

10        A.  It certainly is, yes.

11        Q.  In the dental charts in this case, you agree

12   that Dr. Mitchell charted the teeth that required

13   treatment under the tooth and service plan part of

14   the chart; right?

15        A.  That is correct.

16        Q.  Dr. Mitchell charted the teeth that required

17   treatment under service plan; right?

18        A.  Yes.

19        Q.  Instruction in oral hygiene includes

20   minimally information on plaque control and the

21   proper brushing of the teeth; true?

22        A.  That's true.

23        Q.  Part of preventive dentistry is patient

24   education; true?

25        A.  That is true.

DOVGAN - CROSS                           1059

1      Q.  In your own practice you give oral hygiene

2   instruction material and pamphlets to patients;

3   right?

4      A.  That is true.

5      Q.  In your own practice you record when oral

6   hygiene instructions are given; true?

7      A.  That is true.

8      Q.  For your patients you consider oral hygiene

9   instructions important for prevention; right?

10      A.  I do.

11      Q.  You didn't see information in the dental

12   chart -- dental record that Mr. Smego received

13   dental hygiene instruction, did you?

14      A.  I did not see that in the chart.

15      Q.  You, in your practice, try to document poor

16   oral hygiene in the dental record; right?

17      A.  I do in my own practice; that is correct.

18      Q.  You didn't see anywhere in the record where

19   it reflected Mr. Smego had poor oral hygiene

20   techniques in terms of brushing or flossing, did

21   you?

22      A.  Not in the dental records, no.

23      Q.  You didn't see it at all in the records, did

24   you?

25      A.  No.

DOVGAN - CROSS                      1060

1       Q.   In your practice your front office cancels

2   appointments periodically; true?

3       A.   That can happen.

4       Q.   When your front office cancels appointments

5   in your practice, the front office reschedules those

6   appointments and tries to reschedule to bring those

7   patients in?

8       A.   My front office can cancel patients and my

9   front office can reschedule the patient.  That

10  doesn't necessarily mean the patient will

11  reschedule.

12      Q.   But your front office -- when your front

13  office cancels appointments in your practice,

14  Dr. Dovgan, the front office reschedules those

15  appointments; right?

16      A.   She tries to.

17      Q.   She makes the effort; right?

18      A.   She does.

19      Q.   You agree that dentists can take reasonable

20  measures to deal with dental pain; true?

21      A.   That is true.

22      Q.   You agree that dentists can take a

23  reasonable measure of prescribing painkillers to

24  deal with pain; true?

25      A.   That is also true.

DOVGAN - CROSS                    1061

1    Q.  You agree that a dentist can take the
2  reasonable measure of treating the underlying cause
3  of the dental pain; right?
4    A.  That is correct.
5    Q.  If for whatever reason Dr. Mitchell couldn't
6  provide services in terms of dental care, it would
7  be a reasonable option for Dr. Mitchell to write a
8  medical writ or prescription for that person to be
9  seen elsewhere; right?
10   A.  I don't believe that's her responsibility.
11   Q.  Let me ask you again, Dr. Dovgan.  If for
12  whatever reason Dr. Mitchell could not provide a
13  service in terms of dental care, would it be a
14  reasonable option for Dr. Mitchell to write a
15  medical writ or prescription for that person to be
16  seen elsewhere?
17   A.  She certainly has the ability to.
18   Q.  That would be a reasonable option; right?
19   A.  It could be an option.
20   Q.  That would be a reasonable option?
21   A.  That could be an option.
22   Q.  My question is that would be a reasonable
23  option; right?
24   A.  If she could not treat the patient and she
25  felt that her skills could not properly complete

DOVGAN - CROSS                          1062

1  what the patient needed, then she certainly could

2  refer the patient to an outside source.

3      Q.  Now Dr. Dovgan, I went down to Arizona and I

4  took your deposition, didn't I?

5      A.  Eleven hours.

6      Q.  And I went through that deposition and I

7  went through your report and you testified under

8  oath; right?

9      A.  That is correct.

10     Q.  And you came up here to testify under the

11 same oath?

12     A.  That is correct.

13     Q.  There was a court reporter there; is that

14 right?

15     A.  That is correct.

16     Q.  You were in an attorney's office.  In the

17 same attorney's office that you had that Parsons

18 case you talked about?

19     A.  That is correct.

20     Q.  It's the same oath that you're testifying

21 under oath today; true?

22     A.  That is also correct.

23     Q.  And I asked you the following question, you

24 answered the following question under oath: (As

25 read) "If for whatever --

DOVGAN - CROSS                                    1063

1           THE COURT:  Page and line.

2           Q.  203, 21.

3           (As read)  "If, for whatever reason,

4    Dr. Mitchell could not provide the service in terms

5    of dental care, would it be a reasonable option for

6    Dr. Mitchell to write a medical writ or prescription

7    for that person to be seen elsewhere?"

8           And your answer under oath down in Arizona was:

9    "Like I said, again, that is a reasonable option."

10          Right?  That was your answer?

11          A.  Yes.

12          Q.  Your deposition in this case concerns

13   important facts; right?

14          A.  Yes.

15          Q.  You understand that during the entire time

16   that Mr. Smego was housed at the treatment and

17   detention facility that facility directives stated

18   from 2005 through the current day that the residents

19   will be provided annual dental care; right?

20          A.  That's what it says.

21          Q.  Mr. Smego was seen for visits at least 16

22   times without a health care request?

23          A.  That is probably correct.

24          Q.  That's right, isn't it?

25          A.  I believe so.

1    Q.  Is it right; right?

2    A.  I was thinking --

3        MR. VOGT:  Objection, Judge.  You know --

4    Q.  I'm looking for the answer that the witness

5    gave previously under oath.

6        THE COURT:  The objection is overruled.

7    A.  Yes.

8    Q.  In your opinion, Mr. Smego was entitled to

9    see Dr. Mitchell, in your opinion, for four biannual

10   dental exams and three visits in response to

11   healthcare requests; right?

12   A.  That is correct.

13   Q.  Your opinion is based on visits every two

14   years, not every year; right?

15   A.  That is correct.  Based on the Wexford and

16   Addus contracts.

17   Q.  Your opinion is not based on the directives

18   in this case that provides for annual care; right?

19   A.  Correct.

20   Q.  And you only considered the three written

21   requests; right?

22   A.  Correct.

23   Q.  For your opinions in this case you

24   determined that care was timely provided based only

25   on the three healthcare requests that Mr. Smego

DOVGAN - CROSS                                    1065

1    committed; true?

2        A.  Correct.

3        Q.  You understand that there is more than one

4    way to make healthcare requests known; right?

5        A.  That is also correct.

6        Q.  The physician can refer over to the dentist;

7    true?

8        A.  Correct.

9        Q.  The nurse can actually refer over to the

10   dentist; true?

11       A.  That is also correct.

12       Q.  The dentist can always note an individual

13   for follow-up or next visit?

14       A.  The dentist can do that.

15       Q.  You understand in this case that referrals

16   to a dentist under the facility directives can be

17   made based on avenue realities identified by

18   healthcare staff; right?

19       A.  Correct.

20       Q.  You've reviewed the testimony of Dr.

21   Lochard; right?

22       A.  I have.

23       Q.  You remember Dr. Lochard testified that

24   there are other ways that residents can make dental

25   or medical issues known to medical or dental staff

1   in addition to healthcare requests; right?

2        A.  Yes.

3        Q.  You reviewed the testimony of Danielle

4   Walker-Lowe; right?

5        A.  That is correct.

6        Q.  You understand that in terms of submitting a

7   healthcare request, Danielle Walker testified that

8   there are many ways that an individual can be seen

9   by a dentist; right?

10       A.  That is also correct.

11       Q.  You remember the testimony that Danielle

12  Walker had that Dr. Mitchell could have noted the

13  resident for follow-up visit?  Right?

14       A.  That individual did say that, yes.

15       Q.  You understand that Danielle Walker's

16  testimony was submitting the healthcare request

17  isn't the only and sole way for somebody to see the

18  dentist; right?

19       A.  That is correct.

20       Q.  You reviewed the interrogatories by the

21  medical director; is that right?

22       A.  Also correct, yes.

23       Q.  You read those interrogatories; right?

24       A.  Yes.

25            MR. VOGT:  Objection, Judge.  Can we be

1    heard on this?

2          THE COURT:  You may.  Sidebar.

3    (The following sidebar discussion was held at

4    the bench, out of the hearing of the jury.)

5          MR. VOGT:  Are you going to Bednarz --

6          MR. WATSON:  I'm going to Bednarz.

7          MR. VOGT:  These were barred by the

8    Court on a motion in --

9          MR. WATSON:  We went down and took his

10   deposition and he said he would consider

11   the medical director's testimony and

12   answers to interrogatories.  And I showed

13   him and he expressed his opinions based on

14   his review of those answers to

15   interrogatories.  This is a basis for his

16   opinions in this case.

17         MR. VOGT:  Judge, you barred it.  I

18   mean it's already -- we've argued this

19   point, it's already been barred.

20         MR. WATSON:  And then we went down and

21   took his deposition.  And apparently he had

22   never been shown those before.  And to form

23   his opinions in this case, and I asked him

24   whether he would rely on Dr. Bednarz's

25   answers to interrogatories, he said yes.  I

DOVGAN - CROSS                          1068

1    handed him a copy and I walked through the

2    answers to interrogatories with him to form

3    the basis for his belief that healthcare

4    requests are available in more ways that

5    just submitting written healthcare request.

6         THE COURT:  So where are we going with

7    this?

8         MR. VOGT:  Yeah.  I mean this has

9    already been established, Judge.

10        MR. WATSON:  I'm gonna ask him if he

11   still has the same understanding as he did

12   during his deposition, that healthcare

13   requests are not required, you can't -- you

14   don't have to hound staff and other --

15        THE COURT:  So why do we have to go

16   into Dr. Bednarz --

17        MR. WATSON:  I can refer generally to

18   the medical director?

19        THE COURT:  Yes.

20        MR. VOGT:  All right, Judge.

21   (The following proceedings were held in open

22   court.)

23 BY MR. WATSON:

24   Q.  As I was asking you, Dr. Dovgan, you

25 reviewed and relied on the answers to

DOVGAN - CROSS                     1069

1    interrogatories by the medical director; right?

2         A.  I did.

3         Q.  You read answers to interrogatories and you

4    understand that answers to interrogatories are

5    entitled to the same consideration as you would give

6    if they were made from the witness stand; right?

7         A.  That is correct.

8         Q.  And the answers to interrogatories by the

9    medical director state that: (As read) "The facility

10   has a standardized procedure in place that allows

11   residents multiple avenues to make their health

12   concerns and needs known to staff;" right?

13        A.  That is correct.

14        Q.  And the answers to interrogatories by the

15   medical director state that: (As read) "Residents

16   are not required to hound staff;" right?

17        A.  I'm sorry.  Residents are not required to

18   hound staff?

19        Q.  That's right?

20        A.  Yes, I do remember reading that.

21        Q.  The answers to interrogatories by the

22   medical director state that the presence of nursing

23   staff on each unit four times per day, seven days a

24   week, would tend to various medical needs and

25   communicate regularly with the residents; right?

1    A.  Yes.

2    Q.  The answers to interrogatories by the

3  medical director state that:  (As read)

4  "Furthermore, residents can utilize written

5  healthcare requests to request medical attention or

6  to complain about medical problems;" right?

7    A.  Yes.

8    Q.  That's all part of the multiple avenues that

9  the medical director stated in his answers to

10  interrogatories; right?

11    A.  Yes.

12    Q.  And you read those, yes?

13    A.  I have.

14    Q.  And you've reviewed those; right?

15    A.  I have.

16    Q.  You rely on the testimony of the dental

17  assistant; right?

18    A.  I have, yes.

19    Q.  That's the dental -- is it a dental

20  assistant or dental hygienist?

21    A.  Dental assistant.  There's no dental

22  hygienist.

23    Q.  And who is the dental assistant?

24    A.  The daughter, I believe, of Dr. Mitchell.

25    Q.  And you read her answers to interrogatories;

1   right?

2          MR. VOGT:  Judge, I again object on this.

3          THE COURT:  The objection is overruled.

4      Q.  Is that right?  You read those?

5      A.  Yes, I did.

6      Q.  You give answers to interrogatories the same

7   consideration as you would if they were made from

8   the witness stand; is that right?

9      A.  That is correct.

10     Q.  And the dental assistant's answers to

11  interrogatories that you read state that once a

12  patient made a request for care, another request

13  would not be necessary; right?

14     A.  I'm sorry.  Run that --

15     Q.  I'll be happy to run that by you again.

16     A.  Okay.

17     Q.  The answers to interrogatories --

18     A.  Are you talking about the ones --

19  Dr. Mitchell's daughter?

20     Q.  Correct.

21     A.  Okay.

22     Q.  Dr. Mitchell's daughter, her answers to

23  interrogatories state -- and you read these?

24     A.  Yes.

25     Q.  That once a patient made a request for care,

1   another request would not be necessary; right?

2       A.  I know that I read that.  I don't know if it

3   said that word for word, but I will have to take

4   your word for it.

5       Q.  Would you like me to refresh your

6   recollection?

7       A.  Certainly.

8       Q.  Would your deposition refresh your

9   recollection?

10      A.  Certainly.

11      Q.  May I approach, Your Honor?

12          THE COURT:  You may.

13      Q.  Dr. Dovgan, I'm handing you a page from your

14  deposition, page 98, line 12.  Let me know when

15  you've read it.  No need to read it outloud.

16      A.  Page 98?

17      Q.  98, line 12.

18      A.  Okay.

19      Q.  Dr. Dovgan, in forming your opinions you

20  read and you relied on the answers to

21  interrogatories by the dental assistant who stated:

22  (As read)  "Once a patient made a request for care,

23  another request would not be necessary."  Right?

24      A.  I certainly read that, yes.

25      Q.  And you would give that answer to

DOVGAN - CROSS                                    1073

1    interrogatory the same consideration that you would

2    give a witness testifying under oath from the stand;

3    right?

4         A.  That is correct.

5         Q.  You remember reading those same answers to

6    interrogatories under oath and relying on those same

7    answers to interrogatories, the dental assistant

8    says:  (As read) "Patients were not required to ask

9    for services repeatedly."  Right?

10        A.  If that's what I said in my deposition, yes.

11        Q.  Do you need me to refresh your recollection?

12        A.  No, I will take your word for it.

13        Q.  You remember reading the answers to

14   interrogatory by the dental assistant and those

15   answers to interrogatories sworn to under oath

16   state: (As read)  "Patients were not required to ask

17   for services repeatedly."  Right?

18        A.  Correct.

19        Q.  You agree that as part of the contract

20   between the State of Illinois and Addus all

21   personnel shall comply with the administrative

22   directives; true?

23        A.  I do remember reading that, yes.

24        Q.  You agree with that part of the contract;

25   right?

DOVGAN - CROSS                                    1074

1          A.  I'm not sure it's my job to agree with that

2     contract, but --

3          Q.  Let me ask you the question then.  You agree

4     as part of the contract between the State of

5     Illinois and Addus, all personnel shall comply with

6     the administrative directives; true.

7          A.  That's what it says, yes.

8          Q.  You understand that the State of Illinois

9     and Addus agreed that there could be more than

10    12 hours each week and they only set a minimum;

11    right?

12         A.  That is correct.

13         Q.  In fact, you didn't know when I took your

14    deposition that Dr. Mitchell's contract provides for

15    certain number of hours and she can request

16    additional hours, did you?

17         A.  That is correct.

18         Q.  You didn't see any written requests where

19    Dr. Mitchell requested additional hours according to

20    her contract?

21         A.  No, I saw no written requests.

22         Q.  You understand that personnel under the

23    contract that are contracted within the State of

24    Illinois and Wexford also comply with the directives

25    of the Illinois Department of Human Services; true?

DOVGAN - CROSS                                    1075

1        A.  Correct.

2        Q.  And it's your understanding that the State

3   of Illinois contract with Wexford states that there

4   is a minimum of 15 hours each week for licensed

5   dentist; right?

6        A.  Correct.

7        Q.  You agree that Motrin is a medication that

8   irritated Mr. Smego's stomach; true?

9        A.  I will agree with that.

10       Q.  So if a patient was allergic to Motrin and

11  there were other similar medications in similar

12  dosages, like Tylenol, you would have prescribed

13  that patient the Tylenol; right?

14       A.  If they were allergic, that is correct?

15       Q.  No, that's not my question.  If a patient

16  was allergic to Motrin and there were other similar

17  painkillers in other similar dosages, like Tylenol,

18  you would prescribe that person the Tylenol;

19  correct?

20       A.  I wouldn't prescribe.  Those are

21  over-the-counter.  So I wouldn't prescribe those

22  particular medications; they are over-the-counter;

23  for our particular patients.  I could recommend

24  them.

25       Q.  We talked about your deposition before;

DOVGAN - CROSS                              1076

1   right?

2          A.   We did.   Eleven hours.

3          Q.   And you came up here to testify under oath

4   under the same oath; right?

5          A.   Correct.

6          Q.   Tell the same truth; right?

7          A.   That's correct.

8          Q.   I asked you this question under oath and I

9   said: (As read) "If a patient was allergic to Motrin

10  and there were other similar painkillers in other

11  similar dosages like Tylenol, for example, you would

12  give that patient the Tylenol."  And your answer

13  was:  "I would."

14         Right?

15         A.   I would.   But you said prescribe.

16         Q.   You would just give it to them, you wouldn't

17  even write a prescription?

18         A.   Could be.   We don't prescribe for

19  over-the-counter medication.   That's -- generally

20  they go to the store and buy that.

21         Q.   In any level dose of Tylenol?

22         A.   Generally a thousand milligrams.

23         Q.   Are there dosages above which require a

24  prescription?

25         A.   If you add things like codeine or

DOVGAN - CROSS                              1077

1    hydrocodone, yes.

2         Q.   There are; true?

3         A.   True.

4         Q.   You take into account a patient's allergies

5    when prescribing medication; right?

6         A.   Correct.

7         Q.   Nothing you saw in this record shows that

8    Mr. Smego was given an allergy test; true?

9         A.   That is correct.

10        Q.   And there are actually documented cases for

11   allergies to Motrin; true?

12        A.   There are.  Not many, but there are.

13        Q.   When was the last time you read the back of

14   a Motrin bottle?

15        A.   Read the back of a Motrin -- years.

16        Q.   Not in a long time, have you?

17        A.   Not in a long time; correct.

18        Q.   Nothing in this record shows that

19   Dr. Mitchell sent Mr. Smego for allergy tests; true?

20        A.   Not that I'm aware of.

21        Q.   Dr. Dovgan, this Parsons case where you

22   reviewed a lot of documents; right?

23        A.   That is correct.

24        Q.   You made between $380,000 and $400,000 in

25   total compensation in the Parsons case; right?

DOVGAN - CROSS                    1078

1       A.   That is correct.

2       Q.   Your total income in 2014, was $230,000;

3  right?

4       A.   For expert witness fees?  Correct.

5       Q.   For expert witness fees; right?

6       A.   That's correct.

7       Q.   About 50 percent of your income comes from

8  expert witness work; right?

9       A.   For those two years, yes.

10      Q.   For 2014 and 2013, right?

11      A.   Correct.

12      Q.   You've billed defendant's firm invoices in

13 this case; right?

14      A.   I have.

15      Q.   Last time I took your deposition you hadn't

16 received any payment for your invoices, had you?

17      A.   That is also correct.

18      Q.   You have not?

19      A.   I have not.

20      Q.   So you don't know who you're gonna get paid

21 by in this case, do you?

22      A.   Not to date; no, I do not.

23      Q.   You don't know whether you'll be paid by

24 Dr. Mitchell, do you?

25      A.   I don't know.

DOVGAN - REDIRECT                              1079

1        Q.  You don't know whether you'll be paid by

2  Dr. Mitchell's attorneys, do you?

3        A.  I do not know.

4        Q.  You don't know whether you'll be paid by

5  Dr. Mitchell's employers like Wexford, do you?

6        A.  I don't know.

7        Q.  You don't know one way or the other, do you?

8        A.  Not to date, no.

9        Q.  Based on what you know, Wexford very well

10  could be paying for your expert witness fees; right?

11            MR. VOGT:  Objection, Judge.  I mean --

12            THE COURT:  The objection is sustained.

13            MR. WATSON:  No more questions.

14            MR. VOGT:  Sorry, sir, I just have a couple

15  very quick.

16                  REDIRECT EXAMINATION

17  BY MR. VOGT:

18        Q.  Is there something wrong with Dr. Mitchell

19  traveling five hours to Rushville to help treat the

20  dental care of the residents who are detained there?

21        A.  I find that admirable.

22        Q.  A professional dentist should try and treat

23  the patients who have the greatest needs; right?

24        A.  That's always the case.

25        Q.  And the patients at Rushville need a

 1    dentist; right?

 2         A.  Yes, they certainly do.

 3         Q.  Dr. Mitchell goes there and tries to provide

 4    those residents with dental care, traveling five

 5    hours down, five hours back, ten hours roundtrip to

 6    provide 15 hours of dental care?

 7         A.  I find that incredible personally.

 8         Q.  Just to clarify something on this contract

 9    issue.  Defendant's Exhibit No. 20 was the contract

10    that you were -- I'll just do it this way.  You were

11    talking about --  let me read this to you, sir.

12         (As read)  "Vendor, that's Wexford, shall

13    provide dental checkups to facility residents within

14    two years from the date of the last treatment or

15    exam given and more often if clinically indicated."

16         That's what you were referring to?

17         A.  That is correct.

18         Q.  This is the DHS, the contract that DHS

19    itself proposed and signed with Wexford?

20         A.  That is also correct.

21              MR. VOGT:  Thank you, Judge.  That's all I

22    have for the witness.

23              THE COURT:  Anything further, Mr. Watson?

24         All right.  If you'll take the jurors -- excuse

25    me.  Do you have any questions?

1          No?  All right.  Five minutes.

2          When you return I will instruct you and we will

3     have closing argument.

4          (The jury left the courtroom.)

5               THE COURT:  You're excused.

6          (The witness was excused.)

7               THE COURT:  All right.  You have rested?

8               MR. VOGT:  Yes, Judge.  I was -- well, just

9     a couple of exhibits, Judge.

10              THE COURT:  Yeah, we have a couple of

11    exhibits for plaintiff's, too.  Let's do those real

12    quick.

13              MR. VOGT:  Judge, while we're waiting for

14    that, I again would like to move for a directed

15    evidence at close of evidence.  No reasonable jury

16    in this courtroom could find in favor of the

17    plaintiff.

18              THE COURT:  Motion denied.

19              MR. VOGT:  Thank you, Judge.

20              THE COURT:  Thank you.

21         All right.  I have Plaintiff's Exhibit 119,

22    117, and 14, have not been marked as admitted.

23              MR. VOGT:  Those I thought they were going

24    to be demonstrative.

25              MR. WATSON:  Your Honor, we offered those

1   as summary exhibits.  We offered those under 1005.

2   We expect that we would offer the 117B, with --

3           THE COURT:  You offered A too.

4           MR. WATSON:  Offered A.  B was the summary

5   with the lines and dots to indicate the extracted

6   teeth, Your Honor.

7           THE COURT:  All right.  And any objection

8   to 117B?  It was already admitted.

9           MR. VOGT:  The entire group, Judge?

10  Because the only one that the expert referred to is

11  the first page and the last page.

12          THE COURT:  They referred to this second

13  page, too.

14          MR. WATSON:  We laid the foundation and we

15  said the entire exhibit labeled as 117B was a

16  summary of the records.  Foundational question going

17  to 1005 for a summary of the complete voluminous

18  dental records.

19          THE COURT:  Okay.  So, 117A and 117B are

20  committed and so marked.

21      (Plaintiff's Exhibits 117A and 117B admitted.)

22          THE COURT:  Any objection to Plaintiff's

23  119, the treatise?

24          MR. WATSON:  That does not go into

25  evidence.

1    THE COURT:  I will refer to that as
2  demonstrative also.
3    MR. WATSON:  I would refer to that as
4  impeachment material.
5    THE COURT:  Okay, I'll refer to it as that.
6  I need something on it.  That's what it is
7  certainly.
8    Okay.  It's not admitted.
9    And then Plaintiff's Exhibit 14, the doctor's
10  CV.
11    MR. VOGT:  I don't think it should be
12  admitted in evidence, Judge.
13    MR. WATSON:  It's a summary.  I don't think
14  it has to go back, Your Honor, to be admitted into
15  evidence.
16    THE COURT:  Okay.  I'm sorry, you said it
17  doesn't have to be admitted in evidence?
18    MR. WATSON:  It doesn't have to go back to
19  the jury as admitted evidence.
20    THE COURT:  All right.  So we'll just mark
21  it as a summary.
22    All right.  The overhead, I believe, was
23  Plaintiff's 114, Plaintiff's CD.  Will that go back?
24  It will not; correct?
25    MS. MacDONALD:  We want it to go back, Your

1   Honor, yes.

2           MR. VOGT:  How would they read it?  I'm

3   sorry.

4           MS. MacDONALD:  That was the video from the

5   deposition.

6           THE COURT:  The video of?

7           MS. MacDONALD:  The eye roll and then the

8   lie.

9           THE COURT:  So they have the ability to

10  watch this -- Mr. Vogt?  Mr. Vogt?

11          MR. VOGT:  Yes, Judge.

12          THE COURT:  They have the ability to watch

13  this.  I have a TV and DVD player back there and

14  they will also be able to display the jury

15  instructions on it.

16          MR. VOGT:  Okay.  What does that show,

17  again, if I can ask?

18          MS. MacDONALD:  It's the video of

19  Dr. Mitchell rolling her eyes and then saying she

20  didn't roll her --

21          MR. VOGT:  Oh, Judge, I object to --

22          MS. MacDONALD:  It has been admitted

23  into --

24      (Attorneys speaking simultaneously; court.

25      reporter asks for clarification.)

1    THE COURT:  Is it the whole deposition?

2    MS. MacDONALD:  No, it's just the expert.

3    THE COURT:  Just the excerpt?

4    MS. MacDONALD:  Yeah.

5    MR. VOGT:  Judge, first of all, I think

6    it's -- I'm sure I could have introduced other

7    elements where she wasn't rolling her eyes, Judge.

8    THE COURT:  Well, there were elements where

9    she wasn't rolling her eyes in what I saw.  And I --

10    MR. VOGT:  I mean, Judge, I just don't --

11    THE COURT:  I question whether she was

12    rolling her eyes.

13    MR. VOGT:  I know.  I don't think it's

14    relevant and admissible for that purpose.  And I

15    think because it's the only one, it places undue

16    influence on an issue that is nothing to do with

17    credibility in this case.  All the witnesses,

18    several witnesses were looking up when they were

19    thinking.

20    THE COURT:  Well, you certainly brought

21    that out.  I'm going to allow it.

22    Okay.  Look at the packet of exhibits that we

23    have that will go back to the jury.  And one of the

24    reasons that I do this; I wanted to explain the

25    other day why I go through them and why I mark them

```
 1    myself; is because we had a trial here, James Earl
 2    Ray's brother, who was a bank robber and had a prior
 3    murder conviction that was kept out.  And the murder
 4    conviction went back to the jury and we had to retry
 5    it.  Long before I was here.
 6              MR. CROWL:  That's prejudice, Judge.
 7              THE COURT:  Jury instruction packets, may I
 8    have one?  These are the master finals.  Do you have
 9    any additional objections to the jury instruction
10    packet that you've just been handed?  Or you were
11    handed actually a while ago.
12              MS. MacDONALD:  No, Your Honor.
13              MR. VOGT:  No, Judge.
14              THE COURT:  Okay.  I question, do we have a
15    missing evidence instruction anywhere?
16              MR. VOGT:  No, there's been none tendered
17    nor is there an issue about that.
18              THE COURT:  Okay.  I will tell you, by
19    looking at the jury, they are very tired.  I know we
20    are all very tired.  How long will your closing be?
21              MS. MacDONALD:  I anticipate about
22    20 minutes.
23              THE COURT:  Okay.  Because it was
24    45 minutes in opening --
25              MR. VOGT:  Was I 45 minutes, Judge?
```

1    THE COURT:  -- pretty much.

2    And I'm doing a plea afterwards that's going to

3    take an hour, so we will have to ask you to vacate

4    while I take -- well, I could go downstairs, but

5    you'd have to --

6    I'll have to ask you -- you can leave your

7    belongings here, I will try and have them sit over

8    there, but I will be in the courtroom so if the jury

9    has a question or if the jury has a verdict I'll

10   have to break in and take the verdict and get you

11   guys out of here.

12   MS. MacDONALD:  Can I go back to the

13   question about missing evidence.  What was the

14   concern on that?

15   THE COURT:  Well, the x-rays, the nurses

16   lists --

17   MR. VOGT:  Well, those are all Rushville

18   issues, Judge.  They're not -- no one --

19   THE COURT:  Well, they're missing.

20   MS. MacDONALD:  They're missing, so they

21   could be argued.

22   MR. VOGT:  No, no, hold it, Judge.  They're

23   not missing.  First of all, the x-rays are at

24   Rushville, they just won't allow them to --

25   MR. CAMPBELL:  They were at the IDOC

1  records, we --

2          MR. VOGT:  No, wait, wait, wait.  We're all

3  talking about different things.  There are x-rays at

4  Rushville.  Those x-rays they would not allow anyone

5  to take out.  We have tried.

6          THE COURT:  Why didn't you ask me for a

7  court order?

8          MR. VOGT:  I don't know what to tell you,

9  Judge, but neither side --

10         MR. WATSON:  Because we had the dental

11 records and we felt that --

12         MR. VOGT:  So it's not an issue of missing

13 instruction, Judge.

14     (Simultaneous talking; the court reporter

15     asked for clarification.)

16         THE COURT:  What about the nurses' lists,

17 where are they?

18         MR. VOGT:  We don't know anything about the

19 nurses lists.  They are kept by Rushville, too;

20 again, not Dr. Mitchell.

21         MR. WATSON:  Never produced by DHS.

22         MR. VOGT:  Right.  We subpoenaed that.

23         THE COURT:  And what was the response?

24         MR. VOGT:  They did not have those records

25 still.  Or anymore.

1    THE COURT:  All right.  So I'm going to

2    bring the jury back in, read these instructions.

3    MR. VOGT:  Exhibits?  You want to do them

4    afterwards?

5    THE COURT:  I thought we -- your exhibits?

6    These are the ones that have not been admitted yet?

7    MR. VOGT:  Yes.

8    THE COURT:  I'll do them right now.

9    Okay.  36-42, Smego's A1C.  Any objection?

10    MR. VOGT:  These are the ones that we used

11    with Dr. Lochard.

12    MR. WATSON:  No objection.

13    THE COURT:  It's admitted and so marked.

14    (Defendant's Exhibit 36-42 was admitted.)

15    THE COURT:  36-20, same thing.  Any

16    objection?

17    MR. WATSON:  Your Honor, along with the

18    last objection, as Mr. Crowl, in his prowess

19    yesterday, indicated, we do have an objection to the

20    highlighting and Your Honor indicated that -- didn't

21    view it as attorney product.  So just preserving

22    that objection.

23    THE COURT:  All right.  So over objection.

24    (Defendant's Exhibit 36-20 was admitted.)

25    THE COURT:  36-9 was admitted as well and

1    so marked.

2        (Defendant's Exhibit 36-9 was admitted.)

3            THE COURT:  42 is the list of medical

4    examinations by the doctor, medical doctor.  Any

5    objection?

6            MS. MacDONALD:  No objection, Your Honor.

7            THE COURT:  42 is admitted and so marked.

8        (Defendant's Exhibit 42 was admitted.)

9            THE COURT:  3-17 is the DHS progress note

10   dated 1/2/07.

11           MR. WATSON:  Just the same objection.

12           THE COURT:  3-17 is admitted over the same

13   objection.

14       (Defendant's Exhibit 3-17 was admitted.)

15           THE COURT:  3-018 is the same thing.  Same

16   objection?

17           MR. WATSON:  Correct, Your Honor.

18           THE COURT:  Admitted over objection.

19       (Defendant's Exhibit 3-018 was admitted.)

20           THE COURT:  3-19, physical examination

21   dated 12/10/07.  Any objection?

22           MR. WATSON:  Same objection, Your Honor.

23           THE COURT:  Admitted over objection.  So

24   marked.

25       (Defendant's Exhibit 3-19 was admitted.)

1       THE COURT:  3-20, same thing.  Same

2   objection, admitted over objection.

3       (Defendant's Exhibit 3-20 was admitted.)

4       THE COURT:  3-21, medical record 12/10/07.

5   Progress notes.

6       MR. WATSON:  Same objection, Your Honor.

7       THE COURT:  Admitted over objection.

8       (Defendant's Exhibit 3-21 was admitted.)

9       THE COURT:  3-23?

10      MR. WATSON:  Same objection, Your Honor.

11      THE COURT:  Admitted over same objection.

12      (Defendant's Exhibit 3-23 was admitted.)

13      THE COURT:  3-0 25.

14      MR. WATSON:  Same objection.

15      THE COURT:  Admitted over same objection.

16      (Defendant's Exhibit 3-025 was admitted.)

17      THE COURT:  3-39?

18      MR. WATSON:  Same objection, Your Honor.

19      THE COURT:  Admitted over same objection.

20      (Defendant's Exhibit 3-39 was admitted.)

21      THE COURT:  3-40?

22      MR. WATSON:  Same objection.

23      THE COURT:  Admitted over objection.

24      (Defendant's Exhibit 3-40 was admitted.)

25      THE COURT:  3-41?

1    MR. WATSON:  Same.

2    THE COURT:  Admitted over objection.

3    (Defendant's Exhibit 3-41 was admitted.)

4    THE COURT:  3-42?

5    MR. WATSON:  Same, Your Honor.

6    THE COURT:  Admitted over objection.

7    (Defendant's Exhibit 3-42 was admitted.)

8    THE COURT:  And attempt to resolve

9    grievances, 14-43, August, 2008.

10   MR. WATSON:  Same, Your Honor.

11   THE COURT:  Admitted over objection.

12   (Defendant's Exhibit 14-43 was admitted.)

13   THE COURT:  Any further evidence to be

14   admitted in evidence?

15   MR. WATSON:  The only issue, Your Honor, is

16   there is a redaction that I think both sides need to

17   apply to the Wexford-State of Illinois agreement,

18   which is Defendant's Exhibit 20.  And it references

19   correctional.

20   MR. VOGT:  We have no objection to the

21   redaction, Judge.

22   THE COURT:  Pull out -- I'm sorry, did you

23   say Defendant's 20?

24   MR. WATSON:  Defendant's 20 and --

25   THE CLERK:  All I have over here are

1    plaintiff's.  I don't have any defendant's.

2           THE COURT:  This is defendant's filed

3    exhibits.  They are only the exhibits I just

4    admitted.  I thought we marked other exhibits for

5    defendant.

6           MR. VOGT:  Yes, we did, Judge.

7        The defense has no objection to the redaction

8    that the plaintiff wishes to put on Defendant's

9    Exhibit 20.

10          THE COURT:  So I'm removing Plaintiff's 108

11   from the list of exhibits.  It's not going to go

12   back.  Instead, Defendant's redacted 20 will go

13   back.  And I will mark it as admitted today's date

14   without objection.

15       (Defendant's Exhibit 20 was admitted.)

16          MR. VOGT:  All right, Judge.  Thank you.

17   Five minutes or so, Judge?

18          THE COURT:  Yes.

19       (A recess was taken.)

20          THE COURT:  Back on the record.

21          MS. MacDONALD:  It looks like Plaintiff's

22   Exhibit 1 got misplaced from the Court's copies.

23   Maybe we took it back and never gave it back to you

24   guys.  This is the dental chart.

25          THE COURT:  Do you remember what day it was

1    admitted?

2            MS. MacDONALD:  Yes, it was the first day.

3            THE COURT:  The 24th?

4            MS. MacDONALD:  Yeah, with Dr. Mitchell.

5            THE COURT:  It causes me great

6    consternation that it was not in the packet.

7        It was on plaintiff's pile that it is marked as

8    admitted.  I have clipped what will not go back to

9    the jury.

10            MS. MacDONALD:  Your Honor, there are

11   plaintiff ones that are --

12            THE COURT:  Yeah, some of these are

13   plaintiffs.

14            MS. MacDONALD:  Can I just take a quick

15   look.

16            THE COURT:  Off the record.

17        (A discussion was held off the record.)

18            THE COURT:  All right.  Have you looked

19   at -- hello!

20        Have you looked at the jury instructions, are

21   they in proper form for me to read them to the jury,

22   because that's what we're going to be doing right

23   now.

24            MS. MacDONALD:  Yes, Your Honor.

25            THE COURT:  Okay.  And you've gone through

1    the exhibits.  What happened with all of

2    defendant's?  Did we get all defendant's, Marchal?

3              THE CLERK:  Yes.

4              THE COURT:  Have you gone through the

5    stack.

6              MS. CAMPBELL:  Yes, I did.

7              MR. VOGT:  Judge, it's no big deal, but did

8    you -- I don't recall the Court introducing any

9    evidence for a limited purpose, but --

10              THE COURT:  There was.  When there were

11    objections and -- like hearsay, I said they could

12    take it for a limited purpose.

13              MR. VOGT:  You're right.

14              THE COURT:  Off the record.

15         (A discussion was held off the record.)

16              THE COURT:  Back on the record.  We have

17    the podium in place.  You are not required to stand

18    behind the podium.  Don't get too close to the jury.

19         You have gone over all of the jury

20    instructions?

21              MR. VOGT:  May I approach, Judge.  This is

22    the statement of the case that the Court read

23    initially.  I didn't know if -- that's not -- I

24    don't think that should be included in the

25    instructions.  You know, it's just a thought.  It is

1   not really an instruction.

2           THE COURT:  Susan, defendant is objecting

3   to the statement being read in here.  I don't know

4   what number it is, I don't have the number.

5           MS. GLEASON:  I do have a marked version, I

6   can look.

7           THE COURT:  Do you agree?

8           MS. MacDONALD:  May I take a moment, Your

9   Honor?

10          THE COURT:  Yes.

11          MS. MacDONALD:  No, Your Honor; we agree.

12          THE COURT:  All right.  So I'm using -- I'm

13  removing page 24, statement of the case.  Not given,

14  no objection.  What number is it, Susan?

15          MS. GLEASON:  I'm looking it up, hang on.

16          THE COURT:  Do we have a jury instruction

17  number?

18          MS. GLEASON:  It is Court's 20A.

19          THE COURT:  Court's 20A is removed from the

20  packet.  It will not be given.  Take it out of your

21  packet, Susan, it's page 24.

22          MS. GLEASON:  Okay.

23          THE COURT:  It's out of my packet.  I did

24  not get you to agree, Mr. Vogt, that you would be

25  20 minutes.

1     MR. VOGT:  Oh, yes.

2     MS. MacDONALD:  We will have a brief

3  rebuttal for plaintiff?

4     THE COURT:  Yes, five minutes.

5  Off the record.

6  (A discussion was held off the record.)

7     THE COURT:  Bring the jury, please.

8  What I intend to do is after I read the

9  instructions, after you do closings and rebuttal, I

10  will ask the jurors -- I will tell them I have menus

11  and I will give you menus if you wish to have them

12  now, or you may wait.  And I will leave that

13  decision up to them.

14  Is that acceptable, Ms. MacDonald?

15     MS. MacDONALD:  Yes, Your Honor.

16     THE COURT:  Mr. Vogt?

17     MR. VOGT:  Yes, Your Honor.

18  (The jury entered the courtroom.)

19     THE COURT:  I'm going to read you the jury

20  instructions.  They will be displayed overhead

21  again.  And you'll be given the ability to pull them

22  up on a computer and a computer screen in the jury

23  room, as well as two copies will be given to you.

24  I'm going to try to read quickly so we can get

25  matters resolved here.

1    Members of the jury, you have seen and heard

2    all the evidence and will hear the arguments of the

3    attorneys.  Now, I will instruct you on the law.

4    You have two duties as a jury.  Your first duty

5    is to decide the facts from the evidence in the

6    case.  This is your job and your's alone.  Your

7    second duty is to apply the law that I give to

8    you -- that I give you to the facts.

9    You must follow these instructions even if you

10   disagree with them.  Each of the instructions is

11   important and you must follow all of them.

12   Perform these duties fairly and impartially.

13   Do not allow prejudice to influence you.

14   Nothing I say now and nothing I said or did

15   during the trial is meant to indicate any opinion on

16   my part about what the facts are or about what your

17   verdict should be.

18   During this trial I have asked a witness a

19   question myself.  Do not assume that because I asked

20   questions I hold any opinion on the matters I asked

21   about or on what the outcome of the case should be.

22   The evidence consists of the testimony of the

23   witnesses and the exhibits admitted in evidence.

24   Certain things are not to be considered as

25   evidence.  I will list them for you.

1       First; if I told you to disregard any testimony

2   or exhibits or struck any testimony or exhibits from

3   the record, such testimony or exhibits are not

4   evidence and must not be considered.

5       Second; anything that you may have seen or

6   heard outside the courtroom is not evidence and must

7   be entirely disregarded.

8       Third; questions and objections or comments by

9   the lawyers are not evidence.  Lawyers have a duty

10  to object when they believe a question is improper.

11  You should not be influenced by any objection and

12  you should not infer from my rulings that I have any

13  view as to how you should decide the case.

14      Fourth; the lawyers' opening statements and

15  closing arguments to you are not evidence.  Their

16  purpose is to discuss the issues and the evidence.

17  If the evidence as you remember it differs from what

18  the lawyers said, your memory is what counts.

19      Certain demonstrative exhibits, such as

20  summaries, pictures, or diagrams, have been shown to

21  you.  Demonstrative exhibits are used for

22  convenience and to help explain the facts of the

23  case.  They are not themselves evidence or proof of

24  any facts.

25      Evidence has been presented to you in the form

1    of written answers of one of the parties to written

2    interrogatories submitted by the other side.  These

3    answers were given in writing and under oath before

4    this trial in response to written questions.  You

5    must give the answers the same consideration as if

6    the answers were made from the witness stand.

7         You may notice that an exhibit has been blacked

8    out or whited out.  This is called redaction.  Any

9    redactions were ordered by the Court for a variety

10   of reasons, including that the redacted information

11   is unrelated to the case or the information is not

12   admissible.  You should not guess what has been

13   redacted and the redaction should not affect your

14   consideration of the evidence at all.

15        Any notes you have taken during this trial are

16   only aids to your memory.  The notes are not

17   evidence.  If you haven't taken notes you should

18   rely on your independent recollection of the

19   evidence and not be unduly influenced by the notes

20   of other jurors.  Notes are not entitled to any

21   greater weight than the recollections or impression

22   of each juror about the testimony.

23        In determining whether any fact has been proved

24   you should consider all of the evidence bearing on

25   the question, regardless of who introduced it.

1    You will recall that during the course of this

2 trial I instructed you that I admitted certain

3 evidence for a limited purpose.  You must consider

4 this evidence only for the limited purpose for which

5 it was admitted.

6    You should use common sense in weighing the

7 evidence and consider the evidence in light of your

8 own observations in life.  In our lives we often

9 look at one fact and conclude from it that another

10 fact exists.  In law we call this inference.  A jury

11 is allowed to make reasonable inferences.  Any

12 inference you make must be reasonable and must be

13 based on the evidence in the case.

14    You have -- you may have heard the phrases

15 "direct evidence" and "circumstantial evidence."

16 Direct evidence is proof that does not require an

17 inference, such as the testimony of someone who

18 claims to have personnel knowledge of a fact.

19 Circumstantial evidence is proof of a fact or a

20 series of facts that tends to show that some other

21 fact is true.

22    As an example; direct evidence that it is

23 raining is testimony from a witness who says, "I was

24 outside a minute ago and I saw it raining."

25 Circumstantial evidence that it is raining is the

1  observation of someone entering a room carrying a
2  wet umbrella.
3       The law makes no distinction between the weight
4  to be given to either direct or circumstantial
5  evidence.  You should decide how much weight to give
6  to any evidence in reaching your verdict.  You
7  should consider all the evidence in the case
8  including the circumstantial evidence.
9       You must decide whether the testimony of each
10 of the witnesses is truthful and accurate in part,
11 in whole, or not at all.  You also must decide what
12 weight, if any, you give to the testimony of each
13 witness.
14      In evaluating the testimony of any witness,
15 including any party to the case, you may consider,
16 among other things, the ability and opportunity the
17 witness had to see, hear, or know the things that
18 the witness testified about;
19      The witness's memory;
20      Any interest, bias or prejudice the witness may
21 have;
22      The witness's intelligence;
23      The manner of the witness while testifying; and
24      The reasonableness of the witness's testimony
25 in light of all the evidence in the case.

1       You have heard witnesses give opinions about

2   matters requiring special knowledge or skill.  You

3   should judge this testimony in the same way that you

4   judge the testimony of any other witness.  The fact

5   that such person has given an opinion does not mean

6   you are required to accept it.

7       Give the testimony whatever weight you think it

8   deserves, considering the reason given for the

9   opinion, the witness's qualifications, and all of

10  the other evidence in the case.

11      You may consider statements given by a party or

12  witness under oath before trial as evidence of the

13  truth of what he or she said in the earlier

14  statements, as well as in deciding what weight to

15  give his or her testimony.

16      With respect to other witnesses the law is

17  different.  If you decide that before the trial one

18  of these witnesses made a statement not under oath,

19  or acted in a manner that is inconsistent with his

20  or her testimony here in court, you may consider the

21  earlier statement or conduct only in deciding

22  whether his or her testimony here in court was true

23  and what weight to give to his or her testimony here

24  in court.

25      In considering a prior inconsistent statement

1  or conduct you should consider whether it was simply

2  an innocent error or an intentional falsehood and

3  whether it concerned an important fake or

4  unimportant detail.

5      In this case plaintiff is civilly committed at

6  a treatment and detention center.  All parties are

7  equal before the law.  A person who is civilly

8  committed at a treatment and detention facility is

9  entitled to the same fair consideration that you

10  would give any individual person.

11      It is proper for a lawyer to meet with any

12  witness in preparation for trial.

13      You may find the testimony of one witness or a

14  few witnesses more persuasive than the testimony of

15  a larger number.  You need not accept the testimony

16  of the larger number of witnesses.

17      The law does not require any party to call as a

18  witness every person who might have knowledge of the

19  facts related to this trial.  Similarly, the law

20  does not require any party to present as exhibits

21  all papers and things mentioned during this trial.

22      The Defendant in this case is being sued as an

23  individual for her alleged personal acts.  Neither

24  the State of Illinois, the Illinois Department of

25  Human Services, Wexford Health Sources, Inc., nor

1  Addus Health Care, Inc., is a party to this lawsuit.

2    Plaintiff must prove by a preponderance of the

3  evidence that defendant was personally involved in

4  the conduct that plaintiff explains about.  You may

5  not hold a defendant liable for what other employees

6  did or did not do.

7    When I say that a party must prove something by

8  a preponderance of the evidence, or when I use the

9  expression "if you find" or "if you decide," this is

10  what I mean:  When you have considered all the

11  evidence in the case you must be persuaded that it

12  is more probably true than not true.

13    To succeed on his claim, the plaintiff --

14  that -- yes, his claim, plaintiff must prove each of

15  the following things by a preponderance of evidence:

16    Plaintiff had a serious medical or dental need;

17    Defendant was deliberately indifferent to

18  plaintiff's serious medical or dental need; and

19    Defendant's conduct caused harm to plaintiff.

20    If you find that plaintiff has proved each of

21  these things by a preponderance of the evidence,

22  then you should find for plaintiff and go on to

23  consider the question of damages.

24    If, on the other hand, you find that plaintiff

25  has failed to prove any one of these things by a

1    preponderance of the evidence, then you should find

2    for defendant and you'll not consider the question

3    of damages.

4        When I use the term "serious medical or dental

5    need," I mean a condition that a doctor or dentist

6    says requires treatment, or something so obviously

7    that even someone who is not a doctor or dentist

8    would recognize it as requiring treatment.

9        In deciding whether a medical or dental need is

10   serious you should consider the following factors:

11       The severity of the condition;

12       The harm, including pain and suffering that

13   could result from a lack of medical or dental care;

14       Whether providing treatment was feasible;

15       Any actual harm caused by the lack of medical

16   or dental care.

17       When I use the term "deliberately indifferent,"

18   I mean that defendant actually knew of a substantial

19   risk of serious harm to plaintiff's dental or

20   medical health and that plaintiff consciously

21   disregarded that risk by failing to take reasonable

22   measures to deal with it.

23       In deciding whether defendant failed to take

24   reasonable measures you may consider whether it was

25   practical or possible for her to take corrective

1  action.

2      Deliberate indifference is intentional or

3  reckless conduct, not negligence.  A delay in

4  providing effective treatment may amount to

5  deliberate indifference where the delay causes

6  prolonged and unnecessary pain.  Deliberate

7  indifference may also arise when the treatment

8  decision is such a substantial departure from

9  accepted professional judgement, practice, or

10  standards that the decision is not based on

11  professional judgement.

12      If you find that defendant strongly suspected

13  that things were not as they seemed, yet shut her

14  eyes for fear of what she would learn, you may

15  conclude that she was deliberately indifferent.  You

16  may not conclude that defendant was deliberately

17  indifferent if she was merely careless in failing to

18  discover the truth.

19      When I say that plaintiff must prove by a

20  preponderance of the evidence that defendant's

21  conduct caused harm to plaintiff, I mean that the

22  harm would not have occurred in the natural or

23  probable course of events absent defendant's

24  conduct; and, the harm was of a type that a

25  reasonable person would see as a likely result or

1  natural consequence of her conduct.

2      Plaintiff does not have to prove that

3  defendant's conduct was the only cause of

4  plaintiff's harm.

5      If you find in favor of plaintiff then you must

6  determine the amount of money that will fairly

7  compensate plaintiff for any injury that you find he

8  sustained and is reasonably certain to sustain in

9  the future as a direct result of the failure to

10  provide plaintiff with dental or medical care.

11  These are called compensatory damages.

12      Plaintiff must prove his damages by a

13  preponderance of the evidence.  Your award must be

14  based on evidence and not speculation or guesswork.

15  This does not mean, however, that compensatory

16  damages are restricted to the actual loss of money.

17  They include the physical aspects of injury, even if

18  they are not easy to measure.

19      You should consider the following types of

20  compensatory damages and no others:

21      The reasonable value of medical or dental care

22  and supplies that plaintiff reasonable needed and

23  actually received, as well as the present value of

24  the care and supplies that he's reasonably certain

25  to need and receive in the future;

1        The physical pain and suffering that plaintiff

2    has experienced and is reasonably certain to

3    experience in the future.

4        No evidence of the dollar value of physical

5    pain and suffering has been or needs to be

6    introduced.  There is no exact standard for setting

7    the damages to be awarded on account of pain and

8    suffering.  You are to determine an amount that will

9    fairly compensate plaintiff for the injury he has

10   sustained.

11       If you find in favor of plaintiff, but find

12   that plaintiff has failed to prove compensatory

13   damages, you must return a verdict for the plaintiff

14   in the amount of $1.

15       If you find for plaintiff, you may, but are not

16   required to assess punitive damages against

17   defendant.

18       The purposes of punitive damages are to punish

19   defendant for her conduct and to serve as an example

20   of warning to defendant and others not to engage in

21   similar conduct in the future.

22       Plaintiff must prove by a preponderance of the

23   evidence that punitive damages should be assessed

24   against defendant.  You may assess punitive damages

25   only if you find that her conduct was malicious or

1    in reckless disregard of plaintiff's rights.

2        Conduct is malicious if it is accompanied by

3    ill will or spite or is done for the purpose of

4    injuring plaintiff.  Conduct is in reckless

5    disregard of plaintiff's rights if, under the

6    circumstances, it reflects complete indifference to

7    plaintiff's safety or rights.

8        If you find that punitive damages are

9    appropriate, then you must use sound reasoning

10   setting the amount of those damages.  Punitive

11   damages, if any, should be in an amount sufficient

12   to fulfill the purposes that I've described to you,

13   but should not reflect bias, prejudice, or sympathy

14   toward either party.

15       In determining the amount of any punitive

16   damages you should consider the following factors:

17       The reprehensibility of defendant's conduct;

18       The impact of a defendant's conduct on

19   plaintiff;

20       The relationship between plaintiff and

21   defendant;

22       The likelihood that defendant would repeat the

23   conduct if an award of punitive damages is not made;

24       Defendant's financial condition;

25       The relationship of any award of punitive

1  damages to the amount of actual harm the plaintiff

2  suffered.

3        Upon retiring to the jury room you must select

4  a presiding juror.  The presiding juror will preside

5  over your deliberations and will be your

6  representative here in court.

7        A verdict form has been prepared for you.  Take

8  this verdict form to the jury room and when you've

9  reached unanimous agreement on the verdict, your

10  presiding juror will fill in and date the form and

11  all of you will sign it.

12        I do not anticipate you will need to

13  communicate with me.  If you do need to communicate

14  with me the only proper way is in writing.  The

15  writing must be signed by the presiding juror; or if

16  or she is unwilling to do so, by some other juror.

17  The writing should be given to the Marshal, who will

18  give it to me.  I will respond either in writing or

19  by having you return to the courtroom so I can

20  respond orally.

21        During your deliberations you must not

22  communication with or provide information to anyone

23  by any means about this case.

24        You may not use any electronic device or media,

25  such as a telephone, cellphone, smart phone, iPhone

1    Blackberry, or computer, the internet, any internet

2    service, or any text or instant messaging service,

3    or any internet chat room, blog, or website such as

4    Facebook, MySpace, LinkedIn, YouTube, or Twitter to

5    communicate to anyone any information about this

6    case or to conduct any research about this case

7    until I accept your verdict.

8         The verdict must represent the considered

9    judgement of each juror.  Your verdict, whether for

10   or against the parties, must be unanimous.  You

11   should make every reasonable effort to reach a

12   verdict.  In doing so, you should consult with one

13   another, express your own views, and listen to the

14   opinions of your fellow jurors.

15        Discuss your differences with an open mind.  Do

16   not hesitate to re-examine your own view and change

17   your opinion if you come to believe it is wrong.

18   But you should not consider your honest beliefs --

19   excuse me, you should surrender your honest beliefs

20   about the weight or effect of evidence solely

21   because of the opinions of other jurors or for the

22   purpose of returning a unanimous verdict.

23        All of you should give fair and equal

24   consideration to all the evidence and deliberate

25   with the goal of reaching an agreement that is

1    consistent with the individual judgement of each

2    juror.  You are impartial judges of the facts.

3         The verdict form reads as follows; and this is

4    the jury verdict form that you see;

5         Jury Verdict 1.  On Plaintiff's claim against

6    Defendant, we find in favor of, blank.  And you

7    write in Plaintiff Richard Smego or Defendant

8    Jacqueline Mitchell.

9         And if you found in favor of Defendant

10   Mitchell, do not complete the rest of the form

11   except to date and sign the form.

12        If you find against Defendant Mitchell,

13   complete lines 2 and 3 below.

14        2.  Having found against Defendant Mitchell, we

15   assess compensatory damages in the amount of blank

16   dollars.

17        If you found in favor of plaintiff but found

18   that plaintiff failed to prove compensatory damages,

19   then write $1 for compensatory damages.

20        3.  Having found against Defendant Mitchell, we

21   assess punitive damages, if any, in the amount of,

22   dollar sign blank.  State the amount, or if none,

23   write the word "none."  Then date it, presiding

24   juror's signature and the rest of your signatures.

25        All right.  At this time, closing,

1    Ms. MacDonald.

2         MS. MacDONALD:  Thank you, Your Honor.

3    May I proceed, Your Honor?

4         THE COURT:  Yes.

5         MS. MacDONALD:  Good afternoon, ladies and

6    gentlemen.

7         We greatly appreciate the time that you have

8    took to sit on this jury and especially on this

9    Friday afternoon when I'm sure you all have other

10   places to be.

11       Nine years ago an December 13th, 2005,

12   Dr. Mitchell diagnosed Mr. Smego with twelve

13   cavities.  Today Dr. Mitchell still has not filled

14   three of those cavities.  During that timeframe

15   Dr. Mitchell has seen Mr. Smego fourteen times.

16   Nine of those times she did not fill any of

17   Mr. Smego's cavities.

18       This case isn't about contracts, it's not about

19   healthcare requests, it's not about grievances.

20   This case is about what Dr. Mitchell did when she

21   saw Mr. Smego.  This case is about what Dr. Mitchell

22   did when Mr. Smego was in her dentist chair.

23       No one would expect their dentist to repeatedly

24   see them and not treat them.  No one would expect

25   their dentist to see that one of their teeth was

1    rotting and falling out and then do nothing.  No one

2    would expect their dentist to ignore them and refuse

3    to take steps to help them.  That's why a person

4    goes to the dentist, to get help.

5        Now, at the beginning of this case you heard my

6    colleague, Mr. Watson, in his opening remarks, ask

7    you to focus on two issues here:  What Dr. Mitchell

8    knew and when she knew it.  And that really is the

9    key here.

10       You know that Dr. Mitchell saw Mr. Smego in

11   December, 2005, and on fourteen occasions between

12   then and today.  Fourteen times she saw Mr. Smego

13   and knew he needed his cavities filled.  But nine of

14   those times she did not fill a single cavity.  Nine

15   of the fourteen times.

16       You saw in her own handwriting, in her own

17   notes on the dental chart that you guys have had

18   since the first day of this trial, twelve cavities

19   and then a treatment plan.  She knew on that day

20   that Mr. Smego needed dental care.  She laid out her

21   plan for that dental care.  But then what did she

22   do?  Nothing.

23       For 30 months she kicked the can down the road.

24   She didn't see Mr. Smego for a single follow-up

25   visit that she planned.  She didn't see him in 2006.

1    Eventually in the summer of 2007, she saw him for

2    simple, uncomplicated visits, but she -- just so

3    that she could tick him off her list.  But she

4    didn't dig in, she didn't address his problems.

5         She saw him six times without filling a single

6    cavity.  December 13th, 2005, June 24th, 2007,

7    July 23rd, 2007, August 25th, 2007, May 4th, 2008,

8    and May 25th, 2008.  None of those times did

9    Dr. Mitchell, while Mr. Smego was sitting in that

10   dentist chair, fill a single cavity.

11        And during the time that she delayed

12   Mr. Smego's teeth got worse and worse.  You heard

13   the testimony, tooth No. 2 was dying.  Tooth No. 2

14   had a cavity in it that was untreated and getting

15   worse.  Eventually that tooth started crumbling

16   inside Mr. Smego's mouth.

17        Every day while that tooth was dying Mr. Smego

18   was walking around with the taste of a rotting tooth

19   in his mouth.  And Dr. Mitchell knew it.

20   Dr. Mitchell saw Mr. Smego twice in the two months

21   that immediately preceded that visit where she had

22   to pull tooth No. 2; June 24th, 2007, and July 23rd,

23   2007.  That tooth was dying.  And then on

24   August 25th, she determined that it couldn't be

25   saved.

1          She knew about it, but she did nothing.  And
2     that pattern continued for years.  After Mr. Smego
3     lost tooth No. 2, he still needed fillings in 11
4     other teeth, but Mr. Smego -- or Dr. Mitchell didn't
5     see Mr. Smego for another nine months.
6          She didn't see him even though his therapist
7     called her in November of 2007, and told her that
8     Mr. Smego was having trouble receiving dental
9     services.  She still didn't see Mr. Smego.  She
10    waited a whole another six months after she got that
11    call to see him again.  We can all imagine what she
12    told that therapist when she talked to him in
13    November, 2007.
14         He waited another six months.  So eventually he
15    did, he filed a healthcare request.  And then even
16    when she saw him in May, 2008, after that April,
17    2008 healthcare request, what did she do?  Nothing.
18    Again, sits in the chair, she sees Mr. Smego, but
19    she does nothing.
20         Mr. Smego believed that he could not file a
21    grievance or an attempt to resolve which was part of
22    that grievance process for medical issues from 2006
23    to 2008, based on Rushville's policy.  You saw that.
24         He had been seen -- by the summer of 2008, he
25    had been seen by Dr. Mitchell five times, he had

1    lost a tooth, he had submitted a healthcare request,

2    and still not a single cavity had been filled.

3    Enough was enough.  He decided to file this lawsuit.

4        But even this lawsuit wasn't enough to get

5    Dr. Mitchell to do something.  She didn't even read

6    the complaint.  She didn't care.  The delays

7    continued and to this day, nine years later,

8    Mr. Smego still has three of those cavities.

9        That failure to treat, those delays in --

10   despite knowledge that Mr. Smego was losing teeth,

11   that tooth loss, that's why we're all here today,

12   because Dr. Mitchell didn't care.

13       Now, before I got up to speak the Judge read

14   you all jury instructions for this case.  And I just

15   want to talk briefly about four of the most

16   important ones.

17       First, the standard of proof in this case.  And

18   the Judge told you the standard of proof means that

19   a party must prove something by the preponderance of

20   the evidence.  And that means that it must be more

21   probably true than not true.  That's 51 percent,

22   ladies and gentlemen.  On any of these elements, on

23   any of these parts of the claim, 51 percent more

24   likely true than not.

25       Second, I want to walk through with you the

1    instruction on deliberate indifference.

2         As we can see on the instruction at page 25 of

3    your jury instructions, it says:  To succeed on his

4    claim, plaintiff must prove each of the following

5    things by a preponderance of evidence:

6         1.  Plaintiff had a serious medical condition;

7         2.  Defendant was deliberately indifferent to

8    plaintiff's serious medical or dental need; and

9         3.  Plaintiff's conduct caused harm to

10   plaintiff.

11        The instruction goes on to state that if

12   plaintiff proves all these things by that 51 percent

13   standard, then you should enter a verdict for

14   Mr. Smego and move on to consider damages.

15        So on the first item, plaintiff had a serious

16   medical or dental need.  Ladies and gentlemen, I'll

17   tell you right now you don't have to worry about it.

18   That has been admitted by Dr. Mitchell in her dental

19   records.  And all you need to do is look there to

20   see.

21        On the next page of the instructions it says:

22   When I use the term serious medical or dental need,

23   I mean a condition that a doctor or dentist says

24   requires treatment.

25        And that is exactly what we have in this case,

1    ladies and gentlemen.  We have Dr. Mitchell's dental

2    chart.  December 13th, 2005, 12 cavities, and the

3    services planned for them.  It's on the first page

4    of the exhibit you have had in your hand this whole

5    case.  Services planned, services needed.  A serious

6    medical need.

7        And then throughout the case other witnesses

8    have confirmed that Mr. Smego's dental condition was

9    a serious medical need.  Dr. Lochard testified that

10   painful tooth decay is a serious medical need.  And

11   Dr. Shulman confirmed that as well.

12       The second prong, deliberate indifference, is

13   explained on the next page of your jury

14   instructions.  And you can see that deliberately

15   indifferent, very top there, means that the

16   defendant actually knew of a substantial risk of

17   serious harm to plaintiff's dental or medical

18   health.  And two, the defendant consciously

19   disregarded that risk by failing to take reasonable

20   measures to deal with it.

21       And again, we've already talked about that

22   first part.  Dr. Mitchell actually knew.

23   Dr. Mitchell actually knew because she saw Mr. Smego

24   fourteen times.  She knew because his therapist

25   called him; she knew because Mr. Smego made verbal

1    complaints to her and other folks in the healthcare
2    department; she knew because he filed this lawsuit.
3    And in all the other ways you heard about,
4    Dr. Mitchell knew.
5        And we've also talked about why that's a
6    serious medical need.  Her planned treatment, that
7    dental chart, confirmed not only that she knew, but
8    it was serious because it required treatment.
9        And the failure to take reasonable steps.  We
10   then get three different examples throughout this
11   jury instruction.
12       First; A.  Whether it was practical or possible
13   to take steps to correct the issue.
14       And ladies and gentlemen, you have heard
15   throughout this week and seen lots of testimony and
16   lots of evidence about how it was possible and
17   practical for Dr. Mitchell to take additional steps
18   to help Mr. Smego.
19       She could have seen Mr. Smego just once in
20   2006.  She could have filled tooth No. 2 on
21   June 24th or July 23rd of 2007.  She could have
22   filled any of his cavities in May, 2008.  She could
23   have replaced his temporary fillings with permanent
24   fillings when they fell out.  She could have kept
25   her follow-up appointments and she didn't keep any.

1    She could have taught Mr. Smego about the
2  proper way to take care of his teeth and explain the
3  specific risks that he has in light of his health
4  conditions and his diabetes.
5    She could have shown that she cared about
6  Mr. Smego's wellbeing and prescribed him a different
7  painkiller.  She could have listened to him and
8  prescribed him something that he could take like
9  Tylenol or aspirin or naproxen.  Those were all
10 available, they were all there.  But she just kept
11 doing the same thing.
12    She could have requested additional hours from
13 her employer Wexford.  You've heard all -- multiple
14 witnesses say that.  You heard Defendant's expert
15 admit that today.
16    And she could have sent Mr. Smego offsite to
17 another outside provider for dental treatment.
18    And this is important because all the witnesses
19 that were here said that if treatment was not
20 possible or could not be done at Rushville, then you
21 can send a patient out.  And that is exactly what
22 Dr. Mitchell is claiming in this case.  She is
23 claiming that in light of the constraints on her
24 job, it was not feasible, it was not possible for
25 her to treat everyone.  And if that was true, then

1    she could send him out.  She could have saved those

2    teeth.  But she didn't.

3         Before 2014, there was no approval process.

4    There was no other rubber stamp needed.  All she had

5    to do was write the order and it would have

6    happened.  But she wouldn't do it.

7         All of these steps were practical.  All of

8    those steps you know were possible.  Dr. Mitchell

9    didn't take any of them.

10        We look back to the jury instruction.  Part B

11   up there is a delay in providing effective treatment

12   may amount to deliberate indifference where the

13   delay causes prolonged and unnecessary pain.

14        And, ladies and gentlemen, you hold in your

15   hand in that dental record a timeline of all the

16   delays of care in this case.  18 months, 20 months,

17   30 month, 63 months.  To this day Mr. Smego's teeth

18   are not properly treated for cavities Dr. Mitchell

19   identified in December of 2005.

20        Dr. Shulman told you about the delays.

21   Mr. Smego talked about the delays, the tooth

22   rotting, the pain.  Mr. Smego has shown deliberate

23   indifference in this way too.

24        And he doesn't have to show all the ways and he

25   doesn't have to make it on all of them.  All it

1    takes is one and he's proven all of them.

2        The third example, marked C up there, states

3    deliberate indifference may also arise when the

4    treatment decision is such a substantial departure

5    from accepted professional judgement, practice, or

6    standards that the decision is not based on

7    professional judgement.

8        The experts in this case agreed on the standard

9    of care.  Whether Dr. Mitchell was in Chicago in her

10   private practice or treating the residents at

11   Rushville, the same standards applied to her

12   patients at both places.

13       And it's what a patient expects of their

14   dentist.  Wherever they are and however they're

15   being treated, there are certain things that people

16   expect from the people that are providing them care

17   from their dentist.  And when you sit down in that

18   chair and when a person seeks dental treatment, that

19   person expects more from the person who has the

20   drill in their hand and the ability to stop their

21   pain.  Dr. Mitchell did not treat Mr. Smego how

22   everyone expects their dentist to treat them.

23       You also heard from Dr. Shulman that

24   Dr. Mitchell's failure to treat in the timely

25   fashion and the failure to give Mr. Smego

information about his condition, about the steps he

could take, about the risks he was taking with his

diabetes if he didn't take other steps.

Dr. Mitchell's lawyers focused on that.

Focused on the fact that Mr. Smego had diabetes.

But Dr. Mitchell herself never had that conversation

with him.  Never explained that to him.  And now

they're expecting him to be held accountable here in

this courtroom.

You take the patient as you find him, we all

know that.  Everybody messes up, everybody gets

hurt, everybody seeks a doctor, everybody seeks a

dentist.  And you expect that doctor, that dentist,

to treat you.

The third instruction I want to point out to

you relates to an issue that I expect you'll hear a

lot about from Mr. Vogt.  And that's the causation

issue.

I expect that Mr. Vogt is going to stand up

here and talk a lot about Addus and Wexford, maybe

DHS, maybe the nurses.  How they are the ones that

have caused Mr. Smego to have received such terrible

dental care.  But that doesn't matter.  The

instruction that you were read by the Court states:

The plaintiff must prove by a preponderance of the

1   evidence that defendant's conduct caused harm to

2   plaintiff.  That means that defendant has to be one

3   cause of the harm.  One.

4       If you read that last sentence it says:

5   Plaintiff does not have to prove that defendant's

6   conduct was the only cause of plaintiff's harm.  You

7   could determine that it would have been better if

8   there had been other dentists there, but that still

9   doesn't mean that Dr. Mitchell couldn't have treated

10  Mr. Smego better.  That when Smego was in that chair

11  looking at Dr. Mitchell for treatment, that she

12  couldn't have done more and that she can be held

13  responsibile for not doing more.

14      The law does not let people get away with that.

15  Dr. Mitchell was clearly, indisputably involved in

16  Mr. Smego's dental care.  She was personally

17  responsible for deciding when to see him, how long

18  to see him, which services to provide, and what

19  drugs to prescribe him when he left.

20      And you see that again in the chart.  A

21  detailed log of her involvement in Mr. Smego's care;

22  in the delays, in the failure to make fillings, and

23  in the failure to follow-up on visits.

24      She doesn't have to be the only person or

25  company that contributed to Mr. Smego's harm, she

1    just has to be one of them.

2         And the fourth instruction that I'd like to

3    point out to you, ladies and gentlemen, is

4    instruction on damages.

5         And the damages instruction starts off:  If you

6    find in favor of plaintiff you must determine the

7    amount of money that you're going to award him in

8    this case.  And if we go down towards the bottom

9    there's a couple of different examples.

10        The reasonable value of medical or dental care

11   and supplies that plaintiff reasonably needed.  And

12   two, the physical pain and suffering that plaintiff

13   has experienced.

14        And if we go to the second page we also find

15   language:  If you find in favor of plaintiff, but

16   find that plaintiff has failed to prove compensatory

17   damages, you must return a verdict for Mr. Smego in

18   the amount of a dollar.

19        Mr. Smego has lost a tooth.  He has suffered

20   unnecessary pain.  Yes, he was able to get aspirin

21   from time to time, but as everyone knows who's ever

22   had a toothache, no one wants to do it that way for

23   that long.  No one wants to be on a painkiller,

24   Tylenol, an aspirin, four times a day for 18 months.

25        But for Mr. Smego this case is not about money.

1   He relies on you as the jury to determine an

2   appropriate amount of money if you believe he is

3   entitled to it.  But what he really wants is a

4   judgement in his favor.

5       Only through a judgement can you make the

6   statement that this isn't right.  That the system

7   that's designed and it's suppose to provide care

8   cannot be set up to prevent someone from getting

9   care and to continue harm.

10      If you want to send a message that this just

11  isn't the way to treat people, the judgement is that

12  way.

13      And you'll also see in your instructions an

14  instruction on punitive damages.  And as Dr. Shulman

15  testified, Dr. Mitchell's testimony was clinically

16  reckless.  And because it was reckless, there's a

17  basis to award punitive damages in this case.  And

18  those punitive damages are designed to let

19  Dr. Mitchell know she can't treat Mr. Smego like

20  this.  And that others know that this behavior and

21  that this system and that the kicking the can down

22  the road and not providing treatment just isn't

23  right.

24      And when you get to the end of that

25  determination and the evidence shows that you'll

1    find in plaintiff's favor, you'll be able to fill

2    out a jury verdict form.  And that's a jury verdict

3    form that the Court showed you earlier.  And to find

4    in plaintiff's favor, to find in Mr. Smego's favor,

5    you're gonna write his name on that line in the jury

6    verdict form.  And then he relies on you, ladies and

7    gentlemen, to determine what type of damages you

8    would award.

9         It's interesting that at the beginning of this

10   case Dr. Mitchell's lawyer focused on

11   responsibility.  The lawyers asked a lot of

12   questions, but one of the best ones was your's.

13   Whose responsibility was it to care for Mr. Smego?

14   Whose responsibility was it to make sure that his

15   dental needs were being addressed?  Dr. Mitchell's

16   attorney accused Mr. Smego of not taking

17   responsibility for his dental issues.  But have you

18   heard Dr. Mitchell take responsibility for a single

19   thing at Rushville?  No.

20        Dr. Mitchell has accused Mr. Smego of not

21   brushing his teeth, of not treating his diabetes, of

22   not complaining enough, of not filing enough forms,

23   of not eating well, of not exercising enough.  But

24   Dr. Mitchell has a responsibility too.  Dr. Mitchell

25   is the dentist.  She is the one who diagnosed him

1    with 12 cavities.  She is the one that decided that

2    those cavities needed to be filled.  She's the one

3    who refused to fill those cavities even as Mr. Smego

4    sat in her dentist chair.

5        She reviews the healthcare requests, she

6    prioritizes them, she can call a patient down to her

7    clinic to see them if she's concerned he hasn't had

8    a filling in a while.  She's the one who decides how

9    long an appointment will take.  She's the one that

10   decides what services will be provided at that

11   appointment.  She's the one who decides whether to

12   do a superficial exam and x-rays, or to get in there

13   and to try to stop Mr. Smego's tooth decay.

14       She's the dentist.  She's the person at

15   Rushville responsible for providing the dental care.

16   She's the only one that can treat him there and

17   she's the only one that can send him outside

18   Rushville for treatment.  She is responsible.

19       Dr. Mitchell is the one that has all of the

20   power in this relationship.  She is the

21   decisionmaker.  She is the one that can make the

22   pain stop.  She is the one who can stop the decay.

23   And she is the only one that could have saved

24   Mr. Smego's teeth.  Instead, she chose to keep

25   punching the clock, doing her exams, checking

1    patients off the list, and getting her $75 an hour.

2         And it is this power that she has which is why

3    you and I are here today.  The Constitution protects

4    people when the state is given power over them.  The

5    Constitution requires that people like Mr. Smego who

6    are in state facilities and receiving state care are

7    not treated unfairly because they don't have the

8    power.  That means something.

9         The Constitution is fundamental to who we are

10   as Americans.  Those rights, the protections against

11   oppression and state power are the cornerstone of

12   what makes America unique.  In this case the

13   defendant wants you to be comfortable with what they

14   admit is unconstitutional care.  They want you to

15   say this constitutional violation doesn't matter

16   because Dr. Mitchell had too much on her plate.  But

17   the Constitution should not be so easily brushed

18   aside or diminished.  And neither should Mr. Smego.

19        After Mr. Vogt gives his closing I'll be up for

20   a few more remarks and then we will ask you to

21   return a verdict in Mr. Smego's favor.  Thank you.

22             THE COURT:  Thank you, Ms. MacDonald.

23   Mr. Vogt, your closing.

24             MR. VOGT:  Thank you, Judge.

25        Good afternoon, ladies and gentlemen.  Once

1   again I wanted to thank you for the time and

2   attention you've provided to us during the trial of

3   this case.

4        My wife tells me from time to time that I'm a

5   HEEP.  She tells me that I'm a high energy emotional

6   person.  I wanted to apologize if I got upset during

7   the trial or if I spoke too fast or anything like

8   that.  Sometimes that happens and I hope it didn't

9   interfere with your ability to understand the

10  evidence in the case.

11       A lot of allegations flying around.  A lot of

12  allegations.  Today I heard Dr. Mitchell should not

13  even work there I guess.  She shouldn't have signed

14  the contract.

15       You know, when I first got involved with this

16  case and I learned that Dr. Mitchell traveled five

17  hours to Rushville to then work 15 hours and then

18  turn around and drive -- travel five hours back, I

19  got to tell you, I was overwhelmed.  I thought, what

20  an incredible commitment.  Think about that.  Who

21  travels that much down to a place to provide care

22  and treatment?  Five hours down, pays for it all, by

23  the way you heard; the car, the rent, the gas, the

24  train ticket.

25       But, as you heard, she shouldn't do it.  I

1    don't -- again, I think you've heard me throughout

2    this case; if she doesn't do it, I don't know who

3    will.

4        You know, the system -- by the way, ladies and

5    gentlemen, I ask you to use your common sense.  No

6    one on earth travels ten hours to work fifteen hours

7    for the money.  Especially; I don't mean any

8    disrespect; $75 an hour.  If you work it all through

9    and you subtract all the expenses she's got, this is

10   not something she does.  She does this, ladies and

11   gentlemen, because she likes to help people.  Just

12   think about it.  Why else would she go down there?

13   Most telling in that respect is Smego himself.  What

14   happened here.

15       Now, the issue of the lawsuit getting filed was

16   brought up.  A lawsuit was filed on June 26th, 2008.

17   The records that you have show that on June 22nd,

18   2008, four days before the lawsuit was filed,

19   Dr. Mitchell had repaired three of his teeth.  She

20   repaired three of his teeth and he turned around and

21   filed suit against her anyway.

22       More incredible than that, ladies and

23   gentlemen, even though he sued her, she kept helping

24   him.  She kept seeing him, she kept trying to take

25   care of his teeth, even though he had sued her.

1    You want to know about character, just think

2  about that for a second.  She kept traveling five

3  hours down to see this guy, to take care of the

4  patients, even though he was suing her in a United

5  States Federal District Court.

6    A lot of allegations again.  The oral hygiene

7  instruction.  Well, you saw Mr. Smego.  He never

8  said that he doesn't know how to brush his teeth.

9  There were allegations, oh my gosh, Dr. Mitchell

10  didn't tell him how to take care of himself.  But he

11  never said that.  Never.

12    It's just like the three teeth, three cavities

13  he has still in his mouth.  Okay, everyone agrees

14  they're there.  But ladies and gentlemen think about

15  it; did Dr. Shulman say those teeth have got to come

16  out?  No.  And the plaintiff, when he testified, he

17  didn't say, "I want those teeth out."  Of course

18  not.  There's no reason to take them out, they're

19  fine.  They have been there the entire time.

20    You heard from his own mouth that the last five

21  years conclusively he has done nothing to ask for

22  any type of care; healthcare requests, see the

23  nurse, see the doctor, see anybody, nothing.

24    Well, what about all this pain that we're

25  hearing about.  Ladies and gentlemen, common sense.

1  You saw the records.  The evidence of the medication

2  administration record is overwhelming.

3  Overwhelming.  There is no other conclusion to draw.

4      If you use your common sense, we all know it,

5  dental pain is very challenging.  It is something

6  that all of us respond acutely too.

7      Ladies and gentlemen, if he had any dental

8  pain, he would have asked for the aspirin or the

9  Naprosyn that he had available.  You saw me go

10  through Dr. Lochard and with Dr. Mitchell, I went

11  month after month after month where -- did he take

12  any medication?  Or there might have been aspirin

13  here, aspirin there, but all the way across, zero,

14  zero, zero, none, none, none.

15      All you have to ask yourself is a simple

16  question:  If in fact he was in pain, would he take

17  medication?  I asked him that and did you hear what

18  he said?  He said yes, he would.

19      Their expert today, Dr. Shulman, said the same

20  thing.  That he would expect a patient who was in

21  pain would ask for and take medication.  There's no

22  other way to conclude it.  To suggest all those

23  months, all those years, he was in some type of

24  dental pain, but he was not taking any medication,

25  is ludicrous.

1    The other thing is to suggest that someone --

2  you heard, he's very sharp, he knows what he's

3  doing.  He knows everything to do in this case with

4  regard to activities at Rushville.  He knows how to

5  fill out a healthcare request form.  But he didn't.

6  I don't know why.  It doesn't make any sense to me.

7  I can't figure it out.  Thirty seconds; "my teeth

8  hurt."  Use your common sense.

9    Everyone single witness in this case said the

10  same thing.  You can fill out a healthcare request,

11  or being fair, you can ask a nurse, you could ask a

12  therapist or a doctor, anybody.  It never made any

13  difference.  He never said he did.  There are no

14  other defendants in the case.  There's no

15  allegations against the nurses, there's no

16  allegations against the therapist, there's no

17  allegations against Dr. Lochard; all the people that

18  he could have told.

19    And whether he did or not doesn't make any

20  difference, he's not saying someone did something

21  wrong.  He's not saying someone dropped the ball

22  with regard to what he wanted.  All you have to do

23  is ask yourself, why wouldn't he do it?

24    You saw my questioning of him.  You saw my

25  questioning of all the witnesses.  I beat that dead

1  horse, I'm sorry to say, and I understand that, but

2  my gosh, the system exists.  And you've heard the

3  experts today.  These are established systems,

4  established procedures in the institution, in an

5  institution like DHS has here.  This is the system

6  they use.

7      If -- you heard Mr. Smego again; if he wants to

8  get an appointment with the dentist when he was

9  outside the DHS, he would pick up the phone and

10 call.  But at the DHS, in a secure facility, the

11 method of communication is submit a healthcare

12 request.  No different than picking up the phone and

13 calling.  But he didn't.  I can't explain it, I just

14 know that he didn't.

15     But the one thing, ladies and gentlemen, that I

16 urge you -- you must recognize, I urge you, is that

17 where the responsibility is -- to trigger the system

18 is to fill out the healthcare request, the first

19 question should be, did he fill out a healthcare

20 request?

21     Now, there's no contest in this case, everyone

22 agrees, every healthcare request; there was three of

23 them; regarding dental care, you saw the experts,

24 everyone in this case, even Mr. Smego agreed that

25 Dr. Mitchell responded to all of them.

1    Well, if that's the case, why not fill out

2   another one?  Why -- I don't understand this at all.

3   Why not -- takes 30 seconds, doesn't cost anything,

4   it's not a burden, it's no big deal.  He doesn't

5   hurt, there's no hassles.  If you want to see the

6   dentist you fill it out.

7    I can't explain why he didn't do it, ladies and

8   gentlemen.  Doesn't make any sense to me.  There was

9   no explanation as you remember when he was on the

10  stand.  I kept asking him, why didn't you, why

11  didn't you, why didn't you.

12    But it doesn't make a difference.  The bottom

13  line is he didn't.  And because he didn't -- again,

14  there's no allegations here, keep in mind no one is

15  saying, I told Nurse Judy to tell Dr. Mitchell, or I

16  told Nurse Sam or I told Dr. X or I told Dr. Y.  No

17  suggestion at all.  Because he didn't.

18    I don't know what to say about that.

19    And think about the other evidence.  You saw my

20  questioning with the witnesses.  If he had submitted

21  a healthcare request he would have been seen by

22  Dr. Mitchell, Dr. Mitchell would have taken care of

23  his problem, and we wouldn't be here today.

24    You saw the attempt to resolve.  The entire

25  system at Rushville is for that purpose; try to

1  resolve a problem.  You saw that Illinois law

2  requires it; shall pursue this.  The Administrative

3  Code is right here.  I asked him, why didn't you

4  follow the law?  I don't know.

5       But again, if he had followed -- all you have

6  to ask yourself is if he had done that, what would

7  have happened?  Everyone agrees.  You saw the expert

8  today say it.  Dr. Mitchell would have seen him, she

9  may have taken care of his problem, we wouldn't be

10 here today.

11      The same with the grievance.  You guys have

12 seen my questions of these witnesses, you know the

13 evidence in the case.  Again, if he filed a

14 grievance Dr. Mitchell would have learned about his

15 problem, just like if he filed an attempt to

16 resolve.  She would have seen him, she would have

17 treated him, and we wouldn't be here today.

18      The evidence regarding those two allegations of

19 damages they've got.  Pain and suffering, right?

20      The pain, ladies and gentlemen.  The MAR, the

21 medication administration record, is dispositive.

22 Can't say I'm in pain and not take medication, it's

23 just ludicrous.  If you're in pain every day, or

24 however he was describing it, come on now.

25      The same with tooth No. 2.  Now, tooth No. 2

1  again, everyone agrees he developed two different

2  cavities on the tooth, Dr. Mitchell tried to repair

3  it.  You saw both experts today tell you that yes,

4  she tried to repair it.  The pulp was exposed, she

5  had no choice, the tooth broke apart, she had to

6  extract it.  Both experts agree that happens and

7  that's what she did.

8      What about the cavities?  There's three

9  cavities still in his mouth.  Ladies and gentlemen,

10  just think about this.  When Mr. Smego was on the

11  stand did he ever say, I want the cavities repaired?

12  No.  Today Dr. Shulman, same thing, did he say those

13  cavities got to come out?  No.

14      In the end, ladies and gentlemen, this case is

15  about responsibility.  It really is.  Dr. Mitchell,

16  as you've heard, everyone agrees, she goes down

17  there and she provides 15 hours of dental care to

18  550 residents.  She does it every week.  She goes

19  down there, she takes the list of residents she is

20  suppose to see, and she starts working on the

21  residents one after another after another.  That's

22  the standard in the industry.  You heard from both

23  experts today, that's the way the system works.

24      And I suppose in the end that's Mr. Smego's

25  complaint, I guess.  The system.  He doesn't like

1    it, he wants something different.  I don't know.  We

2    know he didn't sue DHS, they're not here.  Wexford,

3    they're not here.  Addus, they're not here.  And as

4    you heard throughout this case, both from the

5    plaintiff's opening statement all the way through, I

6    mean they're the ones, you saw the figures,

7    extraordinary figures, millions of dollars that

8    these companies are earning.  And we have

9    Dr. Mitchell as the only defendant, when she did her

10   job.

11       There is no one in this case, not a single

12   person in this case, who suggested -- who has

13   suggested that she didn't do what Addus and DHS,

14   Wexford, asked her to do; go there and provide

15   15 hours of care and treatment.

16       Now, if you should decide, ladies and

17   gentlemen, as the experts have told us that, well,

18   there needed to be more time.  She was 15 hours a

19   week as you've heard.  She could never provide the

20   care and treatment to all the residents there.

21   That's not Dr. Mitchell's fault.  The contracts are

22   clear, not more than 15 hours.

23       Plus, ladies and gentlemen, you know, I don't

24   even know what to tell you sometimes.  I mean she

25   works five days a week at the Stateville

1   penitentiary.  Travels five hours down and works 15

2   more hours.  There's only seven days in a week.  To

3   suggest that she should have asked to work more is

4   ludicrous.  I urge you, don't buy that.  My gosh,

5   how much more do they want her to work?  It's not

6   her fault.

7       Again, if Mr. Smego thinks there should be more

8   dental care; and the experts agree that there should

9   be; that's not an issue with Dr. Mitchell, that's

10  something to take up with DHS or Wexford or Addus or

11  whoever is making the millions of dollars, not

12  Dr. Mitchell.

13      You know, Dr. Mitchell, as you saw on the

14  stand, is the only defendant in the case.  She has

15  provided all the care and treatment.  You didn't see

16  anyone today complain about the actual dental work

17  she did.  No one said, oh, her repair of 29 was

18  inappropriate, her repair of 30 was no good, tooth

19  No. 30, her repair of tooth No. 16 was

20  inappropriate, she shouldn't have done the cavity on

21  tooth X.  No one is suggesting that at all.

22      This -- Mr. -- the plaintiff's problem here is

23  that -- well, I guess it's the system they're

24  complaining about.  They want the system to be

25  changed or something.  I'm not even sure.

1    Because again, I keep coming back to that same

2    problem, I keep running into this wall.  Wait a

3    minute, now, if Mr. Smego wanted his teeth taken

4    care of, why didn't he pick up the phone and call

5    the dentist?  Why didn't he submit the healthcare

6    request?  That's what anybody else would do.  If you

7    want to see someone; and he admitted it, you saw my

8    questioning of him, there's no contest on that.

9    In the end, ladies and gentlemen, you sit back

10   in your chair and you ask yourself, what is this

11   case really all about?  You can ask yourself what

12   should have been done, what had to be done?  Again,

13   keeping in mind the system that we're in.  The

14   healthcare request is the triggering system.

15   There are no complaints about the nurses.

16   Dr. Mitchell did, as you heard, she would take her

17   list and if other residents had greater need, she

18   took care of them.  No one is suggesting to the

19   contrary.

20   But one thing is for sure.  You cannot reward

21   Mr. Smego in this case from a simple common sense

22   prospective.  It's not like Dr. Mitchell didn't

23   respond to a healthcare request.  It's not like she

24   ignored a healthcare request.  That didn't occur.

25   What happened here is they want you to say,

1   well, wait a minute, Mr. Smego needed dental care,

2   didn't tell anyone, but Dr. Mitchell should have

3   somehow known that.

4        And we know that's not true because again, even

5   in this trial, sitting on that stand, he didn't say

6   he wants those remaining three teeth taken care of.

7   He didn't.  All the other teeth, of course, have

8   been repaired.  Now there's just three teeth.  And

9   he said they're not causing him any problem and it's

10  undisputed they haven't changed.  And you heard the

11  dentist say, yes, in that instance you could leave

12  them there, like Mr. Smego had done.  That's the

13  appropriate thing to do.  There's nothing wrong with

14  that.  He didn't want the teeth done and they

15  haven't been done.  Like Dr. Mitchell told you, if

16  he wants the teeth taken care of, it's like going to

17  the store, he can say I'd like it done and it would

18  be done.

19       This is not a case where Dr. Mitchell did

20  anything more than what she was hired to do.  To go

21  to Rushville, travel five hours down, provide

22  fifteen hours of care, and go back.  You heard

23  overwhelming evidence, undisputed testimony, that

24  simply because they don't have enough dentists,

25  that's not her responsibility.  She did everything

1    she could for a population base that needs a

2    dentist.

3        You saw the questioning of the expert today.

4    That's what she should do.  A professional dentist

5    goes and does the work, does what she can.  She

6    can't force DHS, Wexford, Addus to do more.  She

7    can't.  That's not her job.  To go on strike and

8    leave them abandoned is ludicrous.  She did exactly

9    the right thing, she kept going there to provide

10   services to patients like Mr. Smego because in the

11   end nobody else would.

12       Ladies and gentlemen, once again, I want to

13   thank you for your time and attention.  I appreciate

14   that we've taken you out of your work and out of

15   your days, out of your normal lives this week.  I

16   hope your ability to deliberate in the case goes

17   quickly.  I thank you again.  And may I ask you to

18   return a verdict in favor of Dr. Jacqueline

19   Mitchell.  Thank you.

20       Thank you, Judge.

21           THE COURT:  Thank you, Mr. Vogt.

22       Ms. MacDonald, brief rebuttal.

23           MS. MacDONALD:  Thank you, Your Honor.

24       Ladies and gentlemen, I feel a little bit like

25   I'm watching a magic trick, where someone wants you

1    to look over here so that you don't see what's

2    happening over here.

3         Mr. Vogt doesn't talk about the dental chart.

4    He doesn't talk about the fourteen times he was in

5    the dental chair.  He doesn't talk about those nine

6    times when he was in that chair and no services were

7    provided.  He claims that no one is complaining

8    about the services that Dr. Mitchell provided and

9    that's just false.

10        Dr. -- Mr. Vogt did not mention the June, 2007

11   visit, or the July, 2007 visit, when Dr. Mitchell

12   could have fixed tooth No. 2.

13        Mr. Vogt claimed that every dental healthcare

14   request was responded to and Mr. Smego was seen.

15   That might have been the case.  And that's what kept

16   happening.  Mr. Smego was seen, but not treated.

17        May, 2008 -- he files a healthcare request in

18   April, 2008, May, 2008, twice he's in the chair.

19   Nothing.

20        Mr. Vogt focuses on the fact he claims that if

21   he had just filed healthcare requests, if he had

22   just filed a grievance, she would have learned.

23   Ladies and gentlemen, she knew.  She knew because

24   she saw him fourteen times.

25        Dr. Mitchell and her lawyer are trying to

 1    create a world where only healthcare requests,

 2    attempt to resolve, and grievances matter.  But

 3    there's no basis in the law or fact for that.  It is

 4    simply not required.

 5         Nowhere in all of those jury instructions did

 6    you see an item, if you find that Mr. Smego has

 7    filed a healthcare request, if you find that

 8    Mr. Smego has filed a grievance, then you can find

 9    for plaintiff.  It's simply not required.  What the

10    law requires is that she knew and then she failed to

11    act.

12         Mr. Vogt argues that Mr. Smego was required to

13    submit a healthcare request repeatedly.  That he

14    could have called -- but he could have called any

15    witness he wanted on that.  You know who he didn't

16    call?  Dr. Mitchell's daughter, the dental

17    assistant, whose interrogatories you heard about

18    from their expert and who stated under oath once a

19    patient made a request for care another request

20    would not be necessary.  Would not be necessary.

21         This requirement of grievances, healthcare

22    requests, no basis in fact or law.  No reason that

23    Mr. Smego was required to take those steps to get

24    the treatment he deserved in that dentist chair.

25         You've heard over and over the many ways that a

1  patient can be seen by a dentist.  You know the
2  healthcare request is not the only one.  You know
3  that Dr. Mitchell had the ability to keep folks in
4  mind, to keep Mr. Smego in mind, to do more steps,
5  to take more steps to treat him when he was in the
6  chair, to ask for more hours, to fill those
7  cavities, and she didn't.
8       The beginning of this case you heard Mr. Vogt
9  admit that the care that Dr. Mitchell had provided
10 was grossly insufficient.  And they have tried to
11 shift all that blame on other folks.  But you know
12 that Dr. Mitchell was involved.  You know that she
13 was the one, when he was in the chair, with the
14 ability to treat him.
15      As Mr. Vogt told you, Mr. Smego's pain goes to
16 the question of damages.  Raised a lot of issues
17 about whether it's believable that Mr. Smego was in
18 pain.  And you know what, Mr. Smego sat up there and
19 he told you the truth.  He didn't tell you that he
20 is in pain every day.  He told you that there was a
21 certain part of that time he was waiting for
22 treatment where he was in pain and another part
23 where he wasn't.  He told you that there were times
24 he could get medication and then there were times
25 that he wasn't.  He's being straightforward, he's

1  telling you the truth.  He still has discomfort, he

2  still has some sensitivity, he still has three

3  cavities.

4      And finally, ladies and gentlemen, what's

5  important is that you don't have to really consider

6  the testimony at all.  You have everything you need

7  on the dental chart I gave you on the first day of

8  this trial.  It shows the timeline, it shows when

9  she knew, and when she failed to act and what it

10  cost Mr. Smego.

11      And so I'd ask you, ladies and gentlemen, that

12  when you go back and have a chance to deliberate,

13  you come back and enter a verdict in my client's

14  favor, Mr. Smego, and make a statement that this is

15  not the way the system should work.  Care is

16  required, change and care are necessary.

17      Thank you.

18          THE COURT:  Thank you, Ms. MacDonald.

19      At this time we will give you the exhibits and

20  the jury instructions and you may go back to

21  deliberate.

22      (The Court Security Officer was sworn.)

23          THE COURT:  Take the jury, please.

24      (The jury left the courtroom.)

25          THE COURT:  The reason I did not ask about

1    menus was Ms. Cathcart, I asked to bring the menus

2    up, and I wanted to make sure which menus she has.

3          And I also, if I have your agreement --

4    Mr. Vogt, are you listening?  If I have your

5    agreement, I would like Ms. Cathcart to make sure,

6    don't we have a diabetic on the jury?

7                MR. VOGT:  We do, Judge.

8                THE COURT:  Do you have any objection to

9    our saying, "Does anyone need anything right now?

10   And do you wish to have menus to order dinner?"

11               MR. VOGT:  Sure.  Whatever you would like.

12               THE COURT:  Is that acceptable?

13               MS. MacDONALD:  Sure.

14               THE COURT:  She may need an apple or

15   something right now.  So we will do that.

16       (The case was in recess for jury

17       deliberation.)

18               THE COURT:  If you will bring in the jury.

19       (The jury entered the courtroom.)

20               THE COURT:  If you'll get the verdict.

21   Court is reconvened.

22       ███████████, may we have the verdict?  Thank

23   you.  I will read it to the courtroom.

24          Thank you, sir.

25          Jury verdict:

1       On Plaintiff's claim against Defendant, we find

2    in favor of Defendant Jacqueline Mitchell.

3       And there are no other entries other than the

4    date and the signatures of the presiding juror and

5    the additional jurors.

6       Would you like me to poll the jury?

7            MR. VOGT:  No, Judge.

8            THE COURT:  Ms. MacDonald?

9            MS. MacDONALD:  No, Your Honor.

10           THE COURT:  All right.  At this time then

11   this completes your jury service.  You should not be

12   called in the next two years.  If you are, please be

13   sure and call in and explain that you've already

14   served on jury duty.

15      And I have to thank you profusely for the time

16   and effort you have put in this week.  I know it's

17   been a long week, it's been a long day.  I

18   appreciate your services.  And I do believe this is

19   the finest system in the world and I thank you.

20      You're excused at this time.  Drive carefully.

21   And leave your notes here.  They will be shedded by

22   my staff.  They will not be viewed.

23      (The jury left the courtroom.)

24           THE COURT:  Counsel, thank you very much.

25   I'm sorry I'm so busy that I can't take the time to

1    give you my appreciation.

2        I appreciate your pro bono services.  I felt

3    like I was on Law and Order this week.  I think you

4    did a phenomenal job.  You wowed my staff.  And me.

5        Thank you.

6            MR. VOGT:  Thank you, Judge.

7            MS. MacDONALD:  Thank you.

8            THE COURT:  While we're still on the

9    record, Court's 9 was never asked because it was a

10   question for Dr. Mitchell.  So I need to put that in

11   the record, make it of record.

12       I believe that takes care of all loose ends.

13       Is there anything else, Mr. Vogt?

14           MR. VOGT:  What that's Judge?

15           THE COURT:  Is there anything further?

16           MR. VOGT:  No, not to my knowledge.

17           THE COURT:  Ms. MacDonald?

18           MS. MacDONALD:  No, Your Honor.

19           THE COURT:  Okay.

20           MR. CROWL:  Your Honor, quick question.  Do

21   we need to mention anything about the appellate

22   issues or does that come later?

23           THE COURT:  No, I should say judgement is

24   entered on the verdict at this time.  All right.

25           MR. CROWL:  So if he wants to appeal, he

1    has --

2              THE COURT:  Fourteen days.

3              MR. CROWL:  I'm sorry, 14 days?

4              THE COURT:  From the date of the written

5    judgement.

6              MR. CROWL:  Okay.  Mr. Smego, do you

7    understand that?

8              THE PLAINTIFF:  Yes.

9              MR. CROWL:  Just for the record.  Mr. Smego

10   realizes he has 14 days if he wants to file an

11   appeal.

12             THE COURT:  Okay.

13             MR. CROWL:  Thank you.

14        (Court was adjourned in this case.)

15

16   I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

17   Reporter, certify that the foregoing is a correct

18   transcript from the record of proceedings in the

19   above-entitled matter

20

21                  This transcripts contains the

22                  digital signature of:

23

24                  Kathy J. Sullivan, CSR, RPR, CRR

25                  License #084-002768